UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
                                              )
GRANITE STATE INSURANCE                       )
COMPANY,                                       )
                                              )
                Plaintiff,                     )
                                              )   Civil Action No.: 09 CV 10607 (RJH)
        -against-                              )
                                              )   **ORAL ARGUMENT REQUESTED**
CLEARWATER INSURANCE COMPANY,                  )
f/k/a ODYSSEY REINSURANCE                       )
CORPORATION, f/k/a SKANDIA                      )
AMERICA REINSURANCE                             )
CORPORATION,                                    )
                                              )
                Defendant.                     )
----------------------------------------------------------

### GRANITE STATE INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

MOUND COTTON WOLLAN & GREENGRASS
One Battery Park Plaza
New York, New York  10004
(212) 804-4200

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS…………….. .................................................................................. 6

      A. The Parties and Contracts .................................................................................. 6

      B. The Dresser and Federal Mogul Branches of Business
          and Related Litigations ..................................................................................... 8

      C. The Dresser Mediation and Coverage Settlement,
          and the Allocation of Loss .............................................................................. 10

      D. The Federal Mogul Coverage Settlement and Subsequent Allocation of Loss ....14

      E. Clearwater was Provided Notice of its Potential Reinsurance Liabilities
          in the 1980s .................................................................................................... 17

      F. Procedural History ......................................................................................... 17


ARGUMENT…………. ........................................................................................................ 19

    I.      CONTROLLING STANDARDS AND CHOICE OF LAW ................................. 19

          A. Summary Judgment Standard .......................................................................... 19

          B. Where There is an Actual Conflict, New York Law Applies to this Dispute ...... 19

    II.     CLEARWATER IS IN BREACH OF ITS CONTRACTUAL DUTIES ................. 23

    III.    CLEARWATER'S LATE NOTICE DEFENSE IS WITHOUT MERIT ................. 24

    IV.    CLEARWATER'S ALLOCATION AND EXHAUSTION DEFENSES
          FAIL AS A MATTER OF LAW ........................................................................ 27

          A. Granite State's "Rising Bathtub" Allocation was Reasonable
          and Proper as a Matter of Law ......................................................................... 29

          B. Clearwater's Exhaustion Defense Fails as a Matter of Law ............................... 33

    V.     "FOLLOW THE FORTUNES" ALSO BARS CLEARWATER'S

ALLOCATION AND EXHAUSTION DEFENSES AS A MATTER OF LAW.....38

    A. "Follow the Fortunes" Controls This Dispute.......................................................38

    B. Clearwater's Allocation and Exhaustion Defenses are Precluded by "Follow
       the Fortunes" ......................................................................................................41

       (1)   Clearwater Has Improperly Challenged AIG's Use of a
            "Rising Bathtub" Allocation ...................................................................42

       (2)   There is No Basis for Clearwater to Re-Litigate the Exhaustion Issue ...44

CONCLUSION......................................................................................................................46

# TABLE OF AUTHORITIES

## Cites

Aetna Cas. & Sur. Co. v. Home Ins. Co.,
882 F. Supp. 1328, 1350 (S.D.N.Y. 1995)...........................................................................40-41

Bank of Am., N.A. v. Viders,
2010 U.S. Dist. LEXIS 136852 at *11 (E.D.N.Y 2010)..................................................23

Christiania General Ins. Corp. v. Great American Ins. Co.,
979 F.2d 268, 280 (2d Cir. 1992)........................................................................................39

Commercial Union Ins. Co. v Seven Provinces Ins. Co.,
9 F. Supp. 2d 49, 66 (D. Mass. 1998), aff'd, 217 F.3d 33 (1st Cir. 2000),
cert. denied, 531 U.S. 1146, 121 S.Ct. 1084 (2001) ................................................40, 42

Employers Reinsurance Corp. v. Massachusetts Mutual Life Ins. Co.,
2008 U.S. Dist. LEXIS 63420 at *20 (W.D. Mo. Aug. 19, 2008) ................................39

Gerling Global Reinsurance Co. v. Ace Property & Cas. Ins. Co.,
42 Fed. Appx. 522 (2d Cir. 2002)................................................................................. 38-39

Gould Inc. v. Arkwright Mutual Ins. Co.,
1995 WL 807071 at *3-*4 (M.D.Pa. Nov. 8 1995).................................................. 34-35

In re Allstate Ins. Co. and Stolarz,
81 N.Y.2d 219, 225, 597 N.Y.S.2d 904 (1993) ...........................................................20

John Hancock Prop. & Cas. Ins. Co. v. Universale Reins. Co., Ltd.,
147 F.R.D. 40, 45 (S.D.N.Y. 1993) ...............................................................................19

K. Bell & Assocs. v. Lloyd's Underwriters,
97 F.3d 632, 637 (2d Cir. 1996) .....................................................................................19

Int'l Surplus Lines Ins. Co. v. Certain Underwriters & Underwriting
Syndicates at Lloyd's of London,
868 F. Supp. 917 (S.D. Ohio 1994) .......................................................................... 40-41

Mills Ltd. Partnership v. Liberty Mutual Ins. Co.,
2010 Del. Super. Lexis 563 (Del. Sup. Ct. Nov. 5, 2010) ................................. 34, 36-37

National Union Fire Ins. Co. of Pittsburg, PA. v. American Re-Insurance Co.,
441 F. Supp. 2d 646, 650 (S.D.N.Y. 2006) ...................................................................41

National Union Fire Ins. Co. of Pittsburgh, Pa. v. Clearwater Ins. Co.,

Docket No. 04-CV-05032 (S.D.N.Y.) ................................................................................39

N. River Ins. Co. v. ACE Am. Reinsurance Co.,
361 F.3d 134 (2d Cir. 2004).......................................................4, 14, 29-32, 38-39, 43, 45

N. River Ins. Co. v. CIGNA Reinsurance Co.,
52 F.3d 1194 (3d Cir. 1995)..................................................................................41, 44

Pereira v. Cogan,
2006 U.S. Dist. LEXIS 49263 (S.D.N.Y. July 12, 2006) ..............................................34

Reliance Ins. Co. v. Transamerica Ins. Co.,
826 So.2d 998 (Fla. Dist. Ct. App. 2001) ...................................................................34

ReliaStar Life Ins. Co. v. IOA Re, Inc.,
303 F.3d 874, 881 (8th Cir. 2002) ..............................................................................40

Rummel v. Lexington Ins. Co.,
945 P.2d 970, 977-78, 981 (N.M. 1997)......................................................................37

Stargatt v. Fidelity and Cas. Co. of New York,
67 F.R.D. 689 (D. Del. 1975), aff'd, 578 F.2d 1375 (3d Cir. 1978).............................34

Stonewall Ins. Co. v. Superior Court,
2010 WL 4277559 (Cal. Sup. Ct. Nov. 1, 2010) .........................................................34

Travelers Cas. & Surety Co. v. Gerling Global Reinsurance Corp. of America,
419 F.3d 181 (2d Cir. 2005) ................................................................................. 41-42

Tri-State Employment Servs., Inc. v. Mountbatten Sur. Co.,
295 F.3d 256, 260 (2d Cir. 2002) .................................................................... 20, 22-23

Unigard Security Ins. Co. v. North River Ins. Co.,
4 F.3d 1049, 1065-66 (2d Cir. 1993) ...........................................................................27

Zeig v. Mass. Bonding and Ins. Co.,
23 F.2d 665 (2d Cir. 1928) ................................................................. 6, 33-35, 37, 45

## Publication

Eugene Wollan,
Handbook of Reinsurance Law, § 1.04(C) (Supp. 2003) ...............................................1

## Statutes

Fed. R. Civ. P. 56....................................................................................................19

Plaintiff, Granite State Insurance Company ("Granite State"), respectfully submits this memorandum of law in support of its motion for summary judgment on its breach of contract and declaratory judgment claims against its reinsurer, Defendant, Clearwater Insurance Company, f/k/a/ Odyssey Reinsurance Corporation, f/k/a Skandia America Reinsurance Corporation ("Clearwater").

## PRELIMINARY STATEMENT

Granite State seeks $4,470,739.10 in reinsurance[1] proceeds that have been billed to Clearwater -- and a declaration that requires Clearwater to pay future billings as rendered -- under two facultative certificates entered into between the parties and designated as Nos. C 26285 and C 27675 ("Reinsurance Certificates"). The Reinsurance Certificates cover certain policies that Granite State issued to its insured, McGraw Edison Company ("McGraw Edison"). (SUF, ¶¶ 17-19; Mansour Dec., Exs. 1 and 2.)[2] Clearwater has refused to pay its share of losses and expenses.

Starting in approximately 2001, Dresser Industries, Inc. ("Dresser")[3] and Federal-Mogul Products, Inc. ("Federal Mogul") sought coverage from dozens of insurers, including Granite State and other members of American International Group, Inc. ("AIG"), for claims arising out of asbestos-related injury. (Yoon Dec., Ex. 3, at Granite State 005481-005483.) Based on a

---

[1]     "Reinsurance is an agreement involving an insurer -- known as the cedent or reinsured -- who transfers certain risks it has assumed to a second insurer, known as the reinsurer." Eugene Wollan, *HANDBOOK OF REINSURANCE LAW*, § 1.04(C) (Supp. 2003) (annexed hereto as appendix "A"). In other words, reinsurance is insurance of insurance.

[2]     "SUF" refers to Granite State's Statement Of Undisputed Material Facts, dated June 9, 2011, submitted in support of this motion. "Yoon Dec.," "Wactlar Dec.," "Diaz Dec.," "Mansour Dec." and "Lasky Dec." refer to the respective declarations of Simon Yoon, Jeffrey Wactlar, Leticia Díaz, Matthew Mansour and Matthew J. Lasky, Esq. submitted in support of this motion. "Exhibit" or "Ex." refer to the exhibits attached to those declarations.

[3]     Dresser was acquired by Halliburton Company ("Halliburton") in 1998 and later became DII Industries, LLC.

1

complex corporate history discussed below, the policies under which Dresser and Federal Mogul claimed coverage included policies issued to McGraw Edison, certain of which were reinsured by Clearwater under the Reinsurance Certificates. (Yoon Dec., ¶¶ 12-13; Wactlar Dec., ¶ 15.) Pursuant to an agreement entered into between Dresser and Federal Mogul, Dresser was given exclusive access to fifty percent of the unexhausted aggregate limits of the policies issued to McGraw Edison, and Federal Mogul was given exclusive access to the other fifty percent. (SUF, ¶ 27; Yoon Dec., ¶ 16, Ex. 4; Wactlar Dec., ¶ 16, Ex. 3.)

The underlying claims for which both Dresser and Federal Mogul sought coverage involved billions of dollars of asbestos bodily-injury liabilities which were the subject of litigation in bankruptcy and state courts. (Yoon Dec., ¶¶ 15, 18-19; Wactlar Dec., ¶¶ 18-20, 22-23.) The AIG insurers (including Granite State) resolved these coverage claims as follows:

- In 2004, AIG reached a $262.2 million dollar settlement with Dresser. (SUF, ¶¶ 36-41; Yoon Dec., Ex. 9.) This settlement was highly favorable to the AIG insurers and their reinsurers because it resolved a potential $425.878 million loss at a significant discount. (Yoon Dec., ¶¶ 20-21.)

- In 2008, AIG reached a settlement with Federal Mogul. (SUF, ¶ 50; Wactlar Dec., Ex. 8.) That settlement required a maximum payment of $72 million. (SUF, ¶ 51; Wactlar Dec., ¶ 39, Ex. 8.) AIG has paid $40 million and the additional $32 million will only be payable if certain benchmarks are met (to date, those marks have not been met and may never be met). (SUF, ¶ 51; Wactlar Dec., ¶ 39, Ex. 8.) This settlement was also highly favorable to the AIG insurers and their reinsurers because it resolved a potential $121 million loss at a significant discount. (Wactlar Dec., ¶ 25.)

Clearwater has been billed $4,470,739.10 to date for its share of these settlements under the Reinsurance Certificates. (SUF, ¶ 22; Mansour Dec., ¶ 18, Exs. 3 and 4.) Rather than pay "promptly" as required by those contracts, Clearwater seeks to avoid its obligations by raising defenses that are baseless as a matter of law.

