UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
GRANITE STATE INSURANCE
COMPANY,

        Plaintiff,

        -against-

CLEARWATER INSURANCE COMPANY,
f/k/a ODYSSEY REINSURANCE
CORPORATION, f/k/a SKANDIA
AMERICA REINSURANCE
CORPORATION,

        Defendant.

Civil Action No.: 09 CV 10607 (RJH)

## DECLARATION OF SIMON YOON

I, **SIMON YOON**, pursuant to 28 U.S.C. § 1746, declare:

1. I submit this declaration in support of plaintiff, Granite State Insurance Company's, Motion for Summary Judgment.

2. I am currently a Complex Director for the Pollution Insurance Products Claims group of Chartis Claims, Inc.[1] During the period discussed in this declaration (2001-2005), I was a Claims Analyst in the Complex Claims Unit within the Toxic Tort Claims Department at American International Group, Inc. ("AIG") and then a Manager within that department.

3. Unless otherwise stated, the facts stated herein are based upon my personal knowledge or information gleaned from AIG's files.

---

[1] Chartis Claims, Inc. was formerly known as AIG Domestic Claims, Inc., which in turn was formerly known as AIG Technical Services, Inc. Since July of 2009, the property and casualty insurance subsidiaries of AIG have operated under the name "Chartis." An overwhelming majority of the documents and events relevant to this dispute pre-date that name change. For ease of reference, "AIG" is used for purposes of this declaration.

4. Granite State Insurance Company ("Granite State") is a Pennsylvania corporation with its principal place of business in New York, New York.

5. Granite State is a subsidiary of AIG. AIG is a Delaware corporation with its principal place of business in New York, New York.

6. C.V. Starr is a former AIG affiliate. C.V. Starr was an underwriting manager that issued certain policies of insurance on behalf of Granite State to the McGraw Edison Company ("McGraw Edison") that are involved in this action.

## Background

7. Starting in 2002, because of the multitude, complexity and escalating volume of asbestos claims being asserted under its policies, AIG centralized the claims handling and adjusting activities for all asbestos claims involving various AIG insurance companies, including Granite State, into AIG's Toxic Tort Claims Department. The Complex Claims Unit within that department, which I joined in late 2002 or early 2003, was responsible for the asbestos claims concerning DII Industries, LLC, as successor in interest to Dresser Industries, Inc. ("Dresser").

## Insurance Policies

8. Between 1980 and 1984, Granite State issued four insurance policies to McGraw Edison, including the two policies at issue in this dispute, Granite State policy No. 6680-1963 and Granite State policy No. 6681-2370 (collectively, "Granite State Policies"). Granite State policy No. 6680-1963 provided excess liability insurance to McGraw Edison for the period March 1, 1980 through March 1, 1981, specifically $10 million of coverage as part of an insurance layer of $25 million excess of $25 million. A true and correct copy of Granite State policy No. 6680-1963 from AIG's Dresser claim file is attached as Exhibit 1. Underlying this policy was a Northbrook Insurance Company policy and a U.S. Fire Insurance Company policy.

(See Ex. 1, at Granite State 000690, "Item 2".) Granite State policy No. 6681-2370 provided excess liability insurance to McGraw Edison for the period March 1, 1981 through March 1, 1982, specifically $15 million of coverage as part of an insurance layer of $25 million excess of $25 million. A true and correct copy of Granite State policy No. 6681-2370 from AIG's Dresser claim file is attached as Exhibit 2. Underlying this policy was a U.S. Fire Insurance Company policy and a First State Insurance Company policy. (See Ex. 2, at Granite State 000508, "Item 2".)

### The Dresser and Federal Mogul Lines Of Business

9. In late 2002 or early 2003, I became responsible for handling the Dresser asbestos claims. In that capacity, I prepared a series of claims status reports, including Exhibit 3 to this declaration which is a true and correct copy of my "Updated Format Report" dated January 21, 2004.

10. As reflected in that report, Dresser became exposed to significant asbestos-related liabilities stemming from the operations of a number of its divisions and businesses as a result of a number of acquisitions and related corporate transactions over the years, including its 1967 acquisition of Harbison-Walker Refractories Company ("Harbison-Walker"), its 1985 assumption of the assets and liabilities of Atlantic Locomotive Company ("ALCO"), and its 1996 assumption of the assets and liabilities of Studebaker-Worthington, Inc. ("S-W"), a successor-in-interest to the Worthington Company ("Worthington"). (See Ex. 3, at Granite State 005479-5480.) Dresser, in turn, was acquired by Halliburton Company ("Halliburton") in 1998. (Id., at 005479)

11. As also reflected in Exhibit 3, in 1967, S-W purchased the stock of the Wagner Electric Corporation ("Wagner"). (See Ex. 3, at Granite State 005479-5480.) At one point,

3

ALCO, S-W and Wagner all operated as indirect subsidiaries of McGraw Edison. (Id., at 005479) In 1985, however, these corporate operations split into two branches, the Dresser branch (which included the ALCO and Worthington operations) and the Federal-Mogul Products, Inc. ("Federal-Mogul") branch (which included the Wagner operations).[2] (Id.)

