# EXHIBIT 9A

EXECUTION COPY

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release ("Agreement") is hereby made and entered into by and among Halliburton Company, DII Industries, LLC and Kellogg Brown & Root, Inc., on the one hand, and AIU Insurance Company, American Home Assurance Company, Birmingham Fire Insurance Company, Granite State Insurance Company, Insurance Company of the State of Pennsylvania, Landmark Insurance Company, Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, New Hampshire Insurance Company, and L'Union Atlantique D'Assurances S.A. (collectively, the "AIG Companies"), on the other hand.

### RECITALS

WHEREAS, the AIG Companies issued certain insurance policies, under which Releasing Policyholders claim to be insured; and

WHEREAS, numerous asbestos-related and silica-related Claims have been asserted against the Releasing Policyholders; and

WHEREAS, the AIG Companies and the Releasing Policyholders are parties to one or more pending Coverage Actions involving the Buyback Policies; and

WHEREAS, the AIG Companies and the Releasing Policyholders disagree as to their respective rights and obligations with respect to insurance coverage under the Buyback Policies; and

WHEREAS, on December 16, 2003, DII Industries, LLC, Kellogg Brown & Root, Inc., and other of their Affiliates filed the Chapter 11 Case and DII Industries, LLC and Kellogg Brown & Root, Inc. continue to operate their respective businesses as debtors and debtors-in-possession; and

WHEREAS, the AIG Companies have raised and filed certain objections in the Chapter 11 Case to the Plan and other matters; and

WHEREAS, each Party, without admitting in any way the validity of the positions or arguments advanced by any of the other Parties, now wishes to, inter alia, (1) compromise and resolve fully and finally, without admission or further adjudication of any issue of fact or law, without limitation in time, any and all Coverage Disputes between them concerning the Buyback Policies, (2) terminate any and all past, present and future obligations whatever of the Parties arising under or in any way relating to the Buyback Policies and with respect to Asbestos Claims and Silica Claims under the Post-1992 Policies, and to do so in accordance with the terms of this Agreement, (3) terminate all Coverage Actions between or among the Parties, (4) resolve certain other disputes between or among them, including in the Chapter 11 Case; (5) the Parties agreed to the concept of a stream of payments over time; (6) Releasing Policyholders agreed to accept a payment of the Payment Amount to DII; (7) the AIG Companies agreed to cause to be paid to DII the Payment Amount to DII in accordance with the terms hereof; (8) subject to the terms of this Settlement Agreement, the AIG Companies agreed



2 Granite 000112

to have the Purchaser pay the Payment Amount to DII, and Releasing Policyholders agreed to the Purchaser's payment of the Payment Amount to DII, in each case in connection with all of the transactions described below that comprise the Transactions (as defined in the Approval Order); provided, however, that, subject to the terms of this Settlement Agreement; and

WHEREAS, the Transactions referred to above consist of, *inter alia*, the following transactions: (1) the payment to DII by the Purchaser of the Payment Amount pursuant to this Settlement Agreement; (2) the entry into an agreement by the Releasing Policyholders and the Purchaser in the form attached hereto as Exhibit 7 (the "Assignment Agreement"), pursuant to which Releasing Policyholders assign to the Purchaser all of each of their right, title and interest in and to a stream of payments to be made over time by the AIG Companies and to be agreed upon between the AIG Companies and the Purchaser (the "AIG Settlement Payments"), unencumbered by any security interests, liens or other encumbrances, claims or interests of any nature, (3) the Parties' entry into this Settlement Agreement, and (4) the Parties' entry, as set forth herein, into releases of various matters and the designation of the AIG Companies as Settling Asbestos/Silica Insurance Company to obtain the benefit of the channeling injunction and releases set forth in Section 10.3 and in this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein and intending to be legally bound hereby, the Parties hereby agree as follows:

## I.   Definitions and Incorporation of Recitals

A.   The Parties agree that all of the Recitals in this Agreement are expressly incorporated herein, are made an integral part of this Agreement, and are binding on the Parties, as applicable, now and hereafter.

B.   The following definitions apply to the capitalized terms herein wherever those terms appear in this Agreement, including the prefatory paragraph, recitals, the sections below and any attachments hereto. Capitalized terms that are not otherwise defined in this Agreement shall have the meanings designated in the Uniform Glossary of Defined Terms for Plan Documents (the "Glossary") filed with the Bankruptcy Court on May 17, 2004. Moreover, each defined term stated in the singular shall include the plural and each defined term stated in the plural shall include the singular. The word "including" means "including without limitation."

C.   For purposes of this Agreement, the following terms shall have the following definitions:

1.   "Affiliate" means, when used with reference to a specific Entity, any Entity that, directly or indirectly, or through one or more intermediaries, Owns or Controls, is Owned or Controlled by, or is under common Ownership or common Control with, such specific Entity.

2.   "Agreement" means this Settlement Agreement and Release.

3.   "AIG Companies" means those insurers that are identified in the preamble to this Agreement.

4.   "AIG Policies" means the insurance policies of the AIG Companies that are identified on Exhibit 2 to this Agreement.

2

2 Granite 000113

5.     "AIG Settlement Payments" shall have the meaning ascribed to such term in the defined in Exhibit 3 to this Agreement.

6.     "Approval Order" means an order of the Bankruptcy Court issued pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, and Sections 105, 363 and 524 of the Bankruptcy Code as well any other provision of the Bankruptcy Code or Rules as may be appropriate, as the Bankruptcy Court may order, approving this Agreement and authorizing Debtors to undertake the settlement and the transactions contemplated by this Agreement. The Approval Order also shall approve and authorize (a) the sale to and purchase by the AIG Companies under section 363(f) of the Bankruptcy Code of Policyholders' rights and interests in the Buyback Policies, and (b) the sale to and purchase by the Purchaser under section 363(f) of the Bankruptcy Code of Policyholders' rights and interests in the AIG Settlement Payments, in each case free and clear of all claims, liens, and interests of third parties, with any such claims, liens, and interests attaching to the proceeds of the sale. The Approval Order further shall contain a finding that the AIG Companies purchased Policyholders' rights and interests in the Buyback Policies in good faith entitling the AIG Companies to the benefits of section 363(m) of the Bankruptcy Code. The Parties shall use their best efforts to obtain an order in the form attached as Exhibit 1, which order includes an appropriate injunction in the Released Carriers' favor, enjoining claims against the Released Carriers relating to or arising out of the Buyback Policies. The Approval Order also shall provide that this Agreement is an Asbestos/Silica Insurance Settlement Agreement, entitling the Released Carriers to the Asbestos/Silica Insurance Company Injunction pursuant to 11 U.S.C. §§ 105 and 524(g). The Approval Order shall be in the form of Exhibit 1 hereto or such other order that is in form and substance reasonably acceptable to Policyholders, the AIG Companies and the Purchaser.

7.     "Asbestos Claims" means Asbestos PI Trust Claims and Asbestos Property Damage Claims.

8.     "Assignment Agreement" shall have the meaning ascribed to such term in the recitals to this Agreement.

9.     "Assignment Agreement Effective Date" shall have the meaning ascribed to such term in the Assignment Agreement.

10.    "Baroid Claims" means any and all Claims related to, or arising out of, the operations, activities or products manufactured and/or distributed by Baroid Corporation and/or any predecessor Entity of the Baroid Drilling Fluids division of Halliburton Energy Services, Inc., a Delaware corporation, including those Claims described on page 23 of the Disclosure Statement. "Baroid Claims" include without limitation Claims by any Entity, including other insurers, for indemnity, contribution or subrogation based on an obligation related to, or arising out of, insurance policies alleged to cover such operations, activities or products. '

11.    "Business Day" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by law to be closed in the State of New York.

12.    "Buyback Policies" means the AIG Policies and the Other Coverages.

3

2 Granite 000114

13.     "Chapter 11 Case" means the Chapter 11 bankruptcy cases filed December 16, 2003, by Mid-Valley, Inc., DII Industries, LLC, Kellogg Brown & Root, Inc., KBR Technical Services, Inc., Kellogg Brown & Root Engineering Corporation, Kellogg Brown & Root International, Inc. (a Delaware corporation), Kellogg Brown & Root International, Inc. (a Panamanian corporation), and BPM Minerals, LLC in the United States Bankruptcy Court for the Western District of Pennsylvania, *In re Mid Valley, Inc., et al.*, Case Nos. 03-35592-JKF, jointly administered.

14.     "Claim" means any past, present or future claim, demand, suit, action, cause of action, obligation, or liability of any nature whatever (including interest of any kind), known or unknown, anticipated or unanticipated, fixed or contingent, accrued or unaccrued, matured or unmatured, which has been or may be asserted by or on behalf of any Entity, including a cross claim, counterclaim, third-party claim, right, request, suit, lawsuit, administrative proceeding, notice (including Potentially Responsible Party notice or its equivalent), arbitration, cause of action or order, including any "claim" as that term is defined in section 101(5) of the United States Bankruptcy Code and any "demand" as that term is defined in section 524(g)(5) of the Bankruptcy Code.

15.     "Control" means the direct or indirect power to direct, or cause the direction of, the management or affairs of an Entity.

16.     "Coverage Action" means each and every pending Asbestos/Silica Insurance Action, including the lawsuits captioned: *Harbison-Walker Refractories Co. v. Dresser Industries, Inc., et al. (In re Global Industrial Technologies, Inc.)*, Adv. No. 02-2151 (Bankr. W.D. Pa.); *Dresser Indus., Inc. v. Alba General Ins. Co., et al. (In re Global Industrial Technologies, Inc.)*, Adv. No. 03-03072 (Bankr. W.D. Pa.); *DII Industries, LLC v. Federal-Mogul Prods., Inc., et al. (In re Federal-Mogul Global, Inc.)*, Adv. No. 01-09018 (Bankr. D. Del.); *Kellogg Brown & Root, Inc. v. AIU Ins. Co., et al.*, No. 2003-03653 (Dist. Ct., Harris Cty., Texas); *Sanchez v. Cooper Indus., et al.*, No. 97 Civ. 1569 (D. N.M.), transferred, MDL No. 875 (E.D. Pa.); and *ACE Property & Cas. Ins. Co., et. al. v. DII Industries, LLC, et. al.*, No. 118591/03 (N.Y. Sup. Ct., N.Y. Cty.).

17.     "Coverage Dispute" means all disagreements between the AIG Companies and Releasing Policyholders as to their respective rights and obligations with respect to insurance coverage under the Buyback Policies.

18.     "Current Affiliates" means (i) the Halliburton Entities, (ii) each of their present and future parents, subsidiaries, Affiliates, successors, Controlled Entities and assigns, (iii) each of their respective predecessors, assigns, officers, directors and employees, and (iv) any of those Entities' (and their predecessors') former Affiliates, assigns, officers, directors, or employees not included within the definition of Past Affiliates.

19.     "Defense Costs" means fees, expenses and costs incurred in the investigation and defense of Claims.

4

2 Granite 000115

20.     "Due Diligence Materials" means the claim submission materials, including documentation of medical and exposure criteria, required by the Asbestos Claimant Settlement Agreements, as set forth in the Plan.

21.     "Effective Date" means, as to each Party, the date that such Party executes the Agreement, provided that each of the Policyholders has executed the Agreement.

22.     "Entity" means any person, individual, partnership, corporation, limited liability company, joint venture company, partnership, joint stock company, estate, trust, unincorporated association, association, joint stock company, joint venture, estate, trust, unincorporated organization, governmental or any political subdivision thereof, the United States Trustee, or other Entity or being of whatever kind, whether or not operating or existing for profit, including any "person" as such term is defined in section 101(41) of the Bankruptcy Code.

