# EXHIBIT 9B

## EXHIBIT 2

"The list is based on current available information, and is not to be deemed and admission or evidence of the existence of that policy."

## NAMED INSURED: Brown & Root, Inc.

| INSURER NAME | POLICY NUMBER | POLICY PERIOD |
|---|---|---|
| AIU Insurance Company | 75-100355 | 01/01/78-01/01/79 |
| | 75-100455 | 01/01/79-01/01/82 |
| | 75-102327 | 01/01/82-01/01/84 |
| | | |
| American General Insurance Company | CL 8767 | 01/01/47-01/01/48 |
| | CL-9441 | 01/01/51-01/01/52 |
| | CL-9704 | 01/01/52-01/01/53 |
| | CL-9981 | 01/01/53-01/01/54 |
| | CL-10450 | 01/01/54-01/01/55 |
| | CL-10451 | 01/01/54-01/01/55 (assumed) |
| | CL 10751 | 01/01/55-01/01/56 (assumed) |
| | CL 10451 | |
| American Home Assurance Company | CE 357184 | 01/23/70-01/01/71 |
| | CB 2691914 | 01/01/71-01/01/72 |
| | CE 2692228 | 01/01/72-01/01/73 |
| | CB 338 02 77 | 01/01/73-01/01/74 |
| | CB 338 17 68 | 01/01/74-01/01/75 |
| | SCLB 80-65436 | 01/01/76-01/01/77 |
| | CB 364-1285 | 01/01/76-01/01/77 |
| | | |
| Granite State Insurance Company | SCLD 80-94180 | 01/01/77-01/01/78 |
| | 6784-2042 | 01/01/84-01/01/85 |
| | | |
| New Hampshire Insurance Company | S 20612 | 01/01/78-01/01/81 |
| | | |
| National Union Fire Insurance Company of Pittsburgh, PA | CLE 3641285 | 01/01/76-01/01/77 |
| | 1186877 | 01/01/77-01/01/78 |
| | 1226561 | 01/01/78-01/01/79 |
| | 1226745 | 01/01/79-01/01/80 |
| | 1226745 | 01/01/79-01/01/80 |
| | 1226848 | 01/01/80-01/01/81 |
| | 9601642 | 01/01/81-01/01/82 |
| | 9601696 | 01/01/82-01/01/84 |
| | 9605925 | 01/01/84-01/01/85 |

2 Granite 000160

**NAMED INSURED:**     NL Industries, Inc.
National Lead Company
Abroad Corporation

| INSURER NAME | POLICY NUMBER | POLICY PERIOD |
|---|---|---|
| American Home | EXA 940-4932RA | 3/1/84-3/1/85 |
| | | |
| American International | 75-100636 | 3/22/78-3/1/79 |
| | Unknown | 10/26/78-3/1/79 |
| | | |
| Birmingham | SE 6074246 | 3/1/84-3/1/85 |
| | | |
| Granite State | 6180-1974 | 3/1/80-3/1/81 |
| | 6179-1111 | 3/1/79-3/1/80 |
| | 6481-5151 | 3/1/81-3/1/82 |
| | 6482-5402 | 3/1/82-3/1/83 |
| | 6483-5577 | 3/1/83-3/1/84 |
| | 6484-5766 | 3/1/84-3/1/85 |
| | | |
| Landmark | | 3/1/80-3/1/81 |
| | FE 4001082 | 3/1/80-3/1/81 |
| | FE 4000091 | 10/26/78-3/1/79 |
| | FE 400-01-28 | 3/1/79-3/1/80 |
| | FE 400-01-29 | 3/1/79-3/1/80 |
| | FE4001147 | 3/1/81-3/1/82 |
| | FE 4001148 | 3/1/81-3/1/82 |
| | FE 4001357 | 3/1/82-3/1/83 |
| | | |
| Lexington | 5520295 | 3/1/80-3/1/81 |
| | GC 550 4578 | 4/18/75-3/31/76 |
| | GC550 4578 | 3/1/76-3/31/76 |
| | CB 5503373 | 3/31/76-3/1/79 |
| | CB 5503372 | 3/31/76-3/1/79 |
| | 5513783 | 3/1/79-3/1/82 |
| | 5513810 | 3/1/79-3/1/80 |
| | 5513784 | 3/1/79-3/1/80 |
| | 5511419 | 3/1/79-3/1/80 |
| | 5540338 | 3/1/80-3/1/82 |
| | 5540339 | 3/1/80-3/1/81 |
| | 5522152 | 3/1/81-3/1/82 |
| | 5570217 | 3/1/82-3/1/85 |
| | 5523806 | 3/1/82-3/1/83 |
| | 881/UHL 0439 | 03/31/76-03/01/79 |
| | 881/UHL 0441 | 03/31/76-03/01/79 |
| | 881/ULL 0304 | 03/01/79-03/01/82 |
| | 881/ULL 0305 | 03/01/79-03/01/80 |
| | 881/ULL 0306 | 03/01/79-03/01/80 |
| | 551 UMA 0140 | 03/01/80-03/01/81 |
| | UNA0145 | 03/01/81-03/01/82 |
| | 551 UNA0146 | 03/01/81-03/01/82 |
| | 551 UPA 0067 | 03/01/82-03/01/85 |
| | 551UQA 0049 | 03/01/83-03/01/84 |

PLAN EXHIBIT 1
Page 2

2 Granite 000161

| INSURER NAME | POLICY NUMBER | POLICY PERIOD |
|---|---|---|
| | 551 URA 0040 | 03/01/84-03/01/85 |
| | 551/USA 0085 | 03/01/85-03/01/86 |
| | 551/USA 0086 | 03/01/85-03/01/86 |
| | | |
| National Union | 978 25 51 | 3/1/80-3/1/81 |
| | 1229599 | 3/1/78-3/1/79 |
| | 1225313 | 3/1/79-3/1/80 |
| | 1225313 | 3/1/79-3/1/80 |
| | 9782551 | 3/1/80-3/1/81 |
| | 991 05 36 | 3/1/81-3/1/82 |
| | 960 30 85 | 3/1/82-3/1/83 |
| | | |
| New Hampshire | 5178-0927 | 3/1/78-3/1/79 |

Named Insured: Dresser Industries, Inc.

| INSURER NAME | POLICY NUMBER | POLICY PERIOD |
|---|---|---|
| AIU Insurance Company | 75-100374 | 11/01/78-11/01/79 |
| | 75-100944 | 11/01/79-11/01/80 |
| | 75-100945 | 11/01/80-11/01/81 |
| | 75-100946 | 11/01/81-11/01/82 |
| | 75-100345 | 11/01/82-11/01/83 |
| | 75-100346 | 11/01/82-11/01/83 |
| | 75-100965 | 11/01/83-11/01/84 |
| | | |
| Granite State Insurance Company | SCLD 80-94102 | 11/01/76-11/01/77 |
| | 80-94116 | 11/01/77-11/01/78 |
| | | |
| Landmark Insurance Company | FE4002121 | 11/01/84-11/01/85 |
| | | |
| Lexington Insurance Company | GC 403143 | 11/01/71-11/01/72 |
| | GC 403438 | 11/01/72-11/01/75 |
| | RLJ 2001 | 11/01/76-11/01/77 |
| | GC 5505740 | 11/01/77-11/01/78 |
| | 5513423 | 11/01/78-11/01/79 |
| | IS 5513981 | 11/01/79-11/01/80 |
| | 5514046 | 11/01/80-11/01/81 |
| | 5520193 | 11/01/81-11/01/82 |
| | 55241513 | 11/01/82-11/01/83 |
| | CX 4923 | 11/01/71-00/01/72 |
| | 551/UQA 0265 | 11/01/83-11/01/84 |
| | | |
| L'Union Atlantique de Assurances | ULL 1229 | 11/01/79-11/01/80 |
| | | |
| New Hampshire Insurance Company | WM-22014 | 11/01/81-11/01/81 |
| | WM-23010 | 11/01/81-11/01/81 |
| | WM-23011 | 11/01/81-11/01/81 |
| | WN-30081 | 11/01/81-11/01/82 |
| | WN-31034 | 11/01/81-11/01/82 |
| | 551/WP-30053/4 | 11/01/82-11/01/83 |
| | 551/WP-31019 | 11/01/82-11/01/83 |
| | | |
| National Union Fire Insurance of Pittsburgh, PA | RLJ 2000 | 11/01/76-11/01/77 |
| | 1226649 | 11/01/77-11/01/78 |
| | 1226717 | 11/01/78-11/01/79 |
| | 1226968 | 11/01/79-11/01/80 |

