UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            )
GRANITE STATE INSURANCE                                     )
COMPANY,                                                    )
                                                            )
                                                            )
            Plaintiff,                                      )
                                                            )  Civil Action No.: 09 CV 10607 (RJH)
            -against-                                       )
                                                            )
CLEARWATER INSURANCE COMPANY,                               )
f/k/a ODYSSEY REINSURANCE                                   )
CORPORATION, f/k/a SKANDIA                                  )
AMERICA REINSURANCE                                         )
CORPORATION,                                                )
                                                            )
                                                            )
            Defendant.                                      )

**DECLARATION OF JEFFREY M. WACTLAR**

I, **JEFFREY M. WACTLAR**, pursuant to 28 U.S.C. § 1746, declare:

1. I submit this declaration in support of plaintiff, Granite State Insurance Company's, Motion for Summary Judgment.

2. I am currently a Complex Director for the Pollution and Single Event ("PASE") group of Chartis Claims, Inc.,[1] 101 Hudson Street, Jersey City, New Jersey, 07302. During the period discussed in this declaration, I was a Claims Analyst in the Complex Claims Unit within the Toxic Tort Department at American International Group, Inc. ("AIG"). With respect to the matters discussed in this declaration, I reported first to Patrick Sweeney in 2005 for approximately 10 months to a year, then to Bill Johnson for about a year, and finally, starting in early 2007, to Steven Parness. Messrs. Sweeny, Johnson and Parness were Assistant Vice

---

[1] Chartis Claims, Inc. was formerly known as AIG Domestic Claims, Inc., which in turn was formerly known as AIG Technical Services, Inc. Since July of 2009, the property and casualty insurance subsidiaries of AIG have operated under the name "Chartis." An overwhelming majority of the documents and events relevant to this dispute pre-date that name change. For ease of reference, "AIG" is used for purposes of this declaration.

Presidents in my group at that time.

3.  Unless otherwise stated, the facts stated herein are based upon my personal knowledge or information gleaned from AIG's files.

4.  Granite State Insurance Company ("Granite State") is a Pennsylvania corporation, with its principal place of business in New York, New York.

5.  Granite State is a subsidiary of AIG. AIG is a Delaware corporation, with its principal place of business in New York, New York.

6.  C.V. Starr is a former AIG affiliate. In its capacity as underwriting manager for Granite State, C.V. Starr underwrote the policies insuring McGraw Edison Company ("McGraw Edison") that are discussed below.

### Background

7.  I joined AIG Technical Services in 2005 as an analyst in the Toxic Tort Claims Department working with asbestos and other mass tort and long-term bodily injury claims.

8.  In approximately 2007, I transferred into the Complex Claims Unit where I continued to work as a claims analyst.

9.  Because of the multitude, complexity and escalating volume of asbestos claims being asserted under its policies, AIG centralized the claims handling and adjusting for all asbestos claims for various AIG insurance companies, including Granite State, into AIG's Toxic Tort Claims Department. As mass tort claims often affect a large number of the AIG companies, this was done, in part, to ensure consistency in the handling and adjusting of asbestos claims.

10. Within the Toxic Tort Claims Department, the Complex Claim Unit had acquired substantial expertise and experience in handling such claims on behalf of the group companies. The Complex Claims Unit adjusted the Federal-Mogul Products, Inc. ("Federal

2

Mogul") asbestos claims on behalf of Granite State and the other group companies named in the coverage litigations with Federal Mogul, which ultimately gave rise to certain of the matters at issue in this litigation.

### Insurance Policies

11. Between 1980 and 1984, Granite State issued four insurance policies to McGraw Edison, including the two policies at issue in this dispute, Granite State policy No. 6680-1963 and Granite State policy No. 6681-2370 (collectively, "Granite State Policies").

12. Copies of the Granite State Policies are maintained in AIG's Federal Mogul claim file in the ordinary course of business.

13. Granite State policy No. 6680-1963 provided excess liability insurance to McGraw Edison for the period March 1, 1980 through March 1, 1981, specifically $10 million of coverage as part of an insurance layer of $25 million excess of $25 million. A true and correct copy of Granite State policy No. 6680-1963 from AIG's claim file is attached as Exhibit 1. Underlying this policy was a Northbrook Insurance Company policy and a U.S. Fire Insurance Company policy. (See Ex. 1, at Granite State 000690, "Item 2".)

