UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
GRANITE STATE INSURANCE
COMPANY,

                Plaintiff,

              -against-

CLEARWATER INSURANCE COMPANY,
f/k/a ODYSSEY REINSURANCE
CORPORATION, f/k/a SKANDIA
AMERICA REINSURANCE
CORPORATION,

              Defendant.
----------------------------------------------------------------x

Civil Action No.: 09 CV 10607
(RJH) (DCF)

**ORAL ARGUMENT REQUESTED**

# CLEARWATER INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGEMENT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ...............................................................................................1

STATEMENT OF FACTS ..................................................................................2

    A.    The Parties ...........................................................................................2

    B.    The Contracts at Issue .........................................................................3

        1.    The Insurance Policies .................................................................3

        2.    The Facultative Certificates ........................................................5

        3.    The Underwriting and Placement of the McGraw Fac Certs.......7

        4.    McGraw Edison's Corporate History ..........................................8

        5.    The Asbestos-Bodily Injury Claims.............................................9

        6.    The Coverage Actions and Settlement Negotiations Between Granite State, Federal Mogul and Dresser/Halliburton .............10

        7.    The AIG Companies Hiring of Alan Gray and Settlement with Dresser/Halliburton...........................................................12

        8.    The Financing Deal with Lehman and Written Settlement Agreement with Dresser/Halliburton.......................................16

        9.    Notice of the Dresser/Halliburton Settlement under the McGraw Fac Certs ...................................................................19

        10.    The Federal Mogul Settlement....................................................20

        11.    Notice to Clearwater under the McGraw Fac Certs Regarding Federal Mogul........................................................................23

ARGUMENT....................................................................................................25

    I.    Governing Law and Principles........................................................25

        A.    Illinois Law Governs the Reinsurance Certificates .....................25

B.   Summary Judgment Standard ....................................................................30

II.  Granite State Is Not Entitled to Coverage Because It Cannot
     Establish Essential Elements of Its Claims Under the McGraw Fac
     Certs ..........................................................................................................31

     A.   Granite State Has Not Submitted the Required Proof of Loss....................31

     B.   Granite State's Claims Should Be Dismissed Because It
          Cannot Demonstrate that the Lower Limit or Attachment
          Point of the McGraw Fac Certs Had Been Penetrated................................33

     C.   Granite State Cannot Meet Its Burden of Providing
          Exhaustion Requirements Under 1980 and 1981 McGraw
          Policies Were Met........................................................................................38

     D.   Granite State's Failure to Comply with the Prompt Notice
          Provision In the McGraw Fac Certs Precludes Recovery
          Under Those Contracts ................................................................................41

          1.   The Dresser/Halliburton Settlement ............................................................44

          2.   The Federal Mogul Settlement....................................................................49

IV.  GRANITE STATE'S CLAIMS SHOULD BE DISMISSED BECAUSE IT
     FAILED TO IMPLEMENT PROCEDURES TO ENSURE TIMELY
     NOTICE OF CLAIMS TO CLEARWATER ..........................................................52

V.   GRANITE STATE'S DEMANDS FOR PAYMENT UNDER THE
     MCGRAW FAC CERTS ARE CONTRARY TO ITS SETTLEMENTS
     WITH DRESSER/HALLIBURTON AND FEDERAL MOGUL.........................56

VI.  CLEARWATER IS NOT LIABLE FOR BILLINGS BASED UPON THE
     LEHMAN FINANCING PAYMENTS ..................................................................58

CONCLUSION...................................................................................................60

APPENDICES

## TABLE OF AUTHORITIES

**Cases:**                                                                                                           **Page**

*AIU Ins. Co. v. TIG Ins. Co.*,
    No. 07 Civ. 7052(SHS)(HBP), 2010 WL 850181 (S.D.N.Y. 2010),
    *vacated on other grounds by AIU Ins. Co. v. TIG Ins. Co.*, No. 07 Civ.
    7052(SHS), 2010 WL 882879, (S.D.N.Y. 2010) ...................................27,28, 29, 30, 31

*Allendale Mut. Ins. Co. v. Excess Ins. Co., Ltd.*,
    992 F. Supp. 271 (S.D.N.Y. 1997) .................................. ..................................36

*Allsopp Sand & Gravel, Inc. v. Lincoln Sand & Gravel Co.*,
    525 N.E.2d 1185 (Ill. App. Ct. 1988) ............................................................31

*Allstate Ins. Co. v. Employers Reinsurance Corp.*,
    441 F.Supp.2d 865(N.D. Ill. 2005) ..............................................25,31,42,43,48,49,52

*Am. Auto. Ins. Co. v. B.D. McClure and Associates, Ltd.*,
    No. 09 C 1589, 2011 WL 211204 (N.D. Ill. Jan. 21, 2011) ...........................................33

*Am. Family Mut. Ins. Co. v. Blackburn*,
    566 N.E.2d 889 (Ill. App. Ct. 1991) ............................................................43

*American Ins. Co. v. North America for Property & Cas. Ins.*,
    697 F.2d 79 (2d Cir. 1982) ....................................................................41

*Amerisure Mut. Ins. Co. v. Global Reinsurance Corp. of Am.*,
    927 N.E.2d 740 (Ill. App. Ct. 2010) ...........................................................52

*Arkwright-Boston Mfrs. Mut. Ins. Co. v. Calvert Fire Ins. Co.*,
    887 F.2d 437 (2d Cir. 1989) ...................................................................26

*Avery v. State Farm Mut. Auto Ins. Co.*,
    835 N.E.2d 801 (Ill. 2005).....................................................................31

*Bellefonte Reinsurance Co. v. Aetna Cas. and Sur. Co.*,
    903 F.2d 910 (2d Cir. 1990) ................................................................36,37

*Burke v. Jacoby*,
    981 F.2d 1372 (2d Cir. 1992) ..................................................................31

*Calvert Fire Ins. Co. v. Yosemite Ins. Co.*,
    573 F. Supp. 27 (E.D.N.C. 1983) ...........................................................35, 37

*Celotex Corp. v. Catrett*,
 477 U.S. 317(1986) ..........................................................................33

*Centaur Ins. Co. v. Safety Nat'l Cas. Corp.*,
 No. 92 C 5996, 1993 WL 434056 (N.D. Ill. Oct. 22, 1993) ...........................42

*Certain Underwriters at Lloyd's London v. Home Ins. Co.*,
 783 A.2d 238 (N.H. 2001) ...........................................................53,56

*Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.*,
 745 F. Supp. 150 (S.D.N.Y. 1990) ....................... .................................26

*Christiania Gen'l Ins. Corp. of New York v. Great Am. Ins. Co.*,
 979 F.2d 268 (2d Cir. 1992) .......................................................26,42,43

*Comerica Inc. v. Zurich Am. Ins. Co.*,
 498 F. Supp. 2d 1019 (E.D. Mich. 2007) ....................................................41

*Commercial Union Ins. Co. v. Swiss Reinsurance Am. Corp.*,
 413 F.3d 121(1st Cir. 2005) .............................................................36

*Constitution Reinsurance Corp. v. Stonewall Ins. Co.*,
 980 F. Supp. 124 (S.D.N.Y. 1997) ..................................................26,49,52

*Folksamerica Reinsurance Co. v. Republic Ins. Co.*,
 No. 03 Civ. 0402(HB), 2003 WL 22852737 (S.D.N.Y. 2003), *vacated on
 other grounds*, 182 Fed. App'x 63 (2d Cir. 2006) ....................................26,28

*Fortress Re v. Jefferson Ins. Co. of N.Y.*,
 465 F. Supp. 333 (E.D.N.C. 1978), *aff'd* 628 F.2d 860 (4th Cir. 1980) ......................43

*Gen. Cas. Co. of Illinois v. Juhl*,
 669 N.E.2d 1211 (Ill. App. Ct. 1996) ......................................................43

*Great Am. Ins. Co. v. Bally Total Fitness Holding Corp.*,
 No. 06 C 4554, 2010 WL 2542191 (N.D. Ill. June 22, 2010) ..................................39,41

*Grynberg v. BP, P.L.C.*,
 No. 06 Civ. 6494(RJH), 2011 WL 1161540 (S.D.N.Y. Mar. 30, 2011) ......................30

*Highlands Ins. Co. v. Employers' Surplus Lines Ins. Co.*,
 497 F. Supp. 169 (E.D. La.) ..............................................................48

*In re Omnicom Group, Inc. Securities Litig.*,
    597 F.3d 501, 509 (2d Cir. 2010) ...................................................................31

*INA Ins. Co. of Illinois v. City of Chicago*,
    379 N.E.2d 34 (Ill. App. Ct. 1978) ..............................................................43

*Int'l Harvester Co. v. Continental Cas. Co.*,
    179 N.E.2d 833 (Ill. App. Ct. 1962) ..............................................................43

*Independence Ins. Co. v. Republic National Life Ins. Co.*,
    447 S.W.2d 462 (Tex. Civ. App. 1969) ..........................................................41

*International Ins. Co. v. Certain Underwriters at Lloyd's London*,
    No. 88 C 9838, 1991 WL 349907 (N.D. Ill. Sept. 16, 1991) ........................52

*Jefferson Ins. Co. of New York v. Fortress Re, Inc.*,
    616 F. Supp. 874 (S.D.N.Y. 1984) .............................. ..................................26

*John Crane, Inc. v. Admiral Ins. Co.*,
    No. 04 CH 8266, 2009 WL 908576 (Ill. Cir. Ct. Mar. 10, 2009) ..................37

*Keehn v. Excess Ins. Co. of Am.*,
    129 F.2d 503 (7th Cir. 1942) .....................................................................42,43

*Lazard Freres & Co. v. Protective Life Ins. Co.*,
    108 F.3d 1531 (2d Cir. 1997) .......................................................................25

*Maremont Corp. v. Continental Casualty Co.*,
    760 N.E.2d 550 (Ill. App. Ct. 2001) ..............................................................37

*Matter of Allstate Ins. Co. (Stolarz)*,
    613 N.E.2d 936 (N.Y. 1993)....................................................................25,26

*Michigan Millers Mut. Ins. Co. v. North American Reinsurance Corp.*,
    452 N.W.2d 841 (Mich. Ct. App. 1990) .......................................................41

*National Union Fire Ins. Co. of Pittsburgh, Pa. v. Am. Re-Insurance Co.*,
    351 F. Supp. 2d 201 (S.D.N.Y. 2005) ......................................................27,28

*Pacific Employers Ins. Co. v. Global Reinsurance Corp. of Am.*,
    No. 09-6055, 2010 WL 1659760 (E.D. Pa. Apr. 23, 2010) .......................36,37

*Perlman v. Time, Inc.*
    478 N.E.2d 1132 (Ill. App. Ct. 1985) ............................................................31

*Qualcomm, Inc. v. Certain Underwriters At Lloyd's, London,*
 73 Cal. Rptr. 3d 770  (Cal. Ct. App. 2008) ..............................................................40,41

*Salce v. Saracco,*
 No. 2-09-1336, 2011 WL 1881060 (Ill. App. Ct. May 12, 2011) ...................................34

*Schultz v. Illinois Farmers Ins. Co.,*
 930 N.E.2d 943(Ill. 2010) ...........................................................................................33

*Security Ins. Co. v. Trustmark Ins. Co.,*
 Civ. No. 3:00 cv 1247 (PCD), 2002 U.S. Dist. LEXIS 27348 (D. Ct. Sept.
 4, 2002) ........................................................................................................................53

*Specialty Surfaces Int'l, Inc. v. Continental Cas. Co.,*
 609 F.3d 223 (3d Cir. 2010) .........................................................................................29

*Stuyvesant Ins. Co. v. United Pub. Ins. Co.,*
 221 N.E.2d 3580 (Ind. App. Ct. 1966) ......................................................................43,48

*TIG Premier Ins. Co. v. Hartford Acc. & Indem. Co.,*
 35 F. Supp. 2d 348 (S.D.N.Y. 1999) .........................................................................26,30

*Transamerica Ins. Co. v. Interstate Pollution Control, Inc.,*
 No. 92 C 20247, 1995 WL 360460 (N.D. Ill. June 16, 1995) ...................................49,52

*Tri-State Employment Servs., Inc. v. Mountbatten Sur. Co. Inc.,*
 295 F.3d 256 (2d Cir. 2002) ..........................................................................................26

*Unigard Sec. Ins. Co., Inc. v. North River Ins. Co.,*
 594 N.E.2d 571 (N.Y. 1992)..........................................................................................25

*Unigard Security Ins. Co. v. North River Mut. Ins. Co.,*
 4 F.3d 1049 (2d Cir. 1993) ..........................................................................36,37,52,53,56

*UNR Industries, Inc. v. Continental Ins. Co.,*
 682 F.Supp. 1434 (N.D. Ill. 1988) ................................................................................43

*Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.,*
 642 N.E.2d 1065 (N.Y. 1994) .......................................................................................25

***Statutes, Regulations and Rules:***

22A Paul Coltoff, Stephen Lease, Thomas Muskus & David Yanes, *Illinois Law and Practice - Insurance* § 580 (2011) .................................................................42

Barry R. Ostrager and Mary Kay Vyskocil, *Modern Reinsurance Law and Practice* § 2.01(b) (2d ed. 2000) .............................................................................1, 42

Fed. R. Civ. P. 56(c) ...................................................................................................30

NY Ins. Law §§ 1303, 4117.........................................................................................44

Restatement (Second) Conflict of Laws § 188 cmt. e (1971) ...........................................27,28, 30

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GRANITE STATE INSURANCE COMPANY                :

                                           :  Civil Action No. 09 Civ. 10607 (RJH)
                                           :  (DCF)

               Plaintiff,         :

         - against -           :

CLEARWATER INSURANCE COMPANY, f/k/a  :
ODYSSEY REINSURANCE CORPORATION,  :
f/k/a SKANDIA AMERICA REINSURANCE  :
CORPORATION                                   :

            Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Defendant Clearwater Insurance Company *(f/k/a* Odyssey Reinsurance Corporation and Skandia America Reinsurance Corporation, hereinafter, "Clearwater") hereby submits this Memorandum of Law in Support of its Cross-Motion for Summary Judgment in this case.

## **INTRODUCTION**

The undisputed facts and applicable law demonstrate that Clearwater is not obligated to pay the amounts sought by Plaintiff Granite State Insurance Company ("Granite State") under facultative reinsurance certificates[1] issued by Clearwater to Granite State for several reasons.

First, Granite State cannot demonstrate that it actually paid the amounts it seeks as required under the facultative certificates. Second, Granite State cannot prove, as it must, that the $25,000,000 attachment point of the facultative certificates was penetrated so as to trigger

---

[1] "Facultative reinsurance is insurance that is purchased for a specific risk insured by the cedent . . . Under a facultative contract, the option, or 'faculty,' to accept or reject each risk offered by the ceding company is exercised by the reinsurer." Barry R. Ostrager and Mary Kay Vyskocil, *Modern Reinsurance Law and Practice* § 2.01(b) at 2-5, 2-6 (2d ed. 2000) (internal quotation marks omitted) (annexed hereto as Appendix A).

Clearwater's obligations to indemnify Granite State under them. Third, Granite State cannot prove exhaustion of $25,000,000 in underlying limits as required by the reinsured policies. Fourth, Granite State's reporting of the claims to Clearwater was late in breach of the prompt notice provision in the reinsurance contracts. Fifth, Granite State has failed to implement reinsurance claims reporting procedures that ensure timely notice to Clearwater and its other reinsurers as required under well-settled law. Sixth, Granite State cannot recover under the facultative certificates because the amounts it seeks are not based on its underlying loss settlements but rather on amounts it paid to a third party under a financing agreement to fund Granite State's settlements. Seventh and finally, Granite State's demand for coverage under the facultative certificates contravenes the basis on which it settled the underlying claims and, therefore, must be denied.

## STATEMENT OF FACTS

### A.    The Parties

Clearwater is a corporation organized under the laws of Delaware, with its principal place of business in Stamford, Connecticut. *See* Second Amended Complaint ¶ 2. Clearwater was formerly known as Odyssey Reinsurance Corporation and Skandia America Reinsurance Corporation. *See* Declaration of Theresa Chavez[2] ("Chavez Decl.") dated July 11, 2011 ¶ 1. Clearwater is affiliated with Odyssey Reinsurance Company ("OdysseyRe") which also has its principal place of business in Stamford, Connecticut. *See id.* at ¶ 3.

Granite State is a corporation organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business in New York, New York. *See* Declaration of

---

[2] Theresa Chavez is a Vice President of Odyssey Reinsurance Company managing Asbestos, Pollution and Hazardous Health ("APH") claims for Clearwater. *See* Chavez Decl., ¶ 1.

Matthew J. Lasky, Esq. ("Lasky Decl."), dated June 9, 2011, Ex. 1 at ¶ 1. Granite State is an

affiliate of the American International Group of Companies ("AIG"). Granite State's Statement

of Undisputed Material Facts In Support of Motion for Summary Judgment dated June 9, 2011, ¶

2 ("Plaintiff's SUMF").

Chartis Claims, Inc. (f/k/a AIG Domestic Claims, Inc. and AIG Technical Services, Inc.)

("AIGTS") handles and manages claims on behalf of Granite State and other AIG insurance

companies. *See* of Declaration of Stephen M. Kennedy, Esq. ("Kennedy Decl.") dated July 11,

2011, Ex. 4 (Jeff Wactlar[3] Deposition Transcript) 14:3–12; Wactlar Decl., ¶ 7.

**B.     The Contracts at Issue**

**1.     The Insurance Policies**

Effective from 1980 to 1984, Granite State issued, through, C.V. Starr & Co. ("C.V.

Starr"),[4] four excess insurance policies to the McGraw Edison Company ("McGraw Edison"), an

Illinois-based corporation (collectively, the "McGraw Policies"). *See* Lasky Decl., Ex. 1 ¶¶ 14,

16, 18, 20; Declaration of Simon Yoon ("Yoon Decl."),[5] Ex. 1 and Ex. 2, submitted in support of

Granite State's Motion for Summary Judgment. At the time the McGraw Policies were issued,

Granite State and C.V. Starr were both AIG member companies. *See* Kennedy Decl., Ex. 1

---

[3] Jeffrey Wactlar is a Complex Director for the Pollution and Single Event PASE group of
Chartis Claims, Inc., 101 Hudson Street Jersey City, New Jersey 07302. During the period
discussed in his declaration, he was Claims Analyst in the Complex Claims Unit within the
Toxic Tort Department at AIG Technical Services. *See* Declaration of Jeffrey Wactlar ("Wactlar
Decl."), ¶ 2, submitted in support of Granite State's Motion for Summary Judgment.
[4] "C.V. Starr was an underwriting manager who issued the Granite State Policies and placed the
reinsurance on behalf of Granite State." *See* Declaration of Matthew Mansour ("Mansour
Decl.,") ¶ 8, submitted in support of Granite State's Motion for Summary Judgment.
[5] Simon Yoon is Complex Director for the Pollution Insurance Products Claims group of Chartis
Claims Inc. During the period discussed in his declaration (2001-2005) he was Claims Analyst
in the Complex Claims Unit within the Toxic Tort Claims Department at AIG Technical Services
and then Manager within that department. *See* Yoon Decl., ¶ 2.

