# EXHIBIT 4

**Page 1**

JEFFREY M. WACTLAR

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
GRANITE STATE INSURANCE COMPANY,

    Plaintiff,

    v.  Civil Action No. 2009 Civ.10607

CLEARWATER INSURANCE COMPANY,
f/k/a ODYSSEY REINSURANCE
CORPORATION, f/k/a SKANDIA
AMERICA REINSURANCE
CORPORATION,

    Defendants.

------------------------------------X

DEPOSITION OF JEFFREY M. WACTLAR
New York, New York
Tuesday, February 15, 2011

REPORTED BY: BARBARA R. ZELTMAN
Professional Stenographic Reporter

Job Number: 2557

**Page 2**

1    JEFFREY M. WACTLAR
2
3
    February 15, 2011
4    10:20 a.m.
5
6    Deposition of JEFFREY M. WACTLAR, taken by
7  Defendant, pursuant to Notice, at the offices of
8  MOUND, COTTON, WOLLAN & GREENGRASS, One Battery Park
9  Plaza, New York, New York, before BARBARA R. ZELTMAN, a
10  Professional Stenographic Reporter and Notary Public
11  within and for the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1    JEFFREY M. WACTLAR
2  A P P E A R A N C E S:
3
4  MOUND, COTTON, WOLLAN & GREENGRASS
5  Attorneys for the Plaintiff
6    One Battery Park Plaza
7    New York, New York  10004
8    BY:  MATTHEW J. LASKY, ESQ.
9
10
11  CLYDE & CO. US LLP
12  Attorneys for the Defendants
13    405 Lexington Avenue
14    New York, New York  10174
15    BY:  STEPHEN M. KENNEDY, ESQ.
16
17
18  DAVIS WRIGHT TREMAINE
19  Attorneys for Defendants
20    Suite 2200
21    1201 Third Avenue
22    Seattle, Washington 98101-3045
23    BY:  BRADLEY R. DUNCAN, ESQ. (appearing
24      telephonically)
25

**Page 4**

1    JEFFREY M. WACTLAR
2
3  KIRKLAND & ELLIS LLP
4  Attorneys for Defendants
5    300 North LaSalle
6    Chicago, IL 60654
7    BY:  LAUREN M. HAWKINS, ESQ.  (appearing
8      telephonically)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  (Pages 1 to 4)

Page 5

1        JEFFREY M. WACTLAR
2
3        IT IS HEREBY STIPULATED AND AGREED
4    by and between the attorneys for the respective
5    parties herein that filing and sealing be and
6    the same are hereby waived.
7        IT IS FURTHER STIPULATED AND AGREED
8    that all objections, except as to the form of
9    the question, shall be reserved to the time
10    of trial.
11        IT IS FURTHER STIPULATED AND AGREED
12    that the within deposition may be signed and
13    sworn to before any officer authorized to
14    administer an oath with the same force and
15    effect as if signed and sworn to before
16    the Court.
17
18
19
20
21
22
23
24
25

Page 6

1        JEFFREY M. WACTLAR
2        JEFFREY M. WACTLAR,
3    having been first duly sworn by
4    Barbara R. Zeltman, Notary Public, was
5    examined and testified as follows:
6    EXAMINATION BY MR. KENNEDY:
7    Q    Good morning, Mr. Wactlar.
8        My name is Steve Kennedy. I'm with
9    Clyde & Co. US LLP and I represent
10    Clearwater Insurance Company in this dispute
11    against Granite State Insurance Company
12    pending in the Southern District of New
13    York.
14        Are you aware of that litigation
15    between Clearwater and Granite State?
16    A    I am.
17    Q    And you understand that it involves
18    facultative coverage that Skandia or
19    Clearwater issued to Granite State regarding
20    certain insurance policies that Granite
21    State issued to McGraw-Edison?
22    A    I'm aware that -- I'm aware that
23    involves reinsurance. The certificates and
24    things like that specifically I'm not aware
25    of.

Page 7

1        JEFFREY M. WACTLAR
2    Q    So the type of reinsurance coverage
3    you are not aware of.
4    A    That's correct.
5    Q    You understand it involves four
6    policies issued by Granite State to
7    McGraw-Edison?
8    A    Yes.
9    Q    You understand that those policies
10    were issued from 1980 to 1983?
11    A    The time frame, I don't have a
12    specific recollection of, but I do recall
13    generally the '80s being the time period of
14    those policies.
15    Q    Okay.
16        Have you ever been deposed before?
17    A    Yes.
18    Q    How many times?
19    A    Twice.
20    Q    And were they matters while you
21    were employed by AIG?
22    A    One was, one wasn't.
23    Q    And the one that was not, was that
24    related to your employment?
25    A    Sort of. It was a legal

Page 8

1        JEFFREY M. WACTLAR
2    malpractice case I was brought into and I
3    testified as a party in that case.
4    Q    Were you lawyer?
5    A    Yes.
6    Q    You are a lawyer?
7    A    Yes.
8    Q    And that was at a law firm you were
9    practicing?
10    A    Yes.
11    Q    And with respect to the second
12    deposition, that was when you were at AIG?
13    A    Yes.
14    Q    What did that involve?
15    A    That was a matter where I handled
16    the underlying claim and it was a coverage
17    action that was brought by the insurer
18    seeking coverage.
19    Q    By the insurer?
20    A    Yes.
21    Q    And what type of claim was it?
22    A    It was a bodily injury claim,
23    multiple plaintiffs that had -- the
24    underlying claim was settled. We were the
25    excess carrier and the insured was seeking

2  (Pages 5 to 8)

Page 13

JEFFREY M. WACTLAR

1
2      Medvin & Elberg in Newark and the
3  Law Office of Lewis Chapman in Wayne.
4      Q   Can you generalize the type of law
5  you practiced with those four firms?
6      A   Yes.
7          It was essentially personal injury,
8  medical malpractice and commercial
9  litigation, with a little bit of general
10  practice work thrown in such as real estate
11  closings and municipal work.
12      Q   And what year did you graduate from
13  Hofstra?
14      A   Hofstra was '92.
15      Q   And when did you graduate from
16  Seton Hall?
17      A   '95.
18      Q   So that puts you in private
19  practice from '95 to 2005?
20      A   Right.
21      Q   And in 2005 you joined AIG?
22      A   Yes.
23      Q   And what department or division did
24  you join?
25      A   I went into what was called "the

Page 14

JEFFREY M. WACTLAR

1
2  toxic tort department" at that time.
3      Q   And was that with an outfit called
4  AIG Domestic --
5      A   Domestic Claims. AIG Domestic
6  Claims Group I think was the name.
7      Q   And what did the toxic tort
8  division handle at the time?
9      A   It handled all asbestos claims,
10  bodily injury asbestos claims and all other
11  toxic long-tail exposure claims tendered to
12  general liability policies.
13      Q   And in private practice, had you
14  had any type of experience with these
15  long-tail liability claims?
16      A   No.
17      Q   And what was the job title that you
18  assumed when you joined AIG in 2005?
19      A   I think it was analyst Level 3.
20      Q   Do you know what that means?  What
21  is a analyst Level 3 as opposed to any other
22  level?
23      A   I think below management, at the
24  time there were analysts Level 1, 2 and 3
25  and the levels denoted I think essentially

Page 15

JEFFREY M. WACTLAR

1
2  levels of experience.
3      Q   Three being the highest?
4      A   Yes.
5      Q   And what could you attain after
6  analyst Level 3?
7      A   Assistant vice president.
8      Q   And is that considered management?
9      A   Yes.
10      Q   Are you an analyst Level 3 today?
11      A   My title is actually complex
12  director.
13          There was sort of a title
14  consolidation/reorganization a few years ago
15  at the company and they did away with the
16  Analyst 1, 2, 3 designations and now you
17  have analysts, senior analyst, complex
18  director.
19      Q   So is it fair to say that since you
20  got to AIG, your responsibilities -- while
21  your title may have changed, your
22  responsibilities are the same?
23      A   Yes.
24      Q   What are those responsibilities?
25      A   I handle files, essentially claims

Page 16

JEFFREY M. WACTLAR

1
2  that are tendered by insureds to policies.
3      Q   And is it primarily asbestos claims
4  that you handle?
5      A   No.  I've actually since changed
6  departments.
7          I'm now in a department that's
8  known as PASE, P-A-S-E, solution and single
9  event is what that stands for.
10      Q   And when did you change
11  departments?
12      A   About two years ago.
13      Q   2009?
14      A   That's about right.  I think it was
15  May of 2009.
16      Q   Prior to that change, was it mostly
17  asbestos claims that you handled?
18      A   Well, since it was a toxic tort
19  department, it was a combination of asbestos
20  and other toxics.
21      Q   Was it predominantly asbestos?
22      A   Asbestos was probably 50 percent of
23  what I handled.
24      Q   So you handled claim files where a
25  claim gets tendered to AIG by an insured?

4  (Pages 13 to 16)

Page 25

JEFFREY M. WACTLAR

1  the asbestos department, the toxic tort
2  department handled claims tendered to older
3  policies, so many of those policies were
4  kept in hard copy or on microfiche, so we
5  would send requests out to have those
6  policies sent to us.
7     Q    And that request would go to where?
8     A    I don't know. I can't recall
9  specifically, but it was some repository of
10 policies.
11    Q    Do you know where that repository
12 is located?
13    A    I don't.
14    Q    Is it just one location?
15    A    I don't recall.
16    Q    So the policy then generally would
17 be in a claim file?
18    A    Yes.
19    Q    Along with the initial notice of
20 claim?
21    A    Yes.
22    Q    If AIG or if you went out and
23 retained coverage counsel at certain point
24 in time, would your communications with

Page 26

JEFFREY M. WACTLAR

1  coverage counsel be placed in the claim
2  file?
3     A    It might be.
4     Q    As a general practice?
5     A    It depends. Written communications
6  might be. Verbal communications, depending
7  on what they were, may not be reduced to a
8  writing that could be put in a claim file.
9     Q    So fair to say that written
10 communications as a general practice would
11 be put into the claim file?
12    A    Generally speaking, yes.
13    Q    And then if there were
14 communications back and forth between AIG or
15 its agent, say coverage counsel on behalf of
16 AIG and the insured or the insured's agent,
17 its counsel, for example, would those
18 communications be placed in the claim file
19 as a matter of general practice?
20    A    I would think so, yes.
21    Q    And the same question for any
22 broker or intermediary that might be
23 involved, would that communications with
24 that broker or intermediary as a general

Page 27

JEFFREY M. WACTLAR

1  practice be placed in the claim file?
2     A    Yes.
3     Q    Have you ever worked on a claim
4  file or account where there was an analysis
5  done of the potential monetary amount and
6  number of claims that were involved --
7  strike that.
8        Have you ever been involved in an
9  asbestos claim where there was analysis done
10 of the potential monetary exposure to the
11 AIG policy at issue?
12       MR. LASKY:  Object to the form.
13    A    Yeah. I mean, that's a tough
14 question to answer and I guess to a certain
15 extent I don't really understand the
16 question.
17       I mean, it would not be uncommon to
18 have counsel give you his or her opinion of
19 a value of a case, so in that regard, yes.
20    Q    Let me ask you this:
21       Have you ever been involved in a
22 case where there were numerous AIG policies
23 at issue?
24    A    Yes.

Page 28

JEFFREY M. WACTLAR

1     Q    What I mean "numerous AIG
2  policies," I mean issued by numerous AIG
3  companies.
4     A    Yes.
5     Q    As an example, Granite State,
6  National Union, Landmark, American Home, for
7  example, those are different AIG companies,
8  right?
9     A    Yes.
10    Q    And you'd been involved in claims,
11 asbestos claims where some or all of those
12 companies were involved in issuing coverage
13 to the insured, right?
14    A    Yes.
15    Q    Okay.
16       Now, when that happens, generally
17 speaking, there may be questions about which
18 policy responds to the claims and which may
19 not; is that right?
20    A    Correct.
21    Q    And as a claims analyst, you have a
22 responsibility, didn't you, to figure out or
23 try to figure out which policies would
24 respond and which policies wouldn't, right?

WINTER REPORTING, INC.    (212) 953-1414

Page 45

JEFFREY M. WACTLAR

1
2  A   I testified about coverage
3  litigation?  You are talking about the
4  coverage litigation, the underlying case in
5  this lawsuit?
6  Q   Well, I was going to ask you what
7  you meant by that reference to coverage
8  litigations.
9  A   Oh, okay.  I understand the
10  question.
11       Yes.  Coverage litigation would be
12  that action by Federal Mogul seeking
13  coverage from the AIG company policies along
14  with other carriers.
15  Q   Okay.
16       You understand that in the Federal
17  Mogul bankruptcy proceedings,
18  Dresser-Halliburton initiated an adversary
19  proceeding against Federal Mogul to resolve
20  the competing claims of coverage under the
21  Granite State McGraw-Edison policies and the
22  other policies?
23  A   That, I'm not familiar with.
24  Q   When you say "the coverage
25  litigation" then, what do you have in mind?

Page 46

JEFFREY M. WACTLAR

1
2  Where was the venue?  When was it initiated?
3  What do you have in mind?
4  A   I have in mind the action by
5  Federal Mogul seeking coverage against AIG,
6  among other companies and other carriers
7  that I handled.
8       It was initiated prior to my
9  handling the claim file, so I don't have a
10  specific recollection of when it was
11  tendered to AIG, but when I refer to
12  coverage litigation, that's generally what I
13  refer to.
14       MR. KENNEDY:  Let's mark as
15  Clearwater Exhibit 4, a document
16  entitled in part Settlement Agreement
17  and Release among the Federal Mogul
18  US Asbestos Personal Injury Trust and
19  the AIG Companies.
20       2GRANITE-0011935 to 1994.
21       (Clearwater Exhibit 4,
22  Settlement Agreement and Release
23  among the Federal Mogul US Asbestos
24  Personal Injury Trust and the AIG
25  Companies, 2GRANITE-0011935 through

Page 47

JEFFREY M. WACTLAR

1
2  2GRANITE-0011994, was marked for
3  Identification.)
4       MR. LASKY:  Is this the entire
5  document?
6       MR. KENNEDY:  This is the
7  entire document produced by you.  I
8  can't --
9       MR. LASKY:  I thought I heard
10  "partial."
11       MR. KENNEDY:  I didn't give the
12  full title of the agreement itself.
13  I used some shorthand reference.
14       MR. LASKY:  Okay.
15  BY MR. KENNEDY:
16  Q   Mr. Wactlar, take as much time you
17  need to look at the document.
18       Do you recognize this document?
19  A   Generally speaking, looks to be the
20  settlement agreement that we entered into.
21  Q   And that was with Federal Mogul
22  Asbestos Trust and other entities?
23  A   Correct.
24  Q   To resolve the claims that Federal
25  Mogul was making under the AIG company

Page 48

JEFFREY M. WACTLAR

1
2  policies?
3  A   That coverage litigation I was
4  talking about earlier, yes.
5  Q   Could you look on Page 4, please.
6  A   Yes.
7  Q   And the third "whereas" clause.
8  A   Yes.
9  Q   Is that the coverage litigation you
10  were referring to?
11  A   That paragraph says "Whereas on
12  September 19, 2006 Federal Mogul Products,
13  Inc. initiated an action against certain
14  insurance companies including certain AIG
15  companies ..."
16       I believe so, yes.
17  Q   And we can go back and look at the
18  policies that are referred to in this
19  agreement, but do you understand that those
20  policies that Federal Mogul was suing on
21  included the McGraw-Edison Granite State
22  policies?
23  A   Yes, that's right.
24  Q   And if you actually look, if you
25  just go to -- if you could please to 1991.

12  (Pages 45 to 48)

Page 89

JEFFREY M. WACTLAR

1  have a general understanding of what did
2  when it was given to you?
3      A   Do I have a general understanding
4  of what I did when I got that file?
5  Generally, I would have looked at the file
6  material, I would have read through the
7  file, I would have determined what status
8  the file was in.
9      Q   Do you recall any discussions with
10  Steve Parness about the file when you were
11  assigned it?
12     A   I don't specifically recall a
13  conversation with Steve Parness but it's
14  very likely that Steve and I sat down and
15  talked about all the new files that I got.
16     Q   I think we talked about this
17  earlier, but if you had any questions
18  regarding the material in the file that you
19  reviewed, you would be consulting maybe the
20  prior claims handler?
21     A   Sure.  That might be one thing I
22  would do.
23     Q   In this instance you don't
24  specifically recall who that was, right?

