# EXHIBIT 5

Page 1

SIMON YOON
IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
GRANITE STATE INSURANCE COMPANY,

    Plaintiff,

    v.  Civil Action No. 2009 Civ.10607

CLEARWATER INSURANCE COMPANY,
f/k/a ODYSSEY REINSURANCE
CORPORATION, f/k/a SKANDIA
AMERICA REINSURANCE
CORPORATION,

    Defendants.
-----------------------------------X

DEPOSITION OF SIMON YOON
New York, New York
Friday, February 18, 2011

REPORTED BY: BARBARA R. ZELTMAN
    Professional Stenographic Reporter

Job Number: 2558

---

Page 3

```
 1            SIMON YOON
 2   A P P E A R A N C E S :
 3
 4   MOUND, COTTON, WOLLAN & GREENGRASS
 5   Attorneys for the Plaintiff
 6      One Battery Park Plaza
 7      New York, New York  10004
 8      BY:  ROBERT E. WILDER, ESQ.
 9
10
11   CLYDE & CO. US LLP
12   Attorneys for the Defendants
13      405 Lexington Avenue
14      New York, New York  10174
15      BY:  STEPHEN M. KENNEDY, ESQ.,
16
17
18
19
20
21
22
23
24
25
```

---

Page 2

```
 1              SIMON YOON
 2
 3
 4          February 18, 2011
 5              9:55 a.m.
 6
 6      Deposition of SIMON YOON taken by
 7   Defendants, pursuant to Notice, at the offices of
 8   CLYDE & CO. US LLP, 405 Lexington Avenue, New York,
 9   New York, before BARBARA R. ZELTMAN, a Professional
10   Stenographic Reporter and Notary Public within and
11   for the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 4

```
 1              SIMON YOON
 2
 3         IT IS HEREBY STIPULATED AND AGREED
 4   by and between the attorneys for the respective
 5   parties herein that filing and sealing be and
 6   the same are hereby waived.
 7         IT IS FURTHER STIPULATED AND AGREED
 8   that all objections, except as to the form of
 9   the question, shall be reserved to the time
10   of trial.
11         IT IS FURTHER STIPULATED AND AGREED
12   that the within deposition may be signed and
13   sworn to before any officer authorized to
14   administer an oath with the same force and
15   effect as if signed and sworn to before
16   the Court.
17
18
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

Page 37

SIMON YOON

1
2 MR. WILDER: Different
3 underwriting company or different
4 year?
5 MR. KENNEDY: I'm not under
6 oath here, Mr. Wilder. I'm talking
7 to Mr. Yoon. If he does not
8 understand a question, you may object
9 to form, but that's all you are
10 limited to.
11 MR. WILDER: Objection. Vague
12 and ambiguous.
13 MR. KENNEDY: Thank you.
14 A    Let me be clear what you are asking
15 me.
16 **Q    Sure.**
17 A    So notice comes in later, you are
18 talking about --
19 **Q    On a different policy relating to**
20 **that insured.**
21 A    That hasn't happened in terms of
22 this account from what I recall from my
23 handling of this account.
24 **Q    When you say "this account," you**
25 **are talking about the McGraw-Edison account?**

Page 38

SIMON YOON

1
2 A    McGraw-Edison/Halliburton account,
3 yes.
4 **Q    When I'm talking about**
5 **McGraw-Edison, I'm not talking about**
6 **Halliburton.**
7 A    But in terms of these losses, I
8 don't remember that happening.
9 **Q    Okay.**
10 **Let's step back away from**
11 **McGraw-Edison or Halliburton.**
12 A    Okay.
13 **Q    Any other account you recall that**
14 **ever happening?**
15 A    I can't recall.
16 **Q    Okay.**
17 **You said that you would make**
18 **coverage determinations with respect to**
19 **claims as a matter of your responsibilities;**
20 **is that right?**
21 A    That is correct.
22 **Q    And you may retain coverage counsel**
23 **and consultants with respect to a claim,**
24 **right?**
25 A    Right.

Page 39

SIMON YOON

1
2 **Q    Would you ever be responsible for**
3 **setting or posting reserves on a claim?**
4 A    Yes.
5 **Q    And are there written policies or**
6 **procedures at AIG to follow with respect to**
7 **posting or setting reserves on a claim?**
8 MR. WILDER: Let me just
9 interject an objection.
10 MR. KENNEDY: Object to the
11 form but that's it. There's no
12 speaking objections, Mr. Wilder. You
13 know that.
14 MR. WILDER: This is not a
15 speaking objection. I'm just saying
16 that as you know, Granite State has
17 objected to discovery on general
18 reserving practices and that's an
19 issue that's before the magistrate.
20 MR. KENNEDY: That's entirely
21 incorrect. If you want to take that
22 position, Mr. Wilder, you are
23 absolutely incorrect and if you
24 prohibit him from testifying on that,
25 I will move the Court and I will ask

Page 40

SIMON YOON

1
2 for costs because you are not correct
3 on that.
4 MR. WILDER: I would ask you
5 not to interrupt me, sir.
6 MR. KENNEDY: You just
7 finished.
8 MR. WILDER: No, I didn't
9 finish.
10 I am letting the witness testify on
11 general reserving practices in accordance
12 with your Rule 30(b)(6) without waiving
13 our objection.
14 I reserve all rights on behalf of
15 Granite State. Proceed.
16 MR. KENNEDY: There was no
17 objection, but that doesn't matter
18 because now we are here and you
19 testified to that.
20 BY MR. KENNEDY:
21 **Q    Are there any written policies or**
22 **procedures at AIG with respect to posting or**
23 **setting reserves?**
24 A    I'm not aware of any.
25 **Q    Are there any unwritten policies or**

10 (Pages 37 to 40)

Page 41

SIMON YOON

1
2  procedures?
3      A   I'm not aware of any.
4      Q   So you could just randomly set
5  reserves if you felt that you wanted to put
6  up a reserve on a claim file?
7          MR. WILDER:  Objection.
8      Argumentative.
9      A   Everything is on a case-by-case,
10 talking to your manager in terms of any
11 decision like that.
12     Q   So you would set reserves in
13 consultation with your manager; is that
14 right?
15     A   That's correct.
16     Q   And would it be based on certain
17 developments or events that happen with
18 respect to the claim?
19         MR. WILDER:  Objection. Vague.
20     Overbroad.
21     A   Generally, when the loss gets to a
22 point somewhat clearly defining what the
23 loss is.
24     Q   So things happen, events happen,
25 right, developments happen in a file that

Page 42

SIMON YOON

1
2  may cause you to discuss setting reserves
3  with your manager; is that right?
4      A   Yes.
5      Q   You wouldn't set a full policy
6  limit reserve necessarily on first notice of
7  a claim, would you?
8      A   Not necessarily.
9      Q   You'd want to know -- you'd want to
10 get information in support for the reserve
11 number you were setting up, right?
12     A   Typically, yes.
13     Q   Now, with respect to your work as
14 an analyst, did you have any responsibility
15 for reporting to AIG's reinsurers?
16     A   Did I specifically?  No.
17     Q   So is there nothing that you did,
18 no act or function that related to AIG
19 reporting to its reinsurers that you are
20 aware of?
21         MR. WILDER:  Objection. Vague.
22     A   I may be asked to prepare a status
23 report from our claims reinsurance person.
24     Q   Okay.
25         Who would that claims reinsurance

Page 43

SIMON YOON

1
2  person be at that time?
3      A   From our department is Paul Colon,
4  C-O-L-O-N.
5          MR. WILDER:  When you finish
6      this line, when it's convenient, can
7      we take a break.
8          MR. KENNEDY:  Sure.
9          Could you read back that last
10     response.
11         (Requested portion of record read:
12     "A.  From our department is Paul
13     Colon.")
14     Q   So at the request of Mr. Colon, you
15 would prepare status reports.
16         Did I understand that correctly?
17     A   Yes.
18     Q   What steps would you take to
19 prepare a status report?
20     A   Review what's in the file, talk to
21 counsel.
22     Q   So you'd review the contents of the
23 claim file, right?
24     A   Yes.
25     Q   And you may talk to counsel, also?

Page 44

SIMON YOON

1
2      A   Correct.
3      Q   And if there were consultants that
4  had been retained, you might talk to them as
5  well?
6      A   Correct.
7      Q   Anything else?
8      A   That's pretty much captures it.
9          MR. KENNEDY:  Why don't we take
10     a break now.
11         (A brief recess was
12     taken.)
13 BY MR. KENNEDY:
14     Q   Mr. Yoon, we just got finished
15 talking about when a claim come in what the
16 steps you would like whether with one policy
17 or multiple policies.
18         Let's take a situation where you
19 were assigned an account where there was a
20 claim file already opened up.
21         Did that ever happen?
22     A   Yes.  I'll talk about this case,
23 this matter, yes.
24     Q   But I want to talk more generally
25 before we talk about the McGraw claims.

11 (Pages 41 to 44)

Page 49

SIMON YOON

1  mainstream unit?
2     A    One of the mainstream units.
3     Q    One of the mainstream units.  Okay.
4        I knew there was a toxic tort
5  department --
6     A    It's all within the same
7  department.
8     Q    Okay.
9        Just for my own sake, I'm just
10  trying to figure this out.
11        There was a mainstream unit we
12  talked about as opposed to a complex unit we
13  talked about.
14     A    Uh-huh.
15     Q    But then you are saying you were in
16  charge of one of the mainstream units, so
17  there were plural mainstream units?
18     A    Yes.
19     Q    And what was the distinction
20  between the units in the mainstream units?
21     A    Pretty much no distinction.
22     Q    How many units were there?
23     A    I believe at the time there were
24  three.

Page 50

SIMON YOON

1     Q    Three of them.  Okay.
2        How about the complex unit.  When
3  you went over from the mainstream units to
4  the complex, was it unit or units?
5     A    There was one complex unit, as I
6  recall.
7     Q    Who was in charge of that complex
8  unit at that time?
9     A    Chris Eskeland.
10     Q    And who was in charge of the
11  mainstream units at the time that you
12  transferred over to the complex unit?
13     A    There were three managers.
14        The only name I recall right now is
15  Sheila O'Brien who was my direct manager.
16     Q    When you became a manager in 2004,
17  did you have people reporting to you?
18     A    Yes.
19     Q    How many?
20     A    I think about five.  Four or five.
21     Q    Now, back in 2003 when you were
22  with the mainstream unit, were you assigned
23  the Dresser/Halliburton file?
24     A    No, I was not.

Page 51

SIMON YOON

1     Q    Did you have any personal
2  involvement?
3     A    At that time, no.
4     Q    Not in 2003 at all?
5     A    Until I got into the complex unit.
6     Q    So you were in the complex unit and
7  were you assigned the Dresser/Halliburton
8  file?
9     A    That's correct.
10     Q    Who had it before you?
11     A    I believe it was Stephen Perrella.
12     Q    Steve Perrella?
13     A    Correct.
14     Q    Do you know why it was assigned to
15  you?
16     A    I think Steve was leaving the
17  company.
18     Q    And he was in the complex unit?
19     A    Correct.
20     Q    Did he report to Chris Eskeland?
21     A    Yes.
22     Q    Now, you understand that at the
23  time that you were assigned it sometime in
24  2003 that the Halliburton entities,

Page 52

SIMON YOON

1  including Dresser, were claiming coverage
2  under policies issued to Studebaker-
3  Worthington?
4     A    Yes.
5     Q    Were you aware they were seeking
6  coverage also under policies issued directly
7  to Dresser Industries?
8     A    Correct.
9     Q    You were aware that they were
10  seeking coverage issued to Kellogg Brown &
11  Root?
12     A    I believe so, yes.
13     Q    You were aware that they were
14  seeking coverage with respect to policies
15  issued to an outfit called Alco Locomotive?
16     A    I believe so.
17     Q    You are aware they were also
18  seeking coverage under policies issued to
19  McGraw-Edison?
20     A    Yes.
21     Q    And in fact, they were actually
22  seeking to -- coverage under the Granite
23  State McGraw-Edison policies that we just
24  reviewed earlier today?

