# EXHIBIT 6

**Page 1**

THERESA A. CHAVEZ - 30(b)(6)
IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
GRANITE STATE INSURANCE COMPANY,

    Plaintiff,

   v.  Civil Action No. 2009 Civ.10607

CLEARWATER INSURANCE COMPANY,
f/k/a ODYSSEY REINSURANCE
CORPORATION, f/k/a SKANDIA
AMERICA REINSURANCE
CORPORATION,

    Defendants.
-----------------------------------X

DEPOSITION OF THERESA A. CHAVEZ
30(b)(6)
New York, New York
Wednesday, December 15, 2010

REPORTED BY: BARBARA R. ZELTMAN
Professional Stenographic Reporter

Job Number: 2318

**Page 2**

1    THERESA A. CHAVEZ - 30(b)(6)
2
3
            December 15, 2010
4                9:45 a.m.
5
6        Deposition of THERESA A. CHAVEZ, 30(b)(6),
7    taken by Plaintiff, pursuant to Notice, at the
8    offices of CLYDE & CO. US LLP, 405 Lexington Avenue,
9    New York, New York, before BARBARA R. ZELTMAN, a
10   Professional Stenographic Reporter and Notary Public
11   within and for the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1    THERESA A. CHAVEZ - 30(b)(6)
2    A P P E A R A N C E S:
3
4    MOUND, COTTON, WOLLAN & GREENGRASS
5    Attorneys for the Plaintiff
6        One Battery Park Plaza
7        New York, New York  10004
8        BY: STUART COTTON, ESQ.
9
10
11   CLYDE & CO. US LLP
12   Attorneys for the Defendants
13       405 Lexington Avenue
14       New York, New York  10174
15       BY: STEPHEN M. KENNEDY, ESQ.
16
17
18   ALSO PRESENT: Lisa A. Keenan, Esq., OdysseyRe
19
20
21
22
23
24
25

**Page 4**

1    THERESA A. CHAVEZ - 30(b)(6)
2
3        IT IS HEREBY STIPULATED AND AGREED
4    by and between the attorneys for the respective
5    parties herein that filing and sealing be and
6    the same are hereby waived.
7        IT IS FURTHER STIPULATED AND AGREED
8    that all objections, except as to the form of
9    the question, shall be reserved to the time
10   of trial.
11       IT IS FURTHER STIPULATED AND AGREED
12   that the within deposition may be signed and
13   sworn to before any officer authorized to
14   administer an oath with the same force and
15   effect as if signed and sworn to before
16   the Court.
17
18
19
20
21
22
23
24
25

WINTER REPORTING, INC.   (212) 953-1414

Page 13

THERESA A. CHAVEZ

just want to object to the extent the form of the question as far as I understand it, we're talking about "claims", not "claim."
   MR. COTTON: Okay.
   MR. KENNEDY: So to that extent, I have an objection to the form of the question.
   MR. COTTON: Okay.
   Q   Let's consider the last questions. This may change your answer to be "claims" rather than "claim."
   A   Well, I think as I said, there are certainly four claims under different facultative certificates for the insured here, McGraw Edison.
      Only two of them are at issue in this litigation.
      I don't recall specifically what the dates were on the two that are here or any of them specifically.
      I believe that between the four of them it was late 2008 and early 2009 that we received the first reports.

Page 14

THERESA A. CHAVEZ

   Because each -- the claim under each certificate was not reported necessarily at the same time. They came in at different times.
   Q   So assuming that we have several reports under different certificates, when you said 2008/2009, were you referring to the earliest report under any certificate?
   A   Yes. It was either late 2008/early 2009.
      MR. COTTON: Let me mark as the next exhibit, the document doesn't have an actual date, but it has a prepared date of 11-22-82.
      Bates Numbers CW-00027.
      (Granite Exhibit 3, Internal Skandia form prepared on 11-22-82, CW-00027, was marked for Identification.)
BY MR. COTTON:
   Q   Could you tell me what this is?
   A   Well, it's an old form that would have been prepared by our underwriting office when a claim was set up. But in this

Page 15

THERESA A. CHAVEZ

instance no claim has actually been set up because there's no claim number here, and the cedent company claim number is listed as none.
   So I'm not sure what the purpose of this being created was without seeing the other documents that relate to it from whatever file it came out of.
      MR. COTTON: Can you read that back to me, please.
      (Requested portion of record read:
      "A   Well, it's an old form that would have been prepared by our underwriting office when a claim was set up. But in this instance no claim has actually been set up because there's no claim number here, and the cedent company claim number is listed as none.
      "So I'm not sure what the purpose of this being created was without seeing the other documents that relate to it from whatever file it came out of.")
      (End of read-back.)
   Q   In the lower left-hand corner

