# Marsh & McLennan

Marsh & McLennan, Incorporated
222 South Riverside Plaza
Chicago, Illinois 60606
Telephone 312 648-6000

August 6, 1982

Mr. Norman A. Kenney
Assistant Treasurer, Risk Management
McGraw-Edison Company
1701 Golf Road
Rolling Meadows, IL  60008

UMBRELLA EXCESS LIABILITY
POLICY NO. 523 067253
U.S. FIRE INSURANCE COMPANY

Dear Norm:

We are sending on to you a couple of endorsements which John
Jolley has now issued for attachment to this policy.

Endorsement No. 39 adds specific cancellation provisions on
behalf of Consumer Power Company of Jackson, Michigan.  This
item goes back to their request for a Certificate of Insurance
with special cancellation provisions, and conversations we had
back in May of 1982.

Endorsement No. 40 reflects the addition of the separate
General Liability policy for the Amoco job to the schedule of
underlying coverage on the Umbrella.

I do hope you will find both of these items in order.

Sincerely,

T. A. Mikkelsen

TAM:md:A-26-F

RECEIVED
AUG 11 1982

cc: William Wilczynski
    John Sachtleben

P.S.  Norm, an endorsement with the special cancellation
      provisions for Consumers Power Company is also enclosed
      for your current auto policy, Northwestern National No.
      BA3239491.

WA-00413
CW 01382

**Marsh &**
**McLennan**

Marsh & McLennan, Incorporated
222 South Riverside Plaza
Chicago, Illinois 60606
Telephone: 312 648-6000

July 1, 1982

Mr. Norman A. Kenney
Assistant Treasurer, Risk Management
McGraw-Edison Company
1701 Golf Road
Rolling Meadows, IL  60008

UMBRELLA EXCESS LIABILITY
POLICY NO. 523 067253-U.S. FIRE
TERM: MARCH 1, 1981/84

*attach to policy*

Dear Norm:

We are sending on to you two Endorsements, No. 37 and No. 38,
which have been issued on the captioned policy.

Endorsement No. 37 reflects the addition to the schedule of
underlying coverages the separate General Liability policy
issued on a job for the City of Detroit, Michigan.  This is an
item which we had worked on based on conversations with Tony as
respects the separate policy, and we have now included this
contract under the Umbrella as we have done in the past.

Endorsement No. 38 adds to the policy a special notice of
cancellation provision for the Metropolitan Waste Water Manage-
ment Commission.  This item is in response to Eric Larson's
letter dated March 24, 1982, and has to do with a contract
entered into by your Worthington Pump Division.  The cancella-
tion provisions were already indicated to the Commission in a
Certificate of Insurance dated April 1, 1982.

Norm, I hope you will find these items in order, but please let
us know if you need any additional information on either of
them.

Sincerely,

*Terri*

T. A. Mikkelsen

TAM:md:A-13-Th

cc:  William Wilczynski
     John Sachtleben

RECEIVED

JUL - - 1982

INSURANCE DEPT.

*Tony's*
*Please review &*
*give to me for*
*attachment to policy*

*OK*
*Tony 7/1*



**Marsh & McLennan**

Marsh & McLennan, Incorporated
222 South Riverside Plaza
Chicago, Illinois 60606
Telephone 312 648-6000

May 20, 1983

Mr. Norman A. Kenney
Assistant Treasurer/Risk Management
McGraw-Edison Company
1701 Golf Road
Rolling Meadows, IL  60008

UMBRELLA EXCESS LIABILITY
POLICY NO. 523 067253 – U.S. FIRE

Dear Norm:

We are sending on to you Endorsement No. 52 which adds another policy to the Schedule of Underlying Insurance on this Umbrella policy.  The primary policy involved is that issued to cover the job accepted by your Service Group isn Australia for the Electricity Commission of New South Wales, Australia.

While the underlying policy has been added to the schedule, it was our understanding that the U.S. Fire Umbrella policy is to provide excess coverage, only in those areas where it would normally apply.  In other words, where the primary policy issued by Preservatrice Skandia may be broader than the U.S. Fire contract, no coverage would apply.  We are thinking primarily of the "Defects" coverage which is included under the Preservatrice policy, but which is not part of the U.S. Fire contract.

I believe you will find this in accordance with the discussion held in Mr. Jolley's office during our visit to Atlanta, but if there are any questions, please let us know.

Sincerely,

T. A. Mikkelsen

TAM:BLK4/E21

cc:  Mr. William Wilczynski
     Mr. John Sachtleben

Enclosure

**RECEIVED**

MAY 23 1983

**INSURANCE DEPT.**

## Marsh & McLennan

Marsh & McLennan, Incorporated
222 South Riverside Plaza
Chicago, Illinois 60606
Telephone 312 648-6000

May 6, 1982

Mr. Norman A. Kenney
Assistant Treasurer
Risk Management
McGraw-Edison Company
One Continental Towers
1701 Golf Road
Rolling Meadows, Illinois   60008

UMBRELLA EXCESS LIABILITY
POLICY NO. 523 067253 - U.S. FIRE
POLICY NO. 9017383 - FIRST STATE

Dear Norm:

We are sending on to you the endorsement for attachment to
each of the captioned policies.  Both endorsements reflect
the annual installment premium which has been charged for
the period March 1, 1982 to 1983.

In both cases, the premiums have already been appropriately
billed to you, and nothing further is needed at this time.

Norm, we are in the process of reviewing the remainder of
your Excess Umbrella Liability placement for the 1982-83
year.  We will be getting these policies in your hands just
as soon as possible.

Sincerely,

T. A. Mikkelsen

TAM/gw:5A15

cc:  Mr. John Sachtleben
     Mr. William Wilczynski

RECEIVED

MAY 1 0 1982

INSURANCE DEPT.

WA-00413
CW 01385

# Marsh & McLennan

Marsh & McLennan, Incorporated
222 South Riverside Plaza
Chicago, Illinois 60606
Telephone 312 648-6000

March 26, 1982

Mr. John Jolley
Senior Vice President
The London Agency, Inc.
P.O. Box 4985
Atlanta, Georgia 30302

McGRAW-EDISON COMPANY
POLICY NO.: 523 067253
TERM:         MARCH 1, 1981-84

Dear John:

McGraw has contacted us recently concerning some work which
they will be doing in Oregon. They have issued a normal
Certificate of Insurance, but the job owner has come back to
them, insisting on a specific cancellation endorsement as a
part of their Liability coverage.

The job owner is the Metropolitan Waster Water Management
Commission, located at 889 Pearl Street, Peoples Bank Building,
Eugene, Oregon 97401. They have requested that the cancella-
tion provisions include the following wording:

> "The insurance covered by this Certificate will not
> be cancelled, materially altered or allowed to lapse,
> except after thirty (30) days written notice has been
> received by: Metropolitan Waste Water Management
> Commission."

John, if there is any difficulty providing this endorsement,
please let us know as soon as possible.

Sincerely,

T. A. Mikkelsen

TAM/gw:5A4

cc: Mr. Eric B. Larson
    Mr. John Sachtleben

WA-00413°
CW 01386



**Marsh & McLennan, Incorporated**
222 South Riverside Plaza
Chicago, Illinois 60606
Telephone 312 648-6000

October 29, 1981

Mr. Eric B. Larson
Manager, Casualty Insurance
McGraw-Edison Company
1701 Golf Road
Rolling Meadows, IL  60008

UMBRELLA EXCESS LIABILITY
UMBRELLA EXCESS LIABILITY
POLICY NO. 523-067253
U.S. FIRE INSURANCE COMPANY
TERM: MARCH 1, 1981/84

Dear Eric:

Here is an endorsement, No. 24, as issued on this
Umbrella policy.  The endorsement definitely
provides that 15 days' notice of cancellation will
be given to Montgomery Ward & Company, in the
event U.S. Fire cancels the policy.

Eric, it was necessary to issue this endorsement
based on the wording of the cancellations provisions
in a Certificate of Insurance recently issued to
Ward's.  We hope you will find this in order, but
please call if you have any questions.

Sincerely,

*Terri*

T. A. Mikkelsen

TAM:u/375

**RECEIVED**

NOV - 2 1981

INSURANCE DEPT.



Marsh & McLennan, Incorporated
222 South Riverside Plaza
Chicago, Illinois 60606
Telephone 312 648-6000

August 10, 1981

Mr. Eric B. Larson
Manager, Casualty Insurance
McGraw-Edison Company
1701 Golf Road
Rolling Meadows, Illinois   60008

UMBRELLA EXCESS LIABILITY
POLICY NO. 523 067253
U.S. FIRE INSURANCE COMPANY
TERM: MARCH 1, 1981/84

Dear Eric:

We are sending on to you six endorsements which have been issued
by U. S. Fire Insurance Company.  All of these endorsements add
a specific clause indicating that notice of cancellation will
be give to various companies.

All of these are in accordance with certificates of insurance
previously issued.  The certificates were issued on the requester's
form, and all contain very restrictive cancellation provisions.
John Jolley felt that is was necessary that the policy be endorsed
to reflect these cancellation provisions.

The entities involved are as follows:

    Texaco, Inc.
    Delta Service Industries
    Teledyne Movivle Offshore, Inc.
    Florida Power & Light Company
    Tenneco Oil Company
    Long Island Rail Road Company
    Ocean Drilling & Exploration Company

Please keep these with your original contract, and let us know if
you have any questions.

Sincerely,

T. A. Mikkelsen

TAM/ag

cc:  Mr. W. J. Wilczynski
     Mr. J. R. Sachtleben

CG5

RECEIVED

AUG 1 2 1981

INSURANCE DEPT.

WA-00414^
CW 01388

**Marsh &
McLennan**

Marsh & McLennan, Incorporated
222 South Riverside Plaza
Chicago, Illinois 60606
Telephone 312 648-6000

September 18, 1981

Mr. Eric B. Larson
Manager, Casualty Insurance
McGraw-Edison Company
1701 Golf Road
Rolling Meadows, Illinois   60008

UMBRELLA EXCESS LIABILITY
POLICY NO. 523-067253
U. S. FIRE INSURANCE COMPANY
TERM:  MARCH 1, 1981-84

Dear Eric:

We are sending on to you three endorsements which John Jolley
has issued applying to your Umbrella Excess Liability coverage.

The first endorsement is effective March 12, 1981, and is a
revised schedule of the underlying insurance.  What this
endorsement is doing is deleting the Ship Repairers Legal
Liability policy from the schedule of underlying coverages.

A second revision to the schedule of underlying insurance is
enclosed, effective August 26, 1981.  This particular endorse-
ment is amending the General Liability policy provided by
Illinois Surplus Lines on your contract with Pacific Gas &
Electric.  What John has done is eliminate the first contract
number, and replaced it with the new contract recently signed
and the new policy that has just been issued.

The third endorsement enclosed, No. 33, eliminates Endorsement
No. 10 from the policy.  That endorsement previously was the
"following form" wording for the Ship Repairers Legal Liability
coverage.

Eric, I hope you find these in order, and please see that they
are attached to your original policy.

Sincerely,

*Jerri*

T. A. Mikkelsen

TAM/gw:3B23

cc:  Mr. W. J. Wilczynski
     Mr. J. R. Sachtleben

RECEIVED
SEP 2 1 1981
INSURANCE DEPT.

WA-004141
CW 01389

J. Whiteley                    June 12, 1981
Wagner Electric
St. Louis, MO

                               E. B. Larson


                               Encroachment Permit
                               City of St. Louis




For your records enclosed is a copy of the correspondence and endorsements
sent to the City of St. Louis on June 8, 1981.



EBL/kjs
Enclosures

WA-004142

CW 01390

# The London Agency, Inc.

1230 W. Peachtree St., N. W.
P. O. Box 4965
Atlanta, Georgia 30302
(404) 875-9641
Telex 54-2445
TWX 810 751-3329

June 8, 1981

# TRACER COPY

Your response to this letter will be apprecia

Mr. Don V. Beindick
Armstrong, Teasdale, Kramer & Vaughn
611 Olive Street
St. Louis, Missouri  63101

Dear Mr. Beindick:

Re:  McGraw-Edison Company, etal
     U.S. Fire Policy #523-067253

In accordance with my recent telephone conversation with Ms. Terri Mikkelsen
of Marsh & McLenna, Chicago, enclosed please find a copy of endorsement #25
for the above captioned showing the City of St. Louis, Missouri as an additional
insured.

Please let us know if we can be of any further assistance.

Very truly yours,

John A. Jolley

JAJ/dbr

Attachment

cc:  Ms. Terri Mikkelsen
     Marsh & McLennan, Inc.

WA-004143

CW 01391

**Marsh & McLennan**

Marsh & McLennan, Incorporated
222 South Riverside Plaza
Chicago, Illinois 60606
Telephone 312 648-6000

June 10, 1981

Mr. Eric B. Larson
Manager, Casualty Insurance
McGRAW-EDISON COMPANY
One Continental Towers
1701 Golf Road
Rolling Meadows, Illinois   60008

UMBRELLA EXCESS LIABILITY
POLICY NO. 523 067253
UNITED STATES FIRE INSURANCE COMPANY
TERM: MARCH 1, 1981/84

Dear Eric:

Here is Endorsement #25 which has been issued by
the London Agency.  In line with our conversation,
this endorsement reflects the addition of the City
of St. Louis, Missouri as an Additional Insured
under the policy, in connection with the encroachment
to the loading dock in St. Louis.  This is the
Wagner Electric - Highway 40 project.

As you requested, a signed copy of this endorsement
was sent directly to your attorneys, Armstrong,
Teasdate, Kramer & Vaughn, for use in their negotiations
for a permit with the City.

I hope this has been handled to your satisfaction
and will enable Wagner to receive the appropriate
permit for the work.

Sincerely,

T. A. Mikkelsen

TAM:u - #73

CC:  Mr. William J. Wilczynski
     Mr. John R. Sachtleben

RECEIVED

JUN 1 2 1981

INSURANCE DEPT.

WA-00414

CW 01392



**Marsh &**
**McLennan**

Marsh & McLennan, Incorporated
222 South Riverside Plaza
Chicago, Illinois 60606
Telephone 312 648-6000

May 22, 1981

Mr. Eric B. Larson
Manager, Casualty Insurance
McGraw-Edison Company
One Continental Towers
1701 Golf Road
Rolling Meadows, Illinois   60008

UMBRELLA EXCESS LIABILITY
POLICY NO. 523 067253
U.S. FIRE INSURANCE COMPANY
TERM:  MARCH 1, 1981-84

Dear Eric:

Here is Endorsement No. 24 which U.S. Fire has processed, and
which we ask that you attach to your original policy.

The endorsement simply indicates that 30 days' written notice
of cancellation will be given to the City of LaHabra, California.
This endorsement had to be issued to comply with the terms of
a Certificate of Insurance previously sent to them.

Sincerely,

T. A. Mikkelsen

TAM/gw:2B10
Enclosure

cc:  Mr. W. J. Wilczynski
     Mr. J. R. Sachtleben

**RECEIVED**

MAY 28 1981

**INSURANCE DEPT.**

WA-00414⁻
CW 01393

Ms. Terri Mikkelsen

Marsh & McLennan, Inc.
222 South Riverside Plaza
Chicago, Illinois 60606

April 30, 1981

Re: Umbrella Excess Liability
    U. S. Fire Policy No. 523 067253
    Term  3/1/81-84

Dear Terri:

Enclosed please find signed and accepted endorsement No. 8 to the subject
policy excluding benefits under uninsured motorist coverage.

Very truly yours,


Eric B. Larson
Manager, Casualty Insurance

EBL/kjs
Enclosure

**Marsh &
McLennan**

Marsh & McLennan, Incorporated
222 South Riverside Plaza
Chicago, Illinois 60606
Telephone 312 648-6000

April 28, 1981

Mr. Eric B. Larson
Manager, Casualty Insurance
McGraw-Edison Company
One Continental Towers
1701 Golf Road
Rolling Meadows, IL  60008

RECEIVED
APR 30 1981
INSURANCE DEPT.

UMBRELLA EXCESS LIABILITY
TERM: MARCH 1, 1981/84
POLICY NO. 523 067253 3-U.S. FIRE
POLICY NO. 917383-FIRST STATE

Dear Eric:

We are pleased to deliver to you the U.S. Fire Insurance Company
and First State Insurance Company Umbrella policies which, together,
provide the first $25,000,000 in liability protection over and above
your self-insured retention and/or underlying insurance coverages.
These policies have been written for a three-year term as of March 1,
1981, with each annual premium to be renegotiated.  We refer you to
Endorsements 19 and 20 which reflect the terms of the annual revision.

The coverages under the policies have been continued as they were
written a year ago.  We would, however, like to remind you of the
loss reporting provisions under the U. S. Fire policy.  They are to
receive quarterly loss runs, and also any claim which is estimated
to be in excess of $100,000 is to be reported to U. S. Fire as soon
as possible.

One other item on the U. S. Fire contract is Endorsement No. 8
which excludes any benefits under Uninsured Motorist coverage.
The original of this endorsement is to be signed as accepted by
McGraw-Edison Company, and then returned to us for transmittal to
John Jolley.

Eric, we ask that you review these policies, and if there are any
questions, please let us know as soon as possible.

