# EXHIBIT 14

(12/17/2010) Ayisha Edgar - Scanned from MFP-05017310 04/23/2010 14:36    Page 1

From: MFP-05017310 <MFP-05017310@tosscan.com>
To: "Colon, Paul" <Paul.Colon@chartisinsurance.com>
Date: 4/23/2010 3:36 PM
Subject: Scanned from MFP-05017310 04/23/2010 14:36
Attachments: DOC042310.pdf

Scanned from MFP-05017310.
Date: 04/23/2010 14:36
Pages:3
Resolution:200x200 DPI
-----------------------------------
Please open the attached document.





**Chartis Claims, Inc.**
**Asbestos Claims Department**
101 Hudson Street, 29th Floor
Jersey City, NJ 07302
April 23, 2010

Evelyn Y. Drew, JD
Assistant Vice-President
Odyssey Re
300 First Stamford Place
Stamford, CT 06902

    Re: **Insured:** McGraw Edison (Dresser & Federal Mogul)
    **Policy Number:** 66801963
    **Claim Number:** 170-054282
    **DOL:** 3/1/80
    **Reinsurer:** Odyssey Re

Dear Ms. Drew:

Please accept this letter in response to your e-mail inquiry of March 19, 2010 to Chris Magnotta of Chartis.

As per your request for Chartis' (AIG) exposure analysis, as to Federal Mogul, the following provides an explanation of how the $72M settlement figure was determined, detailing the background, claims history, litigation/ mediation/settlement discussions, and the exposure analysis that was used to assess the AIG. Companies' potential exposure on this matter and to arrive at the $72M settlement figure.

Asbestos bodily injury claims were first filed against Wagner beginning in 1979. From 1998 to 2001, the time of the Federal Mogul's bankruptcy filing, a total of 51,000 claims were filed against Federal Mogul as successor to Wagner. As of 2001, there were approximately 35,000 asbestos bodily injury claims pending against Federal Mogul, with 93% of the claims characterized as asbestosis claims. The remaining claims consisted of mesothelioma claims (2.2%), lung cancer claims (4.4%), and "other cancer claims.

Declaratory Judgment Actions regarding coverage for the Wagner/ Federal Mogul claims were filed in the New York and New Jersey State Courts. The New York case has been stayed. A motion to dismiss the New Jersey action was filed, but it was expected that the New Jersey action would go forward.

During the litigation of the D.J. action, the parties retained consultants to evaluate and estimate future claims losses. Federal Mogul's consultant, ARPC. Inc., has estimated that future claims against Federal Mogul will range in value from $523.9 million to approximately $1.8 billion, with a median value of $1.031 billion. ARPC has estimated future claims volume against Federal Mogul ranging from a low of 317,640 claims to a high of 799,753 claims, with a median of 548,748 claims.

2 GRANITE 001436

The consultant retained by the carrier group, The Brattle Group, projected that there would be between 102,251 and 168,400 claims filed in the future against Federal Mogul and that these claims would have an aggregate value of $565 million to $811 million nominally ($346 million to $497 million NPV). The Brattle Group consultants believed that a reasonable projection was in the range of $565-$618 million. The Brattle Group Consultants analyzed the claims data that the carriers received from Federal Mogul, prepared claim projections and analysis, and developed allocation models to assess the claims data and develop settlement figures, on a carrier by carrier basis.

The ARPC and the Brattle Group used projections based upon actual claims filings and resolutions over the past two years. The parties' respective estimations of the insurers' collective global exposure differed chiefly based upon the methodologies used to develop the estimates of future liability. Federal Mogul's experts did not provide an analysis of each carrier's claimed exposure. Therefore, we do not have Federal Mogul's estimation of the AIG Member Companies' collective exposure on this matter.

The AIG member companies issued 40 excess liability policies to Studebaker Worthington and McGraw Edison, with aggregate available limits totaling approximately $151MM. Certain of the policies issued by the AIG Companies are multi-year polices. In settlement discussions with Federal Mogul, AIG has taken the position that AIG had $132.8M in available coverage limits, while Federal Mogul has taken the position that $175.8M in limits was available. The $151M figure was calculated assuming a 45% chance that multi-year policies would be annualized.