**Late Notice**. Clearwater claims that the notice provided by Granite State under the Reinsurance Certificates was untimely. This contention, however, is belied by documents ***produced from Clearwater's own files***.  The Reinsurance Certificates state that Granite State "will notify [Clearwater] promptly of any event or development which [Granite State] reasonably believes might result in a claim against [Clearwater]." (SUF, ¶ 21; Mansour Dec., Exs. 1 and 2, ¶ 3(a).) It is indisputable that as early as 1982 -- when Granite State itself first learned of potential liabilities under its policies arising from asbestos-related claims asserted against its insured, McGraw Edison -- Granite State notified Clearwater that potential liabilities existed that might expose Clearwater. (Lasky Dec., Ex. 12.) Additional documents were sent to Clearwater throughout the 1980s concerning such claims. (Lasky Dec., Ex. 12.) Thus, there is no question that Granite State met its obligation to "promptly" notify Clearwater of "any event or development which [Granite State] reasonably believes might result in a claim against [Clearwater]."

**Allocation**.  Once coverage disputes are settled, insurers must determine how to allocate their settlement payments to the policies implicated by the settlement. Allocation is especially important when -- as here -- the settled claims implicate policies at multiple layers and spanning a number of years. In this case, AIG allocated both the Dresser and Federal Mogul losses to its policies under a "rising bathtub" method, (SUF, ¶¶ 42, 53; Yoon Dec., ¶ 39, Ex. 11; Wactlar Dec., ¶ 41, Ex. 9), in which the lowest layer policies are exhausted first, with other policies being penetrated and exhausted in the order of their attachment points and limits. The "rising bathtub" method is widely used and accepted in the insurance industry.  It is also the standard method by which AIG allocates asbestos settlements.  (SUF, ¶ 43; Yoon Dec., ¶ 40; Wactlar Dec., ¶ 42.)

3

In an effort to shift a substantial portion of the loss to other Granite State reinsurers, Clearwater contends that AIG is required to allocate the settlements so that all layers of coverage are given a proportional discount without regard to their attachment points or limits. The desired effect, of course, would be that a portion of the loss that would have fallen under the Reinsurance Certificates would become some other reinsurer's liability.

Clearwater's argument fails as a matter of law. There is no reason, legal or otherwise, why AIG must allocate its settlements in accordance with Clearwater's preferences. A Second Circuit case, indistinguishable on its facts, makes it clear that the "rising bathtub" method for allocation of asbestos settlement payments is reasonable and appropriate *per se*. North River Ins. Co. v. Ace American Reins. Co., 361 F.3d 134 (2d Cir. 2004). Under the rule and reasoning of this controlling decision, Clearwater's objection to Granite State's allocation should be summarily rejected by this Court.

It is also significant here that the Reinsurance Certificates are governed by the "follow the fortunes" doctrine, (SUF, ¶¶ 20-21; Mansour Dec., Exs. 1 and 2, ¶¶ 1 and 3(c)), one of the bedrock principles controlling reinsurance relationships. As interpreted by courts throughout the United States, under "follow the fortunes," a reinsurer may not challenge a ceding company's good-faith settlement or its good-faith allocation of that settlement. Were that not the case, insurers would be severely hampered in their ability to settle coverage disputes, as reinsurers would then seek to re-litigate resolved coverage issues and allocation decisions at the reinsurance level. As a matter of law, "follow the fortunes" bars Clearwater from challenging AIG's decision to use a "rising bathtub" allocation.

**Exhaustion**.    According to Clearwater, it need not pay the amounts billed to it because    -- it says -- the policies underlying Granite State's coverage did not pay their full limits, thus rendering Granite State's settlements with Dresser and Federal Mogul improper and unreasonable.

Putting aside the fact that this position is at odds with Clearwater's argument that Granite State should have allocated the settlements so that all layers received a proportional discount to the limits of polices reinsured by Clearwater, Clearwater's defense fails for two independent reasons. First, Clearwater completely ignores business practicalities and common sense. The magnitude of the liabilities facing Granite State, as well as the insurers below it, were such that if a judgment had been entered against them, the policies below Granite State would be exhausted. (Yoon Dec., ¶¶ 18-19, Ex. 5, at 2 Granite 001795; Ex. 6, at GS Confidential 006624; Wactlar Dec., ¶¶ 22-24, Ex. 6, at GS Confidential 000148-149.)    Accordingly, Granite State and all but one of the underlying insurers sought to (and did) settle their claims with Dresser and Federal Mogul at a discount on their policy limits.[4]    (Yoon Dec., Exs. 8 and 9; Wactlar Dec., Ex. 8; Lasky Dec., Exs. 5 and 6.)

If excess insurers like Granite State could avoid providing coverage under their policies unless and until underlying insurers paid their full limits, insureds would never be able to settle disputed insurance claims with lower layer insurers; it is, of course, highly unlikely that those underlying insurers would "settle" for full limits.    As a result, most coverage disputes would end up being tried, something that would wreak havoc on the court system.    Recognizing that such a

---

[4]        All of the underlying insurers settled the coverage claims related to Dresser. (Yoon Dec., ¶ 32, Ex. 8.) In connection with the Federal Mogul claims, there is no evidence that First State Insurance Company ("First State"), one of the insurers that sat underneath Granite State policy No. 6681-2370, (Wactlar Dec., ¶¶ 13-14), settled its coverage disputes with Federal Mogul.

perverse outcome should not be countenanced, the Second Circuit, in <u>Zeig v. Mass. Bonding and Ins. Co.</u>, 23 F.2d 665 (2d Cir. 1928), found that as long as the insured's potential loss exceeds the limits of underlying insurance, the underlying policies will be deemed exhausted as a matter of law regardless of whether the underlying insurers paid their full limits. The same reasoning should be applied here.

Second, in resolving its coverage disputes with both Dresser and Federal Mogul, AIG made a good-faith determination to settle based on the overall size of the asbestos bodily-injury liabilities that Dresser and Federal Mogul were facing rather than litigate the issue. (Yoon Dec., ¶ 20-21; Wactlar Dec., ¶¶ 24-25.) Accordingly, under "follow the fortunes," Clearwater's exhaustion defense fails for this independent reason as well.

## STATEMENT OF FACTS

### A.    THE PARTIES AND CONTRACTS

Granite State is a Pennsylvania corporation, with its principal place of business in New York, New York and is a subsidiary of AIG. (SUF, ¶¶ 1-2; Yoon Dec., ¶¶ 4-5; Wactlar Dec., ¶¶ 4-5; Lasky Dec., Exs. 3 and 4.)  AIG's principal place of business is also in New York, New York. (SUF, ¶ 3; Yoon Dec., ¶ 5; Wactlar Dec., ¶ 5; Lasky Dec., Ex. 4.)  Granite State is one of various AIG member insurance companies that settled coverage claims with both Dresser and Federal Mogul. (Yoon Dec., Ex. 9; Wactlar Dec., Ex. 8.)  Granite State insured McGraw Edison[5] under the following relevant policies (collectively, "Granite State Policies"):

---

[5]      As noted above, based on a complex corporate history, both Dresser and Federal Mogul were provided access to the policies issued to McGraw Edison.

| Policy No. | Limits | Period |
|---|---|---|
| 6680-1963 | $10 million (part of $25 million) excess of $25 million | March 1, 1980 through March 1, 1981 |
| 6681-2370 | $15 million (part of $25 million) excess of $25 million | March 1, 1981 through March 1, 1982 |

(SUF, ¶¶ 11-12, 14; Yoon Dec., Exs. 1 and 2; Wactlar Dec., Exs. 1 and 2.)

Cases involving complex, mass tort liability often affect a large number of the AIG companies.[6] (Wactlar Dec., ¶ 9.) As a result, the AIG Toxic Tort Department, Complex Claims Unit ("Complex Claims Unit") has developed over time substantial skill and experience in handling such claims on behalf of the AIG companies. (Wactlar Dec., ¶ 10.) The Complex Claims Unit investigated and otherwise handled the Dresser and Federal Mogul asbestos claims on behalf of Granite State and the other group companies involved in coverage litigations. (SUF, ¶¶ 9-10; Yoon Dec., ¶ 7; Wactlar Dec., ¶ 10.)

Clearwater is a Delaware corporation, with its principal place of business in Stamford, Connecticut. (SUF, ¶ 4; Lasky Dec., Exs. 1 and, ¶ 2.) Clearwater is the successor-in-interest to Odyssey Reinsurance Corporation ("Odyssey") and Skandia America Reinsurance Corporation ("Skandia"). (SUF, ¶ 5; Lasky Dec., Ex. 2, Opening Paragraph ) Clearwater issued the two Reinsurance Certificates to Granite State covering losses and expenses under the Granite State Policies. (SUF, ¶ 17; Mansour Exs. 1 and 2.) Each certificate reinsured a 20% share of the coverage provided by the corresponding Granite State Policy. (SUF, ¶¶ 18-19; Mansour Dec., Exs. 1 and 2.)

The basic terms of the Reinsurance Certificates are identical. Paragraph 1 provides:

[Clearwater's] liability under this Casualty Facultative Reinsurance Certificate ("Certificate") shall follow the ceding Company's ("Company") liability in

---

[6]     Since July 2009, the property and casualty insurance subsidiaries of AIG have operated under the name "Chartis." A majority of the documents and events relating to this dispute pre-date that name change. For ease of reference, therefore, these motion papers use the older "AIG" designation.

accordance with the terms and conditions of the policy reinsured hereunder except with respect to those terms and/or conditions as may be inconsistent with the terms of this Certificate.

Paragraph 3 of the Reinsurance Certificates reads:

(a) [Granite State] agrees that it will promptly investigate and will settle or defend all claims under the policy reinsured hereunder and that it will notify [Clearwater] promptly of any event or development which [Granite State] reasonably believes might result in a claim against [Clearwater]. [Granite State] further agrees to forward to [Clearwater] copies of such pleadings and reports of investigations as are pertinent to the claim and/or as may be requested by [Clearwater.]

*      *      *      *

(c) Upon receipt by [Clearwater] of satisfactory evidence of payment of a loss for which reinsurance is provided hereunder, [Clearwater] shall promptly reimburse [Granite State] for its share of loss and loss expense . . .

(d) The term "loss" shall mean only such amounts as are actually paid by [Granite State] in settlement of claims or in satisfaction of awards or judgments[.]

(SUF, ¶¶ 20-21; Mansour Dec., Exs. 1 and 2.)

## B.  THE DRESSER AND FEDERAL MOGUL BRANCHES OF BUSINESS AND RELATED LITIGATIONS

Dresser's significant asbestos liabilities stemmed from the operations of a number of the divisions and businesses it acquired over the years in various corporate transactions, including: its 1967 acquisition of Harbison-Walker Refractories Company ("Harbison-Walker"), its 1985 assumption of the assets and liabilities of Atlantic Locomotive Company ("ALCO"), and its 1996 assumption of the assets and liabilities of Studebaker-Worthington, Inc. ("S-W"), a successor-in-interest to the Worthington Company ("Worthington"). (Yoon Dec., ¶ 10, Ex. 3, at Granite State 005479-5480.)

In 1967, S-W purchased the stock of the Wagner Electric Corporation ("Wagner"), whose brake manufacturing business also gave rise to substantial asbestos liabilities. (SUF, ¶ 24; Yoon Dec., ¶ 11, Ex. 3, at Granite State 005479-5480; Wactlar Dec., ¶ 18, Ex. 4, at Granite State

8

000356.) At one point, ALCO, S-W and Wagner all operated as indirect subsidiaries of McGraw Edison. (SUF, ¶ 25; Yoon Dec., ¶ 11, Ex. 3, at Granite State 005479; Wactlar Dec., ¶ 18, Ex. 4, at Granite State 000356.)   In 1985, however, these corporate relationships split into two branches: the Dresser branch (which included the ALCO and Worthington operations that gave rise to the Dresser asbestos liabilities); and the Federal Mogul branch (which included the Wagner operations that gave rise to the Federal Mogul asbestos liabilities). (SUF, ¶ 26; Yoon Dec., ¶ 11, Ex. 3, at Granite State 005479-5480, 005483; Wactlar Dec., ¶ 18.)

Dresser[7] was named as a defendant in hundreds of thousands of complaints by asbestos bodily-injury plaintiffs arising from, among other Dresser-related operations, Harbison-Walker, ALCO and Worthington. (Yoon Dec., ¶ 10.) In December of 2003, Dresser filed for Chapter 11 bankruptcy protection in the United States District Court for the Western District of Pennsylvania to resolve its numerous asbestos liabilities. (Yoon Dec., Ex. 3, at Granite State 005478.) Various other bankruptcy and plenary coverage actions were filed throughout the country seeking, in part, to determine Dresser's rights to insurance coverage for those asbestos liabilities. (Yoon Dec., ¶ 15, Ex. 3, at Granite State 005478, 005481-005483.)

Because of its acquisition of Wagner, Federal Mogul also faced substantial asbestos bodily injury liabilities.  (Wactlar Dec., ¶18, Ex. 4, at Granite State 00356.)  Federal Mogul sought to resolve all of its pending and future asbestos liabilities by filing for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware. (Wactlar Dec., ¶ 19.)  In 2007, Federal Mogul's bankruptcy plan was approved, a trust was established, and the trustee acquired certain of Federal Mogul's rights under insurance policies.