12. Dresser[3] sought coverage under certain policies issued to McGraw Edison, including the Granite State Policies at issue here, in connection with asbestos liabilities arising from the ALCO locomotive parts operations and the Worthington pump and compressor operations. (See Ex. 3, at Granite State 005479-5481, 005483.)

13. Federal Mogul sought coverage under the same policies issued to McGraw Edison, including the Granite State Policies at issue here, in connection with asbestos liabilities arising from Wagner's brakes operations. (See Ex. 3, at Granite State 005479-5480, 005483.)

14. My January 21, 2004 Status Report (Exhibit 3 hereto) reflects my determination by that time that the total limits of coverage available to Dresser under AIG company policies were $550.878 million. (See Ex. 3, at Granite State 005480-5481.)

## The Coverage Actions

15. As of January 21, 2004, Dresser and Harbison-Walker had both filed for bankruptcy, and there were several pending insurance coverage actions in bankruptcy courts and state courts regarding insurance coverage for Dresser asbestos-related claims under policies

---

[2] In 1985, Cooper Industries ("Cooper") purchased the Wagner Division from McGraw Edison. In 1997, Wagner merged into Cooper's subsidiary Moog Automotive, which was then purchased by Federal-Mogul, Inc. in 1998 and was renamed Federal-Mogul Products, Inc. (See Ex. 3, at Granite State 005480.)

[3] For simplicity, unless otherwise specified, I will refer to "Dresser" as including and incorporating the various Dresser-related entities and divisions whose insurance coverage was resolved by the settlement described below.

4

issued to McGraw Edison by Granite State and other insurers.[4] (See Ex. 3, at Granite State 005478, 005481-005483.)

16. By agreement dated November 4, 2004, Dresser and Federal Mogul agreed to partition the limits of all the policies issued to McGraw Edison (as well as those issued to S-W). Dresser and Federal Mogul were each given access to fifty percent of the unexhausted aggregate limits of the policies. Exhibit 4 to this declaration is a true and correct copy of this agreement ("Partitioning Agreement").

17. Accordingly, as of November 4, 2004, my understanding was that the total limits available to Dresser under policies issued by AIG companies were approximately $425.878 million (the $550.878 million in limits noted in paragraph 14 above, less the approximately $125 million in limits that were made available to Federal Mogul under the Partitioning Agreement).

### AIG's Analysis of Dresser's Asbestos Liability

18. Dresser estimated its exposure for unresolved pending and future asbestos bodily-injury claims was in the range of $2.2 billion to $3.5 billion in ultimate (i.e. nominal) payments. See August 7, 2002 Report titled "Estimated Number And Value Of Current And Future Asbestos Bodily Injury Claims Against DII Industries, LLC and Kellogg, Brown and Root, Inc., Subsidiaries of Halliburton Company" ("Rabinovitz Report"), a true and correct copy of which is attached as Exhibit 5. (Ex. 5, at 2 Granite 001795.)

---

[4] The various bankruptcy proceedings and coverage actions included: In re: Global Industrial Technologies, Inc., Case No. 02-21626-JKF (Bankr W.D. Pa); In re Mid-Valley, Inc. et al., Case No. 03-35592-JFK (Bankr W.D. Pa); Harbison-Walker Refractories Co. v. Dresser Industries, Inc., et al. (In re: Global Industrial Technologies, Inc.), Adv. No. 02-2151 (Bankr. W. D. Pa); Dresser Indus., Inc. v Alba General Ins. Co., et al. (In re: Global Industries Technologies, Inc.), Adv. No. 03-03072 (Bankr W.D. Pa); DII Industrial, LLC v. Federal-Mogul Prods., Inc., et al. (In re: Federal-Mogul Global, Inc.), Adv. No. 01-09018 (Bankr D. Del.); Kellogg Brown & Root, Inc. v. AIU Ins. Co., et al., No. 2003-03653 (Dist. Ct., Harris Cty., Texas); Sanchez v. Cooper Indus., et al., No. 97 Civ. 1569 (D.N.M.), transferred, MDL No. 875 (E.D. Pa); and ACE Property & Cas. Ins. Co., et al., v. DII Industries, LLC et al., No. 118591/03 (N.Y. Sup. Ct., N.Y. Cty.) (collectively, the "Dresser Actions"). (See Ex. 9, infra, at 2 Granite 000115 and 000117.)