23.     "Federal-Mogul" means Federal-Mogul Products, Inc.

24.     "Federal-Mogul ACC" means the official committee of asbestos claimants appointed by the office of the United States Trustee in the Federal-Mogul Bankruptcy on or about October 24, 2001 and January 7, 2002.

25.     "Federal-Mogul Bankruptcy" means the Chapter 11 bankruptcy cases filed October 1, 2001, by Federal-Mogul and others in the United States Bankruptcy Court for the District of Delaware, *In re Federal-Mogul Global Inc., T&N Limited, et al.,* Case Nos. 01-10578-RTL ( jointly administered).

26.     "Federal-Mogul Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Federal-Mogul Bankruptcy.

27.     "Federal-Mogul Future Claimants Representative" means the legal representative for future asbestos-related personal-injury claimants appointed by the Federal-Mogul Bankruptcy Court on or about February 11, 2002.

28.     "50/50 Vertical Partition Order" means an order of the Bankruptcy Court that becomes a Final Order approving (1) a vertical partition of each Buyback Policy issued to Studebaker-Worthington and in effect during the period January 1, 1968 to March 1, 1980, and each Buyback Policy issued to McGraw-Edison and in effect during the period March 1, 1980 to March 1, 1986, pursuant to which 50% of all remaining aggregate limits of any such policy (for all coverages) will be partitioned vertically to DII Industries and the remaining 50% of the aggregate limits will be partitioned vertically to other Entities, as set forth in the Partitioning Agreement, and (2) a fifty percent reduction of all other limits, if any, under each such policy, including a fifty percent reduction of any and all per occurrence limits.  Nothing in this paragraph, however, shall be an admission that any of the policies have additional or separate sets of limits of liability and the Agreement shall not be used to imply or to argue that separate sets of limits of exist for any Buyback Policy.

29.     "Funding Effective Date" means the fifteenth day after the date on which all of the conditions precedent set forth in Section II below have been satisfied or waived and DII Industries has provided written notice to the AIG Companies that all of those conditions

2 Granite 000116

precedent have been satisfied or waived, and if such date is not a Business Day, the first Business Day thereafter.

30.     "Halliburton Entities" means each of (a) Halliburton Company, (b) the Debtors, (c) the Halliburton Current Affiliates (as defined in the Glossary), and (d) the present and former directors, officers, agents, attorneys, accountants, consultants, financial advisors, investment bankers, professionals, experts, and employees of any of the foregoing, in their respective capacities.

31.     "Harbison-Walker Bankruptcy" means the Chapter 11 bankruptcy case filed by Harbison-Walker and others in the United States Bankruptcy Court for the Western District of Pennsylvania, *In re: Global Industrial Technologies, Inc., et al*, Case No. 02-21626-JKF (jointly administered).

32.     "Harbison-Walker Bankruptcy Court" means the United States Bankruptcy Court for the Western District of Pennsylvania having jurisdiction over the Harbison Walker Bankruptcy.

33.     "Harbison Walker Order" has the meaning given in Section 2.1(G) of this Agreement.

34.     "Indemnifying Policyholders" has the meaning given in Section 5.1(A) of this Agreement.

35.     "Indemnified Claim" means any Claim identified in Section 5.1.A or 5.1.B.

36.     "Kellogg Brown & Root" means, Kellogg Brown & Root, Inc., KBR Technical Services, Inc., Kellogg Brown & Root Engineering Corporation, Kellogg Brown & Root International, Inc., a Delaware corporation, Kellogg , Brown & Root, International, Inc., a Panamanian corporation, Kellogg Brown & Root Services, Inc. and Mid-Valley, Inc.

37.     "McGraw-Edison" means McGraw Edison Company.

38.     "NL Industries" means NL Industries, Inc., National Lead Company, Abroad Company, and their respective predecessors, successors, and Affiliates.

39.     "Non-AIG Participating Carriers" has the meaning given in Section 6.1 of this Agreement.

40.     "Other Coverages" means all insurance policies and coverages not set forth on Exhibit 2 of this Agreement, known or unknown, issued or allegedly issued for policy periods incepting prior to or on December 31, 1992 by a Released Carrier to any of the Releasing Policyholders, or under which any Releasing Policyholder claims or may claim to be entitled to insurance coverage or benefits, including, without limitation, any such insurance policies issued to Abroad Corporation, American Locomotive Company, ALCO Products Incorporated, Baroid Corporation, Brown & Root, Inc., Dresser Industries, Inc., Dresser Industries, Halliburton Company, Harbison-Walker Refractories Company (a Pennsylvania corporation), Manning, Maxwell & Moore, McGraw-Edison, National Lead Company, NL Industries, Inc., Reed

6

2 Granite 000117

Rollerbit Company, Studebaker Corporation, Studebaker-Worthington, Inc., Worthington Corporation, Worthington Pump & Machinery Corporation, Worthington Foundation, any of the Halliburton Entities, and/or any Entity identified in Exhibit G to the Disclosure Statement. The term "Other Coverages" shall include (a) all of the coverage programs and insurance policies identified in Plan Exhibit 1, (b) any policies at issue in any Coverage Action and (c) any settlement agreements, coverage-in-place agreements and any other agreements between any Released Carrier and any Releasing Policyholder relating to the AIG Policies and/or any of the policies or coverages described in this Section I.C.34. "Other Coverages" shall not, however, include policies, coverages or settlement agreements issued by an Entity that is not a Released Carrier, but which Entity was acquired or is acquired by a Released Carrier after July 1, 2004. In addition, "Other Coverages" shall not include policies, coverages or settlement agreements issued to an Entity that is not a Halliburton Current Affiliate, but which Entity was acquired or is acquired by a Halliburton Current Affiliate after July 1, 2004; provided, however, that this exception shall not apply to any policies, coverages or settlement agreements otherwise included within the definition of "Other Coverages" as of the Effective Date.

41.    "Own" or "Ownership" means to own, or possess beneficial ownership of, more than fifty percent (50%) of the equity securities or interest of the Entity, but only so long as such ownership continues.

42.    "Parties" means the AIG Companies and Policyholders.

43.    "Partitioning Agreement" means the agreement between, among others, the AIG Companies, Dresser Industries, Federal-Mogul, Cooper Industries, Inc., and certain Non-Participating Insurers, dated November 4, 2004, relating to the 50/50 Vertical Partition Order.

44.    "Past Affiliates" means the Halliburton Entities' (and their predecessors') former parents, former subsidiaries, former Affiliates, former controlled entities, or assigns and the successors to any former parent, former subsidiary, former Affiliate, former controlled entity or assign, and their respective officers, directors and employees; provided, however, that the term "Past Affiliates" shall not include (i) any successors to any Entity that currently is an Affiliate of any Halliburton Entity or (ii) any Entity whose corporate existence ceased (through dissolution, merger, bankruptcy, name change, corporate restructuring or otherwise) while that Entity still was an Affiliate of any Halliburton Entity or any of its predecessors.

45.    "Payment Amount" shall have the meaning ascribed to such term in Exhibit 3 hereto.

46.    "Plan" means Debtors' Fourth Amended Joint Prepackaged Plan of Reorganization dated May 17, 2004 for Mid-Valley, Inc., DII Industries, LLC, Kellogg Brown & Root, Inc., KBR Technical Services, Inc., Kellogg Brown & Root Engineering Corporation, Kellogg Brown & Root International, Inc. (a Delaware corporation), Kellogg Brown & Root International, Inc. (a Panamanian corporation), and BPM Minerals, LLC Under Chapter 11 of the United States Bankruptcy Code, as confirmed by the Bankruptcy Court by order entered on or about July 16, 2004, and as affirmed by the District Court on July 26, 2004.

2 Granite 000118

47.    "Policyholders" means Halliburton Company, DII Industries LLC and Kellogg Brown & Root.

48.    "Post-1992 Policies" means all insurance policies and coverages incepting after December 31, 1992, known and unknown, issued to or allegedly issued to the Releasing Policyholders, or under which the Releasing Policyholders may claim to be insured or entitled to benefits. "Post-1992 Policies" shall not, however, include policies issued by an Entity that is not a Released Carrier, but which Entity was acquired or is acquired by a Released Carrier after July 1, 2004. In addition, "Post 1992 Policies" shall not include policies issued to an Entity that is not a Halliburton Current Affiliate, but which Entity was acquired or is acquired by a Halliburton Current Affiliate after July 1, 2004; provided, however, that this exception shall not apply to any policy otherwise included within the definition of "Post 1992 Policies" as of the Effective Date.

49.    "Purchaser" means a financial institution, trust or other vehicle that holds financial assets that is acceptable to the AIG Companies.

50.    "Released Carriers" means the AIG Companies and all of their past, present and future parents, subsidiaries, Affiliates, managed entities, predecessors, successors, assigns, officers, directors, agents, attorneys and employees.

51.    "Releasing Policyholders" means (i) Policyholders, (ii) Current Affiliates and (iii) Past Affiliates.

52.    "Required Actions" means all obligations of an AIG Company to cause to be made a cash contribution to DII Industries in the amount and on the date identified in Exhibit 3.

53.    "Silica Claims" means Silica PI Trust Claims and Silica Property Damage Claims.

54.    "Studebaker-Worthington" means Studebaker-Worthington, Inc.

55.    "Vertical Partition Non-Products Coverage Claim" means a Claim by any Entity under any Buyback Policy issued to Studebaker-Worthington or McGraw-Edison for insurance coverage for underlying Defense Costs and/or indemnity costs relating to an underlying Claim that is not subject to an aggregate limit in the Buyback Policy.

8

2 Granite 000119

II.    Conditions Precedent to Required Actions, Releases and Indemnification

2.1.    Unless waived by the Parties in writing as provided in Section 2.2 of this Agreement, the Parties' obligations hereunder, including the Required Actions under Section III below, are expressly conditioned on, and subject to, the fulfillment of each of the following conditions precedent:

A.    The Bankruptcy Court has approved this Agreement and ordered that the Debtors are bound by the Agreement and the Approval Order.

B.    The Approval Order has become a Final Order.

C.    The Debtors shall have applied for, and the Bankruptcy Court shall have entered an order amending and/or supplementing the Plan to identify each of the Released Carriers as a Settling Asbestos/Silica Insurance Company on Exhibit 2 to the Plan.

D.    The Approval Order must contain findings or conclusions materially as follows:

1.    The identification of each Released Carrier in the Asbestos/Silica Insurance Company Injunction is fair and equitable with respect to Entities that might subsequently assert Demands against each such Released Carrier under any Asbestos/Silica Insurance Policy issued by the relevant AIG Company.

2.    The contribution by the AIG Companies of the Payment Amount constitutes a reasonable settlement and fair resolution of the alleged liability of the Released Carriers under the Buyback Policies and Post-1992 Policies for Asbestos Claims and Silica Claims, and such contributions satisfy the liability of the Released Carriers, if any, for Asbestos Claims and Silica Claims under the Buyback Policies and Post-1992 Policies.

3.    Such other findings as the Parties may agree on or prior to the date of the hearing on the application by DII Industries and Kellogg Brown & Root, Inc. for the Approval Order.

E.    The Bankruptcy Court has confirmed the Plan pursuant to 11 U.S.C. §§ 1129 and 524(g), such order confirming the Plan has been affirmed by the District Court, and the District Court's affirming order has become a Final Order.