PLAN EXHIBIT 1
Page 4

2 Granite 000163

NAMED INSURED: Worthington Pump & Machinery Corporation
McGraw-Edison Company
Studebaker-Worthington, Inc.
Worthington Corporation

| INSURER NAME | POLICY NUMBER | POLICY PERIOD |
|---|---|---|
| AIU Insurance Company | 75-100055 | 01/01/78-03/01/79 |
| | 75-100054 | 01/01/78-03/01/79 |
| | 75-100053 | 01/01/78-03/01/79 |
| | 75-101026 | 03/01/79-03/01/80 |
| | 75-101027 | 03/01/79-03/01/80 |
| | 75-101028 | 03/01/79-03/01/80 |
| | 75-100908 | 03/01/82-03/01/83 |
| | 75-103524 | 03/01/83-03/01/84 |
| | 75-103525 | 03/01/83-03/01/84 |
| | 75-103591 | 03/01/84-03/01/85 |
| | 75-103592 | 03/01/84-03/01/85 |
| | 75-103656 | 03/01/85-04/15/85 |
| | 75-103663 | 03/01/85-03/01/86 |
| | | |
| American Home Assurance Company | CE 355594 | 03/21/69-03/21/72 |
| | CE 2692335 | 03/21/72-01/01/75 |
| | 501/A7414904 | 10/01/74-03/13/77 |
| | PY105379 | 05/15/79-05/15/80 |
| | | |
| Birmingham Fire Insurance Company of Pennsylvania | SE6073331 | 01/01/78-03/01/79 |
| | SE6073469 | 03/01/79-03/01/80 |
| | | |
| Granite State Insurance Company | SCLD 80-94000 | 10/01/76-01/01/77 |
| | SCLD 80-94063 | 01/01/77-01/01/78 |
| | SCLD 80-94064 | 01/01/77-01/01/78 |
| | 6680-1963 | 03/01/80-03/01/81 |
| | 6681-2370 | 03/01/81-03/01/82 |
| | 6681-2371 | 03/01/81-03/01/82 |
| | 6682-3216 | 03/01/82-03/01/83 |
| | 6682-3217 | 03/01/82-03/01/83 |
| | 6683-3982 | 03/01/83-03/01/84 |
| | 6683-3983 | 03/01/83-03/01/84 |
| | 6684-4637 | 03/01/84-03/01/85 |
| | 6685-5584 | 03/01/85-03/01/86 |
| | | |
| The Insurance Company of the State of Pennsylvania | 4176-7295 | 10/01/76-01/01/77 |
| | | |
| Lexington Insurance Company | GC5500201 | 10/01/74-01/01/77 |
| | 551 1459 | 05/15/79-03/01/80 |
| | 543/55162/80 | 03/01/80-03/01/81 |
| | 543/55163/82 | 03/01/80-03/01/81 |
| | PY105379 | 05/15/79-05/15/80 |
| | | |
| National Union Fire Insurance Company of Pittsburgh, PA | CE1011901 | 01/01/75-01/01/78 |
| | 1229452 | 01/01/78-03/01/79 |
| | GLA 127-0148 | 03/01/79-03/01/80 |

PLAN EXHIBIT 1
Page 5

2 Granite 000164

| INSURER NAME | POLICY NUMBER | POLICY PERIOD |
|---|---|---|
| | 1225321 | 03/01/79-03/01/80 |
| | 1226440 | 03/01/80-03/01/81 |
| | 1226084 | 03/01/81-03/01/82 |
| | 9605832 | 03/01/85-03/01/86 |
| | | |
| Yosemite Insurance Company | YXL106803 | 10/01/74-01/01/77 |

2 Granite 000165



[To be filed under seal only if required by the Court]

### Exhibit 3

A.     The Releasing Policyholders and the AIG Companies agree that the AIG Companies will be obligated to make a stream of payments in amounts and at the times agreed to between the AIG Companies and the Purchaser (the "AIG Settlement Payments"), which AIG Settlement Payments are being assigned by the Releasing Policyholders to the Purchaser pursuant to the Assignment Agreement.

B.     The AIG Companies shall cause the Purchaser (a financial institution, trust or other vehicle that holds financial assets that is acceptable to the AIG Companies) to pay pursuant to the terms of an Assignment Agreement (the form of which is attached hereto as Attachment A), on the Funding Effective Date the amount of $173,620,556.00 million (the "Payment Amount") to DII Industries, which payment shall be final and irrevocable when made.



C.     The AIG Companies agree to have the Purchaser pay the Payment Amount to DII Industries and the Releasing Policyholders agree to the Purchaser's payment of the Payment Amount in each case in connection with the following transactions: (a) the payment to DII Industries by the Purchaser of the Payment Amount pursuant to this Agreement; (b) concurrently with or shortly after the Effective Date (but prior to the hearing on the motion for the Approval Order), the entry into an agreement by Releasing Policyholders and the Purchaser in the form attached hereto as Attachment A (the Assignment Agreement), pursuant to which, upon the payment of the Payment Amount by the Purchaser, the Releasing Policyholders shall assign to the Purchaser all of each of their right, title and interest in and to the AIG Settlement Payments, unencumbered by any security interests, liens or other encumbrances, claims or interests or any nature; and (c) the Parties' entry into this Agreement.  The AIG Companies agree that each of the Releasing Policyholders has the right to assign to the Purchaser all of their respective right, title and interest in and to the AIG Settlement Payments, and the Purchaser has the right to collect the AIG Settlement Payments.

**CONFIDENTIAL**

2 Granite 000166

## Exhibit 3

A.    The Releasing Policyholders and the AIG Companies agree that the AIG Companies will be obligated to make a stream of payments in amounts and at the times agreed to between the AIG Companies and the Purchaser (the "AIG Settlement Payments"), which AIG Settlement Payments are being assigned by the Releasing Policyholders to the Purchaser pursuant to the Assignment Agreement.

B.    The AIG Companies shall cause the Purchaser (a financial institution, trust or other vehicle that holds financial assets that is acceptable to the AIG Companies) to pay pursuant to the terms of an Assignment Agreement (the form of which is attached hereto as Attachment A), on the Funding Effective Date the amount of $____million (the "Payment Amount") to DII Industries, which payment shall be final and irrevocable when made.

C.    The AIG Companies agree to have the Purchaser pay the Payment Amount to DII Industries and the Releasing Policyholders agree to the Purchaser's payment of the Payment Amount in each case in connection with the following transactions: (a) the payment to DII Industries by the Purchaser of the Payment Amount pursuant to this Agreement; (b) concurrently with or shortly after the Effective Date (but prior to the hearing on the motion for the Approval Order), the entry into an agreement by Releasing Policyholders and the Purchaser in the form attached hereto as Attachment A (the Assignment Agreement), pursuant to which, upon the payment of the Payment Amount by the Purchaser, the Releasing Policyholders shall assign to the Purchaser all of each of their right, title and interest in and to the AIG Settlement Payments, unencumbered by any security interests, liens or other encumbrances, claims or interests or any nature; and (c) the Parties' entry into this Agreement. The AIG Companies agree that each of the Releasing Policyholders has the right to assign to the Purchaser all of their respective right, title and interest in and to the AIG Settlement Payments, and the Purchaser has the right to collect the AIG Settlement Payments.

NDC - 023760/0336 - 2005262 V4
NYLIB5 801864.8

2 Granite 000167

Exhibit 4

## Non-AIG Participating Carriers:

1.    Hartford Accident and Indemnity Company, First State Insurance Company, Hartford Casualty Insurance Company, New England Insurance Company, Nutmeg Insurance Company and Twin City Fire Insurance Company.

2.    Zurich American Insurance Company as successor-in-interest to Zurich Insurance Company U.S. Branch by operation of law, Zurich Insurance Company (Switzerland), Zurich International (Bermuda), Ltd., Maryland Casualty Company, for itself and for all liabilities assumed under policies issued by American General Insurance Company, and all other Zurich-related companies.

3.    Allianz AG, Successor in Interest to Allianz Versicherungs AG

4.    Allianz Global Risks U.S. Insurance Company, formerly known as Allianz Insurance Company and Allianz Underwriters Insurance Company, formerly known as Allianz Underwriters, Inc.

5.    Travelers Casualty and Surety Company, formerly known as The Aetna Casualty and Surety Company, and The Travelers Indemnity Company.

6.    Appalachian Insurance Company.

7.    Everest Reinsurance Company and Mt. McKinley Insurance Company.

8.    Employers Reinsurance Corporation.

9.    Westport Insurance Corporation, formerly known as Puritan Insurance Company.

10.    Continental Insurance Company for itself and as successor in interest to the policies issued and alleged to be issued by Harbor Insurance Company, Fidelity and Casualty Company of New York, Columbia Casualty Company, Continental Casualty Company, and Transcontinental Insurance Company.

11.    Century Indemnity Company, Pacific Employers Insurance Company, U.S. Fire Insurance Company, Central National Insurance Company of Omaha, St.Paul Mercury Insurance Company, and ACE Property and Casualty Insurance Company.

12.    One Beacon America Insurance Company

13.    All insurers within the Fairfax Financial Holdings Limited organization, including, but not limited to TIG Insurance Company, individually, and as successor by merger to International Insurance Company and International Surplus Lines Insurance Company, and United States Fire Insurance Company.

1

2 Granite 000168

14.    Stonewall Insurance Company.

15.    Evanston Insurance Company.

16.    Associated International Insurance Company.

17.    Providence Washington Insurance Company.

18.    Insco Limited.

19.    Mutual Marine Office, Inc. as managing agent and as attorney in fact for Employers Mutual Casualty Company and Boston Manufacturers Mutual Insurance Company (n/k/a Arkwright Insurance Company).

20.    Fireman's Fund Insurance Company.

21.    National Surety Corporation.

22.    Federal Insurance Company.

23.    Allstate Insurance Company, for itself and as successor in interest to Northbrook Excess and Surplus Insurance Company, f/k/a Northbrook Insurance Company.