14. Granite State policy No. 6681-2370 provided excess liability insurance to McGraw Edison for the period March 1, 1981 through March 1, 1982, specifically $15 million of coverage as part of an insurance layer of $25 million excess of $25 million. A true and correct copy of Granite State policy No. 6681-2370 from AIG's claim file is attached as Exhibit 2. Underlying this policy was a U.S. Fire Insurance Company policy and a First State Insurance Company policy. (See Ex. 2, at Granite State 000508, "Item 2".)

15. In or about 2006, I was charged with responsibility for the day-to-day handling of the coverage claims by Federal Mogul under the policies issued by the AIG group of

3

companies. It was my understanding that, based on a complex corporate history, Federal Mogul sought coverage for asbestos-related claims under certain policies issued to McGraw Edison, including the Granite State Policies. I also learned that Dresser Industries, Inc. ("Dresser") likewise sought coverage for asbestos-related claims under the same policies issued to McGraw Edison.

16. By agreement dated November 4, 2004, Dresser and Federal Mogul agreed to partition the limits of the policies issued to McGraw Edison[2] including, among others, the Granite State Policies. Under this agreement, Federal Mogul was given exclusive access to fifty percent of the unexhausted aggregate limits of the policies issued to McGraw Edison, and Dresser was given exclusive access to the other fifty percent. Exhibit 3 to this declaration is a true and correct copy of this agreement ("Partitioning Agreement"), as well as the Bankruptcy Court orders approving this agreement.[3]

### The Federal Mogul Asbestos Claims

17. In the course of handling the Federal Mogul asbestos claims, I prepared a series of reports and memos. Exhibit 4 to this declaration is a true and correct copy of a status report I prepared on April 14, 2009 regarding the Federal Mogul asbestos claims.

18. That report records my contemporaneous understanding of the key facts related to the Federal Mogul claims. As reflected in that report, asbestos-related claims had been asserted against Federal Mogul, as successor-in-interest to Wagner Electric Company ("Wagner"), a wholly-owned subsidiary of Studebaker-Worthington, Inc. ("S-W"). (Ex. 4, at

---

[2] The Partitioning Agreement also equally partitioned the limits of policies issued to Studebaker-Worthington, Inc. ("S-W").

[3] These orders were issued by the U.S. Bankruptcy Court for the Western District of Pennsylvania in the matter captioned, In re: Mid-Valley, Inc., et al., Case No. 03-35592-JFK (Dresser's Chapter 11 proceeding), and the U.S. Bankruptcy Court for District of Delaware in the matter captioned, In re: Federal-Mogul Global Inc., et al., Case No. 01-10578 (RTL) (Federal Mogul's Chapter 11 proceeding).

Granite State 000356.) In 1979, S-W was purchased by a subsidiary of McGraw Edison. (Id.) Wagner manufactured and sold asbestos-containing friction products, including brake assemblies and brake block linings. (Id.)

19.     As my April 14, 2009 report further indicates, from 1998 to 2001, roughly 51,000 claims were filed against Federal Mogul as successor to Wagner. (Ex. 4, at Granite State 000356.) By 2001, when Federal Mogul filed its Chapter 11 bankruptcy petition,[4] there were approximately 35,000 asbestos-related bodily injury claims pending against Federal Mogul as successor to Wagner. (Id.) Estimates of future asbestos claims ranged from a low of 102,251 to a high of 799,753 claims. (Id.)

20.     Exhibit 5 to this declaration is a true and correct copy of a settlement authority memo I prepared on or about December 10, 2008, which reflects the key facts concerning the Federal Mogul claims as I understood them. As set forth in that memo, in 2007, before it was scheduled to emerge from bankruptcy, Federal Mogul filed a declaratory judgment action against all of its insurers, including various AIG companies, in New Jersey. (See Ex. 5 at Granite State Priv 0004084.) The New Jersey action was captioned Federal Mogul Products, Inc. v. ACE Property & Cas. Ins. Co., et al., Docket No. L-002535-06 (N.J. Sup. Morris Cty.).[5] (See Ex. 8, infra, at 2 Granite 001239.)