(Francis Cafone[6] Deposition Transcript) at 12:20–22; 187:19–23; Wactlar Decl. at ¶ 6. Today, only Granite State, and not C.V. Starr, is affiliated with AIG. *See* Wactlar Decl. at ¶¶ 5–6.

The first of the two McGraw Policies at issue in this litigation was effective from March 1, 1980 to March 1, 1981 (the "1980 McGraw Policy No. 6680-1963") with limits of $10,000,000 part of $25,000,000 excess of $25,000,000 in underlying umbrella insurance policies (*see* Yoon Decl., Ex. 1 at Granite State 000688), including policies issued by (1) Northbrook Insurance Company Policy No. 63006485 effective March 1, 1980 to March 1, 1981 with limits of $20,000,000 and (2) United States Fire Insurance Company Policy No. 523 077428 7 with limits of $2,500,000. *See,* Kennedy Decl., Ex. 61 and Ex. 86.

The second of the McGraw Policies at issue in this matter was effective from March 1, 1981 to March 1, 1982 (the "1981 McGraw Policy No. 6681-2370") with limits of $15,000,000 part of $25,000,000 excess of $25,000,000 in underlying umbrella insurance policies (*see* Wactlar Decl., Ex. 2 at Granite State 000504),[7] including policies issued by (1) United States Fire Insurance Company Policy No. 523 067253 3, effective March 1, 1981 to March 1, 1984, with limits of $12,500,000 and (2) First State Insurance Company Policy No. 917383 effective March 1, 1981 to March 1, 1984, with limits of $12,500,000. *See* Kennedy Decl., Ex. 10 at CW 001295, CW 01428.

---

[6] Francis Cafone is a Reinsurance Specialist in the Reinsurance Claims Department of American Home Assurance Company and National Union Fire Insurance Company of Pittsburgh, PA (affiliates of Granite State). *See* Kennedy Decl., Ex. 1 at 41:18 – 43:18.
[7] Granite State issued two additional excess policies to McGraw Edison, one effective March 1, 1983 and the other effective March 1, 1984 (collectively, the "1983 and 1984 McGraw Policies"), with the same $25,000,000 underlying attachment point and $15,000,000 policy limits as the 1981 McGraw Policy No. 6681-2370. The 1983 and 1984 McGraw Policies were reinsured by Clearwater under facultative reinsurance certificates that were originally part of this litigation but have since become the subject of arbitration proceedings. *See* Lasky Decl., Ex. 1 at ¶¶ 18–21.

Under the McGraw Policies, Granite State agreed to cover, among other things, all losses

or damages relating to personal injuries arising out of hazards covered by and defined in the

Underlying Umbrella Policies, including, the products liability hazard.

*See* Wactlar Decl., Ex. 1 at Granite State 000690; Ex. 2 at Granite State 000508;

Kennedy Decl., Ex.10 at CW 001365, ¶ 6.

The 1980 and 1981 McGraw Policies are subject to "the same terms, definitions,

exclusions and conditions (except as regards the premium, the amount and limits of

liability and except as otherwise provided herein) as are contained in or as may be added

to the Underlying Umbrella Policies. . . ." Wactlar Decl., Ex. 1 at Granite State 000692;

Ex. 2 at Granite State 000509.   One term that the McGraw Policies are subject to is

"ultimate net loss" which is defined in the underlying U.S. Fire Policies as:

> All sums which the insured, or any company as his insurer, or both, is legally
> obligated to pay as damages, whether by reason of adjudication or settlement,
> because of personal injury . . . liability to which this policy applies . . . .

Kennedy Decl., Ex. 10 at CW 01365.  The McGraw Policies provide that "liability shall

attach to [Granite State] only after the Underlying Umbrella Insurers have paid or have

been held liable to pay the full amount of their respective ultimate net loss liability . . . ."

Wactlar Decl., Ex. 1 at Granite State 000690; Ex. 2 at Granite State 000509.

**2.     The Facultative Certificates**

Granite State reinsured the 1980 and 1981 McGraw Policies with Skandia America

Reinsurance Corporation (n/k/a Clearwater) under two facultative certificates ("McGraw Fac

Certs").  The 1980 McGraw Policy No. 6680-1693 was reinsured under Clearwater Casualty

Facultative Certificate No. SC26285, effective March 1, 1980 to March 1, 1981 (the "1980

McGraw Fac Cert").  *See* Mansour Decl., Ex. 1.  Under the 1980 McGraw Fac Cert, Clearwater

agreed to reinsure 20% up to $2,000,000 of the $10,000,000 limit of the 1980 McGraw Policy

No. 6680-1693 for all loss amounts that exceeded $25,000,000 excess of any scheduled

underlying primary insurance or self-insured retention. *See id.* at Granite State 000198-199.

The 1981 McGraw Policy No. 6681-2370 was reinsured under Clearwater Casualty

Facultative Certificate No. SC27675, effective March 1, 1981 to March 1, 1982 (the "1981

McGraw Fac Cert"). *See* Mansour Decl., Ex. 2. Under the 1981 McGraw Fac Cert, Clearwater

agreed to reinsure 20% up to $3,000,000 of the $15,000,000 limit of the 1981 McGraw Policy

No. 6681-2370 that exceeded $25,000,000 excess of any scheduled underlying primary insurance

or self-insured retention. *See id.* at Granite State 000209.

Clearwater's agreement to reinsure the 1980 and 1981 McGraw Policies was "in

consideration of the payment of premiums, statements contained in the declarations, and subject

to the terms and General Conditions" set forth in the 1980 McGraw Fac Cert. *See* Mansour

Decl., Ex. 1 at Granite State 000200; *id.* Ex. 2 at Granite State 000209.

Under both McGraw Fac Certs, Clearwater agreed to accept liability for losses paid by

Granite State that fell within the coverage of the reinsured policies to the extent such coverage

was not inconsistent with the coverage under the facultative certificates:

> [Clearwater's] liability under this Casualty Facultative Reinsurance Certificate,
> ("Certificate") shall follow [Granite State's] liability in accordance with the terms
> and conditions of the policy reinsured hereunder except with respect to those
> terms and/or conditions as may be inconsistent with the terms of this Certificate.

Mansour Decl., Ex. 1 at Granite State 000199; Ex. 2 at Granite State 000210.

Clearwater also agreed that "upon [its] receipt . . . of satisfactory evidence of

payment of a loss for which reinsurance is provided" under the McGraw Fac Certs, to

"promptly reimburse [Granite State] for its share of the loss . . . ." *Id.* Granite State, on

the other hand, agreed unconditionally to "notify [Clearwater] promptly of any event or

development which . . . [it] reasonably believes might result in a claim against

6

[Clearwater]" under the McGraw Fac Certs, and to "forward to [Clearwater] copies of such pleadings and reports of investigations as are pertinent to the claim and/or as may be requested by [Clearwater]." *Id.* Granite State also agreed that "it shall be [its] duty . . . to notify [Clearwater], promptly, of any changes in the policy reinsured hereunder." *Id.*

Under the McGraw Fac Certs, Clearwater had the right to associate with Granite State in the defense of claims under the reinsured policies and to inspect "all books, records and papers of [Granite State] in any way pertaining to the reinsurance provided hereunder, including but not limited to claims in connection therewith." *Id.*

The McGraw Fac Certs do not contain a choice of law clause. *See id.*

### 3.   The Underwriting and Placement of the McGraw Fac Certs

In seeking to reinsure the McGraw Policies, Granite State, through its affiliate, C.V. Starr in Chicago, Illinois, sent requests for reinsurance to Clearwater's Chicago office. *See* Declaration of Richard Pluth ("Pluth Decl."), ¶¶ 5, 8 and Ex. 3. The McGraw Fac Certs were underwritten and priced by Clearwater's Robert M. O'Brien who was located in Clearwater's Chicago office. *See* Pluth Decl., ¶¶ 7, 14. Negotiations concerning the terms and conditions of coverage under the McGraw Fac Certs occurred between William Green of C.V. Starr's Chicago office and Mr. O'Brien. *See* Pluth Decl., ¶ 8. Following these negotiations, the McGraw Fac Certs were issued to C.V. Starr in Chicago by Mr. O'Brien. *See* Pluth Decl., ¶¶ 9-12.

The McGraw Fac Certs were underwritten and priced with the understanding and agreement that Clearwater would not be obligated to cover loss amounts paid by Granite State unless and until the underlying limit (or attachment point) of the facultative certificates of "$25,000,000 . . . excess of scheduled underlying primary insurance or S[elf] I[nsured] R[etention]" had been satisfied. *See* Pluth Decl., ¶¶ 13, 14. This is expressed in Section B of the Declarations of the McGraw Fac Certs. *See* Mansour Decl., Ex. 1; Ex. 2.

**4.    McGraw Edison's Corporate History**

McGraw Edison's corporate history is long but important to the issues to be decided on

Clearwater's Cross-Motion for Summary Judgment.

In 1979, McGraw Edison (through a subsidiary) acquired Studebaker-Worthington, Inc.

("Studebaker-Worthington"). *See* Kennedy Decl., Ex. 10 at CW 01292. Studebaker-

Worthington had been formed by a 1967 merger of the Worthington Company ("Worthington")

and Studebaker Corp. ("Studebaker"). *Id.*  Prior to the Worthington and Studebaker merger in

1967, Worthington had acquired Atlantic Locomotive Company ("ALCO"). *See, e.g., id.*; Yoon

Decl., Ex. 3 at Granite Site 005479. Both Worthington and ALCO were companies that

manufactured and sold asbestos containing products (Worthington sold asbestos-containing

valves and gaskets in pumps and compressors; ALCO sold asbestos-containing locomotive

parts). *See id.*

After its formation in 1967, Studebaker-Worthington acquired the stock of Wagner

Electric Corporation ("Wagner"). *See* Kennedy Decl., Ex. 10 at CW 01292. Wagner was a

company that sold and manufactured asbestos-containing brake products. *See* Yoon Decl.,  Ex. 3

at Granite Site 005480; *see, e.g.*, Kennedy Decl., Ex. 2 (Leticia Diaz Deposition Transcript[8]) at

82:12–23, 270:7–14. In 1976, Studebaker-Worthington merged ALCO into another of its

subsidiary, Turbodyne. *See* Yoon Decl., Ex. 3 at Granite Site 005479. In 1984, five years after

its acquisition of Studebaker-Worthington (which, as noted, included ALCO/Turbodyne),

McGraw Edison sold ALCO/Turbodyne to Dresser Industries, Inc. ("Dresser"). *See, e.g.,* Yoon

Decl., Ex. 3 at Granite Site 005479.

---

[8] Leticia Diaz is Senior Complex Director in the Asbestos Claims Department of Chartis Claims,
Inc., f/k/a AIG Domestic Claims, Inc., f/k/a AIG Technical Services, Inc., 101 Hudson St., Jersey
City, New Jersey. *See* Declaration of Leticia Diaz ("Diaz Decl."), ¶ 2.

A year later, in 1985, McGraw Edison also sold to Dresser the operations of the Worthington Company. *See id.* In that same year, 1985, Cooper Industries purchased all of the stock of McGraw Edison. *See* Kennedy Decl., Ex. 10 at CW 01292. As a result of this purchase, Wagner became a subsidiary of Cooper. *See id.* Cooper later merged Wagner into another of its subsidiaries, Moog Automotive. In 1998, Federal Mogul Products, Inc. ("Federal Mogul") purchased Moog Automotive from Cooper. *See id.* That same year (1998), Halliburton Company acquired Dresser. *See* Yoon Decl., Ex. 3 at Granite State 005479.

**5.    The Asbestos-Bodily Injury Claims**

By 2001, approximately 51,000 asbestos claims had been filed against Federal Mogul as successor to Wagner (which, as noted above, was sold to Federal Mogul in 1998, as part of Moog Automotive, by Cooper). *See* Kennedy Decl., Ex. 10 at CW 01293. In 2001, Federal Mogul filed for bankruptcy protection. *See id.*

By 2002, Federal Mogul had made coverage demands relating to asbestos-related bodily injury claims under insurance policies issued to McGraw Edison and Studebaker-Worthington (the "ME and SW Policies"), including, but not limited to, the 1980 and 1981 McGraw Policies. *See* Yoon Decl., ¶ 13 and Ex. 3 at Granite Site 005479–80 and 005483. Federal Mogul's claims for coverage were based on its purchase in 1998 of Wagner which, as noted above, was a former McGraw Edison subsidiary company which had manufactured and sold asbestos-containing brake products. *See id.* ¶ 13 and n.2.

By 2002, Dresser and its corporate parent, Halliburton (collectively, "Dresser/ Halliburton"), also made coverage demands under the ME and SW Policies, including, but not limited to, the 1980 and 1981 McGraw Policies, as a potential successor to asbestos liabilities arising out of Worthington's and ALCO's manufacture and sale of asbestos-containing products. *See* Yoon Decl., ¶ 12 and Ex. 3 at Granite Site 005479–80. In addition to the ME and SW

Policies, Dresser/Halliburton also made claims for coverage under insurance policies issued to

the following companies:  Harbison Walker Refractories Company and Kellogg, Brown & Root.

*See* Kennedy Decl., Ex. 5 (Simon Yoon Deposition Transcript) at 51:23–53:24; Kennedy Decl.,

Ex. 2 at 61:6–62:12.   Included among these policies were those issued by other AIG companies

affiliated with Granite State such as Insurance Company of the State of Pennsylvania and

National Union Fire Insurance Company of Pittsburgh, PA.  *See* Yoon Decl., Ex. 3 at Granite

Site 005480–81.

**6.      The Coverage Actions and Settlement Negotiations Between Granite State,
Federal Mogul and Dresser/Halliburton**

As a result of Federal Mogul's and Dresser/Halliburton's competing claims for coverage

under the ME and SW Policies, including the 1980 and 1981 McGraw Policies, several

declaratory judgment actions and other proceedings were commenced by 2003 involving

Dresser/Halliburton, Federal Mogul and various insurers, including, Granite State and other AIG

companies, concerning coverage under those policies.  *See* Yoon Decl., Ex. 3 at Granite Site

005478, 005481, 005483; Kennedy Decl., Ex. 5 at 54:19–24, 58:19–60:24.  In these coverage

actions, Granite State and the other AIG companies retained Thomas Wilkinson and Jack Shea of

Cozen O'Conner to represent them. *See* Kennedy Decl., Ex. 5 at 58:19–59:14.

By December 2003, Dresser filed for bankruptcy. *See* Yoon Decl., Ex. 3 at Granite Site

005478.  As of that time, Dresser/Halliburton, estimated their asbestos-related bodily injury

liabilities of arising out of the Worthington and ALCO business, and therefore subject to

potential coverage under the ME and SW Policies, to be at least $412,000,000.  *See* Yoon Decl.,

¶ 19.  Based on this estimated liability, Granite State believed that the 1980 and 1981 McGraw

Policies would be exhausted. *See* Kennedy Decl., Ex. 5 at 198:12–200:19; 102:24-103:4; *see

also* Yoon Decl., ¶¶ 19, 20.

By 2003, the AIG companies and the other domestic insurers had formed a joint defense

group in an effort to negotiate and settle the claims for coverage made by both Federal Mogul

and Dresser/Halliburton (the "Insurer Joint Defense Group"). *See* Kennedy Decl., Ex. 5 at

51:23-52:5; 60:15–24; Kennedy Decl., Ex. 2 at 75:6–23; Kennedy Decl., Ex. 3 at 28. The

Insurer Joint Defense Group, Dresser/Halliburton and Federal Mogul engaged in court-ordered

mediation and "intensive" settlement negotiations over two years when various settlement offers

were made. *See* Kennedy Decl., Ex. 11 at CW 02776; *see also* Kennedy Decl., Ex. 5 at 71:20–

72:6. As part of these settlement negotiations, the Insurer Joint Defense Group,

Dresser/Halliburton and Federal Mogul agreed sometime in 2004 that the limits of the SW and

ME Policies would be evenly split between Dresser/Halliburton and Federal Mogul (this

agreement later became known as the "Partitioning Agreement" and was memorialized in

November 2004). *See, e.g.*, Kennedy Decl., Ex. 11 at CW 02777. As it relates to the 1980 and

1981 McGraw Policies, the Partitioning Agreement split the limits of those policies as follows:

(1) under the $10,000,000 limit of the1980 McGraw Policy No. 6680-1693, Federal Mogul

received $5,000,000 and Halliburton received $5,000,000; and (2) under the $15,000,000 limit of

the 1981 McGraw Policy No. 6681-2370, Federal Mogul received $7,500,000 and Halliburton

received $7,500,000. *See* Wactlar Decl., Ex. 3 at 2 Granite 000006, 000074.

To assist in understanding their exposure under their policies and to calculate settlement

offers to be made to Dresser/Halliburton and Federal Mogul, the Insurer Joint Defense Group

retained NERA Economic Consulting ("NERA") and The Brattle Group, Inc. ("Brattle"). *See*

Kennedy Decl., Ex. 3 at 29:12–30:14, 47:17–21, 65:24–66:5; Plaintiff's SUF ¶¶ 31,49. NERA's

work generally related to the asbestos claims that Dresser/Halliburton were making under the

Insurer Joint Defense Group's policies issued to Dresser and Harbison Walker (the "Harbison

Walker Line of Coverage"). *See* Kennedy Decl., Ex. 3 at 34:16–21.

Brattle's work, on the other hand, focused on the claims Dresser/Halliburton were making under the SW and ME Policies, including the 1980 and 1981 McGraw Policies, concerning Worthington's and ALCO's manufacture and sale of asbestos-containing valve and locomotive products (the "Studebaker-Worthington Line of Coverage"). *See* Kennedy Decl., Ex. 3 at 34:16–35:16; Yoon Decl., Ex. 3 at Granite Site 005479. Brattle also focused on Federal Mogul's claims under the SW and ME Policies relating to Wagner's manufacture and sale of asbestos containing brake products. *See id*; Kennedy Decl., Ex. 14 at 2 Granite 001436–37. NERA's and Brattle's work was based on information and factors provided to them by the Insurer Joint Defense Group, including, for example, potential coverage defenses and other factors. *See, e.g.,* Yoon Decl., ¶ 24; Wactlar Decl. ¶ 30.