Page 90

JEFFREY M. WACTLAR

1      A   I don't.  I can't say as I sit here
2  at that I specifically recall the prior
3  claims handlers on really any of the files
4  that I got back at that time.
5      Q   Do you recall that Leticia Diaz was
6  assigned the Dresser file at this time?
7      A   I do.
8      Q   Do you recall any discussions with
9  her with respect to that file?
10     A   I can't recall any specific
11  conversations.
12         I remember generally talking to
13  Leticia.  I remember generally talking about
14  the Partition Agreement.
15         As I said earlier I know it existed
16  and I know Leticia and I generally spoke
17  about it but I don't remember any specific
18  conversations with her.
19     Q   So you understood there was a
20  relationship at least in the Partition
21  Agreement between the Dresser claims and the
22  Federal Mogul claims?
23     A   Yes.
24     Q   Do you recall getting up to speed

Page 91

JEFFREY M. WACTLAR

1  with any coverage counsel at this point in
2  time?
3      A   Yes.
4      Q   And what coverage counsel would
5  that be?
6      A   Jim Dolan.  He would have been my
7  contact coverage person.
8      Q   Do you know whether he was also the
9  contact person with respect to the Dresser
10  part of it?
11     A   That, I don't know.
12     Q   And you understand that at this
13  point in time, which when you were assigned
14  the file, that the AIG companies along with
15  the other insurers in the joint defense
16  group were mediating with Federal Mogul?
17     A   I knew -- I don't recall
18  specifically when that mediation took place,
19  but I generally new of a mediation.
20     Q   I mean, you understood that it was
21  an ongoing process, right?
22     A   Correct.
23     Q   That there were a number of
24  meetings between Federal Mogul and the joint

Page 92

JEFFREY M. WACTLAR

1  defense group to try to settle this?
2      A   I did know that, yes.
3      Q   It was really a continuum over
4  time, wasn't it?
5      A   You know, I mean basically, yes.
6  The answer to your question is yes.  I knew
7  that they were attempting to negotiate to a
8  resolution.
9      Q   And your role with respect to that
10  mediation was a fairly critical one, right,
11  as the claims handler to understand what the
12  issues were in the mediation, what the
13  potential dollar amounts were; is that fair
14  to say?
15         MR. LASKY:  Object to the form.
16     A   Well, I don't agree with your
17  classification that my role was critical in
18  the mediation, but I think it was important
19  that I understood, yes, the dollars involved
20  and efforts to resolve the case.
21     Q   And did you undertake an effort to
22  understand what the potential dollars
23  involved were?
24     A   I did.

23  (Pages 89 to 92)

Page 93

JEFFREY M. WACTLAR

1
2  Q   And what did you do to try to
3  understand those potential dollars?
4     A   Well, I would have looked at the
5  coverage involved, in other words, the
6  policies that were in play in this action.
7  So the total coverage dollars involved, you
8  know, in light of the Partition Agreement.
9     I would have looked at what we
10 talked about before, Brattle Group's
11 analysis, the potential impact of those
12 policies, any coverage defenses that we may
13 have had.  Those would generally be the
14 things that I would look at.
15 Q   Do you recall this term that was
16 used at the time among the joint defense
17 group of "the size of the problem"?
18    A   Yeah, that was a term that we
19 generally would use in cases like this.
20 Q   And explain to me what that term
21 means.
22    A   In other words, "the size of the
23 problem" would be like a slang reference to
24 the total asbestos liability attributable to
25 an insured.

Page 94

JEFFREY M. WACTLAR

1
2  Q   And generally, insureds and
3  insurers have usually a marked difference of
4  opinion as to what that potential liability
5  is; is that right?
6     A   Yes, sometimes.
7  Q   And there usually is often a low
8  range and a high range of the total
9  potential liability for asbestos claims in
10 any one claim or account, right?
11    A   That's right.
12 Q   And I think you said the joint
13 defense group retained the Brattle Group to
14 try to help them determine what those ranges
15 might be?
16    A   That's right.
17 Q   And so the size of the problem is
18 one factor to appreciate what any one
19 carrier's or insurer's potential liability
20 might be under the policies, right?
21    A   That's right.
22 Q   There are other factors, aren't
23 there?
24    A   Yes.
25 Q   Coverage defenses would be one,

Page 95

JEFFREY M. WACTLAR

1
2  right?
3     A   Yes.
4  Q   The period of time of coverage, I
5  think you suggested, is another factor,
6  right?
7     A   Yes.
8  Q   Number of occurrences might be
9  another factor?
10    A   Yes, it might.
11 Q   And you take those factors and the
12 joint defense group actually had those
13 factors analyzed, didn't they, with respect
14 to the Federal Mogul claims?
15    A   Well, all those factors, I don't
16 know that -- I can't testify that they had
17 specific each carrier's policy limits,
18 coverage defenses and all those things.
19    My understanding of the Brattle
20 Group is they had sort of analyzed the size
21 of problem, as we referred to it.
22 Q   Didn't they weight the
23 probabilities of the size of the problem to
24 come up with some ranges of potential
25 liability?

Page 96

JEFFREY M. WACTLAR

1
2  Do you understand?
3     A   That's right, yes, they did.
4  Q   Didn't they in their analysis also
5  take into account coverage defenses into
6  their exposure analyses?
7     A   You know, I don't recall.  They may
8  have.  I don't remember specifically.
9  Q   Didn't they factor into their
10 analysis the number of occurrences and
11 weight the probabilities?
12    A   Again, that's -- they certainly may
13 have.  I don't have a specific recollection
14 of what factors they looked at, but
15 generally I know we were looking at those
16 Brattle numbers being important in sort of
17 evaluating the overall value of the claim.
18 Q   Had you looked at these Brattle
19 reports and looked at these factors that
20 were included in them, you would have taken
21 steps to understand them at the time, right?
22    A   Yes.
23 Q   And who would you talk to, assuming
24 they weren't self-evident to you when you
25 were looking at them and you needed to

24  (Pages 93 to 96)

Page 97

**JEFFREY M. WACTLAR**

1  understand them more, who would you have
2  talked to?
3      A   I would have talked to Jim Dolan.
4      Q   Anyone else?
5      A   Not that I can think of.
6      Q   Now, when you were assigned a claim
7  and talking to Leticia Diaz, you understand
8  that the Brattle Group was the consultant
9  used to help settle the Dresser/Halliburton
10  claims?
11      A   I don't have a specific
12  recollection of that.  As I sit here today,
13  I can't tell you whether or not she relied
14  on the Brattle Group, if it was part of her
15  side of the case.
16      Q   You understand, though, that as you
17  became involved, first involved with the
18  Federal Mogul claims, that the Dresser/
19  Halliburton piece had been settled?
20      A   Yes, I was aware of that.
21      Q   Now, going back to these Brattle
22  reports, you said that they were important
23  to AIG's understanding of the value of the
24  claim, right?

Page 98

**JEFFREY M. WACTLAR**

1      A   Yes.
2      Q   And isn't it true that you used
3  these reports -- withdraw the question.
4          When you first were assigned the
5  file, what was the sequence of events?  I
6  mean, there was a preexisting claim file you
7  were assigned?
8      A   Yes.
9      Q   There was coverage counsel, right?
10      A   Yes.
11      Q   In the form of Jim Dolan, Cozen
12  O'Connor?
13      A   Yes.
14      Q   There was a consultant already
15  helping the joint defense group, including
16  AIG companies, right, the Brattle Group?
17      A   Yes.
18      Q   Was Alan Gray involved at this
19  point?
20      A   I don't think so.
21      Q   Was Campos & Stratis involved?
22      A   I don't think they were involved at
23  this point.
24      Q   Was Lynberg & Watkins involved at

Page 99

**JEFFREY M. WACTLAR**

1  all?
2      A   They may have been involved.
3      Q   What was the extent of their
4  involvement?
5      A   They may have had some historic
6  involvement in the file.  They may have been
7  helping us with some analysis.
8          I recall generally working with
9  them, but I can't tell you specifically what
10  we used them or what we relied them for.
11      Q   And that was when you were assigned
12  the file?
13      A   Yes.
14      Q   So all of those things are in
15  place.
16          And what happens next when you get
17  assigned the file?
18      A   Well, as we talked about earlier, I
19  would have probably read through the claim
20  file.  I probably would have talked to Steve
21  Parness.
22          I probably would have noted what
23  vendors or what firms were involved in the
24  file, called them, spoken to them.

Page 100

**JEFFREY M. WACTLAR**

1      It's likely I did all those things.
2      Q   And would you have wanted to know
3  when the next mediation session was, if
4  there was going to be one?
5      A   I would have been interested to
6  know any important developments in the file.
7  I would certainly think that mediation would
8  be an important development in the file.
9      Q   If there had been prior settlement
10  offers by the joint defense group including
11  AIG, would you have wanted to know about
12  that?
13      A   Yes.
14      Q   Would you want to understand the
15  basis for those settlement offers?
16      A   Yes.
17      Q   And do you recall making efforts to
18  determine that?
19      A   I recall generally getting up to
20  speed on the file.  I don't recall
21  specifically learning of any settlement
22  offers or demands other than perhaps policy
23  limit demands when I first got the file.
24      Q   Okay.

25 (Pages 97 to 100)

Page 109

JEFFREY M. WACTLAR

1 going to raise reserves in the next
2 18 months.
3     If you thought you might raise
4 reserves, you would put that down.
5     Q    But these periodic fixed
6 settlements, right, are not projections.
7 They are a certainty that you are going to
8 be making these payments, right?
9     A    That's right.
10     Q    So would they be reflected on the
11 PAQR report?
12     A    They should be.
13     Because projections would be
14 payments that were scheduled to be made as
15 well.
16     Q    I'm sorry.  Did you tell me what
17 the acronym is?
18     A    You know, I was trying to think of
19 it and I knew at some point but I can't
20 remember what that stands for.
21     Project and quarterly report, I
22 guess.  That's a guess.  I don't want to do
23 that.
24     MR. KENNEDY: Let's mark as

Page 110

JEFFREY M. WACTLAR

1 Clearwater Exhibit 9, a document
2 Bates-stamped GRANITE STATE-026480 to
3 026484.
4     (Clearwater Exhibit 9, Federal
5 Mogul Carrier's Offer and Terms,
6 GRANITE STATE-026480 through
7 GRANITE STATE-026484, was marked
8 for Identification.)
9     MR. LASKY: I would just like
10 the record to show that this is a
11 confidential document.  So to the
12 extent it's going to be used in trial
13 or in litigation, it should be used
14 in accordance with the
15 confidentiality agreement we've
16 reached in this litigation.
17 BY MR. KENNEDY:
18     Q    Mr. Wactlar, take as much time as
19 you'd like looking over this document, but I
20 would like know have you seen this document
21 before?
22     A    I don't recall ever seeing this
23 document.
24     Q    If you look on the first page of

Page 111

JEFFREY M. WACTLAR

1 the document, you see Federal Mogul
2 carrier's offer and terms, it looks like.
3     A    Yes.
4     Q    Do you know whose handwriting this
5 is?
6     A    It's not mine.  I don't know whose
7 it is.
8     Q    You see on the second page, looking
9 this over or just generally, do you have an
10 understanding that the insured joint defense
11 group made an offer to Federal Mogul in
12 September '05?
13     A    I don't have a specific
14 recollection of that.
15     I have a vague recollection of an
16 offer being made, but I don't really have a
17 specific recollection as to this offer.
18     Q    But you have a general recollection
19 that an offer was made in September '05?
20     A    Generally, yes.
21     MR. KENNEDY: This exhibit is
22 entitled Federal Mogul Carrier's
23 Offer and Terms.
24     Q    If you go to the third -- fourth

Page 112

JEFFREY M. WACTLAR

1 page in, Mr. Wactlar, there's handwriting
2 there.
3     Do you recognize that handwriting?
4     A    I don't.
5     MR. KENNEDY: Mark as
6 Clearwater Exhibit Number 10, a
7 document Bates Number GRANITE
8 STATE-009119 through 9120.
9     And it's entitled "For settlement
10 discussion purposes only, not admissible
11 in any proceeding subject to mediation
12 privilege, 1-12-06, Carriers Counsel
13 Proposal.
14     (Clearwater Exhibit 10,
15 Carriers Counsel Proposal, 1-12-06,
16 GRANITE STATE-009119 through
17 GRANITE STATE-009120, was marked
18 for Identification.)
19 BY MR. KENNEDY:
20     Q    Mr. Wactlar, have you seen this
21 document before?
22     A    I don't think so.
23     Q    Do you understand that in January
24 of 2006 the carriers made another offer?

28  (Pages 109 to 112)

Page 113

JEFFREY M. WACTLAR

1  A   I have no -- I really don't have a
2  specific recollection, no.
3  Q   Generally speaking, do you
4  understand that they made an offer in
5  January of 2006?
6  A   Even generally would be hard for me
7  to answer in the affirmative.
8      I know there were circumstances
9  back and forth but it's very difficult for
10 me to specifically recall offers made.
11 Q   Forgetting the number, do you
12 recall in this time period, that is, in
13 September '05-January '06, that offers were
14 being made generally?
15 A   Yeah, I remember when I got the
16 file generally knowing about this mediation
17 and to that extent that there was
18 negotiations.
19     So, you know, as far as
20 negotiations involved, offers back and
21 forth, I am aware of that generally, yes.
22 Q   And then if you turn the page, you
23 see the handwriting there?
24 A   Yes.

Page 114

JEFFREY M. WACTLAR

1  Q   Is that your handwriting?
2  A   No.
3  Q   Do you know whose handwriting?
4  A   I don't.
5      MR. KENNEDY: Mark as
6  Clearwater Exhibit 11, a document
7  entitled Federal Mogul/Wagner
8  Mediation AIG Policies. Bates-
9  stamped GRANITE SITE -- I think
10 that's a typo -- 009223 through 9225.
11     (Clearwater Exhibit 11,
12 Federal Mogul/Wagner Mediation AIG
13 Policies, GRANITE SITE-009223
14 through GRANITE SITE-009225, was
15 marked for Identification.)
16 BY MR. KENNEDY:
17 Q   And Mr. Wactlar, have you seen this
18 document before?
19 A   I may have seen this document
20 before.
21 Q   And when's the first time you saw
22 it?
23 A   This may have been contained in the
24 file at some point when I got it.

Page 115

JEFFREY M. WACTLAR

1  A   I have no specific -- you know,
2  I've seen a lot of spreadsheets and charts
3  associated with this file.
4      This may have been one. Very
5  difficult for me to say exactly, this was
6  the exact one.
7  Q   Right.
8      Do you have an understanding of
9  what "split coverage" means up at the top
10 left-hand corner?
11 A   I think that means that the
12 Partition Agreement that we talked about
13 earlier, that Federal Mogul has those policy
14 limits.
15 Q   And you see the policy limits AIG
16 Advocacy, that column titled that?
17 A   Yes.
18 Q   What is AIG advocacy?
19 A   I think what that meant was there
20 was an issue of annualized limits because
21 there were some multi-year policies and we
22 were taking the position that it was just
23 one set of limits. The insured was taking
24 the position that there were multiple

Page 116

JEFFREY M. WACTLAR

1  limits.
2      So I think what that represents is
3  one limit for that multi-year policy.
4  Q   When you were working on this
5  account from 2006 to the time it settled at
6  the end of 2008, were you the only claims
7  analyst on it or were you working with
8  others?
9  A   Well, I was working with Steve
10 Parness, but I was the only analyst-level
11 person working on it.
12 Q   Was Leticia Diaz involved with you
13 on this claim?
14 A   No. Only insofar that we would --
15 I might ask her if she had a policy if I
16 couldn't find a hard copy of a policy but
17 not really --
18 Q   By reason of her handling the
19 Dresser piece?
20 A   Yes.
21 Q   And what about Steve Parness, who
22 was involved, if anyone?
23 A   On a day-to-day basis?
24 Q   Yeah, on a day-to-day basis.