13 (Pages 49 to 52)

**WINTER REPORTING, INC.    (212) 953-1414**

Page 53

SIMON YOON

1
2    A    Correct.
3    Q    Now, with that in mind, you were
4    assigned the file.
5         What did the file look like?
6         Was it one claim file?  Was it
7    multiple claims files?
8    A    I don't recall now what the file
9    looked like back in '03 or '04.
10   Q    But was it one file?
11   A    Like I said, I don't recall.
12   Q    If I wanted to find that out, how
13   would I go about doing that?
14   A    I have no idea.
15   Q    If you were to go back today and
16   say, "Hey, I want to find out at the time I
17   got the file, were there multiple claims
18   files or only one claim file," how would you
19   go about finding that out?
20   A    I wouldn't know how to go about
21   doing that.
22   Q    Now, the time that you were
23   assigned the file in 2003, that is, the
24   Dresser/Halliburton file, you understand
25   that Federal Mogul Corporation was also

Page 54

SIMON YOON

1
2    making competing demands for coverage under
3    the Studebaker-Worthington policies?
4    A    That was my general understanding,
5    yes.
6    Q    And you have a general
7    understanding also that Federal Mogul was
8    also seeking coverage under the
9    McGraw-Edison policies; is that right?
10   A    Correct.
11   Q    Including the Granite State McGraw
12   policies we talked at earlier today?
13   A    That was my understanding, yes.
14   Q    Do you have an understanding that
15   there was -- that Federal Mogul went into
16   bankruptcy sometime in the early 2000s?
17   A    I can't put a date on it, but yes,
18   they were in bankruptcy.
19   Q    But you understand related to that
20   bankruptcy, there were adversary proceedings
21   where Dresser and Federal Mogul were making
22   demands on the Studebaker and McGraw-Edison
23   policies?
24   A    I believe that was the case.
25   Q    You also have a general

Page 55

SIMON YOON

1
2    understanding, too, that dispute between
3    Federal Mogul and the Dresser/Halliburton
4    entities involved the AIG companies?
5         MR. WILDER:  Objection. Vague.
6    A    I don't know what you mean.
7    Q    At the point that you assumed the
8    file, it's true that AIG companies were in a
9    coverage dispute with respect to the Federal
10   Mogul claims under the Studebaker-
11   Worthington and McGraw-Edison policies;
12   isn't that fair to say?
13        MR. WILDER:  Objection.
14   Misstates the record.
15   A    I don't specifically recall that.
16   I just don't recall that.
17   Q    Okay.
18        MR. KENNEDY:  Let's mark as
19   Clearwater Exhibit 39, it's a
20   document entitled Settlement
21   Agreement and Release, execution
22   copy.  It's Bates-stamped
23   2-GRANITE-000112 through
24   2-GRANITE-000208.
25        (Clearwater Exhibit 39,

Page 56

SIMON YOON

1
2    Settlement Agreement and Release,
3    execution copy, 2-GRANITE-000112
4    through 2-GRANITE-000208, was
5    marked for Identification.)
6    BY MR. KENNEDY:
7    Q    And my first question to you,
8    Mr. Yoon is:  You recognize this document,
9    right?
10        MR. WILDER:  Take your time to
11   look at it.
12   A    Yes, I recognize it.
13   Q    Okay.  What is it?
14   A    It says Settlement Agreement and
15   Release.
16   Q    Who does it involve?
17   A    Halliburton companies and AIG
18   companies.
19   Q    Okay.
20        And you are aware that this
21   settlement agreement pertains to the
22   Halliburton/Dresser demands for coverage
23   against various AIG company policies?
24   A    Yes.
25   Q    Including Studebaker-Worthington

14  (Pages 53 to 56)

**Page 57**

SIMON YOON
and McGraw-Edison policies?
A   Correct.
Q   Including, in fact, Granite State McGraw policies that we looked at earlier too, Exhibits 5 through 8, right?
A   That is correct.
Q   Now, if you take a look on Page 4.
And as you look at Page 4, you understand that with the settlement agreement, there was a discontinuation of coverage actions between AIG companies and Dresser and Halliburton entities?
A   I believe that was the case.
Q   If you look actually in Paragraph 16, you see Coverage Action and it's defined.
A   I see that.
Q   You see that there's a reference midway down to DII Industries LLC versus Federal Mogul Product, Inc.?
A   Yes, I see that.
Q   And it refers to the Bankruptcy Court of Delaware in parentheticals.
Do you see that?

**Page 58**

SIMON YOON
A   Yes, I think that's what it's referring to, yes.
Q   Okay.
And do you see also reference to the Ace Property and Casualty Insurance Company versus DII Industries at the very bottom there?
A   Yes.
Q   You understand those proceedings related to Dresser and Halliburton's demands for coverage under the AIG company policies?
A   I can't say definitively one way or the other, but if you say so, yes.
Q   I don't say so, I'm asking.
MR. WILDER: I don't think counsel wants you to speculate.
A   I can't say for sure.
Q   In 2003, did AIG companies have coverage counsel at that point in time?
A   In terms of this matter?
Q   Yeah.
A   Yes, we did.
Q   And who was coverage counsel?
A   Cozen O'Connor.

**Page 59**

SIMON YOON
Q   Who at Cozen O'Connor was acting on behalf of AIG companies?
A   It was Tom Wilkinson and Jack Shea.
Q   And what were they doing on behalf of AIG companies at that point in time when you were assigned the file, if you recall?
A   I believe they were the litigation counsel of record in terms of dec, D-E-C, actions.
And they were serving as our coverage counsel.
Q   As your coverage counsel?
A   Correct.
Q   You are aware at the point in time you were assigned the file, that there were in fact mediations between the AIG companies and the Dresser/Halliburton entities, right?
A   Correct.
Q   And you also are aware that there was mediation between Federal Mogul and the AIG companies, right?
A   Yeah, I don't recall if it was a formal mediation.  I just don't recall.
Q   Do you recall formal settlement

**Page 60**

SIMON YOON
discussions between the AIG companies and Federal Mogul?
A   I don't recall that.
Q   You recall at this time that the Dresser/Halliburton entities were also making coverage demands under policies issued by other insurers?
A   Yes.
Q   And in fact, those other insurers were involved in the same coverage actions as the AIG companies, right?
A   I believe so.  I don't know which ones were named in which, but yeah.
Q   And you are aware that the AIG companies and the other insurers formed an insurer joint defense group at the time that you had been assigned the file?
A   I think it was even before, but, yes.
Q   Do you know sometime before you were assigned the file that group existed?
A   When I got on the file I think the joint carrier group was already in place.
Q   Now, you understand that the joint

15  (Pages 57 to 60)

Page 61

SIMON YOON

1 defense group retained certain experts to
2 assist them with the coverage demands that
3 the Halliburton/Dresser entities were
4 making?
5     A   I know they retained some
6 consultants, yes.
7     Q   Do you know which consultants they
8 retained?
9     A   Nera.
10     Q   Anyone else?
11     A   I believe Brattle.
12     Q   The Brattle Group.
13     Anyone else?
14     A   I think that was it.
15     Q   Now, you recall that the Dresser/
16 Halliburton entities also had their own
17 consultants, right?
18     A   I assume so.
19     Q   But you don't recall?
20     A   I don't recall.
21     Q   Does the name Rabinowitz ring a
22 bell at all?
23     A   I've seen that name during my prep,
24 but otherwise, no.

Page 62

SIMON YOON

1     Q   Do you understand that that person
2 was a consultant for the Dresser/Halliburton
3 entities, generally speaking?
4     A   Through the prep I've been advised
5 that that was probably the case.
6     Q   Now, the Nera and Brattle Group in
7 terms of their function for the joint
8 defense group was what exactly?
9     A   As far as I recall, they were
10 basically running numbers in terms of claim
11 exposure, claim counts, claim values, claim
12 estimations.
13     But also taking into account I
14 think the wishes of various carriers in
15 terms of what they were willing to offer to
16 resolve the dispute with Halliburton and
17 Dresser.
18     Q   Right. Okay.
19     So is it fair to say that the Nera
20 and Brattle Group helped the insurers assess
21 the potential ultimate exposure to
22 Halliburton/Dresser entities regarding the
23 asbestos claims asserted against those
24 entities?

Page 63

SIMON YOON

1     A   Yes. In terms of the underlying
2 claims, yes.
3     Q   And it's also fair to say that they
4 also helped the joint defense group
5 understand the potential exposure that each
6 insurer may have with respect to those
7 asbestos claims under their own policies?
8     A   I don't think that was the case.
9     Q   You don't recall seeing any reports
10 in the file with regard to Nera or Brattle's
11 estimates of exposure under the insurers'
12 policies?
13     A   I believe I remember reports
14 regarding claim counts, claim exposures,
15 claim values.
16     Q   Right.
17     A   And there are various multiple runs
18 and spreadsheets in terms of policies, but I
19 don't think there was any analysis -- I
20 don't recall any analysis that really put
21 those two together and said this is your
22 exposure.
23     Q   Well, you said earlier that the
24 Nera and Brattle Group were retained to help

Page 64

SIMON YOON

1 the insurers to get to a number.
2     Do you recall saying that?
3     A   Yes.
4     Q   What did you mean by that?
5     A   I think it was based on, I don't
6 know, approximate 20 or so carriers involved
7 in this matter, you basically needed a
8 clearinghouse, a collection unit of what
9 each carrier was willing to offer.
10     And I think basically Nera played
11 that role.
12     Q   And so, they helped the insurers
13 determine as a group what number ultimately
14 would be acceptable to the group to offer to
15 Dresser/Halliburton in settlement?
16     A   No, that was not my understanding.
17     Q   So they were a clearinghouse to do
18 what then exactly?
19     A   Like I said, to collect information
20 or collect dollar amounts and put it in some
21 kind of a presentable format in terms of any
22 time there was an offer being made to the
23 insured.
24     Q   What was the offer -- so there were

SIMON YOON

1
2  assigned it?
3     A    That's correct.
4     Q    Was anyone asking for an
5  understanding of what AIG's potential
6  exposure was based on modeling?
7     A    Modeling of what?
8     Q    Modeling by Nera or Brattle of
9  AIG's companies' potential exposure to the
10  Halliburton/Dresser claims?
11    A    I don't believe so.
12       The exposure based on whatever
13  Halliburton was putting out there in terms
14  of its public comments and public statements
15  and information that was conveyed to the
16  joint carriers in the course of a mediation,
17  you know, that was all widely known.  Like I
18  said, public in terms of expected total
19  asbestos liabilities in excess of
20  $4 billion.
21       And so all the members of the
22  carrier group were looking at the same
23  information.
24    Q    And so it was $4 billion that the
25  Dresser/Halliburton entities were claiming

SIMON YOON

1
2  was their exposure for the asbestos claims,
3  right?  It was actually more than that,
4  wasn't it?
5     A    I believe it was excess of, yeah.
6     Q    So why didn't the joint defense
7  group just pay their limits?
8     A    Because there was negotiation going
9  on.
10    Q    The limits, the collective total
11  limits were less than the demand of $4 point
12  something billion; is that right?
13    A    Yeah, I don't know if the 4 billion
14  and change was a demand.  I'm saying that's
15  what they presented as their presumed
16  liabilities.
17       But it's a mediation, it's a
18  negotiation, you know.  Everyone is fighting
19  for their interests.
20    Q    I understand that, but you are
21  going in there in an intelligent way, right.
22  Wouldn't you say that?
23    A    We try.
24    Q    You try.  You try to be armed with
25  the best information you have; isn't that

SIMON YOON

1
2  right?
3     A    Correct.
4     Q    Would you recommend paying the full
5  AIG company policy limits if you had
6  exposure information that said that you were
7  only looking likely to pay 20 percent of
8  those limits?
9     A    No.
10    Q    Would you want the very best
11  information you could get with respect to
12  AIG companies' potential exposure under
13  their own policies on any claims, generally
14  speaking?
15    A    Sure.
16    Q    You'd want to hire consultants to
17  give you that information as accurately as
18  they could give it to you; isn't that right?
19    A    Sure.
20    Q    You said that there were mediations
21  between the joint defense group and the
22  Halliburton/Dresser entities, correct?
23    A    Correct.
24    Q    And that took place over how long
25  of a period of time?