Page 16

THERESA A. CHAVEZ

although it's slightly obscured, it appears to say "Casualty Facultative Claim Notice."
      Is this not a claim notice?
   A   This in itself? No. This is not a claim notice.
   Q   Is this a confirmation of a claim notice?
   A   No. It's an internal document that would have been prepared but the fact that it was prepared doesn't mean that a claim was reported to us by the cedent.
      As I said, I can't determine what the basis of this being prepared was without seeing the other documents that relate to it.
   Q   Now, it says -- it has a cedent company Policy Number 66812370.
      Do you recall that that's the policy number under the certificate which is involved in this litigation?
   A   I have no idea what the policy numbers under the certificate are off the top of my head. I usually don't memorize that information.

Page 17

THERESA A. CHAVEZ

1 
2  Q  Do you see the certificate number
3  on the form?
4  A  Yes.
5  Q  Do you recognize that one?
6  A  Yes. That appears to be one of our
7  certificate numbers.
8  Q  Involved in this case, right?
9  A  Yes. It's 1981, yes.
10 Q  You see the initials R -- maybe
11 middle initial O.
12    Do you know who that was?
13 A  No.
14 Q  Do you remember the name O'Brien as
15 a person who was at Skandia back in those
16 days?
17 A  I wasn't at Skandia back in those
18 days, so no, I don't necessarily remember
19 that name.
20 Q  Is that a name that you remember
21 seeing in reviewing the file?
22 A  Yes, I do recall seeing the name in
23 the file, but I didn't know him personally
24 or wouldn't have known him because it would
25 have been somebody in the Chicago office.

Page 18

THERESA A. CHAVEZ

1
2  Q  You could tell from the file,
3  though, that he is somebody who was at
4  Skandia and an underwriter?
5  A  Well, I know from the review of the
6  documents that he was an underwriter but I
7  don't have personal knowledge of what he
8  did. He was in the underwriting branch
9  office.
10 Q  You said earlier that you couldn't
11 tell whether a claim had been made by the
12 cedent without seeing the rest of the
13 documents that might relate to this,
14 correct?
15 A  Right.
16 Q  And I gather that you have not in
17 your review of the file, to your
18 recollection, seen such other documents?
19    MR. KENNEDY: I just object to
20    the form of the question.
21    MR. COTTON: That's a bad
22    question. I agree.
23 A  I have seen some documents that may
24 relate to this, but I'm not going to testify
25 about those from my memory. If I see the

Page 19

THERESA A. CHAVEZ

1
2  documents in front of me, then I can testify
3  what they relate to and that they belong
4  with this document.
5  Q  By the way, there's a reported date
6  down in the lower right-hand portion of the
7  form. It says 4-'82.
8     Do you know what that relates to?
9  A  Whatever information was being
10 relied on to create this form, most likely
11 was received in 4 of '82.
12 Q  Is it fair to say that it was most
13 likely reported to Skandia in 4 of '82?
14 A  Something was reported to Skandia
15 in 4 of '82. The question is what was
16 reported to Skandia in 4-of '82 and that I
17 can't tell from this document.
18    MR. COTTON: We're going to
19    mark as the next exhibit a -- looks
20    like a memo to file, dated March 23,
21    1982, authored by Marsh & McKlennen,
22    Bates Number CW-00017 through 19.
23    (Granite Exhibit 4, Memo to
24    file dated March 23, 1982 authored
25    by Marsh & McKlennen, CW-00017

Page 20

THERESA A. CHAVEZ

1
2  through CW-00019, was marked for
3  Identification.)
4  BY MR. COTTON:
5  Q  Do you recall having seen that
6  before?
7  A  Yes.
8  Q  Did you see it yesterday?
9  A  Yes, I believe so.
10 Q  Is it fair to say that this came
11 out of the underwriting file?
12 A  Yes.
13 Q  Do you agree this is the underlying
14 claim about which we are in dispute here?
15 A  No, I don't.
16 Q  Explain to me why not.
17 A  Because this is just a memo that
18 indicates that certain claims are being made
19 against Wagner Brake, which is a division of
20 McGraw Edison, by certain claimants as a
21 result of asbestos.
22    It's 32 claimants. Only 32
23 claimants. They are not necessarily the
24 same claimants. They most likely are not
25 the same claimants that are make the claims

**Page 37**

THERESA A. CHAVEZ

A   I can't speak to why he thought it was necessary to put the claims department on notice of these claims.