WA-004147
CW 01395

Marsh & McLennan, Incorporated

Mr. Eric B. Larson
April 28, 1981
Page 2


I would also like to mention that the additional excess policies
completing the full placement of your limits have been received
and are currently being reviewed.  We will get these in your hands
just as soon as possible.

Sincerely,

*Jerri*

T. A. Mikkelsen

TAM/ag
Enclosure

cc:  Mr. William J. Wilczynski
     Mr. John R. Sachtleben

Cl

WA-00414°
CW 01396

ENDORSEMENT NO. 8

This endorsement effective March 1, 1981, forms part of
policy number 523 067253 3
issued to McGRAW-EDISON COMPANY, et al
By United States Fire Insurance Company

It is agreed that the Insured by signing below, hereby agrees to reject any
and all Uninsured Motorists benefits that might otherwise be construed to be
afforded under this policy.

Signed and Accepted by:

_____
Insured

April 30, 1981
_____
Date

All other terms and conditions remain unchanged.
Attached to and made part of the policy of the Company shown above.

_____
Authorized Representative

WA-00414^
CW 01397

# Marsh & McLennan

Marsh & McLennan, Incorporated
222 South Riverside Plaza
Chicago, Illinois 60606
Telephone 312 648-6000
March 5, 1981

Mr. Norman A. Kenney
Assistant Treasurer, Risk Management
McGraw-Edison Company
1701 Golf Road
Rolling Meadows, IL  60008

CASUALTY RENEWAL
EFFECTIVE: MARCH 1, 1981

Dear Mr. Kenney:

Following on John Sachtleben's letter dated March 2, 1981, we are
now pleased to enclose our binders on your entire Casualty program.

Binder No. C834-461 reflects the Automobile Liability and "Insured"
Workers' Compensation coverages, with the exception of Kentucky and
Virginia Compensation.  The binder also restates the policy numbers
which have been assigned by National Union to these renewal coverages.

Binder No. C834-462 indicates the separate insured Workers' Compen-
sation policy which is necessary this year in Kentucky and Virginia.

Binder No. C834-463 reflects the continuation of your Specific Ex-
cess Workers' Compensation coverages in the various states, this
also being provided by National Union.

The next binder, No. C834-464 shows renewal of the Umbrella Excess
policies to be provided by U.S. Fire and First State for a total
limit of $25,000,000 each occurrence.

The last binder reflects the various other Excess Umbrella Liability
coverages, and we have attached to this binder a complete listing of
the full placement.  This attachment, with the exception of several
policies, will also indicate to you the policy numbers which have
been assigned.  We expect the additional policy numbers very shortly
and will pass those on to you as soon as possible.

I hope you will find these to be in order, but please let us know
if you have any comments.

Sincerely,

T. A. Mikkelsen

TAM/ag

cc: Mr. J. R. Sachtleben
F4

WA-004150

CW 01398

## CHART 5: SUMMARY UMBRELLA EVALUATION
### BASED ON POLICY STRUCTURE AND KEY FEATURES COMPARED IN CHART 4

ALWAYS READ EXCLUSIONS AND ENDORSEMENTS CAREFULLY—EVEN ON FORMS IN HIGHER EVALUATION CATEGORIES

| EVALUATION CATEGORY | PRINCIPAL UMBRELLA DEFECTS | |
|---|---|---|
| | INSURERS[1] | NOTES |
| 1. Best overall coverage terms: | ALL | 9 |
| | CNA | 9 |
| | GN | 9 |
| | LM | 3, 8, 9 |
| 2. Umbrellas with only minor, correctable defects | CF | 3 |
| | EMPW | 8, 9 |
| | HOME | 6, 9 |
| | LEX | 9 |
| | RAN | 3 |
| | UP | 3, 6 |
| 3. Umbrellas with major coverage defects which can easily be corrected: | ACS | 3, 5, 9 |
| | AI | 4, 5, 8, 9 |
| | CAUN | 5, 7, 9 |
| | CEN | 3, 5, 9 |
| | CHUB | 3, 5, 6 |
| | CN | 3, 4, 6, 8 |
| | CONT | 3, 5, 9 |
| | FF | 3, 5, 9 |
| | FRE | 3, 4, 9 |
| | FS | 3, 7, 9 |
| | GA | 3, 5, 9 |
| | HARB | 3, 5, 6, 9 |
| | HART | 3, 7, 9 |
| | HIGH | 3, 4, 5, 8 |
| | INA | 5, 7, 9 |
| | L | 3, 4, 8, 9 |
| | MID | 3, 5, 6, 8, 9 |
| | MIS | 3, 8, 9 |
| | NE | 3, 7, 9 |
| | NN | 3, 4, 5, 8, 8 |
| | NOR | 3, 4, 6, 8, 9 |
| | OHIO | 5, 9 |
| | PINE | 3, 6, 9 |
| | PUR | 3, 6, 9 |
| | RG | 5, 6 |
| | RLI | 3, 4, 6, 8, 8 |
| 4. Umbrellas with major coverage defects which cannot easily be corrected (may require revising major sections of the policy): | AH | 3, 7, 9 |
| | AIU | 7, 9 |
| | AM | 3, 4, 5, 7, 8, 9 |
| | BEL | 3, 7, 9 |
| | CU | 3, 4, 6, 8 |
| | GS/NH | 3, 6, 8, 9 |
| | II | 3, 4, 5, 7 |
| | KEMP | 3, 5, 7 |
| | NWM | 3, 5, 7, 8, 9 |
| | SAFE | 3, 6, 7, 9 |
| | STP | 7, 9 |
| | TA | 3, 6, 7, 9 |
| | TRAV | 2, 3, 6, 7, 9 |
| | USFG | 2, 3, 5, 7, 9 |

NOTES:
[1] Listing within evaluation categories is alphabetical, not ranked by order of preference.
[2] Amend to include oral contracts.
[3] "Drop down" coverage is limited, and should be corrected by making the umbrella as broad as primary coverage (see "Policy Terms" tab, page IAff).
[4] Replace "property damage" definition with ISO wording (see "Policy Terms," page IApd).
[5] Amend "occurrence" definition (see "Policy Terms," page DFocc).
[6] "Persons insured" definitions or the insured named in the declarations should include all additional insureds in underlying insurance.
[7] Umbrellas usually should include non-owned aircraft and watercraft. When excluded, these defects often are the most difficult to correct, because they may emanate from a combination of definitions, exclusions, and the "persons insured" provisions of the umbrella. (cf. Chart 4, footnote 4.)
[8] Subsidiaries or new acquisitions coming under the insured's management or control are not automatically covered. Thus, the named insured in the policy declarations must be drafted in the broadest possible manner.
[9] One or more exclusions may require revision. Check exclusions carefully, especially items in red on lines 11-14 of Chart 4.

WA-00415

CW 01399

References & Notes

## Summary Evaluation Criteria

The great differences in umbrella forms make selection of the most important features difficult. Even when the most important features have been identified, grading or ranking of the forms is complicated by their organizational structure, as well as the basic coverage provided by the policy language. In many cases, strengths of a form in one area are offset by weaknesses or defects, but many of these often can be corrected merely by modifying or deleting one or a few policy terms.

Chart 5 solves a problem evaluating the organizational structure of each form, in addition to coverage, which could not easily be represented in the comparison format of charts 1-4. The key point is how easily a form's defects or coverage weaknesses can be corrected. It also is important to identify what should be done to make the necessary modifications. These recommendations for improvement are contained in the footnotes to Chart 5. The notes applicable to each company's form are shown beside the company symbol in each category.

See Chart 4.

No basic umbrella form is "perfect," but some obviously are superior, based on the number of changes required to bring the form up to the minimum standards used in this evaluation. The companies were assigned to the four categories as follows:

1. *Best overall coverage terms:* Each form in this category had at least one exclusion which could be more restrictive than some insureds would desire, but in other respects the coverage of the form was superior. It was considered especially favorable if the umbrella form was automatically as broad as all underlying coverage (CNA).

2. *Umbrellas with only minor, correctable defects:* Each of these forms provides generally good coverage, but lacks the distinctive broadening features of those in the first category. The defects indicated for these forms, as in the first category, usually can be corrected through such measures as more carefully naming the insured to be sure that all subsidiaries or insureds in underlying insurance are covered. Thus, only simple endorsements should be required on these policies.

3. *Umbrellas with major coverage defects which can easily be corrected:* Each of these forms has at least one major defect in coverage. The most common problems are restricted definitions of property damage or occurrences. In many cases, the defect may result from an older form which needs updating to at least match current ISO coverage. In other cases, the umbrella follows ISO wording too closely. The importance of the defects can be learned from reading the pages of *The Umbrella Book* referenced in the notes. In most cases, relatively simple endorsements would correct the defects without grossly disturbing the policy's organizational structure.

See page IApd

4. *Umbrellas with major coverage defects which cannot be easily corrected:* Forms in this category often have the same defects as those in category 3 above, with the addition of complex wording or restrictions in the "persons insured" coverage agreement, such as for automobiles, aircraft or watercraft. Such restrictions may carry over into other definitions and exclusions in the policy, meaning that several terms would have to be modified to provide the standard of coverage used in this evaluation. These changes are not easily made, and may require revision of large portions of the basic policy form. The extensive endorsement wording required to make these changes increases the complexity of coverage wording. An oversight or poor wording in the endorsement would create further problems. The wording of "persons insured" used by Allstate could be a model for these insurers.



WA-004150
CW 01400

## SUMMARY UMBRELLA COMPARISON

**KEY FEATURES your UMBRELLA SHOULD CONTAIN:**

**INSURING AGREEMENTS**

**DEFINITIONS**

**PERSONS INSURED**

**EXCLUSIONS (NOT EXPOSURES NOT EXCLUDED)**

WA-004151
CW 01401



# THE RISK MANAGEMENT LETTER

Volume 1, No. 4   INSURANCE DEPT.                    June/July 1981

## Have You Audited Your Captive Lately?

Captive insurers were definitely "in" during the 70's, and Bermuda has long been the most popular place to form them. But an article in the May, 1981 issue of *Institutional Investor* publicizes what some of us have said for years: Don't form a captive because of assumed tax benefits alone, and periodically reevaluate whether a captive is the best way to finance your risks.

This does not mean that captives are "out," only that the conditions which favored a captive for your firm may have changed. Are the reasons for forming your captive still valid? If self-insurance wasn't feasible before, is it now? Should your retentions be decreased in view of currently available bargain reinsurance? Is your captive manager doing a good job? Should you now be placing other types of coverage in the captive?

A captive audit can answer these and many other questions. If you had an objective feasibility study done before forming the company, that study's conclusions and projections should be checked against the captive's actual performance. Every aspect of the captive's existence and operation should be questioned, including its domicile. For example, passage of the new Vermont Special Insurer Act of 1981 may now make U.S. licensing or domestic domicile more attractive than was previously the case.

One of the most serious problems of *not* auditing your captive is uncertainty about unfunded liabilities. To determine the scope of the problem, first audit claims. Then, have an actuary test reserve adequacy. Many CPA's will no longer certify captive financial statements without such documentation. A qualified audit could harm the financial structure of organizations by jeopardizing the continued availability of public or bank financing. Your situation could be especially risky if outside business accepted for your captive has not been carefully underwritten.

Our staff has recommended and helped form many captives. But more frequently, we have found that self-insurance creates fewer administrative, tax and legal problems, and is more cost-effective.

If your captive has been in existence for more than three years, plan to have it audited soon to avoid unpleasant surprises in the future.

## The Umbrella Nonconcurrency Problem

After reading "What to Look for in Umbrellas" in last month's *Risk Management Letter*, one risk manager asked us to comment further on a problem frequently overlooked: *concurrency* between primary and umbrella policies. An umbrella and its underlying liability policies *must* have the same anniversary dates to avoid a potential coverage gap.

Two types of losses can create concurrency problems: (1) those which exhaust underlying aggregate limits, such as products claims; and (2) losses *not* subject to underlying aggregate limits which continue over time or which result from repeated events ("dripping faucet" losses). Either type of loss, or portion thereof, occurring prior to an umbrella's inception date will not be credited toward reducing the underlying limit warranted in the umbrella. This is because umbrellas require that primary limits be reduced or exhausted only by losses occurring during the *umbrella's* policy period. If your primary and umbrella policies are not concurrent, an unintended "self-insured retention" equal to the warranted *primary* limit could result.

We recommend that you check your primary liability policies and all related umbrella and excess liability policies *now*. If all policies do not have concurrent anniversary dates, call your broker and request an endorsement *before expiration* to correct the problem.

## Discrimination Liability Coverage

Many insureds are concerned about discrimination suits, but have no insurance against them. The recent Solo Cup v. Federal Insurance Co. decision established that firms may be liable for even *unintentional* discrimination, based upon the "disparate impact" concept expressed in Title VII of the Civil Rights Act of 1964. This means that many more corporations and public entities may now be faced with discrimination suits, regardless of merit.

Primary liability policies normally do not cover discrimination. Coverage under standard umbrella forms varies from none (specifically excluded) to virtually unlimited (discrimination listed as a covered personal injury with no qualifications).

Of 70 umbrella forms analyzed in our publication, *The Umbrella Book*, 22 do not list discrimination as a covered personal injury. Seven of the 22 insurers reinforce this omission by explicitly excluding some or all type(s) of discrimination. Four insurers (Comstock, Commercial Union, Liberty Mutual and Northumberland General) provide unqualified discrimination coverage. The remaining 44 carriers restrict coverage to certain types of discrimination.

The most common of these covered types are age, race, religion and sex discrimination. Common restrictions on discrimination coverage are: (a) acts committed by or at the direction of the insured or named insured, (b) if insurance thereof is prohibited by law, and (c) fines and penalties imposed by law. In addition, six insurers exclude employment-related *discrimination*, and two exclude all employment-related *personal injury*. Of course, other insurers may modify discrimination coverage in their basic form by endorsement.

At the very least, we think that your umbrella should *defend* you for almost any discrimination suit. You could have a serious coverage problem if your umbrella excludes all discrimination coverage.

If you are interested in more details on discrimination liability insurance, let us know. We'll send you a reprint of our analysis from *The Umbrella Book*.

A PUBLICATION OF WARREN, McVEIGH & GRIFFIN • RISK MANAGEMENT CONSULTANTS
General Offices: 1420 Bristol Street North, Newport Beach, California 92660 • (714) 752-1058



WA-00415
CW 01402

**McGRAW-EDISON**

To
J. Strayer

Date.
July 30, 1981

From
N. A. Kenney

Internal
Correspondence

Corporate Headquarters

Subject
Blanket Casualty Program

You have raised the question as to coverage provided by our blanket casualty program with regard to lawsuits claiming discrimination. Historically, McGraw-Edison has purchased the broadest personal injury protection for officers and employees that has been available. However, as you might expect there are limitations in the intent of a insured program.

Secondly, McGraw-Edison chose to adopt a self-insured retention in our casualty losses in 1977. Since that time that has been expanded to the level of $500,000 per occurrence which also affects our response. Attached for your review is the definition of personal injury in our first level umbrella program. After you have had an opportunity to review this wording I would suggest that you, Eric and I sit down and discuss those lawsuits presently filed against McGraw-Edison to determine if any aspect of this claim could fall within the scope of our protection.

Norman A. Kenney

NAK/kjs
Enclosure

WA-00415
CW 01403

COLOR KEY:

Row labels (left and right margins):

ISO, ACS, AH, AI, AIU, ALL, AM, BEL, CEN, CF, CHUB, CN, CNA, CONT, CU, EMPW, FF, FRE, FS, GA, GN, GS/MN, HARB, HART, HIGH, HOME, H, INA, KEMP, L, LEX, LM, MID, MIS, NE, NN, NOR, KWM, OHIO, PIKE, PUR, RAN, RG, RLI, SAFE, STP, TA, TRAV, UP, USFG

REFERENCE

WA-00415
CW 01405

**Marsh & McLennan**

Marsh & McLennan, Incorporated
222 South Riverside Plaza
Chicago, Illinois 60606
Telephone 312 648-6000

July 17, 1984

Mr. Norman A. Kenney
Assistant Treasurer, Risk Management
McGraw-Edison Company
1701 Golf Road
Rolling Meadows, IL  60008

U.S. FIRE INSURANCE COMPANY
POLICY: 523067253

Dear Mr. Kenney:

Enclosed are Endorsements 55, 56, and 57 for attachment to
the captioned policy. These endorsements add cancellation
notification for various certificate holders.

The certificate holders shown on the endorsements are
Metropolitan Wastewater Management Commission, General
Electric Trading Company, and New Jersey Bell Telephone
Company.

If you have any questions, please let us know.

Sincerely,

*Mary-Beth*

Mary-Beth Woomer
Technical Assistant

MW:mego5/C16

cc:  Mr. J. R. Sachtleben
     Ms. T. A. Mikkelsen

RECEIVED

JUL 25 1984

INSURANCE DEPT.

WA-00415  CW 01406



**Marsh & McLennan**

Marsh & McLennan, Incorporated
222 South Riverside Plaza
Chicago, Illinois 60606
Telephone 312 648-6000

March 14, 1984

Mr. Norman A. Kenney
Assistant Treasurer
Risk Management
McGraw-Edison Company
1701 Golf Road
Rolling Meadows, IL  60008

U.S. FIRE INSURANCE
POLICY 523 067253

Dear Mr. Kenney:

Enclosed is Endorsement 54 for attachment to the captioned policy.
This endorsement shows that 30 day written notice prior to cancel-
lation will be given to Jewel Companies, Inc. should the captioned
policy be cancelled. Endorsement was issued due to Jewel's Cer-
tificate requirements.