The parties attempted to resolve their disputes through mediation, but were unsuccessful, primarily due to the significant differences involving the choice of law issue and the estimated size of the projected future and total asbestos liabilities. Federal Mogul presented a global settlement demand of $472M vs. a global settlement offer of $145M by the carriers, rejected by Federal Mogul.

Federal Mogul presented a demand of $99M (NPV), or 65% of available limits as calculated by the AIG/Brattle Group.

As stated above, The Brattle Group developed allocation models to provide a reasonable estimate of each insurer's liability and developed settlement figures. This model used variables for allocation method (pro rata or *Carter-Wallace*, a major issue in the underlying litigation), number of occurrences and size of the problem (claims projections). The model also applied discounts of 13.6% for coverage defenses and 5.5% for non-cumulation of liability/prior insurance. Lastly, the model assumed that there was a 45% chance that multi-year policies would be annualized.

A significant factor in the evaluation leading to settlement dealt with what state's law would apply. Application of New Jersey law was more likely since the declaratory judgment action was to proceed in New Jersey. New Jersey law would require allocation of the claims pursuant to *Carter Wallace* as opposed to pro-rata allocation. Moreover, the claims would likely be considered to have arisen from a single occurrence. Lastly, the non-cumulation of liability provision contained in certain of the policies would be deemed unenforceable. Assuming the court found that New Jersey law applied and that Federal Mogul's expert had correctly estimated the size of the problem at approximately $1 billion, approximately $121 million of the $150.1 million in coverage issued by the AIG Companies (or roughly 80.6%) would be exposed. Thus, the application of New Jersey law in this case would have served to increase substantially the exposure faced by the AIG Companies.

2 GRANITE 001437

We believe that the $72M settlement was an extremely favorable resolution for the AIG Companies enabling the AIG Companies to achieve a 40% discount against potentially exposed limits of $121M. The settlement amount was allocated to the AIG Companies' policies based on the bathtub allocation methodology. Moreover, all payments after the first $40M under the settlement agreement are dependent upon the level of Liquidated Wagner Asbestos Claims incurred by the Federal Mogul U.S. Asbestos Personal Injury Trust such that the full amount contemplated under the settlement agreement may not be realized.

As to Dresser, attached are copies of the policies requested, as well as the underlying policies.

As to your inquiry regarding notice, our records indicate that Odyssey Re had previously received notice of this settlement on or before August 30, 2005. *See* attached letter of August 30, 2005 from the undersigned to Michael Somma of Odyssey Re.

Finally, as to the issue of allocation and a discount under the agreement, one of the benefits of this settlement was that Chartis was given the ability to make payments for claims already pending over an extended period of time. As such, we utilized an allocation methodology commonly known as a "bath tub" allocation that was most fair and appropriate in terms of which policies would be implicated first and those that would pay later. Lower layer policies, which would pay first by definition, still did so, while upper layer policies would make payment upon exhaustion of the lower layer policies, as would be the case even if no agreement were in place. Payments over time provide a net present value discount, which pertains to the account overall and not to any specific policy.

Yours truly,

Leticia Diaz
Asbestos Claims Department
Chartis Claims, Inc.

The information and documents contained herein are provided for the sole purpose of responding to your inquiry and should not be used for any purpose other than the handling of our claim by intermediaries and our reinsurers. The documents and information provided herewith, or portions thereof, are privileged (as attorney client privilege or work product) and are provided with the understanding that you will maintain their confidentiality. If any information contained in this response or its enclosures is forwarded to retrocessionaires, we expect that the reinsurer will attempt to ensure that its confidentiality is maintained. If any other party requests this information or documentation, please advise us as to the identity of the requesting party and the nature of the request. No information or documentation provided with or in this letter should be given to any other party without our prior written approval.

2 GRANITE 001438