---

[7]       For simplicity, unless otherwise specified, "Dresser" as referred to herein includes the various Dresser-related entities and divisions whose insurance coverage was resolved by the AIG Dresser Settlement described below.

(Wactlar Dec., Ex. 8, at 2 Granite 001238.)  To determine Federal Mogul's coverage rights, separate actions against various insurers, including AIG member companies, were commenced in New York and New Jersey. (Wactlar Dec., ¶ 20, Ex. 8 at 2 Granite 001239.)  The New York action was stayed while the parties litigated in New Jersey.  (Wactlar Dec., ¶ 20, n. 5.)

Based on their current or past corporate relationships with McGraw Edison, both Dresser and Federal Mogul sought coverage under certain policies issued to McGraw Edison, including the Granite State Policies reinsured by Clearwater under the Reinsurance Certificates. (Yoon Dec., ¶¶ 12-13; Wactlar Dec., ¶ 15.)  By agreement dated November 4, 2004, Dresser and Federal Mogul equally partitioned the limits of the policies issued to McGraw Edison ("Partitioning Agreement").[8] (SUF, ¶ 27; Yoon Dec., ¶ 16, Ex. 4; Wactlar Dec., ¶ 16, Ex. 3.) Dresser was given exclusive access to fifty percent of the unexhausted aggregate limits of the Granite State Policies, and Federal Mogul was given exclusive access to the other fifty percent. (Id.)  This agreement was approved by the bankruptcy courts. (Yoon Dec., Ex. 4, at 2 Granite 000102-000111.)

## C.   THE DRESSER MEDIATION AND COVERAGE SETTLEMENT, AND THE ALLOCATION OF LOSS

In the course of the Dresser bankruptcy proceedings, referred to above and other proceedings that concerned related companies, Dresser and its insurers had been directed to mediate various coverage disputes.  (Yoon Dec., ¶ 22.)  AIG participated in mediation jointly with Dresser's other U.S.-based insurers as part of the "Dresser Domestic Carrier Group." (SUF, ¶ 30; Yoon Dec., ¶ 22.)

Dresser estimated its asbestos bodily injury liabilities at between $2.2 billion and $3.5 billion. (SUF, ¶ 28; Yoon Dec., ¶ 18, Ex. 5, at 2 Granite 001795.)  Dresser advised its insurers

---

[8]     The Partitioning Agreement also equally partitioned the limits of policies issued to S-W.

that there were $2.427 billion of "approved" claims against Dresser -- **at least** $412 million of which related to its Worthington ($370 million) and ALCO ($42 million) operations. (SUF, ¶ 29; Yoon Dec., ¶ 19, Ex. 6, at GS Confidential 006624.) AIG determined that its companies had provided Dresser with combined insurance limits of approximately $425.878 million. (Yoon Dec., ¶ 17.) This figure included fifty percent of the limits of policies subject to the Partitioning Agreement. (Yoon Dec., ¶ 17.)

Based on its review of Dresser's exposure data and its experience with large asbestos claims, AIG's Complex Claims Unit concluded that there would be no benefit to litigating potential coverage defenses under individual policies through trial. (Yoon Dec., ¶¶ 20-21.) To the contrary, AIG determined that, absent a settlement, a judgment against all AIG companies for their total policy limits was likely. (Yoon Dec., ¶ 20.) Accordingly, AIG concluded that a settlement at a significant discount off its limits would be beneficial to AIG (and ultimately its reinsurers). (Yoon Dec., ¶ 21.) In order to obtain a Section 524(g) channeling injunction,[9] Dresser had an urgent need to resolve all potential asbestos liabilities during the bankruptcy proceedings. This presented AIG with a one-time opportunity to settle at the significant discount it hoped to obtain. (Yoon Dec., ¶ 23.)

During more than two years of mediation, the carriers arrived at a series of global settlement offers to present to Dresser, and calculated their respective contributions to these settlement figures based on exposure analyses. (Yoon Dec., ¶ 24.) The Dresser Domestic Carrier Group worked with a consulting firm, NERA Economic Consulting ("NERA"), to facilitate the calculation of each individual carrier's contribution to the various global settlement offers that

---

[9]      A Section 524(g) channeling injunction would enjoin any future asbestos plaintiffs from asserting claims against Dresser for losses arising out of Dresser products or operations.

were made to Dresser. (SUF, ¶ 31; Yoon Dec., ¶ 24.) NERA's role was limited to compiling tables that illustrated how different assumptions, such as varying estimates of Dresser's ultimate liability and the potential impact of several coverage defenses, would affect the contributions of the participating carriers. (Yoon Dec., ¶ 24.) NERA did not perform any substantive analysis of the merits of any defense or the likely outcome of coverage litigation. (Yoon Dec., ¶ 24.)

Ultimately, in May of 2004, an agreement in principle was reached whereby Dresser would release the carriers from all liability for current and future asbestos-related claims in exchange for a combined net present value ("NPV") payment of $624,984,393. (SUF, ¶ 32; Yoon Dec., ¶¶ 27-28.) The contribution of each member of the Dresser Domestic Carrier Group on a NPV basis is reflected in a NERA spreadsheet ("NERA Exposure Table"), attached as Exhibit 7 to the Yoon Declaration. (Yoon Dec., ¶ 29.)

When Dresser agreed with the carriers on a global settlement value, it was unaware of how the carriers had derived their settlement offer and how much each member of the Dresser Domestic Carrier Group had agreed to pay. (Yoon Dec., ¶¶ 25, 29.) Moreover, it was always AIG's intention to pay its contribution pursuant to a schedule and terms that were to be separately negotiated with Dresser. (Yoon Dec., ¶ 30.) Accordingly, when an AIG company, i.e., Granite State, is identified in the NERA Exposure Table, it is followed by a footnote, which provides: "The precise form and payment schedule for AIG's agreed NPV payment obligation will be determined on terms acceptable to [Dresser] and AIG." (Yoon Dec., ¶ 30, Ex. 7, at 2 Granite 001835 and 001838, n. 2.)

On or about November 12, 2004, Dresser and the members of the Dresser Domestic Carrier Group (with the exception of AIG) entered into a Settlement Agreement and Release ("Participating Carriers' Settlement"). (SUF, ¶ 34; Yoon Dec., ¶ 31, Ex. 8.) This settlement

12

resolved various coverage claims, including Dresser's claims under the policies underlying the Granite State Policies. (SUF, ¶ 35; Yoon Dec., ¶ 32, Ex. 8 at 2 Granite 00211, 00214-215, 00218-219, 000287-291.)

The NPV of AIG's share of the Dresser Domestic Carrier Group settlement was $173.6 million. (SUF, ¶ 33; Yoon Dec., ¶ 27, Ex. 7.)  While AIG participated in mediation with the Dresser Domestic Carrier Group, as noted above, AIG always intended to negotiate a separate settlement with Dresser, in part, to spread its payments over a longer period than the six years negotiated by the rest of the group.  (Yoon Dec., ¶ 30.)

Dresser, however, needed up-front cash to fund the Section 524(g) trust created under its Chapter 11 Plan of Reorganization which would allow it to emerge from bankruptcy. (Yoon Dec. ¶ 34.) To accomplish these conflicting objectives, AIG and Dresser negotiated a settlement agreement under which AIG would make payments over time, while allowing Dresser to assign or sell its rights to the AIG payment stream for an immediate cash payment.  (Yoon Dec., ¶ 34.) AIG and Dresser entered into their Settlement and Release Agreement on or about November 12, 2004 ("AIG Dresser Settlement"). (SUF, ¶ 36; Yoon Dec., ¶ 35, Ex. 9.)

Under the AIG Dresser Settlement, as approved by the bankruptcy court, Dresser received the right to a "stream of payments over time" from AIG.  (SUF, ¶ 37; Yoon Dec., ¶ 36, Ex. 9 at 2 Granite 000112.)  Upon the closing of that agreement, Dresser sold its rights to those payments to Lehman Brothers ("Lehman") for an immediate $173.6 million payment. (SUF, ¶¶ 38-39; Yoon Dec., ¶ 36, Ex. 9 at 2 Granite 00185-208.)  AIG thereby became obligated to make quarterly payments to Lehman pursuant to a schedule, and in a total amount agreed between AIG and Lehman. (SUF, ¶¶ 40-41; Yoon Dec., ¶ 37, Ex. 10.)

Once the settlement was in place, AIG proceeded to allocate the aggregate amount payable by its companies to the implicated AIG policies using a "rising bathtub" structure. (SUF, ¶ 42; Yoon Dec., ¶ 39, Ex. 11.)  AIG consistently had used -- and continues to use -- a "rising bathtub" allocation for asbestos losses. (SUF, ¶ 43; Yoon Dec., ¶ 40; Wactlar Dec., ¶ 42.) It is a common method in the industry for allocating asbestos loss.  See e.g., North River, supra, 361 F.3d at 138, n. 6.

AIG began making quarterly AIG Dresser Settlement payments in March of 2005. (Diaz Dec., ¶ 11.)  The Granite State Policies reinsured by Clearwater began contributing to those payments in June 2009, and will be fully exhausted at the end of March 2012.  (SUF, ¶ 44; Diaz Dec., ¶¶ 12-14, Ex. 2.)  As those policies contributed to the loss payments, Granite State billed Clearwater for its 20% share of the Granite State contributions.  (SUF, ¶ 45; Mansour Dec., ¶¶ 13-14, 16, Exs. 3 and 4.)  To date, Clearwater has not paid any of those bills. (SUF, ¶ 46; Mansour Dec., ¶ 19.)  As the "rising bathtub" allocation requires the Granite State Policies to make additional payments to Dresser, further reinsurance bills will be sent to Clearwater.

## D.     THE FEDERAL MOGUL COVERAGE SETTLEMENT AND SUBSEQUENT ALLOCATION OF LOSS

As was the case with Dresser, the bankruptcy courts directed Federal Mogul to mediate its insurance coverage disputes. (Wactlar Dec., ¶ 26.)  AIG participated in mediation jointly with Federal Mogul's other insurers as part of the "Federal Mogul Carrier Group." (SUF, ¶ 48; Wactlar Dec., ¶ 27.)

As of 2001, when Federal Mogul filed its Chapter 11 bankruptcy petition, there were approximately 35,000 asbestos-related bodily injury claims pending against Federal Mogul as successor to Wagner.  (Wactlar Dec., Ex. 4, at Granite State 000356.)  Estimates of future

14

asbestos claims ranged from a low of 102,251 to a high of 799,753. (Wactlar Dec., Ex. 4, at Granite State 000356.) Federal Mogul estimated that its past, present and future asbestos liabilities would be in a range from $523.9 million to approximately $1.8 billion -- with a median value of approximately $1 billion. (SUF, ¶ 47; Wactlar Dec., ¶¶ 22-23, Ex. 6, at GS Confidential 000149.)

The AIG companies had provided Federal Mogul with combined coverage limits of approximately $151 million. (Wactlar Dec., ¶ 21, Ex. 5, at Granite State Priv. 0004084.) This figure included fifty percent of the limits of policies subject to the Partitioning Agreement. Based on its review of Federal Mogul's exposure data and its experience with large asbestos claims, AIG's Complex Claims Unit concluded that there would be no benefit to litigating potential coverage under individual policies through trial. (Wactlar Dec., ¶¶ 24-25.) In AIG's view, absent a settlement, a judgment against all AIG companies for 80.6% of their $151 million policy limits (i.e., $121 million) was likely. (Wactlar Dec., ¶¶ 24-25.) AIG believed, therefore, that a settlement for an amount significantly below $121 million would be beneficial to it (and ultimately its reinsurers). (Wactlar Dec., ¶ 25.)

During bankruptcy court-ordered mediation with Federal Mogul, the carriers arrived at a series of global settlement offers to present to Federal Mogul; these offers took into account exposure analyses prepared by the Brattle Group ("Brattle"), a consulting firm retained by the Federal Mogul Carrier Group. (SUF, ¶ 49; Wactlar Dec., ¶¶ 29-31.)

In addition to scrutinizing claims forecasts by Federal Mogul, Brattle's role was limited to compiling tables that illustrated how different assumptions, such as the potential impact of several coverage defenses, would affect the size of global settlement offers made to Federal Mogul. (Wactlar Dec., ¶¶ 29-32.) Brattle did not perform any substantive analysis of the merits

15

of any defense or the likely outcome of coverage litigation. (Wactlar Dec., ¶ 31.) Federal Mogul rejected all settlement offers made by the Federal Mogul Carrier Group during the mediation. (Wactlar Dec., ¶ 33.)