19. In the context of a court-ordered mediation, Dresser provided AIG with its "DII Industries, LLC Projections of Product Identification," dated January 26, 2004. A true and accurate copy of this document is attached hereto as Exhibit 6. The trustee in bankruptcy reported that, as of December 29, 2003, there were $2.427 billion of "approved" claims against Dresser, **at least** $412 million of which arose from its Worthington ($370 million) and ALCO ($42 million) operations and were therefore covered by the Granite State Policies issued to McGraw Edison. (Ex. 6, at GS Confidential 006624.) At the same time, Dresser was projecting that, under the terms of the reorganization plan, the total amount of Worthington and ALCO allowed claims would multiply significantly. (Ex. 6, at GS Confidential 006625-006630)

20. I reviewed these estimates and other claims data provided by Dresser with my supervisor Chris Eskeland. From the information available, it was clear that the aggregate loss from Dresser claims would exhaust the limits of the policies underlying all of the AIG policies (including the Granite State Policies) as well as the limits of all the AIG policies. Thus, it was our judgment that, unless AIG obtained a judgment that there was no coverage, the full limits of the AIG policies -- $425.878 million -- would be payable.

21. Based on the facts developed in the course of the underlying actions by asbestos claimants against Dresser, we were aware of the existence of potential coverage defenses. However, at the time we were seeking to resolve the Dresser coverage claims, it was evident that the case presented a substantial risk of a policy limits loss. We concluded that settlement was preferable to the risk of litigating policy-by-policy coverage defenses. In that regard, the increasing rate at which asbestos claims were being asserted against Dresser and the real likelihood of a policy limits loss strongly militated in favor of compromise; we concluded that a settlement at a significant discount off of AIG's combined policy limits would be a very

favorable result.

### Mediation

22. AIG participated along with numerous other domestic insurance companies in the Dresser Bankruptcy mediation as part of the "Dresser Domestic Carrier Group," whose goal was to reach agreement with Dresser on a sum which was sufficient to resolve all of the carriers' liabilities under their numerous implicated insurance policies.

23. AIG was aware from prior experience that Dresser's urgent need for a Section 524(g) channeling injunction from the bankruptcy court presented a one-time opportunity to settle with Dresser at a significant discount.

24. The Dresser Domestic Carrier Group worked with NERA Economic Consulting ("NERA") to facilitate the calculation of each individual carrier's contribution to various global settlement offers that were made to Dresser in the mediation. NERA did not, to my knowledge, perform any substantive coverage analysis. Its role was limited to modeling exposure scenarios based on various combinations of criteria and assumptions proposed by the carriers, such as Dresser's potential liability, potential discount factors accounting for differing policy language which might support various coverage defenses, and alternative payout periods.

25. To my knowledge, none of the documents generated by NERA were disclosed to Dresser until after a final global settlement value was ultimately reached. Further, it was my understanding that Dresser was never provided with a policy-by-policy breakdown of each carrier's contribution to the global settlement.

26. It was never my intention or expectation that the documents generated by NERA would have any impact on AIG's internal allocation of the final loss amount agreed upon in settlement.

7

### The Domestic Carrier Settlement

27. In early May, 2004, the Dresser Domestic Carrier Group proposed a global settlement based on a net present value ("NPV") of $624,984,393. AIG's share of that amount was $173,620,556.

28. That figure proved to be acceptable to Dresser, and the parties reached an agreement in principle to enter into a global settlement agreement for a NPV payment of that amount.

29. The amount that each member of the Dresser Domestic Carrier Group agreed to contribute to that offer is reflected in a spreadsheet prepared by NERA, a true and correct copy of which is attached as Exhibit 7 to this declaration ("NERA Exposure Table"). The amounts listed in the NERA Exposure Table reflect the exposure factors discussed above in paragraph 24. To my knowledge, this document was not disclosed to Dresser.