F.    The Harbison-Walker Bankruptcy Court shall enter an order that becomes a Final Order providing that payment of the AIG Settlement Payments and the Payment Amount does not violate the automatic stay imposed by section 362 of the Bankruptcy Code in the Harbison-Walker Bankruptcy or, in the alternative, granting relief from the automatic stay to allow the Policyholders and, among others, the AIG Companies to enter into and carry out the terms of this Agreement (the "Harbison-Walker Order"). The Harbison-Walker Order shall approve the waiver by Harbison-Walker of insurance coverage under all insurance policies issued to Dresser Industries, Inc. and its predecessors, including, Harbison-Walker Refractories Company (a Pennsylvania corporation), in accordance with the terms of the Settlement Agreement and Release by and among DII Industries, Halliburton, Global Industrial

9

Technologies, Inc. and the other GIT Debtors, as approved by the Harbison-Walker Bankruptcy Court on or about December 4, 2003. In addition, Harbison-Walker shall provide, among others, the AIG Companies a written release, in the form of Exhibit 4 to this Agreement.

        G.      The Bankruptcy Court must enter the 50/50 Vertical Partition Order, and · that order must become a Final Order. Policyholders will use their best efforts (i) to seek approval for the 50/50 Vertical Partition Order, and (ii) to obtain the support of and consent to the 50/50 Vertical Partition Order from Federal-Mogul, the Federal-Mogul Future Claimants Representative, and the Federal-Mogul ACC.

        H.      The Federal Mogul Bankruptcy Court must enter an order approving Federal-Mogul's participation in the Partitioning Agreement, and that order must become a Final Order.

        I.      The occurrence of the Assignment Agreement Effective Date.

        J.      Prior to the hearing on the motion for entry of the Approval Order, this Agreement and the Assignment Agreement shall have been executed by the respective parties thereto.

    2.2.      The fulfillment of the conditions precedent set forth in Section 2.1 above may be waived only if all Parties agree to such waiver in writing.

**III.    Payments to DII Industries; Payment of AIG Settlement Payments**

    3.1.      If each of the conditions in Section II is either satisfied or waived in accordance with Section 2.2, then:

        A.      Each of the AIG Companies shall take the Required Actions to cause the Purchaser to pay the Payment Amount to DII Industries pursuant to the terms of Exhibit 3 to this Agreement.

        B.      In the event that the Funding Effective Date is later than the date of the payment of the Payment Amount set forth in Exhibit 3 to this Agreement, then the payment of the Payment Amount shall be deferred until the Funding Effective Date.

        C.      The obligations of the AIG Companies to make the AIG Settlement Payments pursuant to Exhibit 3 to this Agreement shall be joint and several.

        D.      The AIG Companies shall (i) not seek reimbursement of any portion of the AIG Settlement Payments made in respect of the Required Actions from Policyholders under any retrospective premium plan, deductible provision, other self-insurance feature or otherwise under the Buyback Policies, the Post-1992 Policies, any other insurance policy issued to Policyholders or from Policyholders under any other contract, legal theory, law or otherwise; (ii) not seek contribution, indemnification or reimbursement of any portion of the AIG Settlement Payments made in respect of the Required Actions from any other insurer of Policyholders, unless such other insurer seeks recovery from the AIG Companies, or any of them, under a Buyback Policy

10

2 Granite 000121

or a Post-1992 Policy; (iii) not pursue subrogation, equitable or legal indemnity, contribution or reimbursement of the AIG Settlement Payments from any third party in any manner to the extent that would result in that third party's obtaining reimbursement from Policyholders; and (iv) not pursue any recovery against the Asbestos PI Trust or Silica PI Trust. Notwithstanding any of the foregoing, however, nothing contained in this this Section 3.1(D) shall limit the rights of the AIG Companies to make reinsurance claims and pursue their respective reinsurance recoveries.

## IV.     Releases

### 4.1.     Releasing Policyholders' Releases

A.     Buyback Policies: Releasing Policyholders do hereby fully, finally, and completely remise, release, acquit and forever discharge the Released Carriers of and from any and all past, present or future Claims, whether known or unknown, relating to, arising out of, and/or in connection with: (1) the Buyback Policies; (2) the Coverage Actions; (3) any violation or alleged violation (whether or not in bad faith) of any statute or regulation, including without limitation Unfair Claim Practices Acts or other similar statutes of each of the fifty (50) states (when applicable) concerning, relating to and/or arising out of the Buyback Policies; (4) any negligent undertaking or alleged negligent undertaking by or on the part of any Released Carrier concerning, relating to and/or arising out of the Buyback Policies; or (5) any other misconduct committed or allegedly committed by a Released Carrier prior to the Effective Date concerning, relating to and/or arising out of the Buyback Policies. In furtherance of their express intent to effect the release contained in this Section 4.1(A), Releasing Policyholders, effective as of the Effective Date, expressly waive any and all rights each of them may have under any contract, statute, code, regulation, ordinance, or the common law, that may limit or restrict the effect of a general release of Claims or Demands not known to or suspected to exist in their favor at the time of the execution of this Agreement concerning, relating to and/or arising out of the Buyback Policies. Releasing Policyholders expressly assume the risk that acts, omissions, matters, causes, or things may have occurred or will occur which they do not know and do not suspect to exist.

Without limiting the foregoing releases, Releasing Policyholders acknowledge and agree that Released Carriers shall have no further obligation whatever to provide coverage, defense, indemnity and/or any other benefits relating to, arising out of, and/or in connection with the Buyback Policies. It is expressly agreed and understood that Releasing Policyholders will assert no other or further Claims whatever against the Released Carriers in connection with any liability that has arisen or may arise in the future under the Buyback Policies.

B.     Post-1992 Policies: Releasing Policyholders do hereby fully, finally, and completely remise, release, acquit and forever discharge the Released Carriers of and from any and all past, present or future Claims, whether known or unknown, relating to, arising out of, and/or in connection with Asbestos Claims and/or Silica Claims, relating to, arising out of, and/or in connection with: (1) the Post-1992 Policies; (2) Claims that could have been asserted in the Coverage Actions in relation to Asbestos Claims or Silica Claims and the Post-1992 Policies; (3) any violation or alleged violation (whether or not in bad faith) of any statute or regulation, including without limitation Unfair Claim Practices Acts or other similar statutes of each of the

11

2 Granite 000122

fifty (50) states (when applicable) concerning, relating to and/or arising out of the Post-1992 Policies; (4) any negligent undertaking or alleged negligent undertaking by or on the part of any Released Carriers concerning, relating to and/or arising out of the Post-1992 Policies; or (5) any other misconduct committed or allegedly committed by a Released Carrier prior to the Effective Date concerning, relating to and/or arising out of the Post-1992 Policies. In furtherance of their express intent to effect the release contained in this Section 4.1(B), Releasing Policyholders, effective as of the Effective Date, expressly waive any and all rights each of them may have under any contract, statute, code, regulation, ordinance, or the common law, that may limit or restrict the effect of a general release of Claims or Demands not known to or suspected to exist in their favor at the time of the execution of this Agreement concerning, relating to and/or arising out of the Post-1992 Policies and Asbestos Claims or Silica Claims. Releasing Policyholders expressly assume the risk that acts, omissions, matters, causes, or things may have occurred or will occur which they do not know and do not suspect to exist.

Without limiting the foregoing releases, Releasing Policyholders acknowledge and agree that Released Carriers shall have no further obligation whatever to provide coverage, defense, indemnity and/or any other benefits relating to, arising out of, and/or in connection with any Asbestos Claims or Silica Claims or Demands that have arisen or may arise under the Post-1992 Policies. It is expressly agreed and understood that Releasing Policyholders will assert no other or further Claims whatever against the Released Carriers in connection with any Asbestos Claim or Silica Claim that has arisen or may arise in the future under the Post-1992 Policies.

4.2.    AIG Companies' Release

A.    Buyback Policies: The AIG Companies, on behalf of themselves and their respective affiliated Released Carriers, do hereby fully, finally, and completely remise, release, acquit and forever discharge the Halliburton Entities of and from any and all past, present or future Claims, whether known or unknown, relating to, arising out of, and/or in connection with: (1) the Buyback Policies; (2) the Coverage Actions; (3) any violation or alleged violation (whether in bad faith or not) of any statute or regulation, including without limitation Unfair Claim Practices Acts or other similar statutes of each of the fifty (50) states (when applicable) concerning, relating to and/or arising out of the Buyback Policies; (4) any negligent undertaking or alleged negligent undertaking by or on the part of the Halliburton Entities concerning, relating to and/or arising out of the Buyback Policies; or (5) any other misconduct committed or allegedly committed by a Halliburton Entity prior to the Effective Date concerning, relating to and/or arising out of the Buyback Policies. In furtherance of their express intent to effect the release contained in this Section 4.2(A), the AIG Companies, on behalf of the themselves and Released Carriers, as of the Effective Date, expressly waive any and all rights each of them may have under any contract, statute, code, regulation, ordinance, or the common law, that may limit or restrict the effect of a general release of Claims or Demands not known to or suspected to exist in their favor at the time of the execution of this Agreement concerning, relating to and/or arising out of the Buyback Policies. The AIG Companies, on behalf of themselves and their respective affiliated Released Carriers, expressly assume the risk that acts, omissions, matters, causes, or things may have occurred or may occur which they do not know and do not suspect to exist.

12

2 Granite 000123

Without limiting the foregoing releases, the AIG Companies acknowledge and agree that the Halliburton Entities shall have no further obligation under the Buyback Policies. It is expressly agreed and understood that the Released Carriers will assert no other or further Claims whatever against the Halliburton Entities in connection with any liability whatever that has arisen or will arise in the future under the Buyback Policies.

      B.     Post-1992 Policies: The AIG Companies, on behalf of themselves and their respective affiliated Released Carriers, do hereby fully, finally, and completely remise, release, acquit and forever discharge the Halliburton Entities of and from any and all past, present or future Claims, whether known or unknown, relating to, arising out of, and/or in connection with Asbestos Claims and Silica Claims, relating to, arising out of, and/or in connection with: (1) the Post-1992 Policies; (2) Claims that could have been asserted in the Coverage Actions in relation to Asbestos Claims or Silica Claims and the Post-1992 Policies; (3) any violation or alleged violation (whether or not in bad faith) of any statute or regulation, including without limitation Unfair Claim Practices Acts or other similar statutes of each of the fifty (50) states (when applicable) concerning, relating to and/or arising out of the Post-1992 Policies; (4) any negligent undertaking or alleged negligent undertaking by or on behalf of the Halliburton Entities concerning, relating to and/or arising out of the Post-1992 Policies; or (5) any other misconduct committed or allegedly committed by a Halliburton Entity prior to the Effective Date concerning, relating to and/or arising out of the Post-1992 Policies. In furtherance of Released Carriers' express intent to effect the release contained in this Section 4.2(B)., the AIG Companies, on behalf of themselves and their respective affiliated Released Carriers, effective as of the Effective Date, expressly waive any and all rights they may have under any contract, statute, code, regulation, ordinance, or the common law, which may limit or restrict the effect of a general release of Claims not known to or suspected to exist in their favor at the time of the execution of this Agreement concerning, relating to and/or arising out of the Post-1992 Policies and Asbestos Claims or Silica Claims. The AIG Companies, on behalf of themselves and their respective affiliated Released Carriers, expressly assume the risk that acts, omissions, matters, causes, or things may have occurred or will occur which they do not know and do not suspect to exist.