24.    Sentry Insurance a Mutual Company, as assumptive reinsurer of Great Southwest Fire Insurance Company.

25.    Northwestern National Insurance Company, individually and as successor to Universal Reinsurance Corporation and to Bellefonte Underwriters Insurance Company and to Bellefonte Reinsurance Company (formerly Bellefonte Insurance Company).

26.    General Electric Casualty Insurance Company and its predecessor Colonial Penn Insurance Company and Heritage Casualty Insurance Company as their reinsurer and attorney in fact.

27.    Royal Indemnity Company.

28.    Yosemite Insurance Company.

29.    Swiss Reinsurance Company.

30.    American Re-Insurance Company.

31.    Executive Risk Indemnity, Inc. (as successor in interest to American Excess Insurance Company).

2 Granite 000169

32.    European General Reinsurance Company.

\\DC - 0237/0386 - 2005262 v4
NYLIB5 801864.8

3

2 Granite 000170

Exhibit 5

[Harbison-Walker Release]

WDC - 023760386 - 2005262 v4
NYLIB5 801864.8

2 Granite 000171

## RELEASE AND DISCHARGE

This Release and Discharge ("Release") is hereby provided by Global Industrial Technologies, Inc. to the Participating Carriers for good and valuable consideration, including the Participating Carriers' agreement to refrain from litigation with Global Industrial Technologies over any issues relating to the insurance policies issues to Dresser Industries, Inc. and Harbison-Walker Refractories Company, a Pennsylvania corporation, the receipt and sufficiency of which is hereby acknowledged.

WHEREAS, on August 28, 2003, Global Industrial Technologies entered into a settlement agreement and mutual release with DII Industries, LLC ("DII Industries") and Halliburton Company (the "DII/GIT Settlement Agreement"); and

WHEREAS, pursuant to the DII/GIT Settlement Agreement, Global Industrial Technologies assigned to DII Industries all claim, title, or interest that Global Industrial Technologies may have had in or under the Policies;

WHEREAS, the Participating Carriers and DII Industries are entering into a settlement agreement that resolves, inter alia, DII Industries' claims to coverage under the Policies; and

WHEREAS, Global Industrial Technologies agrees to provide each of the Participating Carriers this Release;

NOW, THEREFORE, Global Industrial Technologies hereby releases each of the Participating Carriers as provided below.

### 1. Definitions

The following definitions apply to the capitalized terms herein wherever those terms appear in this Release, including the prefatory paragraph, recitals, the sections below and

2 Granite 000172

any attachments hereto. Moreover, each defined term stated in the singular shall include the plural and each defined term stated in the plural shall include the singular. The word "including" means "including without limitation."

      1.1.    "Affiliate" means, when used with reference to a specific Entity, any Entity that, directly or indirectly, or through one or more intermediaries, Owns and/or Controls, is Owned and/or Controlled by, or is under common Ownership and/or common Control with, such specific Entity.

      1.2.    "Claim" means any past, present or future claim, demand, suit, action, cause of action, obligation, or liability of any nature whatever (including without limitation interest of any kind), known or unknown, anticipated or unanticipated, fixed or contingent, accrued or unaccrued, which has been or may be asserted by or on behalf of any person, including without limitation a cross claim, counterclaim, third-party claim, right, request, suit, lawsuit, administrative proceeding, notice (including potentially responsible party notice or its equivalent), arbitration, cause of action or order, including without limitation, any "Claim" as that term is defined in the United States Bankruptcy Code, 11 U.S.C. § 101(5) and "future demands" as defined under 11 U.S.C. § 524(g)(5).

      1.3    "Control" means the direct or indirect power to direct, or cause the direction of, the management or affairs of an Entity.

      1.4    "Coverage Actions" means the pending insurance coverage actions between Harbison-Walker Refractories Company and certain of the Participating Carriers, Harbison-Walker Refractories Co. v. Dresser Industries, Inc., et al. (In re Global Industrial Technologies, Inc.), Adv. No. 02-2151 (Bankr. W.D. Pa.) and Dresser Indus., Inc. v. Alba

2 Granite 000173

General Ins. Co., et al. (In re Global Industrial Technologies, Inc.), Adv. No. 03-03072 (Bankr. W.D. Pa.).

      1.5     "Entity" means any person, individual, partnership, corporation, limited liability company, joint venture company, joint stock company, estate, trust, unincorporated association , association, joint venture, unincorporated organization, governmental or any political subdivision thereof, the United States Trustee, or other Entity or being of whatever kind, whether or not operating or existing for profit, including any "person" as such term is defined in section 101(41) of the Bankruptcy Code.

      1.6     "Final Order" has the meaning as designated in the Uniform Glossary of Defined Terms for Plan Documents filed with the Mid-Valley Bankruptcy Court on May 17, 2004.

      1.7     "Global Industrial Technologies" means Global Industrial Technologies, Inc., ANH Refractories Company, A.P. Green Industries, Inc., A.P. Green International, Inc., A.P. Green Refractories, Inc., A.P. Green Services, Inc., APG Development Corp., APG Refractories Corp., Chiam Technologies, Inc., Detrick Refractory Fibers, Inc., Global Industrial Technologies Services Company, Global Processing Systems, Inc., GPX Forge Acquisition, Inc., GPX Corp., GIX Foreign Sales Corp., GPX Forge, Inc., GPX Forge-U, Inc., Harbison-Walker International Refractories, Inc., Harbison-Walker Refractories Company, Harbison-Walker Refractories Europe, Ltd., Indresco International Ltd., Intogreen Co., Lanxide Thermocomposites, Inc., RHI American Receivables Corporation, RHI Refractories America, Inc. and TMPSC, Inc. and each of their past, present, and future parents, subsidiaries and Affiliates and all of the foregoing Entities' directors, officers, shareholders, employees, agents,

2 Granite 000174

partners, representatives, attorneys, predecessors, successors, beneficiaries, and assigns when acting in their capacity as such.

     1.8    "Mid-Valley Bankruptcy Court" means the Court hearing the Chapter 11 Bankruptcy cases filed December 16, 2003 by Mid-Valley, Inc., DII Industries, LLC, et al. in the United States Bankruptcy Court for the Western District of Pennsylvania, [*In Re Mid-Valley, Inc., et al.*, Case Nos. 03-35592-JKF, jointly administered.

     1.9    "Own" or "Ownership" means to own, or possess beneficial ownership of, more than fifty percent (50%) of the equity securities or interest of the Entity, but only so long as such ownership continues.

     1.10    "Participating Carriers" means the companies identified on Attachment One hereto, and each of their respective past, present, and future parents, subsidiaries and Affiliates and all of the foregoing Entities' directors, officers, shareholders, employees, agents, partners, representatives, attorneys, predecessors, successors, beneficiaries, and assigns when acting in their capacity as such.

     1.11    "Parties" shall mean Global Industrial Technologies and the Participating Carriers.

     1.12    "Plan" means Debtors' Fourth Amended Joint Prepackaged Plan of Reorganization dated May 17, 2004 for Mid-Valley, Inc., DII Industries, LLC, et al. Under Chapter 11 of the United States Bankruptcy Code.

     1.13    "Policies" means all insurance policies, known or unknown, acknowledged or disputed, that the Participating Carriers at any time issued or allegedly issued to Dresser Industries, Inc. or Harbison-Walker Refractories Company, a Pennsylvania corporation, including the insurance policies identified as H-W Shared Insurance Policies and

-4-

2 Granite 000175

Cleco Shared Insurance Policies in the DII/GIT Settlement Agreement, and any and all coverage-in-place agreements relating to those policies.

      1.14    "Release" means this Release and Discharge.

      2.    Releases

      2.1    Global Industrial Technologies does hereby fully, finally, and completely remise, release, acquit and forever discharge the Participating Carriers of and from any and all past, present or future Claims, known or unknown, relating to, arising out of, and/or in connection with the (1) Policies; (2) the Coverage Actions; (3) any alleged bad faith, violation of any statute or regulation, including, but not limited to, Unfair Claim Practices Acts or other similar statutes of each of the fifty (50) states (if applicable) or any other misconduct or alleged misconduct committed or allegedly committed by any Participating Carrier prior to the date of this Release.

      2.2    Without limiting the foregoing Release, Global Industrial Technologies acknowledges and agrees that the Participating Carriers shall have no further obligation under the Policies (or under any prior agreements relating to the Policies, including any prior coverage-in-place agreements) to pay any Claims, to provide any coverage or to make any defense or indemnity payment with respect to any Claims. It is expressly agreed and understood that Global Industrial Technologies will assert no other or further Claims whatever under the Policies (or under any prior agreements relating to the Policies, including any prior coverage-in-place agreements) and will assert no other or further Claims against the Participating Carriers in connection with any liability alleged to arise under the Policies (or under any prior agreements relating to the Policies, including any prior coverage-in-place agreements). The Participating

2 Granite 000176

Carriers shall have no obligation whatever to provide coverage, defense or indemnity and/or any other benefits with respect to the Policies to Global Industrial Technologies.

### 3. Representations and Warranties

Global Industrial Technologies represents and warrants to the Participating Carriers as follows:

3.1 Organization: Global Industrial Technologies (and all of the Entities listed in the definition of Global Industrial Technologies) is duly organized and validly existing under the laws of its jurisdiction of incorporation or organization and has all necessary power and authority to enter into, and to perform, its obligations under this Release. Global Industrial Technologies is duly authorized to conduct business and is in good standing in each jurisdiction where such authorization is required to conduct its business or perform its obligations under this Release, except where the failure to be so authorized or in good standing would not impair, restrict or limit its ability to perform its obligations under this Release.