21.     My December 10, 2008 memo reflects my determination at the time that the total limits of coverage available to Federal Mogul under AIG policies for the claims at issue was

---

[4]     As noted above, that bankruptcy matter was captioned, In re: Federal-Mogul Global Inc., et al., Case No. 01-10578-RTL (Bankr D. Del.).

[5]     A concurrent action was filed by one of Federal Mogul's insurers in New York state court also seeking to determine Federal Mogul's insurance coverage rights. The New York action was captioned ACE Property & Cas. Ins. Co. v. Federal-Mogul Corp., et al., Index No. 07-601535 (N.Y. Sup. Ct.). (See Ex. 8, infra, at 2 Granite 001239.) The New York action was ultimately stayed while the New Jersey coverage action proceeded.

$151 million.[6] (See Ex. 5, at Granite State Priv. 0004084.)

### AIG's Analysis of Dresser's Asbestos Liability

22.     As set forth in my December 10, 2008 memo (Exhibit 5 hereto), Federal Mogul's consultant had estimated that Federal Mogul's future asbestos liabilities arising from its Wagner operations would range from $523.9 million to approximately $1.8 billion. (See Ex. 5, at Granite State Priv 0004084.)

23.     These estimates were set forth in a March 3, 2004 report from Dr. Tom Florence of ARPC, Inc. ("ARPC Report"), a true and accurate copy of which is attached to this declaration as Exhibit 6. (See Ex. 6, at GS Confidential 000149.) The ARPC Report indicates that the median of the $523.9 million to $1.786 billion estimates was approximately $1 billion. (See id.) The ARPC report was partially revised on June 14, 2005, but the median of Federal Mogul's future liabilities in the revised report was still estimated to be approximately $1 billion. (See id., GS Confidential 000148.) The ARPC Report also set forth AIG's worst case "size of the problem" scenario for future Federal Mogul asbestos liabilities.

24.     I reviewed these estimates and other claims data provided by Federal Mogul with my supervisor Steve Parness. From the information available, we concluded that the aggregate loss from Federal Mogul would exhaust the policies underlying Granite State's policies and, in our judgment, based on Federal Mogul's projections, approximately $121 million of the $151 million of total limits provided to Federal Mogul by AIG companies would be exhausted if the court in the New Jersey coverage action determined that New Jersey law

---

[6] Certain of the AIG policies at issue were multi-year policies, and Federal Mogul took the position that the limits of these policies should be annualized for a total of $175.8 million in AIG company limits. Conversely, AIG took the position that these policies should not be annualized and only provided $132.8 million in limits. The $151 million limits figure was calculated assuming a 45% chance that the multi-year policies would be annualized.

governed the issue of allocation.[7]

25.	Although AIG was aware of the existence of potential coverage defenses, in our judgment, the case presented a substantial risk that AIG would be forced to pay 80.6% of its $151 million policy limits if it did not settle, i.e., $121 million. In fact, there was a possibility that the AIG companies would be forced to pay even more. We therefore concluded that settlement was preferable to the risk of litigating policy-by-policy coverage defenses, and that a settlement that embodied a significant discount off of the $121 million likely exposure would be a very favorable result.

## Settlement Negotiations

26.	During the time that I was responsible for the Federal Mogul claim file, AIG and Federal Mogul took part in bankruptcy court-ordered mediation.

27.	AIG participated in this mediation as part of the "Federal Mogul Carrier Group," which included numerous other insurance companies, including carriers that wrote policies underlying the Granite State Policies, as well as carriers with policies in higher layers.

28.	Over the course of mediation, the carriers arrived at a series of global settlement offers to present to Federal Mogul. These settlement offers took into account certain exposure analyses.

29.	The Federal Mogul Carrier Group retained the Brattle Group ("Brattle") to facilitate calculations for the various global settlement offers that were made to Federal Mogul.

30.	Brattle prepared a number of spreadsheets reflecting various different

---

[7]	As indicated in my December 10, 2008 memo, New Jersey allocation law, as opposed to the commonly used "rising bathtub" method, considers the total amount of limits and time on the risk to calculate an insurer's share of a loss. (Ex. 5, at Granite State Priv. 0004084.) New Jersey allocation law is, therefore, unfavorable for excess carriers such as AIG. Thus, AIG decided to settle rather than face the possibility of an adverse judgment, which, applying New Jersey allocation law, would expose AIG policy limits up to $121 million (if not higher). (Id.)