By December 2003, Brattle had created and circulated a report calculating and allocating the potential liabilities of members of the Insurer Joint Defense Group on a policy-by-policy basis relating to Dresser/Halliburton's and Federal Mogul's claims for coverage under the SW and ME Policies, including the 1980 and 1981 McGraw Policies. *See* Kennedy Decl., Ex. 3 at 209:9–211:24; Kennedy Decl., Ex. 17. In this report, Brattle estimated that Granite State's liability under the 1980 McGraw Policy No. 6680-1693 and 1981 McGraw Policy No. 6681-2370 to be $2,884,148 and $4,392,622, respectively. *See* Kennedy Decl., Ex. 3 at 209:13–212:14; Kennedy Decl., Ex. 17 at Granite_Alan Gray 0339, 0379, 0419, and 0459.

**7.     The AIG Companies Hiring of Alan Gray and Settlement with Dresser/Halliburton**

In February 2004, Granite State and the other AIG companies retained Alan Gray, Inc. ("Alan Gray") to analyze the reports that NERA and Brattle had prepared in connection with the Insurer Joint Defense Group settlement negotiations with Dresser/Halliburton and Federal Mogul. *See* Kennedy Decl., Ex. 3 at 26:4–28:25. Alan Gray was also retained at this time to create various alternative payout streams for the AIG companies in any settlement with

Dresser/Halliburton. *See id.* 213:2–9; *see also id.* 116:16–117:2.  Under these alternative payout

streams, the AIG companies were looking to make payments over a longer period of time than

when Dresser/Halliburton was seeking payment. *See* Kennedy Decl., Ex. 5 at 110:13-111:25.

As part of Alan Gray's work concerning longer payout periods, Alan Gray created a

spreadsheet dated April 19, 2004 (the "April 19, 2004 Alan Gray Spreadsheet"). *See* Kennedy

Decl., Ex. 3 at 111:10–113:13; Kennedy Decl., Ex. 19.  This spreadsheet was based upon a

NERA report that calculated various possible payouts to Dresser/Halliburton under both the

Harbison Walker and the Studebaker-Worthington Lines of Coverage issued by the AIG

companies, including the 1980 and 1981 McGraw Policies. *See* Kennedy Decl., Ex. 3 at 111:5–

113:13, 116:16–22;  Kennedy Decl., Ex. 19 at Granite_Alan Gray 1490.[9]  With respect to the

1980 McGraw Policy No. 6680-1693, the Alan Gray spreadsheet reflected payments, on a

nominal basis, of 72.64% of policy limits (or $3,642,235) and, on a net present value basis,

56.38% of policy limits (or $2,818,798).  *See* Kennedy Decl., Ex. 19 at Granite_Alan Gray 1490.

With respect to the 1981 McGraw Policy No. 6681-2370, the Alan Gray spreadsheet reflected

payments, on a nominal basis, of 74.13% of policy limits (or $5,560,104) and, on a net present

value basis, 57.37% of policy limits (or $4,303,076). *See* Kennedy Decl., Ex. 3 at 111:5–112:16

and Kennedy Decl., Ex. 19 at Granite_Alan Gray 1490.

On or about April 22, 2004, the Insurer Joint Defense Group offered to settle with

Dresser/Halliburton for approximately $735,000,000 (on a nominal basis) or approximately

$620,000,000 (on an NPV basis).  *See* Kennedy Decl., Ex. 20 at Granite_Alan Gray 1767 and

Ex. 3 at 133:20–139:23.  This offer – like prior offers – was based on a NERA report which

---

[9] At a certain point in 2004, NERA took over Brattle's role of calculating the insurers'
contributions under the Worthington Line of Coverage. *See* Kennedy Decl., Ex. 3 at 99:7–101:8.
Brattle, however, remained responsible for estimating the insurers' liability for Federal Mogul's

calculated each insurer's total contribution to the settlement offers on a policy-by-policy basis. *See id.* The contributions under the 1980 McGraw Policy No. 6680-1693 were calculated as $3,642,235 (nominal basis) (72% of limits) and $2,818,127 (net present value basis) (56% of limits). *See* Kennedy Decl., Ex. 21 at Granite_Alan Gray 1389 and Ex. 3 at 140:9-143:5. As respects the 1981 McGraw Policy No. 6681-2370, the contributions to the settlement offer were calculated as $5,560,104 (nominal basis) (74% of limits) and $4,302,051 (net present value basis) (57% of limits). *See* Kennedy Decl., Ex. 21 at Granite_Alan Gray 1389.

On April 26, 2004, AIG representatives, including representatives from Alan Gray, met with Dresser/Halliburton representatives to discuss a possible settlement between the AIG companies and Dresser/Halliburton separate and apart from the other members of the Insurer Joint Defense Group. *See* Kennedy Decl., Ex. 3 at 143:6–144:16; 41:21–42:23. The amount offered by the AIG companies in connection with this meeting was approximately $248,100,000 on a nominal basis and $170,000,000 to $176,200,000 on a net present value ("NPV") basis. *See* Kennedy Decl., Ex. 22; Kennedy Decl., Ex. 3 at 143:6–144:16.

In or around the time of the AIG companies' April 26, 2004 settlement meeting with Dresser/Halliburton, they began to calculate the possible amounts which might have to be paid under their individual policies net of reinsurance. *See* Kennedy Decl., Ex. 5 at 161:5–164:22; Kennedy Decl., Ex. 23. As part of these calculations, the Granite State determined that it might pay gross amounts of $4,629,900 under the 1980 McGraw Policy No. 6680-1693 and $7,067,838 under the 1981 McGraw Policy No. 6681-2370. *See* Kennedy Decl., Ex. 23 at 3 Granite 007135. After taking into account reinsurance, Granite State's liability was calculated to be under the

demands for coverage under the Worthington lines of coverage relating to the Wagner asbestos claims.

1980 McGraw Policy No. 6680-1693 and 1981 McGraw Policy No. 6681-2370, respectively, $265,000 and $496,400. *See* id.

Granite State's and the other AIG companies' attempt to settle outside of the Insurer Joint Defense Group with Dresser/Halliburton ultimately failed. *See, e.g.,* Kennedy Decl., Ex. 3 at 144:2-20. In May 2004, however, the Insurer Joint Defense Group, including the AIG companies, and Dresser/Halliburton reached a settlement in principle, resolving all of Dresser/Halliburton's claims against them. *See* Kennedy Decl., Ex. 5 at 102:24–103:4; *see also id.*, Ex. 24. Under the settlement in principle, the Insurer Joint Defense Group agreed to pay a total settlement of $742,566,502 on a nominal basis over a five year period from 2005 to 2010 or, alternatively, $624,984,393, on a net present value basis to be paid by 2005. *See* Kennedy Decl., Exs. 25, Ex. 26, and Ex. 3 at 163:24–165:17; *see also* Kennedy Decl., Ex. 11 at CW 02777 and Ex.2 at 62:13-21, 65:17-72:21. These settlement amounts represented the aggregate of the contributions each insurer agreed to make under its individual policies as set forth in a report prepared by NERA in May 2004 (the "May 2004 NERA Report"). *See* Yoon Decl., ¶¶ 27, 29; *see also* Kennedy Decl., Ex. 3 at 163:24–165:17 and Ex. 26. With respect to the AIG companies, their collective contribution to the nominal value settlement amount of $742,566,502 was calculated to be $223,179,583. *See* Kennedy Decl., Ex. 11 at CW 02777 and Ex. 2 at 62:13-21, 65:17-72:21. Their collective contribution of the net present value settlement amount of $624,984,393 was $173,620,556. *See* Kennedy Decl., Ex. 3 at 161:18–23; Kennedy Decl., Ex. 5 at 149:8–150:13; Yoon Decl., ¶ 27. Of that $173,620,556, the 1980 McGraw Policy No. 6680-1693 and 1981 McGraw Policy No. 6681-2370 contributions were, respectively, 57% of policy limits (or $2,876,106) and 58% of policy limits (or $4,390,560). *See* Kennedy Decl., Ex. 3 at 163:24–165:17; Kennedy Decl., Ex. 26 at 2 Granite 001835; Yoon Decl., ¶ 29, Ex. 7.

The AIG companies had the option of paying their share of $223,179,583 of the $742,566,502 nominal settlement amount in two installment payments: one in July 2009 for $179,857,876 and one in July 2010 for $43,321,707. *See* Kennedy Decl., Ex. 11 at CW 02777. They, however, did not want to make these payments in that period of time. *See* Kennedy Decl., Ex. 11 and Ex. 2 at 77:21–81:15. Instead, AIG sought to pay the lowest amount it could in settlement with Dresser/Halliburton over the longest period of time possible. *See* Kennedy Decl., Ex. 5 at 104:3–105:9, 131:12–17; *see also* Yoon Decl., ¶ 30. It, therefore, opted to pay its $173,620,556 share of the $624,984,393 net present value settlement amount and sought to find a way to pay that amount over a period of time beyond 2005, when Dresser/Halliburton demanded that it be paid. *See* Kennedy Decl., Ex. 5 at 131:12-17. In the end, they elected to finance their $173,620,556 settlement payment to Dresser/Halliburton over a ten year period through Lehman Brothers ("Lehman"). *See* Kennedy Decl., Ex. 5 at 157:9–20; Yoon Decl., Ex. 9 at 2 Granite 000166-67; Kennedy Decl., Ex. 3 at 128:23–129:16.

In June 2004, Alan Gray provided to Granite State and other AIG companies an allocation of their policy-by-policy contributions to the $173,620,556 settlement amount that they had agreed to pay Dresser/Halliburton. *See* Kennedy Decl., Ex. 3 at 176:14–719:13; 213:13-19. This "policy level detail" allocation reflected that the 1980 McGraw Policy No. 6680-1693 contributed $2,874,167 and the 1981 McGraw Policy No. 6681-2370 contributed $4,387,600 to the total $173,620,556 that the AIG companies agreed to pay Dresser/Halliburton. *See* Kennedy Decl., Ex. 29 at Granite_Alan Gray 1235.

8.    **The Financing Deal with Lehman and Written Settlement Agreement with Dresser/Halliburton**

To finance their $173,620,556 payment to Dresser/Halliburton, the AIG companies entered into an agreement with Lehman under which Lehman agreed to pay $173,620,556 to

Dresser/Halliburton in January 2005 and AIG agreed, in return, to pay Lehman over ten years the principal amount of $173,620,556 plus an additional $88,582,308 for a total of $262,202,864. *See* Kennedy Decl., Ex. 3 at 128:23–129:16; Kennedy Decl., Ex. 5 at 154:20–157:20; Yoon Decl., Ex. 9 at 2 Granite 000166 and Ex. 3; Kennedy Decl., Ex. 31. The AIG companies' payments were structured so that they paid Lehman $2,731,280 in quarterly payments from March 31, 2005 through December 31, 2008, with the quarterly payments then materially increasing to $9,104,266 from March 31, 2009 to December 31, 2014. *See* Kennedy Decl., Ex. 31 at 3 Granite 008695 (the "Lehman Financing Payments"). The total amount and the schedule of the Lehman Financing Payments were negotiated and agreed entirely by and between AIG and Lehman. *See* Yoon Dec., ¶ 37 and Ex. 10.

By August 2004, Lehman had provided to the AIG companies a draft of schedule of the Lehman Financing Payments. *See* Kennedy Decl., Ex. 3 at 179:14–182:18; Kennedy Decl., Ex. 32. Thereafter, based on this draft payment schedule, Alan Gray began in October 2004 working on an allocation to the AIG companies' policies of the Lehman Financing Payments. *See* Kennedy Decl., Ex. 3 at 182:12–18, 188:17–189:5; Kennedy Decl., Ex. 32.

Alan Gray's allocation of the Lehman Financing Payments was based on the "rising bathtub" method rather than on a discount off policy limits basis that was used to calculate each AIG company policy's contribution to the $173,620,556 paid to and accepted by Dresser/Halliburton in settlement. *See* Kennedy Decl., Ex. 2 at 85:10-88:2 and Yoon Decl., Ex. 10. Under the bathtub allocation method, Alan Gray allocated the full $5,000,000 limit of the 1980 McGraw Policy No. 6680-1693 (accounting for the split limits under the Partitioning Agreement) and the full $7,500,000 limit of the 1981 McGraw Policy No. 6681-2370 (again accounting for the split limits under the Partitioning Agreement). *See* Kennedy Decl., Ex. 30 at Granite_Alan Gray 1203-05. Under Alan Gray's allocation of the Lehman Financing Payments,

the payments under the 1980 and 1981 McGraw Policies were scheduled to be made from June 2007 through to September 2011. *See* Kennedy Decl., Ex. 30 at Granite_Alan Gray 1203–04.

In November 2004, Granite State and the other AIG companies finalized and executed their settlement agreement with Dresser/Halliburton. *See* Yoon Decl., Ex. 9. Under the AIG Settlement Agreement, Granite State and the other AIG companies formalized their agreement to pay Dresser/Halliburton $173,620,556 to settle their coverage dispute under the AIG policies, including the McGraw Policies. *See* Yoon Decl., Ex. 9 at 2 Granite 000112, 000121–122, 000164, 000166; Kennedy Decl., Ex. 5 at 110:13–111:5; Kennedy Decl., Ex. 3 at 161:14–24, 171:18–22.

Under the AIG Settlement Agreement, the AIG companies also agreed to Dresser/Halliburton's assignment to Lehman of their rights to any payments by the AIG companies to Lehman. *See* Yoon Decl., Ex. 9 at 2 Granite 000113, 000166; Yoon Decl., ¶¶ 33–34. The AIG Settlement Agreement, however, did not identify the amount AIG agreed to pay Lehman or the period of time over which payments would be made. Plaintiff's SUMF ¶ 13. Dresser/Halliburton and Lehman entered into an assignment agreement under which Lehman agreed to pay $173,620,556 – the AIG companies' share of the $624,984,393 NPV settlement amount – in exchange for Dresser/Halliburton's assignment of any rights to all future payments by the AIG companies to Lehman. (Yoon Decl., ¶ 37 and Ex. 10).

Also in November 2004, the Partitioning Agreement to split evenly the limits of the SW and ME Policies between Dresser/Halliburton and Federal Mogul was finalized and executed. *See* Yoon Decl., Ex. 4. The other insurers executed a separate settlement agreement with Dresser/Halliburton. *See* Kennedy Decl., Ex. 3 at 161:14–20.

At various points in time in 2005 through 2007, Alan Gray modified its initial October 2004 allocation of the Lehman Financing Payments to the AIG companies' policies, including

the 1980 and 1981 McGraw Policies.  As with its initial allocation, these modifications reflected definite, fixed payments to be made under the 1980 and 1981 McGraw Policies as well as the other AIG companies' policies. *See, e.g.,* Kennedy Decl., Ex. 33 at 2 Granite 001343-44.

**9.    Notice of the Dresser/Halliburton Settlement under the McGraw Fac Certs**

On or about February 17, 2009, Clearwater received a one page "Reinsurance Notice of Loss" which merely identified the 1980 McGraw Fac Cert and reflected that the 1980 McGraw Policy No. 6680-1693 had only a one dollar reserve despite the fact that Granite State knew, among many other things, for a certainty almost four and a half years earlier that it was going to be making fixed, definite installment payments under the policy up to the full $5,000,000 in policy limits. *See* Chavez Decl., ¶ 7 and Ex. 3.  The February 17, 2009 notice of loss was not accompanied by any information let alone any information concerning the numerous significant "events" and "developments" that precipitated Granite State's claims against Clearwater under the 1980 McGraw Fac Cert. *See id.*

Following the February 2009 Notice of Loss, Clearwater received in April 2009, a single page "Reinsurance FAC Proof of Loss" dated March 23, 2009, requesting payment of $119,513.20 under the 1980 McGraw Fac Cert with respect to the Dresser/Halliburton settlement. *See* Kennedy Decl., Ex. 34 at CW 01005; Kennedy Decl., Ex. 1 at 72:23–73:24. Although the prior February 2009 notice of loss had reflected an outstanding reserve amount of only $1 under the reinsured policy, the March 23, 2009 "Reinsurance FAC Proof of Loss" revealed that, in only one month time, $598,496 in indemnity and expense had been paid and reserves had been increased by more than $4,400,000 under the 1980 McGraw Policy No. 6680-1693. *Compare* Kennedy Decl., Ex. 34 at CW 01005 *with* Chavez Decl., Ex. 3.

19

Following the March 23, 2009 FAC Proof of Loss, Clearwater requested supporting information, including, for example, whether the Dresser/Halliburton settlement had been on a discount off policy limits basis, and, if so, why Granite State's billings and notices of loss did not reflect that discount and instead reflected a full limit losses under the McGraw Policies. *See, e.g.,* Kennedy Decl., Exs. 36 and 37. Clearwater also asked Granite State to explain why the losses were being reported on an untimely basis. *See id.* Clearwater also requested dates on which it could conduct an audit of Granite State's books and records. *See id.* Granite State ignored Clearwater's information and audit requests until 2010, months after it had commenced this action in December 2009. *See, e.g.,* Kennedy Decl., Ex. 10 at CW 01292–1294. At no time prior to this litigation, did Granite State provide notify Clearwater under the McGraw Fac Certs concerning the Lehman financing deal or that the billings to Clearwater were based on the $262,202,864 Lehman Financing Payments rather than the $173,620,556 million paid to Dresser/Halliburton in settlement. *See* Chavez Decl., ¶ 9.

**10.    The Federal Mogul Settlement**

Following the Dresser/Halliburton settlement in 2004, Federal Mogul continued with its demands for coverage against the insurers, including, Granite State and the other AIG companies, concerning the Wagner asbestos-related claims under the SW and ME Policies. *See* Kennedy Decl., Ex. 3 at 201:5–202:9. In defending against these demands, the AIG companies and the other insurers continued to use Brattle. *See, e.g.,* Kennedy Decl., Ex. 14; Kennedy Decl., Ex. 4 at 91:13–94:11. As it had prior to the Dresser/Halliburton settlement agreement, Brattle prepared reports calculating Granite State's and the other insurer's liability under their respective policies on a discount off policy limits basis. *See, e.g.,* Kennedy Decl., Ex. 14 at 2 Granite 001437; Kennedy Decl., Ex. 4 at 176:12–184:22; Kennedy Decl., Ex. 15; Kennedy Decl., Ex. 2 at 278:17–282:24, 287:2–288:2; Kennedy Decl., Ex. 38.