29 (Pages 113 to 116)

Page 121

JEFFREY M. WACTLAR

1  Heintz & Randolph."
2           Do you see that?
3  A   I do.
4  Q   Do you know who they were?
5  A   No.
6  Q   Putting aside whether you recall
7  seeing this document before, do you have an
8  understanding of what it is?
9  A   Well, there's a coverage chart on
10  the back.
11         It looks like an allocation.
12  Q   To the AIG policies?
13  A   Well, it says "AIG less Yosemite."
14         It would appear to be but I can't
15  make a representation that all the
16  policies -- I didn't contract to have this
17  done.
18  Q   Okay.
19         Just looking at the notation on the
20  bottom left-hand corner on the first page,
21  it says "Cash flow is discounted through
22  1-31-2006 using the yield curve of Treasury
23  bonds as of 1-12-2006."
24         Do you have an understanding of

Page 122

JEFFREY M. WACTLAR

1  what means?
2  A   Probably means net present value.
3  Q   Beyond that do you have an
4  understanding of what it is?
5  A   No.
6  Q   Next notation is "Limited
7  information reflects Federal Mogul share per
8  Partition Agreement November 2004."
9         Do you have an understanding that's
10  the reference of the Partition Agreement we
11  talked about earlier today?
12  A   That seems to be what it is, yes.
13  Q   Next notation is "Exhaustion
14  assumed per correspondence between carriers
15  and bankruptcy counsel."
16         Do you have an understanding of
17  what that means?
18  A   Only what those words say. I mean,
19  I understand what that statement says.
20  Q   In the context of any discussions
21  between AIG, the joint defense group and
22  Federal Mogul, do you have an understanding
23  of what that means?
24  A   Well, again, just that whoever

Page 123

JEFFREY M. WACTLAR

1  prepared this is noting for the user or
2  viewer that exhaustion is assumed per some
3  correspondence that went between the
4  carriers and the bankruptcy counsel.
5  Q   And do you have an understanding of
6  what correspondence?
7  A   I don't. Actually, it may be that
8  Gilbert Heintz firm is bankruptcy counsel.
9  Maybe. I don't know. I'm sort of guessing
10  there. I don't know.
11         MR. KENNEDY:  Mark as
12  Clearwater Exhibit Number 13.
13         It's a series of e-mails. The top
14  one on the first page is from Ted Feldman
15  to Elizabeth Hanke and others dated
16  July 27, 2006.
17         The document is Bates-stamped GS
18  CONFIDENTIAL-002108 through 2111.
19         MR. LASKY:  I want to state for
20  record all the documents that bear
21  confidential stamping are also
22  considered confidential and should be
23  treated as such.
24         MR. KENNEDY:  We have agreement

Page 124

JEFFREY M. WACTLAR

1  to that. There is no issue on that.
2         (Clearwater Exhibit 13, E-mail
3  chain, top e-mail dated Thursday,
4  July 27, 2008, 7:44 p.m.,
5  GS CONFIDENTIAL-002108 through
6  GS CONFIDENTIAL-002111, was marked
7  for Identification.)
8  BY MR. KENNEDY:
9  Q   Mr. Wactlar, you might want to take
10  a moment to review it and let me know when
11  you are done.
12  A   Okay. Okay.
13  Q   I think you said earlier that Ted
14  Feldman was the Federal Mogul trust
15  representative?
16  A   I think so.
17  Q   And this e-mail on the first page
18  of the document is from Ted Feldman, dated
19  July 27, 2006, to David Geronemus.
20         Do you see that?
21  A   Yes.
22  Q   Do you have an understanding that
23  David Geronemus was the mediator between
24  Federal Mogul and the insured joint defense

31  (Pages 121 to 124)

Page 125

JEFFREY M. WACTLAR

1
2  group?
3     A    I remember that name by you making
4  that connection.  It does make sense to me.
5     Q    So yes?
6     A    Yes.
7     Q    Did you ever have any personal
8  interactions with Mr. Geronemus?
9     A    No.
10    Q    Did your counsel, that is, Cozen
11 O'Connor, have any interactions with
12 Mr. Geronemus?
13    A    I believe so.
14    Q    You believe so?
15    A    Yes.
16    Q    You see in the e-mail that
17 Mr. Feldman makes an offer.  He asks
18 Mr. Geronemus to convey an offer of
19 settlement in the first paragraph there of
20 $99 million?
21    A    I see.
22    Q    Do you recall this settlement offer
23 being made in and around this time?
24    A    I vaguely do.
25    Q    Is this the opportunity you were

Page 126

JEFFREY M. WACTLAR

1
2  talking about for the AIG companies to
3  settle out?
4     A    I think this was sort of the
5  beginning of the period in time where we
6  started the ball rolling, yes.
7     Q    And do you recall discussing this
8  offer within AIG?
9     A    I recall having several
10 conversations with Steve Parness where we
11 were talking about some offers back and
12 forth.  It's hard for me to remember this
13 exact one.
14    Q    Okay.
15         I mean, do you have a general
16 recollection as to what the reaction was of
17 yourself and Mr. Parness to a $99 million
18 offer?
19    A    No.
20    Q    Now you see in the second
21 paragraph, although there's no space,
22 beginning with "In calculating this
23 offer ..."?
24    A    Yes.
25    Q    It says in the second sentence, "We

Page 127

JEFFREY M. WACTLAR

1
2  understand that AIG's interested in a
3  payment stream rather than a lump sum
4  payment."
5         Do you see that?
6     A    I do.
7     Q    Do you recall that being discussed?
8     A    I do.
9     Q    And did you ask counsel to convey
10 that to Federal Mogul representatives?
11    A    I think we did.
12    Q    And what was the reason for a
13 payment stream as opposed to a lump sum
14 payment?
15    A    It's just something that we viewed
16 as a favorable term in a settlement.
17         It allowed -- it allowed you to
18 hold your money longer, so settling it for
19 payments over time was a more advantageous
20 settlement.
21    Q    In that discussion, did that come
22 up in the context of Union Carbide, for
23 example?
24    A    Yes.
25    Q    Did it come up in the context of

Page 128

JEFFREY M. WACTLAR

1
2  Cangolleium?
3     A    It probably did.
4     Q    So this is not an uncommon
5  discussion when you consider settlement on
6  these asbestos accounts, right?
7     A    No, it's not.
8     Q    And you considered the pros and
9  cons of a payment stream versus a lump sum
10 payment in settlement?
11    A    Yes.
12    Q    And presumably, the advantage of
13 holding on to the money over a period of
14 time is something to do with AIG's own rate
15 of return on its capital; is that right?
16         MR. LASKY:  Object to the form.
17    A    Well, the way we looked at it was
18 we were able to view it from a net present
19 value approach and so perhaps we're saying
20 the same thing, but there was a monetary
21 advantage to have payment over time.
22    Q    If you have an amount of money and
23 you pay that over a period of time, that
24 nominal amount has a net present value,
25 doesn't it?

32  (Pages 125 to 128)

Page 137

JEFFREY M. WACTLAR

1
2  A  I do.
3  Q  Do you know what that refers to?
4  A  You know, I remember -- I think it
5  was Vellumioid, they were smaller deals I
6  think that were done.  For Cooper.  I
7  actually had the Cooper account for a while.
8  The Vellumioid account does not look
9  familiar to me, although I vaguely remember
10 that name.  But I believe those are smaller
11 deals, like a million or under, that were
12 done contemporaneous or around the same time
13 as this.  So I think that's probably what
14 that's referring to.
15 Q  When you say you had the Cooper
16 account, is that with respect to asbestos?
17 A  I think so, yes.
18 Q  You understand that they, Cooper,
19 in addition to Federal Mogul was making
20 claims under the Granite State McGraw-Edison
21 policies?
22 A  I do have a vague recollection of
23 that, yes.
24 Q  Do you have an understanding that
25 Cooper actually purchased McGraw-Edison

Page 138

JEFFREY M. WACTLAR

1
2  sometime in the mid-1980s?
3  A  Yeah, that does sound familiar.
4  Q  Now, if you go to the front page,
5  it's the second paragraph, last sentence
6  says "In that regard, we are willing to
7  consider any proposal that AIG has in
8  response to our demand."
9  Do you see that?
10 A  I do.
11 Q  And this demand was made in
12 July 2006, right?
13 A  Yeah, that's the dates of the
14 e-mail.
15 Q  Did AIG make a counteroffer to this
16 demand?
17 A  It's likely.
18 Q  Do you know what it was?
19 A  I don't.
20 Q  Do you know how far from the time
21 this offer was made that the AIG
22 counteroffer was made?
23 A  I don't.
24 Q  Do you know if it was in the
25 context of the joint defense group global

Page 139

JEFFREY M. WACTLAR

1
2  offer or was it specific to AIG companies?
3  A  I recall that at this time -- we
4  talked about this before -- this opportunity
5  arose to discuss settlement.
6  At this point, it was just the AIG
7  member companies.
8  Q  Now, looking at the cc's on this
9  e-mail, Robert Horkavitch.  Do you know who
10 he was?
11 A  I don't.
12 Q  How about Ann Kramer?
13 A  I don't know.
14 Q  James P. Hughes?
15 A  That name is familiar, but I don't
16 recall who it is.
17 Q  Was it a Federal Mogul
18 representative; do you recall?
19 A  I don't recall.
20 Q  How about Bette Orr?
21 A  No, I don't know.
22 Q  Moving up on the upper left-hand
23 corner of this document, you see *Sangio
24 Vasu?
25 A  Yes.

Page 140

JEFFREY M. WACTLAR

1
2  Q  Do you know who that is?
3  A  I don't.
4  Q  What about Elizabeth Hanke?
5  A  No.
6  Q  Samantha Martin?
7  A  No.
8  Q  Jonathan Varzally?
9  A  No.
10 Q  Looking at the third paragraph
11 where Mr. Feldman says "In addition, in
12 response to Tom which Wilkinson's request,
13 we attached a policy listing."
14 And if you go to 2110 and 2111, you
15 see a policy listing there?
16 A  Yes.
17 Q  Do you recall Mr. Wilkinson making
18 that request?
19 A  No.
20 Q  Do you have an understanding that
21 the policies attached to this e-mail were
22 the policies that were the subject of
23 Federal Mogul's settlement offer?
24 A  Well, that would be consistent with
25 that type of request; in other words, we all

35  (Pages 137 to 140)

Page 141

JEFFREY M. WACTLAR

1 want to be on the same page, so give us a
2 spreadsheet of the policies you feel are in
3 play.
4 Q    Was there a general agreement when
5 this list was received that these were the
6 policies at issue?
7 A    I would say it's likely.
8 MR. KENNEDY:  Mark as
9 Clearwater Exhibit 14, it is a
10 document entitled Alan Gray. Inc.,
11 88 Broad Street, Boston,
12 Massachusetts.
13 Bates-stamped 3GRANITE
14 STATE-007494.
15 (Clearwater Exhibit 14,
16 Document headed Alan Gray. Inc.,
17 88 Broad Street, Boston,
18 Massachusetts, 3GRANITE
19 STATE-007494, was marked for
20 Identification.)
21 BY MR. KENNEDY:
22 Q    My question to you, Mr. Wactlar,
23 is:  Have you seen this document before?
24 A    I don't recall seeing it.

Page 142

JEFFREY M. WACTLAR

1 Q    You see the handwriting there?
2 A    I do.
3 Q    What is that, do you know, in
4 reference to?
5 A    You mean the cross-out of Patrick
6 Sweeney's name and then my name put there?
7 Q    Yes.
8 A    I can't say with a hundred percent
9 certainty but it's likely when this came in
10 this was my file, so whoever received it in
11 the mailroom or perhaps my claims assistant
12 crossed out Patrick Sweeney's name and wrote
13 my name there.
14 Or it's possible that I may have
15 called -- that Alan Gray may have
16 realized -- that somebody at Alan Gray may
17 have just handwritten my name there.
18 Q    And it looks like there is a claim
19 number there and handwriting.
20 Do you see that?
21 A    Yes.
22 Q    Do you know what claim number that
23 refers to?
24 A    I don't know with specificity but

Page 143

JEFFREY M. WACTLAR

1 it's likely it's a Federal Mogul claim
2 number.
3 170 was a prefix for the toxic tort
4 department.
5 Q    And you see the entries on this
6 invoice.
7 Do you know who K.A.H. was?
8 A    I don't.
9 Q    Or Jay Walker?
10 A    It's possible it could have been --
11 it's possible that could be me, they spelled
12 my name terribly wrong.
13 Q    And it said "Telephone conversation
14 with Jay Walker at AGTS regarding audit."
15 Do you see that?
16 A    Yes.
17 Q    Do you know what the reference to
18 audit was?
19 A    I don't.
20 Q    N.V., do you know who N.V. was?
21 A    No.
22 Q    And P.B.L.?
23 A    No.
24 Q    And there's P.B.L., there's

Page 144

JEFFREY M. WACTLAR

1 actually "Review and organize all notices of
2 loss in the spreadsheet."
3 Do you see that?
4 A    I do.
5 Q    What's that in reference to?
6 A    I can't say with specificity but it
7 would be consistent with a request for
8 assistance by Alan Gray to do just that,
9 review and organize all notices of loss into
10 a spreadsheet.
11 Q    And that would be notices of loss
12 under AIG's policies?
13 A    Likely, yes.
14 Q    Do you recall receiving a
15 spreadsheet like that?
16 A    Not specifically.
17 Q    And that would be -- that would be
18 a spreadsheet that identified and dated the
19 notices of loss?
20 A    It might be.
21 I mean, this sort of thing would be
22 consistent with my efforts to organize the
23 file.
24 And like I said before, get up to

36 (Pages 141 to 144)

Page 145

JEFFREY M. WACTLAR

1  speed with it.
2
3  Q   And then the last entry was "N.V.,
4  review all documentation to prepare summary
5  report."
6       Do you see that?
7  A   I do.
8  Q   Do you recall receiving a summary
9  report?
10  A   Not specifically but it would not
11  be unusual for me to receive a summary
12  report from Alan Gray.
13  Q   And so, by December of 2007, Alan
14  Gray was working on the Federal Mogul
15  account?
16  A   Yes.
17  Q   Did you specifically retain them?
18  A   I think they were retained before I
19  got the file.
20  Q   But these entries here look like
21  something that you would request to get your
22  arms around the file?
23  A   They did.
24       MR. KENNEDY:  Can we take a
25  two-minute break.

Page 146

JEFFREY M. WACTLAR

1
2       (A brief recess was
3  taken.)
4       MR. KENNEDY:  Mark as
5  Clearwater Exhibit 15, a document
6  that is entitled Insured
7  McGraw-Edison Claimant, Agg Tox
8  Asbestos Policy, Term 3-1-80 to
9  3-1-81.
10       Bates-stamped GRANITE SITE-009034
11  to 9041.
12       (Clearwater Exhibit 15,
13  Insured McGraw-Edison Claimant, Agg
14  Tox asbestos Policy, Term 3-1-80 to
15  3-1-81, GRANITE SITE-009034 through
16  GRANITE SITE-009041, was marked for
17  Identification.)
18  BY MR. KENNEDY:
19  Q   Mr. Wactlar, take your time to look
20  at this, but my first question to you is:
21  Do you recognize this document?
22  A   I do recognize this document.
23  Q   Now, starting with the first page,
24  is that your handwriting?
25  A   No.

Page 147

JEFFREY M. WACTLAR

1
2  Q   Do you know whose handwriting that
3  is?
4  A   Well, it's probably the handwriting
5  from whoever opened this file -- well, this
6  could have been my claims assistant or
7  somebody in that central intake department.
8  Q   And the Number 170, you said that's
9  the -- on the right-hand side of the
10  document?
11  A   Yes.
12  Q   That's the toxic tort department,
13  that denotes the toxic tort department?
14  A   Yes.
15  Q   And the 05344.
16       Do you see that number?
17  A   Yes.
18  Q   Can you tell us what that is?
19  A   That would have been the claim
20  number -- the second part of the claim
21  number.  170 dash and then the 05344 would
22  have been the main part of the claim number.
23  Q   And that's the Federal Mogul claim
24  number?
25  A   Well, I can't -- I mean, the

Page 148

JEFFREY M. WACTLAR

1
2  insurer's McGraw-Edison, so in all
3  likelihood, that was the Federal Mogul claim
4  number.
5  Q   And this is a hard copy document
6  somewhere at AIG?
7  A   This looks like it's a photocopy of
8  a green folder which would exist somewhere.
9  Q   And what's the significance of a
10  green folder?
11  A   Green folder is coming to -- that
12  was the color that the toxic tort department
13  used for folders, for claim folders.
14  Q   And it was coming to the toxic tort
15  department, is that what you are saying?
16  A   Yes.
17  Q   And coming from the claim intake
18  department?
19  A   Right.
20  Q   And so this means that a file claim
21  number or a claim file was being set up for
22  this claim?
23  A   Correct.
24  Q   Now, if you turn the page, you see
25  the last name appears in handwriting.

37  (Pages 145 to 148)

Page 149

JEFFREY M. WACTLAR

Do you see that?

A    Yes.

Q    Do you know whose handwriting that is?

A    That was probably CID, central intake department.

Q    And it says "Toxic tort reassigned pending, dated 4-14-2008."

Do you see that?

A    Yes.

Q    And then says "From adjustor Jessica Martin to adjuster Steve Parness."

Do you see that?

A    Yes.

Q    What is the significance of this?

A    This is an internal sort of a transferred document showing that this claim number was opened up, Jessica Martin was the file handler in the claims intake department who opened it.

She was transferring it to my AVP, Steve Parness. And it was probably hand-delivered down to Steve Parness.

Q    So Jessica Martin, she's in Jersey

Page 150

JEFFREY M. WACTLAR

City?

A    I don't know if she still is, but she was at the time.

Q    And if you turn the page, there's a document entitled FNOL Cover Sheet-CID.

Do you see that?

A    I do.

Q    What is that?

A    First notice of loss, cover sheet CID.

This would be a document that I was describing to you before as something that I would fill out and send to CID to open up a claim file. This would be that sheet.

Q    Okay.

A    So it's deceiving because "first notice of loss" doesn't really mean the first time the company is getting it, it just means that it's the first time it's going to CID.

Q    So when you say it's not necessarily the first time the company is getting it, you mean notice of a loss?

A    Or of a particular account or claim

Page 151

JEFFREY M. WACTLAR

policy.

Q    And it says "date 4-7-08." That's the date it was created?

A    The date they received it and, yeah, probably the date they created it. Close to that date.

Q    And down below it has an ECS claim number.

Do you see that on the left-hand side just about a third of the way -- I'd say a fifth of the way down?

A    Right.

Q    What is that?

A    I think that's just the policy number.

That corresponds with the copy in the front.

Q    So that looks like the claim number?

A    Yes.

Q    And then it identifies further down, about two-thirds the way down, that the suit claimant is Aggregate Tox Asbestos?

A    That's right the.

Page 152

JEFFREY M. WACTLAR

Q    And it identifies the policy number there below that?

A    That's right.

Q    And that's for McGraw-Edison?

A    Yes.

Q    And below that it identifies the policy term?

A    Right. The effective dates.

Q    And then it says "assigned to" at the bottom and it looks like handwritten note "Martin"?