SIMON YOON

1
2     A    From the start of my involvement in
3  the account, which was I guess sometime in
4  '03, I believe it went well toward the end
5  of '04, but it started even before my
6  involvement in the account.
7     Q    In 2002?
8     A    I don't know when it started.
9     Q    And who was the mediator?
10    A    David Geronemus.
11    Q    Did you attend any mediation
12  sessions?
13    A    Yes.
14    Q    How many did you attend?
15    A    I think about four or five.
16    Q    And where were they?
17    A    I believe they were all held at the
18  offices of Bingham McCutchin in midtown.
19    Q    Who did Bingham represent, if you
20  know?
21    A    I don't know if they represented
22  anybody but they had a conference room that
23  was large enough.
24    Q    To hold the joint defense group?
25    A    Yeah, you are talking about -- it

18  (Pages 69 to 72)

Page 73

SIMON YOON

was a conference room the size of a
basketball court that was needed to
accommodate everybody.

Q    Right.
     And who did you attend those
mediation sessions with?
A    I was there with our counsels from
Cozen.

Q    Mr. Wilkinson?
A    Wilkinson and also Shea.
     And also representatives from AIU
claims.

Q    Who are they?
A    Jeff Millstone and Diane Proimos,
P-R-O-I-M-O-S.

Q    Anyone else?
A    No.  That's it.

Q    And at those mediation sessions,
what took place?
A    The main thing I recall was, you
know, talks about who was going to increase
their offers, you know, what's the new offer
going to be.
     There were probably some

Page 74

SIMON YOON

administrative joint defense issues that I
don't recall right now in terms of any
specifics.
     But once again, the main thing I
remember is, are we going to increase the
offer, who is going to increase, that kind
of stuff.

Q    And the discussions about
increasing the offer, what was discussed
with respect to whether the joint defense
group is going to increase the offer or not?
A    All I recall is, once again,
basically as a group, are we going to
increase the offer because, you know, David
Geronemus would come back and say, well,
that last offer has been rejected.
     Then there was discussion with all
the carriers while everyone's present in
terms of, you know, once again, increase the
offer, how much, by how much, you know,
who is going to increase more, decrease, you
know.  That's generally all I recall about
that.

Q    Right.

Page 75

SIMON YOON

     And but what would the discussion
be based upon -- let me withdraw the
question.
     There were points in time during
this continuum of the mediation that the
offers were in fact increased by the joint
insurer group, right?
A    That's what I recall, yes.

Q    So when you were having these
discussions about whether an amount of an
offer would be increased, wasn't there a
concern in the room about having a proper
basis upon which to increase an offer?
A    I don't recall that.

Q    No.
     So you had no concern when if
anyone came to you and said, "Mr. Yoon, we
need you to increase AIG companies' offer by
$20 million."
     You accepted that without any
reservation?
     MR. WILDER:  Objection.  Lacks
foundation.
A    No, that's not what I said.

Page 76

SIMON YOON

     I don't even understand the
question.

Q    Well, I mean, there were points in
time that we agreed that the offer by the
sure group was increased, right?
     There had to be some basis on to
increase the offer.
     Or was it just random?
A    No, it was not random, but it's
based on -- I mean, all the carriers there
including us, as I mentioned, were
represented by counsel who were looking at
their policies and doing their analysis.
     And otherwise in terms of these
mediation sessions, it was once again
horse-trading over numbers.
     If there was talk about increasing
the offer, then it's based on the comfort
level of that carrier in whether
they're going to increase their offer at
all, how much they are going to increase it
by.

Q    Mr. Yoon, do you think that when
you deal with coverage counsel on any one

Page 77

SIMON YOON

1  claim that you have a pretty good
2  understanding of what they're doing on
3  behalf of AIG?
4       MR. WILDER: Objection. Form.
5    A   Yes.
6    Q   You do.
7       You feel you are well informed as
8  to the activities of your coverage counsel?
9    A   Generally speaking, yes.
10   Q   Do you let them make decisions on
11  their own without checking in with you
12  first, generally speaking?
13   A   It depends what we're talking
14  about.
15   Q   So, with respect to increasing
16  offers on settlements.
17   A   Absolutely not.
18   Q   Do you feel like you ask for your
19  coverage counsel to give you information
20  relevant to determining the amount of AIG
21  companies' exposure on any one given claim?
22      MR. WILDER: Can you read back
23  that question, please.
24      (Requested portion of record read:

Page 78

SIMON YOON

1      "Q. Do you feel like you ask for
2   your coverage counsel to give you
3   information relevant to determining the
4   amount of AIG companies' exposure on any
5   one given claim?")
6      (End of read-back.)
7      MR. WILDER: Objection. Vague.
8    A   Generally, yes.
9    Q   Now, there came a time when there
10  was an agreement in principle between the
11  joint defense and the Halliburton/Dresser
12  entities, wasn't there, to settle the
13  coverage claim?
14   A   Yes.
15   Q   And that happened sometime in
16  spring of 2004; isn't that right?
17   A   I believe so, yes.
18   Q   And then after that point, the
19  parties were negotiating the actual terms of
20  the settlement agreements that they were
21  going to enter into; isn't that right?
22      MR. WILDER: Objection. Vague.
23  Overbroad.
24   A   You mean, are you talking about the

Page 79

SIMON YOON

1  joint carrier group?
2    Q   Right.
3    A   Yes, I believe so.
4    Q   And the AIG companies actually, as
5  we saw in Exhibit 39, entered into their own
6  settlement agreement with the Halliburton
7  entities, right?
8    A   Ultimately, yes.
9    Q   And you can take a look, but that
10  was entered into or was signed in November
11  of 2004?
12   A   That's what I recall, yes.
13   Q   Mr. Yoon, do you recall retaining
14  Alan Gray sometime in 2004 with respect to
15  the Dresser/Halliburton claims?
16   A   I don't know if I did, but, yeah,
17  we did.
18   Q   Do you know what generally you
19  asked them to do with respect to the
20  Dresser/Halliburton claims?
21   A   I believe it was to assist us in
22  terms of focusing solely in terms of our
23  policies and also to look over in terms of,
24  you know, claim analysis and claim valuation

Page 80

SIMON YOON

1  what information coming from I guess Brattle
2  and Nera.
3    Q   Okay.
4      And the information coming from
5  Brattle and Nera was what generally?
6    A   As I said, information about claim
7  values and claim counts.
8      MR. KENNEDY: Why don't we take
9  a five-minute break.
10     (A brief recess was
11  taken.)
12     MR. KENNEDY: Let's mark as
13  Clearwater Exhibit 40, a document
14  Bates-stamped GS-CONFIDENTIAL-004341
15  to 004441.
16     (Clearwater Exhibit 40, E-mail
17  chain, top e-mail dated Thursday,
18  March 11, 2004, 8:54 p.m., with
19  attachments, GS-CONFIDENTIAL-004341
20  through GS-CONFIDENTIAL-004441, was
21  marked for Identification.)
22     MR. KENNEDY: It's from Cliff
23  Hendler from Crowell Moring to John
24  Shea and others. Subject: Forward

20 (Pages 77 to 80)

Page 101

SIMON YOON

1  months. At least at that time, it was.
2  **Q   Did that change, that period of**
3  **time when it got updated?**
4     A   I couldn't say.  In '07 I left the
5  department.
6     **Q   Why don't we get into that.**
7        So from 2004 you were manager and
8  then you left the department in 2007?
9     A   Yeah.  October of 2007.
10    **Q   And where did you go?**
11    A   I went to the legal department
12 within what's called the Domestic Brokerage
13 Group.
14    **Q   And what did you do there?**
15    A   I serviced an underwriting
16 division.
17    **Q   What underwriting division?**
18    A   It was the Risk Management Group.
19    **Q   What type of risk did they write,**
20 **or did they write risks?**
21    A   All types.
22    **Q   And from 2004 to 2007, did your**
23 **position change or were you always manager?**
24    A   No.  Sometime in 2005, I became an

Page 102

SIMON YOON

1  assistant vice president.
2     **Q   And what were your responsibilities**
3  **then?**
4     A   I was still at one point heading a
5  mainstream group and then later on and up to
6  the time I left the department, I was
7  heading another complex group.
8     **Q   And what was that complex group?**
9     A   We called it the Complex OMT.
10 Other mass tort.  Other than --
11    **Q   Other than asbestos?**
12    A   Right.  Other than asbestos.
13    **Q   And you were an AVP in that**
14 **position, too, in the complex unit?**
15    A   Yes.
16    **Q   And how many people reported to you**
17 **as AVP?**
18    A   When I was heading the mainstream
19 unit as an AVP, it ranged anywhere from
20 about five to about eight people.
21       As AVP, the Complex OMT Group right
22 before I left was up to three people.
23    **Q   Now, in May of 2004, the joint**
24 **defense group reached a settlement in**

Page 103

**SIMON YOON**

1  **principle with the Halliburton/Dresser**
2  **entities, right?**
3     A   That's what I recall, yes.
4     **Q   And it was based upon a global**
5  **settlement number, right?**
6     A   Correct.
7     **Q   And there was an understanding by**
8  **the insurers that there would be a**
9  **distribution by each insurer to that total**
10 **amount, settlement amount?**
11    A   Yes.
12    **Q   And how was that -- how was each**
13 **carrier's contribution calculated?**
14    A   I do not know.
15    **Q   Who would know the answer to that**
16 **question?**
17    A   I have no idea.
18    **Q   So did you ask what AIG's**
19 **contribution amount would be towards that**
20 **global settlement?**
21    A   Absolutely, yes.
22    **Q   Did you find out what it was?**
23    A   Not only did I find out, I was
24 involved in terms of putting together our

Page 104

SIMON YOON

1  number.
2     **Q   What did you do to put together the**
3  **number?**
4     A   We will keep assessing -- once
5  again, it goes back to the horse-trading
6  over numbers.
7        What minimum amounts can we
8  increase our offer by so as to be acceptable
9  to the insured.  And that was the whole
10 process really in terms of the whole
11 mediation, was to get to drive our number,
12 the total number for us as low as possible.
13       And as soon as that was done,
14 within the joint carrier group, because
15 there were certainly benefits for us to do
16 that within the joint carrier group.  The
17 asbestos claimants were given discounts.
18 The insured because of its urgency in terms
19 of finalizing its reorg plan was willing to
20 give carriers discounts.
21       We talked about the 524G protection
22 that the carriers will also be beneficiary
23 of.
24       And so we stay in the group to

26 (Pages 101 to 104)

Page 105

SIMON YOON

1
2  get -- for our interest to drive our overall
3  number down.
4        Once we got to a number that we
5  were comfortable with, at that point then we
6  basically, you know, deviated or departed
7  from the group because we had our second
8  interests that we had to effectuate which
9  was to get the longest possible pay stream.
10  Q   In your view did the carriers get a
11  good deal from Halliburton?
12  A   I was comfortable with what we got.
13        MR. KENNEDY: Let's mark as
14  Clearwater Exhibit 42, a document
15  that's entitled AIG's Total
16  Obligation As Per 4-26-04 Settlement
17  Suggestion.
18        And it's Bates-stamped
19  3-GRANITE-007178 through
20  3-GRANITE-007179.
21        (Clearwater Exhibit 42, AIG's
22  Total Obligation As Per 4-26-04
23  Settlement Suggestion,
24  3-GRANITE-007178 through
25  3-GRANITE-007179, was marked for

Page 106

SIMON YOON

1
2  Identification.)
3  BY MR. KENNEDY:
4  Q   Take as much time as you'd like to
5  look at it.
6        My first question is: Do you see
7  the handwriting on this document?
8  A   Yes.
9  Q   Is it yours?
10  A   Yes.
11  Q   You see in the middle of the page
12  that says "our share under 2009 and 2010
13  payouts"?
14  A   Yes, I see that.
15  Q   And then you have a nominal amount
16  of 223.2 million and then an NPV 5.5 percent
17  of 173.6 million.
18        Do you see that?
19  A   I do see that.
20  Q   Why did you write those notes?
21  A   Why did I write them?
22  Q   Let me withdraw the question.
23        What do those notes mean?
24  A   What it says, "our share under the
25  2009 and 2010 payouts."