Q   Now, without going any further in reviewing documents concerning the McGraw Edison asbestos claims that are the subject of the documents we already reviewed, and assuming that the documents we've reviewed are all part of the underwriting file for T27675, which is the underwriting file's cover page created by Clyde & Co., or folder, identified as G6.

Can you now say whether or not what we marked as Exhibit 3 reflects a claim reported to Skandia?

MR. KENNEDY: Objection to the form of the question.

A   I would still say it does not reflect a claim reported to Skandia. It's just a form that was used to house -- so they can set up a file to house this information.

There is nothing in the documents that we've reviewed thus far that indicate

**Page 38**

THERESA A. CHAVEZ

there is a claim against the coverage issued by Skandia.

MR. COTTON: Let's mark as the next exhibit a letter from Marsh & McKlennen dated February 10, 1983 to a Mr. William Green at CV Starr & Company.

Bates Numbers CW-00391 through 393.

(Granite Exhibit 8, Letter dated February 10, 1983, CW-00391 through CW-00393, was marked for Identification.)

BY MR. COTTON:

Q   Before we get to this document, I want to go over something you said earlier concerning how underwriting files are kept.

Did I correctly understand that underwriting files are not maintained divided by or separated into separate certificate numbers but, rather, separate certificate numbers that may be combined where it's the same -- I'm stumbling here. The same cedent?

A   The same insured.

**Page 39**

THERESA A. CHAVEZ

Q   The same original insured?

A   The same original insured issued by that particular branch office.

Because if we issued certificates in different branch offices, each branch office would have its own file for that insured, but within each branch office there would have been a file for that insured.

Q   So if you issued a dozen certificates, I guess that would be more than usual, you'd have one underwriting file for all of those?

A   Yes. Generally, yes.

Q   Is the same true on the claims side?

A   No.

Q   And how are claims files maintained?

A   Claims files are maintained in separate claim files for each certificate and then if there are multiple claims reported under the certificate, there would be a separate claim file for each claim that was reported on the certificate.

**Page 40**

THERESA A. CHAVEZ

Q   So if Skandia had issued certificates for several years in a row, same essential reinsurance coverage, would it have a separate file for each year?

A   If each year is reported to us by the cedent, then we would have a separate file for each year.

Q   And am I correct that information that is provided concerning the same underwriting claim will find its way into every claim file for which you've issued a certificate?

MR. KENNEDY: Let me object to the form of the question. Again, this really goes back to your use of the word "claim."

MR. COTTON: Claims. Actually, I change that to claims.

Q   You want to hear that question again?

A   Yes.

MR. COTTON: Read back that question. And make "claim," "claims".

Page 57

THERESA A. CHAVEZ

Q  The position taken in the Answer in this case, which we will get to specifically in a moment, concerns a couple of defenses that notice may have been late.

I think the words are "the claim may be barred by virtue of not timely notice where the untimely provision or the failure to provide any information concerning the claims."

Are those positions equally applicable to all parts of the claims, and by "all parts" I mean the Federal Mogul part and the Dresser part?

A  Yes.

Q  And is it Clearwater's position that notice was not received concerning Federal Mogul or Dresser until 2008 or 2009?

A  Yes.

Q  Now, would you agree that at least the letters, whether they went into the underwriting file or the claim file or went into the underwriting file and then was also transmitted to claims, that the letter we've seen marked as Exhibit 3 from Marsh &

Page 58

THERESA A. CHAVEZ

McKlennen in the early '80s going up until I think '84 provided adequate information concerning the underlying claims for Odyssey to be aware of its potential exposure?

MR. KENNEDY: Object to the form of the question.

A  Could you repeat the question.

(Requested portion of record read:

"Q Now, would you agree that at least the letters, whether they went into the underwriting file or the claim file or went into the underwriting file and then was also transmitted to claims, that the letter we've seen marked as Exhibit 3 from Marsh & McKlennen in the early '80s going up until I think '84 provided adequate information concerning the underlying claims for Odyssey to be aware of its potential exposure?")

(End of read-back.)

A  No.