If you have any questions, please let us know.

Sincerely,

*Mary-Beth*

Mary-Beth Woomer
Technical Assistant

MBW/baw 3C15

cc:  Ms. T.A. Mikkelsen
     Mr. W. J. Wilczynski
     Mr. J. R. Sachtleben


RECEIVED

MAR 19 1984

INSURANCE DEPT.

# Marsh & McLennan

Marsh & McLennan, Incorporated
222 South Riverside Plaza
Chicago, Illinois 60606
Telephone 312 648-6000

September 1, 1983

Mr. Mark Faut
Elgar Corporation
8225 Mercury Court
San Diego, CA 92111

McGRAW-EDISON COMPANY, ETAL
CERTIFICATES OF INSURANCE

Dear Mark:

In line with our phone conversation of August 31, we are
sending on to you a supply of "blank" Certificate of Insurance
forms which you may use in sending to your customers.

When the certificates are issued, it is necessary that the name
of the requestor and their address be completed in the box in
the bottom left hand corner. Also, the certificate should be
dated at that time. We also ask that two copies of each
certificate be sent to our office, and another copy be sent to
your Corporate Insurance Department in Rolling Meadows,
Illinois, to the attention of Mr. Norman A. Kenney.

We also ask, Mark, that no changes in the coverages indicated
be made on these Certificates of Insurance. If you find that
any additional coverages are required for a specific requestor
or job, we ask that those requirements be reviewed with your
Corporate Insurance Department, or our office, and we will
prepare any special certificates as needed.

We hope this supply will be adequate for your needs, but if
there are any questions or further supplies are needed, please
let us know.

Sincerely,

T. A. Mikkelsen

TAM:md:A-22-Th

cc: Norman A. Kenney
    William J. Wilczynski
    John R. Sachtleben

RECEIVED

SEP - 6 1983

INSURANCE DEPT.

WA-00416
CW 01408



Marsh & McLennan, Incorporated
222 South Riverside Plaza
Chicago, Illinois 60606
Telephone 312 648-6000

March 1, 1983

Mr. Norman A. Kenney
Assistant Treasurer, Risk Management
McGraw-Edison Company
1701 Golf Road
Rolling Meadows, IL   60008

Re:  UMBRELLA EXCESS LIABILITY
     POLICY NO. 523 067253 - U. S. FIRE
     POLICY NO. 917383 - FIRST STATE
     RENEWAL AS OF MARCH 1, 1983

Dear Norm:

As you know, the renewal negotiations for your first layer Um-
brella policy have been concluded with John Jolley.  To com-
plete your file, we are enclosing the renewal endorsements
which he has issued for both the U. S. Fire and First State
policies.

The renewal premium on both contracts remains the same as ex-
piring.  On the U. S. Fire policy, the premium totals $273,125.
On the First State policy, the premium charged is $265,170, and
in addition, the Illinois Surplus Lines Tax of 3% ($7,95.10) *7955.10
has also been invoiced to you.  Our Invoice No. 65274 is en-
closed for the total of both policies, $546,250.10

The renewal endorsements are evidenced by Endorsement No. 49 on
the U. S. Fire contract, and Endorsement No. 7 issued to the
First State policy.  In addition, Endorsement No. 50 is en-     } to policies
closed to the U. S. Fire policy.  This endorsement reflects the
renewal terms as previously indicated by John Jolley.

First of all, the claims reporting conditions have been amended
so that claims reasonably likely to exceed $250,000 are now to
be reported to the London Agency.  This is instead of the pre-
vious $100,000 threshold.

The wording as respects the scheduling of the AFIA Foreign DIC
policy has also been amended.  The coverage has been clarified

WA-00416

CW 01409

Marsh & McLennan, Incorporated

Mr. Norman A. Kenney
March 1, 1983
Page 2

to show the $1,000,000 limit under the AFIA contract, as well
as a $250,000 limit for Foreign Fire Legal Liability.  In addi-
tion, a condition has been added indicating that if a foreign
loss occurs which is not covered under the AFIA contract, a
self-insured retention of $500,000 each occurrence shall apply,
subject to an annual aggregate retention of $1,000,000.

Norm, we trust that these items are in accordance with your
previous understanding of the renewal, and ask that you attach
the original endorsements to your policies.  If there are any
questions, please call us at your convenience.

Sincerely,

T. A. Mikkelsen

TAM:mg/20-33

cc:  Mr. William J. Wilczynski
     Mr. John Sachtleben

WA-00416?
CW 01410



Marsh & McLennan, Incorporated
222 South Riverside Plaza
Chicago, Illinois 60606
Telephone 312 648-6000

April 12, 1983

Mr. Norman A. Kenney
Assistant Treasurer, Risk Management
McGraw-Edison Company
1701 Golf Road
Rolling Meadows, IL 60008

UMBRELLA EXCESS LIABILITY
POLICY NO. 523 067253
U.S. FIRE INSURANCE COMPANY

Dear Norm:

Enclosed is Endorsement No. 51 which we have just received from
John Jolley on the captioned policy. This endorsement indi-
cates that the wording for your insured Workers' Compensation
coverage has been amended, as respects Employers Liability. We
have noted in reviewing the Compensation policy that the
Employers' Liability coverage provides an aggregate limit by
state. To be sure that we are providing the appropriate excess
coverage, we have amended the Umbrella policy to show the
aggregate, where applicable.

Norm, if you have any questions on this item, we would be happy
to discuss them at your convenience.

Sincerely,

T. A. Mikkelsen

TAM:md:A-18-T

cc: William Wilczynski
    John Sachtleben

RECEIVED

APR 1 3 1983

INSURANCE DEPT.

WA-00416   CW 01411

**Marsh &**
**McLennan**

Marsh & McLennan, Incorporated
222 South Riverside Plaza
Chicago, Illinois 60606
Telephone 312 648-6000

August 3, 1983

Mr. Norman A. Kenney
Assistant Treasurer
Risk Management
McGraw-Edison Company
1701 Golf Road
Rolling Meadows, Illinois 60008

POLICY NO. 523 067253
UMBRELLA EXCESS LIABILITY
U.S. FIRE INSURANCE COMPANY
TERM:  MARCH 1981/84

Dear Norm:

Several months ago, we had discussions with you
concerning the sub-lease agreement which McGraw
has entered into with Evans Products, leasing to
Evans a portion of your hangar at the Pal Waukee
Airport.  We expressed our concern that McGraw
could be held liable for damages caused to the
Evans aircraft, and suggested that you purchase
Hangarkeepers Legal Liability Coverage.

Since McGraw decided not to purchase this separate
coverage, we approached John Jolley for possible
modifications to your U.S. Fire Umbrella Policy.
We have been successful in these negotiations to
delete that "care, custody and control" warranties
in the Umbrella Contract, as respects this lease
agreement with Evans.  This has been done per
Endorsement No. 53 which is now enclosed.

Norm, we hope you are in agreement with our think-
ing and find this endorsement in order.  If there
are any questions, however, please let us know.

Sincerely,

T.A. Mikkelsen

TAM:jgr

RECEIVED

AUG - 5 1983

INSURANCE DEPT.

cc:  Mr. William J. Wilczynski, Account Executive
cc:  Mr. John R. Sachtleben

**Marsh & McLennan**

Marsh & McLennan, Incorporated
222 South Riverside Plaza
Chicago, Illinois 60606
Telephone 312 648-6000

June 25, 1981

Mr. Norman A. Kenney
Assistant Treasurer, Risk Management
McGraw-Edison Company
One Continental Towers
1701 Golf Road
Rolling Meadows, IL   60008

UMBRELLA EXCESS LIABILITY PROGRAM
EFFECTIVE: MARCH 1, 1981

Dear Mr. Kenney:

As you know, during our discussion of your entire Umbrella Excess Lia-
bility placement, we discussed the possibility of writing this coverage
on a three-year basis.  As you know, the lead carriers, U. S. Fire and
First State have their programs already set up on a three-year basis.

We have contacted all of the other companies involved in the placement
of the full limits of $200,000,000.  We have now received all of their
responses, and with several exceptions, the company have advised they
are unable to comply with this request.  For the most part, all of the
companies have indicated they would have difficulties because of their
reinsurance arrangements.

The Highlands Insurance Company who are a participant in the layer of
$25,000,000 excess $50,000,000 have agreed to a three-year contract,
and have already issued their endorsement.  This is now enclosed for
your review.  Only one other company has agreed to a three-year con-
tract, and that is the Central National Insurance Company.  Their
original policy reflected the three-year term.

Under the circumstances, all of the other policies will have to be re-
negotiated with each company as of March 1, 1982.  If you would like
to discuss this further with us, please give us a call at your conve-
nience.

Sincerely,

T. A. Mikkelsen

TAM/ag
cc:  Mr. Eric Larson
     Mr. W. J. Wilczynski
     Mr. J. R. Sachtleben

CF7

RECEIVED

JUN 29 1981

INSURANCE DEPT.

WA-00416F

CW 01413



RENEWS
6682-3216
Member of
NEW HAMPSHIRE
INSURANCE GROUP 1869

NUMBER
6683- 3982

☒ **GRANITE STATE INSURANCE COMPANY**
☐ **NEW HAMPSHIRE INSURANCE COMPANY**
MANCHESTER, NEW HAMPSHIRE

**C. V. STARR & CO.**   #15m PART OF 25m
UNDERWRITING MANAGERS   EXCESS OF PRIMARY

SAN FRANCISCO     SEATTLE     LOS ANGELES     PORTLAND     CHICAGO

## DECLARATIONS

1. Assured:     MC GRAW EDISON COMPANY AND ALL SUBSIDIARIES AND DIVISIONS AS NOW
                OR HEREAFTER CONSTITUTED

   Address:     ONE CONTINENTAL TOWERS
                1701 GOLF ROAD
                ROLLING MEADOWS, ILLINOIS  60008

2. Policy Period: From     MARCH 1,1983 TO MARCH 1,1984
   both days at   12:01 A.M.   (Standard Time) at the location(s) of the risk(s) insured and in accord with the terms and conditions of the form(s) attached.

3. Amount:
                $15,000,000.00 PART OF
                $25,000,000.00 EXCESS OF
                $25,000,000.00 EXCESS OF UNDERLYING

4. Coverage:     EXCESS UMBRELLA LIABILITY

5. Premium: A) Provisional or deposit premium     $ 22,500.00

   B) Minimum Premium                             $ 22,500.00

   C) Basis of Adjustment (Rate)                  FLAT

   D) Audit Period                                NONE

Assignment of this Policy shall not be valid except with the written consent of this Company.

This Policy is made and accepted subject to the foregoing provisions and stipulations and those hereinafter stated, which are hereby made a part of this Policy, together with such other provisions, stipulations, and agreements as may be added hereto, as provided in this Policy.

Unless otherwise provided herein, this Policy may be cancelled on the customary short rate basis by the Assured at any time by written notice or by surrender of this Policy to the Company. This Policy may also be cancelled, with or without the return or tender of the unearned premium, by the Company or by the Underwriting Managers in its behalf, by delivering to the Assured or by sending to the Assured by regular mail, at the Assured's address as shown herein, not less than 30 days written notice stating when the cancellation shall be effective, and in such case Insurers shall refund the paid premium less the earned portion thereof on demand, subject always to the retention by Insurers hereon of any minimum premium stipulated herein (or proportion thereof previously agreed upon) in the event of cancellation either by Insurers or Assured.

Not withstanding anything to the contrary contained herein and in consideration of the premium for which this insurance is written, it is understood and agreed that whenever an additional or return premium of $10.00 or less becomes due from or to the Assured on account of the adjustment of a deposit premium, or of an alteration in coverage or rate during the term or for any other reason, the collection of such premium from the Assured will be waived or the return of such premium to the Assured will not be made, as the case may be.

In Witness Whereof, the Company has caused this Policy to be executed and attested; but this Policy shall not be valid unless countersigned by a duly authorized representative of the Company.

MARCH 29,1983 BG/MS          Secretary

Countersigned

CVS 1114                     ORIGINAL

C. V. STARR & CO.
UNDERWRITING MANAGERS
President
By

WA-00452°
CW 01414

## EXCESS UMBRELLA POLICY

Named Assured: As stated in Item 1 of the Declarations forming a part hereof

and/or subsidiary, associated, affiliated companies or owned and controlled companies as now or hereafter constituted and of which prompt notice has been given to the Company.

## SCHEDULE

| | | |
|---|---|---|
| ITEM 1. | NAMED ASSURED | MC GRAW EDISON COMPANY, ET AL |
| ITEM 2. | Underlying Umbrella Policies: | U.S. FIRE INSURANCE COMPANY |
| ITEM 3. | Underlying Umbrella limits (Insuring Agreement I): | $25,000,000.00 |
| ITEM 4. | Underlying Umbrella Aggregate Limits (Insuring Agreement II): | $25,000,000.00 |
| ITEM 5. | Limit of Liability (Insuring Agreement II): | $15,000,000.00 PART OF $25,000,000.00 |
| ITEM 6. | Aggregate Limit of Liability (Insuring Agreement II): | $15,000,000.00 PART OF $25,000,000.00 |
| ITEM 7. | Notice of Occurrence (Conditions 4) to: C.V. Starr & Co. | THREE EMBARCADERO CENTER SAN FRANCISCO, CALIFORNIA  94111 |

## INSURING AGREEMENTS

**I. COVERAGE**

The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability

(a) imposed upon the Assured by law,

or

(b) assumed under contract or agreement by the Named Assured and/or any officer, director, stockholder, partner or employee of the Named Assured while acting in his capacity as such.

for damages, direct or consequential and expenses on account of:

(i) Personal injuries, including death at any time resulting therefrom.

(ii) Property damage,

(iii) Advertising liability.

caused by or arising out of each occurrence happening anywhere in the World, and arising out of the hazards covered by and as defined in the Underlying Umbrella Policies stated in Item 2 of the Schedule, (hereinafter called the "Underlying Umbrella Insurers").

Attached to and forming part of Policy No.   6683-3982

Issued to:   MC GRAW EDISON COMPANY, ET AL

Dated:   3-1-83

P-431

☒ GRANITE STATE INSURANCE COMPANY

☐ NEW HAMPSHIRE INSURANCE COMPANY

C.V. STARR & COMPANY
Underwriting Managers

By...

WA-0045⸱⸱
CW 01415

ENDORSEMENT NO. 1

AIRCRAFT PRODUCTS EXCLUSION

IT IS AGREED THAT SUCH INSURANCE AS IS AFFORDED BY THIS POLICY SHALL NOT
APPLY TO PERSONAL INJURY AND PROPERTY DAMAGE ARISING OUT OF THE PRODUCTS
HAZARD RELATING TO "AIRCRAFT PRODUCTS" AND "GROUNDING LIABILITY".

A)  AIRCRAFT PRODUCTS MEANS AIRCRAFT (INCLUDING MISSILES OR SPACECRAFT
    AND ANY GROUND SUPPORT OR CONTROL EQUIPMENT USED THEREWITH), AND ANY
    ARTICLE FURNISHED BY THE ASSURED OR THEIR PREDECESSORS IN BUSINESS AS
    MAY BE AGREED BY INSURERS AND ENDORSED HEREON AND INSTALLED IN
    AIRCRAFT OR USED IN CONNECTION WITH AIRCRAFT OR FOR SPARE PARTS FOR
    AIRCRAFT, OR TOOLING USED FOR THE MANUFACTURE THEREOF, INCLUDING
    GROUND HANDLING TOOLS AND EQUIPMENT AND ALSO MEANS TRAINING AIDS,
    INSTRUCTION, MANUALS, BLUEPRINTS, ENGINEERING OR OTHER DATA, AND/OR
    ANY ARTICLE IN RESPECT OF WHICH ENGINEERING OR OTHER ADVICE AND/OR
    SERVICES AND/OR LABOR HAVE BEEN GIVEN OR SUPPLIED BY THE ASURED OR
    THEIR PREDECESSORS IN BUSINESS AS ENDORSED HEREON RELATING TO SUCH
    AIRCRAFT OR ARTICLES.

B)  GROUNDING LIABILITY MEANS THE WITHDRAWAL, AT OR ABOUT THE SAME TIME,
    IN THE INTEREST OF SAFETY, OF ONE OR MORE AIRCRAFT FROM FLIGHT
    OPERATIONS BECAUSE OF A LIKE CONDITION OR SUSPICION THEREOF IN TWO OR
    MORE SUCH AIRCRAFT WHETHER SUCH AIRCRAFT SO WITHDRAWN ARE OWNED OR
    OPERATED BY THE SAME OR DIFFERENT PERSON, FIRMS OR CORPORATIONS.  A
    GROUNDING SHALL BE DEEMED TO COMMENCE ON THE DATE OF AN ACCIDENT OR
    OCCURRENCE WHICH DISCLOSED SUCH CONDITION, OR ON THE DATE AN AIRCRAFT
    IS FIRST WITHDRAWN FROM SERVICE ON ACCOUNT OF SUCH CONDITION, WHICHEVER
    FIRST OCCURS.