In July 2006, the Federal Mogul bankruptcy trustee approached AIG and conveyed a $99 million NPV settlement proposal. (Wactlar Dec., ¶ 36, Ex. 7.) This proposal was the starting point for separate settlement negotiations between AIG and Federal Mogul. (Wactlar Dec., ¶ 37.) Ultimately, AIG and Federal Mogul agreed to resolve their coverage disputes for a maximum payment of $72 million (SUF, ¶ 51; Wactlar Dec., ¶ 39, Ex. 8) -- a 40% discount off the $121 million in exposed AIG limits. The discount will markedly increase if certain benchmarks set forth in the settlement are not met.

Underlying Granite State Policy No. 6680-1963 were Northbrook Insurance Company ("Northbrook") and U.S. Fire Insurance Company ("U.S. Fire") policies. (SUF, ¶ 13; Wactlar Dec., Ex. 1, at Granite State 000690.) A U.S. Fire policy also sat beneath Granite State Policy No. 6681-2370. (SUF, ¶ 15; Wactlar Dec., Ex. 2, at Granite State 000508.) Northbrook and U.S. Fire settled their coverage disputes with Federal Mogul prior to the AIG Federal Mogul Settlement. (SUF, ¶ 52; Lasky Dec., ¶¶ 6-7, Exs. 5 and 6.) There is no evidence as to whether the other insurer that sat beneath Granite State Policy No. 6681-2370 -- First State (Wactlar Dec., ¶ 14) -- resolved its disputes with Federal Mogul.

AIG and Federal Mogul formally executed their Settlement Agreement and Release on or about December 29, 2008 ("AIG Federal Mogul Settlement"). (SUF, ¶ 50; Wactlar Dec., ¶ 38, Ex. 8.) By the terms of that agreement, AIG agreed to pay Federal Mogul $40 million through four fixed payments over three years, and an additional $32 million beginning in 2014 if certain benchmarks are met. (SUF, ¶ 51; Wactlar Dec., ¶ 39, Ex. 8, at 2 Granite 001249-001252.) In

16

exchange, Federal Mogul released AIG with respect to all past, present and future asbestos-related liabilities. (SUF, ¶ 51; Wactlar Dec., ¶ 39, Ex. 8, at 2 Granite 001254-1264.)

As it had done following its settlement with Dresser, AIG allocated its aggregate payment obligations to Federal Mogul to the implicated AIG company policies using the "rising bathtub" method which AIG customarily uses for this type of loss. (SUF, ¶¶ 43, 53; Yoon Dec., ¶ 40; Wactlar Dec., ¶¶ 41-42, Ex. 9.) AIG began making Federal Mogul settlement payments in April 2009. (Diaz Dec., ¶ 19.) The Granite State Policies reinsured by Clearwater began contributing to those payments at that time, and those policies exhausted at the end of April 2011. (SUF, ¶ 54; Diaz Dec., ¶¶ 20-23, Ex. 5.) As those policies contributed to the loss payments, Granite State billed Clearwater for its 20% share. (SUF, ¶ 55; Mansour Dec., ¶ 13-14, 16, Exs. 3 and 4.) To date, Clearwater has not paid any of those bills. (SUF, ¶ 56; Mansour Dec., ¶ 19.)

## E.  CLEARWATER WAS PROVIDED NOTICE OF ITS POTENTIAL REINSURANCE LIABILITIES IN THE 1980s

As will be detailed below, in the early 1980s Clearwater was notified by Granite State (through C.V. Starr)[10] of potential liabilities that might have an impact on Clearwater's reinsurance. (Lasky Dec., Ex. 12.) Throughout the 1980s and 1990s, that information -- contained in correspondence and memos -- was internally directed at Clearwater to its claims department, which set up a file and assigned a claim number. (Lasky Dec., Exs. 10-11, 13-14.)

## F.  PROCEDURAL HISTORY

On December 31, 2009, Granite State commenced this action against Clearwater. On December 1, 2010, Granite State filed its Second Amended Complaint ("Complaint"). (Lasky Dec., Ex. 1.) The Complaint seeks to recover amounts billed to Clearwater under the

---

[10]    C.V. Starr was an underwriting manager who issued the Granite State Policies and placed the reinsurance on behalf of Granite State. (SUF, ¶¶ 7-8; Yoon Dec., ¶ 6; Wactlar Dec., ¶ 6; Mansour Dec., ¶ 8.)

Reinsurance Certificates, as well as a declaration that future billings under the Reinsurance Certificates for losses and expenses respecting the AIG Dresser and Federal Mogul Settlements must be paid by Clearwater on a timely basis.[11] (Lasky Dec., Ex. 1.)

On December 14, 2010, Clearwater filed its Answer To Second Amended Complaint And Demand For Jury Trial ("Answer"). (Lasky Dec., Ex. 2.) The Answer sets forth several vague, factually unsupported, boilerplate affirmative defenses, e.g., "Plaintiff's claims are barred to the extent they are not recoverable under the terms, conditions and limitations under the facultative certificates." (Lasky Dec., Ex. 2, Seventh Affirmative Defense.)

Clearwater is equivocal about the defenses it raises. For instance, it alleges: "Plaintiff's claims *may be barred* in whole or in part by its failure to provide timely and sufficient notice of loss under the applicable facultative certificates," and "[s]ome or all of the claims paid by Plaintiff to its policyholders *may not be covered or may be excluded* from the coverage provided by the applicable facultative certificates." (Lasky Dec., Ex. 2., Fourth and Fifth Affirmative Defenses (emphases added).) Clearwater's allegations that the claims at issue "*may* not be covered" and "*may* be barred" suggests that Clearwater is quite unsure whether its defenses have merit. Indeed, Clearwater does not say that reinsurance coverage is lacking, merely that there is the possibility.

While Clearwater's pleadings are not particularly informative about why it has refused to make payment under the Reinsurance Certificates, Clearwater's Rule 30(b)(6) witness, Theresa Chavez, testified that Clearwater's refusal to pay is based on: (1) Granite State's alleged failure to provide timely notice under the Reinsurance Certificates of the Dresser and Federal Mogul

---

[11] Facultative Certificates Nos. SC 29066 and SC 30932 were originally part of this action, but the parties have agreed to resolve their disputes regarding the Dresser and Federal Mogul billings under these contracts in arbitration. In addition, the claims concerning Colt Industries, Inc. have been settled and are no longer a part of this action.

claims, (see e.g., Lasky Dec., Ex. 2, Fourth Affirmative Defense; Ex. 16, Chavez Tr. 57:2-19);

(2) an objection to AIG's application of a "rising bathtub" allocation to the AIG Dresser and

Federal Mogul Settlements, (see e.g., Lasky Dec., Ex. 16, Chavez Tr. 60:9-25); and (3)

Clearwater's contention that Granite State should not have settled its claims since the insurers

beneath the excess Granite State Policies did not pay their full policy limits, (see e.g., id. at

128:21-129:8). These defenses fail as a matter of law for the reasons set forth below.

## ARGUMENT

## I.

## *CONTROLLING STANDARDS AND CHOICE OF LAW*

### A.    SUMMARY JUDGMENT STANDARD

A motion for summary judgment (under Fed. R. Civ. P. 56) will be granted where there

is no genuine issue of material fact that might affect the outcome of the suit. See John Hancock

Prop. & Cas. Ins. Co. v. Universale Reins. Co., Ltd., 147 F.R.D. 40, 45 (S.D.N.Y. 1993).  In

order to defeat such a motion, the opposing party must come forward with evidence such that a

reasonable jury could return a verdict for that party. See John Hancock, 147 F.R.D. at 45.  Mere

conclusory allegations are not sufficient.  See id. at 46.  In contract actions, the interpretation of

clear and unambiguous language is an issue of law for the court, and is properly addressed on a

motion for summary judgment.  K. Bell & Assocs. v. Lloyd's Underwriters, 97 F.3d 632, 637

(2d Cir. 1996).

### B.    WHERE THERE IS AN ACTUAL CONFLICT,
### NEW YORK LAW APPLIES TO THIS DISPUTE

Hidden in a footnote in one of its discovery motions, and after it relied on New York law

to seek the production of documents, Clearwater suggests that Illinois law governs its dispute

with Granite State. (See Lasky Dec., Ex. 7, p. 13, n. 8.)  While Granite State believes that none

19

of the issues cited below involve a conflict between resolved questions of Illinois and New York law, to the extent that such a conflict does exist, New York law applies.

There are no choice of law provisions in the Reinsurance Certificates. (Mansour Dec., Exs. 1 and 2.) Thus, a "federal court sitting in diversity must apply the choice-of-law rules of the forum state . . . ." Tri-State Employment Servs., Inc. v. Mountbatten Sur. Co., 295 F.3d 256, 260 (2d Cir. 2002). Because the subject litigation is pending in the Southern District of New York, New York choice of law rules apply.

The threshold question is whether there is an outcome-determinative conflict between the applicable laws of the states with a potential interest in the case. If not, there is no need for a choice of law analysis. See In re Allstate Ins. Co. and Stolarz, 81 N.Y.2d 219, 225, 597 N.Y.S.2d 904 (1993). Accordingly, here, only when the laws of New York and Illinois conflict will a choice of law analysis be necessary.

Courts in New York apply a "center of gravity" or "grouping of the contacts" approach to choice of law issues in contract cases. See Tri-State Employment, 295 F.3d at 260-61. "Under this approach, the spectrum of significant contacts -- rather than a single possibly fortuitous event -- may be considered." In re Allstate. 81 N.Y.2d at 226. Courts may consider a variety of significant contacts, including "the domicile or place of business of the contracting parties,"[12] and the place of performance. Tri-State Employment, 295 F.3d at 261.

Granite State maintains its principal place of business in New York. (SUF, ¶ 1; Yoon Dec., ¶ 4; Wactlar Dec., ¶ 4; Lasky Dec., Exs. 3 and 4.) Its parent, AIG, also maintains its

---

[12]     Clearwater is **not** an Illinois corporation, **nor** is its principal place of business in Illinois. (SUF, ¶ 4; Lasky Dec., Exs. 1 and 2, ¶ 2.)

principal place of business in New York. (SUF, ¶¶ 2-3; Yoon Dec., ¶ 5; Wactlar Dec., ¶ 5; Lasky Dec., Exs. 3 and 4.) This suit is pending in New York. Based **solely** on these types of contacts, just this March in a sister suit pending in the Commonwealth Court of Massachusetts, Clearwater stated that Massachusetts "has the most significant relationship to the parties and the matters at issue in this litigation and Massachusetts law should therefore apply."[13] (Lasky Dec., Ex. 8, p. 10.)

That Massachusetts action was brought by Lexington (another AIG company) against Clearwater to recover reinsurance for payments made by Lexington under the same AIG Dresser Settlement at issue here. (See Lasky Dec., Ex. 8, p. 6.) Applying Clearwater's position here, New York "has the most significant relationship to the parties and the matters at issue in this litigation and [New York] law should therefore apply." Accordingly, based on the New York contacts cited above, and Clearwater's acknowledgement of the significance of these contacts, New York law applies to any issue as to which there is a conflict in law.

There are additional factors that establish New York as the "center of gravity" of this dispute. For instance, the place of performance strongly militates in favor of applying New York law inasmuch as the subject reinsurance claims were originally handled by Clearwater (f/k/a Skandia) in New York (its main office at that time). By way of example, in a July 2, 1985 letter with a letterhead bearing Clearwater's New York address, Jean Willig -- a Clearwater reinsurance claims analyst -- noted that "asbestos claims" under, among others, reinsurance certificate Nos. C 26285 and C 27675 (the contracts at issue here) "are now being handled in the New York City office." (Lasky Dec., Ex. 10 (emphasis added).) Ms. Willig admitted in her

---

[13]     In the Massachusetts action, Clearwater took the position that Massachusetts law should apply because Lexington Insurance Company ("Lexington"), the cedent, resided in Massachusetts and because the suit was pending in Massachusetts. (Lasky Dec., Ex. 8, p. 10.)

deposition that before Clearwater moved its operations to Connecticut, Clearwater's "main office" was in New York:

> "Q.    Where did you work?
>
> "A.    I worked in the main office.
>
> "Q.    You think home office and main office are not synonymous?
>
> "Q.    Can you answer that?
>
> "A.    I worked in the one claims department that we had.
>
> "Q.    Where was that, in the main office?
>
> "A.    In '94, we were located in New York City."

(Lasky Dec., Ex. 17, Tr. 57:4-16 (objection omitted).)