30. While the NERA Exposure Table (Exhibit 7 hereto) presents both NPV figures and nominal figures reflecting payment over a six year period for carriers that were not part of the AIG group, because AIG made it clear to all concerned that it intended to negotiate a longer payout period with Dresser, the NERA Exposure Table provides: "The precise form and payment schedule for AIG's agreed NPV payment obligation will be determined on terms acceptable to [Dresser] and AIG." (Ex. 7, at 2 Granite 001835 and 001838, n. 2.)

31. On or about November 12, 2004, Dresser and the Dresser Domestic Carrier Group (with the exception of AIG) entered into a Settlement Agreement and Release ("Participating Carriers' Settlement") memorializing their settlement. A true and correct copy of the Participating Carriers' Settlement is attached as Exhibit 8.

32. U.S. Fire Insurance Company, Northbrook Insurance Company and First State

Insurance Company -- the carriers that issued the policies underlying the Granite State Policies -- were parties to the Participating Carriers' Settlement. (Ex. 8, at 2 Granite 00290-291). These carriers received policy releases from Dresser. (Ex. 8, at 2 Granite 00211, 00214-215, 00218-219, 000287-289).

### The AIG Dresser Settlement

33. AIG and Dresser ultimately entered into a separate settlement agreement and integrated assignment agreement pursuant to which AIG agreed to pay $262,202,864 over ten years to extinguish all of its past and future liability to Dresser.

34. AIG had advised Dresser early in the negotiations that it required a long payment stream for its settlement obligations. However, Dresser wanted to receive as much cash as possible immediately in order to fund its Section 524(g) Bankruptcy Trust. Ultimately, Dresser agreed to settle on the basis of an extended payment stream from AIG, on the condition that it would be permitted to sell its right to future payments for an immediate lump sum payment of $173,620,556 (the NPV of AIG's share of the Dresser Domestic Carrier settlement). This was implemented by way of an Assignment Agreement between Dresser and Lehman Brothers ("Lehman"),[5] whereby Lehman purchased Dresser's right to receive the stream of settlement payments from AIG.

35. AIG and Dresser formally executed their Settlement Agreement and Release on or about November 12, 2004 ("AIG Dresser Settlement"). A true and correct copy of the AIG Dresser Settlement is attached as Exhibit 9.

36. By the terms of that agreement, AIG would be making "a stream of payments over time" in exchange for a full policy buy-back extinguishing all past and future liability under the

---

[5] While the Assignment Agreement is technically between Dresser and the HDK Purchaser Trust, it is my understanding that this was a trust created by Lehman Brothers for purposes of this transaction.

9

policies. The Assignment Agreement, pursuant to which Lehman purchased Dresser's right to receive the AIG settlement payments, was made a part of the AIG Dresser Settlement, and is attached to that agreement as Exhibit 7. (See Ex. 9, at 2 Granite 00185-208.)

37.     Using $173,620,556 as the NPV for the 10-year payment stream, AIG and Lehman negotiated the payment schedule pursuant to which AIG was to pay Lehman. Exhibit 10 hereto is a true and correct copy of the agreed payment schedule by which AIG has paid, and is continuing to make payments to Lehman.

### Allocation of the Dresser Loss

38.     When AIG settles complex claims, it is frequently necessary to allocate the resulting loss to more than one policy. Allocation is required for a host of important, internal business reasons and a methodology is chosen without considering the potential impact on AIG's potential reinsurance recovery.

39.     Once the actual loss to the AIG companies was fixed by the final settlement, I asked Jeff Genereux of Alan Gray, Inc.[6] to allocate the Dresser loss to the various AIG company policies using the "rising bathtub" method. I did not consider the impact of this approach on AIG's potential reinsurance recoveries.

40.     AIG customarily uses the "rising bathtub" method to allocate loss resulting from the settlement of complex asbestos claims because it is widely recognized in the industry and it is the simplest and most logical approach.

41.     Exhibit 11 is a true and correct copy of the "rising bathtub" allocation of the AIG Dresser Settlement prepared by Jeff Genereux.

42.     The "rising bathtub" allocation was used to determine and schedule payments by

---

[6] Alan Gray, Inc. is an insurance services firm that was hired by AIG. Alan Gray, Inc. put together the "rising bathtub" allocation for AIG, which is really a mechanical task that Alan Gray, Inc. has performed on a number of occasions.

Case 1:09-cv-10607-RKE-DCF   Document 48   Filed 06/09/11   Page 11 of 11

the AIG member companies. Because Dresser had assigned AIG's settlement payments, AIG makes the payments to Lehman Brothers.

43. In early 2005, responsibility for handling the Dresser claim file was transferred to Leticia Diaz.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 7, 2011
Jersey City, NJ

_____
Simon Yoon

11