Without limiting the foregoing releases, the AIG Companies acknowledge and agree that the Halliburton Entities shall have no further obligation whatever under the Post-1992 Policies relating to, arising out of, or in connection with any Asbestos Claims or Silica Claims. It is expressly agreed and understood that Released Carriers will assert no other or further Claims against the Halliburton Entities in connection with any Asbestos Claim or Silica Claim that has arisen or may arise in the future under the Post-1992 Policies.

    4.3.    Obligations Under This Agreement

Nothing in this Section 4 affects or impairs in any manner the obligations of the Parties hereto under this Agreement or the Assignment Agreement.

13

2 Granite 000124

## V.   Indemnification

### 5.1.   Indemnification Obligations

A.      Halliburton Company, its successors and assigns, and any Policyholder insured under the Buyback Policies (collectively, "Indemnifying Policyholders"), jointly and severally, agree to defend, indemnify, save and hold harmless Released Carriers, fully and without a cap, from and against any and all past, present or future Claims, Demands, damages, losses, penalties, liabilities, costs, expenses (including reasonable attorneys' fees) and compensation of every kind and nature whatever (including those for punitive or exemplary damages, contribution, indemnity or subrogation) relating to, arising out of, and/or in connection with any Buyback Policy. This indemnification shall include:

1.      Claims by any Entity claiming to be an insured, named insured, additional insured, third party beneficiary, successor to any insured, named insured, additional insured, or third party beneficiary, or otherwise entitled to any rights, benefits, payments, coverage, or compensation under any of the Buyback Policies under which any Current Affiliate is identified as the first named insured (e.g., a policy issued to Dresser Industries, Inc. or Brown & Root, Inc.);

2.      Claims by any Entity claiming to be an insured, named insured, additional insured, third party beneficiary, successor to any insured, named insured, additional insured, or third party beneficiary, or otherwise entitled to any rights, benefits, payments, coverage, or compensation under that portion of any Buyback Policy issued to Studebaker-Worthington or McGraw-Edison partitioned to DII Industries in, or reduced by, the 50/50 Vertical Partition Order.

3.      Claims by any Entity claiming to be an insured, named insured, additional insured, third party beneficiary, successor to any insured, named insured, additional insured, or third party beneficiary or otherwise entitled to any rights, benefits, payments, coverage, or compensation under any of the Buyback Policies issued to any of the Past Affiliates to the extent that any Halliburton Entity, as of the Effective Date, had the right, power or authority to release that Entity's alleged rights to coverage under those policies (e.g., a policy issued to Harbison-Walker Refractories Company (a Pennsylvania Corporation));

4.      Claims by any Entity, including other insurers, for indemnity, contribution or subrogation based on an obligation or duty arising out of or alleged to arise out of the Buyback Policies; and

5.      Claims by any other Entity who does not qualify as an insured under any of the Buyback Policies based upon an obligation or duty arising out of or alleged to arise out of the Buyback Policies.

B.      Indemnifying Policyholders, jointly and severally, agree to defend, indemnify, save and hold harmless Released Carriers, fully and without a cap, from and against any and all past, present or future Claims, Demands, damages, losses, penalties, liabilities, costs, expenses (including reasonable attorney's fees) and compensation of every kind and nature whatever (including, but not limited to, those for punitive or exemplary damages, contribution,

14

indemnity or subrogation) by any Entity relating to, arising out of, and/or in connection with the Post-1992 Policies, but only to the extent that such Claims relate to, arise out of, and/or are in connection with Asbestos Claims or Silica Claims.

        C.      Notwithstanding Sections 5.1.A. and 5.1.B. above, Indemnifying Policyholders shall have no indemnification obligation to any Released Carrier for:

        1.      Claims by Cooper Industries, Inc., including any Entity that it has the power to legally bind in the Partitioning Agreement, or Federal-Mogul, including any Entity that it has the power to legally bind to the Partitioning Agreement, under any Buyback Policy issued to Studebaker-Worthington or McGraw-Edison;

        2.      Claims by any Entity, other than a Halliburton Entity, for coverage under that portion of any Buyback Policy issued to Studebaker-Worthington or McGraw-Edison not partitioned to DII Industries in, or not reduced by, the 50/50 Vertical Partition Order;

        3.      Claims by any Entity, other than a Halliburton Entity, for coverage under any Buyback Policy issued to Studebaker-Worthington or McGraw-Edison for which the Released Carrier that issued that policy received written notice, prior to October 28, 2004, from such Entity claiming to be an insured, or claiming to be entitled to receive benefits under the policy, of either (a) the Claim or (b) a substantially-related Claim based on the identity of the claimant, injury (or damage), cause of injury (or damage) and location of injury (or damage). If actual written notice of such a Claim was received by the carrier that issued a particular policy under which such Entity sought coverage, that carrier cannot avoid the effects of this subparagraph C.3. by asserting the technicality that the notice mistakenly referenced a different Affiliate (not engaged in the business of reinsurance) of that carrier;

        4.      Claims for reinsurance;

        5.      Claims by any Entity, other than a Halliburton Entity, relating to Buyback Policies or Post-1992 Policies issued in favor of NL Industries, except for Baroid Claims;

        6.      Claims by Bombardier (or any of its predecessors, successors, or Affiliates) for coverage, or claims by any insurer of Bombardier (or any of its predecessors, successors, or Affiliates), under policies issued, prior to December 31, 1969, to American Locomotive Company, Alco Products, Inc. (a New York company) or Alco Products, Inc. (a Delaware company);

        7.      Except as provided in Section 5.1.A.1. and 5.1.A.2. above, Claims (other than Baroid Claims) by any Entity, other than a Halliburton Entity, claiming to be an insured, named insured, additional insured, third party beneficiary, or otherwise entitled to any rights or benefits under any of the Buyback Policies issued to any of the Past Affiliates, but only to the extent the Halliburton Entities, as of the Effective Date, did not have the right, power or authority to release that Entity's alleged rights to coverage under those policies;

15

8.      Settlements of Indemnified Claims relating to Vertical Partition Non-Products Coverage Claims to which Policyholders did not consent, but only if Policyholders' consent was not unreasonably withheld; or

9.      Claims for punitive or exemplary damages not relating to or arising out of (i) the Agreement, including the negotiation and execution thereof, (ii) the Partitioning Agreement, including the negotiation and execution thereof, (iii) the Chapter 11 Case, (iv) the Coverage Actions, or (v) Policyholders' handling of any Indemnified Claim pursuant to Section 5.2.

5.2.    Handling of Indemnified Claims

A.      Each Released Carrier promptly shall forward to DII Industries any demand, notice, summons or other process received by it in connection with any Indemnified Claim. Indemnifying Policyholders shall acknowledge promptly in writing whether they agree or disagree that the submitted Claim is an Indemnified Claim under this Agreement.

B.      Indemnifying Policyholders shall have the right to select defense counsel to defend the Indemnified Claim, but Indemnifying Policyholders shall solicit and consider the views of the affected Released Carrier(s) regarding such selection and shall also obtain the consent of the affected Released Carrier(s) to any such selection, which consent shall not be unreasonably withheld. Nothing herein shall constitute any waiver of the Released Carriers' attorney-client privilege. Following solicitation and consideration of the views of the affected Released Carriers and the selection of defense counsel, Indemnifying Policyholders shall have the right to direct the defense of the Indemnified Claim; provided however, that:

1.      Indemnifying Policyholders shall take no position on behalf of the affected Released Carriers, substantive or procedural, without their written consent;

2.      in any filing, Indemnifying Policyholders shall state in the caption of the filing that it is filed by "Halliburton as indemnitor of" the affected Released Carriers;

3.      Indemnifying Policyholders shall provide the affected Released Carriers with draft copies of all pleadings, briefs, discovery requests and responses and other court papers and correspondence sufficiently in advance of filing, service or mailing to permit the affected Released Carriers a reasonable opportunity to review and comment on same; and

4.      Indemnifying Policyholders shall (a) resist production of the affected Released Carriers' documents, information and witnesses upon the determination by the affected Released Carriers that they are not properly discoverable, and (b) produce documents and information of the affected Released Carriers that Indemnifying Policyholders may have in their possession only pursuant to applicable rules, including subpoena rules.

5.3.    Partially Indemnified Coverage Claims. If a Claim for insurance coverage under a Buyback Policy results in an indemnity payment that is partially indemnified and partially not indemnified because of the operation of the 50/50 Vertical Partition Order (a "Straddle Claim"), then the defense costs associated with such Straddle Claim shall be split between the indemnified and non-indemnified portions in the same ratio as the indemnity costs.

16

2 Granite 000127

## VI.   Judgment Reduction

6.1.    In the event any Claim brought by a Current Affiliate against any insurer other than an AIG Company or a carrier whose name is set forth on Exhibit 4 to this Agreement (a "Non-AIG Participating Carrier") results in an adjudication, whether in court or another tribunal under which the Current Affiliate would have been entitled to coverage from a Released Carrier under (a) the Buyback Policies or (b) Post-1992 Policies for an Asbestos Claim or Silica Claim beyond the amounts paid under this Agreement, and the recovery the Current Affiliate obtains against the Non-AIG Participating Carrier includes amounts attributed or allocated to a Released Carrier, the Current Affiliate shall not seek to obtain payments from such Non-AIG Participating Carrier, or to enforce any related judgment to the extent that any sum represents any Released Carrier's attributed or allocated share of any obligation owed to the Current Affiliate.

6.2.    In the event a Current Affiliate obtains a judgment or arbitration award against any Non-AIG Participating Carrier in connection with a Claim, and that Non-AIG Participating Carrier thereafter obtains a judgment or arbitration award against a Released Carrier on the ground that the judgment or arbitration award granted to the Current Affiliate against the Non-Participating Insurer included sums for which a Released Carrier is liable under (a) the Buyback Policies or (b) the Post-1992 Policies for an Asbestos Claim or a Silica Claim, the Policyholders, jointly and severally, shall direct the Current Affiliate in such a manner as to cause the Released Carrier not to be subjected to liability for the judgment or arbitration award against it by reducing the Current Affiliate's judgment or arbitration award against the Non-AIG Participating Carrier. Such a reduction in judgment or arbitration award will be accomplished by subtracting from the judgment or arbitration award against the Non-AIG Participating Carrier the share of the judgment or arbitration award, if any, that is attributable to the Released Carrier. To ensure that such a reduction is accomplished, the Released Carrier shall be entitled to assert this Section 6.2 as a defense in any Claim against it for any such portion of the judgment or arbitration award (and the Policyholders shall cause the applicable Current Affiliate(s) to advocate in favor of such a position), and shall be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect the Released Carrier from any liability for the judgment or arbitration award.