3.2 Authorization: Global Industrial Technologies has all requisite legal power and authority to execute, deliver and provide this Release. The execution and delivery of this Release has been duly and validly authorized and approved by all necessary action on behalf of Global Industrial Technologies.

3.3 Binding Agreement: This Release has been duly executed and delivered by Global Industrial Technologies and this Release constitutes a legal, valid and binding agreement of Global Industrial Technologies, enforceable against it in accordance with its terms. To the extent that Global Industrial Technologies requires bankruptcy court approval to execute this Release, Global Industrial Technologies will use its best efforts to obtain that approval on an expedited basis.

-6-

2 Granite 000177

3.4     Representation:  Global Industrial Technologies has sought and/or
received the advice of counsel prior to the execution of this Release; Global Industrial
Technologies and its counsel have thoroughly analyzed this Release; and Global Industrial
Technologies has executed and delivered this Release in good faith, and for good and valuable
consideration.

4.     Miscellaneous

4.1     Neither Global Industrial Technologies nor the Participating Carriers shall
be deemed the drafter of this Release.  Therefore, any ambiguities can not, and should not, be
construed against either Global Industrial Technologies or the Participating Carriers pursuant to
the doctrine of "contra proferentem," nor is this Release a policy of insurance, and it cannot and
should not be construed against the Participating Carriers on the basis of their identity as
insurance companies.

4.2     This Release is an integrated document and contains the entire agreement
among the Parties regarding the matters herein.  No representations, warranties, promises  or
inducements, whether oral, written, express or implied, have been made or relied on by any Party
other than as set forth in this Release.  This Release prevails over prior communications and
negotiations between and among the Parties regarding the matters herein.  This Release may not
be amended or modified except by a written instrument signed by all of  the Parties affected
thereby.

4.3     Except as expressly provided for in this Release, nothing in this Release
shall create any third-party beneficiary rights in any Entity that is not a Party to this Agreement
nor shall any Entity not a party to the Agreement derive any benefit therefrom.  In the event that
any action or proceeding of any type whatever is commenced or prosecuted by any Entity not a

-7-

2 Granite 000178

Party hereto to invalidate, interpret, or prevent the validation, enforcement, or carrying out of all or any of the provisions of this Release, the Parties mutually agree, represent, warrant, and covenant to cooperate in opposing such action or proceeding.

      4.4     This Release shall not become effective until such time as the Mid-Valley Bankruptcy Court has confirmed the Plan pursuant to 11 U.S.C. §1129 and 524(g), such order confirming the Plan has been affirmed by the District Court, the District Court's affirming order has become a Final Order, and the Effective Date of the Plan, as provided for therein, has occurred.

      IN WITNESS WHEREOF, Global Industrial Technologies, by its duly authorized representatives, has caused this Release to be duly executed as of the date set forth with its signature below:

FOR Global Industrial Technologies, Inc.

By: _____

Name: _Jon A. Allegretti_

Title: _President_

Date: _1/5/05_

Witness: _Dianne J. Smith_

-8-

2 Granite 000179

**Attachment One**

Participating Carriers:

1.     Hartford Accident and Indemnity Company, First State Insurance Company, Hartford Casualty Insurance Company, New England Insurance Company, Nutmeg Insurance Company and Twin City Fire Insurance Company.

2.     Zurich American Insurance Company as successor-in-interest to Zurich Insurance Company U.S. Branch by operation of law, Zurich Insurance Company (Switzerland), Zurich International (Bermuda), Ltd., Maryland Casualty Company, for itself and for all liabilities assumed under policies issued by American General Insurance Company, and all other Zurich-related companies.

3.     Allianz AG, Successor in Interest to Allianz Versicherungs AG

4.     Allianz Global Risks U.S. Insurance Company, formerly known as Allianz Insurance Company and Allianz Underwriters Insurance Company, formerly known as Allianz Underwriters, Inc.

5.     Travelers Casualty and Surety Company, formerly known as The Aetna Casualty and Surety Company, and The Travelers Indemnity Company.

6.     Appalachian Insurance Company.

7.     Everest Reinsurance Company and Mt. McKinley Insurance Company.

8.     Employers Reinsurance Corporation.

9.     Westport Insurance Corporation, formerly known as Puritan Insurance Company.

10.    Continental Insurance Company for itself and as successor in interest to the policies issued and alleged to be issued by Harbor Insurance Company, Fidelity and Casualty Company of New York, Columbia Casualty Company, Continental Casualty Company, and Transcontinental Insurance Company.

11.    Century Indemnity Company, Pacific Employers Insurance Company, U.S. Fire Insurance Company, Central National Insurance Company of Omaha, St.Paul Mercury Insurance Company, and ACE Property and Casualty Insurance Company.

12.    One Beacon America Insurance Company

13.    All insurers within the Fairfax Financial Holdings Limited organization, including, but not limited to TIG Insurance Company, individually, and as successor by merger to International Insurance Company and International Surplus Lines Insurance Company, and United States Fire Insurance Company.

PI-1298219 v1

2 Granite 000180

14.     Stonewall Insurance Company.

15.     Evanston Insurance Company.

16.     Associated International Insurance Company.

17.     Providence Washington Insurance Company.

18.     Insco Limited.

19.     Mutual Marine Office, Inc. as managing agent and as attorney in fact for Employers Mutual Casualty Company and Boston Manufacturers Mutual Insurance Company (n/k/a Arkwright Insurance Company).

20.     Fireman's Fund Insurance Company.

21.     National Surety Corporation.

22.     Federal Insurance Company.

23.     Allstate Insurance Company, for itself and as successor in interest to Northbrook Excess and Surplus Insurance Company, f/k/a Northbrook Insurance Company.

24.     Sentry Insurance a Mutual Company, as assumptive reinsurer of Great Southwest Fire Insurance Company.

25.     Northwestern National Insurance Company, individually and as successor to Universal Reinsurance Corporation and to Bellefonte Underwriters Insurance Company and to Bellefonte Reinsurance Company (formerly Bellefonte Insurance Company).

26.     General Electric Casualty Insurance Company and its predecessor Colonial Penn Insurance Company and Heritage Casualty Insurance Company as their reinsurer and attorney in fact.

27.     Royal Insurance Company.

28.     Yosemite Insurance Company.

29.     Swiss Reinsurance Company.

30.     American Re-Insurance Company.

31.     Executive Risk Indemnity, Inc. (as successor in interest to American Excess Insurance Company).

2 Granite 000181

32.   European General Reinsurance Company.

33.   AIU Insurance Company, American Home Assurance Company, Birmingham Fire
Insurance Company, Granite State Insurance Company, Insurance Company of the State of
Pennsylvania, Landmark Insurance Company, Lexington Insurance Company, National Union
Fire Insurance Company of Pittsburgh, PA, New Hampshire Insurance Company and L'Union
Atlantique D'Assurances S.A.

- 3 -

2 Granite 000182

## Exhibit 6

In accordance with Section 16.5 of this Agreement, notices should be sent as follows:

HALLIBURTON COMPANY:

Albert O. Cornelison, Jr., Esq.
Executive Vice President and General Counsel
Halliburton Company
Five Houston Center
1401 McKinney, Suite 2400
Houston, TX 77010

With a copy to:

Michael G. Zanic, Esq.
Kirkpatrick & Lockhart LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222

DII INDUSTRIES, LLC:

DII Industries, LLC
c/o Albert O. Cornelison, Jr., Esq.
Executive Vice President and General Counsel
Halliburton Company
Five Houston Center
1401 McKinney, Suite 2400
Houston, TX 77010

With a copy to:

Michael G. Zanic, Esq.
Kirkpatrick & Lockhart LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222

KELLOGG BROWN & ROOT, INC.:

Kellogg Brown & Root, Inc.
c/o Albert O. Cornelison, Jr., Esq.
Executive Vice President and General Counsel
Halliburton Company
Five Houston Center
1401 McKinney, Suite 2400
Houston, TX 77010

With a copy to:

Michael G. Zanic, Esq.
Kirkpatrick & Lockhart LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222

WDC - 025376/0386 - 1005262 v4
NYLIB5 801864.8

2 Granite 000183

AIG COMPANIES:

Christopher J. Eskeland
Assistant Vice President
AIG Technical Services, Inc.
Toxic Tort Claims Department
101 Hudson Street, 29th Floor
Jersey City, NH 07302

With a copy to:

Thomas G. Wilkinson, Jr., Esq.
Cozen O'Connor
The Atrium
1900 Market Street
Philadelphia, PA 19103

WDC - 02376/0386 - 2005262 v4
NYLIB5 801864.8

2

2 Granite 000184

Exhibit 7

[Form of Assignment Agreement]

2 Granite 000185

## ASSIGNMENT AGREEMENT

ASSIGNMENT AGREEMENT, dated as of November 12, 2004 (this "Agreement"), made by and among (a) the following parties as sellers hereunder (i) DII INDUSTRIES, LLC, as debtor and debtor-in-possession, and its predecessors, successors and assigns ("DII Industries"), (ii) KELLOGG BROWN & ROOT, INC., as debtor and debtor-in-possession, and its predecessors, successors and assigns "KBR") and (iii) each of the other Releasing Policyholders (as defined in the Settlement Agreement referred to below) (the "Other Releasing Policyholders", and with DII Industries and KBR, collectively, the "Sellers", and each, a "Seller"), (b) solely for purposes of Section 3.1, Section 3.2. and Section 5 of this Agreement, HALLIBURTON COMPANY, and its predecessors, successors and assigns ("Halliburton"), and (c) HDK PURCHASER TRUST, a common law trust organized under the laws of the State of New York (together with its successors and assigns, the "Purchaser").