7

assumptions. These changing assumptions included, but were not limited to, potential discount factors to account for differing policy language which might support various coverage defenses.[8]

31.     It was my understanding that no member of the Federal Mogul Carrier Group ever asked or instructed Brattle to perform a substantive coverage analysis. Nor was Brattle asked to analyze the likely outcome of the coverage litigation or the likely contribution of each insurance policy to a litigated judgment. The Brattle spreadsheets simply reflected Brattle's modeling of variables and scenarios proposed by the Federal Mogul Carrier Group to assist the carriers in developing global settlement offers.

32.     Brattle was also asked to scrutinize the claims forecasts set forth in the ARPC Report identified above in paragraph 23. AIG ultimately used this Brattle analysis as AIG's best case "size of the problem" scenario for estimating future Federal Mogul asbestos liabilities.

33.     To my knowledge, none of the carriers shared their exposure models with Federal Mogul prior to entering into settlements; nor did they ever jointly negotiate or agree with Federal Mogul on the coverage to be provided by any particular carrier or any individual insurance policy. Federal Mogul rejected all settlement offers made by the Federal Mogul Carrier Group.

34.     It was never my intention or expectation that the Brattle spreadsheets would have any impact on AIG's internal allocation of a settlement with Federal Mogul.

## The AIG Federal Mogul Settlement

35.     The court-ordered mediation failed to bring about a settlement between the Federal Mogul Carrier Group and Federal Mogul.

36.     In July 2006, the Federal Mogul bankruptcy trustee approached AIG separately from the other Federal Mogul carriers and conveyed a $99 million net present value

---

[8] Other factors and variables were also considered by Brattle in the spreadsheets.

("NPV") settlement proposal to AIG. A true and accurate copy of that July 27, 2006 settlement proposal is attached as Exhibit 7.

37.     This proposal was the starting point for separate settlement negotiations between AIG and Federal Mogul.

38.     Ultimately, AIG and Federal Mogul resolved their coverage disputes and they executed a Settlement Agreement and Release on or about December 29, 2008 ("AIG Federal Mogul Settlement"). A true and correct copy of the AIG Federal Mogul Settlement is attached hereto as Exhibit 8.

39.     By the terms of that agreement, AIG agreed to pay Federal Mogul $40 million through four fixed payments over three years and an additional $32 million beginning in 2014 if certain benchmarks were met. (See Ex. 8, at 2 Granite 001245, 001249-001252.) In exchange, Federal Mogul agreed to release AIG for all past and future asbestos liabilities. (See Ex. 8, at 2 Granite 001254-1264.)

### Allocation of the Federal Mogul Loss

40.     Whenever AIG settles a complex claim implicating multiple policies, it is necessary to allocate the resulting loss to the various potentially affected policies. That allocation is required for a host of important, internal business reasons. It is done without regard to the potential impact on reinsurance.

41.     I asked Lynn A. Mitchell of Campos & Stratis[9] to allocate the Federal Mogul loss to the various AIG company policies using the "rising bathtub" allocation method. The amount of potential recoverable reinsurance was not a factor in my decision to utilize that approach.

---

[9] Campos & Stratis is an accounting firm that AIG had used on a number of occasions in the past to prepare "rising bathtub" allocations, a mechanical and arithmetical exercise requiring no substantive analysis.

9

42. AIG regularly uses the "rising bathtub" method to allocate loss resulting from the settlement of asbestos claims impacting multiple policies over multiple years because it is the simplest and most logical method of allocation under the circumstances. It is straightforward and logical because it allocates the loss the AIG companies have actually incurred and does not require a highly complex, subjective and uncertain analysis of what each of the dozens of potentially exposed policies might pay absent a settlement.

43. Exhibit 9 is a true and correct copy of the "rising bathtub" allocation of the AIG Federal Mogul Settlement, prepared by Lynn A. Mitchell.

44. Once the "rising bathtub" allocation was completed, it was then used to determine and schedule payments by the AIG member companies, including Granite State, to Federal Mogul.

45. In 2009, responsibility for the handling of the Federal Mogul claim file passed to Steve Schwesinger, and shortly thereafter the file was reassigned to Leticia Diaz.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 8th, 2011
Jersey City, NJ

/Jeffrey Wactlar