For example, in a July 27, 2005 report, Brattle, among other things, projected payments

to be made 1980 McGraw Policy No. 6680-1693 payments of $1,630,422 (on an NPV basis) and

$2,157,541 (on a nominal basis), *see* Kennedy Decl., Ex. 38 at GS Confidential 001133, 001173,

with various smaller, subsequent payments to be made over several years. *See id.* at GS

Confidential 001141, 001149, 001157, 001165, 001181, 001189, 001197, and 001205; Kennedy

Decl., Ex. 2 at 278:22–282:24.  Likewise with respect to the 1981 McGraw Policy No. 6681-

2370, Brattle estimated initial payments of $2,538,915 (on an NPV basis) and $3,449,653 (on a

nominal basis), *see* Kennedy Decl., Ex. 38 at GS Confidential 001133, 001173, with various

smaller, subsequent future payments. *See id.* at GS Confidential 001141, 001149, 001157,

001165, 001181, 001189, 001197, and 001205; Kennedy Decl., Ex. 2 at 278:22–282:24.

Following its July 27, 2005 report, Brattle prepared additional reports in 2005 which

again projected payments to be made under the 1980 McGraw Policy No. 6680-1693 and 1981

McGraw Policy No. 6681-2370, of, respectively, 66% of policy limits (or $3,338,136) and 70 %

of policy limits (or $5,255,302). *See* Kennedy Decl., Ex. 15 at GS Confidential 000003–4.  The

Brattle calculations of Federal Mogul's liabilities for the Wagner claims were an important factor

to Granite State in considering its exposure under its policies and whether to settle.  *See* Kennedy

Decl., Ex. 4 at 273:5–275:7; *see generally* Kennedy Decl., Ex. 14.  The 2004 calculations by

Federal Mogul's consultant, ARPC Inc., of approximately $500,000,000 to more than

$1,000,000,000, were also considered by Granite State in assessing its exposure to the Federal

Mogul/Wagner claims.  *See* Kennedy Decl., Ex. 4 at 273:20–274:6; Kennedy Decl., Ex. 14.

With respect to settlement, there were a number of settlement offers made by Granite

State and other insurers to Federal Mogul at least up to January 2006.  *See* Kennedy Decl., Ex. 4

at 110:12–113:22; Kennedy Decl., Exs. 39 and 40.  By July 2006, Federal Mogul offered to

settle its claims under the AIG companies' policies, including the 1980 and 1981 McGraw

Policies, for $99,000,000. *See* Kennedy Decl., Ex. 41; Kennedy Decl., Ex. 4 at 123:12–126:6, 140:10–141:8. In September 2006, Federal Mogul initiated a coverage action against Granite State and others in New Jersey state court. *See* Wactlar Decl., Ex. 8 at 2 Granite 001239. Thereafter, in May 2007, certain insurers initiated a coverage action against Federal Mogul in New York state court. *See id.*

Despite Brattle's calculations of liabilities specific to the 1980 and 1981 McGraw Policies, Granite State did not create a claim file or post any reserves under those policies until March 2008. *See generally* Kennedy Decl., Ex. 4 146:4–166:25; Kennedy Decl., Exs. 42 and 43. The reserves that it did post in March 2008 were *de minimis* "statistical" reserves of $1 for each policy, *see* Kennedy Decl., Ex. 4 156:7–23; Kennedy Decl., Ex. 42 at Granite Site 009037; Kennedy Decl., Ex. 43 at Granite Site 009029, even though there were "impending settlement discussions" with Federal Mogul, and Granite State understood that the policies would definitely be impacted by the settlement. *See* Kennedy Decl., Ex. 4 at 166:4–170:2 and Ex. 44.

By December 2008, the AIG companies and Federal Mogul had entered into a settlement agreement under which the AIG companies agreed to pay $40,000,000 based on fixed, annual installments of $10,500,000 for three years and then a final fixed payment of $8,500,000. *See* Wactlar Decl., Ex. 8 at 2 Granite 001249–1250 (paragraphs 2(A)(1)–(4)) and 2 Granite 001245 (paragraphs 1(M)–(N)), 2 Granite 001247 (paragraph 1(X)), and 2 Granite 001248 (paragraph 1(AA)), plus an additional $32,000,000 contingent upon whether certain claim thresholds were met. *See id.* at 2 Granite 001250–1252; Kennedy Decl., Ex. 45 at Granite Site 009228. This amount represents approximately a 40% discount off the $121,000,000 policy limits that the AIG companies believed were available to cover the Federal Mogul/Wagner claims. *See* Kennedy Decl., Ex. 14 at 2 Granite 001438.

Although the AIG companies settled with Federal Mogul on a policy limits discount basis for all their policies that were the subject of Federal Mogul's coverage demands, the AIG companies allocated the settlement payments on a rising bathtub basis. *See* Kennedy Decl., Ex. 14 at 2 Granite 001438. Under this method, amounts were allocated to the full limits of the 1980 and 1981 McGraw Policies (which, under the Partitioning Agreement, were $5,000,000 and $7,500,000, respectively). *See* Kennedy Decl., Ex. 46 at CW 01613, CW 01641–1643; *see also* Kennedy Decl., Ex. 47; Kennedy Decl., Ex. 4 at 259:4–260:16.

In March 2009, after years of knowing that their policies would be impacted by Federal Mogul's coverage claims and just as the AIG companies prepared to make their first payment under the Federal Mogul Settlement Agreement, Granite State increased its reserves from *$1* to the full (split) policy limits of $5,000,000 and $7,500,000. *See* Kennedy Decl., Ex. 4 at 246:20–249:8; Kennedy Decl., Ex. 49.

**11.    Notice to Clearwater under the McGraw Fac Certs Regarding Federal Mogul**

In or about April 2008, Clearwater received a one page "Reinsurance Notice of Loss" that it would later learn related to the Federal Mogul claims under the 1981 McGraw Fac Certs. *See* Kennedy Decl., Ex. 50; Kennedy Decl., Ex. 1 at 160:15–161:10; Chavez Decl., ¶ 6, Ex. 2. The information contained on this one page piece of paper was, to say the least, spare. The notice of loss did not state to which claim or loss it applied, let alone provide any information concerning the myriad of "events and developments" relating to Granite State's settlement with Federal Mogul dating back to 2002, when Federal Mogul and Dresser/Halliburton made competing claims of coverage under the 1980 and 1981 McGraw Policies. Instead, it merely set forth the facultative certificate number of the 1981 McGraw Fac Cert, the policy period of the reinsured policy ("03/01/81 TO 03/01/82") and identified the reinsured policy as "CVST

066812370" and a claim number of "170-053345." While, as noted, it did not describe the loss to which it pertained, it indicated there was a $1 reserve. *See* Kennedy Decl., Ex. 50.

Thereafter, almost one year later, in February 2009, Clearwater received the same type of "reinsurance notice of loss" with respect to the 1980 McGraw Fac Cert. *See* Kennedy Decl., Ex. 51; Kennedy Decl., Ex. 1 at 165:5–166:17. As with the April 2008 notice of loss, absolutely no information was provided concerning what the notice related to and certain did not describe any of the "events or developments" on which the Federal Mogul settlement was based. *See* Chavez Decl., ¶¶ 5-6. Also like the April 2008 notice of loss, the February 2009 notice indicated a reserve of only $1 even though Granite State had already entered into a settlement with Federal Mogul under which it agreed to make definite, fixed installment payments.

Approximately one month later, in March 2009, Clearwater received another one page "reinsurance notice of loss" concerning the 1980 McGraw Fac Cert that was almost exactly the same as the February 2009 notice except that it reflected a reserve increase of $4,999,999 to $5,000,000. *See* Kennedy Decl., Ex. 55; Kennedy Decl., Ex. 1 at 169:2–24. Subsequently, in April 2009, Clearwater received a billing or "Reinsurance FAC Proof of Loss" concerning the 1980 McGraw Fac Cert for $291,157 along with a copy of the Federal Mogul settlement agreement and a one page "preliminary reserve" report. *See* Kennedy Decl., Ex. 52.

Thereafter, Clearwater requested information relating to the settlement of the Federal Mogul claims including information concerning issues of, among others, late notice, Granite State's exposure analyses under the policies, and billing Clearwater on a full policy limits basis when it settled on a policy limits discount basis. *See, e.g.,* Kennedy Decl., Ex. 53. Clearwater also asked for dates to review Granite State's files. *See id.* Clearwater's requests, however, went largely ignored. *See* Chavez Decl., ¶¶ 9, 10. Instead of providing audit dates or the

requested information to support its claim, Granite State commenced this litigation in December 2009.

## ARGUMENT

### I.   GOVERNING LAW AND PRINCIPLES

#### A.   Illinois Law Governs the Reinsurance Certificates

There is a dispute between the parties as to whether Illinois or New York law governs the McGraw Fac Certs that do not contain a choice of law provision. The initial step in any choice of law analysis is determining whether there is an actual conflict of law. *See Matter of Allstate Ins. Co. (Stolarz)*, 613 N.E.2d 936, 937 (N.Y. 1993). Here, such a conflict exists. Under Illinois law, prompt notice provisions such as those contained in the McGraw Fac Certs are conditions precedent to coverage under insurance and reinsurance contracts; the insured or reinsured does not need to demonstrate it was prejudiced by violations of such notice provisions. *See Allstate Ins. Co. v. Employers Reinsurance Corp.*, 441 F.Supp.2d 865, 875 (N.D. Ill. 2005) ("when the insured fails to comply with a prompt notice requirement, the insurer may deny liability, regardless of whether it has been prejudiced by the delay") (citations omitted). Under New York law, however, proof of prejudice is required. *See Unigard Sec. Ins. Co., Inc. v. North River Ins. Co.*, 594 N.E.2d 571, 575 (N.Y. 1992).

In the absence of an express contractual provision designating the applicable law, the choice of law rules of the forum state, New York, apply to this diversity action. *See Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1538–39 (2d Cir. 1997). Under New York choice of law rules, courts apply the law of the forum that is the "center of gravity" or has the most significant "grouping of contacts." *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 642 N.E.2d 1065, 1068 (N.Y. 1994); *accord Lazard Freres & Co.*, 108 F.3d at 1539 (citations omitted). Among the factors considered by courts under this approach are the place of

contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties. *See Matter of (Stolarz)*, 613 N.E.2d at 940. Factors "given heavy weight in [this] analysis" are the places of contracting and performance. *Id.* at 939 (internal quotation marks omitted); *see also Tri-State Employment Servs., Inc. v. Mountbatten Sur. Co. Inc.*, 295 F.3d 256, 260–261 (2d Cir. 2002).

Under the New York choice of law rules for reinsurance cases, "the state where the reinsurance contract was issued and the location where performance is expected," i.e., the place to which the ceding company submits claims, typically control. *Folksamerica Reinsurance Co. v. Republic Ins. Co.*, No. 03 Civ. 0402(HB), 2003 WL 22852737, at *5 (S.D.N.Y. 2003), *vacated on other grounds*, 182 Fed. App'x 63 (2d Cir. 2006); *see also Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.*, 745 F. Supp. 150, 157 (S.D.N.Y. 1990) (holding that New York law applied because the "reinsurance contracts were negotiated, issued, and made in New York by a New York reinsurance company," and noting that, in addition, "New York would be the place of performance under the contracts") (*affirmed by Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.*, 979 F.2d 268 (2d Cir.1992); *Arkwright-Boston Mfrs. Mut. Ins. Co. v. Calvert Fire Ins. Co.*, 887 F.2d 437, 439 (2d Cir. 1989) (holding that North Carolina law applied because "the reinsurance certificate was issued [in North Carolina], and any obligation to perform on the reinsurance contract would seem to arise in North Carolina upon presentation of a claim to [the reinsurer]," despite fact that ceding company was a New York corporation); *Jefferson Ins. Co. of New York v. Fortress Re, Inc.*, 616 F. Supp. 874, 877 (S.D.N.Y. 1984) (same analysis); *TIG Premier Ins. Co. v. Hartford Acc. & Indem. Co.*, 35 F. Supp. 2d 348, 350 (S.D.N.Y. 1999) (same analysis); *Constitution Reinsurance Corp. v. Stonewall Ins. Co.*, 980 F. Supp. 124, 126–27 (S.D.N.Y. 1997) (same analysis).

While choice of law analyses under New York law consistently give heavy weight to the

places of negotiation and issuance of reinsurance contracts (*see, e.g., AIU Ins. Co. v. TIG Ins.
Co.*, No. 07 Civ. 7052(SHS)(HBP), 2010 WL 850181, at *7 (S.D.N.Y. 2010), *vacated on other
grounds by AIU Ins. Co. v. TIG Ins. Co.*, No. 07 Civ. 7052(SHS), 2010 WL 882879 (S.D.N.Y.
2010) ("the issuance of the Reinsurance Certificates, one of the factors to be given the most
weight in the choice of law analysis, occurred in Illinois")), the place of performance is not
always considered. *See National Union Fire Ins. Co. of Pittsburgh, Pa. v. Am. Re-Insurance
Co.*, 351 F. Supp. 2d 201, 207 (S.D.N.Y. 2005) (holding that Ohio law applied because (i) the
reinsurance contracts were negotiated in Ohio; (ii) the reinsurance contracts were issued in Ohio;
(iii) the insured was an Ohio Corporation; and (iv) the reinsured policy was issued by the
insurer's Ohio office). Further, where reinsurance contracts do not contemplate a place of
performance or claims are submitted in a number of states, "the place of performance should not
be afforded much weight." *AIU Ins. Co.*, 2010 WL 850181 at *7; *see also* Restatement (Second)
Conflict of Laws § 188 cmt. e (1971) ("the place of performance can bear little weight in the
choice of the applicable law when (1) at the time of contracting it is either uncertain or unknown,
or when (2) performance by a party is to be divided more or less equally among two or more
states with different local law rules on the particular issue").

In this case, before their issuance by Clearwater, the McGraw Fac Certs were
underwritten in Clearwater's Chicago, Illinois office and negotiated between representatives in
Clearwater's Chicago, Illinois office, including, Robert M. O'Brien, an underwriter in
Clearwater's Chicago, Illinois office, and representatives of C.V. Starr's Chicago, Illinois office,
including William Green. *See* Pluth Decl., ¶¶ 6–8 and Ex. 3. The reinsurance certificates were
issued in Chicago, Illinois by Mr. O'Brien to Mr. Green at C.V. Starr & Company's Chicago,
Illinois office. *See* Pluth Decl., ¶¶ 5-12; *see also* Mansour Decl., Ex. 1; Ex. 2; Kennedy Decl.,
Ex. 6 (Theresa Chavez Deposition Transcript) at 17–18. Further, the McGraw Fac Certs became

effective in Illinois, and are therefore deemed to have been issued in Illinois, when Mr. O'Brien

signed them. *See* Pluth Decl. at ¶¶ 9, 12; *see also AIU Ins. Co.*, 2010 WL 850181 at *7 ("The

Reinsurance Certificates were counter-signed by reinsurer's representative in Chicago and

therefore became effective there. Thus, the issuance of the Reinsurance Certificates, one of the

factors to be given the most weight in the choice of law analysis, occurred in Illinois");

*Folksamerica*, 2003 WL 22852737 at *5 (reinsurance certificates were issued in New York when

reinsurer's representative countersigned the certificates); Restatement (Second) of Conflicts §

188 cmt. e ("the place of contracting is the place where occurred the last act necessary, under the

forum's rules of offer and acceptance, to give the contract binding effect[.]").

     The choice of law factors consistently given the most weight by New York courts, i.e.,

the places of negotiation and issuance of the reinsurance contracts, weigh heavily in favor of

applying Illinois law here. As noted, the underwriting of the McGraw Fac Certs took place

entirely in Clearwater's Chicago, Illinois office, their negotiation took place entirely between

Clearwater's Chicago, Illinois office and the Chicago, Illinois office of C.V. Starr, and the

certificates were issued by Clearwater's Chicago, Illinois office to C.V. Starr in Chicago, Illinois.

In addition, other factors considered important to this Court in *National Union Fire Insurance*

*Co. of Pittsburgh, Pa.*, 351 F. Supp. 2d at 207, strongly favor Illinois law. For example, beyond

the important factors of the places of negotiation and issuance of the reinsurance contracts, the

*National Union* court also stressed that the location where the reinsured policy was issued and

where the insured was based are material. *See id.* Here the record is clear that the insured,

McGraw Edison, was based in Illinois (*see* Wactlar Decl., Ex. 1; Ex. 2) and the McGraw Policies

were issued to McGraw Edison at its Rolling Meadows, Illinois and Elgin Illinois addresses

through C.V. Starr's Chicago, Illinois office. *See id.*; *see, e.g.* Mansour Decl., ¶ 8.

Finally, with respect to the place of performance, this factor can be given little, if any, weight in the choice of law analysis because the McGraw Fac Certs do not require that claims be submitted to any particular location, and Granite State sent claims to at least three different states. *See AIU Ins. Co.,* 2010 WL 850181, at *7 ("because [insurer] and [reinsurer] have presented no evidence that the Reinsurance Certificates themselves contemplated a particular place of performance, and have presented evidence that claims were sent to many different states, the place of performance should not be afforded much weight in this choice of law analysis"); *see also Specialty Surfaces Int'l, Inc. v. Continental Cas. Co.,* 609 F.3d 223, 236–237 (3d Cir. 2010) (giving place of performance less weight than other choice of law factors where insurer and insured were uncertain as to the place of performance at the time of contracting). The record is clear that with respect to the amounts it seeks to recover in this action, the claims notices and billings were sent to Clearwater beginning in 2008 to either its San Francisco, California office, its New York, New York office and/or its Stamford, Connecticut office. *See* Kennedy Decl., Exs. 50-51, 54-58; Mansour Decl., Exs. 3-4. All of the billings at issue were sent to Clearwater's Connecticut offices. *See* Mansour Decl., Exs. 3-4. Thus, to the extent that the notices and billings concerning the asbestos claims at issue in this action are considered by the Court in its choice of law analysis, they establish that the place of performance should be given little weight because performance took place in at least three different states. Also diminishing the importance of the place of performance as a factor to be considered here is the fact that the billings received by Clearwater were sent from a Manchester, New Hampshire and some of the notices instruct that payment, if made by check, is to be sent to Newark, New Jersey, and if made by wire transfer, to a bank in New York. *See id.*

However, if the place of performance is to bear any weight in the choice of law analysis here, it should weigh in favor of applying Illinois law. Under New York choice-of-law rules, the

place of performance factor is assessed in part based on what is contemplated by the parties at the time of contracting. *See, e.g., AIU Ins. Co.*, 2010 WL 850181 at *7 (measuring weight of place of performance factor based on whether the reinsurance contracts contemplate a particular place of performance); *see also* Restatement (Second) Conflict of Laws § 188 cmt. e (1971) ("the place of performance can bear little weight in the choice of the applicable law when . . . at the time of contracting it is either uncertain or unknown . . ."); *TIG Premier Ins. Co. v. Hartford Acc. & Indem. Co.*, 35 F. Supp. 2d 348, 350 (S.D.N.Y. 1999) (place of performance is where claims are expected to be made). In support of its contention that it met its notice obligations under the McGraw Fac Certs, Granite State claims that C.V. Starr's Chicago office provided notice of the subject claims to Clearwater's Chicago office in the early 1980s. This contention establishes that Granite State, at the time of contracting, understood and expected performance under the McGraw Fac Certs to take place in Illinois.