A    Right.

Q    And then it says James Hendrin?

A    Hendrin, yes.

Q    Who is that?

A    James Hendrin is an AVP in the claims intake department. That would have been him stamping it in and writing it's going to Martin, who was -- we talked about earlier who probably actually did the data entry to input this and create this claim number.

Q    Okay. If you go to actually 9038 and you look at the top and then you flip

Page 153

JEFFREY M. WACTLAR

1  back to look at the very bottom of 9037
2  where it says "branch case" and then you
3  flip over and it says "written by Jim
4  Hendrin"?
5      A   Right.
6      Q   "Please set up this asbestos case."
7  And that refers to what exactly?
8      A   Exactly opening up this claim
9  number.
10     Q   On this policy?
11     A   Yes.
12     Q   And then if you go to 9037, you see
13 a note says "Branch 170, Case 53344, was
14 written by Jessica Martin." Says "Note
15 title SEG TECH initial note."
16     What is the "SEG TECH initial
17 note"?
18     A   Segmentation technician, who was
19 Jessica Martin, so segmentation being
20 essentially the claims intake person.
21     Q   And it says, the note, "Policy
22 Number 66801963 needs MJC 012 added."
23     A   Yes.
24     Q   What does that mean?

Page 154

JEFFREY M. WACTLAR

1      A   Major class code.
2      Q   What's Major Class Code 012?
3      A   There were and still are internal
4  AIG codes that we would give to
5  particular -- whenever we set up a claim
6  file or claim number, and it would refer to
7  things like is it a products claim, a
8  nonproducts claim and it just helped to run
9  reports and things like that.
10     Q   So I mean is this -- so the 12, is
11 that for a products claim?
12     A   Probably, yeah.  It's probably a
13 products claim.
14     Q   Could it be an asbestos claim?
15     A   There were different codes.
16 Asbestos would have been a code.  Major
17 class code would refer to something else.
18     We've changed the way that this is
19 done now, so it's not as fresh in my mind.
20     We used to be more responsible for
21 doing these things.  Now the claim intake
22 department do a lot more themselves.
23     Q   This says "Sent a request to
24 MJ Claims."

Page 155

JEFFREY M. WACTLAR

1      Do you know what that is?
2      A   Probably the department that puts
3  that major class code into the computer
4  system.
5      Q   And if you go on top just directly
6  above that, it's notes by Jessica Martin, it
7  appears.  And she writes "Shell and coding
8  completed 4-11."
9      A   I mentioned that earlier, the shell
10 and coding, I was giving an example of a
11 slip that we had, a participation in a
12 London Market policy.  They need to be
13 shelled and coded; in other words, they
14 needed to be opened up in the computer
15 system.
16     In other words, a policy gets
17 shelled and coded when there's a claim
18 number opened up on it for the first time.
19 That just means it's added into the computer
20 system.
21     I don't know specifically what
22 "shelled and coded" means, but I was just
23 always under the impression that gets
24 entered into the computer system.

Page 156

JEFFREY M. WACTLAR

1      Q   And then above that, you see
2  "Refreshed into TTAAS."
3      We know that to be the toxic tort
4  accounting system?
5      A   Yes.
6      Q   It says "Open for a dollar.
7  Reassigned to Steve Parness."
8      Do you have an understanding of
9  whether in fact a reserve was open for
10 dollar on this?
11     A   If it says so here, it was.
12     Q   Do you know why it was open for a
13 dollar?
14     A   Just a statistical reserve for a
15 claim file.
16     Q   When you say "statistical reserve,"
17 what does that mean?
18     A   It just means something has to be
19 there to open a claim number.  A dollar, ten
20 dollars, some amount.
21     Q   Could it be zero amount?
22     A   No, it had to be a dollar amount.
23     Q   Now, if you now go to, please,
24 9039.

39  (Pages 153 to 156)

---

Page 157

JEFFREY M. WACTLAR

1
2     And you see this is something "MS
3  case creation worksheet," it appears?
4     A   Yes.
5     Q   Do you know what the "MS" is?
6        Is that LMS?
7     A   I think it is LMS, actually.
8     Q   And what is the significance of
9  this document?
10    A   This is what CID generates when
11 they open up a claim file.
12    Q   And you see your name as the
13 adjuster?
14    A   I do.
15    Q   Did you have any input in creating
16 this document?
17    A   Actually, this is the document that
18 I created.
19       I created that document.
20    Q   Okay.
21    A   The sheet that CID creates is --
22 the one in the front is 9036.
23       This is the document that I fill
24 out and send up to CID to open a claim file.
25    Q   Do you know what "LMS" stands for?

---

Page 158

JEFFREY M. WACTLAR

1
2     A   I'd say it's like litigation
3  management -- something.
4     Q   And if you look at this, it doesn't
5  seem to be any claim number on it actually,
6  right?
7     A   Right.
8     Q   So it identifies the policy and
9  effective dates but not a claim number?
10    A   That's right.
11       Then they would generate the
12 document that is Bates 9036 and that has the
13 claim number on it.
14    Q   And then it says "Date reported
15 2-11-08."
16       Do you see that?
17    A   Right.
18    Q   And "broker," ex'ed out?
19    A   Yes.
20    Q   And "Date received 2-11-08."
21    A   Yes.
22    Q   What's the significance of the
23 2-11-08?
24    A   That's just an internal document --
25 those numbers were -- the date reported goes

---

Page 159

JEFFREY M. WACTLAR

1
2  back to a long time ago where AIG had
3  smaller claims and it was a way for them to
4  track when first report -- when the company
5  was first noticed of a claim.
6        But how 2-11-08 got in there or
7  "broker" got in there, I don't know.  That
8  may have just been a random date that I put
9  in to get the claim opened up.
10    Q   Because in fact, Federal Mogul had
11 been seeking coverage under this for a long
12 time.
13    A   Clearly we knew about this long
14 before, right.
15    Q   And then if you look at PUA1 --
16    A   Right.
17    Q   -- AIA code.  What?
18    A   Those were those codes that I was
19 talking about before.
20        All these codes have meaning and
21 one of it means that it's asbestos.  I think
22 MD stands for asbestos, I don't know what NA
23 stands for.
24    Q   Yeah, we're looking at two
25 different -- I'm looking on top?

---

Page 160

JEFFREY M. WACTLAR

1
2     A   ELAF.  Those are more codes.
3        There is a chart somewhere that I
4  used to keep at my desk and it would have,
5  you know, PUA1A and I would look on the
6  chart, I'd find it and I would write it
7  down.
8     Q   So PUA5A1 AIA code which you were
9  just talking about earlier, that's just more
10 code?
11    A   Yes.
12    Q   If you go down to the Indemnity
13 Reserve box.
14        Do you see that on the left-hand
15 side of the document?
16    A   Yes.
17    Q   What do those entries mean?
18       "Other AIG RM"?
19    A   Those are all prepopulated.  They
20 are just there on the form.
21        I don't know.
22        Those I think also go back to some
23 historic use for this document which we
24 never used in the asbestos department.
25        Not that I know of.

Page 161

JEFFREY M. WACTLAR

1
2  Q    So they were there when you got
3  there?
4  A    They were just on the form.
5  Q    Did you create this on the
6  computer?
7  A    Yeah.  We have this in the electronic
8  form.  I fill out the basic information and
9  then ship it off to the claims intake
10  department.
11  Q    And what's the Legal Reserve box.
12      Do you see that?
13  A    Yes.
14      Again, those are all prepopulated.
15  Those are codes which I'm not sure really
16  are used currently.
17  Q    And if you go down to the box
18  "Reserve Type."
19      Do you see that?
20  A    Yes.
21  Q    001 on the left-hand side?
22  A    Yes.
23  Q    And then 002 on the right-hand
24  side?
25  A    Yes.

Page 162

JEFFREY M. WACTLAR

1
2  Q    What are these entries?
3  A    Reserve Type under 001, you'll see
4  an "I," that's indemnity reserve.
5      And then 002, you'll see the "L,"
6  these a legal reserve.
7      So I put $5,000 just to open --
8  remember I said before there needs to be
9  some dollar amount.  Even though I wrote
10  that "$5,000 CID" just beside the dollars,
11  these are sort of random numbers just to get
12  the claim file open.
13  Q    And it appears to you that you
14  created this on or around March 3, 2008?
15  A    Yes.
16  Q    And then if you turn to the last
17  page, there's a Claims Administration sheet.
18  A    Right.
19  Q    Bates stamp 9041.
20  A    Yes.
21  Q    Says "Shelling Request Form."
22      Do you know who created this?
23  A    No.
24  Q    Do you know whose handwriting?
25  A    No.

Page 163

JEFFREY M. WACTLAR

1
2  Q    Do you see the references in the
3  middle of the page to policy number?
4  A    Yes.
5  Q    That's the McGraw-Edison policy,
6  right?
7  A    Yes.
8  Q    And then it identifies the insured
9  in the next line.
10  A    Yes.
11  Q    Then it identifies "A/S co."
12      Do you see that?
13  A    Yes.
14  Q    What does "A/S" mean?
15  A    I don't know.
16  Q    And you see that reference to
17  "major classes, 012"?
18  A    Yes.
19  Q    Is that the same thing we were
20  talking about earlier?
21  A    Yes, major class code.
22  Q    And then it says Division 43?
23  A    Yes.
24  Q    What's the division?
25  A    I believe that's the underwriting

Page 164

JEFFREY M. WACTLAR

1
2  division.
3  Q    And what division is that?
4  A    I don't know.  Again, there's a
5  chart with division numbers and then the
6  actual name of the division.
7  Q    And is the division name, is it a
8  company name or is it like a unit name?
9  A    No, it's usually a company name.
10  Q    Now, going back to your LMS case
11  creation worksheet.
12      Why are you setting it up at this
13  time?
14  A    Because this was probably an
15  example of what we talked about earlier, me
16  needing to create this claim number in order
17  to start raising reserves in anticipation of
18  a possible settlement.
19  Q    So your expectation -- let me
20  withdraw that.
21      Do you recall that in and around
22  March of '08 settlement discussions were
23  progressing?
24  A    It's likely.  If I was filling this
25  out, it's probably connected to that.

41  (Pages 161 to 164)

Page 165

JEFFREY M. WACTLAR

1
2    Q   Okay.
3        MR. KENNEDY:  I'm going to mark
4    Clearwater Exhibit 16, which is the
5    same type of document as 15.  It's
6    titled Insured McGraw-Edison
7    Claimant, Agg-Tox Asbestos Policy,
8    Term 3-1-81 through 3-1-82.
9        (Clearwater Exhibit 16,
10   Insured McGraw-Edison Claimant,
11   Agg-Tox Asbestos Policy, Term
12   3-1-81 through 3-1-82, GRANITE
13   SITE-009026 to GRANITE SITE-009033,
14   was marked for Identification.)
15       MR. KENNEDY:  Bates Numbers
16   GRANITE SITE-9026 to 9033.
17       As you are looking at that, I'm
18   going to mark as Clearwater Exhibit 17,
19   same type of document.  Same title except
20   the policy term is 3-1-82 to 3-1-83.
21       Bates Numbers GRANITE SITE-9018 to
22   9025.
23       (Clearwater Exhibit 17,
24   Insured McGraw-Edison Claimant,
25   Agg-Tox Asbestos Policy, Term

Page 166

JEFFREY M. WACTLAR

1    3-1-82 through 3-1-83, GRANITE
2    SITE-009018 to GRANITE SITE-009025,
3    was marked for Identification.)
4    BY MR. KENNEDY:
5        Q   Mr. Wactlar, if you can just look
6    at Exhibit 16 and Exhibit 17, my question
7    is:  Is this the same type of case creation
8    or claim creation paperwork for the '81/82
9    policy and the '82/83 policy that is the
10   same as Exhibit 15?
11       A   It is.
12       Q   Okay.
13       Just to round this out, you would
14   have been requesting the claim file creation
15   for these policies because of settlement
16   discussions between AIG companies and
17   Federal Mogul?
18       A   The need to start raising reserves
19   as a result of impending settlement
20   discussions.
21       Q   And you recall identifying these
22   policies as the policies that would be at
23   issue in the settlement with Federal Mogul?
24       A   I do.

Page 167

JEFFREY M. WACTLAR

1
2        Q   Did you personally identify them or
3    did you do that in consultation with anyone
4    else?
5        A   In consultation with others.
6        Q   Who are the others?
7        A   Well, I would have spoken to Steve
8    Parness, the Cozen firm and possibly a
9    consultant like Alan Gray or Campos &
10   Stratis.
11       I know that I had retained Campos &
12   Stratis at some point.  I don't know if it
13   was at this point or later.
14       MR. KENNEDY:  Let's mark as
15   Clearwater Exhibit 18.
16       It's a series of e-mails.
17       The top one is from Mr. Wactlar to
18   Shanon Mumford dated March 12, 2008.  And
19   the Bates range is 3GRANITE-7332 to 7335.
20       (Clearwater Exhibit 18, E-mail
21   chain, top e-mail dated Wednesday,
22   March 12, 2008, 4:21 p.m.,
23   3GRANITE-7332 to 3GRANITE-7335, was
24   marked for Identification.)

Page 168

JEFFREY M. WACTLAR

1
2    BY MR. KENNEDY:
3        Q   Mr. Wactlar, again, please take all
4    the time you'd like to look at these pages
5    of documents, but I want to focus your
6    attention at first on the second page and
7    it's your e-mail to DL Media Altino of
8    March 12, 2008.
9        Who is Altino?
10       A   He's in the claims intake
11   department.
12       I'm not sure if he's an AVP or
13   analyst but he's in that department.
14       Q   You say, "Hi, Tino, here are
15   several case creates we need opened for an
16   upcoming settlement."
17       Do you see that?
18       A   Yes.
19       Q   Do you think this e-mail is related
20   to Exhibits 15 through 17 that we just went
21   over?
22       A   Highly likely.
23       Q   So those were part of the case
24   creates, you believe?
25       A   Yes.

42  (Pages 165 to 168)

Page 169

JEFFREY M. WACTLAR

1
2  Q   And the "upcoming settlement"
3  reference.
4     Do you see that?
5  A   Yes.
6  Q   What was the settlement status at
7  that point in time in March of 2008?
8  A   Probably getting closer which is
9  why I sent it as a rush.
10    But I was probably pressuring to go
11 through this quickly because I knew we
12 needed time to start getting the reserves
13 up.
14 Q   Do you know if the amount in
15 question in March of 2008 was around the
16 $99 million offer that Federal Mogul had
17 made to AIG previously?
18 A   I don't remember.  I can't remember
19 the dollar amounts exactly where we were at
20 this point.
21 Q   So at this point in time, AIG
22 believed it likely that the policies for
23 which they are opening claims files would be
24 impacted to some extent by reason of a
25 settlement with Federal Mogul?

Page 170

JEFFREY M. WACTLAR

1
2  A   Yes.
3  Q   Who is Shanon Mumford?
4  A   Somebody in case creation -- or
5  claims intake department.
6     She was probably one of the
7  technicians there.
8  Q   And if you go to the first page of
9  this document, you see an e-mail from her to
10 you?
11 A   Yes.
12 Q   And she's talking about having a
13 problem with three case creations?
14 A   Right.
15 Q   Do you recall what that was about?
16 A   Yeah, I do.
17    There were some issue -- this is
18 actually -- this is that example that I was
19 talking about that one of them was a
20 subscription policy and we were
21 participating in a layer and we needed
22 different claim numbers for I see there's
23 American home and a Lexington policy and I
24 was just sort of explanation to her -- you
25 see this is a good example of why claim

Page 171

JEFFREY M. WACTLAR

1
2  numbers aren't always opened up because
3  claims intake are sort of trained for the
4  basic things and we get a little more
5  complicated stuff and we have to explain to
6  them that different claim numbers need to be
7  opened up and this is what I am doing here.
8  Q   Why wouldn't AIG just from the get
9  go when they identified the policies that
10 are the subject of the coverage litigations
11 or the mediation/settlement discussions just
12 open a claim file for each policy that's
13 identified?
14 A   That's a good question.
15    I think it's just the nature of the
16 system makes it difficult to do that.
17    I think just there's a lot of
18 departments involved and it always doesn't
19 happen.  Sometimes it happens, not always.
20 Q   Do you recall whether there was a
21 main policy used for the Federal Mogul claim
22 at AIG when you were handling it?
23 A   There probably was.  There was
24 probably something that we referred to as
25 "master," master claim number.