Page 107

SIMON YOON

1
2  Q   But, you appreciate the fact that a
3  reader without any context would not
4  understand what that means?
5  A   Okay.
6  Q   So what's it in reference to and
7  what does it signify?
8        MR. WILDER: Objection. Asked
9  and answered.
10  A   It says here "nominal amounts" and
11  the net -- "NPV" stands for net present
12  value amount.  Under the '09 and 2010
13  payouts.
14  Q   What are the '09 and 2010 payouts.
15        What does that mean?
16  A   The best of my recollection, that's
17  probably referring back to whatever Nera was
18  running at that time.
19  Q   Okay.
20        Whatever Nera was running in to
21  their reports?
22  A   In terms of their runs as to what
23  the carriers' contributions would be.
24  Q   Then you see under this -- under
25  the chart here there's two asterisks and it

Page 108

SIMON YOON

1
2  says "This percentage represents the average
3  of those percentages obtained for those
4  policies for which we are able to obtain
5  Nets," capital N, "at this time."
6        Do you see that?
7  A   I see that.
8  Q   What is the "Nets" reference?
9  A   Nets is referring to, from what I
10  recall looking at this, I'm talking about
11  what our final obligation would be outside
12  of or taking into account reinsurance.
13  Q   And did you calculate Nets at all?
14  A   No.
15  Q   Who would do that?  Whose
16  responsibility would that be?
17  A   It would be someone like Paul
18  Colon.
19        MR. KENNEDY: Let's mark as
20  Clearwater Exhibit 43, an e-mail from
21  Jeff Genereux to Chris Eskeland dated
22  May 11, 2004.  Bates-stamped
23  GRANITE-ALAN GRAY-1242 to 1243.
24        (Clearwater Exhibit 43, E-mail
25  chain, top e-mail dated Tuesday,

27 (Pages 105 to 108)

SIMON YOON

1
2     May 11, 2004, 8:39 a.m.,
3     GRANITE-ALAN GRAY-1242 and
4     GRANITE-ALAN GRAY-1243, was marked
5     for Identification.)
6     BY MR. KENNEDY:
7         Q     Who is Jeff Genereux?
8         A     Jeff Genereux works at Alan Gray.
9         Q     And did you work with him on the
10    Dresser account?
11        A     Yes.
12        Q     And who is Mike Ceppi?
13        A     Mike Ceppi is also with Alan Gray.
14        Q     Is Mike Ceppi the supervisor of
15    Jeff Genereux, do you know?
16        A     I believe he is, yes.
17        Q     Now, it says, if you look at the
18    Jeff Genereux e-mail of Monday, May 10,
19    2004.
20            Do you see that?
21        A     The 5:51 p.m. one?  Yes.
22        Q     It says "Mike, Attached are
23    preliminary numbers on Halliburton as
24    follows: One, AIG has agreed to pay
25    223.2 million with a value at 5.5 percent of

SIMON YOON

1
2     $173.56 million."
3            Do you see that, Mr. Yoon?
4         A     I see that.
5         Q     Do you know what he's referencing
6     there?
7         A     I think he's talking about the NPV
8     value of 173 that AIG companies agreed to
9     and based on his calculation here in terms
10    of these time periods that he's dealing
11    with, I guess it's the '09 and 2010, what
12    the nominal value of that would be.
13        Q     And under the settlement agreement
14    that we looked at earlier that was marked as
15    Exhibit 39, Halliburton agreed to accept a
16    payment of $173.6 million roughly for the
17    settlement of its coverage claims against
18    AIG companies; isn't that right?
19        A     That was the NPV value, yes.
20        Q     That was the amount of money that
21    they agreed to accept to release the AIG
22    companies of all of its claims under the
23    policies that were in dispute, right?
24        A     If you calculate that as the
25    present value, yes, the NPV, yes.

SIMON YOON

1
2         Q     That was the total dollar amount,
3     right?
4         A     Under present value basis, yes.
5     173.
6         Q     And the net present value of an
7     amount of $223 million, was that the nominal
8     amount?
9         A     Under our ultimate agreement?
10        Q     No.  Under the global settlement
11    agreement with the Halliburton/Dresser
12    entities.
13            Did the AIG companies agree to a
14    $223.2 million nominal amount?
15        A     No.
16        Q     No?
17        A     No.  Because all we cared about in
18    terms of the joint carrier group was the
19    NPV.  Because once we drove the NPV level
20    down to a level we were comfortable with, as
21    I said before, then we are going to leave
22    the group because then we had to go and
23    pursue the second key component for us,
24    which is the longest possible pay stream
25    that we can get.

SIMON YOON

1
2         Q     And that's where Lehman Brothers
3     came in, right?
4         A     Ultimately, yes.
5         Q     And the reference here on the
6     second sentence says "if AIG/Lehman pays
7     Halliburton 165 million."
8            Do you see that?
9         A     I see that.
10        Q     What was the reference to Lehman?
11            MR. WILDER:  Object to the
12    form.  Also speculation.
13        A     I don't know.  This is not my
14    e-mail.  I don't know.
15        Q     All right.
16            Do you know that AIG had worked
17    with Lehman before to settle other asbestos
18    accounts?
19        A     I didn't know that.
20        Q     You didn't know that?
21        A     I did not know that until recently.
22        Q     When did you learn that?
23        A     While getting prepped last month in
24    terms of the Lexington/Clearwater
25    litigation.

28  (Pages 109 to 112)

Page 113

SIMON YOON

1
2    Q    And the payment date here that's in
3    the chart, if you look at it.  It says,
4    "below the discount rate of 5.5 percent."
5         You see the chart there where the
6    first entry is "payment date"?
7    A    I see that.
8    Q    And it has under that two dates,
9    7-05-09 and 7-05-2010.
10        Do you see that?
11   A    I see that.
12   Q    And that is actually the same
13   payment dates reflected in Exhibit 42 in
14   your handwriting, right?
15   A    I can't say for sure because in
16   Exhibit 42 I just said '09 and 2010.
17   Q    So you can't say for certain?
18   A    No.
19   Q    Okay.
20        If you look at Paragraph 2, says,
21   "Assuming AIG can get Halliburton to agree
22   to take 165, I put together a payment stream
23   modeled somewhat after the Pfizer
24   Scenario 3."
25        Do you see that?

Page 114

SIMON YOON

1    A    I see that.
2    Q    Do you have an understanding of
3    what Pfizer Scenario 3 is?
4    A    No.
5         MR. KENNEDY:  Let's mark as
6    Clearwater Exhibit 44, an e-mail from
7    HWL EB Parks to various individuals
8    including David Florin, dated June 9,
9    2004.  And it's with attachment and
10   it's Bates-stamped GS-
11   CONFIDENTIAL-002696 through 002704.
12       (Clearwater Exhibit 44, E-mail
13   chain, top e-mail dated Wednesday,
14   June 9, 2004, 9:15 a.m.,
15   GS-CONFIDENTIAL-002696 through GS-
16   CONFIDENTIAL-002704, was marked for
17   Identification.)
18   BY MR. KENNEDY:
19   Q    Mr. Yoon, I want to direct your
20   attention to the e-mail below in the middle
21   of page.
22       It's from Michael Zanic.
23       Do you see that?
24   A    June 7, 4:31 p.m.?

Page 115

SIMON YOON

1
2    Q    Yes.  2004.
3    A    I see it.
4    Q    And it's to, among others, John
5    Shea?
6    A    Yes.
7    Q    And he is attaching a draft term
8    sheet from Dresser/Halliburton.
9         If you look at the attachment,
10   which begins on 002698.
11        Do you see that?
12   A    Yes.
13   Q    And do you have an understanding
14   generally that at this point in June of
15   2004, the parties were discussing the
16   drafting of their settlement agreements that
17   they would enter into?
18   A    That's what I recall.
19   Q    And this was after, again, the
20   settlement in principle between the joint
21   defense group and the Halliburton/Dresser
22   entities in May of 2004?
23   A    I'm not sure about the May part,
24   but yeah, I think generally, yes.
25   Q    Calling your attention to the first

Page 116

SIMON YOON

1
2    page of the term sheet, it says Paragraph 1.
3    "Payment."
4         And it says "Subject to the
5    fulfillment of each of the conditions
6    identified herein, each of the participating
7    carriers shall make cash contributions to
8    DII Industries in the amounts (each payment
9    obligation and collectively the payment
10   obligations) and on the dates identified in
11   Attachment 2."
12        Then it says "The aggregate amount
13   of the payment obligation is hereafter
14   collectively referred to as the settlement
15   amount."
16   A    I see that.
17   Q    Is that collective amount the
18   global amount that the joint defense group
19   agreed to pay to Halliburton/Dresser
20   entities?
21   A    I'm not sure about that.  And it
22   certainly did not include -- I don't think
23   it included our part.
24   Q    Okay.
25        At this point when it references

## Page 117

SIMON YOON

1  participating carriers, AIG companies were
2  participating carriers, right?
3      A   I don't specifically -- I don't
4  recall.  I think we were.
5      Q   Look at Footnote 2 and that's
6  really -- is it says "The precise form and
7  payment schedule for AIG's agreed NPV
8  payment obligations will be determined on
9  terms acceptable Halliburton and AIG."
10     A   I see that.
11     Q   And that I think we agree that the
12  NPV payment obligations was $173.6 million,
13  right?
14     A   173 and change.
15     Q   And change yeah.
16         Now, the reason for this footnote
17  was to address AIG's second concern, as you
18  said, was just to get the longest payment
19  stream possible, right?
20     A   That is correct.
21     Q   And what was the interest of AIG to
22  have the longest payment stream possible?
23     A   I think as with anybody, you know,
24  it allowed you to better control your cash