Q  Let's go to Page 10 under Issues. If we go to the second paragraph, it says "We note from our Lexington Dresser

Page 59

THERESA A. CHAVEZ

files" --

A  What page are you on?

Q  I'm sorry. Page 10. Second paragraph under Issues.

A  Okay.

Q  There is a reference to a Lexington Dresser file.

Am I correct that Lexington Insurance Company has also made the reinsurance claim relating to the -- to a portion at least of the underlying asbestos claim settlement that is at issue here?

A  Well, yes, we did have claims from Lexington for Dresser.

Not necessarily for the same claims.

Q  Is the file for the -- the claim file for the Lexington Dresser claims a separate one from the --

A  Yes.

Q  Is Ms. Drew also in charge of that one?

A  Yes. If it's open, yes.

Q  In the first full paragraph on the

Page 60

THERESA A. CHAVEZ

next page, Page 11, there is a reference about midway in that first full paragraph, "AIG's use of a bathtub allocation."

Is AIG's use of a bathtub allocation among the issues where Clearwater disputes AIG's treatment of the claim?

A  Yes.

Q  And what type of allocation does Clearwater contend was appropriate?

A  I don't know that we have a position as to what allocation was appropriate because on this case we haven't received the exposure analyses that we have requested to determine how the settlement values were arrived at and how the exposure to each individual policy was calculated, but we would expect an allocation to follow the exposure analyses that were done at the time of the settlement. And if the settlement included discounts off policy limits for all policies, then those discounts should be passed on to the reinsurers of each of those policies, not just to the policies at the highest layer.

Page 65

THERESA A. CHAVEZ

 1  Brattle report, so I'm not sure what the
 2  roles of each of those parties were.
 3      Q    And you seen parts of the Brattle
 4  report?
 5      A    I may have seen parts of the
 6  Brattle report in relation to other claims
 7  from other parties, but I don't think I've
 8  seen it in relation to -- at least I don't
 9  recall seeing it in relation to these claims
10  for other claims for AIG.
11      Q    And what is your understanding of
12  the purpose from which the Brattle report
13  was prepared?
14      A    Well, as I just said, I'm not sure
15  what the role of both Nera and Brattle were
16  and which portions of the claim they were
17  assigned to evaluate and how exactly that
18  worked.  So I'm not certain.
19      Q    But it is your view that arriving
20  at the proper allocation is an exercise that
21  can properly be done based on the Nera and
22  Brattle reports?
23          MR. KENNEDY:  Object to the
24      form of the question.

Page 66

THERESA A. CHAVEZ

 1      A    Right.  Because it's our
 2  understanding that they're both involved in
 3  working with the insurer carrier group as a
 4  whole to determine what the exposures were
 5  for the claims that were presented, at least
 6  with respect to the Halliburton piece of the
 7  settlement.  I'm not sure they were involved
 8  in the Federal Mogul part of the claim as
 9  well.
10      Q    You are familiar with a rising
11  bathtub allocation methodology?
12      A    Yes.
13      Q    And is it appropriate in certain
14  circumstances, in your view?
15      A    It can be, yes.
16          MR. COTTON:  Mark a few more
17      exhibits.
18          Let's mark as Exhibit 13, a
19      document bearing Bates Number CW-00181.
20      It is similar to what we marked, I think,
21      as 3, but this is for the other
22      certificate in the case, which is
23      Certificate C26285.
24          (Granite Exhibit 13, Internal

Page 67

THERESA A. CHAVEZ

 1  Skandia form, CW-00181, was marked
 2      for Identification.)
 3  BY MR. COTTON:
 4      Q    Am I right that this is like
 5  Exhibit 3, but for the other certificate, an
 6  internal record that Skandia created back at
 7  the time that this matter -- and I will get
 8  into whether it's a claim or whatever this
 9  matter was reported through Skandia?
10      A    Yes, it's the same internal
11  document that appears to have been created
12  at the time some information was reported to
13  our underwriters.
14      Q    And like the other document, in the
15  lower left-hand corner, it is -- it says
16  "Casualty Facultative Claim Notice,"
17  correct?
18      A    Yes.  Right.
19      Q    And this is a document that is from
20  the underwriting file, correct?
21      A    Yes.  I believe so.  It says
22  "branch office copy," so...
23      Q    And the date, 4-82 in the
24  right-hand corner under the word "reported"