All other terms and conditions remain unchanged

Effective date of this endorsement is:   MARCH 1, 1983          ☐ NEW HAMPSHIRE INSURANCE CO.

Attached to and forming part of No. 6683-3982              ☒ GRANITE STATE INSURANCE COMPANY

Issued to:   MC GRAW EDISON COMPANY, ET AL

Dated·   3-29-83
         CHI -1120 A1 cmp

C. V. STARR & CO.
Underwriting Managers
By

WA-00453
CW 01416

ENDORSEMENT NO. 2

IT IS HEREBY UNDERSTOOD AND AGREED THAT, EXCEPT FOR NON-PAYMENT
OF ANY PREMIUM, THE COMPANY SHALL PROVIDE NINETY (90) DAYS NOTICE
IN THE EVENT OF CANCELLATION.

All other terms and conditions remain unchanged

Effective date of this endorsement is:  MARCH 1, 1983

Attached to and forming part of No. 6683-3982

Issued to:    MC GRAW EDISON COMPANY, ET AL

Dated·        3-29-83

☐ NEW HAMPSHIRE INSURANCE CO.

☒ GRANITE STATE INSURANCE COMPANY

C. V. STARR & CO.
Underwriting Managers

By

WA-0045??
CW 01417

## II. LIMIT OF LIABILITY - UNDERLYING LIMITS

It is expressly agreed that liability shall attach to the Company only after the Underlying Umbrella Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability as follows:-

$ (as stated in Item 3 of the Declarations)  Ultimate net loss in respect of each occurrence, but

$ (as stated in Item 4 of the Declarations)  in the aggregate for each annual period during the currency of this Policy separately in respect of Products Liability and separately in respect of Personal Injury (fatal or non-fatal) by Occupational Disease sustained by any employees of the Assured.

and the Company shall then be liable to pay only the excess thereof up to a further

$ (as stated in Item 5 of the Declarations).  ultimate net loss in all in respect of each occurrence-subject to a limit of

$ (as stated in Item 6 of the Declarations)  in the aggregate for each annual period during the currency of this Policy separately, in respect of Products Liability and separately in respect of Personal Injury (fatal or non-fatal) by Occupational Disease sustained by any employees of the Assured.

## CONDITIONS

### 1. PRIOR INSURANCE AND NON CUMULATION OF LIABILITY-

It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof the limit of liability hereon as stated in Items 5 and 6 of the  Schedule  shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.

Subject to the foregoing paragraph, and to all the other terms and conditions of of this Policy, in the event that Personal Injury or Property Damage arising out of an occurrence covered hereunder is continuing at the time of termination of this Policy the Company will continue to protect the Assured for liability in respect to such Personal Injury or Property Damage without payment of additional premium.

### 2. MAINTENANCE OF UNDERLYING UMBRELLA INSURANCE-

This Policy is subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amount and limits of liability and except as otherwise provided herein) as are contained in or as may be added to the Underlying Umbrella Policies stated in Item 2 of the  Schedule   prior to the happening of an occurrence for which claim is made hereunder.

It is a condition of this Policy that the Underlying Umbrella Policies shall be maintained in full effect during the currency hereof, except for any reduction of the aggregate limits contained therein solely by payment of claims in respect of accidents and/or occurrences occurring during the period of this Policy or by the operation of the Prior Insurance and Non Cumulation of Liability Condition of the Underlying Umbrella Policies.

### 3. CANCELLATION-

This Policy may be cancelled by the Named Assured or by the Company or their representative by mailing written notice to the other party stating when, not less than thirty (30) days (ten [10] days for non-payment of premium) thereafter, cancellation shall be effective. The mailing of notice as aforesaid by the Company or their representative to the Named Assured at the address shown in this Policy shall be sufficient proof of notice and the Insurance under this Policy shall end on the effective date and hour of cancellation stated in the notice. Delivery of such written notice either by the Named Assured or by the Company or their representative shall be equivalent to mailing.

If this Policy shall be cancelled by the Named Assured the Company shall retain the customary short rate proportion of the premium for the period this Policy has been in force. If this Policy shall be cancelled by the Company the Company shall retain the pro rata proportion of the premium for the period this Policy has been in force. Notice of cancellation by the Company shall be effective even though the Company makes no payment or tender of return premium.

### 4. NOTICE OF OCCURRENCE-

Whenever the Assured has information from which they may reasonably conclude that an occurrence covered hereunder involves injuries or damage which in the event that the Assured shall be held liable, is likely to involve this Policy, notice shall be sent as stated in Item 7 of the Schedule as soon as practicable, provided however, that failure to give notice of any occurrence which at the time of its happening did not appear to involve this Policy, but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claim.

### 5. OTHER INSURANCE-

If other valid and collectible insurance with any other Insurer is available to the Assured covering a loss also covered by this Policy, other than Insurance that is in excess of the Insurance afforded by this Policy, the Insurance afforded by this Policy shall be in excess of and shall not contribute with such other insurance.

WA-004530
CW 01418

## EXCLUSIONS

This Policy shall not apply:

1. to Personal Injury or Property Damage

(i) with respect to which an Assured under the Policy is also an Assured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an Assured under any such policy but for its termination upon exhaustion of its limit of liability; or

(ii) resulting from the hazardous properties of nuclear material and with respect to which

(a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or

(b) the Assured is, or had this policy not been issued, would be entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization; or

(iii) resulting from the hazardous properties of nuclear material, if

(a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an Assured or (2) has been discharged or dispersed therefrom; or

(b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an Assured; or

(c) the injury, sickness, disease, death or destruction arises out of the furnishing by an Assured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this subparagraph (c) applies only to injury to or destruction of property at such nuclear facility.

As used herein "hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or byproduct material; "source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any

law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under sub-paragraph (a) or (b) thereof; "nuclear facility" means

(a) any nuclear reactor,

(b) any equipment or device designed or used for (1) separating the isotopes uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Assured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutomium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material; with respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property;

(iv) with respect to liability arising outside the United States of America, its Territories or Possessions, Puerto Rico or the Canal Zone, to any liability of whatsoever nature directly or indirectly caused by, or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel;

2. to any claim based upon the Assured's failure to comply with the federal "Employee Retirement Income Security Act of 1974", or any amendment thereto.

WA-004540

CW 01419



RENEWS
see 6680-1963

*LAYER $25M xs $25M*

NUMBER
6681-2370

2.1

☒ GRANITE STATE INSURANCE COMPANY
☐ NEW HAMPSHIRE INSURANCE COMPANY
MANCHESTER, NEW HAMPSHIRE

## C. V. STARR & CO.
### UNDERWRITING MANAGERS

SAN FRANCISCO    SEATTLE    LOS ANGELES    PORTLAND    CHICAGO

## DECLARATIONS

1. Assured: MC GRAW EDISON COMPANY AND ALL SUBSIDIARIES AND DIVISIONS
   AS NOW OR HEREAFTER CONSTITUTED

   Address: ONE CONTINENTAL TOWERS
   1701 GOLF ROAD
   ROLLING MEADOWS, ILLINOIS  60008

2. Policy Period: From   MARCH 1, 1981 TO MARCH 1, 1982
   both days at 12:01 A.M.   (Standard Time) at the location(s) of the risk(s) insured and in accord with the terms and con-
   ditions of the form(s) attached.

3. Amount:   $15,000,000.00 PART OF
   $25,000,000.00 EXCESS OF
   $25,000,000.00 EXCESS OF UNDERLYING

4. Coverage:   EXCESS UMBRELLA LIABILITY

5. Premium: A) Provisional or deposit premium   $  26,250.00

   B) Minimum Premium   $  26,250.00

   C) Basis of Adjustment (Rate)   FLAT

   D) Audit Period   NONE

Assignment of this Policy shall not be valid except with the written consent of this Company.

This Policy is made and accepted subject to the foregoing provisions and stipulations and those hereinafter stated, which are here-
by made a part of this Policy, together with such other provisions, stipulations, and agreements as may be added hereto, as provided in
this Policy.

Unless otherwise provided herein, this Policy may be cancelled on the customary short rate basis by the Assured at any time by
written notice or by surrender of this Policy to the Company. This Policy may also be cancelled, with or without the return or tender
of the unearned premium, by the Company or by the Underwriting Managers in its behalf, by delivering to the Assured or by sending
to the Assured by regular mail, at the Assured's address as shown herein, not less than 30 days written notice stating when the cancel-
lation shall be effective, and in such case Insurers shall refund the paid premium less the earned portion thereof on demand, subject
always to the retention by Insurers hereon of any minimum premium stipulated herein (or proportion thereof previously agreed upon)
in the event of cancellation either by Insurers or Assured.

Not withstanding anything to the contrary contained herein and in consideration of the premium for which this insurance is
written, it is understood and agreed that whenever an additional or return premium of $10.00 or less becomes due from or to the
Assured on account of the adjustment of a deposit premium, or of an alteration in coverage or rate during the term or for any other
reason, the collection of such premium from the Assured will be waived or the return of such premium to the Assured will not be
made, as the case may be.

In Witness Whereof, the Company has caused this Policy to be executed and attested, but this Policy shall not be valid unless
countersigned by a duly authorized representative of the Company.

*Mivion E. Fafin*
                                    Secretary

*Carl P. Barton*
                                    President

Cy V. STARR & CO.
UNDERWRITING MANAGERS

By *William D...*

Countersigned
CVS 1114

ORIGINAL

WA-0041

CW 01420

ENDORSEMENT NO. 1

AIRCRAFT PRODUCTS EXCLUSION

IT IS AGREED THAT SUCH INSURANCE AS IS AFFORDED BY THIS POLICY SHALL NOT APPLY TO PERSONAL INJURY AND PROPERTY DAMAGE ARISING OUT OF THE PRODUCTS HAZARDS RELATING TO "AIRCRAFT PRODUCTS" AND "GROUNDING LIABILITY":

A)   AIRCRAFT PRODUCTS MEANS AIRCRAFT (INCLUDING MISSILES OR SPACE-CRAFT AND ANY GROUND SUPPORT OR CONTROL EQUIPMENT USED THEREWITH), AND ANY ARTICLE FURNISHED BY THE ASSURED OR THEIR PREDECESSORS IN BUSINESS AS MAY BE AGREED BY INSURERS AND ENDORSED HEREON AND IN-STALLED IN AIRCRAFT OR USED IN CONNECTION WITH AIRCRAFT OR FOR SPARE PARTS FOR AIRCRAFT, OR TOOLING USED FOR THE MANUFACTURE THEREOF, INCLUDING GROUND HANDLING TOOLS AND EQUIPMENT AND ALSO MEANS TRAINING AIDS, INSTRUCTION, MANUALS, BLUEPRINTS, ENGINEER-ING OR OTHER DATA, AND/OR ANY ARTICLE IN RESPECT OF WHICH ENGI-NEERING OR OTHER ADVICE AND/OR SERVICES AND/OR LABOR HAVE BEEN GIVEN OR SUPPLIED BY THE ASSURED OR THEIR PREDECESSORS IN BUSINESS AS ENDORSED HEREON RELATING TO SUCH AIRCRAFT OR ARTICLES.

B)   GROUNDING LIABILITY MEANS THE WITHDRAWAL, AT OR ABOUT THE SAME TIME, IN THE INTEREST OF SAFETY, OF ONE OR MORE AIRCRAFT FROM FLIGHT OPERATIONS BECAUSE OF A LIKE CONDITION OR SUSPICION THEREOF IN TWO OR MORE SUCH AIRCRAFT WHETHER SUCH AIRCRAFT SO WITHDRAWN ARE OWNED OR OPERATED BY THE SAME OR DIFFERENT PERSONS, FIRMS, OR CORPORATIONS.  A GROUNDING SHALL BE DEEMED TO COMMENCE ON THE DATE OF AN ACCIDENT OR OCCURRENCE WHICH DISCLOSES SUCH CONDITION, OR ON THE DATE AN AIRCRAFT IS FIRST WITHDRAWN FROM SERVICE ON ACCOUNT OF SUCH CONDITION, WHICHEVER FIRST OCCURS.

All other terms and conditions remain unchanged

Effective date of this endorsement is:   MARCH 1, 1981

Attached to and forming part of No.   6681-2370

Issued to:   McGRAW EDISON COMPANY, ET AL

Dated·   MARCH 10, 1981   ENDT. #1

☐ NEW HAMPSHIRE INSURANCE CO.

☒ GRANITE STATE INSURANCE COMPANY

C. V. STARR & CO.
Underwriting Managers

By _____

22697A (REV. 1/26)

WA-0041__
CW 01421

ENDORSEMENT NO. 2

CANCELLATION

IT IS HEREBY UNDERSTOOD AND AGREED THAT, EXCEPT FOR NON-
PAYMENT OF ANY PREMIUM THE COMPANY SHALL PROVIDE
___SIXTY (60)___ DAYS NOTICE IN THE EVENT OF CANCELLATION.

All other terms and conditions remain unchanged

Effective date of this endorsement is: MARCH 1, 1981

Attached to and forming part of No.___6681-2371___

Issued to:   McGRAW EDISON COMPANY, ET AL

Dated-   MARCH 10, 1981   ENDT. #2

☐ NEW HAMPSHIRE INSURANCE CO.

☒ GRANITE STATE INSURANCE COMPANY

C. V. STARR & CO.
Underwriting Managers

By_____

3197A (REV. 1/71)

WA-0041   CW 01422

It is agreed that this Policy/Cert. is hereby amended as indicated by ☒

☐ IN CONSIDERATION OF: ☐ AN ADDITIONAL PREMIUM OF    $ _____ ,
                        ☐ A RETURN PREMIUM OF          $ _____ ,
            IT IS UNDERSTOOD AND AGREED THAT THE

☒ IT IS HEREBY UNDERSTOOD AND AGREED THAT THE

| | | |
|---|---|---|
| ☐ Premium | ☐ Deductible | ☐ Address of location of property |
| ☐ Installment | ☐ Self Insured Retention | ☐ Policy  ☐ Cert.  ☐ End. No.    is cancelled |
| ☐ Audit | ☐ Rate | ☐ Pro rata  ☐ Short rate  ☐ Flat |
| ☐ Description of | ☐ Deposit premium | ☐ Name of assured |
| property covered | ☐ Inception date | ☐ Policy/Cert. period |
| ☐ Schedule of | ☐ Expiration date | ☐ Address of the assured |
| Underlying Insurances | ☐ Limit of Liability | ☐ Amount of Insurance |
| ☐ Coverage | | |

☒ Company shall provide  NINETY  (90) _____ days notice in event of cancellation, except in the event of non-payment of premium.

☐ Is amended to READ / INCLUDE / EXCLUDE    ☐ Is charged for the period

All other terms and conditions remain unchanged.    Effective date of this endorsement is:  MARCH 1, 1981 _____

Attached to and forming part of Policy/Cert. No. _____  6681-2370 _____

Issued to:   McGRAW EDISON COMPANY, ET AL      ☐   NEW HAMPSHIRE INSURANCE CO.
                                               ☒   GRANITE STATE INSURANCE CO.

C. V. STARR & CO.
Underwriting Managers

Dated:      JULY 13, 1981                      By _____ William J Green _____

23178 (11/77)              ENDORSEMENT NO.  3 _____

WA-00419^
CW 01423

## EXCESS UMBRELLA POLICY

Named Assured: As stated in Item 1 of the Declarations forming a part hereof

and/or subsidiary, associated, affiliated companies or owned and controlled companies as now or hereafter constituted and of which prompt notice has been given to the Company.

### SCHEDULE

ITEM 1.   NAMED ASSURED          MC GRAW EDISON COMPANY

ITEM 2.   Underlying Umbrella Policies:   U.S. FIRE INSURANCE COMPANY AND FIRST STATE INSURANCE COMPANY

ITEM 3.   Underlying Umbrella limits       $25,000,000.00
          (Insuring Agreement II):

ITEM 4.   Underlying Umbrella Aggregate Limits   $25,000,000.00
          (Insuring Agreement II):

ITEM 5.   Limit of Liability               $15,000,000.00 PART OF $25,000,000.00
          (Insuring Agreement II):

ITEM 6.   Aggregate Limit of Liability     $15,000,000.00 PART OF $25,000,000.00
          (Insuring Agreement II):

ITEM 7.   Notice of Occurrence (Conditions 4) to: C.V. Starr & Co.   THREE EMBARCADERO CENTER
                                                                     SAN FRANCISCO, CALIFORNIA 94111

### INSURING AGREEMENTS

**I. COVERAGE**

The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability

  (a) imposed upon the Assured by law,

or

  (b) assumed under contract or agreement by the Named Assured and/or any officer, director, stockholder, partner or employee of the Named Assured while acting in his capacity as such.

for damages, direct or consequential and expenses on account of:

    (i) Personal injuries, including death at any time resulting therefrom,

    (ii) Property damage,

    (iii) Advertising liability,

caused by or arising out of each occurrence happening anywhere in the World, and arising out of the hazards covered by and as defined in the Underlying Umbrella Policies stated in Item 2 of the Schedule, (hereinafter called the "Underlying Umbrella Insurers").