Also, the reinsurance proofs of loss that were submitted to Clearwater under the Reinsurance Certificates for payment of the claims at issue reflect that Clearwater's wire payments were to be made to AIG at a New York, New York address. (Mansour Dec., Exs. 3 and 4.) Moreover, documents produced by Clearwater, when coupled with Ms. Willig's testimony, reflect that Clearwater paid other claims under Reinsurance Certificate No. C 27675 from its "main" office in New York. (Lasky Dec., Ex. 11 ("EIL payments made off that file").)

Finally, Clearwater has relied on New York law in its motion to compel production of documents.[14] (See e.g., Lasky Dec., Ex. 7, p. 17.) Given that Clearwater has already invoked New York law in this Court in an attempt to obtain further discovery from Granite State, Clearwater cannot now seek to have Illinois law apply to the merits of this dispute because it suits Clearwater's needs. See Tri-State Employment, 295 F.3d at 262 (the Second Circuit

---

[14]    In an effort to compel the production of documents concerning the "adequacy" and "sufficiency" of Granite State's notice procedures and reserving practices, among other New York cases cited throughout its brief, Clearwater relied on federal cases applying New York law.

finding that New York law applied to a dispute based, in part, on "the parties' reliance on New York law in their submissions.")[15]

For the reasons cited above, this Court should apply New York law to the extent there is a conflict between New York and Illinois law.

## II.

### *CLEARWATER IS IN BREACH OF ITS CONTRACTUAL DUTIES*

The elements of a breach of contract claim are:

> (1) the existence of a contract; (2) performance by the party seeking recovery; (3) non-performance by the other party; and (4) damages attributable to the breach.

Bank of Am., N.A. v. Viders, 2010 U.S. Dist. LEXIS 136852 at *11 (E.D.N.Y 2010).  Here, none of these elements is subject to factual dispute.

There is no dispute that Granite State and Clearwater entered into the Reinsurance Certificates.  (SUF, ¶ 17; Mansour Dec., Exs. 1 and 2.)  These contracts require Clearwater to indemnify Granite State for 20 percent of losses paid and related expenses under the Granite State Policies.  (SUF, ¶¶ 18-19; Mansour Dec., Exs. 1 and 2.)  Nowhere in the pleadings or any documents produced in this matter has Clearwater disputed that Granite State has performed its contractual obligation to investigate and resolve the Dresser and Federal Mogul claims, or that Granite State has made the payments in question respecting the AIG Dresser and Federal Mogul Settlements.

---

[15]     It should also be noted that Dresser assigned its payment rights under the AIG Dresser Settlement to Lehman. (SUF, ¶ 38; Yoon Dec., ¶ 36, Ex. 9, at 2 Granite 00185-208.) As a result, AIG was required to make its payments under the AIG Dresser Settlement to the "Structured Asset Receivables Trust, Series 2005-1" located in New York, New York. (Yoon Dec., Ex. 10.)

Clearwater has not disputed -- and cannot dispute -- that under the terms of the Reinsurance Certificates it agreed that upon receipt "of satisfactory evidence of payment of loss" it would "promptly reimburse [Granite State] for its share of loss and loss expense . . ." (SUF, ¶ 21; Mansour Dec., Exs. 1 and 2, ¶ 3(c).) Granite State has submitted proofs of loss to Clearwater totaling $4,470,739.10, Clearwater's 20 percent share of loss and expenses under the Granite State Policies. (SUF, ¶¶ 22, 45, 55; Mansour Dec., ¶¶ 14, 16, 18, Exs. 3 and 4.)) Clearwater refuses to pay. (SUF, ¶¶ 46, 56; Mansour Dec., ¶ 19). Granite State has presented proof of breach of contract, and the supporting facts are not in dispute; Granite State is entitled to judgment as a matter of law unless Clearwater can establish one of its affirmative defenses. As demonstrated below, however, Clearwater's defenses all fail as a matter of law. And, for the same reasons, Granite State is entitled to a declaration under 28 U.S.C § 2201 that future billings are to be paid by Clearwater under the Reinsurance Certificates as they are rendered.

## III.

### *CLEARWATER'S LATE NOTICE DEFENSE IS WITHOUT MERIT*

In its Answer, Clearwater has alleged that it need not pay under the Reinsurance Certificates because Granite State failed to provide timely notice. (Lasky Dec., Ex. 2, Fourth Affirmative Defense.) According to Clearwater's Rule 30(b)(6) witness, Theresa Chavez, Granite State did not provide Clearwater with notice of the claims until 2008 or 2009:

> "Q. And is it Clearwater's position that notice was not received concerning Federal Mogul or Dresser until 2008 or 2009?
>
> "A. Yes."

(Lasky Dec., Ex. 16, Chavez Tr. 57:16-19.)

Ms. Chavez, however, appears to misread the notice provisions in the Reinsurance

Certificates. They provide that Granite State "will notify [Clearwater] promptly of any event or development which [Granite State] reasonably believes might result in a claim against [Clearwater]." (SUF, ¶ 21; Mansour Dec., Exs. 1 and 2, ¶ 3(a).) This was clearly done in the 1980s. A substantial amount of documentary evidence -- **produced from Clearwater's own files**[16] -- shows that in the early 1980s Clearwater was notified by Granite State (through its representative CV Starr)[17] that potential asbestos-related liabilities existed that might result in a claim against Clearwater:

- During the renewal process for the Granite State Policies, CV Starr forwarded to Clearwater a letter dated March 23, 1982 in which Marsh & McLennan -- the producer of the Granite State Policies -- reported that McGraw Edison was facing potential asbestos liability for the Wagner brakes operations, i.e., the Federal Mogul asbestos claims at issue here. (Lasky Dec., Ex. 12, at CW 00017-19.) That letter further advises that the claims against Wagner had been filed "during the last year" (id. at CW 00018);

- A month later, on or about April 29, 1982, William Green of C.V. Starr forwarded to Bob O'Brien of Skandia (n/k/a Clearwater) an April 29, 1982 letter indicating that McGraw Edison was facing "asbestosis claims" and that Granite State had just become aware of the matter (Lasky Dec., Ex. 12, at CW 02128-31);

- A February 11, 1983 C.V. Starr communication received by Clearwater on February 14, 1983 confirms that McGraw Edison was facing an "asbestos situation" (Lasky Dec., Ex. 12, at CW 00390);

- A February 23, 1984 Marsh & McLennan letter sent by C.V. Starr to, and received by Clearwater on February 28, 1984, indicates that McGraw Edison was facing asbestos liabilities in connection with the Wagner brakes operations, as well as the Worthington pumps operations and the ALCO locomotive operations, i.e., the Dresser asbestos claims at issue here (Lasky Dec., Ex. 12, at CW 00249-51).

---

[16]     Documents produced from Clearwater's files have bates numbers with the prefix "CW."

[17]     Again, C.V. Starr was Granite State's underwriting manager who procured the McGraw Edison insurance business and placed its reinsurance. (SUF, ¶¶ 7-8; Yoon Dec., ¶ 6; Wactlar Dec., ¶ 6; Mansour Dec., ¶ 8.) As the documents produced by Clearwater show, C.V. Starr also originally handled the Dresser and Federal Mogul claims for Granite State.

Through these communications, Clearwater clearly was notified by Granite State of an "event or development" that Granite State "reasonably believe[d] might result in a claim against [Clearwater]." While Clearwater now appears to contend that these communications were somehow meaningless, contemporaneous internal Clearwater documents produced by Clearwater in this litigation prove conclusively that when Clearwater received this information it understood that it had been notified of circumstances that "might result in a claim" under the Reinsurance Certificates:

- An internal May 5, 1982 Clearwater communication states: "[We] are forwarding a copy of the latest correspondence received from C.V. Starr & Co. (Granite State Insurance Company) . . . [a]t this point, we are not sure if any of these claims will ever penetrate our layers, but because of the potential number of suits, we find it necessary to make you aware of the situation" (Lasky Dec., Ex. 13, at CW 00012);

- In response to that May 5 communication, an October 14, 1982 Clearwater document states: "I have forwarded the data to our Claims Department to keep them abreast of the situation" (Lasky Dec., Ex. 13, at CW 01514);

- On November 22, 1982, Clearwater prepared "Casualty Facultative Claim Notices" expressly under the Reinsurance Certificates (as well as one under a certificate originally part of this action but now the subject of an arbitration). (Lasky Dec., Ex. 14.) These "claim notices" indicate that McGraw Edison was facing "asbestosis" claims, and the Granite State Policies, as well as Clearwater's Reinsurance Certificates, were implicated by such claims;

- On July 2, 1985, Clearwater's claims department sent a letter to C.V. Starr expressly in connection with the Reinsurance Certificates stating: **"[N]otices of potential exposure arising out of asbestos claims were originally sent to Skandia's Chicago branch and are now being handled in the New York City office"** (Lasky Dec., Ex. 10 (emphasis added));

- In May 1994, Clearwater's Gerard Marquart requested **that an asbestos file be set up as "002"** because "EIL" claims were now being handled under "001" (Lasky Dec., Ex. 13, at CW 00005);

- On June 8, 1994, Clearwater prepared a **"Preliminary Claims Notice" under reinsurance certificate No. C 27675 concerning "asbestos loss" under the Granite State policy reinsured by that certificate, policy No. 6681-2370**. (Lasky Dec., Ex. 11.) That notice further indicates that the "001" file that had

been set up by Clearwater was "originally" asbestos, however "EIL payments made off that file & new asb file created";

- Clearwater computer printouts concerning Reinsurance Certificate No. C 27675 indicate that asbestos claims were further reported to Clearwater by Granite State on May 31, 1994 (Lasky Dec., Ex. 15).

Clearwater's conclusory allegations that it did not receive notice of the Dresser and Federal Mogul claims until 2008 or 2009 are, therefore, belied by Clearwater's own documents. These documents establish, in sum, that shortly ("promptly") after Granite State became aware of potential asbestos claims against McGraw Edison in 1982, i.e., an "event or development" that "might result in a claim against [Clearwater]" under the Reinsurance Certificates, it notified Clearwater of McGraw Edison's potential liabilities and provided additional information concerning this exposure throughout the 1980s and 1990s. It is, therefore, indisputable that Granite State has met its notice obligations under the Reinsurance Certificates.[18]  See Unigard Security Ins. Co. v. North River Ins. Co., 4 F.3d 1049, 1065-66 (2d Cir. 1993) (finding under reinsurance notice provision similar to that at issue here, that reinsurer was obligated to provide notice when it determined that reinsurance might be implicated).

## IV.

### CLEARWATER'S ALLOCATION AND EXHAUSTION DEFENSES FAIL AS A MATTER OF LAW

On one hand, Clearwater takes the position that AIG should not have applied a "rising bathtub" allocation to the AIG Dresser and Federal Mogul Settlements because it should have allocated the settlements by applying a discount to all policies involved:

"Q. And what type of allocation does Clearwater contend was appropriate?

---

[18]   In the event that this Court determines that there is an issue of fact as to when notice was provided to Clearwater, Granite State reserves the right to show that Clearwater's late notice defense fails for additional reasons, including the fact that Clearwater has not suffered any prejudice as a result of the alleged late notice.

"A. I don't know that we have a position as to what allocation was appropriate because on this case we haven't received the exposure analyses that we have requested to determine how the settlement values were arrived at and how the exposure to each individual policy was calculated, **but we would expect an allocation to follow the exposure analyses that were done at the time of the settlement. And if the settlement included discounts off policy limits for all policies, then those discounts should be passed on to the reinsurers of each of those policies, not just to the policies at the highest layer.**"

(Lasky Dec., Ex. 16, Chavez Tr. 60:9-25 (emphasis added).)

On the other hand, Clearwater contends that it need not pay the amounts billed to it because, according to Clearwater, the Granite State Policies it reinsured require that the underlying policies -- to which Granite State's coverage was excess -- pay their full limits before Granite State pays anything under its umbrella policies:

"Q. Is it Clearwater's position that if the underlying policies settled for less than full limits, then at least a portion of any settlement that AIG paid could not be ceded properly to Clearwater to the extent of the shortfall of the limits from the underlying policies' payment?

"A. It could be some, it could be all because it violates the condition of the policy and therefore it violates the condition of the certificate if all of the underlying was not exhausted."

(Lasky Dec., Ex. 16, Chavez Tr. 128:21-129:8.)

Clearwater demands an allocation of loss that would give it the benefit of various discount factors -- applying a coverage discount to all exposed policies regardless of their different attachment points -- so as to shift liability for settlement payments to other reinsurers, yet, at the same time, Clearwater contends that it should not have to pay anything if the policies underlying the Granite State Policies entered into settlements which provided any discount on their limits. Clearwater's position is self-serving, and its disingenuousness is apparent; it should not be countenanced by this Court. Indeed, putting all else aside, as discussed below, the identical allocation and exhaustion defenses were soundly rejected by the Second Circuit.