## VII.   Continuing Litigation

7.1.    Pending the fulfillment or waiver of all Conditions Precedent as set forth in Section II, (i) the Parties agree to seek a stay of each of the Coverage Actions, and (ii) the AIG Companies may continue to prosecute their objections in the Bankruptcy Court and appeals of any orders entered by the Bankruptcy Court or the District Court except that the Policyholders and the AIG Companies shall file or join in a stipulated motion asking the United States Court of Appeals for the Third Circuit to stay proceedings in the consolidated appeals currently pending in that court (Nos. 04-1851, 04-1960, and 04-2049). Notwithstanding anything in this provision or the Agreement to the contrary, after the Effective Date and upon the satisfaction or waiver of all Conditions Precedent set forth in Section 2.1 (except for the requirement in Section 2.1(E) that the Bankruptcy Court or District Court orders have become Final Orders), the AIG Companies shall immediately (i) discontinue the prosecution of any objections in the Bankruptcy Court and any appeals of any orders entered by the Bankruptcy Court, (ii) take all steps necessary to withdraw, waive or dismiss with prejudice all such objections or appeals and (iii)

17

take all steps necessary to withdraw, waive or dismiss with prejudice Insurers' Emergency Motion, per Rule 59(E), to Vacate Order Affirming Confirmation Order and any and all joinders thereto. Prior to the satisfaction of all such conditions precedent, with respect to proceedings in the District Court on (x) any appeals by any AIG Company of the Confirmation Order entered by the Bankruptcy Court, (y) any other orders entered by the Bankruptcy Court in connection with confirmation of the Plan (including but not limited to any final order denying the AIG Companies standing to object to the Plan), or (z) any request by Debtors for entry of an order affirming the issuance of the Asbestos/Silica Insurance Company Injunction, the Policyholders and the AIG Companies shall stipulate to a schedule under which the deadline for the AIG Companies to file briefs shall be deferred until the earlier of the fulfillment or waiver of the conditions precedent set forth in Section 2.1 or December 1, 2004.

## VIII. Legislative Contingency

8.1     The Parties recognize that there are current efforts to enact federal legislation to address asbestos litigation. The AIG Companies, in their sole discretion, may elect to terminate their obligations under this Agreement, through and including January 3, 2005, if a bill becomes federal law that, at any time materially limits or controls the prosecution of asbestos claims in the state or federal courts or in any other forum. This provision is intended to encompass what is commonly understood to be "asbestos reform" legislation and is not intended to encompass general tort reform, class action reform, malpractice reform, or tax reform legislation. If the AIG Companies so elect, the AIG Companies shall have no further obligation under this Agreement and, as between the AIG Companies and all of the Policyholders only, this Agreement shall be null and void as if this Agreement had never existed between Policyholders and the AIG Companies. In the event that the AIG Companies, in their sole discretion pursuant to this section, elect to terminate their obligations under this Agreement, such termination shall (y) prevent the occurrence of the Assignment Agreement Effective Date and (z) prevent the occurrence of the transfer of the AIG Settlement Payments and the payment of the Payment Amount under the Assignment Agreement.

## IX. Coverage Litigation

9.1.    Immediately upon the fulfillment or waiver of the conditions set forth in Sections II and VIII of this Agreement, Policyholders, and all AIG Companies shall dismiss with prejudice and without costs all claims against the carriers whose name is set forth on Exhibit 4 to this Agreement in each of the Coverage Actions. Policyholders will use their best efforts to have Harbison-Walker also dismiss with prejudice and without costs all of its Claims against the AIG Companies; to the extent Harbison-Walker does execute such dismissals, the AIG Companies shall dismiss with prejudice and without costs all of their Claims against Harbison-Walker.

## X. Access to Due Diligence Materials

10.1.   The AIG Companies shall have the right, from time to time, at their own expense and upon reasonable notice, at times and places convenient to Policyholders, to review and/or audit the Due Diligence Materials.

18

## XI.    Dispute Resolution

11.1.    If any dispute should arise concerning the terms, meaning or implementation of this Agreement, the affected Parties shall use their best efforts to reach a prompt resolution of such dispute, but in the event that they are unable to do so, all such disputes shall be determined by the alternative dispute resolution procedures set forth below.

A.    Negotiation and Mediation: The affected Parties shall attempt, in good faith, to promptly resolve through negotiation any dispute relating to the issues described in this Paragraph. If the matter has not been resolved within thirty (30) days after the initiation of discussions (or within such other period as the affected Parties mutually agree), the affected Parties shall further attempt in good faith to resolve the controversy or claim through mediation in accordance with the then-current American Arbitration Association Commercial Mediation Procedures. The affected Parties agree to utilize the services of Mediator David Geronemus, if he is available.

B.    Arbitration: If the matter has not been resolved pursuant to the aforesaid mediation procedure within sixty (60) days after the commencement of such procedure (or within such other period as the affected Parties mutually agree) or if any affected Party fails to participate in the mediation, the controversy shall be settled by arbitration administered by the American Arbitration Association and in accordance with the then-current Commercial Arbitration Rules of the American Arbitration Association. Such arbitration shall be conducted by an arbitrator to be selected by mutual agreement of the affected Parties. If the parties are unable to agree on a single arbitrator, then the matter shall be heard by a panel of three (3) arbitrators, composed of three competent disinterested persons, with the affected Policyholder(s) selecting a single arbitrator, the AIG Companies selecting a single arbitrator and the third arbitrator, who shall serve as chairperson, to be selected by the two arbitrators so chosen. The selection of an arbitrator or arbitrators shall be completed within 30 days of notice of receipt of the matter by the American Arbitration Association. Upon the arbitrators assuming their positions as arbitrators, all Parties to the dispute shall be prohibited from any ex parte communications with any of the selected Arbitrators until completion of the arbitration. The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §§ 1-16, and judgment upon the award rendered by the arbitrator(s) may be entered by any court having jurisdiction thereof. The arbitrator(s) may award to the prevailing affected Party fees and costs incurred in connection with such proceeding, or if each affected Party prevails in part, the arbitrator(s) may appropriately allocate fees and costs in proportion to each affected Party's success in the arbitration. In the event that an affected Party refuses to arbitrate a claim in accordance with this Agreement, any other affected Party may move any court in the United States with jurisdiction to compel the refusing affected Party to arbitrate the claim.

C.    Limitation of Remedies: The procedures specified in this Paragraph shall be the sole and exclusive procedures for the resolution of disputes between the Parties relating to the issues described in this Paragraph. While the procedures specified in this Paragraph are pending, all applicable statutes of limitation or other time limitations upon claims or defenses between the Parties shall be tolled, and the Parties shall take such action, if any, as is required to effectuate such tolling.

2 Granite 000130

## XII.   Representations and Warranties

Each Party represents and warrants to the other Parties as follows:

12.1.   Organization:  Such Party is duly organized and validly existing under the laws of its jurisdiction of incorporation or organization and has all necessary power and authority to enter into, and to perform, its obligations under this Agreement.  Such Party is duly authorized to conduct business and is in good standing in each jurisdiction where such authorization is required to conduct its business or perform its obligations under this Agreement, except where the failure to be so authorized or in good standing would not impair, restrict or limit its ability to perform its obligations under this Agreement.

12.2.   Authorization:  Such Party has all requisite legal power and authority to execute, deliver and perform this Agreement (except, in the case of the Debtors, for the requirement that they obtain Bankruptcy Court approval of their entry into and performance of this Agreement). The execution and delivery of this Agreement by such Party, the performance by such Party of its obligations under this Agreement, and the consummation by such Party of the transactions contemplated by this Agreement have been duly and validly authorized and approved by all necessary action on behalf of such Party.

12.3.   Binding Agreement:  This Agreement has been duly executed and delivered by such Party, and (assuming due authorization, execution and delivery by each other Party) this Agreement constitutes a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except to the extent that enforcement may be limited by applicable bankruptcy, insolvency and other laws of general applicability affecting the enforcement of rights of creditors and by general equity principles, and, in the case of the Debtors, for the requirement that they obtain Bankruptcy Court approval of their entry into and performance of this Agreement.

12.4.   Representation and Negotiation:  This Agreement has been thoroughly negotiated and analyzed by each Party and its respective counsel, each Party has sought and/or received the advice of counsel prior to the execution of this Agreement and the Agreement has been executed and delivered in good faith, pursuant to arms-length negotiations, and for good and valuable consideration.

## XIII.  No Admission of Liability/No Endorsement of Plan

13.1.   Except as necessary to enforce any undertakings set forth in this Agreement, nothing contained in this Agreement is or shall be deemed to be (a) an admission by any of the AIG Companies that any other Party is entitled to any insurance coverage with respect to Asbestos Claims, Silica Claims, any other Claims or Demands or as to the validity of any of the coverage positions that have been or could have been asserted by those Parties; or (b) an admission by the Policyholders as to the validity of any of the coverage positions or defenses to coverage that have been or could have been asserted by the AIG Companies with respect to Asbestos Claims, Silica Claims or any other Claims.

2 Granite 000131

13.2.    By entering into this Agreement, the Parties have not waived and shall not be deemed to have waived any right, obligation, privilege, defense or position they may have asserted or might assert in connection with any Claim, matter, Entity or insurance policy outside the scope of this Agreement.

13.3.    This Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession by any Party of liability, culpability, or wrongdoing. The AIG Companies' entry into this Agreement does not constitute an endorsement of the proposed or confirmed Plan or a statement of position of any kind as to whether the Plan as proposed or confirmed is lawful or unlawful, or whether it reflects a proper or appropriate use or application of the Bankruptcy Code.

## XIV.  Binding Effect

14.1.    This Agreement shall be binding upon and inure to the benefit of the Parties and their predecessors and present and future parent corporations, subsidiaries, Affiliates, successors, assigns, trustees, administrators, and, as between the Parties, upon all Persons and Entities who claim or could claim insurance coverage under the Buyback Policies or the Post-1992 Policies.

## XV.  Further Assurances

15.1.    The Parties shall execute such further documents and agreements and take or cause to be taken such further action as may from time to time be reasonably requested by a Party in order to more effectively carry out the intent and purposes of this Agreement as well as the Partitioning Agreement entered into by, inter alia, the Parties to this Agreement. In amplification of the preceding, all Parties shall not assert or take any position(s) in any litigation, proceeding, arbitration or otherwise that is inconsistent with or contrary to the terms or intent of this Agreement or the Partitioning Agreement. Furthermore, in any litigation concerning any of the Buyback Policies issued to Studebaker-Worthington or McGraw Edison to which a Party is a plaintiff or a defendant, each such Party shall affirmatively take positions that (a) support and seek to implement the provisions to this Agreement and the Partitioning Agreement, including, but not limited to, paragraphs III.A-D, V.D., and VII.A-E thereof, and (b) the products/completed operations limits of liability allocated to DII Industries in accordance with the Partitioning Agreement were exhausted by the payment of the Payment Amount. Further, the Parties agree that this Further Assurances provision is a material consideration to each of the Parties to enter this Agreement.

15.2.    The AIG Companies shall use their reasonable best efforts to comply with reasonable requests from the Releasing Policyholders for documents and other information required by the Releasing Policyholders in connection with any insurance claims, arbitrations, or litigations related to the Payment Amount and/or the AIG Settlement Payments, this Settlement Agreement, or the Asbestos Claims, including the AIG Companies' claims and underwriting files and billing and payment records with respect to the Asbestos Claims or the Silica Claims.

15.3.    The Releasing Policyholders shall use their reasonable best efforts to comply with reasonable requests from the AIG Companies for documents and other information required by the AIG Companies in connection with any reinsurance claims, arbitrations, or litigations

21

2 Granite 000132

relating to the Payment Amount and/or the AIG Settlement Payments, this Settlement Agreement, the Asbestos Claims or the Silica Claims.

## XVI.   Miscellaneous

16.1.    This Agreement is the result of extensive negotiations between the Parties. No Party shall be deemed the drafter of this Agreement. Therefore, any ambiguities cannot, and should not, be construed against any Party pursuant to the doctrine of "contra preferentem," nor is this Agreement a policy of insurance, and it cannot and should not be construed against the AIG Companies on the basis of their identity as insurers.