## RECITALS

Each of (i) the Sellers, and (ii) AIU Insurance Company, American Home Assurance Company, Birmingham Fire Insurance Company, Insurance Company of the State of Pennsylvania, Granite State Insurance Company, Landmark Insurance Company, Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, New Hampshire Insurance Company, and L'Union Atlantique D'Assurances S.A., and their respective predecessors, successors and assigns (collectively, the "AIG Companies"), are parties to that certain Settlement Agreement and Release (the "Settlement Agreement"), pursuant to which, among other things, (x) the Sellers and the AIG Companies compromised and settled certain disputes concerning the AIG Policies (as defined below) to Asbestos Claims (as defined below), Silica Claims (as defined below) and any other Claims (as defined below) and (y) the Sellers and the AIG Companies agreed to enter into a transaction which, subject to the terms and conditions of the Settlement Agreement, includes a simultaneous payment by the Purchaser to DII Industries of the Payment Amount (as defined below) and an assignment to the Purchaser by the Sellers of all of each Seller's right, title and interest in and to the AIG Settlement Payments (as defined in the Settlement Agreement), unencumbered by any security interests, liens or other encumbrances, claims or interests of any nature.

In connection therewith, subject to the terms and conditions hereof, the Sellers desire to sell and assign, without recourse or warranty except to the extent set forth herein, and the Purchaser desires to purchase and acquire, on such terms, all of each Seller's right, title and interest in and to the AIG Settlement Payments, unencumbered by any security interests, liens or other encumbrances, claims or interests of any nature.

NOW THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Sellers and the Purchaser (collectively, the "Parties"), intending to be legally bound, hereby agree as follows:

2 Granite 000186

SECTION 1. DEFINITIONS

1.1    Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"AIG Consent and Agreement":  a Consent and Agreement to be made by the AIG Companies in favor of the Purchaser in respect of this Agreement.

"AIG Companies":  as defined in the Recitals hereto.

"AIG Policies":  as defined in, or by reference in, the Settlement Agreement.

"AIG Settlement Payments":  as defined in, or by reference in, the Settlement Agreement.

"Approval Order":  as defined in, or by reference in, the Settlement Agreement.

"Asbestos Claims":  as defined in, or by reference in, the Settlement Agreement.

"Assignment Agreement Effective Date":  as defined in Section 4 hereof.

"Assignment of AIG Settlement Payments":  an assignment, substantially in the form of Exhibit A, executed by a duly authorized officer of each of the Sellers and Purchaser.

"Bankruptcy Court":  the United States Bankruptcy Court for the Western District of Pennsylvania, Pittsburgh Division, or, as the circumstances or context requires, the District Court.

"Business Day":  a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

"Chapter 11 Case":  as defined in the Plan.

"Claims":  as defined in, or by reference in, the Settlement Agreement.

"Collateral":  as defined in Section 3.4 hereof.

"Confirmation Order":   as defined in, or by reference in, the Settlement Agreement.

"District Court":  the United States District Court assigned to preside over the Plan.

"Final Order":  as defined in, or by reference in, the Settlement Agreement.

"Parties":  as defined in the Recitals hereto.

"Payment Amount": $_____.

2 Granite 000187

"Person": any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

"Plan": as defined in, or by reference in, the Settlement Agreement.

"Prime Rate": from time to time, the rate of interest most recently published in *The Wall Street Journal* (Eastern Edition) as the "prime rate".

"Purchaser Trustee": as defined in Section 5.4 hereof.

"Settlement Agreement": as defined in the Recitals hereto.

"Silica Claims": as defined in, or by reference in, the Settlement Agreement.

"Transaction Documents": the collective reference to this Agreement, the Assignment of AIG Settlement Payments, the AIG Consent and Agreement, the Settlement Agreement and the Approval Order.

      1.2    Other Definitional Provisions.

      (a)    The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

      (b)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

### SECTION 2.  PURCHASE AND SALE; CLOSING; PAYMENT; TERMINATION

      2.1    Purchase and Sale. On the Assignment Agreement Effective Date, subject to the terms and conditions hereof, each Seller shall sell and assign, against payment to DII Industries of the Payment Amount, without recourse or warranty except to the extent set forth herein, and the Purchaser shall purchase and acquire on such terms, all of each Seller's right, title and interest in and to the AIG Settlement Payments, unencumbered by any security interests, liens or other encumbrances, claims or interests of any nature. The amount and timing of the AIG Settlement Payments shall be separately agreed to by the AIG Companies and the Purchaser.

      2.2    Closing. On the Assignment Agreement Effective Date, in a series of transactions that shall be deemed to take place simultaneously, (i) the Sellers and the Purchaser shall execute and deliver the Assignment of AIG Settlement Payments, (ii) the Purchaser and the AIG Companies shall execute and deliver the AIG Consent and Agreement, (iii) the Purchaser shall pay to the DII Industries in immediately available funds, the Payment Amount, and (iv) the AIG Companies and the Purchaser shall agree to the amount and timing of the AIG Settlement Payments.

2 Granite 000188

2.3     Payment. The payment by the Purchaser to DII Industries of the Payment Amount as provided for in clause (iii) of Section 2.2 above shall be without recourse to the Sellers and shall be final and irrevocable when made.     The Purchaser shall not seek reimbursement of all or part of any such payment, whether by way of a claim for contribution or subrogation, or otherwise, from any Person other than any of the AIG Companies.

2.4     Termination. In the event that any of the Approval Order does not become a Final Order or the conditions precedent in Section 4 hereto have not occurred before February 28, 2005, this Agreement (except for this Section 2.4) and the Assignment of AIG Settlement Payments shall be null and void automatically, the AIG Companies shall have no obligation to pay the Purchaser the AIG Settlement Payments, and the Purchaser shall have no obligation to pay the Payment Amount.

### SECTION 3.  REPRESENTATIONS AND WARRANTIES AND COVENANTS

3.1     Representations and Warranties of Sellers and Halliburton. Each of Halliburton and each Seller hereby represents and warrants to the Purchaser that, as of the Assignment Agreement Effective Date:

(a)     It (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and (ii) has all requisite power, and has all governmental licenses, authorizations, consents and approvals necessary, to own its assets and carry on its business as now being or as proposed to be conducted.

(b)     Neither (i) the execution and delivery of the Transaction Documents to which it is a party nor (ii) the consummation of the transactions herein and therein contemplated to which it is a party (the "Transactions") in compliance with the terms and provisions hereof and thereof will (A) conflict with or result in a breach of its charter or by-laws, (B) violate any law, rule or regulation applicable to it, or any order, writ, injunction or decree of any governmental authority applicable to it, or any other material agreement or instrument to which it is a party or by which it or any of its property is bound or to which it is subject, (C) constitute a default under any such material agreement or instrument, or (D) result in the creation or imposition of any lien upon any of its property pursuant to the terms of any such material agreement or instrument.

(c)     It has all necessary corporate or other power, authority and legal right to execute, deliver and perform its obligations under each Transaction Document to which it is a party; the execution, delivery and performance by it of each such Transaction Document have been duly authorized by all necessary corporate or other action on behalf of it; and this Agreement has been duly and validly executed and delivered by it, and the other Transaction Documents to which it is a party when executed and delivered by it, and in the case of this Agreement constitutes, and in the case of such other Transaction Documents when executed and delivered will constitute, a legal, valid and binding obligation of it enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws of general application relating to or

-4-

NCLIB1 239175.3

2 Granite 000189

affecting the enforcement of creditors' rights (in each case excluding the Chapter 11 Case (as defined in, or by reference in, the Settlement Agreement)) and by general equitable principles.

(d)    No authorizations, approvals or consents of, and no filings or registrations with, any governmental authority or any securities exchange or any other Person are necessary for the execution, delivery or performance by it of any Transaction Document to which it is a party or for the legality, validity or enforceability thereof.

(e)    Upon the effectiveness of the Assignment of AIG Settlement Payments, (i) the Sellers shall not have assigned any rights in the AIG Settlement Payments to any Person other than the Purchaser; and (ii) the Sellers shall have transferred to the Purchaser all right, title and interest in and to the AIG Settlement Payments, unencumbered by any security interests, liens or other encumbrances, claims or interests of any nature.

(f)    Timely, adequate and proper notice of the motion seeking approval of the transactions effected by or as contemplated under the Plan (including, but not limited to, the Asbestos/Silica Insurance Company Injunctions and the channeling injunction and releases provided in the Plan and the Transaction Documents) and entry of the Approval Order, including notice of (i) the settlement provided by the Settlement Agreement and the Approval Order as required by Rule 2002(a)(3) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and (ii) the Assignment of AIG Settlement Payments provided under this Agreement and the other Transaction Documents as required by Bankruptcy Rule 2002(a)(2), has been provided by the Sellers by individual mailings to (1) counsel to the Purchaser, (2) each entity set forth in the Debtors' current official service list, including, but not limited to, counsel to the prepetition Asbestos Committee and the Legal Representative, (3) each entity listed on the Bankruptcy Rule 2002 Notice list, and (4) the United States Trustee. Capitalized terms used in this subsection (f) and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

(g)    The Sellers constitute all Persons with an interest as insured parties under the AIG Policies.