Under New York choice of law rules applicable to reinsurance disputes, the balance of factors tips heavily in favor of the Court applying Illinois law to the McGraw Fact Certs as they were negotiated and issued in Illinois, the reinsured policies were issued in Illinois to an Illinois-based insured, and to the extent it is considered, the place of performance, at the time of contracting, was understood and expected to take place in Illinois. As a result, Illinois has the most relevant contacts with the dispute and the most interest in having its law applied.

### B.  Summary Judgment Standard.

Summary judgment is appropriate if the evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Grynberg v. BP, P.L.C.*, No. 06 Civ. 6494(RJH), 2011 WL 1161540, at *6 (S.D.N.Y. Mar. 30, 2011) (*citing* Fed. R. Civ. P. 56(c)).  A plaintiff's claim is properly dismissed when the defendant:

has moved for summary judgment on the ground that undisputed facts reveal that the plaintiff cannot establish essential element of the claim, on which element the plaintiff has the burden of proof, and the plaintiff has failed to come forth with evidence sufficient to permit a reasonable [trier of fact] to return a verdict in his or her favor on that element . . . .

*In re Omnicom Group, Inc. Securities Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (*quoting Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)).

As set forth in detail below, Clearwater's Cross-Motion for Summary Judgment should be granted because there is no genuine issue of material fact concerning Granite State's failure to comply with its obligations owed to Clearwater in this matter.

## II.    GRANITE STATE IS NOT ENTITLED TO COVERAGE BECAUSE IT CANNOT ESTABLISH ESSENTIAL ELEMENTS OF ITS CLAIMS UNDER THE MCGRAW FAC CERTS

### A.    Granite State Has Not Submitted the Required Proof of Loss

Illinois courts have held that the rules of contract interpretation apply to reinsurance contracts. *See Allstate Ins. Co.* v. Employers Reinsurance Corp., 441 F. Supp. 2d 865, 870 (N.D. Ill. 2005). Under Illinois law, in breach of contract cases, plaintiffs must plead and prove that they performed their material obligations under the contract. *See Allsopp Sand & Gravel, Inc. v. Lincoln Sand & Gravel Co.*, 525 N.E.2d 1185, 1188 (Ill. App. Ct. 1988); *Perlman v. Time, Inc.* 478 N.E.2d 1132, 1136 (Ill. App. Ct. 1985). Plaintiffs must also "establish an actual loss or measurable damages resulting from the breach in order to recover." *Avery v. State Farm Mut. Auto Ins. Co.*, 835 N.E.2d 801, 832 (Ill. 2005).

Here, in order for Clearwater to have any payment obligation under the McGraw Fac Certs, Granite State must provide "satisfactory evidence of payment of a loss for which reinsurance is provided . . . The term 'loss' shall mean only such amounts as are actually paid by [Granite State] in settlement of claims or in satisfaction of awards or judgments." Mansour Decl., Ex. 1 at Granite State 000200, (Section 3(c)-(d)); Ex. 2 at Granite State 000210, (Section

3(c)-(d)).  In its Second Amended Complaint, Granite State alleges that it "billed Clearwater for amounts due from Clearwater under the McGraw Fac Certs regarding the amounts paid by Granite State pursuant to the 2004 [Dresser/Halliburton] and 2008 [Federal Mogul] Settlements." Lasky Decl., Ex. 1, ¶ 26.

Granite State, however, has produced absolutely no evidence whatsoever that it actually billed or paid the amounts that it seeks to recover under the McGraw Fac Certs in this action. The record is, for example, completely devoid of any copies of checks, wire transfers or any other proof of payment demonstrating that Granite State has paid amounts concerning the Dresser/Halliburton and Federal Mogul settlements.  Indeed, the record is to the contrary. Documents produced by Granite State in this matter demonstrate that the amounts at issue were not, in fact, paid by Granite State but rather by other, separate and distinct AIG companies, including National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("NUF") and Insurance Company of the State of Pennsylvania ("ICSP").  *See, e.g.,* Diaz Decl., Ex. 2 at 2 Granite 005891-99 (wire transfers from NUF's bank account) and Ex. 5 at 2 Granite 005903-09 (checks written by ISCP and NUF); Kennedy Decl., Ex. 4 at 28:6–10.[10]  Likewise, testimony by Granite State's witness, Leticia Diaz, the representative of Chartis Claims, Inc. (f/k/a AIG Domestic Claims, Inc. and AIG Technical Services, Inc.) responsible for processing payments relating to the Dresser/Halliburton and Federal Mogul settlements, establishes only that "AIG" but not Granite State, made the payments at issue.  Diaz Decl., ¶¶ 14, 23.

---

[10] It is also undisputed that the sender and payee on the billings received by Clearwater was NUF.  *See* Kennedy Decl., Ex. 1 at 210:12–215:13; Kennedy Decl., Exs. 55–58.  The testimony by Granite State that NUF is identified as a payee because Granite State is "a policy issuing company within" a NUF "pooling arrangement" means nothing.  *See* Mansour Decl., ¶ 20. Indeed, Granite State does not even attempt to explain how this testimony bears on the issue that Granite State did not pay any of the loss amounts it seeks in this action.

Because Granite State cannot demonstrate, as it must, that it in fact paid the amounts at issue, summary judgment should be granted in favor of Clearwater. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

**B.      Granite State's Claims Should Be Dismissed Because It Cannot Demonstrate that the Lower Limit or Attachment Point of the McGraw Fac Certs Had Been Penetrated**

As noted above, Granite State bears the burden of proving coverage under the McGraw Fac Certs. In interpreting the McGraw Fac Certs, the primary objective of the court is to give effect to the intention of the parties as expressed in the contract. *See Am. Auto. Ins. Co. v. B.D. McClure and Associates, Ltd.*, No. 09 C 1589, 2011 WL 211204, at *4 (N.D. Ill. Jan. 21, 2011) ("A 'court's primary objective in construing an insurance contract is to ascertain and give effect to the intention of the parties as expressed in the agreement' and if the 'insurance policy terms are clear and unambiguous, they must be enforced as written'") (*quoting Schultz v. Illinois Farmers Ins. Co.*, 930 N.E.2d 943, 948 (Ill. 2010)). Where the language of the parties' agreement is clear and unambiguous, the court must enforce the agreement according to its plain meaning. *See id.*

Here, the preamble on the Declarations pages of the McGraw Fac Certs establishes that the certificates were issued and provide reinsurance "in consideration of the payment of premiums, statements contained in the declarations, and subject to the terms and General Conditions of this Certificate . . . ." Mansour Decl., Ex. 1; Ex. 2. Under Section D of the Declarations ("[Clearwater]'s Liability Reinsurance Period and Basis of Acceptance"), Clearwater's agreed to cover 20% of the limit stated in Section B ("Policy Limits and

Application"). *See id.* Section B state the Policy Limits and Application for: (1) the 1980 McGraw Policy No. 6680-1693 as $10,000,000 part of $25,000,000 excess of $25,000,000 excess of scheduled underlying primary insurance or self insured retentions; and (2) the 1981 McGraw Policy No. 6681-2379 as $15,000,000 part of $25,000,000 excess of $25,000,000 excess of scheduled underlying primary insurance or self insured retentions. *See id.* Section B, therefore, unambiguously sets forth the lower limit or attachment point of the McGraw Fac Certs as $25,000,000 excess of any underlying primary insurance or self insured retention as well as the upper limit as $25,000,000 excess of McGraw Fac Certs' lower limit or attachment point. These express limits define the scope of Clearwater's liability under the McGraw Fac Certs and must be enforced as written. *See id.; see also Salce v. Saracco,* No. 2-09-1336, 2011 WL 1881060, at *3 (Ill. App. Ct. May 12, 2011) ("If the language of a contract is clear and unambiguous, the intent of the parties must be determined solely from the language of the contract itself, which should be given its plain and ordinary meaning, and the contract should be enforced as written").

Here, Granite State has not produced any evidence in this case to prove that payments concerning the Dresser/Halliburton and Federal Mogul settlements were made in excess of the lower limit or attachment point in the McGraw Fac Certs. Indeed, when Granite State's Rule 30(b)(6) witnesses were asked whether the limits of the policies underlying the 1980 and 1981 McGraw Policies were fully paid, they responded that they did not know. For example, Simon Yoon, Granite State's Rule 30(b)(6) witness regarding the issue of whether Granite State determined if the limits of the Northbrook, First State and U.S. Fire policies underlying the 1980 and 1981 McGraw Policies had been fully paid at the time of the Dresser/Halliburton settlement agreement, *see* Kennedy Decl., Ex. 60, admitted at deposition that he had not made such a determination, he was unaware of anyone at Granite State or the other AIG companies that had

34

done so, and could not be "definitive" as to whether any person had done so on their behalf. *See* Kennedy Decl., Ex. 5 at 198:12–206:17. Likewise, Leticia Diaz, Granite State's Rule 30(b)(6) witness regarding the issue of whether Granite State determined if the limits of the policies underlying the 1980 and 1981 McGraw had been fully paid at the time of the Federal Mogul settlement agreement, admitted that she did not know whether such a determination had been made. *See* Kennedy Decl., Ex. 2 at 312:24–313:17; Kennedy Decl., Ex. 60; *see also* Kennedy Decl., Ex. 3 at 229:13–20; Kennedy Decl., Ex. 4 at 277:21–278:7.

The lack of proof that the lower limit or attachment point of the McGraw Fac Certs was breached is fatal to Granite State's claims in this action. Courts have long held that the limits defining the scope of a reinsurer's liability set out in the reinsurance contracts must be upheld. For example, in *Calvert Fire Ins. Co. v. Yosemite Ins. Co.*, 573 F. Supp. 27 (E.D.N.C. 1983), the reinsurer agreed under the reinsurance contract to reimburse the ceding company for all losses in excess of the $25,000 self-insured retention under the reinsured policy to a stated upper limit. *See id.* 27–29. After the reinsured was required to drop down and pay claims within the bankrupt insured's $25,000 self-insured retention, it sought reimbursement from the reinsurer for those payments. *See id.* at 29. It argued that the reinsurer was obligated to pay based on a clause in its reinsurance contract stating that the reinsurer's "liability . . . shall follow" its own, thus requiring the reinsurer to pay a portion of the amount within the self-insured retention that the reinsured had paid. *Id.* at 28. The court, however, rejected this argument, holding instead that the "follow the liability" clause "must be construed to mean that [the reinsurer's] liability followed that of [the reinsured] *within* the limits specified" in the reinsurance contract, including the $25,000 lower limit, or attachment point, of that contract. *Id.* (emphasis in original). Based on this lower limit, the court found that the reinsurer could not be liable for losses paid by its reinsured that were less than $25,000. *See id.* at 30.

A number of other courts have also rejected reinsureds' payment demands for amounts outside of or beyond the limits set forth in the reinsurance contract. Perhaps the most cited of these cases is *Bellefonte Reinsurance Co. v. Aetna Cas. and Sur. Co.*, where the reinsured sought reimbursement for defense expenses that exceeded the stated upper limits of the facultative certificates at issue. 903 F.2d 910, 910–11 (2d Cir. 1990). The "sole issue" in the case, as described by the Second Circuit, was "whether the reinsurers are obligated to [the reinsured] for an amount greater than the amounts stated in the reinsurance certificates." *Id.* at 912. In holding that the reinsurers were not liable, the Second Circuit concluded:

> [T]he reinsurers' entire obligation is quantitatively limited by the dollar amount the reinsurers agreed to reinsure. Once the reinsurers have paid up to the certificate limits, they have no additional liability to [the reinsured] for defense expenses or settlement contributions. Any other construction of the reinsurance certificates would negate the phrase 'the reinsurer does hereby reinsure [the reinsured] . . . *subject to the . . . amount of liability set forth herein.*' The reinsurers are liable only to the extent of the risk they agreed to reinsure. They cannot be liable for the insurer's action in excess of the agreement.

*Id.* at 914 (emphasis added by court).[11] The reasoning behind the *Bellefonte* decision, that reinsurers are not obligated to pay any loss or expense outside of the stated limits of their reinsurance contracts, has been consistently followed in other cases. *See Unigard Sec. Ins. Co. v. North River Ins. Co.*, 4 F.3d 1049, 1071 (2d Cir. 1993); *Commercial Union Ins. Co. v. Swiss Reinsurance Am. Corp.*, 413 F.3d 121, 128 (1st Cir. 2005) (citing *Bellefonte* and *Unigard* and stating "[o]f course . . . specific limits in the certificate control over the general aim of concurrence and ordinary 'follow' clauses"); *Allendale Mut. Ins. Co. v. Excess Ins. Co., Ltd.*, 992 F. Supp. 271, 277 (S.D.N.Y. 1997); *Pacific Employers Ins. Co. v. Global Reinsurance Corp. of*

---

[11] The Second Circuit also rejected the reinsured's argument that the follow the fortunes clause in the facultative certificates obligated to the reinsurers to pay outside the stated limits of the contracts. *See Bellefonte*, 903 F.2d at 913.

*Am.,* No. 09-6055, 2010 WL 1659760, at *5 (E.D. Pa. Apr. 23, 2010) (holding that the

$1,000,000 upper limit of facultative certificate "defines [the reinsurers'] maximum exposure").

Like the facultative certificates in *Calvert* and *Bellefonte*, the McGraw Fac Certs

expressly state both the upper limits of liability above which there is no coverage, as well as the

lower limit or attachment point below which there is no coverage. The McGraw Fac Certs make

clear that Clearwater's agreement to reinsure Granite State was "in consideration of the payment

of premiums, statements contained in the declarations, and subject to the terms and General

Conditions of this certificate . . . ," which statements and terms include the stated lower and

upper limits of the contracts. Mansour Decl., Ex. 1 at Granite State 000199; Ex. 2 at Granite

State 000209. Like the reinsurers in *Calvert*, *Bellefonte*, *Unigard*, and *Pacific Employers*,

Clearwater agreed to reinsure Granite State within these clearly specified limits. Clearwater did

not agree – under the express terms of the McGraw Fac Certs – to provide coverage below the

lower limit of $25,000,000 excess scheduled underlying insurance or SIR. *See* Mansour Decl.,

Ex. 1 at Granite State 000198; Ex. 2 at Granite State 000209. Pluth Decl., ¶¶ 13–14.

Accordingly, given Granite State's failure to demonstrate that payments were made in excess of

the lower limit or attachment point of the McGraw Fac Certs, Granite State's claims in this

action fail as a matter of law. *See John Crane, Inc. v. Admiral Ins. Co.*, No. 04 CH 8266, 2009

WL 908576, at §II(f) (Ill. Cir. Ct. Mar. 10, 2009) ("A party seeking coverage under insurance

policies has the burden to prove that the claims trigger the policies under which it seeks

coverage") (*citing Maremont Corp. v. Continental Casualty Co.*, 760 N.E.2d 550, 556 (Ill. App.

Ct. 2001)).

### C.   Granite State Cannot Meet Its Burden of Proving Exhaustion Requirements Under 1980 and 1981 McGraw Policies Were Met

Granite State must prove not only that its claims are under the terms and conditions of the McGraw Fac Certs (which it cannot as discussed above), but also that the claims at issue are covered under the reinsured policies. As noted, the Insurer Joint Defense Group's agreement to pay $624,984,393 (on an NPV basis) to settle with Halliburton/Dresser (of which the AIG companies agreed to pay $173,620,556) was based on the May 2004 NERA Report which calculated (on a discount off policy limits) the contributions to be made under each insurer's individual policies. *See* Yoon Decl., ¶¶ 27-29; Kennedy Decl., Ex. 3 at 163:24–165:17; Ex. 26. Under that NERA report, the Northbrook Policy No. 63006485 underlying the 1980 McGraw Policy No. 6680-1693 is shown to have contributed $8,791,300 and $7,485,386 on a nominal and NPV basis, respectively, both amounts which are less than the $20,000,000 limit of Northbrook Policy No. 63006485. *See* Kennedy Decl., Ex. 26 at 2 Granite 001837; Ex. 61. Likewise, the May 2004 NERA Report reflects the U.S. Fire Policy No. 5230672533 underlying the 1981 McGraw Policy No. 6681-2370 as contributing $10,530,032 and $8,275,488 on a nominal and NPV basis, respectively, both amounts which are less than the $12,500,000 limit of U.S. Fire Policy No. 5230672533. *See* Kennedy Decl., Ex. 26 at 2 Granite 001838; Ex. 61.[12]

The exhaustion requirement found in Section II (Limit of Liability – Underlying Limits) of the 1980 and 1981 McGraw Policies establish the terms upon which the underlying policies must be paid before coverage is triggered under the McGraw Policies. Those provisions state, in part:

> It is expressly agreed that Liability shall attach to the Company only after the Underlying Umbrella insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability . . .

---

[12] The $12,500,000 limit of First State Policy No. 917383 is also shown by the NERA report not to have been paid in full. *See* Kennedy Decl., Ex. 26 at 2 Granite 001835 and Ex. 61.

Wactlar Decl., Ex. 1  at Granite State 000690; Ex. 2 at Granite State 000509.  Under cases with

similar policy provisions, courts have found them to be unambiguous and to require full payment

of the limits underlying an excess policy as a condition precedent to coverage.  For example, in

*Great Am. Ins. Co. v. Bally Total Fitness Holding Corp.*, the court addressed two underlying

limits clauses in the context of a settlement in an amount less than full policy limits – one in a

third layer policy and another in a fourth layer policy, under Illinois law.  *See* 2010 WL 2542191

at *1.  The third layer policy stated:

> It is expressly agreed that liability for any covered Loss shall attach to the Insurer
> only after the insurers of the Underlying Policies shall have paid, in the
> applicable legal currency, the full amount of the Underlying Limit and the
> Insureds shall have paid the full amount of the uninsured retention, if any,
> applicable to the primary Underlying Policy.

*Id.* The fourth layer policy stated:

> The insurance coverage afforded by the Policy shall apply (1) only in excess of
> all Underlying Insurance and (2) only after all Underlying Insurance has been
> exhausted by payment of the total underlying limit of insurance and (3) only if
> each and every Underlying Insurance Policy has responded by payment of loss as
> a result of any wrongful act.