Page 172

JEFFREY M. WACTLAR

1
2  Q   If you look above the Shanon
3  Mumford e-mail to you there's one from Judy
4  Marotti to you, March 12, and she seems to
5  address Ms. Mumford's e-mail to you below.
6     Who is Judy Marotti?
7  A   She was an attorney at Lynberg &
8  Watkins.
9     MR. LASKY:  Objection.  This
10 particular e-mail looks like it's a
11 privileged e-mail and it was produced
12 inadvertently.
13    MR. KENNEDY:  There's nothing
14 privileged about this document.
15    MR. LASKY:  I'm not going to
16 let him answer questions regarding
17 conversations he had -- privileged
18 conversations he had with counsel.
19    MR. KENNEDY:  I understand that
20 but nothing in this document is
21 privileged.  There's no legal advice
22 being requested and there's no legal
23 advice being given.
24    MR. LASKY:  I'm not going to
25 let him answer questions about

43  (Pages 169 to 172)

JEFFREY M. WACTLAR

1     Q    And the "upcoming settlement"
2 reference.
3      Do you see that?
4     A    Yes.
5     Q    What was the settlement status at
6 that point in time in March of 2008?
7     A    Probably getting closer which is
8 why I sent it as a rush.
9      But I was probably pressuring to go
10 through this quickly because I knew we
11 needed time to start getting the reserves
12 up.
13     Q    Do you know if the amount in
14 question in March of 2008 was around the
15 $99 million offer that Federal Mogul had
16 made to AIG previously?
17     A    I don't remember. I can't remember
18 the dollar amounts exactly where we were at
19 this point.
20     Q    So at this point in time, AIG
21 believed it likely that the policies for
22 which they are opening claims files would be
23 impacted to some extent by reason of a
24 settlement with Federal Mogul?

---

JEFFREY M. WACTLAR

1     A    Yes.
2     Q    Who is Shanon Mumford?
3     A    Somebody in case creation -- or
4 claims intake department.
5      She was probably one of the
6 technicians there.
7     Q    And if you go to the first page of
8 this document, you see an e-mail from her to
9 you?
10     A    Yes.
11     Q    And she's talking about having a
12 problem with three case creations?
13     A    Right.
14     Q    Do you recall what that was about?
15     A    Yeah, I do.
16      There were some issue -- this is
17 actually -- this is that example that I was
18 talking about that one of them was a
19 subscription policy and we were
20 participating in a layer and we needed
21 different claim numbers for I see there's
22 American home and a Lexington policy and I
23 was just sort of explanation to her -- you
24 see this is a good example of why claim

---

JEFFREY M. WACTLAR

1 numbers aren't always opened up because
2 claims intake are sort of trained for the
3 basic things and we get a little more
4 complicated stuff and we have to explain to
5 them that different claim numbers need to be
6 opened up and this is what I am doing here.
7     Q    Why wouldn't AIG just from the get
8 go when they identified the policies that
9 are the subject of the coverage litigations
10 or the mediation/settlement discussions just
11 open a claim file for each policy that's
12 identified?
13     A    That's a good question.
14      I think it's just the nature of the
15 system makes it difficult to do that.
16      I think just there's a lot of
17 departments involved and it always doesn't
18 happen. Sometimes it happens, not always.
19     Q    Do you recall whether there was a
20 main policy used for the Federal Mogul claim
21 at AIG when you were handling it?
22     A    There probably was. There was
23 probably something that we referred to as
24 "master," master claim number.

---

JEFFREY M. WACTLAR

1     Q    If you look above the Shanon
2 Mumford e-mail to you there's one from Judy
3 Marotti to you, March 12, and she seems to
4 address Ms. Mumford's e-mail to you below.
5      Who is Judy Marotti?
6     A    She was an attorney at Lynberg &
7 Watkins.
8      MR. LASKY: Objection. This
9 particular e-mail looks like it's a
10 privileged e-mail and it was produced
11 inadvertently.
12      MR. KENNEDY: There's nothing
13 privileged about this document.
14      MR. LASKY: I'm not going to
15 let him answer questions regarding
16 conversations he had -- privileged
17 conversations he had with counsel.
18      MR. KENNEDY: I understand that
19 but nothing in this document is
20 privileged. There's no legal advice
21 being requested and there's no legal
22 advice being given.
23      MR. LASKY: I'm not going to
24 let him answer questions about

Page 173

JEFFREY M. WACTLAR
2 privileged conversations with
3 counsel.
4        MR. KENNEDY:  That's fine.
5     If I ask questions that asked for
6 privileged information -- I won't, but if
7 I do, then his nonresponse is fine with
8 me, but I'm not going to be asking
9 questions about privileged information.
10 I'm asking about this information which
11 is not privileged.
12     Q    So Mr. Wactlar, Judy Marotti writes
13 to you explaining this issue about case
14 creations and the trouble that Ms. Mumford's
15 having?
16     A    Not so much about the case
17 creations.  More about the substantive
18 nature of -- looks like we've got
19 two-layer -- each two-layer policies, and
20 then it looks like she talks a little bit
21 about how payments will be made.
22     Q    And that's my question.
23        It's why is Ms. Marotti weighing in
24 at this point?
25     A    Judy Marotti was an attorney at

Page 174

JEFFREY M. WACTLAR
2 Lynberg.  I already identified her.  And
3 she's somebody that, as I said earlier, that
4 had some historical information about this
5 claim and was assisting in sorting out some
6 of these issues.
7     Q    But it says "Payments will be made
8 at the 30-million layer and the excess
9 $40-million layer."
10        Do you see that?
11     A    Yes.
12     Q    So there was some number AIG had
13 about making a payment at this point in
14 time.
15     A    No.  Actually no, and I'll tell you
16 why.
17        Well, it's possible, it's possible,
18 but it's also possible we knew we would be
19 paying -- you may assume for the purpose of
20 getting everything opened that we would be
21 paying X, whatever it was, 50, 60, 70, so we
22 may have been just getting things ready to
23 go up to a certain point.
24     Q    So you think it was likely there
25 was a certain point you had in mind?

Page 175

JEFFREY M. WACTLAR
2     A    Yes.
3     Q    And it's because you had that
4 certain dollar amount in mind that you were
5 identifying these policies as policies to be
6 impacted by the settlement?
7     A    That's probably the case.
8     Q    And Ms. Marotti having historical
9 information at Lynberg & Watkins, in
10 addition to that, what is Lynberg Watkins'
11 role at this point in time?
12     A    I'll explain this.
13        Judy Marotti used to be an AIG
14 employee.  She used to work for -- under
15 Steve Parness in the complex group.
16        Judy Marotti was a contract
17 employee for a long time because she lived
18 in California.
19        She then left AIG and went to work
20 at Lynberg & Watkins, so that historical
21 information may have -- she may have handled
22 this file at one point while working at AIG.
23 I don't know that for sure, but it's
24 possible.
25        So I may have been sending her

Page 176

JEFFREY M. WACTLAR
2 inquiries with regard to her knowledge, her
3 historical knowledge of the file.
4     Q    And -- but do you know at this
5 point whether they were actively working as
6 a legal adviser or any other adviser on the
7 Federal Mogul settlement?
8     A    I don't remember the extent of
9 their involvement.
10        (A brief recess was
11 taken.)
12        MR. KENNEDY:  Mark as
13 Clearwater Exhibit 19, e-mail from
14 James Dolan to Jeffrey Wactlar dated
15 8-11-2008 with attachments and it's
16 Bates-stamped GS CONFIDENTIAL-00003
17 through 56.
18        MR. LASKY:  I just warn the
19 witness not to disclose any
20 privileged discussions between him
21 and counsel.
22        (Clearwater Exhibit 19, E-mail
23 dated August 11, 2008, 5:24 p.m.,
24 with attachment, GS CONFIDENTIAL-
25 00003 through GS CONFIDENTIAL-

Page 177

1      JEFFREY M. WACTLAR
2      00056, was marked for
3      Identification.)
4  BY MR. KENNEDY:
5      Q    And again, Mr. Wactlar, take as
6  much time as you'd like to look through the
7  entire document.
8          My first question to you is going
9  to be whether you recognize it.
10     A    This is the Brattle Group report.
11 Okay.
12     Q    So you recognize this document?
13     A    I do.  I remember this report.
14         MR. LASKY:  I just want to
15 point out that the slide presentation
16 is actually part of this document,
17 attachment to the e-mail.
18         MR. KENNEDY:  It's referenced
19 in the e-mail.  Take a look.
20         It attaches both.  The slide
21 presentation of August 12, 2005.
22         MR. LASKY:  Oh, okay.  Thanks.
23     A    I mean, as I said, I can't
24 represent that every single page in here was
25 something that I read at the time, but I

Page 178

1      JEFFREY M. WACTLAR
2  remember generally this is the Brattle
3  report.
4      Q    Do you recall around this time
5  asking Mr. Dolan to send it to you, at least
6  the August 2005 report and the allocation
7  spreadsheet?
8      A    I asked -- I don't know if I asked
9  Jim for it or if -- I mean, I certainly may
10 have asked him for it.  I would want my file
11 to be complete, so if we had it I would
12 probably want it.
13     Q    Now, at this time in August 2008,
14 AIG was putting together a settlement offer
15 to Federal Mogul; is that right?
16     A    Well, this is consistent with what
17 we talked about earlier on the offer by --
18 rather, the demand by the bankruptcy
19 attorneys and we were obviously going to
20 counter with some offer.
21     Q    Now, if you look, Mr. Wactlar, to
22 the first page where Mr. Dolan describes
23 what he attaches.  He attaches, 1, "The
24 Brattle August 12, 2005 report to the
25 insurers group regarding its estimation of

Page 179

1      JEFFREY M. WACTLAR
2  the size of the Wagner problem," right?
3      A    Yes.
4      Q    And it says "along with Brattle's
5  August 31, 2005 chart outlining the dollars
6  attributable to each AIG company in each
7  year from 2005 to 2017."
8          Do you see that?
9      A    I do.
10     Q    Do you recall looking at the
11 estimates of Brattle in their August 31,
12 2005 chart?
13     A    I recall being interested in the
14 size of the problem, yes.
15     Q    Just turning the page to what's
16 Bates-stamped as GS CONFIDENTIAL-4.
17         You see it's labeled Table 3?
18     A    Yes.
19     Q    And it says "Expected value for
20 Wagner claims" and it has various numbers,
21 four values.
22         Do you see that?  Two billion,
23 1.6 billion, 600 and 400 in the upper
24 left-hand corner?
25     A    Yes.

Page 180

1      JEFFREY M. WACTLAR
2      Q    And then it says "The split cover
3  insurance"?
4      A    Yes.
5      Q    Do you understand that to be a
6  reference to the Partitioning Agreement and
7  the splitting of the limits?
8      A    Yes.
9      Q    And then it says "nominal dollars."
10 Do you see that?
11     A    Yes.
12     Q    The date is August 31, 2005?
13     A    Yes.
14     Q    You go down, Carrier Name, and if
15 you go down to that listing, do you
16 understand that those are the AIG policies?
17     A    Yes, they certainly look like it.
18     Q    And then on the top where Carrier
19 Name, it says "Total," so if you go to the
20 middle of the top, it says "Available
21 Aggregate Limits."
22         Do you see that?
23     A    Yes.
24     Q    That looks like the number that
25 we've been talking about, right?  The

45  (Pages 177 to 180)

JEFFREY M. WACTLAR

1   roughly $151 million available limits for
2   the Federal Mogul claim?
3     A    Yes.
4     Q    And then you see the total,
5   67 million plus?
6     A    Yes.
7     Q    Do you understand the Table 3 here
8   to be an estimate by Brattle of the total
9   amount -- total impact to their policies of
10  the Wagner asbestos claims in this chart?
11    A    Sort of.
12     Sixty-seven -- we're assuming total
13  67 million is the total impaction to the
14  151, and if that's the case, then yes, that
15  is what this establishes.
16    Q    I mean, if you turn the page, you
17  see the period of time, it's 2005 to 2017?
18    A    Right.
19    Q    And it seems to be same numbers in
20  terms of total available limits and total,
21  right?
22    A    Right.
23    Q    And it looks like that's -- the
24  67 million plus looks like the total payout

JEFFREY M. WACTLAR

1   under the AIG policies under that period of
2  time?
3    A    It does look like that, yes.
4    Q    You agree with me on that?
5    A    Yeah, it certainly looks like that.
6    Q    And if you turn -- and then if you
7  look below, it actually breaks it out by
8  policy what the estimated impact would be to
9  each AIG policy.
10    Do you see that?
11    A    You mean at Bates Stamp 6?
12    Q    Actually, 4 and 5.
13    A    Well, you mean just to the right.
14    Q    Yeah, below it.
15    You see the policy numbers
16  identified?
17    A    Yes.
18    Q    It looks like Brattle is estimating
19  a policy-by-policy contribution to the total
20  $67 million.
21    A    Right. Oh, yes. Right. Yes. I
22  see.
23    Q    Okay.
24    And if you turn the page to 6 and

JEFFREY M. WACTLAR

1   7, without getting into the specific
2  numbers, but would you agree with me that it
3  appears to be the case that there are other
4  estimates that Brattle was giving with
5  respect to the Wagner asbestos liabilities
6  under AIG policies?
7    A    Yes.
8    Q    And that would be all the way
9  through to GS CONFIDENTIAL-8 to 18?
10    A    Seventeen.
11    Q    Seventeen. Right.
12    Now, looking at the estimates of
13  the total amount that would be impacted on
14  AIG's available limits, looking at the
15  different amounts, do you have an
16  understanding of what AIG believed the
17  likely outcome or the likely total amount to
18  be at the time in August of 2008, looking at
19  this document?
20    A    No. We didn't use this document to
21  determine what we thought we would
22  ultimately pay.
23    Q    What did you -- what was that
24  determination based upon, if not this

JEFFREY M. WACTLAR

1   document?
2    A    Well, it was based in part on this
3  document insofar as this document was able
4  to help us identify the size of the problem.
5    So if we look at the best case
6  scenario that this document told us, which
7  was about $500 million of asbestos claims,
8  along with our policy limits, along with
9  whatever coverage defenses we had, along
10  with whatever strategy we thought was the
11  right strategy to use or effective strategy,
12  ultimately all those things together helped
13  us come up with what we thought was the
14  settlement agreement.
15    Q    And your understanding is that
16  Brattle did look at all of those factors.
17    A    Yes.
18    Q    And their analysis of those factors
19  is found in this report, you understand
20  that?
21    A    I understand that, yes.
22    MR. KENNEDY: Mark as
23  Clearwater Exhibit 20, a series of
24  e-mails.

46   (Pages 181 to 184)

Page 189

JEFFREY M. WACTLAR

1  where Mr. Dolan forwards an e-mail from
2  Mr. Feldman on the first page, where
3  Mr. Feldman tells Mr. Dolan that "The trust
4  hasn't has not yet begun to process asbestos
5  claims."
6      A   Yes.
7      Q   And you forwarded that e-mail on to
8  Mr. Parness.
9      Do you see that?
10     A   Yes.
11     Q   And you say "Let's discuss."
12     A   Yes.
13     Q   Do you recall generally what those
14  discussions were about?
15     MR. LASKY:  Objection.  That's
16  privileged information.  I won't let
17  him answer that question.
18     MR. KENNEDY:  It's not
19  privileged information.  If you
20  direct him not to answer, Mr. Lasky,
21  at your peril I will be applying to
22  the Court to get costs for having to
23  go through this exercise.  I'm asking
24  his --

Page 190

JEFFREY M. WACTLAR

1      MR. LASKY:  He's not going to
2  disclose conversations with his legal
3  counsel.
4      MR. KENNEDY:  Mr. Parness is
5  not his legal counsel.  It's his
6  boss.
7      MR. LASKY:  I thought you were
8  talking about James Dolan.
9      MR. KENNEDY:  Okay.
10     MR. LASKY:  I'm sorry.
11     A   I remember we were gathering
12  information in all likelihood to put
13  together a request for authority to senior
14  management.
15     Q   And do you recall what you were
16  discussing with Mr. Parness about this
17  information?
18     A   It was probably when I looked at
19  this it refresh my recollection at this time
20  when we were trying to figure out how many
21  claims had been actually booked or billed to
22  date.
23     That might be a question that
24  somebody might ask us in a conversation:

Page 191

JEFFREY M. WACTLAR

1  "Well, how much has the trust accumulated
2  thus far."  And so from here we know -- and
3  keeping in mind the nature of the ultimate
4  settlement in that it was the hybrid deal,
5  this is something we might want to know.  So
6  to see if they already billed a hundred
7  million dollars, then making these
8  milestones would be a pointless exercise.
9  So we would want to know this information
10 for purposes of planning the offer as well.
11     Q   Right.  Okay.
12     I mean, wasn't that an issue with
13  respect to Federal Mogul that it in fact
14  went into bankruptcy in 2001?
15     A   Yes.
16     Q   And the general understanding that
17  claims at that point in time were staying
18  against the estate, right?
19     A   Yes.
20     Q   So there was an issue, wasn't
21  there, about really what was the size of the
22  problem as to the asbestos claims against
23  Federal Mogul, right?
24     A   That's right.

Page 192

JEFFREY M. WACTLAR

1      Q   Because the information was really
2  dated from 2001 and prior; is that right?
3      A   This is typical problem in these
4  cases.
5      Q   And isn't it true that Brattle
6  Group had to address that issue themselves?
7      A   That's right.
8      Q   And didn't they decide that they
9  were going to purchase some information from
10 the Manville Trust.
11     Do you recall that?
12     A   I do vaguely recall something about
13  that, yes.  There's some database where you
14  can purchase information and -- yes.
15     Q   And they then began to assess the
16  size of the problem based upon that --
17  Manville information as well as the
18  historical Federal Mogul information; isn't
19  that right?
20     A   That sounds right.
21     Q   And it's true that on the flip
22  side, Federal Mogul's consultant ARPC did
23  the same thing?
24     A   In all likelihood, yes.