## Page 118

SIMON YOON

1  flow.
2      Q   So by participating with the joint
3  defense group, you got the best deal or
4  AIG's companies got the best deal they could
5  because they got Halliburton to take for the
6  AIG companies' share the $173.6 million net
7  present value amount?
8      A   Correct.
9          MR. KENNEDY:  If we can mark as
10  Clearwater Exhibit 45, an e-mail from
11  Thomas Wilkinson to Mr. Yoon dated
12  May 8, 2004 and it's Bates-stamped
13  GRANITE-STATE-PRIV-0006812 to
14  0006815.
15         (Clearwater Exhibit 45, E-mail
16  dated Saturday, May 8, 2004,
17  11:17 p.m., with attachments,
18  GRANITE-STATE-PRIV-0006812 to
19  GRANITE-STATE-PRIV-0006815, was
20  marked for Identification.)
21  BY MR. KENNEDY:
22     Q   Take as much time as you'd like to
23  look this over, but I wanted to call your
24  attention to what Mr. Wilkinson seemed to be

## Page 119

SIMON YOON

1  forwarding on to you which are the
2  attachments and those look like they begin
3  on 6814 and 6815.
4      A   Okay.
5      Q   And you see there's identification
6  of the participating carriers including
7  various AIG companies, right?
8          I'm sorry.  I'm at 6859.
9      A   Okay.
10         It's says "Payments by Carrier,
11  Participating Carriers Only."
12     Q   And if you look at the title, it
13  says "Payments by Carrier, Participating
14  Carriers Only, NPV at 5.5 percent."
15         And then if you look directly down
16  it says "Nominal payments for participating
17  carriers."
18     A   I see that heading.
19     Q   And you see the dates January 1,
20  2005 to January 1, 2010?
21     A   July 1, 2010.
22     Q   To July 1, 2010.
23     A   Yes, I see that.
24     Q   If you look for the AIG companies,

## Page 120

SIMON YOON

1  their entries for July 1, 2009 and July 1,
2  2010.
3      A   You want me to look for all the --
4      Q   You can look at them but basically
5  I just want to see if you are in agreement
6  that generally you don't see any AIG company
7  with amounts prior to July 1, 2009?
8      A   From my quick review, that appears
9  to be the case.
10     Q   And then we talked about your prior
11  exhibit here, if you look to 42.
12     A   Okay.
13     Q   And you wrote "Our share under
14  2009/2010 payments"?
15     A   Yes.
16     Q   And then you have the nominal
17  amount and the NPV amount, right?
18     A   Yes.
19     Q   Is that what you are referring to,
20  is this time period here on this sheet?
21     A   I can't say one way or the other
22  right now.
23     Q   You think that's correct?
24     A   I can't say.

Page 121

SIMON YOON

1  
2  Q    Well, why was Mr. Wilkinson sending
3  this to you?
4      MR. WILDER: Objection. Calls
5  for speculation.
6  A    I don't know why.
7  Q    You have no idea, Mr. Yoon?
8  A    He was sending it because I'm
9  thinking because he's our counsel and this
10  is one of the things that's happened within
11  the carrier group.
12  Q    Right.
13      But you understand that he's
14  sending you these as the global numbers that
15  the joint defense group agreed to with
16  respect to the Halliburton/Dresser
17  settlement?
18  A    The joint carrier group agreed
19  to -- I think these were the amounts that
20  the carriers individually were willing to
21  contribute. I believe.
22  Q    And this was the Nera spreadsheet
23  you referred to earlier, isn't it?
24  A    This is one of Nera's spreadsheets.
25  There are lots of Nera spreadsheets.

Page 122

SIMON YOON

1  
2  Q    You are right.
3      MR. KENNEDY: Let's mark as
4  Clearwater Exhibit 46.
5      And it's an e-mail from Mr. Yoon to
6  Leticia Diaz dated February 10, 2005.
7      And it's with attachments.
8      And it's Bates-stamped
9  3-GRANITE-007154 through
10  3-GRANITE-007176.
11      (Clearwater Exhibit 46,
12  E-mail, dated Thursday,
13  February 10, 2005, 1:35 p.m., with
14  attachments, 3-GRANITE-007154
15  through 3-GRANITE-007176, was
16  marked for Identification.)
17  A    Okay.
18  Q    You can take all the time you'd
19  like to look at this document, but I'd like
20  you to go to what's been Bates-stamped
21  3-GRANITE-007169.
22  A    Okay.
23  Q    Is that your handwriting?
24  A    This looks like my handwriting.
25  Q    And you recognize this Nera

Page 123

SIMON YOON

1  
2  spreadsheet as the one we were just looking
3  at in Exhibit 45?
4  A    Let me just go back to Exhibit 45.
5      From my quick review, it seems to
6  be the same thing from Exhibit 45.
7  Q    Okay.
8      And you see that below here under
9  the Participating Carriers column under the
10  Nominal and the NPV columns?
11  A    Okay.
12  Q    There's your handwriting, right?
13  A    I believe so, yes.
14  Q    Is it your understanding that the
15  $223,179,583 is AIG company's share of the
16  total nominal amount on this document?
17  A    I think that's what I was adding up
18  based on what's on this sheet which has a
19  nominal calculation up to July 2010.
20  Q    But what we saw in the term sheet
21  and what you said is -- AIG was interested
22  in the net present value amount, right?
23  A    Correct.
24  Q    In the settlement with Dresser/
25  Halliburton?

Page 124

SIMON YOON

1  
2  A    Correct.
3  Q    And you calculated that amount,
4  didn't you?
5  A    The net present value? Yes.
6  Q    And where is that?
7  A    Right next to -- on the
8  Participating Carrier columns.
9      There's one for nominal and one for
10  NPV.
11  Q    And that's the amount that the AIG
12  companies on the net present value agreed to
13  contribute to the total net present value
14  amount of the carrier group, right?
15  A    Carrier group offer, yes.
16  Q    Which the total amount is
17  $624,984,393, right?
18  A    Regarding that, I could only go by
19  what's here.
20      That appears to be the case.
21  Q    Now, if you go to 3-GRANITE-007165.
22  And it's up further in the same document.
23  A    Okay.
24  Q    This looks like another Nera
25  spreadsheet; is that right?

31 (Pages 121 to 124)

Page 129

SIMON YOON

1   contribution -- let me withdraw the
2   question.
3        Do you understand that this is a
4   summary of the nominal payments that the
5   participating carriers offered to make to
6   Halliburton/Dresser?
7   A   That's my understanding.
8   Q   And you also see that it's a
9   summary or total amount of the net present
10  value amount that the participating carriers
11  were offering to pay Dresser/Halliburton?
12  A   It appears to be. Just has the
13  "NPV" below what appears to be the nominal
14  amount.
15  Q   Which you can find those numbers on
16  the preceding page, right?
17  A   I believe so, yes.
18  Q   And then if you look
19  2-GRANITE-001832 and we are on Exhibit 47.
20       So the one I just marked. First
21  page.
22  A   Okay.
23  Q   And then if you go to
24  2-GRANITE-1838.

Page 130

SIMON YOON

1   A   Okay.
2   Q   You see at the bottom of 1838 the
3   NPV at 5.5 percent, the total amount?
4   A   Yes. What it says here is looks
5   like 624,984,393.
6   Q   Right.
7        And you've got the same footnote
8   that you seen before, Number 2, where it
9   says "The precise form and payment schedule
10  for AIG's agreed NPV payment obligations
11  will be determined on terms acceptable to
12  Halliburton and AIG."
13  A   I see that.
14  Q   Okay.
15       Now, if you go to the first page of
16  Exhibit 47.
17  A   Okay.
18  Q   You see the "AIU companies"?
19  A   Yes.
20  Q   And then you see under the Nominal
21  column under Participating Carriers?
22  A   Yes.
23  Q   You see Footnote 2?
24  A   Yes.

Page 131

SIMON YOON

1   Q   And then you go to Footnote 2 and
2   it's just as we read, right?
3   A   That appears to be.
4   Q   Because we established that AIG at
5   this point in time, in May of 2004, is
6   interested only in contributing to the net
7   value amount to the global settlement
8   agreement with Halliburton and Dresser?
9   A   Not interested?
10  Q   That's what they agreed to?
11  A   The only thing that we agreed to at
12  that point was the NPV value of 173 and
13  that, you know, wasn't the end-all of
14  whatever agreement was evident because, as I
15  said, the second component was the longest
16  possible pay stream that we wanted.
17  Q   I understand that part.
18       But in terms of the net present
19  value amounts, if you go back to
20  2-GRANITE-1832 to 1837.
21  A   Okay.
22  Q   Within those pages, if you look at
23  that, there are only -- next to "AIG
24  Companies" there's only the net present

Page 132

SIMON YOON

1   value amount?
2   A   From my quick review, that appears
3   to be.
4        Actually, I'm not looking at all
5   the other carriers but I'm looking at what
6   seems to be -- what are AIG member companies
7   and they only seem to have the NPV values.
8   Q   And if you add up those net present
9   value amounts, we know it's $173,620,556,
10  right?
11  A   If I did my original calculation
12  correctly on Exhibit 44.
13  Q   Where are you looking? Exhibit 46?
14  A   Is it 46?
15       So if I did my calculations
16  correctly on Exhibit 46, it would be
17  173 million and change.
18  Q   Okay.
19       So these spreadsheets then are,
20  these are the spreadsheets of the
21  carriers -- what each carrier agreed to
22  contribute on either a nominal basis or a
23  net present value basis to the global
24  settlement agreement offer to Halliburton

Page 133

SIMON YOON

1  and Dresser?
2  
3    A    That's my understanding, yes.
4    Q    Now, looking at the other carriers,
5  do you know whether they paid the nominal
6  amount or their net present value amount?
7    A    I do not know.
8    Q    Let's just talk about the
9  settlement agreement without looking at
10 documents and maybe we can avoid marking
11 more exhibits.
12   A    Okay.
13   Q    There was interest by AIG to pay
14 their net present value amount over the
15 longest period of time possible, right?
16   A    Correct.
17   Q    So they had discussions -- you had
18 discussions or AIG had discussions with
19 Halliburton regarding that, right?
20   A    I believe starting from April or
21 maybe even a little earlier in 2004, once
22 the NPV values were -- the final NPV values
23 were being put together that was acceptable
24 or getting close to being acceptable to
25 Dresser or Halliburton, for AIG member

Page 134

SIMON YOON

1
2  companies, I was already looking for the
3  longest possible pay stream.
4         And we may have communicated that
5  at that time.
6    Q    To Halliburton?
7         MR. WILDER:  Could you read
8  back that question and answer.
9         (Requested portion of record read:
10        "Q. So they had discussions -- you
11 had discussions or AIG had discussions
12 with Halliburton regarding that, right?
13        "A. I believe starting from April
14 or maybe even a little earlier in 2004,
15 once the NPV values were -- the final NPV
16 values were being put together that was
17 acceptable or getting close to being
18 acceptable to Dresser or Halliburton, for
19 AIG member companies, I was already
20 looking for the longest possible pay
21 stream.")
22        MR. WILDER:  Thank you.
23 BY MR. KENNEDY:
24   Q    And is it fair to say that
25 Halliburton -- fair to say that they agreed

Page 135

SIMON YOON

1
2  to that concern or they understood it -- let
3  me withdraw the question.
4         That they understood that issue
5  that AIG was raising about the longest
6  possible payment stream?
7    A    I don't think they cared about
8  that.
9         What Halliburton was expressing to
10 us was that they wanted as much money
11 upfront as possible.
12   Q    So as long as there was a
13 arrangement where they would get their money
14 as quickly as possible, they were fine with
15 AIG arranging for some other alternative
16 payment options.
17        Is that fair?
18   A    No.  When they expressed to us that
19 they wanted as much money upfront as early
20 as possible and approached us about that, we
21 tried to facilitate that process.  Because
22 there was also, as you pointed out, some
23 benefit to us as well, a key benefit which
24 was through that we could try to lengthen
25 our pay stream.