Page 68

THERESA A. CHAVEZ

 1  is the date that it was reported to Skandia,
 2  approximately?
 3      A    I believe that's the approximate
 4  date that the underwriting information
 5  regarding some pending asbestos claims
 6  against McGraw Edison were reported to
 7  Skandia.
 8          MR. COTTON:  Let's mark as the
 9      next exhibit another copy of a
10      document that we marked earlier, but
11      this one, subject to all of those
12      caveats that Mr. Kennedy's
13      explanation of the file folders,
14      their having been created by his
15      firm, came out of the underwriting
16      file for the certificate that is
17      identified in CW-00181, which is
18      Exhibit 13.
19          MR. KENNEDY:  I'm sorry.  Did
20      we mark this?
21          MR. COTTON:  We marked a
22      different version.
23          MR. KENNEDY:  So is this
24      officially marked as an exhibit.

| Page 73 | Page 75 |
|---|---|
| THERESA A. CHAVEZ | THERESA A. CHAVEZ |

**Page 73**

1   THERESA A. CHAVEZ
2   Q   Now, am I correct that the part
3   about promptly investigate and settle all
4   claims under the policy is not a focus of
5   Clearwater's defense?
6   A   Correct. It's the second line of
7   it.
8   Q   Second part of it?
9   A   That it would notify Skandia
10  promptly of any event or development which
11  the company reasonably believes might result
12  in a claim against Skandia.
13  Q   Am I correct that you do not
14  believe that the report reflected in
15  Exhibit 3, which is Casualty Facultative
16  Claim Notice, did not notify Skandia of any
17  event or development which the company
18  reasonably believes might result in a claim
19  against Skandia?
20  A   That's correct. There's no
21  indication there would be a claim against
22  Skandia based on the information in that
23  report.
24  Q   Well, the words "might" was on it?
25  A   Might.

**Page 74**

1   THERESA A. CHAVEZ
2   Q   You don't think it satisfies?
3   A   No, it doesn't satisfy.
4   Q   And do you agree that -- I'll
5   withdraw that.
6       Now, we have these dates, 2-8,
7   2-09, when you believe Skandia or Clearwater
8   or whoever it was at the time was notified
9   of an event or development which the company
10  reasonably believed might result in a claim;
11  is that correct?
12      MR. KENNEDY: Object to you say
13      dates "2-8 or '09." I'm not clear on
14      the question.
15  Q   Your earlier testimony I believe,
16  and I may not recall it correctly, is that
17  you believe that the first notification
18  under the certificate that was given by
19  Granite to Skandia/Clearwater was in 2008 or
20  2009; is that fair to say? Is that what you
21  said?
22  A   Yes.
23  Q   And you believe that was late?
24  A   Yes.
25  Q   Now, when do you believe Granite

**Page 75**

1   THERESA A. CHAVEZ
2   should have notified Skandia that would not
3   have been late?
4   A   Well, I think that's something that
5   we're still trying to determine based on the
6   documents that we've requested.
7       Again, we don't have the exposure
8   analyses that were performed to evaluate
9   their exposure, but certainly this claim was
10  pending against Granite State; the insured
11  had made a claim for coverage under Granite
12  State's policy.
13      Once the insured made the claim for
14  coverage under the Granite State policy and
15  had filed that DJ action, whether it was in
16  the bankruptcy court or in state court, I
17  don't recall off the top of my head, but
18  once those claims were filed and Granite
19  State became aware that it was no longer
20  120 claims that were pending against this
21  insured, but there were thousands of claims
22  pending against the insured and that the
23  insured was actually seeking coverage from
24  Granite State under the policies to pay
25  those claims, at that point when it became a

**Page 76**

1   THERESA A. CHAVEZ
2   much more realistic possibility that there
3   was going to be an exposure under these
4   policies, the matter should have been
5   reported to Odyssey at that time.
6       What that date is I'm not entirely
7   certain but it goes back to well before
8   2008. It would go back to at least 2002 or
9   possibly even earlier than that.
10  Q   And at that time, you believe that
11  there should have been a notification and
12  that would have been the initial notice of
13  claim?
14  A   Yes. Because that would have been
15  the initial notice of a claim for coverage
16  under Granite State's policy.
17      The information that had been
18  provided previously was not notice of a
19  claim under the policy or the certificate.
20  It was just notice of some pending claims
21  against the insured and it was provided for
22  underwriting purposes, not for claims
23  purposes.
24      MR. COTTON: Let's mark as the
25      next exhibit, the Answer to Amended