Attached to and forming part of Policy No.   6681-2370

Issued to:   McGRAW EDISON COMPANY

Dated:   MARCH 1, 1981

☒ GRANITE STATE INSURANCE COMPANY

☐ NEW HAMPSHIRE INSURANCE COMPANY

C.V. STARR & COMPANY
Underwriting Managers

By ..................................................

P-431

WA-0041⸱
CW 01424

## II. LIMIT OF LIABILITY - UNDERLYING LIMITS

It is expressly agreed that liability shall attach to the Company only after the Underlying Umbrella Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability as follows:-

| | |
|---|---|
| $ (as stated in Item 3 of the Declarations) | Ultimate net loss in respect of each occurrence, but |
| $ (as stated in Item 4 of the Declarations) | in the aggregate for each annual period during the currency of this Policy separately in respect of Products Liability and separately in respect of Personal Injury (fatal or non-fatal) by Occupational Disease sustained by any employees of the Assured. |

and the Company shall then be liable to pay only the excess thereof up to a further

| | |
|---|---|
| $ (as stated in Item 5 of the Declarations). | ultimate net loss in all in respect of each occurrence-subject to a limit of |
| $ (as stated in Item 6 of the Declarations) | in the aggregate for each annual period during the currency of this Policy separately, in respect of Products Liability and separately in respect of Personal Injury (fatal or non-fatal) by Occupational Disease sustained by any employees of the Assured. |

## CONDITIONS

### 1. PRIOR INSURANCE AND NON CUMULATION OF LIABILITY-

It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof the limit of liability hereon as stated in Items 5 and 6 of the Schedule shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.

Subject to the foregoing paragraph, and to all the other terms and conditions of of this Policy, in the event that Personal Injury or Property Damage arising out of an occurrence covered hereunder is continuing at the time of termination of this Policy the Company will continue to protect the Assured for liability in respect to such Personal Injury or Property Damage without payment of additional premium.

### 2. MAINTENANCE OF UNDERLYING UMBRELLA INSURANCE-

This Policy is subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amount and limits of liability and except as otherwise provided herein) as are contained in or as may be added to the Underlying Umbrella Policies stated in Item 2 of the Schedule prior to the happening of an occurrence for which claim is made hereunder.

It is a condition of this Policy that the Underlying Umbrella Policies shall be maintained in full effect during the currency hereof, except for any reduction of the aggregate limits contained therein solely by payment of claims in respect of accidents and/or occurrences occurring during the period of this Policy or by the operation of the Prior Insurance and Non Cumulation of Liability Condition of the Underlying Umbrella Policies.

### 3. CANCELLATION-

This Policy may be cancelled by the Named Assured or by the Company or their representative by mailing written notice to the other party stating when, not less than thirty (30) days [ten [10] days for non-payment of premium) thereafter, cancellation shall be effective. The mailing of notice as aforesaid by the Company or their representative to the Named Assured at the address shown in this Policy shall be sufficient proof of notice and the Insurance under this Policy shall end on the effective date and hour of cancellation stated in the notice. Delivery of such written notice either by the Named Assured or by the Company or their representative shall be equivalent to mailing.

If this Policy shall be cancelled by the Named Assured the Company shall retain the customary short rate proportion of the premium for the period this Policy has been in force. If this Policy shall be cancelled by the Company the Company shall retain the pro rata proportion of the premium for the period this Policy has been in force. Notice of cancellation by the Company shall be effective even though the Company makes no payment or tender of return premium.

### 4. NOTICE OF OCCURRENCE-

Whenever the Assured has information from which they may reasonably conclude that an occurrence covered hereunder involves injuries or damage which in the event that the Assured shall be held liable, is likely to involve this Policy, notice shall be sent as stated in Item 7 of the Schedule as soon as practicable, provided however, that failure to give notice of any occurrence which at the time of its happening did not appear to involve this Policy, but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claim.

### 5. OTHER INSURANCE-

If other valid and collectible insurance with any other insurer is available to the Assured covering a loss also covered by this Policy, other than insurance that is in excess of the Insurance afforded by this Policy, the Insurance afforded by this Policy shall be in excess of and shall not contribute with such other insurance.

## EXCLUSIONS

This Policy shall not apply:

1. to Personal Injury or Property Damage

  (i) with respect to which an Assured under the Policy is also an Assured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an Assured under any such policy but for its termination upon exhaustion of its limit of liability; or

  (ii) resulting from the hazardous properties of nuclear material and with respect to which

   (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or

   (b) the Assured is, or had this policy not been issued, would be entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization; or

  (iii) resulting from the hazardous properties of nuclear material, if

   (a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an Assured or (2) has been discharged or dispersed therefrom; or

   (b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an Assured; or

   (c) the injury, sickness, disease, death or destruction arises out of the furnishing by an Assured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this sub-paragraph (c) applies only to injury to or destruction of property at such nuclear facility.

As used herein "hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or byproduct material; "source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under sub-paragraph (a) or (b) thereof; "nuclear facility" means

   (a) any nuclear reactor,

   (b) any equipment or device designed or used for (1) separating the isotopes uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

   (c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Assured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

   (d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material; with respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property:

  (iv) with respect to liability arising outside the United States of America, its Territories or Possessions, Puerto Rico or the Canal Zone, to any liability of whatsoever nature directly or indirectly caused by, or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel;

2. to any claim based upon the Assured's failure to comply with the federal "Employee Retirement Income Security Act of 1974", or any amendment thereto.

# FIRST STATE INSURANCE COMPANY
Wilmington, Delaware

(A Stock Insurance Company Herein Called The Company)

Agrees with the Insured, named in the Declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the statements in the Declarations and subject to all the terms of this policy:

1. Coverage: To indemnify the Insured for such loss as would have been payable under all of the terms of the Liability Coverages afforded by the underlying policies listed in Item 5 of the Declarations if the limits of liability stated in Item 4 of the Declarations were available under the underlying policies in addition to the limits of liability stated in Item 5 of the Declarations (hereinafter called the "underlying limits"); provided the Company's obligation hereunder shall apply only to loss in excess of such underlying limits.

2. Limits of Liability — Underlying Limits: Liability under this policy shall attach to the Company only after the underlying insurers have paid or have been held to pay the full amount of their respective loss liability as described in the underlying limits, and the limits of liability of the Company under this policy shall then be as follows:

   a. The limit of liability stated in Item 4 of the Declarations as applicable to each accident or occurrence is the total limit of liability for all damages as a result of any one accident or occurrence, and

   b. subject to the above provision respecting each accident or occurrence, the limit of liability stated in Item 4 of the Declarations as "each aggregate" is the total limit of the Company's liability for all damages arising out of a hazard in the underlying policies for which an aggregate is designated.

3. Payment of Costs: "Costs" incurred by the Insured personally, with the written consent of the Company, and for which the Insured is not covered by the underlying insurers, shall be apportioned as follows:

   a. In the event of claim or claims arising which appear likely to exceed the underlying limit, no "costs" shall be incurred by the Insured without the written consent of the Company.

   b. Should such claim or claims become adjustable prior to going into court for not more than the underlying limit, then no "costs" shall be payable by the Company.

   c. Should, however, the sum for which the said claim or claims may be so adjustable exceed the underlying limit, then the Company, if it consents to the proceedings continuing, shall contribute to the "costs" incurred by the Insured in the ratio its proportion of the ultimate net loss as finally adjusted bears to the whole amount of such ultimate net loss.

   d. In the event that the Insured elects not to appeal a judgment in excess of the underlying limit, the Company may elect to conduct such appeal at its own cost and expense, and shall be liable for the taxable court costs and interest incidental thereto, but in no event shall the total liability of the Company exceed its limit of liability as stated above, plus the expense of such appeal.

4. Application of Salvage: All salvage, recoveries, or payments recovered or received subsequent to a loss settlement under this policy shall be applied as if recovered or received prior to such settlement, and all necessary adjustments shall then be made between the Insured and the Company, provided always that nothing in this clause shall be construed to mean that losses under this policy are not recoverable until the Insured's ultimate net loss has been finally ascertained.

C-51-2

WA-00416 CW 01427

No. 917383

917177
Renewal of No.

**DECLARATIONS — EXCESS LIABILITY POLICY**     STOCK COMPANY

# FIRST STATE
### INSURANCE COMPANY
WILMINGTON, DELAWARE

Administrative Offices: 60 Batterymarch Street, Boston, Massachusetts 02110

Named Insured and Mailing Address

McGRAW-EDISON COMPANY & ITS OWNED OR
FINANCIALLY CONTROLLED SUBSIDIARIES
One Continental Tower
1701 Golf Road
Rolling Meadows, Illinois   60008

Item 1.   Policy Period: From March 1, 1981     To March 1, 1984

12:01 A.M., Standard Time at the address of the named Insured as stated herein.

Item 2.   Premium:      Advance Premium:  $ 287,500.   (Annual)
Rate: Flat Charge
Minimum Premium: $ 287,500.   (Annual)

If the Policy Period is more than one year and the premium is to be paid in installments, premium is payable on:

| Effective Date | 1st Anniversary | 2nd Anniversary |
|---|---|---|
| $ 287,500. | $ 287,500. | $ 287,500. |

Item 3.   Coverage:   Umbrella Liability

Item 4:   Limits of Liability:   The limit of the Company's liability shall be as stated herein, subject to all the terms of this policy having reference thereto.

$12,500,000. part of $25,000,000. each Occurrence and in the Aggregate (where applicable) excess of underlying insurance or self-insured retention.

Item 5.   Underlying Policy and Limits:

Policy Number: 523-067253
Limits: $12,500,000. part of $25,000,000. each Occurrence and in the Aggregate (where applicable) excess of underlying insurance or self-insured retention.

Company:   United States Fire Insurance Company

Item 6.   During the past three years no insurer has cancelled insurance issued to the named insured, similar to that afforded hereunder, unless otherwise stated herein.

JAJ/ddv

Countersigned by: _Ralph J. Palmieri_

Date of Issue:   March 23, 1981

C-141

WA-00416 CW 01428

5. Attachment of Liability: Liability under this policy shall not attach unless and until the underlying insurers shall have admitted liability for the underlying limits or unless and until the insured has by final judgment been adjudged to pay a sum which exceeds such underlying limits.

6. Application of Underlying Policies: This policy, except where provisions to the contrary appear herein, is subject to all of the conditions, agreements, exclusions and limitations of and shall follow the underlying policies in all respects, including changes by endorsement.

7. Maintenance of Underlying Insurance: It is a condition of this policy that the policies of the underlying insurance shall be maintained in full effect during the currency of this policy, except for any reduction of the aggregate limits contained therein by payment of losses during the policy period.

8. Notification of Claims: The insured upon knowledge of any occurrence likely to give rise to a claim hereunder shall give immediate written advice to the Company.

9. Definitions:

a. Loss: The word "loss" means the sum paid in settlement of losses for which the insured is liable after making deductions for all recoveries, salvages, and other insurance (other than recoveries under the policy of the underlying insurance), whether recoverable or not, and shall exclude all expenses and "costs."

b. Costs: The word "costs" means interest on judgments and investigation, adjustment and legal expenses (excluding, however, all expenses to salaried employees and retained counsel and all office expenses of the insured).

c. Receipts: The word "receipts" means the gross amount of money charged by the named insured for such operations by the named insured or by others during the policy period as are rated on a receipts basis other than receipts from telecasting, broadcasting or motion pictures, and includes taxes, other than taxes which the named insured collects as a separate item and remits directly to a governmental division.

C-51-2

WA-00416 CW 01429

ENDORSEMENT # 1

The following Service of Suit Clause is not to become effec-
tive unless or until the Insured has notified this Company
in each specific claim of its intention to sue.

Service of Suit Clause

It is agreed that in the event of the failure of this Company
to pay any amount claimed to be due hereunder, this Company,
at the request of the Insured, will submit to the jurisdiction
of any Court of Competent Jurisdiction within the United States
and will comply with all requirements necessary to give such
Court jurisdiction and all matters arising hereunder shall be
determined in accordance with the law and practice of such
Court.

It is further agreed that service of process in such suit may
be made upon the highest one in authority bearing the title
"Commissioner", "Director", or "Superintendent" of Insurance
of the state or commonwealth wherein the property covered by
this policy is located, and that in any suit instituted against
it upon this contract this Company will abide by the final de-
cision of such Court or any Appellate Court in the event of an
appeal. The one in authority bearing the title "Commissioner",
"Director", or "Superintendent" of Insurance of the state or
commonwealth wherein the property covered by this policy is
located is hereby authorized and directed to accept service of
process on behalf of this Company in any such suit and/or upon
the Insured's request to give a written undertaking to the In-
sured that they will enter a general appearance upon this Com-
pany's behalf in the event such a suit shall be instituted.

This endorsement to take effect on the 1st   day of    March     , 19 81.
All other items and conditions remain unchanged.

Attached to and forming part of Policy No.   917383     of FIRST STATE
INSURANCE COMPANY.

Issued to:  McGRAW-EDISON COMPANY, ETAL

C-47

ENDORSEMENT #2

PARTICIPATING POLICY - CLARIFYING ENDORSEMENT

In consideration of the premium charged, it is agreed that Item 5. of
the Declarations, Underlying Policy and Limits, is amended to read:

Item 5.   Participating Policy and Limits

It is further agreed that Item 1. of the Insuring Agreements is deleted
and replaced as follows:

> Coverage:   To indemnify the Insured for such loss as would
> have been payable under all of the terms of the Liability
> Coverages afforded by the participating policy listed in
> Item 5 of the Declarations; provided the Company's
> obligation hereunder shall apply only to loss in excess of
> underlying insurance or a self-insured retention as scheduled
> in the participating policy.

It is further agreed that Item 6. of the Insuring Agreements is deleted
and replaced as follows:

6.   Application of Participating Policy:  This policy, except where
provisions to the contrary appear hereing, is subject to all of
of the conditions, agreements, exclusions and limitations of and
shall follow the participating policy in all respects, including
change by endorsement.

This endorsement to take effect on the 1st day of March, 1981.
All other items and conditions remain unchanged.

Attached to and forming part of Policy No. 917383 of FIRST STATE
INSURANCE COMPANY.

Issued to: McGRAW-EDISON COMPANY, ET AL

CAMERON AND COLBY COMPANY

By _Ralph T. Palmer_
    Authorized

A-20

ENDORSEMENT #3

In consideration of the premium charged, it is agreed that Condition 7 of the policy jacket, Cancellation, is amended to read as follows:

".....not less than ninety (90) days thereafter, such cancellation shall be effective, except for non-payment of premium or non-compliance by the Insured of the Annual Review Provision of the policy in which event ten (10) days notice will be given."

This endorsement to take effect on the 1st day of March, 1981. All other items and conditions remain unchanged.

Attached to and forming part of Policy No. 917383 of FIRST STATE INSURANCE COMPANY.

Issued to:  McGRAW-EDISON COMPANY, ETAL

CAMERON AND COLBY COMPANY

By _Ralph J. Palmieri_
Authorized

ENDORSEMENT #4

In consideration of the premium charged, it is agreed that this policy is subject to annual review of exposures at each anniversary date and the Insured agrees to provide such anniversary review information as may be required by the Company. Future installment premiums may be adjustable in accordance with this annual review provision and the Insured agrees that annual review information will be provided to the Company at least thirty (30) days prior to each anniversary date.

This endorsement to take effect on the 1st day of March, 1981. All other items and conditions remain unchanged.

Attached to and forming part of Policy No. 917383 of FIRST STATE INSURANCE COMPANY.

Issued to: McGRAW-EDISON COMPANY, ETAL

CAMERON AND COLBY COMPANY

By _Ralph T. Palmieri_
Authorized

This endorsement effective March 1, 1981
forms part of policy number  917383
issued to  McGRAW-EDISON COMPANY, ET AL
By First State Insurance Company


In consideration of a return premium of $8,374.00, it is agreed that
Item #2 of the Declarations, Premium, is amended to show an annual
installment of $279,126.00.


*see letter of
5/24/82
RHK*


All other terms and conditions of this policy remain unchanged.

Endorsement No. X5
FM.101.0.229(12-77)

JAJ/pab 5/7/81

Authorized Representative

WA-00417 CW 01434

ENDORSEMENT #6

In accordance with Endorsement No. 4, Annual Review Endorsement, it
is agreed that for the period from March 1, 1982 to March 1, 1983 the
annual installment due will be $265,170.

This endorsement to take effect on the 1st day of.March, 1982.
All other items and conditions remain unchanged.

Attached to and forming part of Policy No. 917383 of FIRST STATE
INSURANCE COMPANY.

Issued to:  McGRAW-EDISON COMPANY, etal

CAMERON & COLBY COMPANY

By _____

Authorized

JAJ/dbr
March 5, 1982

WA-00417 CW 01435

ENDORSEMENT #7

In accordance with Endorsement No. 4, Annual Review Endorsement, it is agreed that for the period from March 1, 1983 to March 1, 1984 the annual installment due will be $265,170.00.

This endorsement to take effect on the 1st day of March, 1983. All other items and conditions remain unchanged.

Attached to and forming part of Policy No. 917383 of FIRST STATE INSURANCE COMPANY.