## A.   GRANITE STATE'S "RISING BATHTUB" ALLOCATION WAS REASONABLE AND PROPER AS A MATTER OF LAW

When an insurer settles asbestos-related or similar cumulative injury losses, it must decide how to allocate that loss to multiple policies. Insurers need to make allocation decisions for important business reasons that have nothing to do with potential reinsurance recoveries.[19] Indeed, insurers must allocate settlement payments to particular insurance policies even if there is no reinsurance at all.

In settlements of this type, there may be more than one reasonable allocation methodology, but only one can be implemented. The ceding insurer alone has the obligation to pay the entire loss and determine an appropriate allocation to all of its policies. In contrast, the numerous reinsurers who may be implicated by an insurance coverage settlement have conflicting interests that may affect their views on allocation. Under these circumstances, no single reinsurer should be permitted to compel the cedent to utilize its preferred allocation to the possible detriment of the cedent and the other reinsurers who participate in different years and on different layers of coverage. Yet, that is precisely what Clearwater is trying to do -- force AIG to implement Clearwater's preferred method of allocation so that Clearwater pays less and other reinsurers pay more. (Lasky Dec., Ex. 16, Chavez Tr. 60:9-25.)

It is undisputed that AIG allocated its AIG Dresser and Federal Mogul Settlements using a "rising bathtub" allocation. (SUF, ¶¶ 42, 53; Yoon Dec., ¶ 39, Ex. 11; Wactlar Dec., ¶ 41, Ex. 9.) The "rising bathtub" "is a phrase used to describe a provision in the Wellington Agreement[20]

---

[19]    For instance, allocation of settlement payments is necessary to determine the extent of impairment of a policy's limits of liability, and the application of such payments to particular policies also is needed to determine the application of deductibles and retrospective premiums.

[20]    "The Wellington Agreement . . . is an accord reached between a group of insureds, facing thousands of asbestos-product claims, and their insurers." North River Ins., 361 F.3d at 137, n. 4. In 1985, several

that deals with how losses would be allocated to insurers." North River Ins., 361 F.3d at 138, n. 6. Under this allocation, losses are allocated to the lowest layer policies first and, "like a bathtub, fill from the bottom layer up." Id. AIG regularly uses the "rising bathtub" method to allocate loss resulting from the settlement of multi-year asbestos claims; it uses it because it is the simplest and most logical approach. (SUF, ¶ 43; Yoon Dec., ¶ 40; Wactlar Dec., ¶ 42.)

Nevertheless, Clearwater insists that because, in its settlement analysis, AIG took into account exposure tables compiled by NERA (for the Dresser claims) and Brattle (for the Federal Mogul claims) which were commissioned by the respective carrier groups involved in settlement negotiations, AIG was required to allocate its losses in accordance with those tables. (Lasky Dec., Ex. 16, Chavez Tr. 60:9-25.) Clearwater is wrong, and its contentions reflect a failure to distinguish between the type of **exposure analysis** that enables an insurer to determine how much it is prepared to pay to settle and how the **actual loss** is to be allocated upon payment under the settlement.

The fundamental distinction between exposure and loss was the underpinning of the Second Circuit's rejection of Clearwater's theory in North River Ins., 361 F.3d 134, a case involving facts nearly identical to those present here. In that case, North River had resolved claims implicating multiple layers of insurance coverage for asbestos losses incurred by Owens-Corning. Like AIG and the other insurers in the Dresser and Federal Mogul disputes, North River had raised a "number of [coverage] defenses which, if successful, would have eliminated or dramatically reduced North River's liability under its policies." Id. at 137. Also, like AIG and

---

insurers and asbestos producers entered into the Wellington Agreement to establish a non-profit claims handling center that coordinated claims payments on behalf of the asbestos producers. See North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1200-01 (3d Cir. 1995). "The Agreement encouraged settlements in place of costly litigation and established arbitration procedures to adjudicate claims that producers and their insurers could not settle." Id.

the other insurers in the underlying disputes at issue here, North River "conducted an analysis of possible outcomes" based on a range of "damage and coverage scenarios" reflecting "potential defenses." Id. at 138.

Once the settlement amount was agreed to, North River -- an affiliate of Clearwater [21] -- did not allocate in accordance with these "damage and coverage scenarios," and instead allocated to its lowest layer policies first using the "rising bathtub" method. Id. As here, this meant that the lower layers bore 100 percent of the loss, with no discount for potential coverage defenses. Conversely, higher layers, whose exposure was taken into account in determining the overall settlement amount, received the full benefit of the discount from the total limits of coverage at issue, and paid nothing.

The Second Circuit's description of the stance that the reinsurer took in North River precisely describes Clearwater's position here:

> ACE objects to North River using a pre-settlement analysis to reach its decision to settle with Owens-Corning for $335 million, then using the rising bathtub method to allocate the settlement, ignoring its pre-settlement analysis and the assignment of risk to layers above ACE.

Id. at 141. The North River Court rejected this objection to the allocation, because "ACE's argument confuses risk of loss, and loss." Id. at 142.

The Court then explained the distinction between risk of loss and actual loss.   It recognized that an insurer must analyze exposure and risk in order to determine how much to pay in settlement. But, the court held, once the insurer determines the settlement amount, pre-settlement exposure analysis is irrelevant:

> An insurer may engage in all manner of analyses to inform its decision as to whether, and at what amount, to settle, but those analyses are irrelevant to the contractual obligation of the reinsurer to indemnify the reinsured for loss under

---

[21]      Both Clearwater and North River Insurance Company are ultimately owned by Fairfax Financial Holdings Limited.

31

> the reinsurance policy. When a claim is adjudicated or compromised at a figure that falls within the first layer of coverage, the risk as to the second and higher levels is eliminated, and no "loss" is suffered in any other layer than the first.

Id. [22]

The reasoning of North River controls here. The NERA and Brattle exposure models were developed for the purpose of determining potential settlement offers from the respective carrier groups. (Yoon Dec., ¶ 24; Wactlar Dec., ¶¶ 29-31.) AIG never intended for these **exposure** models to control its internal **loss** allocations. (Yoon Dec., ¶ 26; Wactlar Dec., ¶ 34.)

Although AIG received a discount from its combined policy limits, it did not negotiate or agree with Dresser or Federal Mogul on the amount due under any individual policy. (Yoon Dec., ¶ 25; Wactlar Dec., ¶ 33.) In fact, neither Dresser nor Federal Mogul ever saw the amounts reflected in the NERA or Brattle exposure analyses on a policy-by-policy basis before settling. (Yoon Dec., ¶ 25; Wactlar Dec., ¶ 33.) Like the internal exposure analyses prepared by the ceding company in North River, the NERA and Brattle exposure models have no bearing on the appropriate method of allocating the Dresser and Federal Mogul losses. Moreover, as the Court noted in North River, the exposure-based allocation advocated by Clearwater would be improper because the Reinsurance Certificates cover loss, not exposure.

In addition, by upholding North River's use of a "rising bathtub" allocation, the Court of Appeals determined that such an allocation is proper and reasonable *per se* for asbestos losses. North River Ins., 361 F.3d at 141-143. AIG allocated its asbestos losses based on the same method. (SUF, ¶¶ 42, 53; Yoon Dec., ¶ 39, Ex. 11; Wactlar Dec., ¶ 41, Ex. 9.) AIG's allocation is proper, and Clearwater's objection to AIG's use of a "rising bathtub" allocation fails as a

---

[22]    The holdings in North River that (a) pre-settlement exposure analysis is irrelevant to proper allocation of actual loss, and (b) that a "rising bathtub" allocation is appropriate for asbestos losses, were independent of the Court's discussion of the "follow the fortunes" doctrine in other portions of its opinion. These holdings state independent bases for summary judgment against Clearwater on the allocation issue.

matter of law.

## B.    CLEARWATER'S EXHAUSTION DEFENSE FAILS AS A MATTER OF LAW

Paragraph II ("Limit Of Liability-Underlying Limits") of the Granite State Policies provides that "liability shall attach to [Granite State] only after the Underlying Umbrella insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability . . . " (SUF ¶ 16; Yoon Dec., Ex. 2; Wactlar Dec., Ex. 2.)  Presumably on the basis of this provision, Clearwater argues that Granite State had no coverage obligations under its policies unless and until the insurers below Granite State paid one hundred percent of their limits. (Lasky Dec., Ex. 16, Chavez Tr. 128:21-129:8.)  Clearwater is wrong.

This very same argument has already been rejected by the Second Circuit.  In Zeig, 23 F.2d 665, an excess insurer argued that its insured was not entitled to recover because the underlying primary policy settled for less than its limits. Id. at 666.  The excess policy at issue provided that underlying coverage had to be "exhausted in payment of claims to the full amount of the expressed limits." Id.  Rejecting the excess insurer's argument, the Second Circuit held that underlying exhaustion is not an issue where, as here, the amount of the loss is "greater than the amount of the expressed limits of the [underlying] insurance." Id.

In the Court's decision, Judge Augustus N. Hand emphasized the strong public policy of encouraging settlements and the proposition that the excess insurer suffered no disadvantage by reason of the fact that the primary insurer did not pay its full limits:

> To require an absolute collection of the primary insurance to its full limit would in many, if not most, cases involve delay, **promote litigation, and prevent an adjustment of disputes** which is both convenient and commendable.  A result harmful to the insured, and of **no rational advantage to the insurer**, ought only to be reached when the terms of the contract demand it.

Id. (emphases added).

33

Notably, these policy considerations have been recognized by various courts throughout the United States which have likewise found that excess carriers cannot avoid their obligations to pay claims based on compromise settlements by lower layer carriers. See e.g., Stargatt v. Fidelity and Cas. Co. of New York, 67 F.R.D. 689 (D. Del. 1975), aff'd, 578 F.2d 1375 (3d Cir. 1978); Mills Ltd. Partnership v. Liberty Mutual Ins. Co., 2010 Del. Super. Lexis 563 (Del. Sup. Ct. Nov. 5, 2010); Reliance Ins. Co. v. Transamerica Ins. Co., 826 So.2d 998 (Fla. Dist. Ct. App. 2001); Stonewall Ins. Co. v. Superior Court, 2010 WL 4277559 (Cal. Sup. Ct. Nov. 1, 2010) (addressing exhaustion in the bankruptcy asbestos context).

Other courts -- including the Southern District of New York -- have taken Zeig further, and have found that an excess carrier's coverage will attach even if the underlying carriers have not settled. For instance, in Pereira v. Cogan, 2006 U.S. Dist. LEXIS 49263 (S.D.N.Y. July 12, 2006), a third layer excess insurer, Executive Risk Indemnity Inc. ("Executive"), argued that it did not have to provide any coverage to its insured because the carrier below was insolvent and therefore unable to pay anything under its first layer of insurance. Id. at *24. Executive's exhaustion defense was based on its policy language which stated that it "shall provide the Insured with insurance excess of the Underlying Insurance . . . only after all Underlying Insurance has been exhausted by actual payment of claims or losses thereunder." Id. at *23-*24.

Relying on Zeig, Judge Laura Swain rejected Executive's exhaustion defense: "[i]nterpreting the policy to excuse the excess insurers from providing coverage within their respective layers on account of the unrelated insolvency of an intermediary insurer would work a similar hardship on the insureds, who have already been deprived of a layer of coverage by the insolvency, and provide a windfall to the excess insurers." Id. at *26.

Likewise, in Gould Inc. v. Arkwright Mutual Ins. Co., the Middle District of

34

Pennsylvania found that an insured could pursue claims against excess carriers where the insured had not collected any money from the underlying umbrella carrier, or even made a claim against that underlying carrier. 1995 WL 807071 at *3-*4 (M.D.Pa. Nov. 8 1995) (Zeig "in no way holds that exhaustion of the underlying policy was strictly a result of the settlement").

What can be gleaned from Zeig and its progeny, therefore, is that courts seek to encourage settlements and adjustment of disputes, refusing to permit insurers to evade their contractual liabilities based on the technical argument that the underlying insurers did not pay their full limits. These courts have determined that as long as the loss exceeds the limits of underlying insurance, the underlying policies will be deemed exhausted as a matter of law (unless the excess policies expressly prohibit exhaustion by settlement or other means). Moreover, while settlement by the underlying insurers is evidence of exhaustion, it is not required to prove exhaustion. Clearwater's exhaustion defense, therefore, must fail as a matter of law.