16.2.    Failure to require performance of any aspect of this Agreement does not constitute a waiver of future performance.

16.3.    This Agreement is an integrated agreement and contains the entire agreement among the Parties regarding the matters herein. No representations, warranties, promises or inducements, whether oral, written, express or implied, have been made or relied on by any Party other than as set forth in this Agreement. This Agreement prevails over prior communications, negotiations and term sheets between and among the Parties regarding the matters herein. This Agreement may not be amended or modified except by a written instrument signed by all of the Parties affected thereby.

16.4.    Except as expressly provided for in this Agreement, nothing in this Agreement shall create any third-party beneficiary rights in any Entity that is not a Party to this Agreement nor shall any Entity not a party to the Agreement derive any benefit therefrom. In the event that any action or proceeding of any type whatever is commenced or prosecuted by any Entity not a Party hereto to invalidate, interpret, or prevent the validation, enforcement, or carrying out of all or any of the provisions of this Agreement, the Parties mutually agree, represent, warrant, and covenant to cooperate in opposing such action or proceeding.

16.5.    Any notices, requests and demands required or permitted to be provided under the Agreement, in order to be effective, shall be in writing, and unless otherwise expressly provided herein, shall be deemed to have been duly given and made when actually delivered, or in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed to the recipient(s) at the address(es) set forth on Exhibit 6 to this Agreement.

16.6.    This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original and all of which when taken together shall constitute the same instrument. Each Party shall deliver one duly executed counterpart to the other Parties. Each counterpart may be delivered by facsimile transmission, and a faxed signature shall have the same force and effect as an original signature.

16.7.    The Parties shall agree on the terms of the press releases to be issued upon the execution of this Agreement and shall consult with each other before issuing any other press releases with respect to this Agreement and the transactions contemplated herein, including any termination of this Agreement for any reason.

2 Granite 000133

16.8.   This Agreement is a confidential mediation document. Except for disclosure to Harbison-Walker, the terms of this Agreement shall remain confidential until it is presented to the Bankruptcy Court for approval. Presentation of this Agreement to the Bankruptcy Court of the District Court for approval shall not constitute a waiver of the mediation privilege and other privileges attaching to the parties confidential negotiations leading up to this Agreement.

16.9.   Nothing in this Agreement shall impact in any way the reinsurance rights of the AIG Companies. Moreover, notwithstanding the scope of the mutual releases provided herein, nothing in those releases are meant to release any Entity in its capacity as a reinsurer of any AIG Company under any of the policies or Claims or demands referred to in this Agreement.

16.10.  Except as expressly set forth herein, any and all obligations owed by any Party under this Agreement are several and not joint. Therefore, except as expressly set forth herein, no Party shall be responsible for another Party's performance of this Agreement.

16.11.  This Agreement shall be governed by, and shall be construed in accordance with the laws of the State of New York without regard to choice of law rules. The Parties' consent to the application of the laws of the State of New York to this Agreement does not constitute an admission by any Party that the laws of the State of New York apply to the Buyback Policies or the Post-1992 Policies nor to any claims made thereunder.


IN WITNESS WHEREOF, this Settlement Agreement and Release, consisting of twenty-three (23) pages, excluding the signature pages and attachments, has been read and signed by the duly authorized representatives of the Parties on the dates set forth below.

23

BY:

**Halliburton Company**

By:  _____

Title:  _Executive VP_

Date:  _11/12/04_

**DII Industries, LLC**

By:  _____

Title:  _Vice - President_

Date:  _11/12/04_

**Kellogg Brown & Root, Inc.**

By:  _____

Title:  _____

Date:  _____

AIG Technical Services, Inc, as authorized representative for AIU Insurance Company, American Home Assurance Company, Birmingham Fire Insurance Company, Granite State Insurance Company, Insurance Company of the State of Pennsylvania, Landmark Insurance Company, Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, New Hampshire Insurance Company and L'Union Atlantique D'Assurances S.A.

By:  _____

24

2 Granite 000135

BY:

**Halliburton Company**

By: _____

Title: _____

Date: _____

**DII Industries, LLC**

By: _____

Title: _____

Date: _____

Kellogg Brown & Root, Inc.

By: _____

Title: Senior Vice President and
Chief Financial Officer

Date: November 12, 2004

AIG Technical Services, Inc, as authorized representative for AIU Insurance Company, American Home Assurance Company, Birmingham Fire Insurance Company, Granite State Insurance Company, Insurance Company of the State of Pennsylvania, Landmark Insurance Company, Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, New Hampshire Insurance Company and L'Union Atlantique D'Assurances S.A.

By: _____

24

2 Granite 000136

NOV 16 2004 20:18 FR AIG TOXIC        212 809 0642 TO 912157012437    P.03

BY:

**Halliburton Company**

By: _____

Title: _____

Date: _____

**DII Industries, LLC**

By: _____

Title: _____

Date: _____

**Kellogg Brown & Root, Inc.**

By: _____

Title: _____

Date: _____

AIG Technical Services, Inc, as authorized representative for AIU Insurance Company,
American Home Assurance Company, Birmingham Fire Insurance Company, Granite
State Insurance Company, Insurance Company of the State of Pennsylvania, Landmark
Insurance Company, Lexington Insurance Company, National Union Fire Insurance
Company of Pittsburgh, PA, New Hampshire Insurance Company and L'Union Atlantique
D'Assurances S.A.

By: _____

24

2 Granite 000137

Title: _Asst. Vice President_

Date: _11/16/04_

25

2 Granite 000138

**Exhibit 1**

**Form of Approval Order**

26

2 Granite 000139

IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Jointly Administered at |
| MID-VALLEY, INC., *et al.*, | ) | Case No. 03-35592- JKF |
| | ) | |
| Debtors. | ) | Chapter 11 |
| | ) | |
| | ) | Docket No. _____ |
| | ) | |
| MID-VALLEY, INC., *et al.*, | ) | Related to Docket No. 2024 |
| | ) | |
| Movants, | ) | Related to Agenda No. 7 |
| | ) | |
| vs. | ) | Hearing Date and Time: |
| | ) | November 18, 2004 at 2:00 p.m. |
| (NO RESPONDENT), | ) | |
| Respondent(s). | ) | Objection Deadline |
| | ) | November 11, 2004 |

**ORDER AUTHORIZING AND APPROVING SETTLEMENT AGREEMENT
AND RELEASE AMONG DII INDUSTRIES, LLC, KELLOGG BROWN &
ROOT, INC., AND OTHER RELEASING POLICYHOLDERS AND AIG
COMPANIES AND RELATED TRANSACTIONS, INCLUDING THE
ASSIGNMENT OF THE AIG SETTLEMENT PAYMENTS**

The Court has considered the "Expedited Motion for Orders Pursuant to 11 U.S.C. §§

105(a) and 363(b)(1), (f) and (m) and Fed. R. Bank. P. 9019 and 6004 (A) Approving Insurance

Settlement Agreements with Various Insurers and Other Interested Parties and (B) Authorizing

Sale of Buyback Policies" (the "Motion"), filed by the debtors and debtors-in-possession herein

(collectively, the "Debtors"), seeking approval, pursuant to Rules 2002(a)(3), 9014, and 9019 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and sections 363(f), 1107,

1108, and 1146(c) and other applicable sections of the title 11 of the United States Code, 11

NYLIB5 801718.6

2 Granite 000140

U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), of (1) that certain Settlement Agreement and Release (such agreement, including the exhibits thereto, the "Settlement Agreement") among (a) the Debtors, and (b) AIG Technical Services, Inc. on behalf of AIU Insurance Company, American Home Assurance Company, Birmingham Fire Insurance Company, Granite State Insurance Company, Insurance Company of the State of Pennsylvania, Landmark Insurance Company, Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, New Hampshire Insurance Company, and L'Union Atlantique D'Assurances S.A., and their respective predecessors, successors and assigns (collectively, the "AIG Companies"), and (2) the transactions set forth in the Settlement Agreement (the "Transactions"), including, but not limited to, (a) the compromises, settlements and releases set forth therein, (b) upon receipt of the Payment Amount upon the terms set forth in the Settlement Agreement, the entry into that certain Assignment Agreement among Debtors, as Sellers, and the Purchaser, as purchaser, in substantially identical form as annexed to the Settlement Agreement as Exhibit 7 (such agreement, including the schedules and exhibits thereto, the "Assignment Agreement"), and the transactions contemplated therein, and (c) as of the Assignment Agreement Effective Date (as defined in the Assignment Agreement) upon completion of the closing series of transactions set forth in section 2.2(i)–(iv) of the Assignment Agreement (the "Closing Transactions"), the transfer by the Debtors of the AIG Settlement Payments free and clear of all security interests, liens, claims, encumbrances, and other interests of any nature. Capitalized terms used in this Order and not otherwise defined herein shall have the meanings ascribed to such terms in the Settlement Agreement or, if not defined therein, in the Assignment Agreement or, if not defined in either the Settlement Agreement or the Assignment Agreement, the Uniform

2

2 Granite 000141

Glossary of Defined Terms for Plan Documents filed of record on May 17, 2004 (Docket No. 1514). The Settlement Agreement relates to the AIG Policies.

Adequate notice of the Motion was given by individual mailing to: (1) counsel to the Purchaser, (2) each entity set forth in the Debtors' current official service list, including, but not limited to, counsel to the Asbestos Committee and the Legal Representative, and (3) each entity listed on the Bankruptcy Rule 2002 Service list.

A hearing was held on November 18, 2004 (the "Hearing") to consider the Motion and the Settlement Agreement, and all interested parties were given an opportunity to be heard and to present evidence. Objections to the Motion, if any, have been resolved by agreement or are overruled, and after due deliberation and sufficient cause appearing therefore, this Court hereby makes the following Findings of Fact and Conclusions of Law:

## I.      FINDINGS OF FACT:

IT IS HEREBY FOUND AND DETERMINED THAT:[1]

### Jurisdiction, Final Order, and Statutory Predicates

A. This Court has jurisdiction to hear and determine the Motion and to grant the relief requested therein pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b). This Motion presents a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (M), and (O).

B. This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). The parties may consummate the Transactions immediately upon entry of this Order. To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal

---

[1]      Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

3

2 Granite 000142

Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order.

**Notice of the Motion and the Settlement**

C. The notice of the Motion described above constitutes due, sufficient, and timely notice of the Motion, the Hearing, the Settlement Agreement and the Transactions to all Entities entitled thereto in accordance with the requirements of the Bankruptcy Code, the Bankruptcy Rules, this Court's Modified Order Granting Motion To Limit Notice and Interim Order Establishing Official Service List, dated December 17, 2003, and the due process requirements of both the United States Constitution and other applicable law. No other or further notice of the Motion or of this Order is necessary.

**Good Faith Nature of Settlement Agreement and Reasonableness of the Terms of the Settlement Agreement, the Assignment Agreement, and the Transactions**

D. The Debtors negotiated with the AIG Companies and the Purchaser at arm's length and in good faith to reach agreement on the matters resolved through the Settlement Agreement, the Assignment Agreement, and the Transactions.

E. Pursuant to Bankruptcy Rule 9019, and in consideration of the terms, compromises, and exchanges of consideration contained in the Settlement Agreement, the Assignment Agreement and the Transactions, and all other facts and circumstances of these Reorganization Cases, the provisions of the Settlement Agreement and the Assignment Agreement are: (i) fair and reasonable settlements; (ii) valid and proper exercises of the Debtors' business judgment; (iii) exchanges for reasonably equivalent value; (iv) fair, equitable, and well within the range of reasonableness for approval of the Settlement Agreement, the Assignment Agreement, and the Transactions; and (v) considering all of the factors set forth in *In re Martin*,

4

2 Granite 000143

91 F.3d 389, 393 (3d Cir. 1996), as discussed in the Motion, in the best interests of the Debtors, their Estates, their creditors, and other parties-in-interest.