(h)    In the event that Section 3.4 is applicable, each Seller represents that, as of the Assignment Agreement Effective Date with respect to the Collateral:

(i)    The Sellers own and have good and marketable title to the Collateral, free and clear of any lien, claim, encumbrance or interest of any Person, except for the interests created under, or expressly permitted by, this Assignment Agreement.

(ii)    Other than the security interest granted to Purchaser pursuant to Section 3.4 hereof, the Sellers have not pledged, assigned, sold, granted a security interest in or otherwise conveyed any of the Collateral. The Sellers have not authorized the filing of and are not aware of any financing statements against any such Seller that include a description of collateral covering the Collateral other than any financing statement relating to the security interest granted to the Purchaser hereunder or that has been terminated; the Sellers are not aware of any material unpaid or unsatisfied judgment, tax

NCLIB1 239175.3

2 Granite 000190

or Pension Benefit Guaranty Corporation lien filings or lien filings under the Employee Retirement Income and Security Act of 1974, as amended, against any such Seller.

(iii)     This Assignment Agreement together with the Assignment of AIG Settlement Payments creates a valid and continuing security interest (as defined in the Uniform Commercial Code as in effect in the State of New York) in the Collateral in favor of the Purchaser, for the benefit and security of Purchaser, which security interest is prior to all other liens in the Collateral and is enforceable as such against creditors of and purchasers from any Seller and is not subject to the claims of creditors of or purchasers from the Sellers.

(iv)     The Sellers have received all consents and approvals required for the grant of a security interest in the Collateral hereunder to the Purchaser.

The representations and warranties of the Sellers contained in this Section 3.1 shall survive the Assignment Agreement Effective Date.

3.2     Covenants of the Sellers and Halliburton.  Each of Halliburton and each Seller hereby covenants and agrees from and after the Assignment Agreement Effective Date as follows:

(a)  So long as this Agreement shall not have terminated pursuant to Section 2.4 hereof, it shall not amend, or consent to any amendment to, the Settlement Agreement in any manner that would affect the AIG Settlement Payments without the prior written consent of the Purchaser, and it shall provide the Purchaser with prior written notice of any other proposed amendment to the Settlement Agreement.

(b)  In the case of a Seller, in the event that such Seller shall receive any payments, securities, instruments or any other property from the AIG Companies in respect of any AIG Settlement Payment, it shall hold any such payment, securities, instruments or other property as property of the Purchaser to which the Purchaser has an absolute right and shall promptly account for and deliver to the Purchaser at such Purchaser's expense all such payments, securities, instruments or any other property (and, in the case of any payment, interest thereon at a rate of interest equal to the Prime Rate, commencing on the date that is five (5) Business Days after the earlier of (i) the date on which such Seller receives written notice from the Purchaser that such payment has been made to such Seller and (ii) the date on which such Seller otherwise acquires actual knowledge that such payment has been made to it) in the same form as may have been received together with any endorsements or documents necessary to transfer such property to the Purchaser, and pending such delivery to hold the same secure in trust for the Purchaser absolutely.

(c)  Other than as contemplated by this Agreement, in the case of a Seller, such Seller shall not grant or purport to grant any security interests in or liens or other encumbrances of any nature on any AIG Settlement Payment to any other Person or otherwise transfer or purport to transfer any interest of any nature in any AIG Settlement Payment to any other Person.

(d)  It shall not, prior to the date which is one year and one day after the final payment of AIG Settlement Payments, petition or otherwise invoke or cause the Purchaser to

-6-

2 Granite 000191

invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the Purchaser under any federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Purchaser or any substantial part of its property, or making a general assignment for the benefit of creditors, or ordering the winding up or liquidation of the affairs of the Purchaser.

(e) In the case of each Seller, in the event of a bankruptcy filing by or against it, to the extent permitted by applicable law, such Seller will not oppose any motion by the Purchaser to obtain relief from the automatic stay, if necessary or applicable, with respect to any AIG Settlement Payment, and such Seller waives any and all rights to impair, or challenge in any manner whatsoever, including, without limitation, the validity, priority, extent and/or perfection of the Purchaser's right, title and interest in and to all AIG Settlement Payments.

(f) It shall not, prior to the date which is one year and one day after the final payment of AIG Settlement Payments, institute against, or join or assist any other Person in instituting against, Purchaser any suit, litigation, or other proceeding.

(g) At any time or from time to time after the Assignment Agreement Effective Date, it shall, upon the reasonable request of another Party, execute and deliver any further instruments or documents, and exercise commercially reasonable efforts to take such further actions as may reasonably be required, to fulfill and implement the terms of this Agreement or realize the benefits intended to be afforded hereby. After the Assignment Agreement Effective Date, and upon prior reasonable request, it shall exercise commercially reasonable efforts to cooperate with the other Parties, at the requesting Party's expense, in furnishing non-privileged records, information, testimony and other assistance in connection with any inquiries, actions, audits, proceedings, or disputes involving any of the Parties hereto (other than in connection with disputes between the Parties hereto) related to the AIG Settlement Payments.

The covenants of Halliburton and the Sellers contained in this Section 3.2 are continuing and shall survive the Assignment Agreement Effective Date.

3.3     Representations and Warranties of the Purchaser.   The Purchaser hereby represents and warrants to each Seller as follows:

(a) The Purchaser (i) is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization; and (ii) has all requisite power, and has all governmental licenses, authorizations, consents and approvals necessary, to own its assets and carry on its business as now being or as proposed to be conducted.

(b) Neither (i) the execution and delivery of the Transaction Documents to which it is a party nor (ii) the consummation of the transactions herein and therein contemplated in compliance with the terms and provisions hereof and thereof will (A) conflict with or result in a breach of its organizational documents, (B) violate any law, rule or regulation applicable to it, or any order, writ, injunction or decree of any governmental authority applicable to it, or any other material agreement or instrument to which it is a party or by which it or any of its property is bound or to which it is subject, (C) constitute a default under any such material agreement or

NCLIB1 239175.3

2 Granite 000192

instrument, or (D) result in the creation or imposition of any lien upon any of its property pursuant to the terms of any such material agreement or instrument.

(c) It has all necessary corporate or other power, authority and legal right to execute, deliver and perform its obligations under each Transaction Document to which it is a party; the execution, delivery and performance by Purchaser of each such Transaction Document have been duly authorized by all necessary action on behalf of the Purchaser; and this Agreement has been, and the other Transaction Documents to which it is a party will be, duly and validly executed and delivered by the Purchaser and constitutes, or in the case of such other Transaction Documents when executed and delivered will constitute, a legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws of general application relating to or affecting the enforcement of creditors' rights (in each case excluding the Chapter 11 Case (as defined in, or by reference in, the Settlement Agreement)) and by general equitable principles.

(d) No authorizations, approvals or consents of, and no filings or registrations with, any governmental authority or any securities exchange or any other Person, in each case except as shall have been obtained and shall be in full force and effect, are necessary for the execution, delivery or performance by Purchaser of any Transaction Document to which it is a party or for the legality, validity or enforceability thereof.

3.4     Security Interest. Although the parties intend that the purchase and sale of the AIG Settlement Payments shall be a purchase and sale and not a loan, in the event that such purchase and sale is deemed to be a loan by a court of competent jurisdiction, each Seller shall be deemed to have pledged to the Purchaser as security for the performance by such Seller of its obligations with respect to such deemed loan, and shall be deemed to have granted the Purchaser a security interest in, all its right, title and interest in and to the AIG Settlement Payments and all proceeds thereof (collectively, the "Collateral"). Each Seller authorizes the Purchaser to file such UCC financing statements as shall be necessary or advisable, in the opinion of the Purchaser, to perfect the foregoing security interest.

3.5     Legal, Tax, Accounting or Other Treatment. Notwithstanding any other provision contained in this Agreement or the Transaction Documents, it is specifically understood and agreed that neither Sellers nor any Person acting on behalf of any of them, makes any warranties or representations or has any responsibility to disclose any relevant information, or has any other responsibility or duty, nor have Sellers or any person acting on their behalf made any covenants or undertakings as to the legal, tax, accounting or other treatment to be accorded Purchaser or any other legal, tax, accounting or other consequences, if any, to Purchaser as a result of or by virtue of the transactions described in this Agreement.

SECTION 4.  CONDITIONS PRECEDENT

The effectiveness of this Agreement, and the occurrence of the transactions contemplated herein, are subject to the prior or contemporaneous satisfaction or waiver by the Purchaser of each of the following conditions precedent (the first date on which all such

NCLIB1 239175.3

2 Granite 000193

conditions precedent are satisfied, the "Assignment Agreement Effective Date"); provided that the Assignment Agreement Effective Date shall in no event occur before January 4, 2005:

(a)     Legal Opinions.  The Purchaser shall have received the legal opinions of counsel to the Sellers and counsel to the AIG Companies, in each case in form and substance satisfactory to the Purchaser.

(b)     Transaction Documents.  The Purchaser shall have received a counterpart of each of the Transaction Documents, duly executed and delivered by each of the parties thereto.