*Id.* The fourth layer policy added that "[i]n the event of exhaustion of all of the limits of

insurance of the Underlying Insurance solely as a result of actual payment of loss or losses

thereunder, this Policy shall . . . apply as Primary Insurance . . ." *Id.*

The court found both clauses to be unambiguous and held that because the underlying

policies had not fully paid their limits, the excess insurer's obligation to indemnify the insured

had not been triggered.  *See id.* at *5.  The court found that liability did not attach to the excess

policy for the following reasons: (1) the method of exhaustion was clearly defined as actual

payment by the "insurers of the Underlying Policies" in the Third Layer policy; (2) the policy

expressly named the underlying insurers who issued the Third and Fourth Layer policies, and (3)

the payment amount was defined as the combined aggregate of the underlying policy limits. *Id.*

at *4–5.

The McGraw Policies are equally unambiguous on all points: under the McGraw Policies, the method of exhaustion is clearly defined as either actual payment or an obligation to pay by the "Underlying Umbrella Insurers" the entire limits of the policies; the underlying insurers and limits are specifically named in the Schedule of the McGraw Policies, and; the underlying payment amount is defined as $25,000,000.

The California Court of Appeals recently construed language almost identical to the Underlying Limits provision in the McGraw Policies and held that it unambiguously required the underlying insurer to pay or be held liable to pay the entire underlying policy limit before coverage under an excess policy is triggered. *See Qualcomm, Inc. v. Certain Underwriters At Lloyd's, London*, 73 Cal. Rptr. 3d 770, 777 (Cal. Ct. App. 2008).

In *Qualcomm*, the insured settled with its primary insurer for $16,000,000, which was $4,000,000 less than the primary policy limits, and then sought from its excess insurer the remaining $9,000,000 of the loss in excess of the primary policy limits, arguing that its payment of the $4,000,000 gap remaining under the primary policy was sufficient to exhaust the primary policy. *See id*. at 773–774. The excess insurer denied the claim on the basis that the excess policy was not triggered until the primary insurer paid the underlying policy limits in full. *See id*. The excess policy stated, in part: "Underwriters shall be liable only after the insurers under each of the Underlying Policies have paid or have been held liable to pay the full amount of the Underlying Limits of Liability." *Id*. at 774.

The court agreed with the excess insurer's denial of coverage holding that, according to the plain and ordinary meaning of the exhaustion provision, the insured's partial payment of the underlying limits was not sufficient to exhaust the primary policy and the excess carrier's liability did not attach until the primary carrier actually paid or was held legally liable to pay the full underlying limit. *See id*. at 779–780. Since the primary insurer settled with the insured for

less than full policy limits, the court held that the primary policy was not exhausted and that coverage under the excess policy was never triggered. *See id.* at 780; *see also Comerica Inc. v. Zurich Am. Ins. Co.*, 498 F. Supp. 2d 1019, 1020–21, 1029 (E.D. Mich. 2007) (holding excess policy that was triggered "after all such 'Underlying Insurance' has been reduced or exhausted by payments for losses" required exhaustion of the primary policy's liability limits by actual payment of losses by the primary insurer).

Like the policies discussed in *Great American, Qualcomm*, and *Comerica*, the exhaustion requirement in the 1980 and 1981 McGraw Policies is unambiguous and should be enforced as written. Because Granite State cannot meet its burden of proving that the exhaustion requirement in the 1980 and 1981 McGraw Policies was satisfied, Clearwater should not be held liable to indemnify Granite State. *See, e.g., Michigan Millers Mut. Ins. Co. v. North American Reinsurance Corp.*, 452 N.W.2d 841, 844 (Mich. Ct. App. 1990) (holding reinsurer not liable to reimburse excess carrier that paid settlement amounts that were below underlying limit of excess coverage); *see also American Ins. Co. v. North America for Property & Cas. Ins.*, 697 F.2d 79, 81 (2d Cir. 1982) (holding reinsurer not obligated to indemnify reinsured for part of settlement covering punitive damages when reinsured policy did not provide such coverage); *Independence Ins. Co. v. Republic National Life Ins. Co.*, 447 S.W.2d 462, 469 (Tex. Civ. App. 1969) (holding reinsurer not obligated to reimburse reinsured for loss not covered by reinsured policy).

**D.**   **Granite State's Failure to Comply with the Prompt Notice Provision In the McGraw Fac Certs Precludes Recovery Under Those Contracts**

The McGraw Fac Certs required Granite State to "notify [Clearwater] promptly of ***any event or development*** which . . . [Granite State] reasonably believes might result in a claim against [Clearwater]. [Granite State] further agrees to forward to [Clearwater] copies of such pleadings and reports of investigations as are pertinent to the claim . . . ." Mansour Decl., Ex. 1

41

at Granite State 000200, (Section 3(a)); Ex. 2 at Granite State 000210, (Section 3(a)). (emphasis added) (the "Prompt Notice Provision"). Under Illinois law, prompt notice provisions in reinsurance contracts are a condition precedent to coverage. *See Keehn v. Excess Ins. Co. of Am.*, 129 F.2d 503, 505 (7th Cir. 1942); *Allstate Ins. Co..*, 441 F. Supp. 2d at 875. These type of provisions are not mere technicalities. They serve important functions such as allowing reinsurers "to reserve properly, to adjust premiums to reflect the loss experience under the reinsurance contract, and to decide whether to exercise the option of associating with the reinsured in the handling and disposition of the claim." Barry R. Ostrager and Mary Kay Vyskocil, *Modern Reinsurance Law and Practice* § 8 at 8-3 (2d ed. 2000) (*citing Christiania Gen. Ins. Co. v. Great American Ins. Co.*, 979 F.2d 268, 274, 276–277 (2d Cir. 1992)) (annexed hereto as Appendix A).

Failure by the reinsured to comply with prompt notice provisions means a reinsurer may deny coverage irrespective of whether it has been prejudiced by the delay in notice. *See Keehn,* 129 F.2d at 505; *Allstate Ins. Co.*, 441 F. Supp.2d at 875; Barry R. Ostrager and Mary Kay Vyskocil, *Modern Reinsurance Law and Practice* § 8.03[a] at 8-10 (citing *Keehn,* 129 F.2d at 505) (annexed hereto as Appendix A); 22A Paul Coltoff, Stephen Lease, Thomas Muskus & David Yanes, *Illinois Law and Practice - Insurance* § 580 (2011) ("[t]he failure of the reinsured to give the reinsurer notice of a loss in accordance with the terms of the reinsurance contract constitutes a bar to recovery by the reinsured against the reinsurer . . .").

Prompt notice provisions are generally construed to require notice within a reasonable time after the duty to give notice has arisen. *See Centaur Ins. Co. v. Safety Nat'l Cas. Corp.*, No. 92 C 5996, 1993 WL 434056, at * 5–7 (N.D. Ill. Oct. 22, 1993) (applying objective standard of reasonableness in assessing whether notice obligation was triggered); *see also Christiania Gen'l Ins. Corp. of New York v. Great Am. Ins. Co.*, 979 F.2d 268, 275–276 (2d Cir. 1992) (concluding

42

that prompt notice provision requires notice within objectively reasonable time after duty arises). Ceding companies are held to a stricter standard of compliance when determining whether a loss has been notified in a reasonable period of time. *See Christiania*, 979 F.2d at 278 (*citing* 19 Couch on Insurance § 80:71); *UNR Industries, Inc. v. Continental Ins. Co.*, 682 F.Supp. 1434, 1443 (N.D. Ill. 1988) (finding that parties who are sophisticated as to matters of insurance are held to a higher standard in determining whether notice was late); *Int'l Harvester Co. v. Continental Cas. Co.*, 179 N.E.2d 833, 835 (Ill. App. Ct. 1962) (same); *Stuyvesant Ins. Co. v. United Pub. Ins. Co.*, 221 N.E.2d 358, 360 (Ind. App. Ct. 1966).

Illinois and other courts have found relatively short delays by even non-insurance companies in providing notice to be unreasonable. *See Keehn*, 129 F.2d at 504–05 (finding year-and-a half delay untimely as matter of law); *see also Gen. Cas. Co. of Illinois v. Juhl*, 669 N.E.2d 1211, 1214 (Ill. App. Ct. 1996) (holding seven-and-a half month delay "unreasonable as matter of law"); *INA Ins. Co. of Illinois v. City of Chicago*, 379 N.E.2d 34, 37 (Ill. App. Ct. 1978) (notice given 16 months after injuries occurred and three months after litigation commenced was untimely under prompt notice provision); *Stuyvesant Ins. Co. v. United Public Ins. Co.*, 221 N.E.2d 358, 362 (Ind. App. Ct. 1966) (finding a delay of eight months to be unreasonable); *Fortress Re v. Jefferson Ins. Co. of N.Y.*, 465 F. Supp. 333, 338 (E.D.N.C. 1978), *aff'd* 628 F.2d 860 (4th Cir. 1980) (finding notice 12 months after accident with high claim potential to be "fatal" as a matter of law). The question of whether an insured or ceding company has provided timely notice is a question of law for the Court to decide when the facts are undisputed. *See Allstate*, 441 F. Supp. 2d at 871; *see also Am. Family Mut. Ins. Co. v. Blackburn*, 566 N.E.2d 889, 894 (Ill. App. Ct. 1991) (whether notice is timely is question of law where there is no controversy as to facts).

With respect to its settlements with Dresser/Halliburton and Federal Mogul, the undisputed facts establish beyond any doubt that Granite State failed to promptly notify Clearwater of "events or developments" that might result in a claim against Clearwater under the McGraw Fac Certs.

**1.     The Dresser/Halliburton Settlement**

The first time Clearwater received notice under the McGraw Fac Certs concerning the Dresser/Halliburton settlement was in February 2009, almost five years after that settlement had been agreed to in principle. *See* Chavez Decl., ¶¶ 6-7. In February 2009, Clearwater received a one page document merely identifying the 1980 McGraw Fac Cert and reflecting that the reinsured 1980 McGraw Policy No. 6680-1693 had only a one dollar reserve posted under it, even though Granite State had already committed to pay its full split limit of $5,000,000 five years previously in 2004.[13] *See* Chavez Decl., ¶ 6, Ex.3.   The February 2009 notice to Clearwater provided absolutely no information whatsoever concerning the numerous and significant "events" and "developments" that led up to Granite State's settlement with Dresser/Halliburton and its claims under the McGraw Fac Certs, including:

- Between 1998 and 2001, there were approximately 51,000 asbestos bodily injury claims asserted against Federal Mogul related to Wagner's manufacture and sale of asbestos-containing products. *See* Wactlar Decl., ¶ 19.

---

[13] Insurance companies are obligated by law to establish reserves to cover amounts, among others, for all reported losses or claims and related expenses incurred but not paid, including amounts related to estimated liability on any notice received by an insurer of the occurrence of any event which may result in a loss. *See, e.g.*, NY Ins. Law §§ 1303, 4117; February 7, 2008 Opinion of State of New York Insurance Department (stating that "In general, upon receipt of a claim, the insurance company will review the claim to establish whether there is a potential exposure that a claim will have to be paid. If there is liability, the insurer must establish an estimated reserve, in an amount that is adequate to fully settle the claim") (annexed hereto as Appendix B). Clearly, a $1 reserve on a $5,000,000 liability known by Granite State for five years is, on its face, wholly inadequate.

- By 2001, Federal Mogul had filed for bankruptcy when there were approximately 35,000 asbestos bodily injury claims pending against it related to Wagner's manufacture and sale of asbestos-containing products. *See* Wactlar Decl., ¶ 19.

- By 2002, Federal Mogul had made demands for coverage under the 1980 and 1981 McGraw Policies as respects to the Wagner-related asbestos bodily injury claims. *See* Yoon Decl., ¶13.

- By 2002, Dresser/Halliburton had also made coverage demands under the 1980 and 1981 McGraw Policies concerning asbestos bodily injury claims related to Worthington's and ALCO's manufacture and sale of asbestos-containing products. *See* Yoon Decl., ¶ 12, Ex. 3 at Granite Site 005482-005485.

- By 2003, there were numerous coverage actions involving the competing demands for coverage by Dresser/Halliburton and Federal Mogul under the 1980 and 1981 McGraw Policies, including, but not limited to, the adversary proceeding initiated by Dresser/Halliburton in the Federal Mogul bankruptcy proceeding. *See* Yoon Decl., ¶¶ 12, 13, Ex. 3 at Granite Site 005479, 005481-83.

- By 2003, Granite State and the other AIG Companies had retained Cozen O'Conner as their coverage counsel to defend against Dresser/Halliburton's and Federal Mogul's demands for coverage under their policies, including the 1980 and 1981 McGraw Policies. *See* Kennedy Decl., Ex. 5 at 58:19–59:14.

- By 2003, Granite State and the other AIG companies had become part of the Insurer Joint Defense Group to defend against the coverage demands made by both Dresser/Halliburton and Federal Mogul. *See* Kennedy Decl., Ex. 5 at 51:23-52:5:60:5-24.

- From 2002 to 2004, Granite State had participated in "intensive" mediations and settlement negotiations with both Dresser/Halliburton and Federal Mogul during which settlement offers were made. *See* Kennedy Decl., Ex. 11 at CW 02776; *see also id.*, Ex. 5 at 71:20-72:6.

- By 2003, the Insurer Joint Defense Group had retained NERA and Brattle to calculate partial liabilities and proposed settlement contributions under their individual policies concerning Dresser/Halliburton's demands for coverage regarding the Harbison-Walker and Worthington/ALCO-related asbestos claims and Federal Mogul's demands for coverage regarding the Wagner-related asbestos claims. *See* Kennedy Decl., Ex. 3 at 29:12–30:14, 47:17–21, 65:24–66:5; Plaintiff's SUMF ¶¶ 31,49.

- By 2003, Dresser/Halliburton had stated that its total expected asbestos liabilities were in excess of $4,200,000,000. *See* Kennedy Decl., Ex. 5 at 69:12–70:5; Yoon Decl., Ex. 3 at Granite Site 005485.

- In December 2003, Brattle produced a report projecting that Granite State's liability for the Dresser/Halliburton and Federal Mogul claims under the 1980 and 1981 McGraw Policies was $2,884,148 and $4,392,622, respectively. *See* Kennedy Decl., Ex. 3 at 209:9–211:24; Kennedy Decl., Ex. 17 at Granite_Alan Gray 0339, 0379, 0419, and 0459.

- In April 2004, the Insurer Joint Defense Group's settlement offer to Halliburton/Dresser had increased on a nominal basis to more than $735,000,000 and on a net present value basis to more than $620,000,000. *See* Kennedy Decl., Ex. 3 at 133:20–139:23; Ex. 20 at Granite_Alan Gray 1767. This offer was based on NERA's report which calculated each insurer's total contribution to the settlement offers on a policy-by-policy basis. *See id.* The contributions under the 1980 McGraw Policy No. 6680-1693 were $3,642,235 (nominal basis) and $2,818,127 (net present value basis). *See* Kennedy Decl., Ex. 3 at 140:9–143:5; Kennedy Decl., Ex. 21 at Granite_Alan Gray 1389. The contributions under the 1981 McGraw Policy No. 6681-2370 were $5,562,431 on a nominal basis and $4,303,851 on a net present value basis. *See* Kennedy Decl., Ex. 21 at Granite_Alan Gray 1389.

- On April 26, 2004, Granite State and the AIG companies met with Dresser/Halliburton to discuss settlement outside of the Insurer Joint Defense Group. *See* Kennedy Decl., Ex. 3 at 143:6–144:16; 41:21-42:23. In connection with that meeting, the AIG companies offered to settle with Halliburton/Dresser on a net present value basis of between $170,000,000 to $176,200,000, which was slightly less than the $173,600,000 amount they settled for with Dresser/Halliburton in May 2004 as part of the global Insurer Joint Defense Group settlement. *See* Kennedy Decl., Ex. 3 at 143:6–144:16; *see also id.* 41:9–42:23; Kennedy Decl., Ex. 22.

- At the time of AIG's April 26, 2004 settlement meeting with Dresser/Halliburton, Granite State and the other AIG companies began to calculate the potential amounts which would be paid under their individual policies net of reinsurance. *See* Kennedy Decl., Ex. 5 at 161:2–164:22; Ex. 23. With respect to the 1980 and 1981 McGraw Policies, Granite State's net liability, taking into account reinsurance, was calculated to be, respectively, $265,000 and $496,000. *See id.,* Ex. 23 at 3 Granite 007135.

- In May 2004, the Insurer Joint Defense Group, including Granite State, reached a settlement in principle with Dresser/Halliburton, resolving all of Dresser/Halliburton's claims against them. *See* Kennedy Decl., Ex. 5 at 102:24–103:4; Yoon Decl., ¶¶ 27, 28. Under the settlement in principle, the Insurer Joint Defense Group agreed to pay a total amount of

$624,984,393, on a net present value basis. *See* Kennedy Decl., Ex. 3 at 163:24–165:17; Exs. 25 and 26.

- With respect to the AIG companies, their collective share of the net present value $624,984,393 settlement was $173,620,556. *See* Kennedy Decl., Ex. 3 at 161:10–24; Kennedy Decl., Ex. 5 at 149:8–150:13; Yoon Decl., ¶ 27.

- The contributions under the 1980 and 1981 McGraw Policies to the AIG companies' $173,620,556 share of the settlement were, respectively, 43% off of policy limits (or $2,876,106) and 42% off of policy limits (or $4,390,560). *See* Kennedy Decl., Ex. 3 at 163:24–165:17; Kennedy Decl., Ex. 26 at 2 Granite 001835; Yoon Decl., ¶ 29, Ex. 7.

- By the time Granite State and the other AIG companies agreed to pay $173,620,556 to settle with Halliburton/Dresser in May 2004, they believed the Dresser's/Halliburton liabilities presented "large exposure" to their policies and could consume all of the insurance policies issued by the Insurer Joint Defense Group. *See* Kennedy Decl., Ex. 5 at 198:12–200:19.

- Also in 2004, Granite State altered the 1980 and 1981 McGraw Policies by agreeing to split their policy limits in half and give each half to Dresser/Halliburton and Federal Mogul. *See* Kennedy Decl., Ex. 11 at CW 02777; Wactlar Decl., Ex. 3 at 2 Granite State 000006 and 000074.

- In 2004, Granite State and the AIG companies entered into an agreement with Lehman under which Lehman agreed to pay AIG's $173,620,556 settlement amount to Dresser/ Halliburton in exchange for the $262,000,000 Lehman Financing Payments over ten years, from March 2005 to December 2014. *See* Kennedy Decl., Ex. 3 at 128:23-129:6; Ex. 5 at 154:20-157:20; Yoon Decl., Ex. 9 at 2 Granite 000167 and Ex.10.

- By October 2004, Alan Gray, on behalf of AIG companies, began allocating the Lehman Financing Payments to AIG's policies, resulting in a schedule of fixed, definite payments to be made under those policies, including payments that would consume the policy limits of the 1980 and 1981 McGraw Policies in June 2009 to 2011. *See* Kennedy Decl., Ex. 30 at Granite_Alan Gray 1203–1205.