48  (Pages 189 to 192)

Page 193

```
1         JEFFREY M. WACTLAR
2       MR. KENNEDY: Mark as
3   Clearwater Exhibit 21, an e-mail by
4   Mr. Feldman dated August 27, 2008 to
5   Mr. Dolan and it's Bates-stamped
6   GRANITE STATE-034570.
7       (Clearwater Exhibit 21, E-mail
8   dated Wednesday, August 27, 2008,
9   2:15 p.m., GRANITE STATE-034570,
10  was marked for Identification.)
11  BY MR. KENNEDY:
12      Q   Are you aware of certain
13  environmental claims that Federal Mogul had
14  made against the policies at a certain
15  point?
16      A   Not really.
17          No.
18      Q   Okay.
19          Have you seen this e-mail before?
20      A   I don't recall specifically seeing
21  this e-mail but this e-mail is somewhat
22  consistent with what we might request in a
23  settlement like this to include
24  environmental release. We try to make it as
25  favorable to the company and other
```

Page 194

```
1         JEFFREY M. WACTLAR
2   departments.
3       Q   To get as broad a release as you
4   can?
5       A   Yes.
6       Q   And the phone conference that's
7   referred to on Wednesday, August 20, 2008.
8           Do you see that?
9       A   Yes.
10      Q   Do you have any recollection of
11  that phone conference between Mr. Feldman
12  and Mr. Dolan?
13      A   Only that I recall Steve Parness
14  and myself generally talking with Mr. Dolan generally
15  about the possibility of including
16  environmental release in the deal.
17      Q   And then he writes at the bottom of
18  the first paragraph, Mr. Feldman does, he
19  says "I expressed my understanding that this
20  point was addressed at the settlement
21  meeting that you attended in December 2007."
22          Do you see that?
23      A   Yes.
24      Q   Do you recall a settlement meeting
25  occurring or taking place in December of
```

Page 195

```
1         JEFFREY M. WACTLAR
2   2007?
3       A   Not specifically.
4       Q   Generally speaking?
5       A   Yes.
6       Q   Did you attend that settlement?
7       A   No.
8       Q   How about Mr. Parness?
9       A   I don't think so.
10      Q   Do you know if anyone within AIG
11  attended it?
12      A   I don't think so.
13      Q   Now, the second paragraph, it says
14  "You indicated" -- I'm going to skip the
15  first phrase there. There is a question
16  mark in the left-hand for good reason, I
17  think. But I'm going start up with "You
18  indicated that the draft agreement that you
19  transmitted contained a payment stream that
20  was proposed in connection with all of these
21  as inclusive of environmental claims."
22          Do you see that?
23      A   Yes.
24      Q   Do you recall seeing a draft
25  agreement in and around August of 2008 from
```

Page 196

```
1         JEFFREY M. WACTLAR
2   Federal Mogul?
3       A   We would have received the draft
4   obviously before the final, so we probably
5   were looking at a draft agreement at some
6   point.
7       MR. KENNEDY: Matt, do you know
8   whether you produced a draft
9   agreement from Federal Mogul that
10  precedes this e-mail?
11      MR. LASKY: I don't know the
12  exact dates but I know we produced
13  various e-mails of drafts -- I don't
14  know the dates.
15      MR. KENNEDY: If we determine
16  we haven't receive this draft, we
17  will follow-up.
18      MR. LASKY: From Federal Mogul.
19      MR. KENNEDY: That appears to
20  be referred to in this e-mail.
21      (Request made.)
22      MR. LASKY: I'll take it under
23  advisement.
24      Q   The next sentence following that
25  one is "You explained that a total of four
```

49  (Pages 193 to 196)

Page 197

JEFFREY M. WACTLAR

1 payment stream options were discussed."
2
3     Do you know what he's referring to?
4     A   I do.
5     We had a number of different
6 payment stream options.
7     We were exploring time frames,
8 frequency, amounts, things like that.
9     Q   And those payment stream options
10 were apparently discussed within AIG and
11 maybe with counsel, but at least within AIG
12 sometime prior to this e-mail, right?
13     A   It would seem so.
14     Q   And the numbers with respect to
15 those payment stream options were within
16 what range?
17     A   Well, we were somewhere around
18 $40 million guaranteed payments and then
19 there were certain milestones following
20 that, that if those were met then there
21 would be subsequent payments.
22     Q   Depending upon future claim
23 activity?
24     A   Right.
25     Q   And then you see that Mr. Feldman

Page 198

JEFFREY M. WACTLAR

1
2 requests "the details of the four payment
3 streams" in that third paragraph, last
4 sentence?
5     A   Yes.
6     Q   Do you know whether AIG provided
7 that information to Mr. Feldman?
8     A   It's likely that we did because the
9 deal eventually was entered into.
10     MR. KENNEDY:  Mark as
11 Clearwater Exhibit 22, an e-mail from
12 Mr. Wilkinson to S. Gilbert, so Scott
13 Gilbert, dated September 30, 2008.
14     And it's Bates-stamped GRANITE
15 STATE-034565 through 566.
16     (Clearwater Exhibit 22, E-mail
17 dated Tuesday, September 30, 2008,
18 12:27 p.m., with attachment,
19 GRANITE STATE-034565 through
20 GRANITE STATE-034566, was marked
21 for Identification.)
22 BY MR. KENNEDY:
23     A   Okay.
24     Q   And have you had a chance to look
25 at the attachment?

Page 199

JEFFREY M. WACTLAR

1
2     A   Yes.
3     Q   Do these appear to be the four
4 payment options that were referred to in the
5 earlier e-mail?
6     A   I think so.
7     Q   And you see that on the second page
8 of this document it says "Revised Settlement
9 Offer"?
10     A   Yes.
11     Q   What was the revision?  What was
12 the preceding settlement offer?
13     A   I don't know.
14     We probably had a few sort of
15 working models and I don't know the extent
16 of the revisions.
17     It would be impossible for me to
18 recall exactly what the changes were.
19     Q   And you see Option B, the alternate
20 amount.
21     Does that look to be the final
22 agreement?
23     A   It looks like -- the numbers seem
24 to look right, as I recall $40 million --
25 the MPV was not that much less because it

Page 200

JEFFREY M. WACTLAR

1
2 wasn't spread out over that much time.
3     Q   And you see the total MPV amount or
4 the alternate amount for Option B is
5 $38,218,000, right?
6     A   Right.
7     Q   Was that amount the amount paid
8 directly to Federal Mogul under the
9 settlement agreement?
10     A   I don't recall.  I'd have to look
11 at the final agreement and see if it's the
12 same, but certainly now I don't recall the
13 guaranteed payment portion.
14     Q   My question is:  Do you know
15 whether in fact a lump sum under the
16 settlement agreement was paid to Federal
17 Mogul as opposed to periodic installment
18 payments?
19     A   No, it was installment payments.
20     Q   And those are being made by AIG
21 directly to Federal Mogul?
22     A   Yes.
23     Q   There's no third --
24     A   I think so.  We could be paying a
25 trustee.  I suppose that's possible.

JEFFREY M. WACTLAR

1
2  Q   All right.
3      But aside from that, there's no one
4  that paid on behalf of AIG to Federal Mogul
5  the net present value amount?
6  A   No.
7  Q   And you see in the third paragraph
8  where Mr. Wilkinson says "You'll note this
9  proposal reduces the overall nominal value
10 of the proposal previously discussed by
11 $2 million ..."?
12 A   Yes.
13 Q   "... and eliminates the
14 environmental release as a material term of
15 the deal"?
16 A   Yes.
17 Q   So it looks like there may have
18 been a prior offer that was $2 million more
19 than the offer reflected in the payment
20 streams in the attachment to this document?
21 A   That would appear correct.
22 Q   Do you recall that?
23 A   I do remember putting a value,
24 trying to come up with a value of the
25 environmental release and that would be a

JEFFREY M. WACTLAR

1
2  negotiating tool in trying to reduce the
3  overall settlement, if they weren't going to
4  include the environmental release.
5  Q   If you look at the third paragraph,
6  the last sentence, it says "Please note this
7  proposal includes a full Section 524G
8  protection for the FM Trust and does not
9  impose a million-dollar cap for all insurers
10 as suggested in your draft."
11      Do you see that?
12 A   Yes.
13 Q   Do you know what the million-dollar
14 cap refers to?
15 A   I have no idea what that is.
16 Q   And it says "as suggested in your
17 draft."
18      Is that a draft term sheet?
19 A   I don't know what that is.
20 Q   And it said "suggested in your
21 draft"?
22 A   Right.
23 Q   Do you know what the "draft" was.
24 Was it a draft settlement agreement?
25 A   It sounds like it was.

JEFFREY M. WACTLAR

1
2  This is from Tom to Scott Gilbert,
3  so I guess this would have been the Trust's
4  proposed deal and then us responding to it.
5      So yeah, I don't know what their
6  proposed $1 million cap was.
7      MR. KENNEDY:  Mark as
8  Clearwater Exhibit 23, an e-mail from
9  Steve Parness to Mr. Wactlar dated
10 September 3, 2008.
11     It's Bates-stamped GRANITE
12 STATE-PRIV-0000272 to 274.
13     (Clearwater Exhibit 23, E-mail
14 dated September 3, 2008,
15 12:23 p.m., with attachment,
16 GRANITE STATE-PRIV-0000272 to
17 GRANITE STATE-PRIV-0000274, was
18 marked for Identification.)
19 BY MR. KENNEDY:
20 Q   Do you recall seeing this document
21 before?
22 A   I do.
23 Q   And this e-mail attaches a Federal
24 Mogul settlement memo?
25 A   Right.

JEFFREY M. WACTLAR

1
2  Q   Who drafted the memo?
3  A   This was probably Steve Parness and
4  myself together.
5      It was either Steve and myself or
6  myself.
7      Typically we would draft the memo
8  and then I would send it to Steve and then
9  Steve would send it on to senior management
10 for ultimate review and approval.
11 Q   So when it says "I'm writing to
12 request settlement authority," the "I" is
13 referring to you?
14 A   It's a little bit of semantics.  It
15 might be Steve or I.  I don't know.
16 Q   Under "Coverage" on the memo, it
17 sets out the total available limits as
18 $151 million and then identifies the
19 individual AIG company limits?
20 A   Yes.
21 Q   And then it says "National Union
22 issued a primary policy which has been
23 exhausted."
24      Do you see that?
25 A   Yes.

Page 205

JEFFREY M. WACTLAR

1
2    Q   Do you recall there being a
3 National Union policy that's been exhausted?
4    A   I do remember.  I do remember
5 discussing that there was this primary
6 policy that was exhausted.
7    Q   Do you know if that National Union
8 policy was the master policy under which the
9 Federal Mogul claim got set up?
10   A   I don't.
11   Q   Then the next sentence says "The
12 lowest attachment point of available
13 coverage is excess of $20 million."
14       Do you see that?
15   A   Yes.
16   Q   What did you mean by the "lowest
17 attachment point"?
18   A   Meaning above that, exclusive of
19 that primary policy, the other insurance
20 started at an attachment point of
21 $20 million, you know, 20 million and one
22 dollar.  Just above $20 million.
23   Q   So the other policies were excess
24 policies; is that right?
25   A   Yes.

Page 206

JEFFREY M. WACTLAR

1
2    Q   If you go to the next page which is
3 274, it says Proposed Settlement.
4       "Subject to bankruptcy court
5 approval, AIG will pay Federal Mogul
6 10.5 million per year through 2011 for a
7 total of $42 million," right?
8    A   Yes.
9    Q   If we look at Exhibit 22, which is
10 dated after this document, you see the
11 amount that is offered under at least
12 Option B is $40 million, right?
13       $2 million less?
14   A   Yes.
15   Q   Does this $42 million, if you
16 recall, contemplate a release of the
17 environmental claims?
18   A   It might.  It might.  I don't
19 remember.
20   Q   Looking at Option A, if we stay
21 with Exhibit 22, that seems to be for a
22 greater amount than Option B amounts.
23   A   Yes.
24   Q   Why was it that, if you know,
25 Federal Mogul chose Option B rather than

Page 207

JEFFREY M. WACTLAR

1
2 Option A?
3    A   I don't recall.
4       I mean, Option B included, but I'm
5 not sure if both included the milestone
6 payments as well, but I don't know why they
7 would have chosen B over A.
8    Q   I see.
9       So the milestone payments related
10 only to Option B?
11   A   Right.  It's possible.
12   Q   And the claim file creation that we
13 saw for the Granite State policies, we
14 talked about earlier the shelling, all
15 related to these payment stream options in
16 2008?
17   A   Yes.
18   Q   So those were created with the
19 understanding that these payment stream
20 options were being discussed within AIG,
21 right?
22   A   Yes.
23   Q   And with the understanding that
24 they would impact -- these payment stream
25 options would impact those policies where a

Page 208

JEFFREY M. WACTLAR

1
2 claim file was created?
3    A   Yes.
4    Q   In Exhibit 23 at the last page
5 there, it says Advantages of the Proposed
6 Settlement.
7    A   Yes, I see.
8    Q   And it says, "Number 1, Due to the
9 size of the insured's potential losses and a
10 probably adverse allocation ruling under New
11 Jersey law, this agreement severely limits
12 the applicability of the 151 million issued
13 to Federal Mogul."
14       Do you see that?
15   A   Yes.
16   Q   So there was an understanding that
17 the size of the problem of the Wagner
18 liabilities could be much greater to AIG
19 than the $40 million that they were offering
20 to settle this case?
21   A   Yes.
22   Q   And I think you said that
23 understanding was derived in part at least
24 from the consultant reports that you had
25 received from Brattle?

Page 221

JEFFREY M. WACTLAR

1  bottom?
2  A   Yes.
3  Q   So does it appear that you were
4  asking in December of '08 to open up a claim
5  on this policy?
6  A   Yes.
7  Q   Why December of '08 when we saw the
8  other three Granite State McGraw-Edison
9  policies being -- the claims files being
0  opened up in March of '08?
1  A   It's possible and likely since the
2  policy itself is attached that I just -- I
3  may not have been able to find the copy
4  before. I probably found the copy and then
5  sent it up to be shelled, coded and opened.
6  Q   Do you need the policy, physical
7  policy itself to actually open up the file?
8  A   You do, if it hadn't been shelled
9  and coded previously.
0  Q   If it had not been?
1  A   Right.
2  Q   If it had been shelled and coded
3  with respect to the Dresser claim, would you
4  have to do that again for the Federal Mogul

Page 222

JEFFREY M. WACTLAR

1  claim?
2  A   You would have to open up the claim
3  number, but you wouldn't necessarily have to
4  give them the hard copy of the policy.
5  Q   Okay.
6     Is that the only difference?
7  A   As far as I can remember, yeah.
8  Q   And to get the claim number, would
9  you have to fill out the LMS claim
0  worksheet?
1  A   Yes.
2     MR. KENNEDY: Let's mark as
3  Clearwater Exhibit 28, a memorandum
4  to Steve Parness from Jeffrey Wactlar
5  dated 12-9-2008 regarding the Federal
6  Mogul settlement authority request.
7     Bates-stamped GRANITE SITE 9227 to
8  9228. Memorandum, December 9, 2008.
9     (Clearwater Exhibit 28,
0  Memorandum dated December 9, 2008,
1  GRANITE SITE-009227 to GRANITE
2  SITE-009228, was marked for
3  Identification.)
4     THE WITNESS: Okay.

Page 223

JEFFREY M. WACTLAR

1  BY MR. KENNEDY:
2  Q   Have you seen this document before?
3  A   Yes.
4  Q   Are those Mr. Parness' initials on
5  top there?
6  A   Yes.
7  Q   And do you know if you wrote this?
8  A   This was -- I don't know if this
9  was the exact version of the other
0  settlement memo that we had looked at. This
1  may have been a work in progress. This was
2  sort of, as I was describing before, the
3  official coming from me to Steve who then
4  would sign it and forward it up to senior
5  management for review.
6  Q   And would that be Mr. Brian at this
7  time?
8  A   That would then go up to Jeff
9  Johnson.
0  Q   And Jeff Johnson -- was Mr. Parness
1  the direct report of Mr. Johnson?
2  A   Yes.
3  Q   So did Mr. Ryan get replaced by
4  Mr. Johnson?