Page 136

SIMON YOON

1
2    Q    Okay.
3         MR. KENNEDY:  You want to take
4  a break now.
5         MR. WILDER:  For lunch.
6         (A luncheon recess was
7  taken at 12:59 p.m. to 1:52 p.m.)
8  A F T E R N O O N  S E S S I O N
9         SIMON YOON,
10 resumed, having been previously
11 duly sworn, was examined
12 and testified further as follows:
13 CONTINUED EXAMINATION BY MR. KENNEDY:
14        MR. KENNEDY:  I'll mark as
15 Clearwater Exhibit 48, an e-mail from
16 Jeff Genereux dated May 5, 2004 to
17 Mike Ceppi.
18        And it's Bates-stamped GRANITE-ALAN
19 GRAY-1427 to GRANITE-ALAN GRAY-1428.
20        (Clearwater Exhibit 48, E-mail
21 chain, top e-mail dated May 5,
22 2004, GRANITE-ALAN GRAY-1427 and
23 GRANITE-ALAN GRAY-1428, was marked
24 for Identification.)
25

34  (Pages 133 to 136)

**WINTER REPORTING, INC.    (212) 953-1414**

Page 141

SIMON YOON

1  be the agreement to partition the
2  Studebaker-Worthington/McGraw-Edison limits?
3     A   It appears to be.
4     Q   And it happened in and around the
5  time of the final written settlements
6  between AIG companies and Halliburton and
7  Dresser, right?
8     A   I think around that time period,
9  yeah.
10    Q   November 2004?
11    A   Yes.
12    Q   Then if we go back to Exhibit 48,
13  which we were just on.
14    A   Yup.
15    Q   Staying on the second page there.
16  Two, it states "Dresser will
17  consider a longer payout."
18       Do you see that?
19    A   Yes.
20    Q   And then it says "Dresser would be
21  interested in financial instrument to
22  finance long-term payout as long as they can
23  sell it to the market and wants AIG to do it
24  because they are more sophisticated at it."

---

Page 142

SIMON YOON

1     Appears that 2 and 3 go to the
2  subject we have already discussed and you've
3  already testified to and that is AIG was
4  interested in a longer payout stream than
5  what Dresser wanted; is that fair to say?
6     A   I think generally, yeah.
7     Q   Do you know how quickly Dresser
8  wanted AIG to make their payment -- their
9  net present value payment?
10    A   They wanted it yesterday.
11       As I said before, they wanted as
12  much money as early as possible.
13    Q   From all carriers?
14    A   From all carriers and I think
15  that's the reason -- and I believe it's
16  reflected in terms of term sheets where they
17  specifically asked for I believe the ability
18  to assign the agreement with even the joint
19  carriers.
20    Q   So they could sell the payment
21  obligations out to the marketplace, right?
22    A   That was my understanding.
23    Q   So they get immediate money?
24    A   Correct.

---

Page 143

SIMON YOON

1     Q   But at this point, it appears that
2  they were agreeable to consider some sort of
3  financing of the AIG amount as long as they
4  were paid right away?
5     A   I think that was generally the
6  case.
7     Q   Now, you see 4, it says "Mediator
8  is going back to the group requesting
9  everyone increase NPV by 2 percent."
10    A   I see that.
11    Q   And it says "up to certain amounts,
12  to 640 million."
13       Do you see that?
14    A   I see that.
15    Q   And we looked at documents earlier,
16  the Nera spreadsheets that reflect actually
17  the net present value amount ended up being
18  around $624 million, right?
19    A   That was the certainly NPV value in
20  terms of exhibits you showed me. I'm not
21  sure what stage those discussions involving
22  the mediator those prior exhibits referenced
23  but that was certainly one of the amounts at
24  issue.

---

Page 144

SIMON YOON

1     There were so many. There were so
2  many going back and forth.
3     Q   Okay.
4        And I don't mean to belabor this
5  but I just want to make it clear because we
6  were looking at a few today.
7     A   Okay.
8     Q   And just so I'm clear on this, if I
9  would show you Clearwater Exhibit 46 and you
10  were to go to 3-GRANITE-007169.
11    A   Okay.
12    Q   That has your handwriting on it I
13  think we talked about, right?
14    A   Yes.
15    Q   And I think I understood you to say
16  that the notation of $173,620,556 was the
17  net present value amount of -- let me
18  withdraw that -- that 173 is AIG's share of
19  the net present value amount that was
20  offered by the carriers in settlement of the
21  Dresser/Halliburton claims, right?
22    A   As reflected here, yes.
23    Q   And then I think we looked at how
24  you would calculate that. If you go to

36  (Pages 141 to 144)

Page 149

SIMON YOON

1              SIMON YOON
2  page, you see that same $624 million net
3  present value number?
4    A  I see that.
5    Q  And you don't see a nominal amount,
6  total nominal amount?
7    A  Not in this exhibit, no.
8    Q  And if you go to Exhibit 47 and you
9  look at 2-GRANITE-001832 to 2-GRANITE-001838
10  and you look at all the AIG company numbers,
11  they are all net present value numbers?
12      MR. WILDER:  That was asked and
13  answered.
14    Q  Right?
15    A  Yes.
16    Q  And if you were to add those up, we
17  agree it would be 173 million plus?
18    A  I would think so.
19    Q  Yes?
20      I just want to -- I know we went
21  over this before.  I just want to, because
22  you said you weren't certain about certain
23  dates so I want to get clarification.
24      Yes, you would think so?
25    A  Yes.

Page 150

1              SIMON YOON
2    Q  And that is the amount -- that
3  173.6 and change is the amount that AIG
4  agreed to pay Dresser/Halliburton net
5  present value in settlement of the coverage
6  against the AIG companies?
7    A  Right.  That's the net present
8  value basis which, once again as I said many
9  times already, half of the consideration for
10  us in terms of getting this deal done with
11  Halliburton.
12      The other part being the payment
13  stream.
14    Q  Okay.
15      And on the global payment amount,
16  we're talking about, for example, Exhibit 47
17  representing the amounts the paying carriers
18  were going to pay either on a nominal basis
19  or a net present value basis?
20      MR. WILDER:  Object to the
21  form.
22    A  I missed the first part of that
23  question.
24    Q  The global amount that the insurer
25  group agreed to pay was one lump sum, right?

Page 151

1              SIMON YOON
2  Or it was -- either it was a lump sum on a
3  nominal basis or net present value basis,
4  right?
5    A  What I'm saying, I'm not definitive
6  one way or the other in terms of nominal or
7  net present value in terms of all the
8  carriers together, because obviously my goal
9  is to focus on AIG member company's limits.
10      And so once we arrived at the 173
11  NPV value then, as I said before, I moved on
12  to the next stage for us to get the longest
13  possible payout.
14      And so basically what I'm saying,
15  from that time period as to what all the
16  other carriers are paying, I know there were
17  term sheets that we went through, it was
18  being communicated to Halliburton, it really
19  didn't matter to us.
20    Q  But I'm just talking --
21    A  That's why I can't be definitive.
22    Q  I understand.  It's your
23  understanding that the amounts agreed to be
24  paid by the carriers in total settlement to
25  Dresser/Halliburton along with AIG was a

Page 152

1              SIMON YOON
2  global amount, right?
3      I mean, that was the point of
4  staying in the global joint defense group,
5  to get the best deal, right?
6      MR. WILDER:  Object to the
7  form.  Compound.
8    A  To arrive at one, initially the one
9  global amount, yes.
10    Q  And that's represented in
11  Exhibit 47 and other exhibits that we've
12  seen, right?
13    A  I believe so.  Yes.
14    Q  And that represents the amount that
15  the carriers as a group were willing to pay
16  Halliburton/Dresser in settlement of the
17  coverage amounts that they were making
18  against those carriers, including the AIG
19  companies?
20    A  That's my understanding.
21    Q  Let's go back to Exhibit 48.
22    A  Okay.
23    Q  On 5, it says "Chris/Simon are
24  getting their numbers together to determine
25  how much they have committed already for

Page 153

SIMON YOON

2  other accounts to determine what they can
3  pay 2008 forward."
4        Do you see that?
5    A   I see that.
6    Q   Do you recall getting numbers
7  together?
8    A   No.
9    Q   I take it the other accounts would
10  be the other toxic tort accounts?
11   A   I think that would be my
12  understanding.
13   Q   Now, was there an annual cap in
14  place for how much AIG could pay on toxic
15  tort accounts?
16   A   I don't remember. I don't remember
17  that.
18   Q   Were there any caps that you
19  remember for -- just generally any caps?
20   A   You know, that's something that was
21  really for Chris.
22   Q   Well, I understand maybe really for
23  Chris, but I'm asking you.
24   A   I'm not aware of any.
25   Q   You're not aware of any, generally?

Page 155

SIMON YOON

2    A   Okay.
3    Q   You see 3(1)(a)?
4    A   Yes.
5    Q   The reference to the purchaser in
6  that paragraph, is that to a Lehman Brothers
7  Control Trust?
8    A   I believe that's what that's in
9  connection with.
10   Q   So effectively the purchaser was
11  Lehman Brothers?
12   A   I'm just trying to remember the
13  relationship with the purchaser.
14       MR. WILDER: Read the question
15  back, please.
16       (Requested portion of record read:
17       "Q. So effectively the purchaser
18       was Lehman Brothers?")
19       (End of read-back.)
20   A   I don't recall just from this
21  subsection who the purchaser actually was.
22  I think there were other documents that may
23  clarify that.
24   Q   And you recall seeing other
25  documents that clarify it?

Page 154

SIMON YOON

2    A   What I always understood is that
3  you can't pay any and all amount at any time
4  you want, so as I mentioned before, there
5  are cash flow considerations that we took
6  into account in terms of looking for the
7  longest possible pay stream.
8        Was I specifically aware of a cap?
9  No.
10   Q   But I mean, Mr. Yoon, let me remind
11  you, you are under oath.
12   A   Yes.
13   Q   And I'm asking you again your
14  vaguest recollection of any cap or limit to
15  paying out toxic tort claims?
16       MR. WILDER: Asked and answered
17       and argumentative.
18   A   I don't recall. I don't recall
19  that.
20   Q   If you go to Exhibit 39, please,
21  Mr. Yoon.
22       That's the Halliburton/Dresser/AIG
23  company settlement agreement?
24   A   Okay.
25   Q   And if you go to Page 10?

Page 156

SIMON YOON

2    A   I'm saying I think there are other
3  documents that would clarify that.
4    Q   That would clarify it?
5        Well, let's go back then to --
6    A   I think the purchaser was the trust
7  that was created by or created in connection
8  with the Lehman financing.
9    Q   The Lehman financing of the
10  $173.6 million-plus settlement amount to
11  Halliburton?
12   A   Right. The 173 and change, yes.
13   Q   And if we go to Exhibit 3 of the
14  settlement agreement, 2-GRANITE-000166.
15   A   Okay.
16   Q   You see Paragraph A.
17   A   I see A.
18   Q   You see the definition where it
19  says "AIG settlement payments."
20       Do you see that?
21   A   I see that.
22   Q   And it says that "AIG companies
23  will be obligated to make a stream of
24  payments at amounts at times agreed between
25  the AIG companies and the purchaser."

39  (Pages 153 to 156)

Page 157

SIMON YOON

1
2       Do you see that?
3       A    "AIG companies will be obligated to
4  make a stream of payments in amounts and at
5  times" -- yes.
6       Q    And that relates to the financing
7  agreement?
8       A    I believe so.
9       Q    And what was the total amount that,
10 if you recall generally speaking, that AIG
11 agreed to pay Lehman Brothers for financing
12 of the Halliburton/Dresser settlement
13 payment?
14      A    I believe the total amount is
15 262 million and change which I understood to
16 be the nominal amount for the ten-year
17 period of 173 NPV amount.
18      Q    And the ten-year period being from
19 2005 to the end of 2014, around there?
20      A    Something like that, yes.
21           MR. KENNEDY:  And I'll mark as
22 Clearwater Exhibit 49, an e-mail from
23 Donal, D-O-N-A-L, Luna to, among
24 others, Mr. Yoon dated November 15,
25 2004.