Issued to:  McGRAW-EDISON COMPANY, et al

CAMERON & COLBY COMPANY

By _Ralph J. Colman_
                    Authorized

JAJ/dbr
February 11, 1983

WA-00417 CW 01436

Attach Coverage Form(s) and Endorsement(s) Here

## NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
(BROAD FORM)

This policy shall not apply:

I. Under any Liability Coverage, to injury, sickness, disease, death or destruction

(a) with respect to which an Insured under the policy is also an Insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the Insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America or any agency thereof, with any person or organization.

II. Under any Medical Payments Coverage, or under any Supplementary Payments provision relating to immediate medical or surgical relief to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III. Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

(a) the nuclear material (1) is at any nuclear facility owned by or operated by or on behalf of, an Insured or (2) has been discharged or dispersed therefrom;

(b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an Insured; or

(c) the injury, sickness, disease, death, or destruction arises out of the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV. As used in this policy:
"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or byproduct material;

"source material", "special nuclear material" and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means:

(a) any nuclear reactor,

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing, or packaging waste,

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

with respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

## WAR RISK EXCLUSION ENDORSEMENT

This policy shall not apply to any liability of the Insured directly or indirectly occasioned by, happening through or in consequence of war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public or local authority.

# FIRST STATE
### INSURANCE COMPANY
#### WILMINGTON, DELAWARE

Agrees with the insured, named in the declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the statements in the declarations and subject to the limits of liability, exclusions, conditions and other terms of this policy:

The Insuring Agreements and any Special Provisions are contained in the separate Coverage Form or Forms issued to complete this policy.

## CONDITIONS

**1. Premium Computation:** The deposit premium stated in the declarations is an advance premium only unless otherwise specified. Upon termination of this policy, the earned premium shall be computed in accordance with the rates and minimum premium applicable to this insurance as stated in the Declarations. If the earned premium thus computed exceeds the advance premium paid, the Named Insured shall pay the excess to the Company; if less, the Company shall return to the Named Insured the unearned portion paid by such Insured. The Named Insured shall maintain records of the information necessary for premium computation on the basis stated in the Declarations and shall send copies of such records to the Company at the end of the policy period, as the Company may direct.

**2. Inspection and Audit:** The Company shall be permitted but not obligated to inspect the Named Insured's property and operations at any time. Neither the Company's right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the Named Insured or others, to determine or warrant that such property or operations are safe.

The Company may examine and audit the Named Insured's books and records at any time during the policy period and extensions thereof and within three years after the final termination of this policy, as far as they relate to the subject matter of this insurance.

**3. Action Against Company:** No action shall lie against the company unless, as a condition precedent thereto, the Insured shall have fully complied with all the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.

**4. Subrogation:** In the event of any payment under this policy, the company shall be subrogated to all the insured's rights of recovery therefor against any person or organization and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights.

**5. Changes:** Notice to or knowledge possessed by any person shall not effect a waiver or change in any part of this policy or stop the Company from asserting any rights under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part hereof, signed by an authorized representative of the Company.

**6. Assignment:** Assignment of interest under this policy shall not bind the Company until its consent is endorsed hereon; if, however, the Named Insured shall be adjudged bankrupt or insolvent, this policy shall cover the Named Insured's legal representative as Named Insured; provided that notice of cancellation addressed to the Insured named in the Declarations and mailed to the address shown in this policy shall be sufficient notice to effect cancellation of this policy.

**7. Cancellation:** This policy may be canceled by the insured by surrender thereof to the Company or any of its authorized agents or by mailing to the company written notice stating when thereafter the cancellation shall be effective. This policy may be canceled by the company by mailing to the insured at the address shown in this policy written notice stating when not less than ten days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of the surrender or the effective date and hour of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the insured or by the company shall be equivalent to mailing. If the insured cancels, earned premiums shall be computed in accordance with the customary short rate table and procedure. If the company cancels, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancelation is effected or as soon as practicable after cancelation becomes effective, but payment or tender of unearned premium is not a condition of cancelation.

**8. Terms of Policy Conformed to Statute:** Terms of this policy which are in conflict with the statutes of the State wherein this policy is issued are hereby amended to conform to such statutes.

In Witness Whereof, the company has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned by a duly authorized representative of the company.

*Michael J. Welch*
Secretary

*Richard E. Stone*
President

WA-00417   CW 01438

# FIRST STATE

## I N S U R A N C E   C O M P A N Y

WILMINGTON, DELAWARE

STOCK COMPANY

McGRAW–EDISON COMPANY & ITS OWNED OR
FINANCIALLY CONTROLLED SUBSIDIARIES
One Continental Tower
1701 Golf Road
Rolling Meadows, Illinois   60008

This policy is made and accepted subject to the provisions and stipulations hereinafter stated, which are hereby made a part of this policy, together with such other provisions, stipulations and agreements as may be added hereto, provided in this policy.

C-139-1 10-76

WA-00417 CW 01439

**Marsh &
McLennan**

Marsh & McLennan, Incorporated
222 South Riverside Plaza
Chicago, Illinois 60606
Telephone 312 648-6000

May 12, 1982

Mr. Norman A. Kenney
Assistant Treasurer
Risk Management
McGraw-Edison Company
One Continental Towers
1701 Golf Road
Rolling Meadows, IL   60008

Re:  UMBRELLA EXCESS LIABILITY
     POLICY NO.: 523 067253 - FIRST STATE
     TERM:  MARCH 1, 1981/84

Dear Norm:

In line with our phone conversation of May 10th, I am sending
on to you Endorsements No. 34 and 35 issued by U. S. Fire In-
surance Company.

Endorsement No. 34 was issued to delete Endorsement No. 24
issued effective September 28, 1981.  The reason for deleting
the endorsement is simply a mis-numbering of that Endorsement
No. 24.

Endorsement No. 35 continues the appropriate consecutive
numbering of the endorsements, and re-adds the appropriate
cancellation provisions on behalf of Montgomery Ward & Com-
pany.  With this information, the U. S. Fire policy should
be up-to-date as far as the consecutive numbering of endorse-
ments.

You also mentioned in our conversation that you did not see
an Endorsement No. 5 on Policy No. 9017383, issued by the
First State.  Our records also do not indicate that endorse-
ment number, but in looking further, we do see that endorse-
ments number 4 are attached.  We are, however, checking

RECEIVED

MAY 14 1982

INSURANCE DEPT.

WA-00417 CW 01440

Marsh & McLennan, Incorporated

Mr. Norman A. Kenney
May 12, 1982
Page 2

further with John Jolly at The London Agency for a clarifi-
cation of these items, and will be in touch with you shortly.

Sincerely,

*Jeni*

T. A. Mikkelsen

TAM:mg/01

cc:  Mr. John Sachtleben

WA-00418 CW 01441



Marsh & McLennan, Incorporated
222 South Riverside Plaza
Chicago, Illinois 60606
Telephone 312 648-6000

May 24, 1982

Mr. Norman A. Kenney
Assistant Treasurer,
Risk Management
McGraw-Edison Company
1701 Golf Road
Rolling Meadows, IL  60008

Re:  UMBRELLA EXCESS LIABILITY
     POLICY NO. 917383
     FIRST STATE INSURANCE COMPANY
     TERM:  MARCH 1, 1981/84

Dear Norm:

In a recent phone conversation you brought up the fact that
your records indicated that Endorsement No. 5 was missing on
this policy.

We mentioned in our letter dated May 12th that Endorsement No.
5 indeed was missing, but the policy seemed to contain two
Endorsements No. 4.  We have discussed this with John Jolley
of the London Agency.  It does indeed appear that a numbering
error was made, and the second Endorsement No. 4 should actu-
ally indicate Endorsement No. 5.  The endorsement involved is
that issued May 7, 1981, which reads as follows:

     "In consideration of a return premium of $8,374, it is
     agreed that Item No. 2 of the Declarations, Premium,
     is amended to show an annual installment of $279,126."

Norm, the London Agency has corrected their files to reflect
that it should actually be Endorsement No. 5.  They have asked
that you also make this notation, rather than their reissuing
any additional endorsements.

RECEIVED

MAY 26 1982

INSURANCE DEPT.

WA-00418  CW 01442

Marsh & McLennan, Incorporated

Mr. Norman A. Kenney
May 24, 1982
Page 2

We hope this will be satisfactory to you, and will bring the
policy up-to-date with all items in consecutive order.

Sincerely,

T. A. Mikkelsen

TAM:mg/01

cc: Mr. John Sachtleben

WA-00418 CW 01443

**Marsh & McLennan**

Marsh & McLennan, Incorporated
222 South Riverside Plaza
Chicago, Illinois 60606
Telephone 312 648-6000

May 27, 1981

Mr. Eric B. Larson
Manager, Casualty Insurance
McGraw-Edison Company
One Continental Towers
1701 Golf Road
Rolling Meadows, IL  60008

UMBRELLA EXCESS LIABILITY
FIRST STATE INSURANCE COMPANY 1.2
POLICY NO. 917383
TERM: MARCH 1, 1981/84

Dear Eric:

Here is Endorsement No. 4 issued to this policy as of the March 1,
1981 inception date.

The endorsement reflects a reduction of $8,374 in the premium.
Eric, this was done so that the appropriate Surplus Lines Tax
for this same amount would be billed and your total cost on
this policy remains at $287,500.

While no billings are enclosed, we have amended our accounting
records to reflect the proper allocation for the Illinois Surplus
Lines Tax.

Sincerely,

*Jerri*

T. A. Mikkelsen

TAM/ag
Enclosure

cc:  Mr. W. J. Wilczynski
     Mr. J. R. Sachtleben

P5

**RECEIVED**

MAY 28 1981

INSURANCE DEPT.

WA-00418 CW 01444

# INSURANCE BINDER

**acord**

THIS BINDER IS A TEMPORARY INSURANCE CONTRACT, SUBJECT
TO THE CONDITIONS SHOWN ON THE REVERSE SIDE OF THIS FORM.

**Binder No.**
C834-464

**NAME AND ADDRESS OF AGENCY**

Marsh & McLennan Agency, Inc.
222 S. Riverside Plaza
Chicago, Illinois 60606

**COMPANY** U. S. Fire Insurance Company
and First State Insurance Company

Effective 12:01am March 1, ,19 81
Expires 12:01 am April 30, ,19 81

☒ This binder is issued to extend coverage in the above named
company per expiring policy # 523-077428 &
(except as noted below) 917177

**Description of Operation/Vehicles/Property**

Assigned Renewal Policy Nos.:

U. S. Fire - 523-067253
First State - 917383

**NAME AND MAILING ADDRESS OF INSURED**

McGraw-Edison Company
One Continental Towers
1701 Golf Road
Rolling Meadows, Illinois   60008

| P R O P E R T Y | Type and Location of Property | Coverage/Perils/Forms | Amt of Insurance | Ded. | Coins % |
|---|---|---|---|---|---|
| | | | | | |

| | Type of Insurance | Coverage/Forms | Limits of Liability | |
|---|---|---|---|---|
| | | | Each Occurrence | Aggregate |

**LIABILITY**

☐ Scheduled Form          ☐ Comprehensive Form
  ☐ Premises/Operations
  ☐ Products/Completed Operations
  ☐ Contractual
☒ Other (specify below)
☐ Med. Pay.   $          Per Person   $          Per Accident
☐ Personal Injury

Coverage/Forms: ☐ A   ☐ B   ☐ C

| | Each Occurrence | Aggregate |
|---|---|---|
| Bodily Injury | $ | $ |
| Property Damage | $ | $ |
| Bodily Injury & Property Damage Combined | $25000000 | $ 25000000 |
| Personal Injury | | $ |

**AUTOMOBILE**

☐ Liability          ☐ Non-owned          ☐ Hired
☐ Comprehensive-Deductible   $
☐ Collision-Deductible   $
☐ Medical Payments   $
☐ Uninsured Motorist   $
☐ No Fault (specify):
☐ Other (specify):

| Limits of Liability | |
|---|---|
| Bodily Injury (Each Person) | $ |
| Bodily Injury (Each Occurrence) | $ |
| Property Damage | $ |
| Bodily Injury & Property Damage Combined | $ |

☐ WORKERS' COMPENSATION — Statutory Limits (specify states below)          ☐ EMPLOYERS' LIABILITY — Limit   $

**SPECIAL CONDITIONS/OTHER COVERAGES**

Umbrella Excess Liability - Excess of $500,000
Self-Insured Retention or Underlying Coverages
as Scheduled

Premium:   $575,000 Annual (Combined) - Flat Charge

**NAME AND ADDRESS OF** ☐ MORTGAGEE   ☐ LOSS PAYEE   ☐ ADD'L INSURED

LOAN NUMBER

Marsh & McLennan Agency, Inc.

By:

Signature of Authorized Representative
Date 3-3-81

ACORD 75 (6-77)

**AIG Domestic Claims Inc.**
Toxic Tort Claims Department
101 Hudson Street, 29th Floor
Jersey City, New Jersey 07302
Direct Dial: (201) 631-7782
Facsimile: (201) 631-5007

August 30, 2005

Michael Somma
Odyssey Reinsurance
300 First Stamford Place
Stamford, CT 06901

Re: Insured:      Dresser Ind.
    Lex. Claim No:   030-901730
    Your Claim No.:  Unknown
    Policy No.:     0403143

Dear Mr. Somma;

This correspondence responds to your inquiry wherein you requested loss details and exhaustion of underlying limits.

Attached are copies of policy and status report explaining the loss details.

With respect to your question regarding exhaustion of underlying limits, we are advised by Alan Gray Inc. that based upon the Global settlement reached with Halliburton /Dresser and its insurers, both domestic and the London Market and based upon the settlement and bathtub allocation, the coverage beneath Lexington's policy 403143 will be exhausted by claim payments.

This information and documents contained herein are provided for the sole purpose of responding to your inquiry and should not be used for any purpose other than the handling of our claim by intermediaries and our reinsurers. The documents and information provided herewith, or portions thereof, are privileged (as attorney client privilege or work product) and are provided with the understanding that you will maintain their confidentiality. If any information contained in this response or its enclosures is forwarded to retrocessionaires, we expect that the reinsurer will attempt to ensure that its confidentiality is maintained. If any other party requests this information or documentation, please advise us as to the identity of the requesting party and the nature of the request. No information or documentation provided with or in this letter should be given to any other party with out our prior written approval.

CW 01446

Very truly yours

Leticia Diaz
Toxic Tort Claims Department

CW 01447

**AIG Domestic Claims Inc.**
Toxic Tort Claims Department
101 Hudson Street, 29th Floor
Jersey City, New Jersey 07302
Direct Dial: (201) 631-7012
Facsimile: (866) 244-0604

June 10, 2005

TO:            ALL INTERESTED REINSURERS
FROM:      Leticia C. Diaz
RE:            HALLIBURTON/DRESSER
CLAIM #:   030-901073
POLICY:     GC403143, $9MM P/O $15MM XS $10MM

Please be advised that on June 15, 2005 AIG Member Companies will be forwarding a payment totaling $2,731,280 in accordance with our settlement agreement. These payments are for the defense and indemnification of asbestos bodily injury claims. The entire policy limits under the above captioned policy are exposed in this settlement.

Settlement payments to date are made based on a bathtub basis by lowest attaching AIG policy amounts. In the case of this insured, allocations were also computed by all of the different divisions party to the settlement.

This insured had many subsidiaries which were all involved in various lines of business, however, Halliburton is an energy services and engineering and construction firm. Its liability stems from dealing with asbestos containing products.

The information contained herein is provided for the sole purpose of responding to the inquiry and should not be used for any purpose other than the handling of our claim by intermediaries and our reinsurers. The information is provided herewith, or portions thereof, is privileged (as attorney-client priviledged work product) and is provided with the understanding that you will maintain its confidentiality.

If any information contained in this response or any enclosures sent herewith is forwarded to retrocessionaires, we expect that you as an intermediary will attempt to ensure that its confidentiality is maintained. If any other party requests this information or documentation, please advise us as to the nature of such request.

CW 01448

**STATUS REPORT**

TO:          ALL INTERESTED REINSURERS
FROM:        Leticia C. Diaz
DATE:        April 6, 2005
RE:          DRESSER INDUSTRIES/HALLIBURTON

**CURRENT STATUS:** An agreement has been reached with Dresser Industries, Inc./DII Industries/Halliburton (Dresser). The Releasing Policyholders have agreed to release all claims, present and future, known or unknown, in connection with the policies at issue in the Harbison-Walker Adversary Proceeding, as well as the portion of the policies portioned to Dresser in the Federal Mogul Adversary Proceeding for all asbestos related claims. Pursuant to the agreement reached, scheduled payments commencing in March 2005 and ending in December 2014 will be processed. The first scheduled payment has already been issued.

**KEY UPDATES SINCE OCTOBER 2003:** Please note that the information below is being provided from a historical and informational purpose only. All issues pertaining to Dresser/Halliburton have been resolved via the Settlement Agreement finalized and executed on November 12, 2004.

1)      In October 2003, ACE filed a DJ action in New York County Supreme in its effort to consolidate all pending DJ actions discussed below and to be heard in a New York court. AIG companies were named as nominal defendants in this action, along with all other insurers with coverage to Dresser/Halliburton and its entities. The bankruptcy court has imposed a stay on this action, which is still in effect as of the date of this report.