First, it is undisputed that the Granite State Policies attached excess of $25 million. (SUF, ¶¶ 12, 14; Yoon Dec., Exs. 1 and 2; Wactlar Dec., Exs. 1 and 2.) It is also undisputed that Dresser (a) estimated that the total value of unresolved current and future asbestos bodily-injury claims against it to be in the range of $2.2 billion to $3.5 billion in ultimate (i.e. nominal) payments, and (b) reported that there were $2.427 billion of "approved" claims against it -- at least $412 million of which related to its Worthington ($370 million) and ALCO ($42 million) operations. (SUF, ¶¶ 28-29; Yoon Dec., ¶¶ 18-19, Ex. 5, at 2 Granite 001795, Ex. 6, at GS Confidential 006624.) There is also no factual dispute that Federal Mogul estimated that its past, present and future liabilities would range from $523.9 million to approximately $1.8 billion -- with a median value of approximately $1 billion. (SUF, ¶ 47; Wactlar Dec., ¶¶ 22-23, Ex. 6, at

GS Confidential 000149.)  Clearly, the hundreds of millions to billions of dollars in estimated loss far exceeds the $25 million dollars of underlying insurance limits.

Second, the carriers below Granite State settled Dresser's coverage claims in November 2004. (SUF, ¶¶ 34-35; Yoon Dec., ¶¶ 31-32, Ex. 8.)  Similarly, the carriers that sat below Granite State Policy No. 6680-1963 settled their coverage disputes with Federal Mogul. (SUF, ¶ 52, Lasky Dec., ¶¶ 6-7, Exs. 5 and 6.)  One of the two carriers that sat below Granite State Policy No 6681-2370 -- U.S. Fire, yet another affiliate of Clearwater[23] -- likewise settled its coverage disputes with Federal Mogul. (SUF, ¶52, Lasky Dec., ¶ 6, Ex. 5.)  With those settlements, these policies -- underlying the Granite State Policies -- were exhausted as a matter of law.  See Mills, 2010 Del. Super. Lexis at *28 ("settling with the underlying insurance companies . . . exhausted the underlying policies as a matter of law").

There is nothing in the Granite State Policies that barred either Dresser or Federal Mogul from exhausting the underlying insurance through settlement. The Granite State Policies at paragraph II ("Limit Of Liability-Underlying Limits") provide that "liability shall attach to [Granite State] only after the Underlying Umbrella insurers have paid or **have been held liable to pay** the full amount of their respective ultimate net loss liability . . . " (SUF ¶ 16; Yoon Dec., Exs. 1 and 2, ¶ II (emphasis added).)  Nearly identical language was analyzed in Mills, 2010 Del. Super. Lexis 563, in which a high excess policy stated that it: "only provides coverage when the Underlying Limit of Liability is exhausted by reason of the insurers of the Underlying Policies paying or **being held liable to pay** in legal currency the full amount of the Underlying Limit of Liability as loss." Id. at *4 (emphasis added).

The excess insurer who wrote that policy claimed that it had no liability because the lower layer polices did not pay their full limits under a settlement.  Rejecting this defense, the

---

[23]     U.S. Fire and Clearwater both are ultimately owned by Fairfax Financial Holdings Limited.

court relied on Zeig and found that "the majority of courts . . . hold that settlement with an underlying carrier functionally exhausts that carrier's coverage." Id. at *19, *27. Applying Mills here, the "have been held liable to pay" language of the Granite State Policies sanctions a finding of underlying exhaustion by settlement as a matter of law. See also Rummel v. Lexington Ins. Co., 945 P.2d 970, 977-78, 981 (N.M. 1997) (finding settlement below limits can exhaust underlying policies pursuant to "has been held liable to pay" language).

Finally, although there is no evidence as to whether First State, one of the insurers underlying Granite State Policy No. 6681-2370, has settled with Federal Mogul, the fact remains that Federal Mogul's estimated pending and future liabilities -- $523.9 million to approximately $1.8 billion -- far exceeded the $25 million attachment point of Granite State Policy No 6681-2370. Under the Zeig line of authorities, therefore, the underlying First State policy should be deemed exhausted.

In Rummel, 945 P.2d 970, the court was faced with underlying exhaustion language very similar to that at issue here: the "liability of the Company under this policy shall not attach unless and until the Insured's Underlying Insurance *has paid or has been held liable to pay* the total applicable underlying limits." Id. at 977 (emphasis in original). The excess insurer -- Lexington -- denied coverage, in part, because one of the underlying insurers simply refused to pay any of its limits. Id. at 980. Declining to allow Lexington to repudiate its excess insurance coverage on that basis, the Court found that an excess insurer "is not necessarily relieved of liability under its contract" where an underlying insurer refuses to pay "because of a good faith assessment of the claim, through error or mistake, or as an act of bad-faith." Id. at 980-81. Applied here, given the size of the exposure at issue, Granite State was not relieved of its liability under Policy No. 6681-2370 simply because First State may be refusing to pay its limits.

Accordingly, Clearwater's exhaustion defense must fail as a matter of law.

## V.

### *"FOLLOW THE FORTUNES" ALSO BARS CLEARWATER'S ALLOCATION AND EXHAUSTION DEFENSES AS A MATTER OF LAW*

"The follow-the-fortunes doctrine 'binds a reinsurer to accept the cedent's good faith decisions on all things concerning the underlying insurance terms and claims against the underlying insured: coverage, tactics, lawsuits, compromise, resistance or capitulation.'" North River, 361 F.3d at 139-140 (citations omitted). Recognizing that this doctrine bars its allocation and exhaustion defenses, Clearwater takes the untenable position that "follow-the-fortunes" does not apply to the Reinsurance Certificates. (Lasky Dec., Ex. 18, Drew Tr. 28:12-21.) The language of the contracts and controlling law, however, establish that Clearwater is wrong, and that this paramount principle of the reinsurance relationship bars Clearwater's allocation and exhaustion defenses as a matter of law.

### A.   "FOLLOW THE FORTUNES" CONTROLS THIS DISPUTE

Paragraph 1 of the Reinsurance Certificates provides:

[Clearwater's] liability under this Casualty Facultative Reinsurance Certificate ("Certificate") **shall follow the ceding Company's ("Company") liability** in accordance with the terms and conditions of the policy reinsured hereunder except with respect to those terms and conditions as may be inconsistent with the terms of this Certificate.

(SUF, ¶ 20; Mansour Dec., Exs. 1 and 2 (emphasis added).)

On multiple occasions, the Second Circuit has found that identical or similar language incorporates the "follow the fortune" doctrine into the subject reinsurance contracts. See North River, 361 F.3d at 137 ("The facultative reinsurance contracts . . . each contained a follow-the fortunes provision, providing that the 'liability of the Reinsurer . . . shall follow that of the Company'"); Gerling Global Reinsurance Co. v. ACE Prop. & Cas. Ins. Co., 42 Fed. Appx. 522

38

(2d Cir. 2002) ("follow the fortunes" applies to facultative certificates "which provide that 'the liability of [the reinsurer] shall follow that of [the ceding company]'"); <u>Christiania General Ins. Corp. v. Great American Ins. Co.</u>, 979 F.2d 268, 280 (2d Cir. 1992) (where certificates provided that "the reinsurance provided under this certificate shall follow coverage of [the ceding company's] policy," the doctrine of "follow the fortunes" applied). Indeed, Clearwater itself has admitted that the exact language at issue here is a "follow the fortunes" clause in a memorandum of law submitted in another Southern District of New York case, <u>National Union Fire Ins. Co. v. Clearwater Ins. Co.</u>, Docket No. 04-CV-05032 (S.D.N.Y.). (Lasky Dec., Ex. 19, p. 13-14.)

> It is also undisputed that paragraph 3(c) of the Reinsurance Certificates provides:
>
> (c)  Upon receipt by [Clearwater] of satisfactory evidence of payment of a loss for which reinsurance is provided hereunder, [Clearwater] shall promptly reimburse [Granite State] for its share of loss and loss expense . . .

(SUF, ¶ 21; Mansour Dec., Exs. 1 and 2.) Courts have held that similar language requires a reinsurer to "follow the settlements" of its cedent. See e.g., <u>Employers Reinsurance Corp. v. Massachusetts Mutual Life Ins. Co.</u>, 2008 U.S. Dist. LEXIS 63420 at *20 (W.D. Mo. Aug. 19, 2008) ("Follow the settlements" is related to "follow the fortunes," and binds a reinsurer to its cedent's settlement decisions).[24]

Here, the conclusion that under the Reinsurance Certificates Clearwater is bound to follow -- and cannot second-guess -- AIG's settlements is bolstered by other language within the Reinsurance Certificates as well. For example, paragraph 3(a) of the contracts states that Granite State "will promptly investigate and **will settle** or defend all claims under the policy reinsured

---

[24]     "Follow the fortunes" is sometimes described as "follow the settlements," which "essentially describes the follow-the-fortunes doctrine in the settlement context." <u>North River</u>, 361 F.3d at 136, n. 2. "The phrases 'follow-the-fortunes' and 'follow-the-settlements' are used interchangeably. Both doctrines are related." <u>Employers Reinsurance</u>, 2008 U.S. Dist. LEXIS 63420 at *15.

hereunder[.]" (SUF, ¶ 21; Mansour Dec., Exs. 1 and 2 (emphasis added).)  Paragraph 3(d) of the Reinsurance Certificates also defines "loss" as "such amounts as are actually paid by [Granite State] in **settlement of claims . . .**" (SUF, ¶ 21; Mansour Dec., Exs. 1 and 2  (emphasis added).) Accordingly, the Reinsurance Certificates clearly provide Granite State with the indisputable right, indeed, the responsibility to settle the claims under its policies -- as AIG has done here -- and under the definition of "loss" require Clearwater to pay its share of such settlements. If Clearwater is permitted to challenge AIG's settlements, as it seeks to do here, these contractual provisions lose their effect; AIG has no incentive to settle if Clearwater can at the reinsurance level seek to litigate the issues that AIG had resolved at the insurance level.

Moreover, this Court has held that "follow the fortunes" is implied in all reinsurance contracts: "the court finds that it is customary within the reinsurance industry for reinsurers to follow the claim settlement decisions of the ceding company even in the absence of an explicit loss settlement clause." Aetna Cas. & Surety Co. v. Home Ins. Co., 882 F. Supp. 1328, 1350 (S.D.N.Y. 1995), motion to vacate denied, 882 F. Supp. 1355 (S.D.N.Y. 1995).  As this Court further observed, "it would be difficult to imagine how reinsurance transactions could function in the absence of such an undertaking." Id.

Other courts around the country have likewise found that "follow the fortunes" is implied in all reinsurance contracts. See e.g., ReliaStar Life Ins. Co. v. IOA Re, Inc., 303 F.3d 874, 881 (8th Cir. 2002) (follow the fortunes doctrine has a "customary application in the reinsurance business"); Commercial Union Ins. Co. v Seven Provinces Ins. Co., 9 F. Supp. 2d 49, 66 (D. Mass. 1998), aff'd, 217 F.3d 33 (1st Cir. 2000), cert. denied, 531 U.S. 1146, 121 S.Ct. 1084 (2001) (follow the fortunes has "long been established by law in the reinsurance industry"); International Surplus Lines v. Certain Underwriters at Lloyd's London, 868 F. Supp. 917, 920

(S.D. Ohio 1994) (follow the fortunes "is applied to all reinsurance contracts," even in the absence of express language on the issue).

Accordingly, this Court should find that the doctrine of "follow the fortunes" applies to the Reinsurance Certificates as a matter of law.

**B.    CLEARWATER'S ALLOCATION AND EXHAUSTION DEFENSES ARE PRECLUDED BY "FOLLOW THE FORTUNES"**

The "follow the fortunes" doctrine generally requires "that the reinsurer will follow the fortunes or be placed in the position of the [reinsured]." Aetna Cas., 882 F. Supp. at 1347 (S.D.N.Y. 1995) (internal quotation marks and citation omitted). In this regard, "follow the fortunes" is fundamental to the orderly transfer of risk from cedent to reinsurer -- the very reason reinsurance exists.

The "purpose of the follow the settlements doctrine is to prevent the reinsurer from second-guessing the settlement decisions of the reinsured, thereby promoting good-faith settlements by the reinsured." National Union Fire Ins. Co. of Pittsburg, PA. v. American Re-Insurance Co., 441 F. Supp. 2d 646, 650 (S.D.N.Y. 2006) (citations omitted). To properly attack a cedent's settlement determinations, ***the reinsurer must prove*** that the cedent's determinations were in bad faith, or that the cedent's actions had no reasonable basis. See North River, 52 F.3d at 1204; Travelers Cas. & Surety Co. v. Gerling Global Reinsurance Corp. of America, 419 F.3d 181, 191 (2d Cir. 2005) (to evade liability under "follow the fortunes," the reinsurer must make an "extraordinary showing"); see also Int'l Surplus Lines Ins, Co. v. Certain Underwriters & Underwriting Syndicates at Lloyd's of London, 868 F. Supp. 917, 923 (S.D. Ohio 1994) (limiting the scope of the inquiry under "follow the fortunes" to whether a cedent's coverage determination was "reasonable," and, if so, holding that the determination "is binding on reinsurers").