F. Upon the Confirmation Order becoming a Final Order and the payment of the Payment Amount to DII Industries by the Purchaser pursuant to the terms of the Settlement Agreement, if such events, in fact, occur, the Purchaser shall be deemed a "good faith" purchaser pursuant to and within the meaning of section 363(m) of the Bankruptcy Code with respect to the Purchaser's purchase of the AIG Settlement Payments.

G. The Settlement Agreement, the Assignment Agreement, and the Transactions confer a substantial benefit upon the Debtors' Estates, by providing for, among other things (i) the settlement of complex litigation and (ii) payment to DII Industries by the Purchaser of the Payment Amount in immediately available funds.

H. The contributions by the AIG Companies under the AIG Policies in the Settlement Agreement constitute reasonable settlements and fair resolutions of the alleged liability of the AIG Companies under the AIG Policies for Asbestos Claims and Silica Claims, and such contributions satisfy the liability of the AIG Companies, if any, for Asbestos Claims and Silica Claims under the AIG Policies.

**Validity of Transfer**

I. Upon the Assignment Agreement Effective Date and upon completion of the Closing Transactions, the transfer of the AIG Settlement Payments to the Purchaser shall be and hereby will be as of such date a legal, valid, and effective transfer of the AIG Settlement Payments, and vests the Purchaser with all right, title, and interest in and to the AIG Settlement Payments free and clear of all of the following: mortgages, security interests, conditional sale or other title retention agreements, pledges, liens (as that term is defined in section 101(37) of the

5

2 Granite 000144

Bankruptcy Code), judgments, demands, easements, charges, encumbrances, defects, options, covenants, claims, other encumbrances, and restrictions of all kind (collectively, "Encumbrances").

J. The Purchaser would not have entered into the Assignment Agreement and would not consummate the Transactions contemplated thereby if the transfer of the AIG Settlement Payments to the Purchaser were not free and clear of all Claims and Encumbrances of any Entity (including, but not limited to, the Debtors, or any other Entity) or if the Purchaser would be liable for any claim or liability relating to the AIG Settlement Payments or the AIG Policies.

K. Immediately prior to the assignment and transfer of the AIG Settlement Payments to the Purchaser as contemplated in the Transactions, (i) the Debtors and other Persons subject to this Court's jurisdiction will possess all rights, title, and interest to the AIG Settlement Payments and (ii) the AIG Settlement Payments will constitute the exclusive property of the Debtors.

L. Upon the Assignment Agreement Effective Date and upon completion of the Closing Transactions, the AIG Settlement Payments and payments thereunder and proceeds thereof shall no longer be property of the Debtors, their Estates (or of any Entity other than the Purchaser) and, to the extent that any such Entity, or any of their successors in interest, become the subject of a future case under the Bankruptcy Code, such AIG Settlement Payments and payments thereunder and proceeds thereof will not be property of any such prospective bankruptcy estate within the meaning of section 541 of the Bankruptcy Code. Both the substance of the Transactions being effected in the settlement being approved in this Order, and

6

2 Granite 000145

the intent of the Parties, demonstrates that the transfer of the AIG Settlement Payments from the Debtors to the Purchaser is a true sale transaction.

M. Upon the payment of the Payment Amount to DII Industries by the Purchaser: (i) the assignment to the Purchaser of the AIG Settlement Payments shall be effective and binding upon the Debtors, their Estates, and all other Entities; (ii) except as specifically provided in the Settlement Agreement, none of the Debtors or any other Entity (other than the Purchaser) shall have any rights, title or interest or other property rights or interests in or to the AIG Policies or the AIG Settlement Payments and the payments and proceeds thereof; (iii) to the extent that any other Entity (other than the Purchaser), or any of their successors in interest, become the subject of a case under the Bankruptcy Code, or to the extent that the Debtors become the subject of a case under the Bankruptcy Code other than the pending Reorganization Cases, such AIG Settlement Payments and payments thereunder and proceeds thereof will not be property of any such prospective bankruptcy estate within the meaning of section 541 of the Bankruptcy Code; and (iv) none of the Debtors, or any other Entity (other than the Purchaser) shall have any reversionary rights or interests in the AIG Settlement Payments.

**Section 363(f) is Satisfied**

N. The Debtors may transfer the AIG Settlement Payments free and clear of all Claims and Encumbrances against the Debtors or their Estates because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Claims and Encumbrances, in each case against the Debtors, their Estates, who did not object, or who withdrew their objections, to the transfer of the AIG Settlement Payments, the Motion, the Settlement Agreement, the Assignment, and/or the Transactions are deemed to

7

2 Granite 000146

have consented to such transfer free and clear of any and all Claims and Encumbrances pursuant to section 363(f)(2) of the Bankruptcy Code.

## No Successor Liability

O. The transfer of the AIG Settlement Payments to the Purchaser does not and will not subject the Purchaser to any liability by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, including, without limitation, any theory of antitrust, insurance, environmental, successor or transferee liability, labor law, *de facto* merger, or substantial continuity or otherwise. Nothing in the Settlement Agreement, the Assignment Agreement, this Order or any other Transaction Document creates or imposes any liability upon the Purchaser on account of the AIG Policies and the Purchaser is not assuming any liabilities or obligations under the AIG Policies.

## Transfer Taxes

P. Pursuant to section 1146(c) of the Bankruptcy Code, the sale of the AIG Settlement Payments to the Purchaser and the payment of the Payment Amount are determined to be under or in contemplation of a plan to be confirmed under section 1129 of the Bankruptcy Code and, therefore, the Payment Amount and the AIG Settlement Payments are exempt from any transfer, stamp, sales, use, duty, value added, or any other similar tax, including, without limitation, any bulk sales tax in all relevant jurisdictions arising as a result of or in connection with the Debtors' sale and transfer of the AIG Settlement Payments to the Purchaser.

## Authority to Enter into Settlement Agreement and to Effect the Transactions

Q. Each of the Debtors and the Releasing Policyholders (i) has full corporate power and authority to enter into and perform the Settlement Agreement, the Assignment

8

2 Granite 000147

Agreement, the other Transaction Documents and the Transactions to which it is a party and (ii) has the authority to take all corporate action necessary to authorize and approve the Settlement Agreement, the Assignment Agreement, the other Transaction Documents and the Transactions to which it is a party. In addition, no consent, authorization or approval, and no filing or registration, of any type or kind, other than those expressly provided for in the Settlement Agreement and the Assignment Agreement, is required for the Debtors or the other Sellers to (i) give effect to the terms of the Settlement Agreement and the Assignment Agreement and (ii) consummate the Transactions. Further, the consummation of the Transactions by the Debtors and the other Sellers does not conflict, contravene, or cause a breach, default or violation of any law, rule, regulation, contractual obligation or organizational or formation document. In addition, except as provided for herein and the Assignment Agreement, the consummation of the Transactions by the Debtors and the other Sellers, does not result in the creation or imposition of any lien or security interest upon the AIG Settlement Payments.

**Releases and Designation of the AIG Companies**
**as Settling Asbestos Insurance Companies**

R.   Pursuant and subject to the terms and conditions of the Settlement Agreement, the AIG Companies specifically have contracted to receive (a) all of the benefits of being designated in the Confirmation Order as a Settling Asbestos/Silica Insurance Company, including, but not limited to, the channeling injunction and releases set forth in section 10.3 of the Plan, and (b) the releases contained in the Settlement Agreement, and, pursuant and subject to the terms and conditions of the Settlement Agreement, the AIG Companies shall be entitled to, upon entry of this Order, the protections provided by such designation and treatment without further order of this Court.

**No Objections Filed**

9

NYLIB5 801718.6

2 Granite 000148

S.  No objections have been filed with respect to the Motion or the entry of this Order.  To the extent any Entity (a) either (i) received proper notice of these matters or (ii) having had notice of these Reorganization Cases, elected not to request notices regarding these Reorganization Cases, and (b) failed to object to the Motion and the entry of the Confirmation Order, then such Entities (including, without limitation, the Debtors) hereby shall have no right to file or prosecute an appeal of this Order or the Confirmation Order.

## II.    CONCLUSIONS OF LAW

NOW, THEREFORE, BASED ON THE FOREGOING FINDINGS OF FACT, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED EFFECTIVE IMMEDIATELY, AS FOLLOWS:

To the extent any Conclusions of Law set forth below herein constitutes a Finding of Fact, this Court so finds.

### General Provisions

1.  Pursuant to the terms of this Order, the relief requested in the Motion is granted and approved in all respects, and the Settlement Agreement, the Assignment Agreement, and the Transactions are hereby approved in all respects.

2.  All objections, if any, to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are overruled on the merits.

### Approval of Settlement Agreement and the Assignment Agreement

3.  The Settlement Agreement and the Assignment Agreement and all of the terms and conditions thereof are hereby approved in their entirety and, notwithstanding anything to the contrary in this Order, to the extent of any conflict or inconsistency between the provisions

10

2 Granite 000149

of this Order and the terms and conditions of the Settlement Agreement and/or the Assignment Agreement, as between the Debtors, the AIG Companies and the Purchaser, as the case may be, the Settlement Agreement and/or the Assignment Agreement shall govern and control.

4. The Debtors are authorized and empowered, and hereby directed, to take any and all actions necessary or appropriate, in accordance with the terms of the Settlement Agreement and the Assignment Agreement, and without further order of the Court, to (a) consummate, carry out and implement the Transactions, (b) consummate, carry out and implement the transfer of all of their right, title, and interest in and to the AIG Settlement Payments to the Purchaser, (c) execute and deliver, perform under, consummate, carry out, implement and close fully the Settlement Agreement and the Assignment Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Settlement Agreement, the Assignment Agreement, and the Transactions, and (d) to take all further actions as may be reasonably requested in accordance with the Settlement Agreement and the Assignment Agreement by the AIG Companies and the Purchaser, as the case may be, for the purpose of transferring and conveying to the Purchaser the AIG Settlement Payments, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Settlement Agreement and the Assignment Agreement. The Settlement Agreement, the Assignment Agreement, and this Order constitute valid and binding obligations of the Debtors and each of their Estates, which shall be enforceable in accordance with the terms thereof.

5. All of the terms and provisions of this Order shall be binding in all respects upon the Debtors, any trustees of the Debtors, the Debtors' Estates, all creditors and shareholders of the Debtors, all interested parties, and their respective successors and assigns.

11

2 Granite 000150

Transfer of the AIG Settlement Payments

      6. Pursuant to section 363(f) of the Bankruptcy Code and as provided in Paragraphs (I), (J), (N), and (O) above, the AIG Settlement Payments shall be transferred to the Purchaser upon the Assignment Agreement Effective Date and the Payment Date free and clear of (a) all Encumbrances and (b) any and all Claims of any kind and nature, whether arising prior to or subsequent to the commencement of the Reorganization Cases, in each case accruing, arising or relating to the period on or prior to the Assignment Agreement Effective Date. The payment of the Payment Amount pursuant to the terms of the Settlement Agreement and the Assignment Agreement by the Purchaser shall be deemed to be a final and irrevocable payment.