(c)     Settlement Agreement.  All conditions precedent to the effectiveness of the Settlement Agreement shall have been satisfied, and the Purchaser shall have received an opinion of counsel to the Sellers to that effect in form and substance satisfactory to the Purchaser.

(d)     Confirmation Order.  The Confirmation Order shall be a Final Order, and the Purchaser shall have received an opinion of counsel to the Sellers to that effect in form and substance satisfactory to the Purchaser.

(e)     Approval Order.  The Approval Order shall be a Final Order, and the Purchaser shall have received an opinion of counsel to the Sellers to that effect in form and substance satisfactory to the Purchaser.

(f)     Plan Effective Date.  The "Effective Date", as defined in the Plan, shall have occurred, and the Purchaser shall have received an opinion of counsel to the Sellers to that effect in form and substance satisfactory to the Purchaser.

SECTION 5.  MISCELLANEOUS

5.1     Binding Effect.  The terms of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors, nominees, and assigns; provided that no Seller shall assign its obligations hereunder without the prior written consent of the Purchaser, and any purported such assignment shall be void *ab initio*.

5.2     Notices.  All notices, requests and demands to or upon any Party hereto to be effective shall be in writing (including by facsimile transmission; provided, that all facsimile transmissions shall also be sent by hand delivery or overnight courier) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made (a) in the case of delivery by hand, when delivered, (b) in the case of delivery by overnight courier, one Business Day after being deposited with such overnight courier, or (c) in the case of delivery by facsimile transmission, when sent and receipt has been electronically confirmed, in each case addressed as set forth in Schedule 1 hereto.

2 Granite 000194

5.3   Indemnity.

(a) Each of Halliburton and each Seller hereby indemnifies Purchaser and holds it harmless against any and all losses, claims, damages or liabilities to which Purchaser may become subject arising in any manner out of or in connection with any representation or warranty of Halliburton or a Seller set forth in this Agreement or any other Transaction Document failing to be true and correct as of the date made or deemed made or the breach by Halliburton or a Seller of or failure by Halliburton or a Seller to observe or comply with any covenant or agreement of a Seller set forth in this Agreement or any other Transaction Document, except to the extent it is finally judicially determined that such losses, claims, damages or liabilities resulted from the gross negligence or willful misconduct of Purchaser or the material breach by Purchaser of its obligations hereunder or under the other Transaction Documents to which it is a party.

(b) Each of Halliburton and each Seller hereby agrees to reimburse Purchaser promptly upon request for any legal or other expenses reasonably incurred by it in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuits, investigations, claims or other proceedings with respect to which Halliburton or a Seller is indemnifying Purchaser hereunder.

(c) Any request for reimbursement shall contain reasonable detail for a Seller to verify the propriety of such request.

(d) Each Seller agrees that the indemnification and reimbursement commitments set forth in this Section 5.3 shall apply whether or not the Purchaser is a formal party to any such lawsuits, claims or other proceedings and that such commitments shall extend upon the terms set forth in this paragraph to any controlling person, affiliate, director, officer, employee or agent of Purchaser (each, with Purchaser, an "Indemnified Person"). If indemnification is to be sought hereunder by an Indemnified Person, then as soon as practicable such Indemnified Person shall notify Halliburton and the Sellers of the commencement of any action or proceeding with respect thereto; provided, however, that the failure to so notify Halliburton or a Seller shall not relieve Halliburton to such Seller from any liability that it may have to such Indemnified Person pursuant to this Section 5.3, except to the extent that Halliburton or such Seller has been prejudiced in any material respect by such failure, or from any liability it may have to such Indemnified Person other than pursuant to this Section 5.3.

5.4   Limitation of Liability of Purchaser Trustee.   It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by U.S. Bank National Association (together with its successors and permitted assigns, "Purchaser Trustee"), not individually or personally, but solely as trustee of the Purchaser, in the exercise of the powers and authority conferred and vested in it, (b) each of the representations, undertakings and agreements herein made on the part of the Purchaser or Purchaser Trustee is made and intended not as personal representations, undertakings and agreements by Purchaser Trustee but is made and intended for the purpose for binding only the Purchaser, (c) nothing herein contained shall be construed as creating any liability on the Purchaser Trustee, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under

10

2 Granite 000195

the parties hereto and (d) under no circumstances shall Purchaser Trustee be personally liable for the payment of any indebtedness or expenses of the Purchaser or Purchaser Trustee or be liable for the breach of failure of any obligation, representation, warranty or covenant made or undertaken by the Purchaser or Purchaser Trustee under this Agreement or any other Transaction Documents. Notwithstanding anything herein or in any of the Transaction Documents to the contrary, nothing herein shall create or impose any liability upon the Purchaser on account of the AIG Policies, and the Parties hereby acknowledge that the Purchaser is not assuming any liabilities or obligations under the AIG Policies.

     5.5    Amendments. No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by officers of each of the Parties and no waiver of any provision of this Agreement, nor consent to any departure by any Party, shall be effective unless it is in writing and signed by an officer of the Party affected thereby, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it is given.

     5.6    Counterparts. This Agreement may be executed in counterparts and all such counterparts taken together shall be deemed to constitute a single agreement. Delivery of an executed counterpart of a signature page to this Agreement in Portable Document Format (PDF) or by facsimile transmission shall be effective as delivery of a manually executed original counterpart thereof.

     5.7    Entire Agreement. This Agreement shall constitute the entire understanding and agreement between the Parties hereto with respect to the subject matter hereof.

     5.8    Severability. If any clause or provision of this Agreement is deemed to be invalid, void or unenforceable, it shall be severed from this Agreement and all other provisions herein shall remain in effect.

     5.9    GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

     5.10    SUBMISSION TO JURISDICTION. EACH PARTY IRREVOCABLY CONSENTS TO PERSONAL AND SUBJECT MATTER JURISDICTION IN THE BANKRUPTCY COURT AND DISTRICT COURT THROUGH AND INCLUDING THE DATE THAT THE CHAPTER 11 CASE ARE CLOSED AND IN THE STATE AND/OR FEDERAL COURTS OF NEW YORK, IN THE UNITED STATES OF AMERICA, FOR RESOLUTION OF ANY ISSUE THAT ARISES BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT, AND SERVICE OF PROCESS MAY BE MADE UPON ANY PARTY BY MAILING AND/OR FAXING TO THE OTHER PARTIES A COPY OF THE APPLICABLE DOCUMENTATION.

     5.11    WAIVER OF JURY TRIAL. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN

11

2 Granite 000196

ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY ASSIGNMENT AGREEMENT.

   5.12 <u>Limitation on Recourse Arising From Sale of AIG Settlement Payments</u>. Notwithstanding anything herein to the contrary, the sale by the Sellers to the Purchaser of the AIG Settlement Payments hereunder and under the Assignment of AIG Settlement Payments is made without representation, warranty or covenant by any Seller, except as expressly set forth in the Transaction Documents to which a Seller is a party, and recourse to a Seller in connection therewith is limited solely to such Seller's obligations under Section 5.3 hereof.

   5.13 <u>Acknowledgements; Confidentiality</u>.

   (a) Each of the Sellers and Halliburton acknowledges that it has entered into the Settlement Agreement and this Agreement in consideration of the payment by the Purchaser of the Payment Amount and without regard to the amount of the AIG Settlement.

   (b) Each of Halliburton and each Seller agrees to keep confidential this Agreement and the Consent and Agreement and the terms hereof and thereof, provided that the foregoing shall not apply to disclosure (i) consisting of the filing of this Agreement and the Consent and Agreement as exhibits to any pleadings filed in the Chapter 11 Case, (iii) to its employees, directors, agents, attorneys, accountants and other professional advisors who are directly involved in the transactions contemplated by this Agreement or otherwise need to know of such transactions, or (iv) in response to any subpoena or order of any court or other governmental authority or as may otherwise be required pursuant to any applicable laws. Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, all persons may disclose to any and all persons, without limitation of any kind, the federal income tax treatment or structure of the transaction contemplated hereby, any fact relevant to understanding the federal tax treatment or structure of such transaction, and all materials of any kind (including opinions or other tax analyses) relating to such federal tax treatment or structure.

[SIGNATURES FOLLOW]

2 Granite 000197

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

**PURCHASER**

**HDK PURCHASER TRUST**

By:  U.S. BANK NATIONAL ASSOCIATION, not in its individual capacity but solely as trustee on behalf of the Purchaser, as Purchaser Trustee

By: _____
    Name:  David J. Kolibachuk
    Title:    Vice President

**HALLIBURTON**

**HALLIBURTON COMPANY**

By: _____
    Name: Albert O. Cornelison, Jr., Esq.
    Title: Executive Vice President and
    General Counsel

**SELLERS**

**DII INDUSTRIES, LLC**

By: _____
    Name: Albert O. Cornelison, Jr., Esq.
    Title: Vice President

NCLIB1 259175.7

2 Granite 000198

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

**PURCHASER**

**HDK PURCHASER TRUST**

By: U.S. BANK NATIONAL ASSOCIATION, not in its individual capacity but solely as trustee on behalf of the Purchaser, as Purchaser Trustee

By: _____
     Name:
     Title:

**HALLIBURTON**

**HALLIBURTON COMPANY**

By: _____
     Name: Albert O. Cornelison, Jr., Esq.
     Title: Executive Vice President and
     General Counsel

**SELLERS**

**DII INDUSTRIES, LLC**

By: _____
     Name: Albert O. Cornelison, Jr., Esq.
     Title: Vice President

13

2 Granite 000199

KELLOGG BROWN & ROOT, INC.