- Alan Gray's initial allocation schedule was subsequently modified in 2005 to 2007. Each iteration of the schedule reflected that definite, fixed payments would be made under the AIG companies' policies, including the 1980 and 1981 McGraw Policies. *See, e.g.* Kennedy Decl., Ex. 33 at 2 Granite 001343-44.

Based on any reasonable and objective standard, Granite State knew or should have known that each and every one of the foregoing events and developments and "might result in a claim against [Clearwater]" under the McGraw Fac Certs, thereby triggering Granite State's duty to promptly notify Clearwater as a matter of law. *See, e.g., Allstate Ins. Co.*, 441 F. Supp. 2d at 874–875 (prompt notice requirement triggered by any event or development that might result in a claim, e.g., dramatic increase in number of claims); *Highlands Ins. Co. v. Employers' Surplus Lines Ins. Co.*, 497 F. Supp. 169, 170, 172–73 (E.D. La.) (prompt notice requirement triggered by reinsured's knowledge of accident and lawsuit brought against it by victim of accident); *Stuyvesant Ins. Co.*, 221 N.E.2d at 362 (prompt notice requirement triggered when reinsured knew of accident covered by reinsured policy and when lawsuit initiated against it). In fact, it is clear from many of these events and developments, such as the May 2004 NERA Report and the various iterations of Alan Gray's allocation of the Lehman Financing Payments, Granite State *knew for an absolute certainty* that claims would be made under the McGraw Fac Certs no later than 2004. Granite State, however, provided absolutely no notice of these or the other events or developments relevant to its settlement of the Dresser/Halliburton settlement and its claims under the McGraw Fac Certs.[14]

Instead, Granite State waited until 2009 to begin providing information to Clearwater under the McGraw Fac Certs concerning the Dresser/Halliburton settlement, at the same time Clearwater received its first billings with respect to that settlement under those contracts. *See* Chavez Decl. ¶¶ 7-8. This egregious delay constitutes late notice

---

[14] Granite State was also obligated but failed to provide to Clearwater copies of all pleadings relating to the various coverage actions, settlement and mediation reports, the NERA and Brattle reports, and other documents pertinent to its claims and/or requested by Clearwater. *See*

under the McGraw Fac Certs as a matter of law and is a clear breach of the Prompt

Notice Provision in the McGraw Fac Certs. As a consequence, Clearwater's Cross-

Motion for Summary Judgment as respects Granite State's claims based on the Dresser/

Halliburton settlement should be granted in its entirety. *See Allstate Ins. Co,* 441 F.

Supp. 2d at 875 (granting reinsurer's motion for summary judgment based on cedent's

failure to satisfy condition precedent requiring prompt notice); *Constitution Reinsurance*

*Corp. v. Stonewall Ins. Co.*, 980 F.Supp. 124, 127–28 (S.D.N.Y. 1997) (same); *see also*

*Transamerica Ins. Co. v. Interstate Pollution Control, Inc.*, No. 92 C 20247, 1995 WL

360460, at *17 (N.D. Ill. June 16, 1995) (granting insurer's motion for summary

judgment due to insured's untimely notice).

### 2. The Federal Mogul Settlement

As with the Dresser/Halliburton settlement, Granite State breached its duty to

promptly notify Clearwater under the McGraw Fac Certs of events and developments

concerning its settlement with Federal Mogul and its duty to provide copies of pleading

and reports relevant to Granite State's claims for coverage of the Federal Mogul

settlement under the McGraw Fac Certs. As noted above, it is undisputed that by 2002

Federal Mogul was making demands for coverage under the 1980 and 1981 McGraw

Policies concerning at least 35,000 pending asbestos claims filed against it, with

projected liabilities ranging as high as $1,800,000,000. *See* Kennedy Decl., Ex. 14 at 2

Granite 001436; Kennedy Decl., Ex. 63 at Granite State Priv 0000273. It is also

undisputed that Granite State participated in "intensive" negotiations with Federal Mogul

in 2002 to 2004 to resolve Federal Mogul's claims under its policies. *See* Kennedy Decl.,

---

Mansour Decl., Ex. 1 at Granite State 000200 (Section 3(a)); Mansour Decl., Ex. 2 at Granite
State 000210 (Section 3(a)); Chavez Decl., ¶¶ 5–11.

Ex. 11 at CW 02776. As a result of these negotiations, Granite State, among other insurers, agreed in 2004 that Federal Mogul and Dresser/Halliburton would split the limits of the 1980 and 1981 McGraw Policies to cover the asbestos claims asserted against them. *See* Yoon Decl., Ex. 4; *see also* Kennedy Decl., Ex. 13 at GS Confidential 004341.

Furthermore, by March 2004, Federal Mogul's claims consultant, ARPC, Inc., calculated that Federal Mogul's potential liability for Wagner claims ranged from approximately $520,000,000 up to $2,000,000,000. *See, e.g.*, Kennedy Decl., Ex.14 at 2 Granite 001436; Wactlar Decl., ¶ 23. Moreover, Granite State's consultant, Brattle, had issued reports in 2003 and 2005 projecting liabilities and payments under the 1980 and 1981 McGraw Policies in the millions of dollars with respect to Federal Mogul/Wagner claims. *See* Kennedy Decl., Ex. 3 at 209:13–212:14; Kennedy Decl., Ex. 17 at Granite Alan Gray 0339, 0379, 0419 and 0459; Kennedy Decl., Ex. 38 at GS Confidential 001133, 001141, 001149, 001157, 001165, 001173, 001181, 001189, 001197 and 001205; Kennedy Decl., Ex. 2 at 278:2–282:24; Kennedy Decl., Ex. 15 at GS Confidential 000003–4, 0000052..

It is undisputed that the ARPC and Brattle estimates of Federal Mogul's liabilities for the Wagner claims were important factors to Granite State in considering its own exposure under its policies and whether to settle. *See* Kennedy Decl., Ex. 4 at 273:5–275:23; *see generally* Kennedy Decl., Ex. 14. With respect to Granite State's settlement with Federal Mogul, there were a number of settlement offers made by Granite State and other insurers to Federal Mogul at least up to January 2006. *See* Kennedy Decl., Ex. 4 at 110:12–113:22; Kennedy Decl., Ex. 39, 40. By July 2006, Federal Mogul offered to settle its claims against Granite State and the other

AIG companies' policies for $99,000,000. *See* Kennedy Decl., Ex. 41; Kennedy Decl., Ex. 4 at

123:12–126:6, 140:20–141:8.

In September 2006, Federal Mogul initiated a coverage action against Granite State and

other insurers in New Jersey state court. *See* Wactlar Decl., Ex. 8 at 2 Granite 001239.  Less

than a year later, in May 2007, certain insurers initiated a coverage action against Federal Mogul

and other parties, including the AIG companies, in New York state court. *See id.*

Despite the initiation of these lawsuits, the parties continued to negotiate a settlement.

*See, e.g.*, Kennedy Decl., Ex. 64; Kennedy Decl., Ex. 4 at 193:2–195:5.  By March 2008, Granite

knew, based on "impending settlement discussions," that the 1980 and 1981 McGraw Policies,

and, therefore, the McGraw Fac Certs, would be impacted.  *See* Kennedy Decl., Ex. 4 at 146:4–

170:2; Exs. 42 and 44.  By December 2008, Granite State and the other AIG companies settled

for $72,000,000, with $40,000,000 to be paid over three years under fixed, definite installment

payments plus up to an additional $32,000,000 if certain thresholds were reached.  *See* Wactlar

Decl., Ex. 8 at 2 Granite 001249–50 (paragraphs 2(A)(1)–(4)) and 2 Granite 001245 (paragraphs

1(M)–(N)), 2 Granite 001247 (paragraph 1(X)), and 2 Granite 001248 (paragraph 1(AA)) and 2

Granite 001250-52.

There is no material issue of fact concerning Granite State's failure to advise Clearwater

under the McGraw Fac Certs of any and all of the foregoing events and developments relating to

the Federal Mogul settlement. *See* Chavez Decl., ¶¶ 5-6.  There is also no material issue of fact

that Granite State failed to provide any of the pleadings in the various coverage actions and

investigative reports, such as the Brattle and NERA reports, relating to its claims under the

McGraw Fac Certs. *See id.* ¶¶ 10-11.  Indeed, the first time that Granite State provided any

information concerning the Federal Mogul settlement was in April 2009, when Clearwater began

to receive billings under the reinsurance certificates regarding that settlement. *See id.* ¶¶ 5- 6;

Kennedy Decl., Ex. 52.  Prior to 2009, the only item received by Clearwater pertaining to

Federal Mogul's claims under the 1980 and 1981 McGraw Policies was a one-page "Reinsurance

Notice of Loss" that did not identify to which claim it related or provide any substantive

information.  *See* Chavez Decl., ¶¶ 5-6..  It merely identified the 1981 McGraw Fac Cert, the

reinsured policy period ("03/01/81 TO 03/01/82"), a description of the reinsured policy as

"CVST 066812370," a claim number of "170-053345" (which Clearwater learned in 2009

related to the Federal Mogul settlement under the 1981 McGraw Policy No. 6681-2370), and a

$1 reserve under the policy.  *See* Chavez Decl., ¶ 6, Ex. 2.

Based on this record, it is plain that Granite State's delay over a period of several years to

notify Clearwater under the McGraw Fac Certs was, as matter of law, untimely and a breach of

the prompt notice provision in those contracts.  As a result, Clearwater is entitled to summary

judgment in its favor with respect to Granite State's claims relating to the Federal Mogul

settlement.  *See Allstate Ins. Co.,* 441 F. Supp. 2d at 875; *see also Constitution Reinsurance

Corp.,* 980 F. Supp. at 126–27; *Transamerica Ins. Co.,* 1995 WL 360460, at *17.

## IV.    GRANITE STATE'S CLAIMS SHOULD BE DISMISSED BECAUSE IT FAILED TO IMPLEMENT PROCEDURES TO ENSURE TIMELY NOTICE OF CLAIMS TO CLEARWATER

Courts have held that parties to a reinsurance contract owe one another a duty of utmost

good faith.  *See Amerisure Mut. Ins. Co. v. Global Reinsurance Corp. of Am.*, 927 N.E.2d 740,

749 (Ill. App. Ct. 2010); *Unigard Security Ins. Co. v. North River Mut. Ins. Co.*, 4 F.3d 1049,

1069; *see also International Ins. Co. v. Certain Underwriters at Lloyd's London*, No. 88 C 9838,

1991 WL 349907, at *20 (N.D. Ill. Sept. 16, 1991) (stating that a reinsurance relationship

requires "good faith and cooperation").  In the context of reporting claims, courts have found the

duty of good faith requires ceding companies "to place the reinsurer 'in the same [situation] as

himself [and] to give him the same means and opportunity of judging . . . the value of the risks'"

*Unigard*, 4 F.3d at 1069 (*quoting Chrisitiania General Ins. Corp. v. Great American Ins. Co.*,

979 F.2d 268 (2d Cir. 1992).  As part of this duty of good faith, ceding companies should have

routine practices and procedures that ensure prompt and timely notification of material facts and

developments during the claims handling process.  *See id.*; *Certain Underwriters at Lloyd's*

*London v. Home Ins. Co.*, 783 A.2d 238, 241–42 (N.H. 2001); *see also Security Ins. Co. v.*

*Trustmark Ins. Co.*, Civ. No. 3:00 cv 1247 (PCD), 2002 U.S. Dist. LEXIS 27348, at *18–20 (D.

Ct. Sept. 4, 2002).  Such procedures are necessary because ceding companies have virtually

exclusive possession of information regarding the underlying claims which they must promptly

and fully disclose to their reinsurers so as to avoid unnecessary duplication of claims-handling

and monitoring.  *See Unigard*, 4 F.3d at 1054, 1069.  As the United States Court of Appeals for

the Second Circuit stated:

> [B]ecause information regarding risks lies with the ceding insurer,
> the reinsurance market depends upon a high level of good faith to ensure
> prompt and full disclosure.  Absent such disclosure, reinsurers would have
> to duplicate actuarial and claims-handling efforts of ceding insurers, and
> reinsurance would become unavailable.  *Courts should thus adopt*
> *information-forcing default rules based on the good faith the reinsurance*
> *market demands.*
>
> \* \* \* \*
>
> [I]f a ceding insurer has implemented routine practices and controls to
> ensure notification to reinsurers but inadvertence causes a lapse, the
> insurer has not acted in bad faith. But if a ceding insurer does not
> implement such practices and controls, then it has willfully disregarded
> the risk to reinsurers and is guilty of gross negligence. A reinsurer,
> dependent on its ceding insurer for information, should be able to expect
> at least this level of protection, and, if a ceding insurer fails to provide it,
> the reinsurer's late loss notice defense should succeed.

*Id. at 1066, 1069* (emphasis added).

Here, it is undisputed that Granite State does not have *any* procedures or practices to

ensure the timely notification of claims to its reinsurers concerning asbestos-related settlement

agreements under which it commits to making definite, fixed installment payments over a period

of time, e.g., the Dresser/Halliburton and Federal Mogul settlement agreements.  According to its

witnesses, Granite State enters into this type of fixed-payment settlement agreements, *see, e.g.,*

Kennedy Decl., Ex. 2 at 30:11–32:17, but it does not have any practices or procedures to ensure

that its reinsurers of the policies that are the subject of those agreements are timely notified.  In

fact, Francis Cafone, Granite State's Rule 30(b)(6) witness concerning its reinsurance reporting

practices, *see* Kennedy Decl., Ex. 60, admitted at deposition the following:

> Q.  Now, AIG enters into other agreements with its policyholders such as
> fixed installment payments over a period of time; right?
>
> A.  Yes.
>
> Q.  And, in fact, the AIG settlement with the Dresser/Halliburton was a fixed
> installment payment over time; right?
>
> A.  I believe it was.
>
> . . . .
>
> Q.  With respect to the negotiation of those fixed installment payment
> agreements, are there policies and procedures that relate to AIG's
> reporting to reinsurers of their negotiation of those types of agreements?
>
> A.  No.
>
> Q.  With respect to the entering into those fixed installment agreements, are
> there any policies and procedures that govern AIG's reporting to its
> reinsurers that they're entering into those agreements?
>
> A.  No.

Kennedy Decl., Ex. 1 at 183:4–84:13.

These startling admissions prove that Granite State, when entering into settlement

agreements such as the Dresser/Halliburton and Federal Mogul settlement agreements, under

which it commits to pay definite, fixed amounts over time, does not have **any**, let alone routine

or reasonable, procedures in place to make sure that its reinsurers are promptly notified of those

type of agreements.  The absence of such reporting procedures undisputedly constitutes a breach

by Granite State of its duty of good faith owed to Clearwater and its other reinsurers to promptly

notify them of fixed, definite installment payments it *knows or should know* will be made under

its policies and the applicable reinsurance contracts.

Indeed, even more broadly, beyond Granite State's lack of reporting procedures with

respect to settlement agreements under which definite, fixed installments are made, the general

practices that Granite State purportedly relies on to generate loss notices to its reinsurers are not

designed in any way whatsoever to ensure reasonable or timely notice to its reinsurers.  Under

these practices, Granite State purportedly generates loss notices either (1) automatically when

reserves are established under a reinsured policy by the claims department or (2) manually.  *See*

Kennedy Decl., Ex. 1 at 171:11–76:23.  The automated reserve notice system, however, is

fundamentally flawed because, as Simon Yoon, its Rule 30(b)(6) witness concerning its practices

and procedures for setting of reserves for asbestos-related claims, testified, Granite State has

absolutely no procedures or policies, written or unwritten, with respect to setting loss reserves.

*See* Kennedy Decl., Ex. 5 at 40:21–41:15.  Indeed, the complete lack of policies or procedures

governing Granite State's setting of reserves is evident in this case.  Incredibly, despite the fact

that Granite State had known of its liability under the 1980 and 1981 McGraw Policies for years,

its reserves *remained at $1* all the way up until March 2009.  *See* Kennedy Decl., Exs. 55-56.

Granite State's understatement of its reserves with respect to the 1980 and 1981 McGraw

Policies necessarily meant, under its flawed reinsurance notice procedures, that Clearwater

would not and did not receive timely notice under the McGraw Fac Certs of the

Dresser/Halliburton and Federal Mogul settlements.

As respects Granite State's "manual" practice of reporting to reinsurers, Mr. Cafone

admitted that there were no policies or procedures governing Granite State's issuance of notice to

its reinsurers. *See* Kennedy Decl., Ex. 1 at 181:3–14. He also admitted that there are no criteria relating to when Granite State will manually send out notices to its reinsurers. *See id.* The absence of any policies, procedures or criteria concerning Granite State's manual sending of notices was starkly on display in its handling of the claims under the McGraw Fac Certs. As discussed in detail above, despite the numerous and material events and developments that transpired in connection with the Dresser/Halliburton and Federal Mogul settlements over the course of several years, Clearwater did not receive any information under the McGraw Fac Certs regarding those events or developments until beginning in April 2009, far past the time Granite State actually knew and should have known that a claim would be made under the McGraw Fac Certs.

In short, the record makes clear that Granite State does not have any, let alone reasonable, policies or procedures that ensure the timely reporting of claims to Clearwater under the McGraw Fac Certs. Its failure to have such procedures and policies constitutes a breach of its duty of good faith owed to Clearwater which warrants dismissal of its claims in this case. *See Unigard*, 4 F.3d at 1069; *Certain Underwriters at Lloyd's*, 783 A.2d at 241–42.

## V.   GRANITE STATE'S DEMANDS FOR PAYMENT UNDER THE MCGRAW FAC CERTS ARE CONTRARY TO ITS SETTLEMENTS WITH DRESSER/HALLIBURTON AND FEDERAL MOGUL

To the extent that Granite State's claims are not dismissed for the reasons set forth above, they should nevertheless be rejected because they contravene Granite State's settlements with Dresser/Halliburton and Federal Mogul.

The McGraw Fac Certs provide that Clearwater's "liability under [the certificates] shall follow [Granite State's] liability in accordance with the terms and conditions of the policy reinsured hereunder except with respect to those terms and/or conditions as may be inconsistent with the terms of [the certificates]" Mansour Decl., Ex. 1; Ex. 2. The record makes clear that

Granite State agreed to contribute to the Dresser/Halliburton and Federal Mogul settlements on the basis that its liability was for a percentage of policy limits basis only. Granite State, however, is demanding coverage under the McGraw Fac Certs on the basis that it agreed to pay the full limits of the 1980 and 1981 McGraw Policies.