Page 224

JEFFREY M. WACTLAR

1  A   No. No. Ron was somebody who we
2  typically discussed reserving with.
3  Generally speaking, the ultimate decision
4  would go -- I wouldn't say the ultimate
5  decision, but Ron would make the
6  recommendation along with us to Jeff
7  Johnson, who is the senior vice president on
8  the toxic tort department.
9  Q   When you say "the recommendation,"
0  is that regarding settlement or reserve or
1  both?
2  A   Ron would really make the
3  recommendations on reserves since Ron --
4  Steve and I would negotiate the settlement
5  so we would make these recommendations.
6  Q   What was Ron's title?
7  A   I think he was considered vice
8  president.
9  Q   Of the toxic torque department?
0  A   Yes.
1  Q   Do you know if Jeff Johnson was the
2  final decision-maker on whether to accept
3  this settlement proposal?
4  A   For this amount I think it required

Page 225

JEFFREY M. WACTLAR

1  one or level of management approval.
3      Q    Do you know who that was?
4      A    I think at that time that would
5  have been Andrew Nadolna.
6      Q    If you go to the Advantages of the
7  Proposed Settlement in the back here.
8          You say "Of the 151 million limits
9  AIG companies issued to Federal Mogul under
10  the agreement, AIG will pay no more than
11  $72 million if certain benchmarks are hit,"
12  right?
13     A    Right.
14     Q    We know that these benchmarks only
15  relate to 32 million of the 72, right?
16     A    Yes.
17     Q    So the 40 million were definite
18  certain payments of the period of time.
19     A    Right.
20     Q    And the time was upon the trigger
21  date of the settlement agreement, they would
22  be amount of $10.5 million due within fairly
23  right around that point in time, right?
24     A    Right.
25     Q    And then in a year after --

Page 226

JEFFREY M. WACTLAR

1
2      A    I think they were yearly payments.
3      Q    There would be yearly payments up
4  to the $40 million?
5      A    Right.
6      Q    So if you assume that the
7  $72 million was all the cap, you are looking
8  at -- my rough math here is something like
9  53 percent discount off the policy limits?
10     A    Right.
11     Q    And then, 2, you say "By making
12  payments over a series of years, at least
13  the payments of $40 million subject to
14  payment caps, AIG receives the benefit of a
15  cost savings in terms of the net present
16  value of its ultimate liability insurance."
17  Right?
18     A    Right.
19     Q    Is that Number 2, does that relate
20  to the 32 million or the 40 million?
21     A    Well, mainly both because we're
22  paying the 42 over time and the 32 even
23  beyond that.
24     Q    The 40 over time?
25     A    The 40 over time. If the

Page 227

JEFFREY M. WACTLAR

1
2  benchmarks kick in or met, then we would be
3  paying that additional 32 further on.
4      Q    And do you know what the net
5  present valuing discount rate you were
6  using?
7      A    No.
8      Q    No?
9      A    No.
10     Q    Do you recall that being discussed
11  at the time in December --
12     A    It changes constantly.  The rates
13  changed all the time.  It's what market
14  rates are.
15         MR. KENNEDY:  Clearwater
16  Exhibit 29 is an e-mail from Lynn
17  Mitchell to Judy Marotti.
18         And it's Bates-stamped GRANITE CS-8
19  to 10.
20         (Clearwater Exhibit 29, E-mail
21  dated Friday, December 12, 2008,
22  6:13 p.m., GRANITE CS-0008 through
23  GRANITE CS-0010, was marked for
24  Identification.)
25  BY MR. KENNEDY:

Page 228

JEFFREY M. WACTLAR

1
2      Q    Okay.
3          The second page you see Judy
4  Marotti to Lynn Mitchell and you are cc'ed?
5      A    Yes.
6      Q    It says "Lynn please find the
7  policy chart that I forgot to attach to my
8  last e-mail."
9          And if you turn the page, it looks
10  like there's a policy chart there.
11         Do you know how the policy chart
12  was created?
13     A    I suspect that generally speaking,
14  if I'm going to rely on a policy chart, I'd
15  ask coverage counsel to prepare it for me.
16     Q    Coverage counsel?
17     A    Yes.  And you know, in this case, I
18  can't say -- and that may be the Lynberg
19  Watkins involvement is helping me put
20  together the coverage chart.  It's possible.
21     Q    Okay.
22         Judy Marotti's involvement?
23     A    Right.
24     Q    Look on the front page there, it's
25  an e-mail dated December 12, 2008 from Lynn

57  (Pages 225 to 228)

**Page 229**

JEFFREY M. WACTLAR

1  Mitchell to Judy Marotti.
2      It says "Assuming that I'm
3  interpreting the underlying limits, this is
4  the allocation for the first $25 million
5  payment."
6      Do you see that?
7   A   Yes.
8   Q   Do you know what the $25 million
9  payment refers to?
10  A   We may have been trying to sort out
11  how I was going to make the first -- it may
12  have been a projection. I may have needed
13  to project it. So I may have been -- you
14  know, hence the PAQR 18 months, so it may
15  have included the first two payments, 10/5
16  and 10/5.
17      So it may relate back to that PAQR
18  reference. And based on the previous
19  e-mail, it seems it's all what that was
20  about. I sort of suspect that that's what
21  that is.
22      And I'm sort of putting Lynn in
23  touch with Judy to help me figure out how
24  I'm going to project those two payments on

**Page 230**

JEFFREY M. WACTLAR

1  PAQR.
2   Q   The 10.5?
3   A   10.5. So it's really not 25. It's
4  like 21. So I don't know why it says 25.
5  Maybe the 25 is like an easy point. I don't
6  know. It seems like that's what it probably
7  was.
8      MR. KENNEDY: Let's mark as
9  Clearwater Exhibit 30, an e-mail from
10  Lynn Mitchell to Judy Marotti dated
11  January 13, 2009. It's Bates-stamped
12  GRANITE CS-23 to 25.
13      (Clearwater Exhibit 30, E-mail
14  chain, top e-mail dated Tuesday,
15  January 13, 2009, 1:36 p.m.,
16  GRANITE CS-0023 to GRANITE CS-0025,
17  was marked for Identification.)
18  BY MR. KENNEDY:
19  Q   You see that on the bottom of this,
20  it's a Judy Marotti e-mail, same date, to
21  Lynn Mitchell.
22      It's asking her to "redo the
23  allocation of the first 25 and the first two
24  10.5 million."

**Page 231**

JEFFREY M. WACTLAR

1   Q   Do you know what that reallocation
2  was about?
3   A   This seems to me that we were -- we
4  had a couple scenarios that we were playing
5  with when we were looking at the payments.
6      So in other words, maybe one of the
7  settlement offers was going to be an initial
8  payment of $25 million, so it seems like
9  that's what we were talking about.
10  Q   But at this point in time, though,
11  hadn't the settlement agreement been entered
12  into?
13      And it's not a memory test, so --
14  A   It does seem like.
15      This was already in 2009, so -- I
16  don't know why. Maybe there was a mistake
17  made.
18      I think this was -- you know what
19  this was, this was -- this is what I said
20  previously.
21      I had asked Lynn to do a payment
22  allocation for me to help me figure out as I
23  made my payments 10.5, 10.5, 10.5 and 8 what
24  policies those would be allocated to. And

**Page 232**

JEFFREY M. WACTLAR

1  this was an e-mail with some confusion
2  between Judy and Lynn sorting out. I think
3  Lynn thought there was a first payment of
4  25, when that wasn't correct because the
5  payment was 10.5. And I had put Judy and
6  Lynn together to sort this out.
7      It wasn't for PAQR. It was because
8  Judy had policy information, because I must
9  have asked the Lynberg firm to do the
10  coverage chart for me and she had that
11  information readily available, so I put Judy
12  and Lynn in touch together so that Judy
13  could give Lynn the information she needed
14  to do the payment allocation.
15      In other words, so when I started
16  making my payments, I would know and be
17  ready to go. So when I did my payment
18  forms, because there was a whole other form
19  you had to do to issue a payment, it would
20  be done correctly.
21  Q   So you think the $25 million
22  payment was an error or a mistake?
23  A   Yes, it was a mistake.
24      MR. KENNEDY: Let's mark

58  (Pages 229 to 232)

WINTER REPORTING, INC.   (212) 953-1414

Page 245

JEFFREY M. WACTLAR

1   Identification.)
2   BY MR. KENNEDY:
3       Q   Mr. Wactlar, do you recall seeing
4   this e-mail before?
5       A   No.
6       Q   You see Mr. Johnson writing
7   Mr. Perez.
8           Who is Mr. Perez?
9       A   David Perez held the position of
10  executive vice president prior to Andrew
11  Nadolna.
12      Q   Do you know why he was writing this
13  e-mail?
14      A   It looks like it's in response to
15  an inquiry.
16      Q   And at this point in March of '08,
17  we saw the opening for the claims files for
18  certain policies, the Granite State
19  McGraw-Edison policies, so we know that --
20  well, I think you testified that there were
21  settlement discussions and we saw reference
22  to pending settlement agreement in e-mails
23  in and around this time.
24      A   Okay.
25

Page 246

JEFFREY M. WACTLAR

1       Q   Okay.
2           But you also testified about there
3   was difficulty about getting information
4   from Federal Mogul because they went into
5   bankruptcy in 2001?
6       A   That's exactly right.
7       Q   Do you know, looking at this
8   e-mail, whether there was a desire within
9   AIG to perform a claim audit?
10      A   I don't know so much that there was
11  a desire to perform a claim audit but this
12  is a good example of what I indicated
13  previously, that management was always
14  interested in real claim information.
15          And that's why we would have asked
16  Ted Feldman for that information, sort of
17  almost anticipating this would be a standard
18  question that we might get asked.
19      MR. KENNEDY: Now, if we can
20  mark as Clearwater Exhibit 33, a
21  document entitled Federal Mogul-ECS.
22          Bates-stamped GRANITE SITE-009071
23  to 9079.
24          (Clearwater Exhibit 33,

Page 247

JEFFREY M. WACTLAR

1       Federal Mogul-ECS, GRANITE
2   SITE-009071 through GRANITE
3   SITE-009079, was marked for
4   Identification.)
5   BY MR. KENNEDY:
6       Q   Have you seen this document before?
7       A   Yes.
8       Q   When do you recall seeing it?
9       A   I prepared it.
10      Q   And what is this document?
11      A   This is the executive claims
12  summary.
13          This is the document which is sent
14  up through the chain; in other words, I sign
15  it, Steve Parness signs it, Jeff Johnson
16  signs it and I think ultimately at this
17  point Andrew Nadolna signs it, and if it
18  goes through that chain successfully you can
19  proceed to raise your reserves.
20      Q   Now, you see on the second page it
21  says at the very bottom left-hand of the
22  page, it says "Potential exposure, prior
23  growth zero.
24      A   Gross reserves ... Where are you

Page 248

JEFFREY M. WACTLAR

1   looking?
2       Q   Left-hand corner, bottom left-hand
3   corner on the second page.
4       A   Got you.
5       Q   It says "Potential exposure. Prior
6   growth zero. Gross $27,500,000."
7       A   Right.
8       Q   Does that mean prior to the date of
9   this executive claim summary, the reserves
10  on this policy were zero?
11      A   Yeah, this group of policies was
12  zero.
13      Q   And these group of policies, if you
14  were to go to the next page, there's a
15  spreadsheet there, right?
16      A   Yes.
17      Q   Dated March 4, 2009?
18      A   Right.
19      Q   Prepared by you.
20          And that shows the policies where
21  there were reserve increases, right?
22      A   Right.
23      Q   It says "Prior reserve, four
24  dollars," yet it's just --

62  (Pages 245 to 248)

Page 249

JEFFREY M. WACTLAR

1
2 A    This is prepopulated by our
3 computer system, so it is what it is.
4      I believe that number is
5 prepopulated, but the essence of it is we
6 had no real reserves.
7      They were just small statistical
8 reserves.
9 Q    If you go back to Exhibit 24.
10      It's the long paper, looks like
11 this. Just a single sheet.
12 A    Got it.
13 Q    You see this is a similar-looking
14 spreadsheet to 9073?
15 A    Yes.
16 Q    And the date is different,
17 obviously, August 29, 2008.
18      And it shows a reserve increase
19 already.
20      So can you explain to me what the
21 difference is, why there's on 9073, the
22 prior reserves are only four dollars?
23      MR. LASKY: Object to the form.
24 A    These are the same documents. This
25 never went through. This was prepared --

Page 250

JEFFREY M. WACTLAR

1
2 this was a draft prepared in anticipation of
3 the final one which is attached to the CCS.
4 Q    I see.
5      And "this" being Exhibit 24?
6 A    Right.
7      If you notice, the amount was
8 25 million on this document.
9 Q    Right.
10 A    The amount is 27.5 on this
11 document. It was changed in our drafting
12 process.
13 Q    Okay.
14      Now, do you recall with respect to
15 Exhibit 24, did you send that to Steve
16 Parness for approval?
17 A    This would get -- you mean
18 specifically 24?
19 Q    Yeah.
20 A    It generally gets sent as a package
21 for approval. This was just a work in
22 progress.
23 Q    Okay. Got it.
24      I mean, do you recall asking for
25 significant reserve increases in August of

Page 251

JEFFREY M. WACTLAR

1
2 '08 on these policies, as reflected in
3 Exhibit 24?
4      MR. LASKY: Object to the form.
5 A    The reserve, no.
6      Well -- no. I mean this, again,
7 was as we were preparing our documents.
8      Ultimately, this right here dated
9 3-12 is when it was put through.
10 Q    If you go to 9074 to 9077, they all
11 appear to be a reserve autonomy increase
12 request relating to the four McGraw-Edison
13 policies.
14 A    Uh-huh.
15 Q    Is that something that you filled
16 out?
17 A    Yes.
18      These are the actual sheets that
19 tell the person in New York to raise the
20 reserve to amounts that are beyond my
21 authority.
22 Q    And your authority was what?
23 A    $250,000.
24 Q    If you look 9074 it says "Current
25 autonomy level, 500,000."

Page 252

JEFFREY M. WACTLAR

1
2 A    Autonomy is different. Autonomy is
3 not reserve.
4      Autonomy is the concept that you
5 only can -- you can only raise reserves and
6 pay so much on a claim file without getting
7 an autonomy increase.
8      And generally, as far as -- I don't
9 know how they're set, but I think they're
10 all basically set at $500,000.
11 Q    Is that in the aggregate on a
12 claim?
13 A    Yes.
14 Q    That's not per payment, it's in the
15 aggregate?
16 A    Right.
17 Q    In the new autonomy level, you are
18 asking for five and a half million?
19 A    Right. That represents -- when you
20 say reserves, you raise autonomy up with the
21 reserves.
22 Q    So once you get the reserve
23 increase, you then have the authority to
24 release it in actual paid dollars?
25 A    Exactly.

63 (Pages 249 to 252)

Page 253

JEFFREY M. WACTLAR

1  JEFFREY M. WACTLAR
2      Q   Who is the manager -- that look
3  like Steve Parness' signature or initials?
4      A   Yes.
5      Q   And then who is AB?  If I'm reading
6  that correctly to the right.
7      A   That actually is probably Andy
8  Barberis.  This is just an educated guess,
9  but Andy Barberis and Andrew Nadolna have
10  the same function.  It's just that Andrew
11  Nadolna oversees certain departments and
12  Andy Barberis oversees other departments.
13      It may have been that Andrew was
14  out and we wanted to get it done, so -- you
15  know, they just fill in for each other.  So
16  if it doesn't go through Andrew, it would go
17  through Andy.  That's the most logical
18  explanation of "AB."
19      Q   What departments does Andy oversee,
20  at least at the time of this document?
21      A   You know, I don't remember exactly
22  what departments.
23      I know Andrew Nadolna oversees
24  toxic tort, the pollution department, maybe
25  the medical malpractice department.