Page 158

SIMON YOON

1
2      Bates stamped 3-GRANITE-008680
3  through 8695.
4      (Clearwater Exhibit 49, E-mail
5  dated November 15, 2004, 9:20 a.m.,
6  with attachment, 3-GRANITE-008680
7  through 3-GRANITE-008695, was
8  marked for Identification.)
9  BY MR. KENNEDY:
10      Q    Now, just taking a step back.
11           Do you understand that as part of
12 the AIG companies and Dresser/Halliburton
13 settlement, there was an assignment
14 agreement?
15      A    Yes.
16      Q    And that assignment agreement was
17 between Halliburton/Dresser entities and
18 Lehman Brothers, effectively?
19      A    That's my understanding, yes.
20      Q    And under that assignment
21 agreement, Halliburton/Dresser entities
22 agreed to assign any and all rights to the
23 AIG company financing payments over to
24 Lehman Brothers?
25           Is that your understanding

Page 159

SIMON YOON

1
2  generally?
3      A    I don't recall that.
4      Q    Looking at Exhibit 49, do you have
5  any reason to believe you didn't get this
6  e-mail?
7      A    No.
8      Q    If you go to the last page, which
9  is 3-GRANITE-008695.
10      A    Okay.
11      Q    Does that appear to be the payment
12 stream by AIG to Lehman Brothers?
13      A    It looks like it, yes.
14      Q    And that was for the financing of
15 the Halliburton/Dresser settlement?
16      A    Yes.
17      Q    I thought I recalled you testifying
18 that by April of 2004, late April 2004, AIG
19 companies and Halliburton were getting
20 closer to a number they both could agree to.
21           Is that fair to say?
22      A    Yes.
23           The lead-up to that is obviously
24 what the AIG member companies were willing
25 to pay within the global context which I

Page 160

SIMON YOON

1
2  believe around that time Halliburton/Dresser
3  was I believe getting more comfortable with.
4      But, yeah.
5      Q    Okay.
6           And if you go to Exhibit 42.
7      A    Okay.
8      Q    And you see it's AIG's "total
9  obligation as per 4-26-04 settlement
10 suggestion."
11      A    I see that.
12      Q    So is it fair to say based upon
13 this document that AIG is trying to
14 determine what its payment would be under a
15 global settlement offer to Dresser/
16 Halliburton?
17      A    Can you repeat that question.
18           (Requested portion of record read:
19           "Q. So is it fair to say based
20 upon this document that AIG is trying to
21 determine what its payment would be under
22 a global settlement offer to Dresser/
23 Halliburton?")
24           (End of read-back.)
25      A    I believe so.

40  (Pages 157 to 160)

WINTER REPORTING, INC.   (212) 953-1414

Page 161

SIMON YOON

1
2    Q    And is this document in connection
3    with those efforts?
4    A    Those efforts to --
5    Q    To determine the amounts that AIG
6    might pay under a settlement with
7    Halliburton/Dresser entities?
8    A    I think generally, yes, is one of
9    the things.
10         MR. KENNEDY: If I can mark as
11   exhibit -- Clearwater Exhibit 50, a
12   document entitled Dresser AIG,
13   Combined Harbison and Studebaker
14   Settlement Suggestion on April 26,
15   2004.
16         It's Bates stamped 3-GRANITE-007134
17   through 7148.
18         (Clearwater Exhibit 50,
19   Dresser AIG, Combined Harbison and
20   Studebaker Settlement Suggestion on
21   4-26-2004, 3-GRANITE-007134 through
22   3-GRANITE-007148, was marked for
23   Identification.)
24   A    Okay.
25

Page 162

SIMON YOON

1
2    BY MR. KENNEDY:
3    Q    In the upper left-hand corner --
4    handwriting in the upper left-hand corner,
5    is that your handwriting?
6    A    That looks like my handwriting.
7    Q    Can you tell me basically what this
8    document represents?
9    A    There are claim numbers, policy
10   numbers, policy limits, amounts to be paid.
11   Nets.
12   Q    Right. And this is in connection
13   with the Dresser/Halliburton settlement
14   discussions?
15   A    That's what it seems to say as the
16   heading.
17   Q    Do you have any reason to doubt
18   that it's not the case?
19   A    No.
20   Q    And it says the claim number is --
21   what does that represent, generally?
22   A    "Claim number" is the claim number.
23   Q    It was assigned by AIG?
24   A    Yes.
25   Q    And the policy number, that is the

Page 163

SIMON YOON

1
2    policy number of policies that are subject
3    to the Dresser/Halliburton settlement?
4    A    I believe so, yes.
5    Q    And "Gross to be paid."
6         What does that represent?
7    A    I don't recall.
8    Q    Does that look like an amount that
9    at least AIG by late April 2004 was
10   considering paying under these policies?
11   A    I can't say one way or the other.
12   Q    Would there be any reason -- can
13   you think of any other reason to put "gross
14   paid" like this if it weren't to determine
15   what AIG might pay under these policies?
16         MR. WILDER: Objection. Lacks
17   foundation.
18   A    No.
19   Q    So it seems reasonable that this
20   entry of "Gross to be paid" would relate to
21   amounts that AIG might be considering paying
22   in connection to the Harbison-Walker
23   settlement agreement?
24   A    I can't say one way or the other.
25   Q    You don't know, Mr. Yoon?

Page 164

SIMON YOON

1
2    A    No, I don't.
3    Q    No?
4    A    No.
5    Q    Really? You don't know if these
6    amounts reflect what AIG was considering to
7    pay in connection with the
8    Dresser/Halliburton settlement agreement?
9    A    They may very well be.
10   Q    And "the nets," I think you
11   testified earlier, relate to Mr. Colon's
12   efforts to determine the net amounts that
13   AIG was responsible for after reinsurance
14   was taken into account?
15         MR. WILDER: Objection.
16   Misstates the record.
17   A    Generally, the nets are referring
18   to the amounts that our policies -- the
19   amount that we would be obligated under the
20   policies, taking into account reinsurance.
21   Q    After reinsurance is considered?
22   A    Yes.
23   Q    Let's go through the claim numbers
24   here.
25         The 030 prefix, does that relate to

41 (Pages 161 to 164)

Page 177

SIMON YOON

1
2      If he had any questions, he may
3  come to me. I don't recall any specific
4  conversations.
5      Q   How about discussions with anyone
6  else other than Mr. Wactlar?
7      A   Like I said, it would only be with
8  counsel, to the extent that they still felt
9  they wanted to talk to me about that.
10     Q   And your understanding is after the
11  Dresser/Halliburton settlement, there were
12  still negotiations between Federal Mogul and
13  AIG companies?
14     A   I believe so, yes.
15     Q   And there were mediations, weren't
16  there?
17     A   That, I'm not sure of.
18     Q   Do you recall attending any
19  mediation sessions involving Federal Mogul?
20     A   No, I don't.
21         MR. KENNEDY: Let me mark as
22  Clearwater Exhibit 52, a document
23  entitled Memo from the Desk of Simon
24  Yoon, Bates-stamped GRANITE-
25  SITE-004832.

Page 178

SIMON YOON

1
2         (Clearwater Exhibit 52, Memo
3         from the Desk of Simon Yoon,
4         GRANITE-SITE-004832, was marked for
5         Identification.)
6         THE WITNESS: Okay.
7  BY MR. KENNEDY:
8      Q   Is that your handwriting?
9      A   It looks like it, yes.
10     Q   It looks like this note is dated
11  June 9, 2006?
12     A   It looks like it, yes.
13     Q   And you have an entry here,
14  Number 1 is "Trust expenses, very broad."
15         Do you see that?
16     A   Yes.
17     Q   Do you have an understanding of
18  what that means?
19     A   No.
20     Q   Do you know the circumstances under
21  which you wrote this note?
22     A   No.
23     Q   And Number 2, "Timing issue."
24         Do you see that?
25     A   I see that.

Page 179

SIMON YOON

1
2      Q   What did you mean by "Timing
3  issue"?
4      A   I don't recall.
5      Q   Do you see to the right of it, "FM
6  says there are various streams of
7  liability"?
8      A   Yes, I do see that.
9      Q   What did you mean by that?
10     A   Do I not recall.
11     Q   "FM trust," the note below that.
12         What did you mean by that?
13     A   I don't recall that, either.
14     Q   Did you see this document in
15  preparation of your deposition?
16     A   Yes, I did.
17     Q   You see "Notation reinsurance
18  issues"?
19     A   I see that.
20     Q   How did you know there were
21  reinsurance issues?
22         MR. WILDER: Object to the
23  form. Lacks foundation.
24     A   I didn't know that.
25     Q   What did you mean by that when you

Page 180

SIMON YOON

1
2  wrote that?
3      A   I don't recall why I wrote that.
4      Q   Were there any issues of allocation
5  with respect to Federal Mogul amounts that
6  you were thinking about paying?
7      A   I wasn't involved in terms of the
8  Federal Mogul account, and so I see this
9  exhibit in front of me, I see the date of
10  June 9, '06, but as I said, my involvement
11  was peripheral.
12         You know, and so I'm not aware of
13  any issues regarding allocation or anything
14  regarding Federal Mogul.
15     Q   All right.
16         You see "Wagner DJ" in sort of bold
17  print on the bottom there?
18     A   I see that.
19     Q   What did you mean by that notation?
20     A   I don't recall.
21         MR. KENNEDY: Mark as
22  Clearwater Exhibit 53, a document
23  entitled Memo from the Desk of Simon
24  Yoon, with attachment. Bates-stamped
25  GRANITE-SITE-005258 to 5259.

45  (Pages 177 to 180)

**WINTER REPORTING, INC.   (212) 953-1414**

Page 181

1          SIMON YOON
2       (Clearwater Exhibit 53, Memo
3     from the Desk of Simon Yoon, with
4     attachment, GRANITE-SITE-005258 and
5     GRANITE-SITE-005259, was marked for
6     Identification.)
7          THE WITNESS:  Okay.
8   BY MR. KENNEDY:
9       Q    You see this note, it says at the
10  very bottom "No Federal Mogul policies to
11  come into play with respect to asbestos
12  losses."
13          Do you see that?
14      A    I see that.
15      Q    What did you mean by that note?
16      A    I don't recall that.
17      Q    This is your handwriting, right?
18      A    Yes.
19      Q    Do you recall what you meant by
20  that?
21      A    I don't recall.
22      Q    You note, the first notation,
23  "Total available limits for Federal Mogul's
24  asbestos losses range from approximately
25  130 million to 150 million."

Page 182

1          SIMON YOON
2     You underlined asbestos.
3          Do you see that?
4      A    Yes.
5      Q    Are you aware of any other Federal
6   Mogul losses that were at issue?
7      A    No.
8      Q    Is it your understanding that this
9   was essentially the range of available
10  limits with respect to the Federal Mogul
11  claims?
12      A    I think whenever I wrote it, that's
13  my understanding, that was my understanding
14  of it.
15      Q    If you turn to the next page and
16  that's 5259, there's an Account Status
17  Report as of May 02, 2000.
18          Do you see that?
19      A    I see the date.
20      Q    What is an account status report
21  generally?
22      A    It's a report on the account.
23          I don't know what better way for me
24  to explain.
25      Q    What does it tell the reader?