2)      On December 16, 2003, Dresser/Halliburton filed its pre-packaged petition for Chapter 11 Bankruptcy protection in the U.S. Bankruptcy Court for the Western District of Pa (Judge Fitzgerald). This is a collective filing on behalf of Dresser and seven other entities formerly related to Dresser, and it is titled the Mid-Valley bankruptcy. (The eight entities are DII Industries, Mid-Valley, Inc., Kellogg Brown & Root, Inc., KBR Technical Services, Inc., Kellogg Brown & Root Engineering Corp., Kellogg Brown & Root Int'l, Inc. (Del.), Kellogg Brown & Root Int'l, Inc. (Panama) and BPM Minerals, LLC).

3)      In response to the Mid-Valley bankruptcy, ACE has filed, and various carriers have joined in on, various motions with the bankruptcy court: 1) motion to dismiss the pre-pack filing; 2) motion for insurer standing; 3) motion to strike Eric Green as the Future's Representative; 4) that the bankruptcy court should abstain from adjudicating the non-core state law insurance coverage issues (Motion to Abstain); 5) motion to lift the stay imposed by the bankruptcy court as to ACE's DJ action in New York. To date, AIGTS has not participated or joined in on any such motions filed by ACE or various other carriers who have thus far joined ACE.

CW 01449

4)    The insurers' motion to dismiss the pre-pack is set for hearing on February 11, 2004, which is when motions regarding insurer standing and Eric Green will also be addressed further.

## BACKGROUND INFORMATION:

Dresser is seeking coverage under policies issued to **Studebaker-Worthington, Inc. (S-W)** from 1967-1979 and **McGraw-Edison Company (M-E)** from 1979-1985 for asbestos liabilities associated with products manufactured by Worthington Company and asbestos exposures associated with Atlantic Locomotive Company ("ALCO"). Dresser is also seeking coverage under policies issued to itself (to cover **Harbison-Walker** asbestos liabilities) and to **Kellogg Brown & Root** (to cover the latter's asbestos liabilities).

As of 1967, Worthington Company was an independently operated entity and ALCO was its subsidiary. In 1967, however, Studebaker Corp. and Worthington Company merged to form S-W. Also in 1967, S-W purchased stock of Wagner. Accordingly, both ALCO and Wagner continued to be operated as wholly-owned subsidiaries of S-W. It is noted that in 1976, ALCO merged into another of S-W's subsidiaries, Turbodyne.

In 1979, S-W merged with Kane Holding, Inc. (an indirect subsidiary of M-E). **Accordingly, S-W, ALCO and Wagner all operated as indirect subsidiaries of M-E.** In 1984, Dresser purchased ALCO (Turbodyne operations) from M-E.

In 1985, however, the above corporate arrangements split into two separate branches that now constitute the **Dresser/Halliburton branch** and the **Federal-Mogul branch**, with both branches having shared interests in the S-W and M-E coverage from 1967-1985, as presented above.

Specifically, the **Dresser/Halliburton branch** is comprised of the following:
- ALCO / Turbodyne operations (purchased from M-E in 1984)
  (In 1985, Dresser assumed all assets and liabilities of ALCO/Turbodyne and dissolved same) (ALCO claims are product BI claims stemming from asbestos-containing locomotive parts)
- Worthington operations/division (purchased from M-E in 1985)
  (In 1996, Dresser assumed all assets and liabilities of S-W and dissolved same) (Worthington claims are product BI claims stemming from asbestos-containing valves and gaskets in pumps and compressors)

Additionally, the following complete the **Dresser/Halliburton branch:**
- Harbison-Walker Refractory (acquired by Dresser in 1967)
- Kellogg Brown & Root (KBR)

In 1998, Halliburton then purchased and merged with Dresser, with Halliburton allegedly serving as a holding company. Halliburton is one of the world's largest oilfield services companies and a provider of engineering and construction services. Halliburton purchased Brown & Root, an engineering and construction company, in 1962, and it

acquired M.W. Kellogg through the merger with Dresser, which acquired Kellogg in 1988. KBR, accordingly, serves as Halliburton's engineering and construction group, one of two wholly-owned operating subsidiaries. The other subsidiary is what it calls its Energy Services Group.

The **Federal-Mogul branch** is comprised of the following: Moog Automotive/Cooper Industries/Wagner (brake pads/clutch facings). The specific history is as follows:
- in 1985, Cooper purchased the Wagner Division from M-E (this is the key acquisition which allows Federal Mogul to invoke S-W and M-E coverage)
- in 1997, Wagner is merged into Cooper's subsidiary Moog
- in 1998, Federal-Mogul, Inc. purchased Moog and renamed it Federal-Mogul Products, Inc.

## COVERAGE:

As indicated above, Dresser is seeking coverage under policies issued to Studebaker-Worthington, Inc. (S-W) from 1967-1979 and McGraw-Edison Company (M-E) from 1979-1985 for asbestos liabilities associated with products manufactured by Worthington Company and asbestos exposures associated with Atlantic Locomotive Company ("ALCO").

Dresser, however, is also seeking coverage for asbestos losses attributed to Harbison-Walker (H-W) and KBR. Accordingly, there are three (3) sets of policy limits at issue: 1) S-W and M-E's; 2) H-W's; and 3) KBR's.

Total policy limits for S-W (1967-79) & M-E (1979-85):

| Insurer | S-W Limits | M-E Limits | Total Limits |
|---|---|---|---|
| AIU | $20M | $55M | $75M |
| American Home | $10M | 0 | $10M |
| Birmingham | $10M | 0 | $10M |
| Granite State | $11M (AIU) | $85M | $96M |
| ICSOP | $2M | 0 | $2M |
| National Union | $25M | $20M | $45M |
| Lexington | $12M | 0 | $12M |
| Totals | $90M | $160M | $250M |

**AIGTS: $164M**

**AIU: $86M**

Total policy limits for H-W (1971-1983) (named insured is Dresser):

| Insurer | Total Limits |
|---|---|
| AIU | $120M |

| NH (AIU-London) | $1.378M |
| Granite State | $10M |
| Landmark | $5M |
| National Union | $20M |
| Lexington | $76.5M |
| **Totals** | **$232.878M** |

AIGTS: $111.5M
AIU: $121.378M

Total policy limits for KBR

Total limits issued to KBR is approximately $68M, of which $18M was issued by AIU.

AIGTS: $50M
AIU: $18M

**Total Combined Limits for all Insureds:**

AIGTS (plus Lexington): $325.5M
AIU: $225.378M

**PENDING ACTIONS/BANKRUPTCIES:**

There are a total of 2 DJ actions, 1 bankruptcy and 3 adversary proceedings pending at this time involving Dresser and its entities. There are also two separate on-going mediations being conducted at this time.

A)   Dresser's Declaratory Relief Action (N.D. Texas) – Dresser Coverage Action

In August 2001, Dresser filed its DJ action against its insurers in Dallas County, TX. Certain London insurers then had the Dresser Coverage Action removed to federal court (N.D. Texas), and they have further sought to have this action transferred to U.S. District Court for the Western District of Pennsylvania. This matter has now been transferred to the Western District of Pa. Due to the status of the bankruptcies (pending and proposed) and other related matters, this action, for all intents and purposes, has been stayed (although an official stay has not been ordered by court).

B)   Harbison-Walker Bankruptcy

On February 14, 2002, H-W filed its Voluntary Petition under Chapter 11 in the U.S. Bankruptcy Court for the Western District of Pennsylvania. The case is assigned to Judge Fitzgerald.

C)   Dresser/H-W Adversary Proceeding

On March 21, 2002, H-W filed its Complaint in Harbison-Walker Refractories Co. v. Dresser Industries, Inc., et al., in the same U.S. Bankruptcy Court for the Western District of Pennsylvania.

H-W, as debtor, initially filed this action against Dresser and its carriers. The basis for naming Dresser is perceived to be due to disputes between H-W and Dresser regarding H-W's claims handling of H-W's asbestos liabilities. Dresser allegedly criticized H-W's claims handling procedures by pointing out, among other things, that H-W's settlement amounts were too high and that H-W billed carriers for amounts not incurred and/or paid, thereby leading to premature exhaustion of the policies at issue. (For more information of H-W, see (E) below regarding GIT Adversary Proceeding).

Currently, H-W and Dresser are working together in this matter, with Dresser taking over all responsibilities, as against the carriers. For all intents and purposes, this proceeding is basically the same as the Dresser Coverage Action, discussed above.

D)   KBR Declaratory Relief Action (TX) – KBR Coverage Action

In March 2002, KBR filed its coverage action against its insurers in Texas state court. We have been advised by our counsel, Cozen O'Connor, that this matter is moving slowly at this time.

Cozen also advised that the KBR portion of the overall Dresser situation may get resolved by the following set of circumstances: 1) London and Dresser had entered into a coverage-in-place agreement many (unknown) years ago, the terms of which are currently in dispute; 2) the two parties are in negotiations to resolve their dispute (no suits have been filed); and 3) if the parties can reach an agreement, such resolution would allegedly resolve all KBR asbestos liabilities at issue in the overall Dresser matter.

E)   Global Industrial Technologies' (GIT) Adversary Proceeding

At this time, Cozen has very little information with respect to this matter. GIT, however, is connected to Harbison-Walker in that, in 1992, Harbison-Walker spun-off into several other entities (INDRESCO, RHI, etc.). It is believed that GIT was the successor to INDRESCO (GIT, however, is allegedly also connected to Honeywell's NARCO, etc, serving or having served as the umbrella company for all these entities).

It is also noted that after all of its spin-offs in the 1990s, Harbison-Walker still survives as a stand-alone entity, with its representatives attending (but not participating) in the on-going mediations.

CW 01453

F)    Dresser Industries v. Federal Mogul Products, Inc.
       (US Bankruptcy Court – District of Delaware)

This is the adversary proceeding instituted by Dresser against Federal Mogul in connection with the latter's bankruptcy filing in the same Delaware bankruptcy court. This adversary proceeding involves the <u>S-W and M-E asbestos liabilities</u> and the dispute between these two parties for rights to, and coverage under, the policies issued to S-W and M-E from 1967 to 1985. Once again, Federal Mogul's interest in these policies at issue stems from its eventual acquisition of the <u>Wagner</u> Division of M-E.

**DRESSER'S CURRENT STATUS:**

<u>Dresser's Bankruptcy Filing</u> (but see key updates above)

Dresser, KBR and other Halliburton subsidiaries are expected to file their bankruptcy also in the U.S. Bankruptcy Court for the Western District of Pennsylvania. The anticipated filing is 3rd quarter of 2003 (proposed to be filed on July 14, 2003). This filing is to be in the form of a <u>pre-packaged Chapter 11</u>, and the Disclosure Statements and solicitation packages are to be sent out in the very near future. The filing of this pre-packaged Chapter 11 is expected to follow the Harbison-Walker bankruptcy discussed above and also be assigned to Judge Fitzgerald.

As per Dresser's Term Sheet, the following two trusts are to be created under its reorganization plan:

-    Section 524(g) Asbestos Trust; and
-    Section 105 Silica Trust

According to the Term Sheet, both trusts will be funded with "Halliburton money" filtered through its various subsidiaries at issue. Halliburton's total contribution is planned to be upto $4.2B, as follows:

-    Cash – not to exceed $2.775B for both trusts combined
      (this amount is to address currently pending asbestos and silica claims in the
      amount of approx. $2.5B – the total number of claimants covered by this
      amount has been estimated at 340,000 claimants)

      Halliburton has supposedly guaranteed this amount regardless of
      insurance proceeds, but of course <u>it will seek reimbursement from its insurers</u>
      for the amount.

-    59.5 million shares of Halliburton common stock (value to be set on date of
      filing of the Disclosure Statement/Plan) (the potential value ranges from
      $20/share to $28/share – resulting in projections between $836M and $955M)

CW 01454

- Two one-year notes (one each from Dresser and KBR) guaranteed by Halliburton (expected to have an aggregate market value of $30M)

- any insurance proceeds recovered in excess of $2.3B (BUT not to exceed $700M)

It is noted that Dresser's counsel, Kirkpatrick & Lockhart, has presented the following figures regarding Dresser's insurance program:

- **Total limits issued to S-W and M-E by all carriers – approx. $1.8B in solvent coverage**
  - approx. $160M in insolvent coverage
  - Excess of approx. $60M in SIRs
- Approximately $53M in limits allegedly impaired
- Approximately $30M in limits governed by various coverage-in-place agreements (CIPs) – including $12M in exhausted coverage

With respect to CIPs or other insurance agreements, Kirkpatrick has advised of prior agreements with Lloyds, London, North Star Reinsurance, Lumbermens Mutual, Stonewall Insurance and Wagner brake-related CIPs. Kirkpatrick also advised of other exhausted agreements with the following carriers: 1) National Union; and 2) Continental Insurance.

Our counsel, Cozen, has advised that the **total limits issued to cover H-W by all carriers amount to approx. $2.1B (with London issuing $1.2B)**. Once again, these are policies with Dresser as the named insured. **Accordingly, the combined limits available to Dresser as issued by all carriers amount to approx. $3.9B (not including total limits issued to KBR by all carriers).**

Cozen further advised that Dresser reached an <u>agreement in principle</u> with the **Asbestos Creditors Committee (ACC)** in December 2002 with respect to resolving its outstanding liabilities. The contribution plan of approx. $4.2B, as presented above, is the means through which Dresser will satisfy this agreement when executed (this agreement has not been executed as of the date of this report). Once again, although the total number of current claimants has been estimated at 340,000 (to be covered by the cash contribution of $2,775B), **the number of future claimants has not been determined to date.**

In December 2002, prior to the introduction of the above agreement in principle between Dresser and ACC, negotiations took place between Dresser and the carriers to resolve <u>solely the H-W asbestos liabilities</u>, with settlement offers being made by some of the carriers. London, for instance, offered $450M (out of its total limits of $1.2B issued to H-W). AIGTS, at the time, offered $44.2M (out of its total limits of $111.5M issued to H-W by DBG and Lexington). (The actual breakdown per DBG company and Lexington is as follows: 1) Granite State - $4.4M; 2) National Union - $9.8M; 3) Lexington - $30M;

CW 01455

and 4) Landmark – 0).  The AIG's proposal was conditioned upon various points, including the right of complete buy back of all of its Dresser policies.

Ultimately, as among London and various domestic carriers, including AIG, the total settlement package amounted to approx. $700M.  Dresser rejected these offers to resolve the H-W asbestos liabilities, and it then introduced its $4.2B plan to resolve all of its asbestos liabilities.

Key points and issues:

1.    Dresser's $4.2B plan is a proposal to resolve all of its asbestos liabilities for all of its entities, and current mediations are focused on same.  Once again, the combined limits available to Dresser as issued by all carriers amount to approx. $3.9B (not including total limits issued to KBR by all carriers).

2.    The KBR portion of the overall Dresser situation may get resolved if London and Dresser can resolve their dispute with respect to their coverage-in-place agreement.

3.    There are issues regarding late notice of these asbestos claims by Dresser and its entities.  This issue has not been fully explored or litigated, and the discovery process in any relevant actions in which we can explore this issue has not even commenced.

4.    There are issues raised by the carriers, including AIG, as to whether Dresser has standing to invoke S-W and M-E policies at issue.  With respect to the Delaware adversary proceeding (between Dresser and Federal Mogul), Phase I of this action is to address the corporate histories of both parties so as to address this issue.

5.    As with any such bankruptcies involving the ACC and future asbestos claimants, we need to closely monitor the Trust Distribution Plan (TDP) to be proposed by the debtor, Dresser.  The TDP will set forth the criteria to be utilized in reviewing and assessing the claims submitted for payment under the trusts created, and hence we need to seek a stringent TDP  (to the extent that we are allowed by the bankruptcy court) in order to ensure that only those worthy claims qualify for payment under such trusts.

Dresser Other Claims:

Dresser also has other non-asbestos, non-silica claims for which we are attempting to obtain current status reports.

Hearing Loss/HAVS

The hearing loss and HAVS claims against Dresser arise out of hand tools manufactured by Dresser's former subsidiary, Intool, Inc., formerly Industrial Tool Division of Dresser Industries, Inc.  Intool is now a division of Indresco, a Dresser relative (see below).

Indresco's Intool Division manufactures portable pneumatic tools (drills, high-powered screwdrivers, grinders, and mechanically operated wrenches) under the Cleco trademark. Intool also manufactures aircraft parts, automobile shock absorbers, and industrial equipment under the Cleco brand name.  Cleco is another defendant.

By way of background, Dresser Industries, Inc. purchased Cleco Pneumatic Tool, including the Cleco hand tool product line, in May 1969.  Dresser purchased Cleco from G.W. Murphy Industries, which had purchased it in 1967 from the Cleveland Pneumatic Tool Company.  Cleveland Pneumatic was founded in 1894.  In April, 1979, Dresser merged Cleco Pneumatic Tool with its Air Tool division and called the new division the Industrial Tool Division of Dresser Industries, Inc.  The division was renamed Intool in 1987.  On August, 1992 Dresser spun off seven "non-core" subsidiaries (including Intool) as part of a new independent publicly traded company named Indresco ("Industrial Dresser Companies").  In November 1995, Indresco was restructured and changed its name to Global Industrial Technologies, Inc.