41

Under this established law, therefore, Clearwater bears the "extraordinary" burden of showing that Granite State's coverage and settlement decisions are somehow so unreasonable that "follow the fortunes" should not bind Clearwater to these decisions. It is a significant burden to make such a showing:

> The standard is a high one: the reinsurer must show "gross negligence or recklessness," or that the settlement was not even "arguably" within the scope of the reinsurance coverage. The reinsurer cannot dispute good faith determinations that a risk was covered by the underlying insurance policy, or good faith interpretations of policy terms.

Commercial Union, 9 F. Supp. 2d at 66.

### (1)    Clearwater Has Improperly Challenged AIG's Use Of A "Rising Bathtub" Allocation

This case presents a perfect example of why "follow the fortunes" is critical to the reinsurance relationship. Clearwater seeks to re-litigate AIG's decision to allocate its settlements using a "rising bathtub" allocation. According to Clearwater, AIG was required to use Clearwater's preferred allocation, i.e., applying a uniform discount to all layers of coverage. (Lasky Dec., Ex. 16, Chavez Tr. 60:9-25.) As noted above, Clearwater wants to shift a portion of the loss that falls to Clearwater under AIG's current allocation to those policies and reinsurers that covered higher layers.

Of course, if a reallocation were implemented pursuant to Clearwater's demands, it would likely lead to the reinsurers of these higher layers then challenging AIG's reallocation. In order to prevent such a destructive dynamic, the Second Circuit has determined that "follow the fortunes" extends to post-settlement allocation decisions. Travelers Cas., 419 F.3d at 189 ("Judicial review of either the settlement decision or the allocation decision 'has the equal likelihood of undermining settlement and fostering litigation'" (citations omitted)).

42

In fact, applying "follow the fortunes," the Second Circuit has already determined that where a cedent implemented a "rising bathtub" allocation for asbestos losses, the reinsurer had no basis to demand that the allocation be in accord with the cedent's pre-settlement exposure analysis: "the follow-the-settlements doctrine extends to a cedent's post-settlement allocation decisions, regardless of whether an inquiry would reveal an inconsistency between that allocation and the cedent's pre-settlement assessments of risk, as long as the allocation meets the typical follow-the-settlements requirements i.e., is in good faith, reasonable, and within the applicable policies." North River, 361 F.3d at 141.

Clearwater cannot meet its "extraordinary" burden to show that the requirements of North River are not met here. It is incontrovertible that nowhere do the Granite State Policies prohibit the use of a "rising bathtub" allocation. (Yoon Dec., Exs. 1 and 2; Wactlar Dec., Exs. 1 and 2.) Nor has Clearwater come forward with any documents or other evidence showing that AIG has acted in bad-faith by applying the "rising bathtub" allocation to its settlements. It was reasonable for AIG to use the "rising bathtub" allocation for a multitude of undisputed reasons, including:

- AIG regularly uses the "rising bathtub" method to allocate loss resulting from the settlement of multi-year asbestos claims because it is the simplest and most logical approach, (SUF, ¶ 43; Yoon Dec., ¶ 40; Wactlar Dec., ¶ 42);

- Clearwater itself recognizes that the "rising bathtub" method is used in the insurance industry, (Lasky Dec., Ex. 16, Chavez Tr. 66:11-16.);

- The "rising bathtub" was used in the Wellington Agreement to allocate **thousands** of asbestos claims, and thus indicates that the insurance industry as a whole recognized that this method was fair, equitable and appropriate, see North River Ins., 361 F.3d at 138, n. 6; and

- the Second Circuit has determined that the "rising bathtub" method is proper and reasonable *per se* for asbestos losses, see id. at 141-143.

Accordingly, Clearwater's objection to AIG's "rising bathtub" allocation is barred under "follow the fortunes" as a matter of law.

### (2)   *There Is No Basis For Clearwater To Re-Litigate The Exhaustion Issue*

As noted above, to properly attack a cedent's settlement determinations, the reinsurer must prove that the cedent's determinations were in bad faith, or that the cedent's actions had no reasonable basis. See North River, 52 F.3d at 1204. Put another way, under "follow the fortunes," to prevail on its exhaustion defense, Clearwater must make the "extraordinary" showing that AIG's decision to settle with Dresser and Federal Mogul was not even "arguably" proper given the fact that the carriers below Granite State did not pay 100 percent of their limits. This is a burden Clearwater cannot meet.

It is undisputed that by Dresser's estimates it was facing a total of $2.2 billion to $3.5 billion in unresolved current and future asbestos bodily-injury claims, (SUF, ¶ 28; Yoon Dec., ¶ 18, Ex. 5, at 2 Granite 001795), and Federal Mogul estimated that it was facing pending and future liabilities in the range of $523.9 million to approximately $1.8 billion, (SUF, ¶ 47; Wactlar Dec., ¶¶ 22-23, Ex. 6, at GS Confidential 000149). There were also $2.427 million of "approved" claims against Dresser -- at least $412 million of which related to its Worthington ($370 million) and ALCO ($42 million) operations. (SUF, ¶ 29; Yoon Dec., ¶ 19, Ex. 6, at GS Confidential 006624.)

Simon Yoon and Jeff Wactlar, the AIG claims handlers for the Dresser and Federal Mogul claims respectively, testified:

> I reviewed these estimates and other claims data provided by Dresser with my supervisor Chris Eskeland. From the information available, it was clear that the aggregate loss from Dresser claims would exhaust the limits of the policies

> underlying all of the AIG policies (including the Granite State Policies) as well as
> the limits of all the AIG policies. Thus, it was our judgment that, unless AIG
> obtained a judgment that there was no coverage, the full limits of the AIG policies
> -- $425.878 million -- would be payable.

(Yoon Dec., ¶ 20.)

*    *    *    *    *    *

> I reviewed these estimates and other claims data provided by Federal Mogul with
> my supervisor Steve Parness. From the information available, we concluded that
> the aggregate loss from Federal Mogul would exhaust the policies underlying
> Granite State's policies and, in our judgment, based on Federal Mogul's
> projections, approximately $121 million of the $151 million of total limits
> provided to Federal Mogul by AIG companies would be exhausted if the court in
> the New Jersey coverage action determined that New Jersey law governed the
> issue of allocation.

(Wactlar Dec., ¶ 24.)

AIG's decision to settle rather than litigate an exhaustion defense was clearly reasonable in light of Zeig and its progeny, discussed supra, at pp. 33-38, **which would have required** Granite State to pay under its policies regardless of whether the insurers below paid their full limits. The fundamental purpose of "follow the fortunes," therefore, would be violated if Clearwater were permitted to "second-guess" Granite State's good-faith settlement decision. See North River, 361 F.3d at 139-140 ("follow the fortunes" binds reinsurer to cedent's good faith interpretation of insurance terms and decisions to settle.)

Accordingly, Clearwater's exhaustion defense is barred under "follow the fortunes" as a matter of law.

## CONCLUSION

For the above reasons, Plaintiff, Granite State Insurance Company, respectfully requests that this Court grant summary judgment against Defendant, Clearwater Insurance Company, f/k/a/ Odyssey Reinsurance Corporation, f/k/a Skandia America Reinsurance Corporation, (a) awarding damages in the amount of $4,470,739.10 (together with prejudgment interest) for breach of contract under the two facultative certificates entered into between the parties and designated as Nos. C 26285 and C 27675; (b) declaring that Clearwater must promptly pay all future billings that arise under those contracts in connection with the AIG Dresser and Federal Mogul Settlements at issue in this litigation; and (c) such other and further relief as this Court deems proper.

Dated: New York, New York
      June 9, 2011

MOUND COTTON WOLLAN & GREENGRASS

By: _____

    Stuart Cotton (SC 7346)
    Robert Wilder (RW 3285)
    Matthew J. Lasky (ML 6666)

    One Battery Park Plaza
    New York, New York 10004
    (212) 804-4200
    *Attorneys for Plaintiff*
    *Granite State Insurance Company*

# APPENDIX A

# HANDBOOK OF REINSURANCE LAW

**Eugene Wollan**



ASPEN
PUBLISHERS

1185 Avenue of the Americas, New York, NY 10036
www.aspenpublishers.com

2003 SUPPLEMENT

- The terms of the contracts have regard to the time value of money. Future investment income is explicitly defined as a factor in the premium calculation.
- There may be limited risk transfer (especially of underwriting risk).
- There is a close connection between the cedent's own loss experience and the actual cost of reinsurance. This is because the profits or losses arising from the contract are shared between the reinsurer and the cedent to a substantial extent. Premiums may be refunded or additional premiums may become payable in the light of claims experience.[33]

### [7]   Reinsurance to Close

This specimen is indigenous to the Lloyd's market, where Syndicates normally operate on a three-year basis. In recent years, as a result of major catastrophes and mass tort developments, it frequently proved entirely impracticable to close the books after only three years because too many claims remained outstanding. Reinsurance to close was developed to circumvent this difficulty. It is simply reinsurance of the losses that are still open, with its terms based on the best estimates of outstanding liabilities.[34] It can also be used in a runoff situation, that is, to enable a Syndicate that is no longer writing business to close its books by transferring elsewhere its remaining claim liabilities.[35]

### [C]   Retrocession

Just as reinsurance is insurance of insurance, so retrocession is simply reinsurance of reinsurance:

Reinsurance is an agreement involving an insurer—known as the cedent or reinsured—who transfers certain risks it has assumed to a second insurer, known as the reinsurer. When this reinsurer in turn transfers this risk, the transaction is known as a retrocessional

---

[33] Omar Hameed, *Alternative Risk Transfer: Legal and Regulatory Issues,* 5 No. 7 Andrews Sec. Litig. & Reg. Rep. 10 (Dec. 8, 1999).

[34] Allen v. Lloyd's of London, 94 F.3d 923 (4th Cir. 1996); Long Island Lighting Co. v. Aetna Casualty & Surety Co., No. 96 Civ. 9664 (MBM), 1997 WL 567342 (S.D.N.Y. Sept. 11, 1997).

[35] *See* Millennium Petrochemicals, Inc. v. C. G. Jago, 50 F. Supp. 2d 654 (W.D. Ky. 1999).

agreement. The transferring reinsurer is known as a retrocedent; the assuming reinsurer is known as a retrocessionaire.[36]

## § 1.05    PORTFOLIO TRANSFERS

This kind of arrangement inhabits the borderline between true reinsurance and something else, perhaps best described in the words of recognized authorities on the business aspects of reinsurance:

> Two other types of reinsurance could reasonably fall under the rubric of proportional reinsurance: "portfolio reinsurance" and "fronting contracts." The simultaneous reinsurance of a defined group of policies already in force has been defined as "portfolio reinsurance." A separate and less common form of portfolio reinsurance arises when a reinsurer assumes the risk for all of a direct insurer's business, or all of one or more classes of the direct insurer's business, effectively substituting the reinsurer for the original insurer. This form of reinsurance usually arises when the reinsured is liquidating its business, whether voluntarily or involuntarily.[37]
>
> Under a type of contract called portfolio reinsurance, the reinsurer assumes liability for the reinsured's full book of business, or portfolio, or perhaps for one or more classes of the business. This will occur because the reinsured is liquidating its business, either perforce or voluntarily. In the absence of novations between the insureds and the reinsurer, the contract is one of true reinsurance, although the reinsurer will presumably take active control of claims and, for that reason, if no other, be treated for practical purposes as a direct insurer.[38]

## § 1.06    FRONTING ARRANGEMENTS

A fronting contract is, in essence, a validated fiction. The cedent issues its policies, which are then reinsured 100 percent or very close to it, with the cedent being paid a modest fee, often a very small percentage of the premium, for the use of its name and its "paper" (the policies). The most common reason for such an arrangement is that the reinsurer

---

[36] John Hancock Property & Cas. Ins. Co. v. Universale Reins. Co., Ltd., 147 F.R.D. 40, 42 (S.D.N.Y. 1993); Employers Ins. of Wausau v. Jackson, 190 Wis. 2d 597, 527 N.W.2d 681, *reconsideration denied*, 534 N.W.2d 88 (Wis. 1995).

[37] John S. Diaconis, *Introductory Comments and Basic Overview of Reinsurance Terms*, 793 PLI/Comm 7 (Practicing Law Institute Sept. 1999).

[38] Graydon S. Staring, Law of Reinsurance § 2:7, at 7 (1993).