      7. Upon the occurrence of the Assignment Agreement Effective Date and the Payment Date: (a) all Entities, if any, holding Encumbrances or Claims of any kind and nature accruing, arising or relating to a period prior to the Assignment Agreement Effective Date with respect to the AIG Settlement Payments hereby are (i) barred from asserting such Encumbrances or Claims against the Purchaser and the AIG Companies, or any of their respective affiliates, stockholders, parent entities, successors, assigns, officers, directors or employees, or the AIG Settlement Payments, (ii) authorized and directed to release such Encumbrances and Claims, and (iii) deemed automatically to have unconditionally released and terminated such Claims and Encumbrances; and (b) the Purchaser and the AIG Companies shall have no liability or responsibility for any Claim or Encumbrance arising, accruing, or relating to a period prior to the Assignment Agreement Effective Date.

      8. Except with respect to any rights, obligations, Claims or liabilities under or relating to the Settlement Agreement or the Assignment Agreement, immediately upon payment in full by the Purchaser of the Payment Amount to DII Industries, and without the necessity of

12

2 Granite 000151

any further act by the Debtors or further order of this Court, all of the rights, titles, interests, and benefits of the Debtors and their Estates in and with respect to the AIG Settlement Payments are transferred, sold, and assigned to the Purchaser, and such transfer, sale, and assignment shall be free and clear of any and all Claims and Encumbrances whatsoever pursuant to section 363(f) of the Bankruptcy Code, and shall result in the extinguishment of any right of any Entity to bring any claim against the Purchaser with respect to the AIG Settlement Payments or the AIG Policies.

        9.    Nothing in this Order, the Settlement Agreement, the Assignment Agreement or the Transactions shall cause the Purchaser to have or create any insurance liability or obligation to any Entity arising under or in connection with the AIG Policies or the Other Coverages.

**Releases**

        10.    Except with respect to any rights, obligations, Claims or liabilities under or relating to the Settlement Agreement, and subject to the limitations set forth in the Settlement Agreement, and subject to all of the provisions of the Settlement Agreement, including provisions rendering the Settlement Agreement null and void in certain circumstances, immediately upon payment in full of the Payment Amount to DII Industries or as otherwise ordered by this Court, and without the necessity of any further act by the Debtors or further order of this Court, the releases and provisions set forth in section IV of the Settlement Agreement shall be effective and binding upon the Entities set forth therein.

        11.    Upon the payment in full by the Purchaser of the Payment Amount, the Releasing Policyholders, on the one hand, and the AIG Companies, on the other hand, shall

13

2 Granite 000152

dismiss all Claims against each other with respect to the AIG Policies with prejudice, with each Party bearing its own fees and costs.

**Protective Lien**

12.     Although this Court hereby determines that the transfer of the AIG Settlement Payments to the Purchaser pursuant to the terms of the Settlement Agreement and the Assignment Agreement shall be a purchase and sale of the AIG Settlement Payments that may not be recharacterized in any manner, to the extent that a court of competent jurisdiction disregards this Order and determines that such transactions constitutes a loan, then, in such case, the Purchaser shall (a) automatically be deemed to hold a secured loan (the "Secured Loan") in accordance with the provisions of sections 3.1(h) and 3.4 of the Assignment Agreement, and (b) hold a first priority lien and security interest (the "Senior Lien") in and to the Collateral securing the repayment of the  Payment Amount.  The Secured Loan shall be senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court, or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with sections 363, 364, and/or any other sections of the Bankruptcy Code or other applicable law.  This Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of such Senior Liens, effective as of the date and time of entry of this Order, subject only to the occurrence of the Assignment Agreement Effective Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the Collateral or other act to validate or perfect such security interest or lien (a "Perfection Act").  Notwithstanding the foregoing, if the Purchaser shall, in its sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, the Purchaser is authorized to perform such act and the

14

2 Granite 000153

Debtors are authorized and directed to perform such act to the extent necessary or required by the Purchaser, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Order notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file, and/or record any document in regard to such act in accordance with applicable law. The Purchaser may choose to file, record, or present a certified copy of this Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of this Order in accordance with applicable law. Should the Purchaser so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, or perfection of the Senior Liens by virtue of entry of this Order. Notwithstanding the foregoing, this Court hereby decrees that, in light of the substance of the transaction as a true sale of the AIG Settlement Payments to the Purchaser, which corresponds to the express intent of the Parties, the Transactions should not, in any circumstance, be recharacterized as a loan or any other transaction by any other court.

**Additional Provisions**

13. The consideration provided by the Purchaser for the AIG Settlement Payments pursuant to the Settlement Agreement and the Assignment Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

14. This Order is and shall be binding upon and shall govern the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, administrative agencies, governmental units,

15

2 Granite 000154

secretaries of state, federal, state, and local officials, and all other Entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the AIG Settlement Payments. All Claims or Encumbrances of record as of the date of this Order shall forthwith be removed and stricken as against the AIG Settlement Payments, without further order of the Court or act of any party. Upon the Assignment Agreement Effective Date, the entities listed above in this paragraph are authorized and specifically directed to strike all such recorded Claims and Encumbrances against the AIG Settlement Payments as provided for herein from their records, official or otherwise.

15. Each and every federal, state, and local governmental agency, unit or department are hereby directed to accept this Order as sole and sufficient evidence of the transfer of title of the AIG Settlement Payments to the Purchaser, and such agency or department may rely upon this Order in consummating the Transactions contemplated by the Settlement Agreement and the Assignment Agreement.

16. If any Entity that has filed a financing statement, mortgage, mechanic's lien, *lis pendens*, or other document or agreement evidencing a Claim or Encumbrance against or interest in the AIG Settlement Payments that are being transferred free and clear, as provided herein, shall not have delivered to the Debtors prior to the Assignment Agreement Effective Date, in proper form for filing and executed by the appropriate parties, a termination statement, instrument of satisfaction, release of all such Claims or Encumbrances which such Entity has with respect to the AIG Settlement Payments or otherwise, the Debtor and the Purchaser are hereby authorized to execute and file such statement, instrument, release, or other document on behalf of such Entity with respect to the AIG Settlement Payments.

16

2 Granite 000155

17. The Purchaser is not a successor to the Debtors or their Estates by reason of any theory of law or equity or as a result of the consummation of the Transactions or otherwise.

18. The terms and provisions of the Settlement Agreement and the Assignment Agreement, together with the terms and provisions of this Order, shall be binding in all respects upon all entities, including the Debtors, any trustee of the Debtors, the Debtors' Estates, its creditors, its shareholders, and all interested parties, administrative agencies, governmental units, secretaries of state, federal, state and local officials, maintaining any authority relating to the AIG Settlement Payments, and their respective successors or assigns, and upon any Entities asserting a Lien against or interest in the AIG Settlement Payments to be sold and assigned to the Purchaser.

19. Nothing contained in the Plan or any other plan of reorganization or liquidation, or order of any type or kind entered in (a) these Reorganization Cases, (b) any subsequent chapter 7 case into which the chapter 11 case may be converted, or (c) any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of the Settlement Agreement, the Assignment Agreement or the terms of this Order. This Order shall be binding upon and enforceable against, among others, the Debtors, their Estates, and any and all chapter 7 and chapter 11 trustees thereof.

20. The failure specifically to include any particular provision of the Settlement Agreement and the Assignment Agreement in this Order shall not diminish or impair the efficacy of such provision, it being the intent of this Court that the Settlement Agreement and the Assignment Agreement and each and every provision, term, and condition thereof be authorized and approved in its entirety.

17

2 Granite 000156

21. This Order shall be effective immediately upon its entry. The ten (10) day stay provided in Bankruptcy Rule 6004(g) is hereby waived.

22. The Transactions are undertaken by the Purchaser and the AIG Companies, as the case may be, in good faith (as that term is used in section 363(m) of the Bankruptcy Code), and Purchaser and the AIG Companies shall continue to be acting in good faith (as that term is used in section 363(m) of the Bankruptcy Code) by proceeding to close the Transactions, even if such Assignment Agreement Effective Date occurs immediately upon entry of this Order. Accordingly, the reversal or modification on appeal of the authorization to consummate the Transactions provided herein shall not affect the validity of the transfer of the AIG Settlement Payments to the Purchaser upon the terms set forth in the Settlement Agreement and the Assignment Agreement, unless such authorization is duly stayed prior to the Assignment Agreement Effective Date pending such appeal. Upon the payment of the Payment Amount by the Purchaser, Purchaser is a purchaser in good faith of the AIG Settlement Payments, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code. Each and every entity is enjoined from commencing or continuing an action seeking relief under section 363(n) of the Bankruptcy Code and, the Transactions may not be avoided, and no damages may be assessed against the Purchaser or the AIG Companies or any other party.

23. Subject to the section 24 of this Order, the Settlement Agreement and the Assignment Agreement and any other document memorializing a transaction required to consummate any of the Transactions may be modified, amended, or supplemented by the parties thereto, in a writing signed by such parties in accordance with the terms thereof, without further order of the Court, provided that (a) any such modification, amendment, or supplement is not material and (b) to the extent practicable, notice of any modification, amendment, or supplement

18

NYLIBS 801718.6

2 Granite 000157

should be delivered to (i) counsel to the Asbestos Committee and (ii) the Legal Representative at least five (5) days prior to the effective date of any such modification, amendment, or supplement.

24. So long as the Settlement Agreement and Assignment Agreement shall not have terminated pursuant to the terms of such agreements, none of the Debtors shall amend, or consent to any amendment to, the Settlement Agreement or the Assignment Agreement in any manner that would affect the AIG Settlement Payments without the prior written consent of the Purchaser.

25. Notwithstanding any other provision of this Order, if the Settlement Agreement is properly terminated under the terms thereof, then this Order, with the exception of section 26 of this Order, shall be null and void and not be binding on any Entity.

26. If the Settlement Agreement is properly terminated under the terms thereof, then any and all statutes of limitation or repose or other time-related limitations, with respect to any Claim by any Entity, shall be deemed to have been tolled for the period from October 29, 2004 through the date that the Settlement Agreement is declared terminated or null and void, and no Entity shall be entitled to assert or rely on any time-related defense to any Claim by any other Entity related to such period.

27. Subject to the following sentence, the Court shall retain exclusive jurisdiction over any proceeding that involves the validity, application, construction or modification of the Settlement Agreement and this Order, and may make such further orders with respect thereto as are proper and appropriate. Upon and after the payment of the Payment Amount in accordance with the Settlement Agreement, the Court shall not have jurisdiction in any manner relating to the Settlement Agreement or the Assignment Agreement or the other transactions contemplated

19

2 Granite 000158

therein and the Parties shall resolve any such disputes in accordance with the applicable agreement between such disputing parties.

28. The provisions of this Order are non-severable and mutually dependent.

29. This Order is entered in conjunction with the Order Granting Expedited Motion for Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b)(1), (f) and (m) and Fed. R. Bankr. P. 9019 and 6004 (A) Approving Insurance Settlement Agreements and Related Agreements with Various Insurers and Other Interested Parties and (B) Authorizing Sale of Buyback Policies.

30. Counsel for the Debtors shall immediately serve a copy of this Order on all parties on the Official Service List, the 2002 Service List, all parties to the Settlement Agreement, and any other parties in interest and file a certificate of service with the Clerk of the Bankruptcy Court within ten (10) days hereof.

Dated: November 18, 2004

The Honorable Judith K. Fitzgerald
United States Bankruptcy Judge

20

NYLIB5 801718.6

2 Granite 000159