By:

Name:   Jerry H. Blurton
Title:   Senior Vice President and
         Chief Financial Officer

## OTHER RELEASING POLICYHOLDERS

By:  Halliburton, not in its individual capacity,
     but as representative of Halliburton Current
     Affiliates, as set forth on Exhibit 16 to the
     Plan


By:_____
Name: Albert O. Cornelison, Jr., Esq.
Title: Executive Vice President and
General Counsel of Halliburton Company

2 Granite 000200

KELLOGG BROWN & ROOT, INC.

By: _____
    Name:
    Title:

### OTHER RELEASING POLICYHOLDERS

By: Halliburton, not in its individual capacity,
    but as representative of Halliburton Current
    Affiliates, as set forth on Exhibit 16 to the
    Plan

By: _____
Name: Albert O. Cornelison, Jr., Esq.
Title: Executive Vice President and
    General Counsel of Halliburton Company

-14-

2 Granite 000201

Schedule 1
to Assignment Agreement

## NOTICE INFORMATION

### SELLERS

DII INDUSTRIES, LLC

DII Industries, LLC
c/o Albert O. Cornelison, Jr., Esq.
Vice President and General Counsel
Halliburton Company
Five Houston Center
1401 McKinney, Suite 2400
Houston, TX 77010
Telephone: (713) 759-2620
Facsimile: (713) 759-2622

Michael G. Zanic, Esq.
Kirkpatrick & Lockhart LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222
Telephone: (412) 355-6219
Facsimile: (412) 355-6501

KELLOGG BROWN & ROOT, INC.

Kellogg Brown & Root, Inc.
c/o Albert O. Cornelison, Jr., Esq.
Halliburton Company
Five Houston Center
1401 McKinney, Suite 2400
Houston, TX 77010
Telephone: (713) 759-2620
Facsimile: (713) 759-2622

Michael G. Zanic, Esq.
Kirkpatrick & Lockhart LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222
Telephone: (412) 355-6219
Facsimile: (412) 355-6501

NCLIB1 2391753

OTHER RELEASING POLICYHOLDERS

Other Releasing Policyholders
c/o Albert O. Cornelison, Jr., Esq.
Halliburton Company
Five Houston Center
1401 McKinney, Suite 2400
Houston, TX 77010
Telephone: (713) 759-2620
Facsimile: (713) 759-2622

Michael G. Zanic, Esq.
Kirkpatrick & Lockhart LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222
Telephone: (412) 355-6219
Facsimile: (412) 355-6501

**PURCHASER**
HDK PURCHASER TRUST
c/o U.S. Bank National Association
100 Wall Street, 16th Floor
New York, NY 10005

**HALLIBURTON**

HALLIBURTON COMPANY

Albert O. Cornelison, Jr., Esq.
Executive Vice President and General Counsel
Halliburton Company
Five Houston Center
1401 McKinney, Suite 2400
Houston, TX 77010
Telephone: (713) 759-2620
Facsimile: (713) 759-2622

Michael G. Zanic, Esq.
Kirkpatrick & Lockhart LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222
Telephone: (412) 355-6219
Facsimile: (412) 355-6501

NCLIB1 239175.3

EXHIBIT A

**FORM OF ASSIGNMENT OF AIG SETTLEMENT PAYMENTS**

ASSIGNMENT OF AIG SETTLEMENT PAYMENTS, dated as of _____, 2004 (this "Assignment"), is made by and among (i) DII INDUSTRIES, LLC, as debtor and debtor-in-possession, and its predecessors, successors and assigns ("DII Industries"), (ii) KELLOGG BROWN & ROOT, INC., as debtor and debtor-in-possession, and its predecessors, successors and assigns ("KBR") and (iii) each of the other Releasing Policyholders (together with Halliburton DII Industries and KBR, collectively, the "Assignors", and each, an "Assignor") and HDK PURCHASER TRUST, a common law trust organized under the laws of the State of New York (together with its successors and assigns, the "Assignee").

Reference is made to that certain Assignment Agreement, dated as of _____, 2004 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), entered into by and among the Assignors, Halliburton and the Assignee. Capitalized terms used but not otherwise defined herein shall have the meanings assigned thereto by the Agreement.

WHEREAS, subject to the terms and conditions of this Assignment, each Assignor desires to sell, transfer and irrevocably assign to the Assignee all of its right, title and interest in and to the AIG Settlement Payments (unencumbered by any security interests, liens or other encumbrances, claims or interests of any nature); and

WHEREAS, the Assignee is willing to accept such assignment of the AIG Settlement Payments;

NOW THEREFORE, each of the Assignors and the Assignee agree as follows:

1.    ASSIGNMENT.    Each Assignor hereby absolutely and irrevocably assigns and transfers to the Assignee, as of the date hereof, all right, title, benefit and interest it has or may have in and to the AIG Settlement Payments and all proceeds thereof (the "Assigned Claim"). For the avoidance of doubt, the Assigned Claim includes the right to pursue in the name of the Assignors or directly, by legal proceeding or otherwise, the AIG Companies, including any successors or assigns, for failure to pay any of the AIG Settlement Payments. From and after the effectiveness of the assignment, the Assigned Claim shall be the sole property of the Assignee.

2.    CONSIDERATION.    In consideration of the assignment described in Paragraph 1 above, the Assignee shall pay to the DII Industries (or as otherwise directed by the Bankruptcy Court) on the Assignment Agreement Effective Date, by wire transfer of immediately available funds, an amount equal to the Payment Amount. Each Assignor acknowledges that such consideration is full and adequate consideration for the Assigned Claim and directs the Assignee to wire the funds to the following account (or as otherwise directed by the Bankruptcy Court):

2 Granite 000204

| Bank: | Citibank N.A. |
| | New York, NY |
| SWIFT: | CITIUS33 |
| ABA#: | 021000089 |
| A/C# : | 40715617 |
| A/C Name: | DII Industries, LLC |

3.     REPRESENTATIONS AND WARRANTIES.     Each Party hereby confirms each of the representations and warranties made by it to the other Party pursuant to the Agreement are true and accurate as of the date hereof.

4.     LIMITATION ON RECOURSE ARISING FROM THE SALE OF AIG SETTLEMENT PAYMENTS.  Notwithstanding anything herein to the contrary, the sale by the Assignors to the Assignee of the AIG Settlement Payments hereunder and under the Agreement is made without representation, warranty or covenant by any Assignor, except as expressly set forth in the Transaction Documents to which it is a party, and recourse to any Assignor in connection therewith is limited solely to such Assignor's obligations under the Transaction Documents.

5.     BINDING EFFECT.  The terms of this Assignment shall be binding upon and inure to the benefit of each of the Assignors, the Assignee, and their respective successors, nominees, and assigns.

6     AMENDMENT.  No amendment of any provision of this Assignment shall be effective unless it is in writing and signed by officers of each Assignor and the Assignee, and no waiver or any provision of this Assignment, nor consent to any departure by any Assignor or the Assignee therefrom, shall be effective unless it is in writing and signed by an officer of the party affected thereby, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it is given.

7.     COUNTERPARTS.  This Assignment may be executed in counterparts and all such counterparts taken together shall be deemed to constitute a single agreement. Delivery of an executed counterpart of a signature page to this Assignment in Portable Document Format (PDF) or by facsimile transmission shall be effective as delivery of a manually executed original counterpart thereof.

[SIGNATURES FOLLOW]

NCLIBI 2391753

2 Granite 000205

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be executed as of the date first above written by their respective duly authorized officers.

ASSIGNORS

DII INDUSTRIES, LLC

By: _____
     Name:  Albert O. Cornelison, Jr., Esq.
     Title:  Vice President

KELLOGG BROWN & ROOT, INC.

By: _____
     Name:
     Title:

OTHER RELEASING POLICYHOLDERS

By:  Halliburton, not in its individual capacity,
     but as representative of Halliburton Current
     Affiliates, as set forth on Exhibit 16 to the
     Plan

By: _____
     Name: Albert O. Cornelison, Jr., Esq.
     Title:  Executive Vice President and
     General Counsel of Halliburton Company

2 Granite 000206

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be executed as of the date first above written by their respective duly authorized officers.

ASSIGNORS

DII INDUSTRIES, LLC

By: _____
    Name:  Albert O. Cornelison, Jr., Esq.
    Title:  Vice President

KELLOGG BROWN & ROOT, INC.

By: _____
    Name:  Jerry H. Blurton
    Title:  Senior Vice President and
            Chief Financial Officer

OTHER RELEASING POLICYHOLDERS

By:  Halliburton, not in its individual capacity,
    but as representative of Halliburton Current
    Affiliates, as set forth on Exhibit 16 to the
    Plan

By: _____
Name: Albert O. Cornelison, Jr., Esq.
Title: Executive Vice President and
      General Counsel of Halliburton Company

3.

NCLIB1 239175.3

2 Granite 000207

ASSIGNEE

HDK PURCHASER TRUST

By: U.S. BANK NATIONAL ASSOCIATION,
not in its individual capacity but solely as
trustee on behalf of the Purchaser, as
PURCHASER TRUSTEE


By: _____
Name:
Title:

NCLIB1 239175.3

2 Granite 000208