With respect to the Dresser/Halliburton settlement, it is undisputed that Granite State and the other AIG companies agreed to settle with Halliburton/Dresser for $173,620,556. It is also undisputed that that amount was taken from the May 2004 NERA Report that set forth the precise amount that each AIG company policy paid toward the $173,620,556. *See* Yoon Decl., ¶ 29; Kennedy Decl., Ex. 26 and Ex. 3 at 163:24–165:17. The contributions under the 1980 and 1981 McGraw Policies toward the overall $173,620,556 settlement amount were, respectively, $2,876,106 and $4,390,560. *See* Kennedy Decl., Ex. 26 at 2 Granite 001835; Ex. 3 at 163:24– 165:17; Yoon Decl., ¶ 29. These amounts reflect a discount off the $5,000,000 (split) limit of the 1980 McGraw Policy and the $7,500,000 (split) limit of the 1981 McGraw Policy of, respectively, 43% and 42%.

Likewise, with respect to the Federal Mogul settlement, each and every Brattle report in the record reflects that Granite State's and the other AIG companies' calculated their liabilities under their policies were for less than the full (split) policy limits. Moreover, Granite State admits that it and the other AIG companies' $72,000,000 settlement received at least a "40% discount against potentially exposed limits of $121M." Kennedy Decl., Ex. 14 at 2 Granite 001438.

Despite actually achieving a savings off policy limits in its settlements with Dresser/Halliburton and Federal Mogul, Granite State nevertheless demands that Clearwater reimburse it under the McGraw Fac Certs as if it were fully *liable* for the limits of the 1980 and 1981 McGraw Policies. It is unreasonable and contrary to the express terms of the McGraw Fac

Certs for Granite State to receive the benefits of the discounts but denying them to Clearwater in order to maximize its reinsurance recoveries.  Thus, assuming that Clearwater has any liability at all for the Dresser/Halliburton and Federal Mogul settlements (which it does not), such liability can only be based on the discount off policy limits received by Granite State under the reinsured policies.  *See* Mansour Decl., Ex. 1 at Granite State 000200 (Section 1) and Ex. 2 at Granite State 000210 (Section 1).

It is evident from the arguments made by Granite State in this action, that it believes Clearwater may not challenge its claims cession or allocation because follow the fortunes somehow applies to the McGraw Fac Certs.  *See*, e.g., Kennedy Decl., Ex. 78 at 1–2.  Granite State, however, is not correct.  The McGraw Fac Certs do not contain follow the fortunes or follow the settlements clauses or language.  *See* Wactlar Ex. 1; Ex. 2; Pluth Decl., ¶ 17.  Nor were follow the fortunes or follow the settlements intended to be implied in the McGraw Fac Certs.  *See* Pluth Decl., ¶ 18.  Accordingly, contrary to Granite State's claims, the follow the fortunes/settlements concepts are inapplicable here.

## VI.   CLEARWATER IS NOT LIABLE FOR BILLINGS BASED UPON THE LEHMAN FINANCING PAYMENTS

During settlement negotiations between the AIG companies and Dresser/Halliburton, Dresser/Halliburton advised the AIG companies that it would require the settlement amount to be paid immediately, as opposed to receiving payments over time, in order to fund its Section 542(g) Bankruptcy Trust so it could pay asbestos claims and emerge from bankruptcy.  *See* Yoon Decl., ¶ 34 and Ex. 3 at Granite Site at 005483-84.  The AIG companies, however, insisted on paying their share of any settlement amount to Dresser/Halliburton over a period of several years.  *See* Kennedy Decl., Ex. 5 at 133:13-134:3.

As a result, when the AIG companies and Dresser/Halliburton agreed settle to for

$173,620,556, AIG arranged for financing from Lehman Brothers. *See* Kennedy Decl., Ex. 3 at

128:23-129:16; Ex. 5 at 154:20-157:20;Yoon Decl., Ex. 9 at 2 Granite 000112, 000121–122,

000164, 000166. Before this litigation, Granite State never reported to Clearwater under the

McGraw Fac Certs that its settlement agreement with Dresser/Halliburton was financed by

Lehman Brothers. *See* Chavez Decl., ¶9. Clearwater, however, has since learned that Granite

State's payment demands under the McGraw Fac Certs are based, not on the $173,620,556 paid

to Dresser/Halliburton in settlement, but rather on the $262,202,864 that the AIG companies

agreed to pay Lehman Brothers over time for financing their settlement with

Dresser/Halliburton. Granite State's demands for payment on this basis are improper.

The1980 and 1981 McGraw Policies incorporate by reference the definition of

loss set forth in the underlying U.S. Fire Policies which is:

> All sums which the insured, or any company as his insurer, or both, is legally
> obligated to pay as damages, whether by reason of adjudication or settlement,
> because of personal injury . . . liability to which this policy applies . . . .

Kennedy Decl., Ex. 10 at CW 001365. The record makes clear that the $173,620,556 amount

that the AIG companies agreed to pay and the Dresser/Halliburton agreed to accept in settlement

was used by Dresser/Halliburton to pay asbestos-related damages. *See* Yoon Decl., ¶ 34 and Ex.

3 at 2 Granite Site 005483-84. It is this amount, therefore, that constitutes "loss" under the

McGraw Policies. "Loss" does not include the additional $88,582,308 in financing charges that

the AIG companies paid to Lehman Brothers. As a consequence, billings to Clearwater based on

any other figure than the $173,620,556 is improper and Clearwater has no obligation to respond

to them under the McGraw Fac Certs.

## CONCLUSION

In light of the foregoing, Clearwater respectfully requests that this Court grant its Cross-Motion for Summary Judgment and dismiss Granite State's claims against Clearwater in their entirety and with prejudice.  Alternatively, the Court should reduce the claims against Clearwater in proportion to the discounts received by Granite State under the reinsured policies.

Dated: July 15, 2011
      New York, New York

                              Respectfully submitted,

                              By: _Stephen M. Kennedy_
                              Stephen M. Kennedy (SK 5572)
                              CLYDE & CO US LLP
                              405 Lexington Avenue
                              New York, New York 10174
                              Tel: (212) 710-3900
                              Fax (212) 710-3950

                              *Attorneys for Defendant Clearwater*
                              *Insurance Company*

# APPENDIX A

# MODERN REINSURANCE LAW AND PRACTICE

## SECOND EDITION

### BARRY R. OSTRAGER
### AND
### MARY KAY VYSKOCIL



GLASSER
LegalWorks

Copyright ©        2000 by Glasser Legal Works.

All rights reserved. No part of this publication may be reproduced
or transmitted in any form or by any means, electronic, or mechan-
ical, including photocopy, recording or any information storage and
retrieval system, without permission in writing from the publisher.

Requests for permission to make copies of any part of this work
should be submitted to:

        Permissions, Glasser Legal Works
        150 Clove Road
        Little Falls, NJ 07424

ISBN 1-888075-90-2

Printed in the United States of America

n.2 (S.D.N.Y. 1993); *Old Reliable Fire Ins. Co. v. Castle Reins. Co.*, 665 F.2d 239, 241 (8th Cir. 1981). The reinsurance treaty defines the class of risks to be reinsured. *See, e.g., Aetna Ins. Co. v. Glens Falls Ins. Co.*, 327 F. Supp. 11, 14 (N.D. Ga. 1971), *rev'd*, 453 F.2d 687 (5th Cir. 1972) (excluding from reinsurance coverage all inland marine risks). A treaty reinsurer may not decline to reinsure and the ceding company may not decline to cede a specific risk that falls within the classes of insurance covered by the terms of the treaty. *Compagnie de Réassur. d'Ile de France v. New England Reins. Corp.*, 57 F.3d 56 (1st Cir.), *cert. denied*, 516 U.S. 1009 (1995); *North River Ins. Co. v. CIGNA Reins. Co, supra*, 52 F.3d at 1199 ("Once a treaty is written, a reinsurer is bound to accept all of the policies under the block of business, including those as yet unwritten"); *In re Pritchard & Baird, Inc.*, 8 Bankr. 265, 268 n.6 (D.N.J. 1980) ("'Treaty Reinsurance' is reinsurance in which the reinsurer is bound to accept the risks and the ceding company is bound to cede them.").

A treaty contract is formed when a cedent transfers to a reinsurer a portion of the premiums for its policies and a corresponding portion of potential losses; no further action is required. *In re Midland Ins. Co., supra*, 79 N.Y.2d at 258, 590 N.E.2d at 1188, 582 N.Y.S.2d at 60. Once a particular reinsurance treaty is in place, the dealings between the parties proceed in an informal fashion.

## [b] Facultative Reinsurance

Facultative reinsurance is reinsurance that is purchased for a specific risk insured by the cedent. *North River Ins. Co. v. CIGNA Reins. Co., supra*, 52 F.2d at 1199; *Compagnie de Réassur. d'Ile de France v. New England Reinsurance Corp., supra*, 57 F.3d 56; *Unigard Sec. Ins. Co. v. North River Ins. Co., supra*, 4 F.3d at 1054 ("In facultative reinsurance, a ceding insurer purchases insurance for a part, or all, of a single insurance policy"); *Allendale Mut. Ins. Co. v. Excess Ins. Co.*, 970 F. Supp. 265, 267 (S.D.N.Y. 1997) *reb'g granted*, 992 F. Supp. 271, (S.D.N.Y. 1998), *remanded for juris. determination*, 172 F.3d 37 (2d

Cir. 1999), *vacated on juris. grounds*, 62 F. Supp. 2d 116 (S.D.N.Y. 1999); *Christiania Gen. Ins. Corp. v. Great American Ins. Co.*, 979 F.2d 268, 271 (2d Cir. 1992). As one court explained:

> Facultative reinsurance is the individual placement, offer and acceptance between the insurance company and reinsurance company of every risk that is being placed. It can be accepted or rejected on an individual basis. In this respect it differs from...treaties...in that under the terms of those treaties, the reinsurer is obligated to accept what has been offered.

*Calvert Fire Ins. Co. v. Unigard Mut. Ins. Co.*, 526 F. Supp. 623, 628 n.8 (D. Neb. 1980) (citations omitted). *See also Employers Ins. of Wausau v. American Centennial Ins. Co.*, No. 86 Civ. 8576 (KTD), 1989 WL 6631, slip op. at 3 (S.D.N.Y. Jan. 24, 1989); *Mutuelle Generale Francaise Vie v. Life Assurance Co. of Pa.*, 688 F. Supp. 386, 388 n.3 (N.D. Ill. 1988) ("As an alternative to treaty reinsurance, companies can enter into facultative reinsurance arrangements, under which the reinsurer and reinsured negotiate and reach agreement on the cession of individual risks"); *In re Pritchard & Baird, Inc.*, 8 Bankr. at 258 n.6.

Under a facultative contract, the option, or "faculty," to "accept or reject each risk offered by the ceding company" is exercised by the reinsurer. *Omaha Indem. Co. v. Royal American Managers, Inc.*, 777 F. Supp. 1488, 1490 (W.D. Mo. 1991); *see also Sumitomo Marine & Fire Ins. Co.-U.S. Branch v. Cologne Reins. Co., supra*, 75 N.Y.2d at 301, 552 N.E.2d at 142, 552 N.Y.S.2d at 894.

Each risk assumed by a facultative reinsurer receives a separate reinsurance certificate. Facultative reinsurance of a single risk can be placed with a number of reinsurers, each issuing its own certificate and assuming a part of the total liability. *Christiania Gen. Ins. Corp. v. Great American Ins. Co., supra*, 979 F.2d at 271. A fac-

# 8/The Notice Requirement

Facultative certificates and reinsurance treaties written on an excess-of-loss basis typically require the reinsured to give the reinsurer notice of any occurrence or accident which appears likely to involve the reinsurance. Notice of claims permits the reinsurer to reserve properly, to adjust premiums to reflect the loss experience under the reinsurance contract, and to decide whether to exercise the option of associating with the reinsured in the handling and disposition of the claim. *Unigard Sec. Ins. Co. v. North River Ins. Co.*, 4 F.3d 1049, 1065 (2d Cir. 1993). *See also Christiania Gen. Ins. Corp. v. Great American Ins. Co.*, 979 F.2d 268, 274, 276-77 (2d Cir. 1992).

## § 8.01   WHAT TRIGGERS NOTICE?

Under the typical notice clause in a reinsurance certificate, notice is triggered by an occurrence or accident which appears likely to involve the reinsurance certificate. These terms are not defined in the standard reinsurance certificate, but are understood to have the same meaning as those terms are defined to have in the underlying policy. *See generally* Ostrager & Newman, HANDBOOK ON INSURANCE COVERAGE DISPUTES, § 16.02 (Aspen Law & Bus. 9th ed. 1998). *But see Travelers Indem. Co. v. Scor Reins. Co.*, 62 F.3d 74, 78 (2d Cir. 1995) (reinsurance contract requiring notice of occur-

8-3

## [a] Traditional View: Prejudice Presumed

In a handful of jurisdictions, including New York, late notice will operate to relieve a direct insurer of its policy obligations as a matter of law even though there is no showing of prejudice. In those states, prejudice is presumed from untimely notice. *See generally* B. Ostrager & T. Newman, HANDBOOK ON INSURANCE COVERAGE DISPUTES § 4.02[c][1] (Aspen Law. & Bus. 9th ed. 1998).

Similarly, a cedent's failure to comply with a policy's notice requirements may prevent recovery on a reinsurance contract without a specific showing of prejudice. *Liberty Mut. Ins. Co. v. Gibbs,* 773 F.2d 15 (1st Cir. 1985) (applying Massachusetts law); *Keehn v. Excess Ins. Co.,* 129 F.2d 503 (7th Cir. 1942) (applying Illinois law); *Casualty Ins. Co. v. Constitution Reins. Co.,* No. 91 L 14732, slip op. (Ill. Cir. Ct., Cook County Jan. 29, 1996) (applying Illinois law); *Stuyvesant Ins. Co. v. United Pub. Ins. Co.,* 139 Ind. App. 539, 221 N.E.2d 358 (1966) (applying Indiana law); 13A Appleman, Insurance Law and Practice §§ 7697 at 550-51 (1976).

In *Liberty Mutual Insurance Co. v. Gibbs, supra,* Liberty Mutual was reinsured by Lloyd's of London for 80 percent of all payments in excess of $250,000 to Boston Edison Company. Under the reinsurance contract, Liberty Mutual was required "upon knowledge of any loss or losses which may give rise to a claim under this policy [to] advise [underwriters] thereof as soon as reasonably possible." 773 F.2d at 16. Reinsurers were first given notice by Liberty Mutual of a particular claim against Boston Edison almost four years after the complaint was filed and almost one month after a jury returned a verdict against Boston Edison for $465,000. The court held that the reinsurers had no duty to indemnify Liberty Mutual because the notice provision was breached.

Liberty Mutual asserted that the late notice had not prejudiced the reinsurers and that since the primary insurer bears the burden

# APPENDIX B

**STATE OF NEW YORK**
**INSURANCE DEPARTMENT**
25 BEAVER STREET
NEW YORK, NEW YORK 10004

Eliot Spitzer
Governor

Eric R. Dinallo
Superintendent

The Office of General Counsel issued the following opinion on February 7, 2008, representing the position of the New York State Insurance Department.

**Re: Insurance Company Reserves**

**Questions Presented:**

1. Must a liability insurer establish a reserve upon receipt of a liability claim?

2. Must a liability insurer effectuate settlements of claims in good faith when liability under the policy is shown to be clear?

**Conclusions:**

1. Yes. A liability insurer in New York is required to establish reserves for claims.

2. Yes. An insurer is required to effectuate settlement agreements in good faith.

**Facts:**

The inquiry is of a general nature, without reference to specific facts.

**Analysis:**

N.Y. Ins. Law § 1303 (McKinney 2006), which discusses the requirement of establishing reserves, is relevant to the inquiry. That statute reads in pertinent part as follows:

> Every insurer shall, except as provided in section one thousand three hundred four [1] of this article and subject to specific provisions of this chapter, maintain reserves in an amount estimated in the aggregate to provide for the payment of all losses or claims incurred on or prior to the date of statement, whether reported or unreported, which are unpaid as of such date and for which such insurer may be liable, *and also reserves in an amount estimated to provide for the expenses of adjustment or settlement of such losses or claims.* (Emphasis added.)

Thus, by its very terms, Section 1303 of the Insurance Law requires that insurers maintain reserves for the payment of losses or claims and expenses, incurred on or prior to the statement date, whether reported or unreported. Reserves are funds created for the purpose of paying anticipated claims under insurance policies. In general, upon receipt of a claim, the insurance company will review the claim to establish whether there is a potential exposure that

a claim will have to be paid. If there is liability, the insurer must establish an estimated reserve, in an amount that is adequate to fully settle the claim.

The inquirer's second question asks whether an insurer is obliged to effectuate the prompt settlements of a claim. Insurance Law § 2601(a)(4) is relevant to the inquiry. It defines certain acts that constitute unfair claims settlement practices and prohibits insurers doing business in New York from engaging in such acts. The statute reads in pertinent part, as follows:

> (a) No insurer doing business in this state shall engage in unfair claim settlement practices. Any of the following acts by an insurer, if committed without just cause and performed with such frequency as to indicate a general business practice, shall constitute unfair claim settlement practices:
>
> ....
>
> (4) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims submitted in which liability has become reasonably clear, except where there is a reasonable basis supported by specific information available for review by the department that the claimant has caused the loss to occur by arson. After receiving a properly executed proof of loss, the insurer shall advise the claimant of acceptance or denial of the claim within thirty working days; ... (Emphasis added.)

Additionally, N.Y. Comp. Codes R. & Regs. tit. 11, Part 216 (2006) (Regulation 64) addresses unfair claims settlement practices and claim cost control measures of insurers doing business in New York. The preamble to Regulation 64, which is summarily set forth in N.Y. Comp. Codes R. & Regs. tit. 11, § 216.0(a), provides, in pertinent part, as follows:

> (a) Section 2601 of the Insurance Law prohibits insurers doing business in this State from engaging in unfair claims settlement practices and provides that, if any insurer performs any of the acts or practices proscribed by that section without just cause and with such frequency as to indicate a general business practice, then those acts shall constitute unfair claims settlement practices. This Part contains claim practice rules which insurers must apply to the processing of all first- and third-party claims arising under policies subject to this Part....

Consequently, both Insurance Law § 2601 and Regulation 64 provide that an insurance company must effectuate a settlement promptly and in good faith when there is a reasonable basis for doing so.

For further information, you may contact Supervising Attorney D. Monica Marsh at the New York City office.

---

[1] Insurance Law §1304 provides that most insurers authorized to transact insurance under Insurance Law § 1113 must maintain reserves on all life insurance policies or certificates and annuity contracts in force; on disability benefits; and additional reserves as prescribed by the superintendent as necessary on account of the particular insurer's policies, certificates and contracts.