Page 254

1  JEFFREY M. WACTLAR
2      Andy Barberis I know oversees my
3  current department, the PASE department, the
4  mass tort department, so there's some
5  division oversight there.
6      Q   If you go to 9072, back to the
7  executive claim summary under Case
8  Evaluation, you see the second-to-last
9  sentence and the last sentence refer to an
10  audit.
11      A   Yes, that's right.
12      Q   It's true, though, that AIG's
13  obligation to pay Federal Mogul the
14  $40 million was irrespective of any audit,
15  right?
16      A   Yes.
17      Q   So the accuracy of the claims data
18  really related to the contingent liability
19  of the 32 million?
20      A   Right.
21      Q   Now, looking up on the executive
22  claim summary, it has a report date.
23      Do you see 2-11-2008?
24      A   Yes.
25      Q   And we discussed that I think

Page 255

1  JEFFREY M. WACTLAR
2  previously, that that was you believe a
3  randomly chosen date as a report of loss
4  date?
5      A   You know, that's interesting.
6      That I think is prepopulated and
7  you are right, that does seem to coincide
8  with that other date.  And I don't know why
9  that date was selected.
10      Q   Could it be that when you shell out
11  a claim file, it gets created -- it gets
12  included into the executive claim summary
13  automatically?
14      A   It's possible because you see
15  there's one claim number in the upper
16  right-hand corner.  That may have been the
17  date that I created that claim number or the
18  date that I put in as the reported date on
19  that claim number.
20      Again that, you know, is an example
21  of how there's sometimes one claim number
22  used but in reality there are many claim
23  numbers involved.
24      Q   We agree, though, that the loss was
25  reported by Federal Mogul as to these

Page 256

1  JEFFREY M. WACTLAR
2  policies long ago?
3      A   Yeah.
4      Q   That being pre-prepartitioning
5  agreement?
6      A   Right.
7      MR. KENNEDY:  Let's mark as
8  Clearwater Exhibit 34, and it's a
9  letter from Campos & Stratis to
10  Mr. Wactlar dated February 23, 2009.
11      Bates-stamped 2GRANITE-002116 to
12  2119.
13      (Clearwater Exhibit 34, Letter
14  dated February 23, 2009,
15  2GRANITE-002116 through
16  2GRANITE-002119, was marked for
17  Identification.)
18  BY MR. KENNEDY:
19      Q   Do you recall receiving this
20  letter?
21      A   Yes.
22      Q   And basically, could you just tell
23  us what this represents generally?
24      A   This was the result of the
25  assignment that I had asked Campos & Stratis

64  (Pages 253 to 256)

Page 257

JEFFREY M. WACTLAR

1  to perform which was a payment allocation.
2      And this refers -- first two pages
3  are basically sorts of a written summary of
4  what they did and then the resulting
5  spreadsheet which would assist me in
6  actually making my payments, Payment 1,
7  Payment 2, Payment 3, Payment 4 and so on.
8      Q   Under "Coverage," Ms. Mitchell
9  notes "We analyzed the coverage chart
10 prepared by Bates White."
11     What coverage chart was prepared by
12 Bates White, if you know?
13     A   We had a coverage chart that
14 Bates & White must have done a long, long
15 time ago.
16     But it was way before I was
17 handling the file, but it was a coverage
18 chart which we had and it appeared accurate,
19 and I think it was a coverage chart that we
20 sort of was using as reference material.
21     Q   Is Bates White a law firm?
22     A   I think Bates White is another
23 actuarial-type firm, I think.
24     Q   Do you know if they were retained

Page 258

JEFFREY M. WACTLAR

1  by the joint insured defense group?
2      A   It's possible.
3      Q   But you don't know who they were --
4      A   No.
5      Q   -- who they were retained by?
6      A   No.
7      Q   If you go to the next page where it
8  says "Allocation method and assumptions."
9      It says "After determining the
10 attachment points of the AIG policies."
11     Do you see that?
12     A   Yes.
13     Q   Do you have an understanding of
14 what she is referring to in terms of
15 "attachment points"?
16     A   Yes, the points at which the
17 policies that we're going to pay attached
18 at.
19     In other words, there were excess
20 policies that attached at a certain point.
21 We talked about this before, excess of
22 $20 million.
23     Q   So their obligation to pay
24 triggered at $20 million in that example you

Page 259

JEFFREY M. WACTLAR

1  just gave?
2      A   Yes.
3      Q   It says "We allocated the
4  settlement payments on pro rata share basis
5  of the layers of the available coverage."
6      What was your understanding of "pro
7  rata"?
8      A   Bathtub allocation.
9      Q   But pro rata to what?  What does
10 "pro rata" refer to?
11     A   Just evenly across policies.
12     Q   Policy years?
13     A   Evenly across the policy years of
14 the lowest layer, lowest attachment points,
15 yes.  Going up.
16     Q   And then it says in the last
17 sentence of that paragraph, "We triggered
18 only those policies whose underlying limits
19 had been fully exhausted before accessing
20 the next layer of coverage."
21     A   Right.
22     Q   And we talked a little bit about
23 that generally, but not with respect
24 specifically to Federal Mogul account,

Page 260

JEFFREY M. WACTLAR

1  correct?
2      A   Right.
3      Q   Why is it that that was the method
4  adopted by Campos & Stratis to allocate?
5      A   If there is no other indication,
6  the method that we typically used to
7  allocate is a bathtub approach.  So I would
8  have said to Lynn Mitchell, "Do this by
9  using a bathtub allocation."  She was
10 calling it "pro rata" and they are the same
11 thing in my mind.
12     Q   And so if there's nothing -- no
13 other reason to allocate it any other way,
14 AIG would adopt a bathtub methodology?
15     A   Usually.
16     Q   Is that with respect to asbestos
17 claims only?
18     A   Oh, I couldn't tell you what other
19 departments would do.
20     From my understanding and the work
21 that I did in the asbestos department, we
22 would just typically apply a bathtub
23 allocation.
24     In these situations where the

65  (Pages 257 to 260)

Page 261

JEFFREY M. WACTLAR

1  agreement was silent, where there wasn't
2  some other requirement by law, that's what
3  we would typically do.
4    Q    So we talked about the
5  insurance principle underlying that earlier
6  generally, but not with respect to the
7  Federal Mogul account.
8    A    Right.
9    Q    And that general principle being
10  that a policy that sits below another policy
11  ought to be exhausted before the next policy
12  gets -- its obligations get triggered.
13      MR. LASKY: Object to the form.
14    Q    Is that right?
15    A    Yes.
16      MR. KENNEDY: When I have a
17  question pending, Matt, you ought to
18  be not instructing the witness by any
19  discussions with him or looks.
20      MR. LASKY: What's your
21  question? He already answered your
22  question.
23  BY MR. KENNEDY:
24    Q    If you turn the page.

Page 262

JEFFREY M. WACTLAR

1    Does this represent the allocation
2  of the Federal Mogul payments?
3    A    Yeah, looks like it does.
4    Q    And there are no dates on this
5  because prior to this or at the time of this
6  letter in February '09, the trigger date had
7  not been activated yet under the settlement
8  agreement; is that your understanding?
9    A    Right.
10    There might be -- no, I think that
11  is correct.
12    Q    What were you going to say?
13    A    There might have been a revised
14  version because I'm seeing that the first
15  payment of 1, 2, 3, 4, 5 Granite State
16  payments.
17    And one AIU payment.
18    And I raised reserves once on four
19  Granite State policies.
20    I think there was a revised version
21  in this chart.
22    I have this recollection of there
23  being some revision of this for some reason.
24    Q    Well, wasn't there a Lexington

Page 263

JEFFREY M. WACTLAR

1  London policy that was originally part of
2  the allocation of Federal Mogul settlement
3  payments?
4    A    I don't know.
5      MR. KENNEDY: Let me mark as
6  Clearwater Exhibit 35, an e-mail from
7  Lynn Mitchell to Judy Marotti dated
8  January 5, 2009.
9      Bates stamped GRANITE-CS-0019 to
10  20.
11      (Clearwater Exhibit 35, E-mail
12  chain, top e-mail dated Monday,
13  January 5, 2009, 9:00 p.m.,
14  GRANITE-CS-0019 to GRANITE-CS-0020,
15  was marked for Identification.)
16  BY MR. KENNEDY:
17    Q    And take your time looking at it,
18  but if you turn the page there, you'll see a
19  Lexington London policy.
20    A    Yes.
21    Q    And that policy does not appear to
22  be on the Campos & Stratis allocation.
23    A    That might be why --
24    Q    Do you know why that was taken off?

Page 264

JEFFREY M. WACTLAR

1  Or out of the allocation spreadsheet.
2  Excuse me.
3    A    I think I know.
4    Q    What do you know?
5    A    If you recall, the e-mail we talked
6  about with the Lex London slip, what did we
7  call it? It was a subscription policy.
8    Q    Yup.
9    A    The problem was we needed to get
10  that policy, we couldn't locate the policy.
11  We knew it existed but we couldn't locate
12  it, but we needed to get it in order to send
13  it to be shelled and coded so we can get a
14  claim number open so we could get money up
15  on that policy.
16    I think since we couldn't get it in
17  time to put the ECS through, we removed it
18  and then at some later date, I think -- I
19  think it would have been after I left --
20  money may have been put up on that one
21  remaining policy once that was done.
22    I think we ran into a situation
23  where it was very unusual where claims
24  intake had never seen a subscription policy

66 (Pages 261 to 264)

**Page 269**

JEFFREY M. WACTLAR

1  think is that in days.
2  Q   Would you patch them in to the
3  committee or would you talk to them offline?
4  A   No. It would be just like this
5  with the same speaker phone and I would call
6  them up, "Would you answer a quick question?
7  We have the committee here."
8  Q   Okay.
9  Now, with respect to Exhibit 37, we
10  went over the ECS and it showed the 27.5
11  being posted.
12  He writes "No claims notes since
13  2005".
14  Do you have an understanding what
15  he's referring to?
16  A   Yes.
17  Q   What is he referring to?
18  A   This was Andrew getting familiar
19  with the department and so he would be
20  looking through our electronic claim notes,
21  and I think what happened here was he was
22  looking under McGraw-Edison, which is what
23  is prepopulated on the ECS, because he
24  probably saw the ECS. He didn't look at the

**Page 270**

JEFFREY M. WACTLAR

1  notes. He didn't see any notes. He said
2  that's strange, we're putting up a lot of
3  money. But they were probably kept under
4  the name Federal Mogul.
5  So we probably sent him a response
6  saying they are under Federal Mogul and he
7  said okay.
8  Q   What's the electronic claim notes,
9  what's that system?
10  A   It's part of TTAS.
11  It's just for major things like
12  drafting ECS, major developments.
13  MR. KENNEDY: Matt, do you know
14  if you produced TTAS claim notes?
15  MR. LASKY: I'd have to go back
16  and look. You can request it and
17  I'll take it under advisement.
18  (Request made.)
19  BY MR. KENNEDY:
20  Q   It it's also not on fourth quarter
21  '08 PAQR.
22  A   Because he probably looked under
23  McGraw-Edison and didn't see it, when we
24  called it Federal Mogul.

**Page 271**

JEFFREY M. WACTLAR

1  Q   And you had estimated -- we talked
2  about it -- as a $10.5 million payment in
3  '09 on the PAQR?
4  A   Right. Exactly.
5  MR. KENNEDY: Mr. Wactlar,
6  thank you for your time. I have no
7  further questions.
8  I'm done with my questions.
9  Mr. Lasky, you want to talk to the
10  witness before you decide whether you
11  have questions or not? And I just want
12  to note my objection to the extent that
13  you have a consultation with him where
14  you possibly orchestrated his testimony
15  without you just going directly into
16  asking questions right now. I object to
17  that because I think that's completely
18  improper.
19  In fact, it's just not done as a
20  matter of custom and practice and I'm
21  going to move to strike it.
22  MR. LASKY: Fine.
23  MR. KENNEDY: For the record
24  he's staying in the room. Thank you

**Page 272**

JEFFREY M. WACTLAR

1  very much.
2  EXAMINATION BY MR. LASKY:
3  Q   Jeff, when you were discussing your
4  testimony regarding the way bathtub
5  allocations are done in your prior testimony
6  that in a bathtub allocation the lower
7  policies had to exhaust before the next
8  policy, the layer of policies would pay.
9  That testimony just referred to the
10  bathtub allocation itself, not how you can
11  settle or what policies you could settle,
12  correct?
13  A   That's right. It's just a general
14  concept of the bathtub allocation.
15  I didn't refer to the world of
16  possibilities of different scenarios.
17  MR. LASKY: Actually, that's
18  all I have.
19  FURTHER EXAMINATION BY MR. KENNEDY:
20  Q   That raises actually one follow-up
21  question.
22  When you were -- you testified
23  earlier that you were the only claims
24  analyst working under Mr. Parness' direction

68  (Pages 269 to 272)

Page 273

JEFFREY M. WACTLAR

1  from '06 to the time of settlement in '08 of
2  the Federal Mogul claims, right?
3      A   Right.
4      Q   When you settled -- when you were
5  working on settlement and prior to making
6  payments according to the Campos & Stratis
7  or agreeing to make payments under --
8  withdrawn.
9      Prior to agreeing to pay the
10  $40 million under the settlement agreement,
11  had you determined that the policies
12  underlying the AIG policies had fully
13  exhausted?
14      A   Yes.
15      Q   You had looked into that?
16      A   Yes.
17      Q   Okay.
18      And what did you do?
19      A   I in particular would have looked
20  at the Brattle Group's numbers and the
21  projections that our best case scenario was
22  a $500 million exposure and worse case
23  scenario over a billion, if you looked at
24  the ARPC or whatever Federal Mogul's

Page 274

JEFFREY M. WACTLAR

1  consultant was.
2      So having said that, when I looked
3  at where we were in the tower, it was rather
4  obvious that the lower policies were going
5  to be exhausted before we would be impacted.
6      Q   So you made a determination that
7  they would -- the underlying policies, the
8  policies underlying AIG policies would be
9  exhausted?
10      A   They would have to.
11      Q   They would have to be?
12      A   Yes.
13      Q   Did you make a determination they
14  actually paid the full policy limits before
15  agreeing to a settlement?
16      A   I'm not sure there was any way I
17  could have done that. I didn't undertake an
18  effort to call those carriers and
19  determine -- you know. Then you are getting
20  into a situation where you got discovery
21  issues, you've got all the carriers kind of
22  working on their own deals.
23      But as a matter of common practice,
24  and that's why the Brattle numbers were

Page 275

JEFFREY M. WACTLAR

1  important because we wanted to know the size
2  of the problem, among other reasons, to know
3  where we were in the tower we would
4  ultimately pay as high up as we were, but
5  also that the lower limits would be
6  exhausted.
7      Q   In answer to my question of whether
8  you actually made that determination of
9  whether the underlying policies had paid
10  their full limits, the answer is no, right?
11      MR. LASKY: Object to the form.
12      A   Well, I think I made the
13  determination, but I did not undertake an
14  investigation as far as calling the
15  underlying carrier and getting some letter
16  or verification from them that they had paid
17  their full limits.
18      But looking at where we were in the
19  tower, and who was below us and the exposure
20  on our best day, along with the fact that
21  all the carriers groups we knew were working
22  on their own settlements.
23      And I most likely made a call to
24  Cozen & O'Connor just to say "Is there any

Page 276

JEFFREY M. WACTLAR

1  issue with regard to exhaustion that I need
2  to worry about?" That would have been my
3  extent of my determination.
4      Q   And what did Cozen & O'Connor say?
5      MR. LASKY: Objection. That's
6  privileged.
7      A   Yeah, that's counsel.
8      I will tell you that there was
9  nothing said that gave me pause as to the
10  exhaustion issue.
11      Q   Let me ask you this. You said you
12  would have called.
13      Do you in fact, sitting here today,
14  do you recall having a conversation?
15      A   Yeah, I do. It would be my
16  absolute common custom and practice.
17      Because you get to know certain
18  pieces of information that are important to
19  senior management, and one of the questions
20  that would have been asked was "Do we know
21  that the underlying was exhausted?" And I
22  would have wanted to make that phone call to
23  know I had an answer on that.
24      Q   Mr. Wactlar, it's important here,

69  (Pages 273 to 276)

WINTER REPORTING, INC.    (212) 953-1414

Page 277

**JEFFREY M. WACTLAR**

1
2  you are under oath: Sitting here today, do
3  you recall that conversation?
4      A   I don't recall -- I recall making
5  the call to Jim Dolan. I don't recall the
6  specific words that were spoken.
7      Q   And you don't recall what he said
8  to you?
9      A   No.
10     Q   And just so I'm clear, am I right
11 that with respect to the policies that
12 underlay the AIG policies, you did not
13 personally confirm one way or the other
14 whether they had fully paid out, in fact?
15     MR. LASKY:  Object to the form.
16     A   Again, it is my opinion that I did,
17 but not to the extent that you are
18 suggesting.
19     Q   Well, it's very -- I understand the
20 exposure analysis.
21     But Mr. Wactlar, what I'm asking
22 you is a very specific question and that is
23 whether you in fact had looked into whether
24 those carriers issuing the policies
25 underlying the AIG policies had in fact paid

Page 278

**JEFFREY M. WACTLAR**

1
2  out their full limits?  And the answer is
3  either yes or no.
4      MR. LASKY:  Object to the form.
5      A   I did not make phone calls to the
6  carriers and get either verbal or written
7  responses to that question, no.
8      MR. KENNEDY:  I have no further
9  questions.
10
11     (The deposition was concluded at
12 5:06 p.m.)
13
14 _____
        **JEFFREY M. WACTLAR**
15
16 Subscribed and sworn
17 to before me this
18 _____ day of _____, 2011
19
20 _____
        Notary Public
21
22
23
24
25

Page 279

1      JEFFREY M. WACTLAR
2  STATE OF NEW YORK   )   PAGE _____ of _____
                       ) ss:
3  COUNTY OF NEW YORK  )
4      I wish to make the following
5  changes, for the following reasons:
6  PAGE LINE
7  ___  ___   CHANGE: _____
8           REASON: _____
9  ___  ___   CHANGE: _____
10          REASON: _____
11 ___  ___   CHANGE: _____
12          REASON: _____
13 ___  ___   CHANGE: _____
14          REASON: _____
15 ___  ___   CHANGE: _____
16          REASON: _____
17 ___  ___   CHANGE: _____
18          REASON: _____
19 ___  ___   CHANGE: _____
20          REASON: _____
21
22 _____         _____
   Witness's signature         Date
23
24
25

Page 280

1      JEFFREY M. WACTLAR
2      C E R T I F I C A T E
   STATE OF NEW YORK   )
3                      : ss.
   COUNTY OF NEW YORK  )
4      I, BARBARA R. ZELTMAN, Shorthand
5  Reporter and Notary Public, within and
6  for the State of New York, do hereby
7  certify:
8      That JEFFREY M. WACTLAR, the
9  witness whose deposition is hereinbefore
10 set forth, was duly sworn by me and that
11 such deposition is a true record of the
12 testimony given by the witness.
13     I further certify that I am not
14 related to any of the parties to this
15 action by blood or marriage, and that I
16 am in no way interested in the outcome of
17 this matter.
18     IN WITNESS WHEREOF, I have hereunto
19 set my hand this 28th day of February,
20 2011.
21
22
23 _____
   BARBARA R. ZELTMAN
   Court Reporter and Notary Public
24
25

70  (Pages 277 to 280)