Page 183

1          SIMON YOON
2      A    It tells the claim number, the
3   insured, you know, some basic policy -- you
4   know, the policy number and policy dates.
5      Q    But I see more than one claim
6   number here.
7          Do you?
8      A    Yes, I do.
9      Q    And it seems like it relates to the
10  insured as McGraw-Edison?
11      A    Yes.
12      Q    Okay.
13          So it tells me as of May 2, 2000
14  what claims are open with respect to
15  McGraw-Edison; is that right?
16      A    May 2, 2000, it would seem to
17  capture that, yes.
18          MR. KENNEDY:  Let's mark as
19  Clearwater Exhibit 54, an e-mail from
20  Patrick Sweeney to Amy Friedman dated
21  November 5, 2004, attaching other
22  e-mails, and it's Bates-stamped
23  GRANITE-SITE-009167 through 9170.
24      (Clearwater Exhibit 54, E-mail
25  chain, top e-mail dated Friday,

Page 184

1          SIMON YOON
2   November 5, 2004, 2:53 p.m.,
3   GRANITE-SITE-009167 through
4   GRANITE-SITE-009170, was marked for
5   Identification.)
6   BY MR. KENNEDY:
7      Q    If you go to the second-to-last
8   page, please, to 9169, at the very bottom,
9   you'll see an e-mail from you to Anthony
10  Iandoli, Patrick Sweeney and William Bush,
11  November 1, 2004, 3:58 p.m.
12          Do you see that?
13      A    I see that.
14      Q    Do you recall sending this e-mail?
15      A    No.
16      Q    And November 1, 2004, AIG companies
17  hadn't yet entered into a written settlement
18  agreement with the Halliburton/Dresser
19  entities; isn't that right?
20      A    Yeah, it wasn't executed yet.
21      Q    And this is the subject,
22  "Halliburton."
23          Are you referring to the
24  Halliburton/Dresser claims that were at
25  issue between AIG companies and those

46  (Pages 181 to 184)

Page 197

SIMON YOON

1  BY MR. KENNEDY:
2
3      Q   Mr. Yoon, please take a look at
4  these pages.
5      A   Okay.
6      Q   Do you have an understanding of
7  what these documents are?
8      A   Just what they say.
9      Q   What do they say?  What's your
10  understanding of what these documents are?
11      A   These appear to be letters from
12  folks at AIG Technical Services, my old
13  department, toxic tort claims department, to
14  Coblence & Warner.  I don't know who they
15  are.
16          And the subject line is
17  "McGraw-Edison/Cooper Industries/Wagner
18  Electric asbestos claims."
19      Q   Have you seen these documents
20  before?
21      A   No.
22      Q   Do you see the reference -- go to
23  the first page, 9179.
24          To claim Number 17004142.
25          Do you see that?

Page 198

SIMON YOON

1
2      A   I see that.
3      Q   Do you know what policy that
4  relates to?
5      A   No, I do not.
6      Q   Do you have an understanding
7  whether any of these pages of documents
8  relate to the Granite State McGraw-Edison
9  policies?
10      A   Oh, I can't say one way or the
11  other.
12      Q   Mr. Yoon, before or as AIG was
13  entering into the settlement agreement with
14  Halliburton/Dresser and before it agreed to
15  pay to Dresser entities 173.6 million-plus
16  dollars, did you undertake any investigation
17  as to whether the policies underlying the
18  Granite State McGraw policies had been fully
19  exhausted?
20      A   In terms of that 173 net present
21  value and what we agreed to in terms of net
22  present value basis, we looked at in terms
23  of every mediation session which involved
24  all the carriers on all the towers and
25  coverage block for those claims for that

Page 199

SIMON YOON

1
2  insured, for those sets of insureds, and
3  looking at the total presumed liabilities
4  and the burn rate, the information that were
5  being provided by the insured in terms of
6  the burn rate and the presumed liabilities,
7  basically it was very clear that it was
8  going to be taking up all of those coverage
9  blocks.
10      Q   And at what point in time was it
11  very clear to AIG that that was going to happen?
12      A   I think based on what they
13  initially presented.
14          The understanding was that --
15  exactly when, I can't say.
16      Q   Just give me a year.
17      A   I can't say one way or the other.
18      Q   2003, would you say AIG had that
19  understanding?
20      A   I think based on the presumed
21  liabilities, the understanding, '03 -- I
22  mean, I can't put a date on year on it.
23      Q   2010?
24      A   2010?  I mean, at this point the
25  settlement is done.

Page 200

SIMON YOON

1
2      Q   Exactly.
3          So it was sometime before the
4  settlement, correct?
5      A   Correct.
6      Q   And you don't know what year?
7      A   No.  But certainly leading up to
8  the settlement it became more and more
9  clear.
10      Q   There was grave exposure under
11  AIG's policies?
12      A   Large exposure, yes.
13      Q   Under all the policies?
14      A   Or many of them, but we were
15  certainly getting more clear definition in
16  terms of $173 million NPV value.
17      Q   And that policy included the
18  McGraw-Edison Granite State policies?
19      A   Yes.
20      Q   Now, back to my question.
21          Before AIG agreed to enter into the
22  settlement agreement with Dresser/
23  Halliburton, did you undertake an
24  investigation as to whether the policies
25  underlying the Granite State McGraw policies

50  (Pages 197 to 200)

WINTER REPORTING, INC.   (212) 953-1414

Page 201

SIMON YOON

1  in fact had paid out their full limits?
2
3      MR. WILDER:  You, Simon you, or
4  AIG?
5      MR. KENNEDY:  You, Mr. Yoon.
6      A   No.
7      Q   Are you aware of anyone at AIG that
8  undertook such an investigation?
9      A   I'm not aware of it.
10     Q   Are you aware of anyone on behalf
11 of AIG that undertook such an investigation?
12     A   I'm sure our counsel did.
13     Q   But are you aware of it or you are
14 just thinking that counsel did?
15     A   Our counsel is there to do those
16 kind of things.
17     Q   I understand that but my question
18 is little different.
19         Do you know whether your counsel
20 did or did not do that?
21     A   I can't be definitive but that's
22 certainly stuff we would ask our counsel to
23 do.
24     Q   But in this specific instance, do
25 you know or do you not know they in fact did

Page 202

SIMON YOON

1  that?
2      A   I'm not definitive on that.
3      MR. KENNEDY:  I'll mark as
4  Clearwater Exhibit 56, a document
5  entitled Dresser Industries, Inc.
6  Worthington/Alco Coverage.
7         And it's Bates-stamped GRANITE-
8  STATE-093447.
9      (Clearwater Exhibit 56,
10 Coverage chart, GRANITE-STATE-
11 093447, was marked for
12 Identification.)
13 BY MR. KENNEDY:
14     Q   Mr. Yoon, you understand that this
15 is a coverage chart of all of the insurers'
16 policies with respect to the
17 Dresser/Halliburton claims, asbestos claims?
18     A   I'm not sure that it is, but it's
19 something I guess from looking at the
20 document, it's something that Kirkpatrick &
21 Lockhart as Halliburton's counsel provided.
22     Q   Do you recall receiving a copy of
23 this?
24     A   Not specifically, but I probably

Page 203

SIMON YOON

1  had it and I probably looked at it before.
2      MR. KENNEDY:  Give me like five
3  minutes, because I think we are about
4  done.
5      (A brief recess was
6  taken.)
7      MR. KENNEDY:  I have no
8  additional questions.  Thank you for
9  your time, Mr. Yoon.
10     EXAMINATION BY MR. WILDER:
11     Q   Mr. Yoon, do you recall that
12 Mr. Kennedy was asking you questions about
13 exhaustion?
14     A   Generally, yes.
15     Q   And you testified about information
16 you obtained in mediation statements?
17     MR. KENNEDY:  Objection.
18     Q   Mediation sessions?
19     MR. KENNEDY:  Objection to the
20 extent that you are linking
21 exhaustion and mediation session
22 information together.
23     I don't recall that testimony.  I
24 don't believe it happened.

Page 204

SIMON YOON

1      Q   Do you recall giving testimony
2  about obtaining information at mediation
3  sessions about exposure?
4      A   Yes.
5      Q   Was there any other factor that you
6  took into account in connection with the
7  question of underlying exhaustion in this
8  settlement?
9      A   Once again, all the carriers in the
10 coverage block were present.
11         They all ultimately also agreed to
12 resolve their disputes with Halliburton, and
13 so for me, each of those sessions, mediation
14 sessions served as a live analysis in terms
15 of all the carriers' liabilities and their
16 payment obligations.
17         And so -- and then once again
18 taking into account the burn rate and the
19 presumed liabilities, you know, for me that
20 satisfied -- that was certainly one of the
21 main points that satisfied for me about
22 underlying exhaustion.
23     MR. WILDER:  Thank you.
24 Nothing further.

51 (Pages 201 to 204)

Page 205

```
 1          SIMON YOON
 2     FURTHER EXAMINATION BY MR. KENNEDY:
 3     Q    But just to be clear, that didn't
 4  mean you undertook or anyone you are aware
 5  of undertook an investigation that the
 6  investigation that the underlying limits in
 7  fact had been exhausted, right?
 8        MR. WILDER:  Objection.
 9     Q    Nothing that you just said in
10  response to Mr. Wilder's question changes
11  your answer that you are unaware of anyone
12  on behalf of AIG undertaking an
13  investigation as to whether the underlying
14  limits were in fact exhausted.
15        Does it?
16        MR. WILDER:  Objection.
17  Misstates the record.
18     A    I think what I testified to earlier
19  was that our counsels may have done that on
20  our behalf, but in terms of whether I did, I
21  mean yeah, I said I can't be definitive
22  about that.
23     Q    And I also didn't limit it to you.
24  I said anyone that you are aware of.
25        Whether you in fact know, Mr. Yoon,
```

Page 206

```
 1          SIMON YOON
 2  sitting here today, testifying under oath,
 3  whether anyone on behalf of AIG actually
 4  undertook an investigation as to whether the
 5  full underlying limits of the policies
 6  underlying the Granite State McGraw policies
 7  were exhausted?
 8        MR. WILDER:  Also, you don't
 9     have to keep reminding the witness
10     that he's under oath.  It's
11     offensive.
12        MR. KENNEDY:  To you, maybe.
13     But I've got a record I've got to
14     clarify here.
15     Q    So could you please answer that
16  question?
17     A    I can't be definitive.  Yes.
18        MR. WILDER:  Nothing further.
19
20        (Continued on next page.)
21
22
23
24
25
```

Page 207

```
 1          SIMON YOON
 2
 3        MR. KENNEDY:  I have no further
 4  questions, either.
 5
 6        (The deposition was concluded at
 7  3:44 p.m.)
 8
 9        _____
          SIMON YOON
10
   Subscribed and sworn
11
   to before me this
12
   _____ day of _____, 2011
13
14
        _____
15        Notary Public
16
17
18
19
20
21
22
23
24
25
```

Page 208

```
 1          SIMON YOON
 2  STATE OF NEW YORK  )    PAGE _____ of _____
                       ) ss:
 3  COUNTY OF NEW YORK )
 4        I wish to make the following
 5  changes, for the following reasons:
 6  PAGE  LINE
 7  ___ ___   CHANGE: _____
 8        REASON: _____
 9  ___ ___   CHANGE: _____
10        REASON: _____
11  ___ ___   CHANGE: _____
12        REASON: _____
13  ___ ___   CHANGE: _____
14        REASON: _____
15  ___ ___   CHANGE: _____
16        REASON: _____
17  ___ ___   CHANGE: _____
18        REASON: _____
19  ___ ___   CHANGE: _____
20        REASON: _____
21
22  _____      _____
    Witness's signature      Date
23
24
25
```

52 (Pages 205 to 208)

**WINTER REPORTING, INC.    (212) 953-1414**