Indresco was divided into three manufacturing divisions: (1) refractories (protective ceramic liners, tiles and bricks), (2) mining and specialty equipment, and (3) air tools for the automotive and aerospace industries.  The hearing loss and HAVS claims arise out of the latter group.

According to the insured's Director of Risk Management in a 7/27/98 telephone conversation, Dresser does not consider the hearing loss and HAVS claims to be active against Dresser.  Linda Nabors said that Indresco, pursuant to the 1992 spin off agreement, agreed to defend and indemnify these claims

Current Status:

We have requested Bivona & Cohen to provide us with an update as to all pending NIHL/HAVS claims, if any.  In a recent status update (5/30/03) regarding such claims in Mississippi, Bivona advised of the following: 1) the agreement to settle all NIHL/HAVS claims, reached more than five years ago, still has not been consummated; 2) it has not been consummated because the plaintiffs have not complied with providing their supporting medical documentation and the execution of the agreement was contingent upon production of same by the plaintiffs; but 3) the plaintiffs also have not pursued this matter to date.

With respect to any other NIHL/HAVS claims in other jurisdictions, Bivona has provided the following update: 1) Texas – all claims settled and no pending matters; 2) Connecticut – all claims settled globally by Dresser for $950,000 in 1998, no indemnification request to AIG since all policies are high-layer excess policies; and 3) West Virginia – trial of test plaintiffs to commence in the near future in the

CW 01457

consolidated NIHL trial setting (plaintiffs selected thus far for the test group do not have claims against Dresser), and hence we will continue to monitor the situation.

Chemicals:

Prior analysts reported that the following claims may be pending:

a.    Debbie Durham – Formaldehyde
b.    Mack Skaggs - Benzene

Current check in our system does not indicate any claims open for any chemical exposure cases.

**PLAN OF ACTION:**  Continue to process scheduled payments via wire transfer in a timely fashion according to the terms of the settlement agreement.

This information and documents contained herein are provided for the sole purpose of responding to your inquiry and should not be used for any purpose other than the handling of our claim by intermediaries and our reinsurers. The documents and information provided herewith, or portions thereof, are privileged (as attorney client privilege or work product) and are provided with the understanding that you will maintain their confidentiality. If any information contained in this response or its enclosures is forwarded to retrocessionaires, we expect that the reinsurer will attempt to ensure that its confidentiality is maintained. If any other party requests this information or documentation, please advise us as to the identity of the requesting party and the nature of the request. No information or documentation provided with or in this letter should be given to any other party with out our prior written approval.

GENERAL COVER

030-90/023

# LEXINGTON INSURANCE COMPANY

## WILMINGTON, DELAWARE

RENEWAL OF No.

BROKER:

Richard L. Jarrett, Sr.
2745 N. Central Expressway
Dallas, Texas  75204

CODED

COMMISSION: 12½%    CODE:  6-8-3-7

Transmittal #   241

GC 403143

Insured's Name and Address:

Dresser Industries, Inc.
P.O. Box 718
Dallas, Texas

Policy Period:  (Mo. Day Yr.)

From    11/1/71    to    11/1/72

25,000.00 PREMIUM         RATE  See Declarations  AMOUNT

In consideration of the stipulations herein named and of the premium above specified the Company does insure the Insured named above, hereinafter called the Insured, whose address is shown above, from the inception date shown above, at noon, to the expiration date shown above, at noon, Standard Time at place of issuance, to an amount not exceeding the amount(s) above specified, on the following described property:

Excess Umbrella Liability as per
the attached forms.

| Branch | 04 | | REINSURANCE | | |
|--------|-----|---|------------|---|---|
| Dept. | 2 | Co. No. | % | Comm. | |
| Liab. Prod. | 1133 | | | | |
| Sub. Prod. | 00315 | | | | |
| Comm. | 12½ | | | | |

Boston, Massachusetts

Countersigned:

OKD 2700-X-F    11/15/71   NS

Ptd. in U.S.A                                    Agent

CW 01459

## EXCESS LIABILITY DECLARATIONS

ITEM 1.    NAMED ASSURED AND ADDRESS:

                  **Dresser Industries, Inc.**
                  **P.O. Box 718**
                  **Dallas, Texas**

ITEM 2.    UNDERLYING UMBRELLA INSURERS AND POLICY NUMBER:

                  **(a) INA**
                      **Policy Number to be advised**
                  **(b) Various Companies and Policies**

ITEM 3.    UNDERLYING UMBRELLA LIMITS
          (INSURING AGREEMENT II):
                  **(a) $2,000,000.00**
                  **(b) $8,000,000.00 X/S $2,000,000.00**

ITEM 4.    UNDERLYING UMBRELLA AGGREGATE LIMITS
          (INSURING AGREEMENT II):
                  **(a) $2,000,000.00**
                  **(b) $8,000,000.00 X/S $2,000,000.00**

ITEM 5.    LIMIT OF LIABILITY
          (INSURING AGREEMENT II):

              **$7,500,000.00 P/O $22,500,000.00 X/S Item #3 above.**

ITEM 6.    AGGREGATE LIMIT OF LIABILITY
          (INSURING AGREEMENT II):

              **$7,500,000.00 P/O $22,500,000.00 X/S Item #4 above.**

ITEM 7.    NOTICE OF OCCURRENCE (CONDITION 4) TO:

                  **Lexington Insurance Company**
                  **25 New Chardon Street**
                  **Boston, Massachusetts  02114**

                  **Attn:  Claims Manager**

ITEM 8.    POLICY PERIOD:

                          **12:01 AM Standard Time at the Address of the**
               **11/1/71  to  11/1/72**   **Insured as stated elsewhere herein.**

ITEM 9.    PREMIUM

                  **$25,000.00**
           Attached to and forming part of Policy No.  GC 403143

CW 01460

## EXCESS BROAD FORM LIABILITY

Named Assured:   Dresser Industries, Inc., including any subsidiary company (and including any subsidiaries thereof) and any other company of which it assumes active management.

### INSURING AGREEMENTS

1.   Coverage - Underwriters hereby agree, subject to the limitations, terms and conditions hereinafter mentioned, to pay on behalf of the Assured all sums which the Assured shall become legally obligated to pay as damages because of:

   A.   Personal Injury
   B.   Property Damage
   C.   Malpractice
   D.   Advertising Offense
   E.   Employee Benefits Liability
   F.   Marine Liabilities
   G.   Aircraft Liability
   H.   Employer's Liability

   caused by or arising out of each occurrence happening anywhere and arising out of the hazards covered by and as defined in the underlying policies and/or certificate of insurance (or portions of them) described in the schedule of Underlying Insurance attached hereto which has been issued by Insurance Company of North America or Underwriters at Lloyd's, London and certain Insurance Companies (hereinafter called the "Underlying Insurers").

II.   Limit of Liability - Underlying Limits

   It is expressly agreed that liability shall attached to the Underwriters only after the Underlying Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability as follows:-

| Coverage | Limit of Underlying Insurance |
|---|---|
| A.   Personal Injury - Per Occurrence | $10,000,000 |
| B.   Property Damage - Per Occurrence | $10,000,000 |
| C.   Malpractice - Per Occurrence | $10,000,000 |
| D.   Advertising Offense - Per Occurrence | $10,000,000 |
| Any Combination of A, B, C & D Above | $10,000,000 |
| E.   Employee Benefits Liability - Per Claim | $10,000,000 |
| F.   Marine Liabilities - Per Occurrence | $20,000,000 |
| G.   Aircraft Liability - Per Occurrence | $10,000,000 |
| H.   Employer's Liability - Per Occurrence | $10,100,000 |

Limited, however to $10,000,000. in the aggregate for each annual period during the currency of this Insurance separately in respect of Products Liability and separately in respect of Employee Benefits Liability and separately in respect of Personal Injury (fatal or non-fatal) by Occupational Disease sustained by any employees of the Assured.

l

CW 01461

~~And the underwriters    son shall then be liable to pa~~ly the excess thereof
up to a further:-

$22,500,000. Ultimate Net Loss in respect of each occurrence

Subject to a limit of:-

$22,500,000. In the aggregate for each annual period during the currency
of this Insurance separately in respect of Products Liability
and separately in respect of Employee Benefits Liability and
separately in respect of Personal Injury (fatal or non-fatal)
by Occupational Disease sustained by any employees of the
Assured.

## DEFINITIONS

Wherever used herein:-

The term "Ultimate Net Loss" shall mean the total sum which the Assured or the
Underlying Insurers, or both, become obligated to pay by reason of the hazards
covered hereunder, either through adjudication or compromise, and shall also
include hospital, medical and funeral charges and all sums paid as salaries,
wages, compensation, fees, charges and law costs, premiums on attachment or
appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators
and other persons, and for litigation, settlement, adjustment and investigation
of claims and suits which are paid as a consequence of any occurrence covered
hereunder, excluding only the salaries of the Assured's or any Underlying Insurer's
permanent employees.

The term "Assured" shall mean the Named Assured and any additional Assured included
in the Underlying Policies described in the Schedule of Underlying Insurance
attached hereto.  The inclusion or addition hereunder of more than one Assured
shall not operate to increase Underwriters' Limit of Liability.

## CONDITIONS

1.   Prior Insurance and Non-Cumulation of Liability -

It is agreed that if any damages covered hereunder are also covered in
whole or in part under any other excess policy issued to the Assured
prior to the inception date hereof the Limit of Liability hereon shall
be reduced by any amounts due to the Assured on account of such damages
as may be covered under such prior insurance.

Subject to the foregoing paragraph and to all the other terms and conditions
of this Insurance in the event that damages arising out of an occurrence
covered hereunder is continuing at the time of termination of this Insurance
Underwriters will continue to protect the Assured for liability in respect
of such damages without payment of additional premium.

2.   Maintenance of Underlying Insurance -

This Insurance is subject to the same terms, definitions, exclusions and
conditions (except as regards the premium, the amount, the limits of
liability and coverages afforded which are not specified in the Schedule
of Underlying Insurance attached hereto) as are contained in or as may be
added to the underlying policies described in the Schedule of Underlying
Insurance attached hereto prior to the happening of an occurrence for
which claim is made hereunder.

11

CW 01462

3.    CANCELLATION -

This Insurance may be cancelled by Dresser Industries, Inc. or by the Underwriters hereon or their representative by mailing written notice to the other party stating when, not less than ninety (90) days thereafter, cancellation shall be effective.  The mailing of notice aforesaid by Underwriters or their representative to Dresser Industries, Inc. at the address shown herein shall be sufficient proof of notice, and this Insurance shall cease on the effective date and hour of cancellation stated in such notice.  Delivery of such written notice either by Dresser Industries, Inc. or by the Underwriters or their representatives shall be the equivalent to mailing.

If this Insurance be cancelled by Dresser Industries, Inc. the Underwriters shall retain the customary short rate proportion of the premium for the period this Insurance has been in force and if cancelled by Underwriters they shall retain the pro rata proportion of the premium for the period this Insurance has been in force.  Notice of cancellation by the Underwriters or their representative shall be effective even though no payment or tender of return premium is made.

4.    Notice of Occurrence -

Whenever the Assured has information from which they may reasonably conclude that an occurrence covered hereunder involves damages which, in the event that the Assured shall be held liable, is likely to involve this Insurance, notice shall be sent to either:

                    Richard L. Jarrett, Sr.
                    2745 N. Central Expressway
                    Dallas, Texas  75204

or to

                    Mendes and Mount
                    27 William Street
                    New York, New York  10005

as soon as practicable, such notice to contain sufficient particulars to enable Underwriters to identify this Insurance and the date and circumstances of such damages.  Provided, however, that failure to give notice of any occurrence which, at a subsequent date, would appear to give rise to claims hereunder, shall not prejudice such claims.

5.    Other Insurance -

If other valid and collectible insurance with any other insurer is available to the Assured covering damages covered by this Insurance, other than insurance that is written as excess of this Insurance, the Insurance afforded hereunder shall be in excess of and shall not contribute with such other Insurance.

Attaching to and forming a part of Policy No.        GC 403143

Effective:  1 November 1971

Assured:  Dresser Industries, Inc. et al

LEXINGTON INSURANCE COMPANY

by _____

## SCHEDULE OF UNDERLYING INSURANCE

**Underlying Insurer**

Insurance Company of North America
Policy No. SRL 5050

**Coverage Afforded**

Division I - Blanket Liability Covering:
A. Personal Injury
B. Property Damage
C. Malpractice
D. Advertising
E. Employee Benefits
F. Marine Liabilities consisting of Protection and Indemnity, Wharfinger's Liability, Stevedore's Liability, Terminal Liability and Charterer's Liability

Division II - Aircraft Liability Covering:
A. Bodily Injury, Excluding Passengers
B. Bodily Injury Passengers
C. Property Damage

Insurance Company of North America
Policy No. RWC 125120

Employer's Liability, Including Maritime Liability, Jones Act Liability

Underwriters at Lloyd's, London and Certain Insurance Companies at London, England

Excess Liabilities over the Marine Liabilities described above

It is specifically agreed that this insurance shall not apply to those coverages or hazards covered by the above policies which are not specifically described above.

Attaching to and forming a part of Policy No.    GC 403143

Effective:  1 November 1971

Assured:  Dresser Industries, Inc. et al

LEXINGTON INSURANCE COMPANY

by _N. B. Smith_____

CW 01464

ENDORSEMENT NO. 1

### SEEPAGE AND POLLUTION CLAUSE

This Insurance does not cover any liability for:-

(1) Removal of, loss or damage to subsurface oil or gas or any other natural substance, the property of others,

   provided always that this paragraph (1) shall not apply to any liability which would otherwise be covered under this Insurance for such removal, loss or damage directly attributable to blowout, cratering or fire of an oil or gas well owned or operated by, or under the control of, the Assured.

(2) Property damage resulting from subsidence caused by subsurface operations of the Assured.

(3) Property damage caused by seepage, pollution or contamination, unless such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this Insurance,

   but this paragraph (3) shall not be construed as excluding any liability which would otherwise be covered under this Insurance for property damage caused by a sudden, unintended and unexpected happening during the period of this Insurance arising out of seepage, pollution or contamination.

This clause shall not extend this Insurance to cover any liability which would not have been covered under this Insurance had this clause not been attached.


All other terms and conditions remaining unchanged.

Attaching to and forming a part of Policy No.     GC 403143

Effective: 1 November 1971

Assured: Dresser Industries, Inc. et al

LEXINGTON INSURANCE COMPANY

by _____ N.B. Smith _____

ENDORSEMENT NO. 2

## SERVICE OF SUIT CLAUSE

The following Service of Suit Clause is not to become effective unless or until the Insured has notified this Company in each specific claim of its intention to sue.

It is agreed that in the event of the failure of this Company to pay any amount claimed to be due hereunder, this Company, at the request of the Insured, will submit to the jurisdiction of any Court of Competent Jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

It is further agreed that service of process in such suit may be made upon the highest one in authority bearing the title "Commissioner", "Director" or "Superintendent" of Insurance of the state or commonwealth wherein the property covered by this certificate is located, and that in any suit instituted against it upon this contract this Company will abide by the final decision of such Court or any Appellate Court in the event of an appeal. The one in authority bearing the title "Commissioner", "Director" or "Superintendent" of Insurance of the state or commonwealth wherein the property covered by this certificate is located is hereby authorized and directed to accept service of process on behalf of this Company in any such suit and/or upon the Insured's request to give a written undertaking to the Insured that they will enter a general appearance upon this Company's behalf in the event such a suit shall be instituted.

All other terms and conditions remaining unchanged.

Attaching to and forming a part of Policy No.    GC 403143

Effective:  1 November 1971

Assured:  Dresser Industries, Inc. et al

LEXINGTON INSURANCE COMPANY

by _____ N.B. Smith

## NUCLEAR ENERGY LIABILITY EXCLUSIONS

It is agreed that the policy does not apply:

1.  Under any Liability Coverage, to injury, sickness, disease, death or destruction

    (a)  with respect to which an Insured under the policy is also an Insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    (b)  resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the Insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

2.  Under any Medical Payments Coverage, or under any Supplementary Payments provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of a nuclear facility by any person or organization.

3.  Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

    (a)  The nuclear material (1) is at any nuclear facility owned by or operated by or on behalf of, an Insured or (2) has been discharged or dispersed therefrom;

    (b)  the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an Insured; or

    (c)  the injury, sickness, disease, death or destruction arises out of the furnishing by an Insured of services, materials, parts of equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

4.  As used in this exclusion:

    "hazardous properties" include radioactive, toxic or explosive properties;

    "nuclear materials" means source material, special nuclear material or byproduct material.

    "source material", "special nuclear material", and "byproduct material" have

CW 01467

-2-

the meaning given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation or a nuclear reactor;

"waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means

(a)   any nuclear reactor,

(b)   any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)   any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d)   any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

Attached to and forming part of Policy No.  GG 403143

Issued to      Dresser Industries, Inc.

Effective      11/1/71

LEXINGTON INSURANCE COMPANY

CW 01468

WAR EXCLUSION CLAUSE

This policy shall not apply to any liability of the Insured due to war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public or local authority.

Attached to and forming part of Policy No.   GC 403143

Issued To   Dresser Industries, Inc.

Effective   11/1/71

LEXINGTON INSURANCE COMPANY