# EXHIBIT 46



**CHARTIS**

Chartis Claims, Inc.
**Asbestos Claims Department**
101 Hudson Street, 29th Floor
Jersey City, NJ 07302

August 5, 2009

Julie Tavernese
Assistant Vice President
Odyssey Re
300 First Stamford Place
Stamford, CT 06902

**RECEIVED**
AUG 26 2009
**APH UNIT**

Re:  Insured          :   McGraw Edison (Federal Mogul)
     Chartis Claim Nos :   170-053344, 170-053345, 170-053346, 170-057620
     DOL              :   3/1/80, 3/1/81, 3/1/82 & 3/1/83
     CIC Claim Nos     :   SC26285*1980*3, SC27675*1981*2
                          SC29066*1982*2 & SC30932*1983*2

     Ceding Cos        :   ISCOP/Granite State

Dear Ms. Tavernese:

In response to your letter dated June 8, 2009 to Ms Wakeman as it pertains to Federal Mogul, please be advised as follows:

The Federal Mogul account was settled pursuant to the partitioning agreement in Dresser. Therefore it was agreed that a vertical partition of the limits of liability under the policies with 50% of the available limits going to Dresser and 50% of the remaining available limits going to Federal Mogul or any other entity that may attempt to prove coverage under these policies. The Partitioning Agreement was approved by the bankruptcy court. As such, two claim numbers were created for the Granite State Policy effective 03/01/1980. (170-054282 & 170-0543344) Both claim numbers received $5.0 million of the $10.0 million coverage limit.

A copy of the Partitioning Agreement is attached.

A copy of the Settlement Agreement is attached.

A copy of the allocation and explanation of its methodology are attached.

Please be advised that the information and documents contained herein are provided for the sole purpose of responding to your inquiry and should not be used for any purpose



EXHIBIT

CW 01613

other than the handling of our claim by intermediaries and our reinsurers. The documents and information provided herewith, or portions thereof, are privileged and are provided with the understanding that you will maintain their confidentiality. If any information contained in this response or its enclosures is forwarder to retrocessionaires, we expect that the reinsurer will attempt to ensure that its confidentiality is maintained. If this information or documentation is requested by any other party, please advise us as to the identity of the requesting party and the nature of the request. No information or documentation provided with or in this letter should be given to any other party without our prior written approval.

Very truly yours

Steve Schwesinger
Asbestos Claims Department

CW 01614

<u>Partitioning Agreement</u>

This Partitioning Agreement ("Agreement") is entered into this 4th day of November 2004 among DII Industries, LLC, Federal-Mogul Products, Inc., Cooper Industries, Inc. and the Participating Carriers.

<u>Recitals</u>

WHEREAS, the Participating Carriers issued or subscribed to certain liability insurance policies to Studebaker-Worthington, Inc. and McGraw-Edison Company as identified on Attachment "A" hereto; and

WHEREAS, DII Industries, Federal-Mogul and Cooper assert that they are each separately entitled to insurance coverage under the Subject Policies; and

WHEREAS, by this Agreement, the Parties intend to adopt, by way of compromise and accord, and without prejudice to or waiver of their respective positions in other matters, including their respective positions in any pending litigation or future litigation (except as expressly set forth in this Agreement), a settlement regarding, *inter alia*, the partitioning of the limits of liability, self-insured retentions ("SIRs"), deductibles, any other self-insurance features, and the erosion of limits of liability, SIRs, deductibles or any other self-insurance features of the Subject Policies among DII Industries, LLC, Federal-Mogul Products, Inc., Cooper Industries, Inc., and, as and if approved by appropriate Final orders of the DII Industries Bankruptcy Court and the Federal-Mogul Bankruptcy Court, other entities that claim or may claim to be insured or to be otherwise entitled to rights and/or benefits under the Subject Policies.



WDC - 023764/0386 - 2012001 v3

1

CW 01615

*Agreements:*

NOW, THEREFORE, in full consideration of the foregoing and of the mutual agreements herein contained, and intending to be legally bound hereby, the Parties agree as follows:

I.    Incorporation of Recitals.

The Parties agree that all Recitals in this Agreement are expressly incorporated herein, are made an integral part of this Agreement, and are binding on the Parties, as applicable, now and hereafter.

II.    Definitions.

The following definitions will apply to the listed terms wherever those terms appear throughout the Agreement or in any attachments hereto. Further, each defined term stated in a singular form shall include the plural form, each defined term stated in plural form shall include the singular form, and each defined term stated in the masculine form or in the feminine form or in the neuter form shall include all others. Moreover, the term "including" means "including without limitation".

A.    Agreement: The term "Agreement" shall mean this Partitioning Agreement, as the same may be amended from time to time in writing in accordance with its provisions.

B.    Consent Agreement: The term "Consent Agreement" shall have the meaning set forth in paragraph III.F. hereof.

C.    Cooper: The term "Cooper" shall mean Cooper Industries, Inc., its predecessors, subsidiaries, corporate affiliates, and all of their respective directors, officers, employees, agents, attorneys, representatives, successors and assigns, acting as such.

WDC- 02276/0384 - 2017091 v3

2

CW 01616

D.   Coverage Lawsuit:  The term "Coverage Lawsuit" shall mean the adversary proceeding filed by DII Industries in the Federal-Mogul Bankruptcy captioned _Dresser Industries, Inc. v. Federal-Mogul Products, Inc., et al._, (Chapter 11, Case No. 01-10578, Adversary Proceeding No. 01-09018, Del. Bankr.).

E.   DII Industries:  The term "DII Industries" shall mean DII Industries, LLC, its predecessors, subsidiaries, parents, corporate affiliates, and all of their respective directors, officers, employees, agents, attorneys, representatives, successors and assigns, acting as such.

F.   DII Industries Application:  The term "DII Industries Application" shall have the meaning set forth in paragraph VI.A. hereof.

G.   DII Industries Approval Order:  The term "DII Industries Approval Order" shall have the meaning set forth in paragraph VI.A. hereof.

H.   DII Industries Bankruptcy:  The term "DII Industries Bankruptcy" shall mean the Chapter 11 bankruptcy cases filed by DII Industries, LLC, Mid-Valley, Inc., Kellogg Brown & Root, Inc., KBR Technical Services, Inc., Kellogg Brown & Root Engineering Corporation, Kellogg Brown & Root International Inc. (a Delaware Corporation), Kellogg Brown & Root International Inc. (a Panamanian Corporation), and BPM Minerals, LLC.

I.   DII Industries Bankruptcy Court:  The term "DII Industries Bankruptcy Court" shall mean the United States Bankruptcy Court for the Western District of Pennsylvania, Pittsburgh Division.

J.   DII Industries Glossary:  The term "DII Industries Glossary" shall mean the Uniform Glossary of Terms for Plan filed with the Bankruptcy Court in the DII Industries Bankruptcy on May 17, 2004 as the "Amended Disclosure Statement Exhibit A."

WDC - 023776/03166 - 2017001 v3

3

CW 01617

K.    <u>Federal-Mogul</u>: The term "Federal-Mogul" shall mean Federal-Mogul Products, Inc., its predecessors, parents, subsidiaries, corporate affiliates, and all of their respective directors, officers, employees, agents, attorneys, representatives, successors and assigns, acting as such, and the Federal-Mogul Asbestos Personal Injury Trust proposed in connection with the plan of reorganization filed by Federal-Mogul Products, Inc. and others in the United States Bankruptcy Court for the District of Delaware, *In re Federal-Mogul Global Inc., T&N Limited, et al.*, Case Nos. 01-10578-RTL (jointly administered).

L.    <u>Federal-Mogul Application</u>: The term "Federal-Mogul Application" shall have the meaning set forth in paragraph VI.B. hereof.

M.    <u>Federal-Mogul Approval Order</u>: The term "Federal-Mogul Approval Order" shall have the meaning set forth in paragraph VI.B. hereof.

N.    <u>Federal-Mogul Bankruptcy Court</u>: The term "Federal-Mogul Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Delaware.

O.    <u>Final</u>: The term "Final" when used in reference to a court order shall mean an order: (a) as to which the time to appeal or otherwise seek appellate review has expired and as to which no appeal shall then be pending, or (b) in the event that an appeal of the order has been sought, such court order shall have been affirmed by the highest court to which such court order was appealed and the time to take any further appeal or seek further appellate relief shall have expired.

P.    <u>Funding Date</u>: The term "Funding Date" shall mean the first business day following the date on which DII Industries and its affiliates fund the Asbestos PI Trust (as such term is defined in the DII Industries Glossary).

CW 01618

Q.    **Insolvent London-based Carriers**:  The term "Insolvent London-based Carriers" shall mean the London-based insurance companies identified on Attachment "C" hereto.

R.    **Insolvent London Recoveries**:  The term "Insolvent London Recoveries" shall have the meaning set forth in paragraph V.B. hereof.

S.    **Non-Carrier Parties**:  The term "Non-Carrier Parties" shall mean DII Industries, Federal-Mogul and Cooper.

T.    **Non-Participating Carriers**:  The term "Non-Participating Carriers" shall mean those insurance companies or insuring entities (i) who are not Participating Carriers and (ii) that issued or subscribed liability insurance policies to Studebaker-Worthington, Inc. from January 1, 1968 to March 1, 1980 or to McGraw-Edison Company from March 1, 1980 to March 1, 1986.

U.    **Participating Carriers**:  The term "Participating Carriers" shall mean the insurance companies that execute this Agreement, their respective predecessors, parents, subsidiaries, corporate affiliates and all of their respective directors, officers, employees, agents, attorneys, representatives, successors and assigns, acting as such.

V.    **Parties**:  The term "Parties" shall mean DII Industries, Federal-Mogul, Cooper, and the Participating Carriers.

W.    **Partitioning Provisions**:  The term "Partitioning Provisions" shall mean the partitions and reductions set forth in section III.

X.    **Payment**:  The term "Payment" shall have the meaning set forth in paragraph V.B. hereof.

5

CW 01619

Y.    Person: The term "Person" shall mean an individual, a corporation, a partnership, a joint venture, an association, a trust, any other entity or organization, and any federal, state or local government or any governmental or quasi-governmental body or political subdivision or any agency, department, board or instrumentality thereof, specifically including a "governmental unit" as defined by 11 U.S.C. § 101(27).

Z.    SIRs: The term "SIRs" shall have the meaning set forth in the recitals hereof.

AA.    Subject Policies: The term "Subject Policies" shall mean the liability insurance policies identified on Attachment "A" hereto and any similar liability insurance policies that were issued to Studebaker-Worthington, Inc. from January 1, 1968 to March 1, 1980 or to McGraw Edison Company from March 1, 1980 to March 1, 1986. For purposes of this definition, "similar liability insurance policies" shall not include D&O, workers' compensation, automobile, or employer liability coverage.

BB.    Underwriters' Limits: The term "Underwriters' Limits" shall have the meaning set forth in paragraph VII.D. hereof.

III.    50/50 Vertical Partitioning of the Limits of Liability of the Subject Policies.

A.    The Parties agree that the unexhausted aggregate limits for each Subject Policy (for all coverages) shall be partitioned such that DII Industries shall have exclusive access to fifty percent (50%) of the unexhausted aggregate limits for each Subject Policy (for all coverages); and Federal-Mogul, along with all Persons that Federal-Mogul has the legal right to bind, and Cooper, along with all Persons that Cooper has the legal right to bind, shall share and have access to the fifty percent (50%) of the unexhausted aggregate limits for each Subject Policy (for all coverages) to which DII Industries does not have the exclusive right.

NDC - 02376/0385 - 2817001 v3                            6

CW 01620

B.     The Parties agree that all other limits of liability, if any, under the Subject Policies (including all per occurrence limits of liability) shall be reduced by fifty percent (50%).

C.     All SIRs (including aggregate SIRs and per occurrence SIRs), all deductibles (including aggregate deductibles and per occurrence deductibles) and all other self-insurance features in the Subject Policies shall be reduced by fifty percent (50%).

D.     Fifty percent (50%) of all prior erosion of any aggregate limit under any Subject Policy issued by a Participating Carrier (including any aggregate limit associated with an SIR, deductible or other self-insurance feature) shall be deducted from that portion of the aggregate limit partitioned to DII Industries and the other fifty percent (50%) shall be deducted from that portion of the aggregate limit partitioned to Federal-Mogul, including all Persons that Federal-Mogul has the legal right to bind, and to Cooper, including all Persons that Cooper has the legal right to bind. From the date of this Agreement forward, any SIR, deductible or other self-insurance feature that has an applicable aggregate limit can be eroded or exhausted by any Persons (except DII Industries) that are insured or otherwise entitled to rights and/or benefits under the Subject Policies. Nothing in this subparagraph III.D., however, shall be deemed an admission by any Party that DII Industries, or any other Person, is insured or is otherwise entitled to rights and/or benefits under any Subject Policy.

E.     To effectuate the partition described in paragraphs III.A.-D., and for purposes of determining the attachment point of the Subject Policies issued by the Participating Carriers only, all aggregate limits of liability (including any limit associated with an SIR, deductible or other self-insurance feature) in each Subject Policy issued by a Participating Carrier or a Non-Participating Carrier shall be deemed to be reduced by fifty percent (50%), as to DII Industries, on the one hand, and as to Federal-Mogul, Cooper and any other Person bound by

CW 01621

a Consent Agreement or the Partitioning Provisions, on the other hand. In addition, all other limits of liability issued by a Non-Participating Carrier shall be deemed to be reduced by fifty percent (50%).

F.     The DII Industries Application will seek, among other things, an order of the DII Industries Bankruptcy Court (or any other court with the jurisdiction to issue such an order) that provides that certain Persons claiming (or which may in the future claim) to be insured or to be otherwise entitled to rights and/or benefits under the Subject Policies: (i) share solely in the aggregate limits of liability apportioned to Federal-Mogul and Cooper under this Agreement; and (ii) shall be bound by the fifty percent (50%) reduction of all other limits of liability, if any, under the Subject Policies, (in accordance with paragraph III.B. hereof) and will receive the benefit of Paragraphs III.C.-E. above. Federal-Mogul, along with all Persons that Federal-Mogul has the legal ability to bind, and Cooper, along with all Persons that Cooper has the legal ability to bind, agree that they will: (x) take no action to impede or oppose the entry of the Partitioning Provisions or any agreement by which non-Parties agree to be bound as set forth in subparagraphs (i) and (ii) hereof ("Consent Agreement") or contest same in any manner in any proceeding or otherwise; and (y) share such partitioned aggregate limits as provided in such order containing the Partitioning Provisions or any Consent Agreement; and (z) be bound by the 50% reduction of all other limits of liability.

G.     Nothing contained in this Agreement shall be: (1) construed as creating any rights in any non-signatory to this Agreement; or (2) an admission by any Party that any Person (whether signatory or non-signatory to this Agreement) that claims or may claim to be insured or to be otherwise entitled to rights and/or benefits under the Subject Policies is insured or is entitled to such rights or benefits.

CW 01622

IV.    Preservation of All Insurance Coverage Issues and Disputes.

A.    Other than as set forth in Sections III, VII.A.-C. and IX of this Agreement, or in any other written agreement or agreements between or among any or all of the Parties (including the Settlement Agreement and Release between Halliburton Company, DII Industries, LLC and Kellogg, Brown & Root, Inc., on the one hand, and certain Participating Carriers, on the other) (the "Halliburton Settlement"), all coverage issues and disputes, including factual disputes, between or among the Non-Carrier Parties, the Participating Carriers, the Non-Participating Carriers and any other Person(s) that claims or may claim to be insured or to be otherwise entitled to rights and/or benefits under the Subject Policies are preserved, and the Parties' positions with respect to such issues shall not be prejudiced. Those issues include, but are not limited to: (a) the existence or extent of exhaustion of any limit of liability in any Subject Policy; (b) the existence or extent of exhaustion of any SIR, deductible or other self-insurance feature in any Subject Policy; (c) whether any of the Non-Carrier Parties or any other Person that claims or may claim to be insured or to be otherwise entitled to rights and/or benefits under the Subject Policies has any rights to coverage under the Subject Policies; (d) whether the Participating Carriers have breached their obligations, if any, under the Subject Policies; (e) whether any of the Non-Carrier Parties have breached their obligations, if any, under the Subject Policies; and (f) to the extent, if any, to which any Non-Carrier Party or any Person that claims or may claim to be insured or to be otherwise entitled to rights and/or benefits under the Subject Policies is entitled to insurance coverage under one or more of the Subject Policies, the amount, if any, of such alleged coverage and how any such alleged coverage responds to covered claims, if any, except as set out in this Agreement.

CW 01623

B.      Nothing contained in this Agreement, including Sections III., IV.A., VII. or XX., or any subsections thereof, shall be deemed an admission by any Party that any Subject Policy has or does not have a single aggregate for all types of claims, or that any of the Subject Policies have or do not have additional or separate limits of liability.  This Agreement shall not be used to argue or imply any resolution, one way or the other, of any these issues.

V.      Cooperation Between and Among the Non-Carrier Parties.

A.      DII Industries and Federal-Mogul shall cooperate with each other to access insurance coverage under any Subject Policy issued or subscribed by Insolvent London-based Carriers.  All recoveries against Insolvent London-based Carriers, regardless as to whether DII Industries' claims or Federal-Mogul's claims predominate, will be allocated fifty percent (50%) to DII Industries and fifty percent (50%) to Federal-Mogul.

B.      To the extent that by January 1, 2006, the total of Federal-Mogul's recoveries from the insolvent London-based Carriers received by Federal-Mogul on or before January 1, 2006 (the "Insolvent London Recoveries"), do not equal at least $4,500,000, DII Industries will pay to Federal-Mogul (or to the Federal-Mogul 524(g) trust or into an appropriate escrow account) on or before January 6, 2006 the difference between the Insolvent London Recoveries and $4,500,000 (the "Payment").  Any recoveries received by Federal-Mogul from the insolvent London-based Carriers from and after January 1, 2006, shall be paid, in kind, to DII Industries until such time as DII Industries is fully reimbursed for the amount of the Payment.  From and after the point when DII Industries is fully reimbursed for the amount of the Payment, all subsequent recoveries from the insolvent London-based Carriers shall be split equally between DII Industries and Federal-Mogul.  Cooper shall not be entitled to receive any share of the settlement memorialized in the Letter Agreement, dated September 27, 2004, between and

WDC - 023760116 - 2017001 v3                          10

CW 01624

among KWELM Management Services Limited, DII Industries and Federal-Mogul. Payments to DII Industries and Federal-Mogul by Insolvent London-based Carriers shall be credited toward exhaustion of the limits of the insurance policies subscribed by such settling Insolvent London-based Carriers.

C.    As between and among the Non-Carrier Parties and any other Person subject to the Partitioning Provisions that claims or may claim to be insured or to be otherwise entitled to rights and/or benefits under the Subject Policies, the limits of liability in any Subject Policy issued by or subscribed by a non-London-based insolvent insurer shall be allocated and apportioned as if such Subject Policy had been issued by a Participating Carrier. To the extent that such insolvent non-London-based insurers do not consent to such allocation and apportionment, the Non-Carrier Parties shall cooperate in accessing the products/completed operations limits of liability associated with the Subject Policies issued by or subscribed to by such insolvent non-London-based insurers. Any recoveries from such insolvent non-London-based insurers shall split fifty percent (50%) to DII Industries and fifty percent (50%) to Federal-Mogul and Cooper, with any division or sharing of such fifty percent (50%) to be determined by Federal-Mogul and Cooper. To the extent that a Non-Carrier Party receives more in proceeds or payment from an insolvent non-London-based insurer than is appropriate under this paragraph, such Non-Carrier Party shall, within forty-five (45) days pay such excess amounts to the other Non-Carrier Party(s) in accordance with the terms of this paragraph.

D.    As between and among the Non-Carrier Parties and any other Person subject to Partitioning Provisions or a Consent Agreement that claims or may claim to be insured or to be otherwise entitled to rights and/or benefits under the Subject Policies, the limits of liability for all solvent Non-Participating Carriers shall be split in accordance with paragraph

11

CW 01625

III.A.-B. above.  The Non-Carrier Parties will cooperate in accessing the limits of liability applicable to any Subject Policy issued by any such solvent Non-Participating Carrier.  Any recoveries from such solvent Non-Participating Carriers shall be allocated in accordance with the procedure set forth in paragraph V.C. above.

VI.     <u>Bankruptcy Court Approvals</u>.

A.      Within five (5) business days from and after the execution and delivery of this Agreement, DII Industries shall file a motion pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019 (the "DII Industries Application") with the DII Industries Bankruptcy Court for an expedited hearing and Order approving the entry by DII Industries into and the carrying out of the Agreement (the "DII Industries Approval Order") and for the relief set forth in paragraph III.F. hereof and shall use its best efforts to obtain the DII Industries Approval Order.  To the extent that DII Industries is not able to obtain the DII Industries Approval Order or such Order does not contain the Partitioning Provisions, DII Industries has the right, but not the obligation, to file an adversary proceeding in the DII Industries Bankruptcy in an attempt to obtain an order containing the Partitioning Provisions.  In the event that such an adversary proceeding is filed, all Parties agree to consent to the jurisdiction of the DII Industries Bankruptcy Court, including waiving the application of the automatic stay as needed.  If DII Industries files such an adversary proceeding and fails or determines that it is unable or unlikely to obtain an order containing the Partitioning Provisions by June 30, 2005, it shall have the right and ability—in good faith and after reasonable consultation with the other Parties following the meet-and-confer process described in Paragraph VI.D. below—to terminate this Agreement after July 31, 2005 and by such termination to have this Agreement be null and void and of no force or effect (with no Party hereto having any right

CW 01626

to any damages or any other relief under this Agreement or any of the negotiations attendant thereto).

B.      Within five (5) business days from and after the execution and delivery of this Agreement, Federal-Mogul shall file a motion pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019 (the "Federal-Mogul Application") with the Federal-Mogul Bankruptcy Court for an expedited hearing and Order approving the entry by Federal-Mogul into and the carrying out of the Agreement (the "Federal-Mogul Approval Order"), and shall use its best efforts to obtain the Federal-Mogul Approval Order.

C.      No Party shall object to the DII Industries Application or the Federal-Mogul Application, and all Parties shall, at DII Industries' or Federal-Mogul's reasonable request, affirmatively support either or both applications, provided no Party shall be required to support any portion of any application that is inconsistent with its rights or obligations under this Agreement.

D.      This Agreement shall be of no force or effect—other than with respect to provisions regarding efforts to obtain the DII Industries Approval Order and the Federal-Mogul Approval Order—unless and until the DII Industries Approval Order and the Federal-Mogul Approval Order (or other orders of the DII Industries Bankruptcy Court and/or the Federal-Mogul Bankruptcy Court that are the substantive equivalents of the DII Industries Approval Order and/or the Federal-Mogul Approval Order) are Final Orders.  In the event that the DII Industries Approval Order and the Federal-Mogul Approval Order (or other orders of the DII Industries Bankruptcy Court and/or the Federal-Mogul Bankruptcy Court that are the substantive equivalents of the DII Industries Approval Order and/or the Federal-Mogul Approval Order) are not Final orders by June 30, 2005, the Parties shall meet-and-confer to determine whether an

WDC - 02376/0166 - 2017031 v3

13

CW 01627

alternative approach can sufficiently protect each of their respective interests.  If the Parties do not agree on an acceptable alternative approach by July 31, 2005, this Agreement shall become null and void *ab initio*, unless extended by agreement of all the Parties.

VII.    Waiver of Rights.

In consideration of the various promises and agreements contained in this Agreement and without limiting any other provisions in this Agreement, including Section IV, or the Halliburton Settlement Agreement, the parties agree that:

A.    DII Industries waives any and all rights, if any, and shall have no rights to any of the limits of liability of the Subject Policies not partitioned to DII Industries.  Nothing in this Agreement, including this provision VII.A., however, shall be deemed to modify or limit any release provided by DII Industries to any Participating Carrier in connection with any other agreement.

B.    Federal-Mogul and Cooper waive their rights, if any, as follows: (i) individually and collectively, as to the fifty percent (50%) of the aggregate limits of liability of the Subject Policies allocated to DII Industries, (ii) individually, to receive more than fifty percent (50%) of any other limits of liability, if any, of any Subject Policy, and (iii) collectively, to receive more than fifty percent (50%) of any per occurrence limits of liability of any Subject Policy, solely in the event that claims submitted by both arise from a single occurrence.

C.    Taking into account pre-existing erosion, if any, that is to be allocated in accordance with Paragraph III.D. of this Agreement, the Participating Carriers, in accordance with Paragraph III.E. of this Agreement, waive any rights to argue and have no rights to argue that exhaustion of more than fifty percent (50%) of any applicable underlying limits of liability and fifty percent (50%) of any applicable self-insurance features is necessary to demonstrate the

CW 01628

appropriate exhaustion of the underlying limits of liability, as to DII Industries, on the one hand, or as to Federal-Mogul, Cooper and any other Person bound by a Consent Agreement or the Partitioning Provisions, on the other hand.

      D.    Notwithstanding the allocation of the limits of liability set forth in Section III. above, the unexhausted products limits of liability of the Underwriters at Lloyd's, London participation in policies numbered 564/UC0017 (01/01/71-11/15/73) and 564/UC0018 (01/01/71-11/15/73) (the "Underwriters' Limits") are allocated entirely to DII Industries; further, to the extent that Underwriters at Lloyd's, London pay to DII Industries the full amount of the Underwriters' Limits in accordance with the January 24, 2004 Settlement Agreement and Mutual Release by and between Halliburton Company, DII Industries, and certain Underwriters at Lloyd's, London, the Underwriters' Limits are and shall be, and shall be deemed to be, exhausted for all purposes. The non-products/non-completed operations limits of liability of the insurance policies identified in this paragraph are not affected by this paragraph.

      E.    DII Industries, Federal-Mogul and Cooper agree to enter into a setlement with North Star Reinsurance Corporation in relation to the insurance policy numbered NSX 8963 (for the period January 1, 1971 to January 1, 1973) issued to Studebaker-Worthington, Inc. calling for the payment of the remaining unexhausted products limits of liability of such insurance policy. DII Industries shall receive fifty percent (50%) of the proceeds from such settlement and Federal-Mogul and Cooper shall each receive twenty-five percent (25%) of the proceeds.

      F.    Cooper waives any rights it may have to the products/completed operations limits of liability, both any per occurrence limits and any aggregate limits, of any insurance policies issued to Federal-Mogul's predecessors prior to January 1, 1968, including,

CW 01629

without limitation, American Employers Ins. Co. policy no. A22-8299-001, but this waiver will not change, as between American Employers Ins. Co. (now One Beacon) and Federal-Mogul, the status of any prior payments, settlements or releases.

VIII.   Payments to Cooper.

In consideration of the agreements made by Cooper contained herein, DII Industries shall pay to Cooper the total amount of Forty-Six Million Dollars ($46,000,000). This amount shall be paid in three installments as follows:  (a) Sixteen Million Dollars ($16,000,000) on the Funding Date; (b) Fifteen Million Dollars ($15,000,000) on the first anniversary of the Funding Date; and (c) Fifteen Million Dollars ($15,000,000) on the second anniversary of the Funding Date.  DII Industries shall obtain from Halliburton Company a guaranty in favor of Cooper of the payments set forth in this paragraph in the form of the guaranty attached hereto as Attachment "D".  The failure to provide such guaranty shall void this Agreement as to all Parties.

IX.   Premiums and Other Fees.

The Parties agree that to the extent there are retrospective premiums, handling fees, taxes or any other fees due and owing as a result of any claim payments or claim handling arrangements, that such fees or taxes, if any, shall be charged exclusively and solely to the Non-Carrier Party or to the entity that received the claim payment or on whose behalf the claim was handled.

X.   Confidentiality.

A.   The Parties agree that all matters relating to the negotiation of this Agreement, but specifically excluding the Agreement itself, shall be confidential and are not to be disclosed to any third party, except (a) the Parties' accountants, auditors, lenders, employees or attorneys; (b) any other Person as required by operation of law or lawful subpoena or order of

CW 01630

court; (c) any governmental agency in connection with any reporting, disclosure, or other regulatory requirements; (d) in any proceeding to enforce the terms of this Agreement, subject to an appropriate form of confidentiality order; (e) any reinsurer, or reinsurer intermediary, of a Participating Carrier acting as such; or (f) as necessary to gain approval of the DII Industries Application or the Federal-Mogul Application.

B.    In the event that a private litigant, by way of document request, interrogatory, subpoena, or questioning at deposition or trial, attempts to compel disclosure of anything protected by Paragraph X.A. above, the Party from whom disclosure is sought shall object to providing the requested information on the ground that this Agreement prevents such disclosure. In the event that such private litigant seeks an order from any court or governmental body to compel such disclosure, or in the event that a court, government official, or governmental body (other than the Internal Revenue Service or Securities and Exchange Commission) requests or requires disclosure of anything protected by Paragraph X.A. above, the Party from whom disclosure is sought shall immediately give written notice by facsimile or hand-delivery to each other Party, and shall immediately provide copies of all notice papers, orders, requests or other documents in order to allow each Party to take such protective steps as may be appropriate. No Party shall be obligated, however, to take any such protective measure (but may do so at its sole discretion), other than objecting to any such initial request and providing notice to each other Party of any efforts to compel disclosure, as set forth above under this Paragraph X.B. Notice under this Paragraph X.B. shall be made to the Persons identified in Paragraph XVII. of this Agreement. All costs incurred by a Party in accordance with this provision shall be the sole responsibility of the Party incurring such costs.



CW 01631

C.    Material protected by this Paragraph X. shall be deemed to fall within the protection afforded to compromises and offers to compromise by Rule 408 of the Federal Rules of Evidence and similar provisions of state law or state rules of court.

XI.    Representations.

A.    Each of the signatories represents and warrants to each other signatory that: (a) it has the full right, power and authority to execute and deliver this Agreement on its own behalf and on behalf of its subsidiaries and corporate affiliates, and (b) this Agreement will, upon, execution and delivery, constitute a valid and binding agreement enforceable against it in accordance with it terms subject, however, to Section Paragraph VI.C. above. Further, each of the signatories, other than Cooper, represents and warrants to each other signatory (other than Cooper) that it has not assigned any of its rights, interests or causes of action relating to the Subject Policies to any other entity.

B.    Cooper represents and warrants that it has not transferred or assigned to its corporate parent any actual or alleged rights or interests under any of the Subject Policies.

XII.    Non-Prejudice and Construction of Agreement.

A.    This Agreement is the product of informed negotiations and involves compromises of the Parties' previously stated legal positions. Accordingly, this Agreement does not reflect upon the Parties' views as to rights and obligations with respect to matters or Persons outside the scope of this Agreement. This Agreement is without prejudice to positions taken by the Parties with regard to the Subject Policies. Except as specifically set forth herein, the Parties specifically disavow any intention to create rights in third parties under or in relation to this Agreement.



WDC - 02376A385 - 2017001 v3

18

CW 01632

B.    This Agreement is the jointly drafted product of arms-length negotiations among the Parties with the benefit of advice from counsel, and the Parties agree that it shall be so construed. As such, no Party will claim that any ambiguity in this Agreement shall, as a matter of law, be construed against any other Party.

XIII.   No Modification.

No change or modification of this Agreement shall be valid unless made in writing and signed by each of the Parties (or their attorney-in-fact) whose interests are affected by such change or modification.

XIV.   Integration.

This Agreement, including its Attachments, constitutes the entire agreement among the Parties with respect to the subject matters hereof, and supersedes all discussions, agreements and understandings, both written and oral, among the Parties with respect hereto.

XV.   Governing Law.

This Agreement shall be governed by, and shall be construed in accordance with, the laws of the state of New York without regard to its choice of law rules. The Parties' consent to the application of the laws of the state of New York to this Agreement does not constitute an admission by any Party or evidence that the laws of the state of New York apply to the Subject Policies or to any claims made thereunder, if any. Further, the presence of this provision in this Agreement shall not be used by any Party to advocate the application of New York law to the Subject Policies or to any claim made thereunder, if any.

CW 01633

XVI.   Counterparts.

This Agreement may be executed simultaneously in two or more counterparts, each of which so executed shall be deemed to be an original against the Party whose signature appears thereon, but all of which together shall constitute one and the same instrument.

XVII.   Notices.

Unless another Person is designated, in writing, for receipt of notices hereunder, notices to the respective Parties shall be sent to the following Persons:

DII Industries:

> Albert O. Cornelison, Esq.
> Executive Vice President and
> General Counsel
> Halliburton Company
> Five Houston Center
> 1401 McKinney, Suite 2404
> Houston, TX  77010

With a copy to:

> Michael G. Zanic, Esq.
> Kirkpatrick & Lockhart, LLP
> Henry W. Oliver Building
> 535 Smithfield Street
> Pittsburgh, PA  15222

Cooper:

> Diane K. Schumacher, Esq.
> Senior Vice President and General Counsel
> Cooper Industries, Inc.
> P.O. Box 4446
> Houston, TX 77210

With a copy to:

> Michael H. Ginsberg, Esq.
> Jones Day
> 500 Grant Street, Suite 3100
> Pittsburgh, PA 15219-2502

Federal-Mogul :

> David M. Sherbin
> Senior Vice President,  General Counsel &
> Corporate  Secretary
> Federal Mogul Corporation
> World Headquarters
> 26555 Northwestern Highway
> Southfield, MI  48034

20

CW 01634

With a copy to:

Bette M. Orr
Gilbert Heintz & Randolph LLP
1100 New York Avenue, NW
Suite 700
Washington, DC 20005

Insurance Counsel to
Federal-Mogul Asbestos
Claimants' Committee:

Robert M. Horkovich, Esq.
Anderson, Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY 10020

Participating Carriers:

As set forth on Attachment "B"

XVIII.  *Further Assurances.*

The Parties shall execute such further documents and agreements and to take or cause to be taken such further action as may from time to time be reasonably requested by a Party in order to more effectively carry out the intent and purposes of this Agreement. In amplification of the preceding, all Parties shall not assert or take any position(s) in any litigation, proceeding, arbitration or otherwise that is inconsistent with or contrary to the terms or intent of this Agreement and in any litigation concerning any of the Subject Policies to which a Party is a plaintiff or a defendant, each such Party shall affirmatively take positions that support and seek to implement the provisions to this Agreement, including, but not limited to, paragraphs III.A-G, V.D., and VII.A-E hereof. Further, the Parties agree that this Further Assurances provision is a material consideration to each of the Parties to enter this Agreement. Notwithstanding the foregoing, however, nothing in this Section XVIII, shall be deemed to require any Party, other than Cooper or Federal-Mogul, to defend the allocation between Cooper and Federal-Mogul of alleged rights to coverage under the Subject Policies set forth in Section XX below.

CW 01635

XIX. Successors and Assigns.

This Agreement shall inure to the benefit of and be binding on the Parties hereto and on their respective successors and assigns.

XX. Cooper/Federal-Mogul Allocation.

A. Except as provided in Section VII, and subject to Section IV and to any rights, if any, that any other Person has in such limits, the limits allocated to Federal-Mogul and Cooper shall be shared as follows:

1. For the five years from the date this Agreement becomes effective, Cooper and Federal-Mogul will share the remaining products liability/completed operations limits of the Subject Policies, except the CNA Policies, as defined, and those policies issued by Insolvent London-based Carriers and other insolvent insurers (subject to XX.A.7. below) (what Federal-Mogul and Cooper characterize as the "FM-Cooper Shared Products Limits"), for the payment of insured claims 50% to Federal-Mogul and 50% to Cooper, in the aggregate but not on a policy by policy basis.

2. After the expiration of five years from the date this Agreement becomes effective (5th Anniversary), the sharing percentages shall be calculated for the next five years as follows:

a. If, on or before the 5th Anniversary, Federal-Mogul has accessed the full amount of its 50% share and

i. Cooper has not accessed at least half of its 50% share of the FM-Cooper Shared Products Limits, twenty (20) percentage points of Cooper's share of the FM-Cooper Shared Products Limits shall be added to the Federal-Mogul share and

22

CW 01636

thereafter, the allocation of FM-Cooper Shared Products Limits shall be 70% to Federal-Mogul and 30% to Cooper; or

    ii.  Cooper has accessed at least half of its 50% share of the FM-Cooper Shared Products Limits, ten (10) percentage points of Cooper's share of the FM-Cooper Shared Products Limits shall be added to the Federal-Mogul share and thereafter, the allocation of FM-Cooper Shared Products Limits shall be 60% to Federal-Mogul and 40% to Cooper.

    b.  If, on or before the 5th Anniversary, Federal-Mogul has not accessed the full amount of its 50% share and Cooper has not accessed the full amount of its 50% share of the FM-Cooper Shared Products Limits, the period set forth in XX.A.1. above shall be extended for two years (the "First Add-on Period"). If, after the expiration of the First Add-on Period, Federal-Mogul has not accessed the full amount of its 50% share and Cooper has not accessed the full amount of its 50% share of the FM-Cooper Shared Products Limits, the period set forth in XX.A.1. above shall be extended again for another two years ("Second Add-on Period").

    3.  If paragraph XX.A.2.a. above has been the effective provision, after the expiration of ten years from the effective date (10th Anniversary), the sharing percentages for any remaining FM-Cooper Shared Products Limits shall be calculated thereafter as follows:

    a.  If, on or before the 10th Anniversary, Cooper has not accessed the full amount of its 30%, 40% or 50% share, as the case may be, of the FM-Cooper Shared Products Limits, any remaining Federal-Mogul share, as well as Cooper's remaining

WDC - 023764/0346 - 2017001 v5

23

CW 01637

share of the FM-Cooper Shared Products Limits shall be shared on a "first come, first served" basis, except as provided in paragraph XX.A.3.b. below.

b.    Federal-Mogul will not access the last 10% of the limits of the McGraw Edison Policies that are part of the FM-Cooper Shared Products Limits, that is 5% of the full limits of such McGraw Edison Policies, for a period of ten years from the 10th Anniversary.  Thereafter, any such limits which have not been accessed by Cooper shall be shared with Federal-Mogul on a "first come, first served" basis.

4.    If paragraph XX.A.2.b. above has been the effective provision,

a.    If, after the expiration of the First Add-on Period, Federal-Mogul has accessed the full amount of its 50% share and Cooper has not accessed the full amount of its 50% share of the FM-Cooper Shared Products Limits, then their respective shares shall be shifted to those set forth in paragraph XX.A.2.a. above until the 10th Anniversary and thereafter, as provided in XX.A.3. above, or

b.    If, after the expiration of the Second Add-on Period, Federal-Mogul has accessed the full amount of its 50% share and Cooper has not accessed the full amount of its 50% share of the FM-Cooper Shared Products Limits, then their respective shares shall be shifted to those set forth in paragraph XX.A.2.a. above until the 10th Anniversary and thereafter, pursuant to XX.A.3. above, or

c.    If, after the expiration of the Second Add-on Period, Federal-Mogul has not accessed the full amount of its 50% share of the FM-Cooper Shared Products Limits, the remaining FM-Cooper Shared Products Limits shall be shared as provided in paragraph XX.A.3. above, except that, wherever "10th Anniversary" appears in that paragraph, it shall be changed to the "expiration of the Second Add-on Period."

CW 01638

5.      Federal-Mogul and Cooper each shall have the right to make any settlement with a Participating Carrier, with the consent of the other, which consent shall not unreasonably be withheld. It shall not be unreasonable to withhold consent where the settlement impairs the ability of the other party to access its share of the remaining FM-Cooper Shared Products Limits because the settlement is for less than full policy limits. Federal-Mogul and Cooper shall (a) provide the other advance notice of imminent settlement negotiations and (b) execute consents or settlement agreements at the request of the other as may reasonably be required to effectuate this paragraph. Participating Carriers may enter into settlements directly with Federal-Mogul or Cooper notwithstanding the foregoing provisions of this paragraph 5 as between Federal-Mogul and Cooper.

6.      For the purposes of this subsection XX.A., to qualify as having "accessed" limits, Federal-Mogul and Cooper shall demonstrate to the other that it has (a) incurred liabilities, (b) in the case of the Federal-Mogul Asbestos Personal Injury Trust, liquidated claims, (c) submitted claims to insurers and/or (d) received payment from insurers, in each case on account of product liability or completed operations claims.

7.      With respect to Subject Policies issued by insolvent insurers, other than Insolvent London-based Carriers, Federal-Mogul and Cooper agree to share any recoveries in proportion to the pre-bar date claims submitted by each to the administrator of the estate in question; provided, however, that if the administrator expressly states that it is not making any allowance for a specific group of claims, the calculation of the proportion due Federal-Mogul and Cooper shall exclude those claims.

8.      In the event that a Person claiming to be insured under the Subject Policies, other than the Non-Carrier Parties, receives payment of claim(s) under the Subject

NDC - 023764346 - 2017004 v3                           25

CW 01639

Policies, the resulting exhaustion will be allocated between Federal-Mogul and Cooper on the same basis as their respective prescribed shares at the time the claim is paid by the insurance company.

9.      Federal-Mogul and Cooper shall keep all Participating Carriers reasonably informed of their respective consumption of what they refer to as the "FM-Cooper Shared Products Limits." If any Participating Carrier pays or fails to pay a claim based on erroneous information provided either by Federal-Mogul or Cooper of the amount of consumption, if any, of limits allocated to either, the remedy of the aggrieved Non-Carrier Party shall be solely against the Non-Carrier Party which provided the erroneous information. Paragraphs XX.A.1-8 shall not preclude carriers from settling claims with, or paying judgments obtained by, other Persons claiming rights under the "FM-Cooper Shared Products Limits."

10.      Cooper waives all rights to receive any portion of the share of the products/completed operation limits of liability allocated to Federal-Mogul and Cooper of the following Subject Policies issued by Continental Insurance Company: (i) No. L 130 71 52 (1/1/68-1/1/69), (ii) No. LX633 12-91 (1/1/68-1/1/71), (iii) L 143 87-70 (1/1/69-1/1/70), and (iv) L 164 85-50 (1/1/70-1/1/71) (the "CNA Policies").

WDC - 023764/0316 - 2017001 v3

CW 01640



**CAMPOS&STRATIS**
a professional association
CERTIFIED PUBLIC ACCOUNTANTS

310 Cedar Lane

Teaneck, New Jersey 07666

201/602-0300
Fax: 201/692-0722
212/285-1010

February 23, 2009

Jeffrey M. Wactlar
AIG Domestic Claims, Inc.
101 Hudson Street, 29th Floor
Jersey City, New Jersey 07302

Re:    Federal-Mogul/Wagner Settlement Payment Allocation
       Our File No. 17485

Dear Mr. Wactlar:

Please allow the following to serve as our report on the allocation methodology used for the Federal-Mogul/Wagner settlement payments.   The attached worksheets should serve as the allocation to all affected AIG policies for the initial $40M payout, and for the potential $32M additional future payout.

COVERAGE

We analyzed the coverage chart prepared by Bates White and a coverage spreadsheet prepared by The Brattle Group to determine which policies would be affected in a pro-rata allocation of $72M, according to their attachment points.  For many policies, The Brattle Group spreadsheet was somewhat vague regarding the attachment point, so we referred to the Bates White coverage chart to determine underlying limits.  We note that the coverage chart was a miniaturized version that did not always include policy limits, policy numbers, etc.  However, from these combined sources, we made our determination of the attachment point for each affected policy as shown on the attached worksheets.

PAYMENTS

Our allocation is based on four initial annual payments totaling $40M, which consists of three $10.5M payments followed by an $8.5M payment.  At your request, we also allocated four potential annual payments of $8M each, which may be due in the years 2014 through 2017 if Federal-Mogul's claims reach certain agreed upon amounts.

CW 01641

Mr. Wactlar
Page 2 of 2

**CAMPOS&STRATIS**

### ALLOCATION METHOD AND ASSUMPTIONS

After determining the attachments points of the AIG policies, we allocated the settlement payments on a pro-rata share basis to the layers of available coverage. We were provided with policy limits for "AIG Advocacy" on the coverage spreadsheet from The Brattle Group. We applied the "AIG Advocacy" policy limits rather than the policy limits set forth on the coverage chart. Please note that there are several policies with multi-year limits. For those policies, we applied the "AIG Advocacy" limit for each policy year in effect. We triggered only those policies whose underlying limits had been fully exhausted before accessing the next "layer" of coverage. Our analysis is attached.

Please contact me if you have any questions regarding this report or the attached spreadsheet.

Very truly yours,

CAMPOS & STRATIS

Lynn A. Mitchell, CPA

Enc.

CW 01642

# FEDERAL/AIU/WACHNER SETTLEMENT DRAFT PAYMENT ALLOCATION

| Insurer | Policy No. | Named Insured | Policy Start | Policy End | Layer Amount | Underlying | Policy Limits (AIG Amount) | Payment 1 | Payment 2 | Payment 3 | Payment 4 | Payment 5 | Payment 6 | Payment 7 | Payment 8 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oneida Ltd | (GLD ID-9485) 75-100032 | S-W, Inc. NY, NY | 1/1/1971 | 1/1/1974 | $10,000,000 | $1,500,000 | $1,250,000 | $1,250,000 | | | | | | | | $1,250,000 |
| AIU | 64-86-1065 | S-W, Inc. et al, NY, NY | 1/1/1978 | 2/1/1979 | $10,000,000 | $5,250,000 | $1,250,000 | | | | | | | | | $1,250,000 |
| Oneida Ltd | 64-81-2570 | No-E Illinois | 3/1/1981 | 3/1/1982 | $25,000,000 | $25,000,000 | $7,500,000 | | | | | | | | | $7,500,000 |
| Oneida Ltd | 64-81-2570 | No-E Illinois | 3/1/1981 | 3/1/1982 | $25,000,000 | $22,500,000 | $7,500,000 | | | | | | | | | $7,500,000 |
| Oneida Ltd | (675-7941) | No-E Illinois | 3/1/1982 | 3/1/1983 | $25,000,000 | $27,500,000 | $7,500,000 | | | | | | | | | $7,500,000 |
| Oneida Ltd | CB 181 061 | No-E Illinois | 1/1/1977 | 1/1/1978 | $10,000,000 | $25,000,000 | $7,500,000 | $2,111,111 | $1,363,634 | | | | | | | $7,500,000 |
| National Union | 1224612 | S-W, Inc. and Welsh/Jones, Inc. | 1/1/1977 | 3/1/1979 | $10,000,000 | $25,000,000 | $2,500,000 | $2,045,442 | $1,998,000 | $2,000,000 | | | | | | $5,000,000 |
| American Home | CE 555154 | S-W NY, NY | 1/1/1969 | 1/1/1975 | $5,000,000 | $36,500,000 | $2,500,000 | | $900,000 | $4,000,000 | | | | | | $7,500,000 |
| American Home Assurance | CE 555154 | S-W NY, NY | 2/1/1970 | 2/1/1972 | $5,000,000 | $38,500,000 | $2,500,000 | | | $900,000 | $1,600,000 | | | | | $5,000,000 |
| American Home | CE 555194 | S-W NY, NY | 2/1/1971 | 2/1/1972 | $5,000,000 | $34,185,000 | $2,500,000 | | | $2,500,000 | $1,000,000 | | | | | $5,000,000 |
| American Home | CE 649333 | S-W NY, NY | 2/1/1972 | 1/1/1973 | $5,000,000 | $32,185,000 | $2,500,000 | | | | $1,000,000 | | | | | $5,000,000 |
| American Home | CE 649333 | S-W NY, NY | 2/1/1972 | 1/1/1975 | $5,000,000 | $32,185,000 | $2,500,000 | | | | $1,000,000 | | | | | $5,000,000 |
| American Home | CB 649333 | S-W NY, NY | 1/1/1974 | 1/1/1975 | $5,000,000 | $28,295,000 | $2,500,000 | | | | $500,000 | $2,000,000 | | | | $2,500,000 |
| National Union | CB 101 391 | S-W, Inc. and Welsh/Jones, Inc. | 1/1/1991 | 1/1/1993 | $10,000,000 | $57,765,000 | $1,000,000 | | | $500,000 | $1,000,000 | | | | | $1,500,000 |
| National Union | CB 101 391 | S-W, Inc. and Welsh/Jones, Inc. | 1/1/1991 | 3/1/1993 | $10,000,000 | $24,745,000 | $5,000,000 | | | | $1,600,000 | $1,400,000 | $2,000,000 | | | $5,000,000 |
| AIU | 75-100024 | S-W, Inc. et al, NY, NY | 3/1/1979 | 2/1/1980 | $5,000,000 | $31,900,000 | $1,250,000 | | | | $1,600,000 | $2,400,000 | | | | $6,500,000 |
| National Union | 1221521 | S-W, Inc. et al, NY, NY | 3/1/1979 | 3/1/1980 | $10,000,000 | $56,000,000 | $2,500,000 | | | | | $1,300,000 | $1,200,000 | | | $2,500,000 |
| Lexington | QC 5590201 | S-W, Inc. NY, NY | 1/1/1974 | 1/1/1975 | $40,000,000 | $40,780,000 | $2,500,000 | | | | | | | $330,000 | $2,170,000 | $2,500,000 |
| Lexington | QC 5590201 | S-W, Inc. NY, NY | 1/1/1974 | 1/1/1975 | $40,000,000 | $40,780,000 | $2,500,000 | | | | | | | $2,170,000 | $330,000 | $2,500,000 |
| Lexington | QC 5590201 | S-W, Inc. NY, NY | 1/1/1977 | 1/1/1978 | $40,000,000 | $52,500,000 | $2,500,000 | | | | | | | | $345,391 | $345,391 |
| Lexington | QC 5590201 | S-W, Inc. NY, NY | 1/1/1974 | 1/1/1977 | $40,000,000 | $52,500,000 | $2,500,000 | | | | | | | | $345,391 | $345,391 |

Confidential. Prepared by Carpus & Jarvis

CW 01643

FEDERAL INSURANCE/WAGNER
SETTLEMENT PAYMENT ALLOCATION

| Insurer | Policy No. | Named Insured | Policy Start | Policy End | Layer Amount | Underlying (MR2 Amount) | Policy Limits (MR2 Amount) | Payment 1 | Payment 2 | Payment 3 | Payment 4 | Payment 5 | Payment 6 | Payment 7 | Payment 8 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Granite State | 5CLG 10-94844 | S.W. Bro. et al, NY, NY | 10/1/1974 | 10/1/1977 | $40,000,000 | $40,700,000 | $353,000 | | | | | | | | $143,115 | $143,115 |
| Lex. Co. of the State (?) | 4171-7235 | S.W. Bro. et al, NY, NY | 10/1/1974 | 10/1/1977 | $40,000,000 | $40,700,000 | $353,000 | | | | | | | | $143,115 | $143,115 |
| Granite State | 5CLG 10-94844 | S.W. Bro. et al, NY, NY | 1/1/1977 | 1/1/1978 | $40,000,000 | $40,700,000 | $220,000 | | | | | | | | $14,115 | $14,115 |
| AIU | 75-100054 | S.W. et al, NY, NY | 1/1/1978 | 1/1/1979 | $40,000,000 | $40,700,000 | $120,000 | | | | | | | | $1,099,000 | $1,099,000 |
| National Union | 1217442 | S.W. Inc., NY, NY | 1/1/1978 | 1/1/1978 | $40,000,000 | $40,700,000 | $1,190,000 | | | | | | | | $1,099,000 | $1,099,000 |
| TOTAL | | | | | | | $9,134,001 | $14,500,000 | $14,600,000 | $16,600,000 | $9,600,000 | $3,000,000 | $9,000,000 | $9,200,000 | $3,500,000 | $17,000,000 |

Confidential: Prepared by Campos & Stratis

2/26/2005

Page 2 of 2

CW 01644

SETTLEMENT AGREEMENT AND RELEASE AMONG

THE FEDERAL-MOGUL U.S. ASBESTOS PERSONAL INJURY TRUST,

REORGANIZED FEDERAL-MOGUL PRODUCTS, INC.,

COOPER INDUSTRIES, LLC, AIU INSURANCE COMPANY,

AMERICAN HOME ASSURANCE COMPANY,

AIG CASUALTY COMPANY
(f/k/a BIRMINGHAM FIRE INSURANCE COMPANY OF PENNSYLVANIA),

GRANITE STATE INSURANCE COMPANY,

INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA,

LEXINGTON INSURANCE COMPANY,

AIG EUROPE S.A (solely as successor in interest to
L'UNION ATLANTIQUE S.A. D'ASSURANCES),

AND

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

CW 01645

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (the "Agreement") is made by, between and among The Federal-Mogul U.S. Asbestos Personal Injury Trust (the "Trust," as further defined herein), Reorganized Federal-Mogul Products, Inc. ("Reorganized FMP," as further defined herein, Cooper Industries, LLC ("Cooper LLC"), AIU Insurance Company, American Home Assurance Company, AIG Casualty Company (f/k/a Birmingham Fire Insurance Company of Pennsylvania), Granite State Insurance Company, Insurance Company of the State of Pennsylvania, Lexington Insurance Company, AIG Europe S.A. (solely as successor in interest to L'Union Atlantique S.A. D'Assurances), and National Union Fire Insurance Company of Pittsburgh, PA (collectively, "the AIG Companies," as further defined herein). The Trust, Reorganized FMP, Cooper LLC, and the AIG Companies are each referred to herein as a "Party" and collectively as the "Parties."

### WITNESSETH THAT:

WHEREAS, the AIG Companies issued certain liability insurance policies to Studebaker-Worthington, Inc. ("Studebaker") and/or McGraw-Edison Company ("McGraw"), each an alleged former parent of Wagner Electric Corporation ("Wagner"), which policies are listed on Attachment A hereto (the "Subject Policies"); and

WHEREAS, numerous "Asbestos Claims" (as defined herein) may be asserted against the Trust pursuant to the "Fourth Amended Plan" (as defined herein), the "Confirmation Order" (as defined herein), the Federal-Mogul U.S. Asbestos Personal

2

CW 01646

Injury Trust Agreement, and the Federal-Mogul U.S. Asbestos Personal Injury Trust Distribution Procedures; and

WHEREAS, Cooper LLC also asserts rights in the Subject Policies as an alleged successor to Studebaker and McGraw; and

WHEREAS, on or about October 1, 2001, the "F-M Debtors" (as defined herein) commenced the Reorganization Cases; and

WHEREAS, on or about November 5, 2007, the F-M Debtors filed their Fourth Amended Joint Plan of Reorganization (as Modified) (the "Fourth Amended Plan") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"); and

WHEREAS, on or about November 8, 2007, the Bankruptcy Court entered an order confirming the Fourth Amended Plan, and on or about November 14, 2007 the United States District Court for the District of Delaware (the "District Court") affirmed the Bankruptcy Court's order confirming the Fourth Amended Plan;

WHEREAS, on or about December 27, 2007, the Plan Effective Date occurred;

WHEREAS, pursuant to the Fourth Amended Plan, the Trust was established and received, among other things, certain of Federal-Mogul Products, Inc.'s rights to the proceeds of the Subject Policies; and

WHEREAS, the Parties anticipate that numerous Asbestos Claims will be asserted against the Trust; and

WHEREAS, there are disputes among the Parties regarding their respective rights and obligations with respect to insurance coverage for Asbestos Claims under the Subject Policies (the "Coverage Dispute"); and

3

CW 01647

WHEREAS, Federal-Mogul Products, Inc. and the AIG Companies were parties to an adversary proceeding styled *DII Industries LLC (formerly Dresser Industries, Inc.) v. Federal-Mogul Products, Inc., et al.,* Adversary Proceeding No. 01-09018 that was pending in the District Court (the "Adversary Proceeding") until March 28, 2007, when United States District Judge Joseph H. Rodriguez entered an "Order Granting Certain Defendant Insurance Companies' Joint Motion to Abstain From Hearing Adversary Proceeding"; and

WHEREAS, in the Adversary Proceeding, Federal-Mogul Products, Inc. sought declaratory relief, actual compensatory and consequential damages, plus interest thereon, among other relief, and the AIG Companies denied that they owed any damages or relief as alleged and have defended against Federal-Mogul Products, Inc.'s claims in the Adversary Proceeding; and

WHEREAS, on September 19, 2006, Federal-Mogul Products, Inc. initiated an action against certain insurance companies, including certain of the AIG Companies, in the Superior Court of New Jersey styled Federal-Mogul Products, Inc. v. Ace Property & Casualty Ins. Co., et al., Docket No. L-002535-06 (Morris County) (the "New Jersey Coverage Action"); and

WHEREAS, on or about May 8, 2007, certain insurers, initiated an action against Federal-Mogul Corporation and Federal-Mogul Products, Inc., as well as other parties (including the AIG Companies), in the Supreme Court of the State of New York, New York County, styled *Ace Property and Casualty Insurance Company, et al. v. Federal-Mogul Corporation, et al.,* Index No. 07-601535 (the "New York Coverage Action"); and

WHEREAS, in consideration of certain monetary payments and other considerations, and subject to the terms of this Agreement, the Parties wish to enter into

4

CW 01648

this Agreement, as set forth below, to settle and resolve the Coverage Dispute as between them, to provide for mutual releases as detailed in Section 3 below, to provide for dismissals with prejudice of the New Jersey Coverage Action and the New York Coverage Action as between them, to provide for a permanent withdrawal of the AIG Companies' claims, objections and appeals, if any, as provided in Section 6.D below, to limit the AIG Companies' future actions in certain respects, as more fully set forth herein, and to resolve certain other matters, all as set forth below.

## AGREEMENTS:

NOW, THEREFORE, in full consideration of the foregoing and of the mutual agreements contained herein, and intending to be legally bound hereby, the Parties agree as follows:

1.   **Definitions**

For purposes of this Agreement and Attachment A hereto, the following definitions apply to the capitalized terms herein wherever those terms appear in this Agreement, including the prefatory paragraph, the recitals, the sections below and Attachment A hereto.  Capitalized terms in the prefatory paragraph, the recitals, the sections below and Attachment A hereto have the meanings ascribed to them therein to the extent they are not otherwise defined in this Definitions section.  Capitalized terms that are not defined in this Agreement are given the meanings designated in the Fourth Amended Plan, as constituted on the "Execution Date" (as defined herein).  Moreover, each defined term stated in the singular shall include the plural and each defined term stated in the plural shall include the singular, and each defined term stated in the

5

CW 01649

masculine form or in the feminine form or in the neuter form shall include all others. The word "including" means "including, but not limited to."

A.   <u>Agreement</u>:  The term "Agreement" means this Settlement Agreement and Release, as the same may be amended from time to time in writing in accordance with the provisions thereof.

B.   <u>AIG Companies</u>:  The term "AIG Companies" means AIU Insurance Company, American Home Assurance Company, AIG Casualty Company (f/k/a Birmingham Fire Insurance Company of Pennsylvania), Granite State Insurance Company, Insurance Company of the State of Pennsylvania, Lexington Insurance Company, AIG Europe S.A. (solely as successor in interest to L'Union Atlantique S.A. D'Assurances), and National Union Fire Insurance Company of Pittsburgh, PA, together with their respective (1) corporate predecessors; (2) current corporate parents, subsidiaries and the successors of such parents, subsidiaries and affiliates; and (3) as to the Entities identified in subsections 1.B(1) and (2) above, their respective current, former and future directors, members, officers, owners, shareholders, employees, agents, partners, representatives, adjusters, joint venturers, assigns,and attorneys (solely in their capacity as counsel for AIU Insurance Company, American Home Assurance Company, AIG Casualty Company (f/k/a Birmingham Fire Insurance Company of Pennsylvania), Granite State Insurance Company, Insurance Company of the State of Pennsylvania, Lexington Insurance Company, AIG Europe S.A. (solely as successor in interest to L'Union Atlantique S.A. D'Assurances), and National Union Fire Insurance Company of Pittsburgh, PA), and as to all of the foregoing in this Section 1.B, solely in their respective capacities as such as to this subsection 1.B(3).

8

CW 01650

C.    **Asbestos Claims**:  The term "Asbestos Claims" means the following:  (1) any and all past, present and future Claims, demands, actions, suits, proceedings, notices of partial or total responsibility, whether presently known or unknown, that seek compensatory, punitive or statutory damages, declaratory judgment, injunctive relief, medical monitoring, or any other form of relief whatsoever, on account of alleged bodily injury, personal injury, fear of future injury, medical monitoring, mental injury or anguish, emotional distress, shock, sickness, disease, loss of consortium, or any other illness or condition, death, property damage, loss of use of property, or diminution in the value of property, abatement or removal of asbestos or asbestos-containing products, arising from alleged, potential or actual exposure (or presence) of any type or nature whatsoever to asbestos, an asbestos-containing product, and/or any other substance, product, matter or material in any form or state that contains or is alleged to contain asbestos, either alone or in combination with any other substance; (2) Claims or suits alleging in whole or in part exposure to asbestos and/or asbestos containing products in addition to any other substance, chemical, pollutant, waste, or material of any nature; (3) Claims that involve, in whole or in part, alleged exposure to asbestos or asbestos containing products relating to or arising out of or from the packaging, handling, repairing, designing, use, marketing, installation, removal, manufacture, distribution, sale, re-sale, existence or presence (whether on premises owned or controlled by F-M Debtors or otherwise) of asbestos or an asbestos-containing product, either alone or in combination with any other substance; and (4) Asbestos Personal Injury Claims and Asbestos Property Damage Claims.

    D.    **Asbestos Products Claims**:  The term "Asbestos Products Claims" means those Asbestos Claims that fall within the scope of the terms "products hazard,"

CW 01651

"completed operations hazard," or "products liability," or their equivalents, contained or incorporated in the Subject Policies.

E.    <u>Business Day</u>:  The term "Business Day" means any day that is not a Saturday, a Sunday or a federal holiday in the United States of America.

F.    <u>Claim</u>:  The term "Claim" means any of the following:  (1) "Claim" as that term is defined in the United States Bankruptcy Code, 11 U.S.C. § 101(5), and specifically includes, without express or implied limitation, any rights under sections 502(g) or 502(h) of the Bankruptcy Code; (2) "Demand" as that term is defined in the United States Bankruptcy Code, 11 U.S.C. § 524(g)(5); (3) any claim of a derivative nature, any potential or unmatured contract claims, and any other contingent claim or (4) any claim, whether past, present or future, known or unknown, asserted or unasserted, foreseen or unforeseen, fixed or contingent, or direct or indirect, and whether in law, equity, admiralty or otherwise, including, without limitation, an Asbestos Claim. The term "Claim" further includes, without limitation, any claim (a) arising out of, related to, or in any manner involving asbestos or any other substance, product, matter or material in any form or state, any cumulative or other injury or damage, any activity, operation, premises, or exposure or any alleged bad faith, unfair claim practices, unfair trade practices, deceptive trade practices, insurance code violations, fraud, misrepresentation, alleged undertaking, duty or obligation, non-disclosure, breach of fiduciary duty, conspiracy, or extra-contractual or tort liability; (b) for any form of damages, punitive damages, indemnity or defense obligations, insurance premiums (whether retrospectively rated or otherwise), deductibles, self-insured retentions, costs, expenses, contribution or subrogation, and (c) for the loss of the loss

8

CW 01652

agreement, promise, representation or warranty; or (d) any direct action or statutory or regulatory right of action, assertion of right, complaint, cross-complaint, counterclaim, affirmative defense, writ, demand, inquiry, request, suit, lawsuit, liability, action, cause of action, administrative proceeding, governmental action, order, judgment, settlement, lien, loss, cost or expense.

G.    Confirmation Order:  The term "Confirmation Order" means the Order entered by the Bankruptcy Court on November 8, 2007 confirming the Fourth Amended Plan to the extent necessary for the Fourth Amended Plan to become effective.

H.    Cooper:  The term "Cooper" means (1) Cooper LLC; (2) each of Cooper LLC's parents, members, subsidiaries, divisions, holding companies, merged companies, acquired companies, partners, representatives and joint venturers, predecessors-in-interest, successors-in-interest and assigns, solely in their respective capacities as such; (3) each of the directors, members, owners, officers, shareholders, agents and employees of any of the foregoing, solely in their respective capacities as such; and (4) each of Cooper's attorneys and agents, solely in their respective capacities as such; *provided, however,* that, for purposes of and when used in subsection 3.C.1 only, as to each of the foregoing identified in subsections 1.H(2) through 1.H(4), only to the extent that Cooper LLC has the power and authority to grant the releases set forth in subsection 3.C.1 on their behalf.

I.    Court:  The term "Court" means, the Bankruptcy Court, the District Court supervising the Reorganization Cases, the Third Circuit Court of Appeals or the United States Supreme Court, as applicable.

9

CW 01653

J.   Execution Date:  The term "Execution Date" means the earliest date upon which all of the Parties (or their authorized representatives) have executed this Agreement.

K.   Final Order:  The term "Final Order" means an order as to which the time to appeal, petition for certiorari, or move for reargument, rehearing or reconsideration has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument, rehearing, or reconsideration shall then be pending or as to which any right to appeal, petition for certiorari, reargue, rehear or reconsider shall have been waived in writing by all Entities possessing such rights, or, in the event that an appeal, writ of certiorari, or reargument, rehearing or reconsideration thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or from which certiorari has been denied or reargument, rehearing or reconsideration was sought and denied, and the time to take any further appeal, petition for certiorari, or move for further reargument, rehearing or reconsideration shall have expired.

L.   F-M Debtors:  The term "F-M Debtors" means the Debtors and Debtors-In-Possession as defined in the Fourth Amended Plan.

M.   Fourth Payment Date:  The term "Fourth Payment Date" means the date three years (1,095 days) following the Initial Payment Date.   Should the Fourth Payment Date fall on a day other than a Business Day, then the Fourth Payment Date shall be the next Business Day.

N.   Initial Payment Date:  The term "Initial Payment Date" means the date fifteen Business Days following the d.      ... .. ... Trust provides written n

10

CW 01654

the AIG Companies that the Trigger Date has occurred, such written notice to be provided in accordance with Section 17 hereof.

O.    Injunction Date:  The term "Injunction Date" means the date on which the Injunction Order becomes a Final Order.

P.    Injunction Order:  The term "Injunction Order" means an order of the District Court providing that the AIG Companies are entitled to all of the rights and protections afforded to a Protected Party under the Plan, including the protection of an injunction under Section 524(g) of the Bankruptcy Code, which order shall be in a form and substance acceptable to the Trust, Cooper LLC, and the AIG Companies.

Q.    Liquidated Wagner Asbestos Claim:    The term "Liquidated Wagner Asbestos Claim" means a Wagner Asbestos Claim that has been (1) liquidated and allowed in an amount determined pursuant to the provisions of the Plan and the Federal-Mogul U.S. Asbestos Personal Injury Trust Distribution Procedures, as may be amended from time to time pursuant to its terms; and (2) qualified for payment under the terms of the Federal-Mogul U.S. Asbestos Personal Injury Trust Distribution Procedures, as may be amended from time to time pursuant to its terms.

R.    Person:  The term "Person" shall mean an individual, a corporation, a partnership, a joint venture, an association, a trust, any other Entity or organization, and any federal, state or local government or any governmental or quasi-governmental body or political subdivision or any agency, department, board or instrumentality thereof.

S.    Plan:  The term "Plan" means the Fourth Amended Plan and Plan Documents as such may be further m...... .......... ...:. .............. with the terms thereof; provided, however, that such modifications:

11

CW 01655

1.    are consistent with the terms of this Agreement;

2.    do not adversely affect the interests of the AIG Companies under this Agreement; and

3.    continue to provide for an injunction that is at least as broad and inclusive as the "Third Party Injunction" (as defined in the Fourth Amended Plan) that applies to Settling Asbestos Insurance Companies.

T.    <u>Products Claim</u>:  The term "Products Claim" means any Claim that falls within the scope of the terms "products hazard," "completed operations hazard," or "products liability," or their equivalents, contained or incorporated in the Subject Policies, including, without limitation, any Asbestos Products Claim.

U.    <u>Released Claims</u>:  The term "Released Claims" means the Claims released in Section 3 of this Agreement.

V.    <u>Reorganized F-M Corp.</u>:  The term "Reorganized F-M Corp." means Federal-Mogul Corporation as it exists following the Effective Date.

W.    <u>Reorganized FMP</u>:  The term "Reorganized FMP" means Federal-Mogul Products, Inc. as it exists following the Effective Date.

X.    <u>Second Payment Date</u>:  The term "Second Payment Date" means the date one year (365 days) following the Initial Payment Date.  Should the Second Payment Date fall on a day other than a Business Day, then the Second Payment Date shall be the next Business Day.

Y.    <u>Settlement Payments</u>:  The term "Settlement Payments" means the payments identified in and required pursuant to Section 2 below.

12

CW 01656

Z.   <u>Subject Policies</u>:  The term "Subject Policies" means:  (1) all known and unknown insurance policies issued by the AIG Companies to Studebaker and/or McGraw prior to 1987, including but not limited to the insurance policies at issue in the Adversary Proceeding, the New Jersey Coverage Action; and/or the New York Coverage Action, and/or that are identified in Attachment A hereto; and (2) any and all known and unknown insurance policies issued or allegedly issued by the AIG Companies to Federal-Mogul Products, Inc. prior to 1987; and (3) any and all known and unknown insurance policies issued or allegedly issued by the AIG Companies prior to 1987, which Reorganized FMP or any of the reorganized F-M Debtors, Cooper LLC, or the Trust claims or may claim provide coverage for "Wagner Claims" (as defined herein); *provided*, however, and subject to Section 18.C below, that policies issued to "Cooper Industries, Inc." as the first named insured or a named insured are not "Subject Policies."

AA.   <u>Third Payment Date</u>:  The term "Third Payment Date" means the date two years (730 days) following the Initial Payment Date.  Should the Third Payment Date fall on a day other than a Business Day, then the Third Payment Date shall be the next Business Day.

BB.   <u>Trigger Date</u>:  The term "Trigger Date" means the day on which written notice is transmitted to the AIG Companies in the manner set forth in Section 17 of this Agreement, stating that all of the following have occurred; *provided*, that all of the following have in fact occurred:

1.   the Injunction Order has become a Final Order, and

13

CW 01657

2.    the Injunction Order provides that, with respect to the Subject Policies, the AIG Companies are entitled to all the rights and protections afforded to a Protected Party under the under the Plan, including the protection of an injunction under Section 524(g) of the Bankruptcy Code.

CC.    <u>Trust</u>:    The term "Trust" means The Federal-Mogul U.S. Asbestos Personal Injury Trust established in accordance with the Fourth Amended Plan, the Confirmation Order, the Federal-Mogul U.S. Asbestos Personal Injury Trust Agreement, and the Federal-Mogul U.S. Asbestos Personal Injury Trust Distribution Procedures.

DD.    <u>Wagner Asbestos Claims</u>: The term "Wagner Asbestos Claims" means any and all Asbestos Claims arising or allegedly arising, directly or indirectly, from acts, omissions, business, or operations of Wagner.

EE.    <u>Wagner Claims</u>: The term "Wagner Claims" means Wagner Asbestos Claims and any and all Products Claims, arising or allegedly arising, directly or indirectly, from acts, omissions, business, or operations of Wagner.

2.    <u>Payment of the Settlement Amount</u>

A.    The AIG Companies shall make the following payments to the Trust:

1.    the AIG Companies shall pay the sum of Ten Million Five Hundred Thousand United States Dollars ($10,500,000.00) to the Trust on the Initial Payment Date;

2.    the AIG Companies shall pay an additional Ten Million Five Hundred Thousand United States Dollars ($10,500,000.00) to the Trust on or before the Second Payment Date;

14

CW 01658

3.   the AIG Companies shall pay an additional Ten Million Five Hundred Thousand United States Dollars ($10,500,000.00) to the Trust on or before the Third Payment Date; and

4.   the AIG Companies shall pay an additional Eight Million Five Hundred Thousand United States Dollars ($8,500,000.00) to the Trust on or before the Fourth Payment Date.

5.   Additional Payments

(a)   In addition to the payments set forth in subsections 2.A.1 through 2.A.4 above, in the event that the Trust incurs at least Eight Hundred Million United States Dollars ($800,000,000.00) in Liquidated Wagner Asbestos Claims, then the AIG Companies shall pay an additional Eight Million United States Dollars ($8,000,000.00) to the Trust within thirty (30) days of the date on which the Trust provides a summary of said incurred and liquidated amounts, together with written, certified notice to the AIG Companies stating that the Trust has incurred at least Eight Hundred Million United States Dollars ($800,000,000.00) in Liquidated Wagner Asbestos Claims, but in no event shall this payment become due or be made prior to May 15, 2014.

(b)   In addition to the payments set forth in subsections 2.A.1 through 2.A.5(a) above, in the event that the Trust incurs an additional Fifty Million United States Dollars ($50,000,000.00) or more in Liquidated Wagner Asbestos Claims, such that the value of all such Liquidated Wagner Asbestos Claims, in the aggregate, is at least Eight Hundred Fifty Million United States Dollars ($850,000,000.00), then the AIG Companies shall pay an additional Eight Million United States Dollars ($8,000,000.00) to the Trust within thirty (30) days of the date on

15

which the Trust provides a summary of said incurred and liquidated amounts, together with written, certified notice to the AIG Companies stating that the Trust has incurred an additional Fifty Million United States Dollars ($50,000,000.00) or more in Liquidated Wagner Asbestos Claims and that the value of all such Liquidated Wagner Asbestos Claims, in the aggregate, is at least Eight Hundred Fifty Million United States Dollars ($850,000,000.00); *provided, however,* that in no event shall this payment become due or be made prior to May 15, 2015.

(c)     In addition to the payments set forth in subsections 2.A.1 through 2.A.5(b) above, in the event that the Trust incurs an additional Fifty Million United States Dollars ($50,000,000.00) or more in Liquidated Wagner Asbestos Claims, such that the value of all such Liquidated Wagner Asbestos Claims, in the aggregate, is at least Nine Hundred Million United States Dollars ($900,000,000.00), then the AIG Companies shall pay an additional Eight Million United States Dollars ($8,000,000.00) to the Trust within thirty (30) days of the date on which the Trust provides a summary of said incurred and liquidated amounts, together with written, certified notice to the AIG Companies stating that the Trust has incurred an additional Fifty Million United States Dollars ($50,000,000.00) or more in Liquidated Wagner Asbestos Claims and that the value of all such Liquidated Wagner Asbestos Claims, in the aggregate, is at least Nine Hundred Million United States Dollars ($900,000,000.00); *provided, however,* that in no event shall this payment become due or be made prior to May 15, 2016.

(d)     In addition to the payments set forth in subsections 2.A.1 through 2.A.5(c) above, in the event that the Trust incurs an additional Fifty Million United States Dollars ($50,000,000.00) or more in Liquidated Wagner Asbestos

16

CW 01660

Claims, such that the value of all such Liquidated Wagner Asbestos Claims, in the aggregate, is at least Nine Hundred Fifty Million United States Dollars ($950,000,000.00), then the AIG Companies shall pay an additional Eight Million United States Dollars ($8,000,000.00) to the Trust within thirty (30) days of the date on which the Trust provides a summary of said incurred and liquidated amounts, together with written, certified notice to the AIG Companies stating the Trust has incurred an additional Fifty Million United States Dollars ($50,000,000.00) or more in Liquidated Wagner Asbestos Claims and that the value of all such Liquidated Wagner Asbestos Claims, in the aggregate, is at least at least Nine Hundred Fifty Million United States Dollars ($950,000,000.00), *provided, however,* that in no event shall this payment become due or be made prior to May 15, 2017.

B.    For the avoidance of doubt, the payments set forth in subsections 2.A.2 through 2.A.5 above shall become due only in the event the Trust first provides written notice to the AIG Companies that the Trigger Date has occurred, as contemplated by Section 2.A.1 above, such written notice to be provided in accordance with the provisions of Section 17 below.

C.    None of the Settlement Payments, or any part thereof, shall now or in the future be subject to retrospective premium charges, deductibles, charge backs, self-insured retentions, or any other setoff or adjustment of any type under the Subject Policies. The AIG Companies covenant, with respect to the Subject Policies and the Released Claims, not to sue the Trust, the reorganized F-M Debtors, including without limitation Reorganized FMP, or C..... for any ........ ..... ..... .. .... ..... deductibles, charge backs, self-insured retentions, or any other setoff or adjustment of

17

CW 01661

any type under, arising out of or relating to the Subject Policies, which they may have as a result of this Agreement.

D.    Each of the Parties may allocate the Settlement Payments among the Subject Policies as it sees fit, in its sole discretion, and no Party shall be bound by any other Party's allocation.

E.    Time is of the Essence

Time is of the essence with respect to the payment of the Settlement Payments and the entry of the dismissals identified in Section 4 below.

F.    Finality of Payment

Subject to the terms of Section 2.G below, any and all payments by the AIG Companies are deemed final and irrevocable payments upon the occurrence of the Trigger Date.

G.    Periodic Audits

After reasonable notice to the Trust, the AIG Companies will be entitled to carry out, at their sole expense, an audit of the notifications made by the Trust pursuant to Sections 2.A.5(a) through 2.A.5(d) in connection with Liquidated Wagner Asbestos Claims. The Trust will cooperate in good faith with such audit, which cooperation may include making reasonably available to the AIG Companies files, claim records and pertinent personnel, and receipts, statements of account, or other proof of Liquidated Wagner Asbestos Claims. Any and all audits conducted by or on behalf of the AIG Companies pursuant to this Section 2.G shall be subject to a confidentiality agreement good faith [illegible] commencement of any such audit.

18

CW 01662

3.    **Releases**

A.    Releases By the Trust

1.    Effective on the Trigger Date, the Trust shall be deemed to (and hereby does) remise, release, covenant not to sue and forever discharge the AIG Companies forever from and against any and all past, present, existing, potential or future obligations for any manner of action, causes of action, choses in action, administrative action or proceedings, defense, indemnity, claims of bad faith, arbitrations, mediations, suits, duties, debts, accounts, promises, warranties, damages (consequential, punitive or statutory), claims for extra-contractual damages, injuries, rights, agreements, requests for relief, costs, expenses, penalties, fees, sums of money, losses, liabilities, Claims or Demands of any kind, nature, character or description whatsoever, in law or in equity, whether presently known or unknown, asserted or unasserted, suspected or unsuspected, whether sounding in tort or contract, or arising under the statutes or administrative regulations of any jurisdiction, with respect to any and all past, present or future Claims of any type whatsoever that the Trust ever had, now has, or hereafter may have concerning:

(a)    Asbestos Claims, including Asbestos Products Claims, under, arising out of or relating to the Subject Policies;

(b)    Claims that were or could have been asserted in the Adversary Proceeding, the New Jersey Coverage Action, and/or the New York Coverage Action in connection with Asbestos Claims, including Asbestos Products Claims, under, arising out of or relating to the Subject P...

(c) ...   ...  ... alleg... ...... ...  ... ... ... ... ... tud tund) of any statute or reg...tion, including ...... ... ...tion ... ... ... Claim Practices

19

CW 01663

Acts or similar statutes of each of the fifty (50) states (where applicable) concerning, relating to and/or arising out of Asbestos Claims, including Asbestos Products Claims, under, arising out of or relating to the Subject Policies;

(d)   any negligent undertaking or alleged negligent undertaking by or on the part of the AIG Companies concerning, arising out of or relating to Asbestos Claims, including Asbestos Products Claims, under, arising out of or relating to the Subject Policies; or

(e)   any breach of contract, failure to abide by any duty or obligation, or fraud, misrepresentation, nondisclosure, misconduct or alleged bad-faith committed by the AIG Companies prior to the Execution Date concerning, relating to and/or arising out of Asbestos Claims, including Asbestos Products Claims, under, arising out of or relating to the Subject Policies.

2.   The occurrence of the Trigger Date shall be deemed by the Parties to terminate any and all obligations whatsoever of the AIG Companies to the Trust for the Released Claims delineated in this Section 3.A with respect to Asbestos Claims, including Asbestos Products Claims, under, arising out of or relating to the Subject Policies.

3.   In furtherance of its express intent to effect the releases contained in this Section 3.A, the Trust, as of the Trigger Date, expressly waives any and all rights it may have under any contract, statute, code, regulation, ordinance, or common law, that may limit or restrict the effect of a general release of any Claims not known to or suspect to exist in its favor at the time of the execution of this Agreement relating to and/or arising out of the Released Claims delineated in this Section 3.A. Without limiting the foregoing releases, the Trust acknowledges and agrees that the

20

CW 01664

AIG Companies shall have no further obligation whatsoever to the Trust to provide coverage, defense, indemnity and/or any further obligation whatsoever relating to, arising out of, and/or in connection with the Released Claims delineated in this Section 3.A. It is expressly agreed and understood that with respect to the Subject Policies, the Trust will not assert any other or further Claims whatsoever against the AIG Companies in connection with any liability that has arisen, or may arise in the future, out of the Released Claims delineated in this Section 3.A.

4.    Notwithstanding anything in this Agreement to the contrary, nothing in this Section 3.A shall be construed as releasing the AIG Companies from their obligations under this Agreement, including, without limitation, the obligation to pay in full the Settlement Payments pursuant to Section 2 above.

5.    THE TRUST ACKNOWLEDGES THAT IT HAS BEEN ADVISED BY ITS ATTORNEYS CONCERNING, AND IS FAMILIAR WITH, CALIFORNIA CIVIL CODE SECTION 1542 AND EXPRESSLY WAIVES ANY AND ALL RIGHTS UNDER CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES THAT "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR," AND UNDER ANY OTHER FEDERAL OR STATE STATUTE OR LAW OF SIMILAR EFFECT.

expressly assu...

matters, causes or things may have co...

...to exist, and hereby wai... the term...

21

CW 01665

common law that either: (i) narrowly construes releases purporting by their terms to release claims in whole or in part based upon, arising from, or related to such acts, omissions, matters, causes or things; or (ii) restricts or prohibits the releasing of such claims.

7.    It is the intention of the Trust to reserve no rights or benefits whatsoever in connection with the Released Claims delineated in this Section 3.A and to assure the AIG Companies their peace and freedom from all such Released Claims delineated in this Section 3.A.

8.    Nothing contained in this Section 3 or elsewhere in this Agreement or the Injunction Order shall release, and the Released Claims delineated in this Section 3.A do not include, any rights to coverage of, or any claims for coverage by, the Trust under, arising out of or relating to the limits applicable to non-Asbestos Claims under, arising out of or relating to the Subject Policies.  Likewise, it is agreed that the AIG Companies fully reserve their rights to dispute any possible claims to coverage that are not released by this Agreement.

B.    <u>Releases By Reorganized FMP</u>

1.    The Parties recognize and acknowledge that, as a result of the confirmation of the Fourth Amended Plan, Reorganized FMP does not have any liability for Asbestos Claims, including, without limitation, Asbestos Products Claims.

2.    Effective on the Trigger Date, Reorganized FMP shall be deemed to (and hereby does) remise, release, covenant not to sue and forever discharge the AIG Companies forever from and against a.... ....st, present, existing, r or future obligations for any manner of ........ .... .... action, choo.. .... ..., administrative action or proceedings, defense, indemnity, claims of bad f....,

22

CW 01666

arbitrations, mediations, suits, duties, debts, accounts, promises, warranties, damages (consequential, punitive or statutory), claims for extra-contractual damages, injuries, rights, agreements, requests for relief, costs, expenses, penalties, fees, sums of money, losses, liabilities, Claims or Demands of any kind, nature, character or description whatsoever, in law or in equity, whether presently known or unknown, asserted or unasserted, suspected or unsuspected, whether sounding in tort or contract, or arising under the statutes or administrative regulations of any jurisdiction, with respect to any and all past, present or future Claims of any type whatsoever that Reorganized FMP ever had, now has, or hereafter may have concerning:

(a)     Products Claims under, arising out of or relating to the Subject Policies.

(b)     Claims that were or could have been asserted in the Adversary Proceeding, the New Jersey Coverage Action, and/or the New York Coverage Action in connection with Products Claims under, arising out of or relating to the Subject Policies;

(c)     any violation or alleged violation (whether or not in bad faith) of any statute or regulation, including, without limitation, Unfair Claim Practices Acts or similar statutes of each of the fifty (50) states (where applicable) concerning, relating to and/or arising out of Products Claims under, arising out of or relating to the Subject Policies;

(d)     any negligent undertaking or alleged negligent undertaking ~~or on the part of the ~~ ~~ ~~ ~~ relation to~~ ~~Claims under, ~~ ~~to the Subject ~~ ~~ ~~

23

CW 01667

(e)     any breach of contract, failure to abide by any duty or obligation, fraud, misrepresentation, nondisclosure, misconduct or alleged bad-faith committed by the AIG Companies prior to the Execution Date concerning, relating to and/or arising out of Products Claims under, arising out of or relating to the Subject Policies.

3.      The occurrence of the Trigger Date shall be deemed by the Parties to terminate any and all obligations whatsoever of the AIG Companies to Reorganized FMP for the Released Claims delineated in this Section 3.B with respect to Products Claims under, arising out of or relating to the Subject Policies.

4.      In furtherance of its express intent to effect the releases contained in this Section 3.B, Reorganized FMP, as of the Trigger Date, expressly waives any and all rights it may have under any contract, statute, code, regulation, ordinance, or common law, that may limit or restrict the effect of a general release of any Claims not known to or suspected to exist in its favor at the time of the execution of this Agreement concerning, relating to and/or arising out of the Released Claims delineated in this Section 3.B. Without limiting the foregoing releases, Reorganized FMP acknowledges and agrees that the AIG Companies have no further obligation whatsoever to Reorganized FMP to provide coverage, defense, indemnity and/or any further obligation whatsoever relating to, arising out of, and/or in connection with the Released Claims delineated in this Section 3.B.  It is expressly agreed and understood that with respect to the Subject Policies, Reorganized FMP will not assert any other or further

e, out of the Re              ted in this Sect

3.B.

24

CW 01668

5.      REORGANIZED FMP ACKNOWLEDGES THAT IT HAS BEEN ADVISED BY ITS ATTORNEYS CONCERNING, AND IS FAMILIAR WITH, CALIFORNIA CIVIL CODE SECTION 1542 AND EXPRESSLY WAIVES ANY AND ALL RIGHTS UNDER CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES THAT "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR," AND UNDER ANY OTHER FEDERAL OR STATE STATUTE OR LAW OF SIMILAR EFFECT.

6.      Reorganized FMP expressly assumes the risk that acts, omissions, matters, causes or things may have occurred that it does not know or does not suspect to exist and hereby waives the terms and provisions of any statute, rule or doctrine of common law that either: (a) narrowly construes releases purporting by their terms to release claims in whole or in part based upon, arising from, or related to such acts, omissions, matters, causes or things; or (b) restricts or prohibits the releasing of such claims.

7.      It is the intention of Reorganized FMP to reserve no rights or benefits whatsoever in connection with the Released Claims delineated in this Section 3.B and to assure the AIG Companies their peace and freedom from all such Released Claims delineated in this Section 3.B.

25

CW 01669

C.    Releases by Cooper

1.    Effective on the Trigger Date, Cooper shall be deemed to (and hereby does) remise, release, covenant not to sue and forever discharge the AIG Companies from and against any and all past, present, existing, potential or future obligations for any manner of action, causes of action, choses in action, administrative action or proceedings, defense, indemnity, claims of bad faith, arbitrations, mediations, suits, duties, debts, accounts, promises, warranties, damages (consequential, punitive or statutory), claims for extra-contractual damages, injuries, rights, agreements, requests for relief, costs, expenses, penalties, fees, sums of money, losses, liabilities, Claims or Demands of any kind, nature, character or description whatsoever, in law or in equity, whether presently known or unknown, asserted or unasserted, suspected or unsuspected, whether sounding in tort or contract, or arising under the statutes or administrative regulations of any jurisdiction, with respect to any and all past, present or future Claims of any type whatsoever that Cooper ever had, now has, or hereafter may have concerning:

(a)    Products Claims under, arising out of or relating to the Subject Policies;

(b)    any violation or alleged violation (whether or not in bad faith) of any statute or regulation, including, without limitation, Unfair Claim Practices Acts or similar statutes of each of the fifty (50) states (where applicable) concerning, relating to and/or arising out of Products Claims under, arising out of or relating to the Subject Policies, and/or any disputes associated t... ...

26

CW 01670

(c)     any negligent undertaking or alleged negligent undertaking by or on the part of the AIG Companies relating to Products Claims under, arising out of or relating to the Subject Policies; or

(d)     any breach of contract, failure to abide by any duty or obligation, or other misconduct or alleged bad-faith committed by the AIG Companies prior to the Execution Date concerning, relating to and/or arising out of Products Claims under, arising out of or relating to the Subject Policies.

(e)     The occurrence of the Trigger Date shall be deemed by the Parties to terminate any and all obligations whatsoever of the AIG Companies to Cooper with respect to Products Claims under, arising out of or relating to the Subject Policies.

2.     In furtherance of its express intent to effect the releases contained in this Section 3.C, Cooper, as of the Trigger Date, expressly waives any and all rights it may have under any contract, statute, code, regulation, ordinance, or common law, that may limit or restrict the effect of a general release of any Claims not known to or suspected to exist in its favor at the time of the execution of this Agreement concerning, relating to and/or arising out of the Released Claims delineated in this Section 3.C. Without limiting the foregoing releases, Cooper acknowledges and agrees that the AIG Companies shall have no further obligation whatsoever to Cooper to provide coverage, defense, indemnity and/or any other benefits relating to, arising out of, and/or in connection with the Released Claims delineated in this Section 3.C. It is expressly agreed a. . . . . . . . . . . . .espe... . . . . . . . . . . . . will ass... . . other or further Claims whatsoever against the AIG Companies in conne... . . . . . . .

27

liability that has arisen or may arise in the future out of the Released Claims delineated in this Section 3.C.

3.      COOPER ACKNOWLEDGES THAT IT HAS BEEN ADVISED BY ITS ATTORNEYS CONCERNING, AND IS FAMILIAR WITH, CALIFORNIA CIVIL CODE SECTION 1542 AND EXPRESSLY WAIVES ANY AND ALL RIGHTS UNDER CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES THAT "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR," AND UNDER ANY OTHER FEDERAL OR STATE STATUTE OR LAW OF SIMILAR EFFECT.

4.      Cooper expressly assumes the risk that acts, omissions, matters, causes or things may have occurred that it does not know or does not suspect to exist and hereby waives the terms and provisions of any statute, rule or doctrine of common law that either: (a) narrowly construes releases purporting by their terms to release claims in whole or in part based upon, arising from, or related to such acts, omissions, matters, causes or things; or (b) restricts or prohibits the releasing of such claims.

5.      It is the intention of Cooper to reserve no rights or benefits whatsoever in connection with the Released Claims delineated in this Section 3.C and to assure the AIG Companies their peace and freedom from all such Released Claims delineated in this Section 3.C.

6.      Nothing contained in this Section 3.C.     where in this Agreem . . . or the Injunction Order shall release, and the Released Claims in this Section 3.C  .

28

CW 01672

not include, any rights to coverage of, or any claims for coverage by, Cooper under, arising out of or relating to the non-products/non-completed operations limits of the Subject Policies.

D.   Releases By the AIG Companies

1.   At the same time the releases delineated in Sections 3.A, 3.B and 3.C above become effective, and except as provided in Section 6.D below, the AIG Companies shall be deemed to (and hereby do) remise, release, covenant not to sue and forever discharge the Trust, Reorganized FMP and Cooper forever from and against any and all past, present, existing, potential or future obligations for any manner of action, causes of action, choses in action, administrative action or proceedings, claims of bad faith or reverse bad faith, arbitrations, mediations, suits, duties, debts, accounts, promises, warranties, damages (consequential, punitive or statutory), claims for extra-contractual damages, injuries, rights, agreements, requests for relief, costs, expenses, penalties, fees, sums of money, losses, liabilities, or Claims of any kind, nature, character or description whatsoever, in law or in equity, whether presently known or unknown, asserted or unasserted, suspected or unsuspected, whether sounding in tort or contract, or arising under the statutes or administrative regulations of any jurisdiction, arising out of, or in connection with or relating to:

(a)   as to the Trust only, (i) Asbestos Claims, including Asbestos Products Claims, under, arising out of or relating to the Subject Policies; and (ii) Claims that were or could have been asserted in the Adversary Proceeding, the New Jersey Coverage Action, and/or the New York Coverage Action in connection with Asbestos Claims, including Asbestos Products Claims, under, arising out of or relating to the Subject Policies;

29

CW 01673

       (b)    as to Reorganized FMP only, (i) Products Claims under, arising out of or relating to the Subject Policies; and (ii) Claims that were or could have been asserted in the Adversary Proceeding, the New Jersey Coverage Action, and/or the New York Coverage Action in connection with Asbestos Claims, including Asbestos Products Claims, under, arising out of or relating to the Subject Policies; and

       (c)    as to Cooper only, Products Claims under, arising out of or relating to the Subject Policies.

       2.    In furtherance of the AIG Companies' express intent to effect the releases contained in this Section 3.D, and except as provided in Section 6.D below:

       (a)    the AIG Companies, as of the Trigger Date, expressly waive any and all rights they may have under any contract, statute, code, regulation, ordinance, or common law, that may limit or restrict the effect of a general release of any Claims or Demands not known to or suspected to exist in their favor at the time of the execution of this Agreement concerning, relating to and/or arising out of the Released Claims delineated in this Section 3.D;

       (b)    without limiting the foregoing releases, the AIG Companies acknowledge and agree that the Trust (subject to the provisions of Section 2.F above), Reorganized FMP, and Cooper shall have no further obligations whatsoever to the AIG Companies relating to, arising out of, and/or in connection with the Released Claims applicable to each, as delineated in this Section 3.D;

       (c)    it is expressly agreed and understood that with respect to the Released Claims delineated in subsection 3.D.1.(c) above, the AIG Co . . . . . . . . . . . assert any oth . . . . . . . . . . . . me . . .

30

CW 01674

(d)   it is expressly agreed and understood that with respect to the Released Claims delineated in subsection 3.D.1.(b) above, the AIG Companies will not assert any other or further Claims whatsoever against Reorganized FMP; and

(e)   it is expressly agreed and understood that with respect to the Released Claims delineated in subsection 3.D.1.(c) above, the AIG Companies will not assert any other or further Claims whatsoever against Cooper.

3.   Notwithstanding anything to the contrary herein, nothing in this Section 3.D shall be construed as releasing the Trust, Reorganized FMP or Cooper from their respective obligations under this Agreement.

4.   THE AIG COMPANIES ACKNOWLEDGE THAT THEY HAVE BEEN ADVISED BY THEIR ATTORNEYS CONCERNING, AND ARE FAMILIAR WITH, CALIFORNIA CIVIL CODE SECTION 1542 AND EXPRESSLY WAIVE ANY AND ALL RIGHTS UNDER CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES THAT "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR," AND UNDER ANY OTHER FEDERAL OR STATE STATUTE OR LAW OF SIMILAR EFFECT.

5.   The AIG Companies expressly assume the risk that acts, omissions, matters, causes or things may have occurred that they do not know or do not suspect to exist and hereby waive the terms and provisions of any statute, rule or doctrine of . . . law . . . hen: (a) none . . . . . . . . terms to release claims in whole or in part based upon, arising from, or related to . . .

31

CW 01675

acts, omissions, matters, causes or things; or (b) restricts or prohibits the releasing of such claims.

6.      Except as set forth in Section 2.F as to the Trust only, it is the intention of the AIG Companies to reserve no rights or benefits whatsoever in connection with the Released Claims delineated in this Section 3.D and to ensure the Trust, Reorganized FMP and Cooper their peace and freedom from all such Released Claims delineated in this Section 3.D.

E.      Upon the Trigger Date, the Parties shall be bound by the releases delineated in this Section 3.

F.      Exhaustion/Impairment of Policy Limits

The occurrence of the Trigger Date shall be deemed by the Parties:

1.      as to the Trust and Reorganized FMP, to exhaust all limits of liability, including without limitation all occurrence and aggregate limits under the Subject Policies, except insofar as this Section 3 limits the extent of releases as to the Subject Policies.   If any Person thereafter inquires regarding the impairment or exhaustion of the limits of the Subject Policies, to the extent that such limits of liability are released pursuant to this Section 3, the Trust, Reorganized FMP, and the AIG Companies shall represent that all such limits of liability have been exhausted and are no longer available to the Trust and Reorganized FMP; and

2.      as to Cooper, to exhaust all limits of liability applicable to Products Claims under, arising out of or relating to the Subject Policies.  If any Person thereafter inquires regarding the impairment or exhaustion of the ... ... ... ... Cooper and the AIG Companies ... ... represent that ... ... ... ... ...

32

CW 01676

Products Claims under or in connection with the Subject Policies have been exhausted and are no longer available to Cooper.

4.   **Dismissal of Adversary Proceeding, New Jersey Coverage Action and New York Coverage Action**

A.   No later than ten (10) Business Days following the Trigger Date, Reorganized FMP and/or the Trust (as applicable) will dismiss with prejudice its Claims, counterclaims or cross-claims (if any) against the AIG Companies in the Adversary Proceeding, the New Jersey Coverage Action, and the New York Coverage Action, with respect to Released Claims. It shall not be a breach of this Agreement if Reorganized FMP and/or the Trust (as applicable) is unable to file a notice of dismissal with prejudice of its Claims, counterclaims or cross-claims (if any) with respect to Released Claims against the AIG Companies in the Adversary Proceeding because of the March 28, 2007 Order of the District Court abstaining from the Adversary Proceeding.

B.   No later than ten (10) days following the Trigger Date, the AIG Companies shall dismiss with prejudice their Claims, counterclaims or cross-claims (if any) against the Trust, Reorganized F-M Corp., Reorganized FMP, and Cooper in the Adversary Proceeding, the New Jersey Coverage Action, and the New York Coverage Action, (as applicable) with respect to Released Claims. It shall not be a breach of this Agreement if the AIG Companies are unable to file a notice of dismissal with prejudice of its Claims, counterclaims or cross-claims (if any) with respect to Released Claims against the Trust, Federal-Mogul Corporation, Federal-Mogul Products, Inc., Coop, in t Adversary Proceeding because of the March 28, 2007 Order of the Di

33

CW 01677

C.   The Parties shall bear their own costs, expenses, and counsel fees in the Adversary Proceeding, the New Jersey Coverage Action, and the New York Coverage Action.  Nothing herein shall prevent the Trust (as applicable), Reorganized F-M Corp., and/or Reorganized FMP from recovering their costs, expenses and counsel fees in the Adversary Proceeding, the New Jersey Coverage Action, and the New York Coverage Action from any Entity other than the AIG Companies.

5.   **Defense of the Third-Party Injunction**

A.   In the event that, following the Trigger Date, any Claim is brought against the AIG Companies that is subject to the Third Party Injunction, the Trust will exercise its reasonable best efforts (at its sole expense) to establish that such Claim is enjoined as to the AIG Companies by operation of the Third Party Injunction.  To that end, the Trust will, at its expense, defend the application of the Third Party Injunction as to any Claim asserted against the AIG Companies that is subject to the Third Party Injunction. The Trust shall not have any obligation to further defend or to indemnify any Claim that is not subject to the Third Party Injunction.

B.   Within fifteen (15) Business Days of the AIG Companies' receipt of any demand, notice, summons or other process in connection with any Claim that the AIG Companies reasonably believe is subject to the Third Party Injunction, the AIG Companies shall forward such demand, notice, summons or other process to the Trust. The Trust shall notify the AIG Companies in writing within fifteen (15) Business Days of its receipt of notice of such Claim from the AIG Companies whether the Trust agrees that such Claim is subject to the Trust's defense obligation

34

CW 01678

pursuant to Section 5.A above, the Trust and the AIG Companies shall meet and confer to attempt to resolve any such dispute. If the Trust and the AIG Companies are unable to resolve such dispute by meeting and conferring, they may litigate before the Bankruptcy Court (or, if the Bankruptcy Court refuses to exercise jurisdiction, before any court of competent jurisdiction) whether the Claim at issue triggers the Trust's obligations pursuant to Section 5.A above. While such dispute remains unresolved, the AIG Companies shall have the right to defend the Claim they contend is subject to the Third Party Injunction as they deem appropriate, but shall be entitled to reimbursement from the Trust of all reasonable expenses incurred by the AIG Companies in defending such Claim, in the event that the Bankruptcy Court, the District Court, or any court of competent jurisdiction later determines that the Claim at issue triggered the Trust's obligations pursuant to Section 5.A above. The AIG Companies shall cooperate reasonably with the Trust with respect to the obligations set forth in this Section 5.

6.    **Bankruptcy-Related Obligations**

A.    The Trust shall file, no later than ten (10) Business Days after the Execution Date, a motion seeking entry of the Injunction Order, which motion shall be in a form and in substance reasonably satisfactory to the AIG Companies (the "Motion"). The AIG Companies will reasonably support the Trust's efforts to obtain entry of the Injunction Order.

B.    Adequate notice of the Motion and of the hearing on the Motion shall be given by mailing a copy of the Motion and notice of the hearing on the Motion to: (i) counsel for the [illegible] Committees (to [illegible] Official [illegible]

35

CW 01679

11.7 of the Fourth Amended Plan; (2) counsel for the FCR; (3) all other Persons or Entities, including but not limited to Federal-Mogul Products, Inc.'s insurers, that, as of the date the Motion was filed, had filed a notice of appearance or other demand for service of papers in the Reorganization Cases; (4) Federal-Mogul Products, Inc.'s insurers that are or were parties to the Adversary Proceeding, the New York Coverage Action, and/or the New Jersey Coverage Action; and (5) any other presently existing Entities that are insureds or have claimed to be insureds under the Subject Policies, solely to the extent those Persons are known to the Trust.

C.      Subject to the provisions of subsections 6.F.1 and 6.F.2 below, immediately upon the Execution Date, unless and until this Agreement becomes null and void pursuant to its terms (if ever), the AIG Companies shall not actively assist or cooperate with any other party in connection with the Adversary Proceeding, the New York Coverage Action, the New Jersey Coverage Action or the appeal from the Bankruptcy Court appealing the Order of the Bankruptcy Court, entered on March 19, 2008 by Judge Judith K. Fitzgerald in bankruptcy case number 01BK10578 as it pertains to the Subject Policies (the "Bankruptcy Appeal"), except as to Claims not released under this Agreement, and only to the extent any such Claims may be involved in the Adversary Proceeding, the New York Coverage Action, the New Jersey Coverage Action or the Bankruptcy Appeal.

D.      Within two (2) days after the Trigger Date, unless and until this Agreement becomes null and void pursuant to its terms (if ever), the AIG Companies shall withdraw with prejudice

36

CW 01680

1.    their participation in any and all of the pending contested matters related in any way to the Reorganization Cases, the Adversary Proceeding, the New York Coverage Action, the New Jersey Coverage Action or the Bankruptcy Appeal, except as to Claims not released under this Agreement and only to the extent any such Claims may be involved in the Adversary Proceeding, the New York Coverage Action, the New Jersey Coverage Action or the Bankruptcy Appeal, and any related proceedings; and

2.    each of the proofs of claim set forth on Attachment B hereto to the extent that such proofs of claim relate to (a) Products Claims under, arising out of, or relating to the Subject Policies; and (b) Claims that were or could have been asserted in the Adversary Proceeding, the New Jersey Coverage Action, and/or the New York Coverage Action in connection with Asbestos Claims, including Asbestos Products Claims, under, arising out of or relating to the Subject Policies; *provided*, however, that such proofs of claim shall not be withdrawn to the extent they relate to matters other than those specified in clauses (a) and (b) above.

E.    The AIG Companies shall not assist or cooperate with any other party with respect to defenses or limitations to insurance coverage for Wagner Asbestos Claims asserted against any of the reorganized F-M Debtors, the Trust, or Cooper.

F.    Following the Trigger Date, the Trust and Cooper (but as to Cooper, only with respect to subsection 6.F.2 as it applies to the Adversary Proceeding, the New Jersey Coverage Action, the New York Coverage Action or the Bankruptcy Appeal) shall not:

37

1. serve any new discovery or pursue any existing discovery as to the AIG Companies pertaining to insurance coverage for the Released Claims; or

2. introduce evidence in any way related to the AIG Companies in the Adversary Proceeding, the New Jersey Coverage Action, the New York Coverage Action or the Bankruptcy Appeal; *provided, however,* that the Trust may introduce:

(a) with the consent of the AIG Companies, which consent shall not be withheld unreasonably, this Agreement and the Settlement Payments to be paid hereunder (i) for the purposes of effectuating insurance coverage from an insurer other than the AIG Companies, so long as not presented as any kind of admission by the AIG Companies that they, in fact, owed obligations under the Subject Policies; (ii) in connection with any claim for contribution, subrogation, indemnification, reimbursement or other similar claim asserted against the AIG Companies with respect to coverage for Wagner Claims; and/or (iii) for the purposes of demonstrating the exhaustion of the products/completed operations limits under the Subject Policies;

(b) the Subject Policies; and

(c) such portions of any documents or other materials that are not specific to the AIG Companies and that do not characterize any act, decision, obligation or position of the AIG Companies or characterize the terms and conditions of any of the Subject Policies.

G. The Trust shall not seek to terminate, reduce, or limit the scope of the Third Party Injunction with respect to the AIG Companies.

38

CW 01682

### 7.   Effectiveness Of Agreement And Voidability

A.     This Agreement is subject to the contingency set forth in this Section 7.A. If the Court does not enter an order that provides that the AIG Companies are entitled to the protections of the Third-Party Injunction, then any Party (other than Cooper) may declare this Agreement null and void by providing written notice to the other Parties in the manner provided in Section 17 below within sixty (60) days of the date on which such order becomes a Final Order, in which case, this Agreement shall terminate, subject to the provisions of Section 7.B below.

B.     Notwithstanding anything in this Agreement to the contrary, in the event this Agreement is declared by any Party (other than Cooper) to be null and void pursuant to this Section 7:

1.     this Agreement, other than Sections 1, 7, 12, 13, and 17 (which sections shall remain in full force and effect), shall be vitiated and shall be a nullity and shall be void *ab initio*;

2.     upon thirty (30) days prior written notice to the Trust (pursuant to Section 17 below), the portion of the Settlement Payments that were paid by the AIG Companies to the Trust pursuant to Section 2 above, if any, together with any accrued interest thereon, shall be re-paid by the Trust to the AIG Companies;

3.     the Parties shall not be bound by the terms of any Injunction Order;

4.     the AIG Companies shall not be entitled to all of the rights and protections afforded to a Protected Party under the Plan, including the protection of an injunction under Section 524(g) of the Bankruptcy Code;

39

CW 01683

5.    the Parties shall have all of the rights, defenses and obligations under or with respect to the Subject Policies that they would have had absent this Agreement;

6.    the releases provided in Section 3 above shall become null and void _ab initio_;

7.    to the extent that the AIG Companies could have participated in any pending contested matters described in Section 6 above, the Parties shall be free to pursue their claims against one another in the Adversary Proceeding, the New Jersey Coverage Action, the New York Coverage Action and/or the Bankruptcy Appeal; and

8.    any otherwise applicable statutes of limitations or repose, or other time-related limitations, shall be deemed to have been tolled for the period from the Execution Date through the date that this Agreement is declared null and void, and no Party shall assert, plead, raise or otherwise rely on or take advantage of, whether actively or passively, any time-related defense to any Claim by any other Party related to such period, and if any Party breaches this obligation, it shall be deemed to have created a new cause of action against it at the time of such breach for which it shall be liable in damages equal to the amount of damages it avoided by reason of the breach.

8.    **Judgment Reduction**

The Parties agree that, to the extent any other insurer has or may have a contribution, subrogation, indemnification, reimbursement or other similar claim against one or more of the AIG Companies in connection with coverage for Released Claims such other Insurer may assert such claim as a defense or offset against any claim for coverage for underlying Released Claims that Reorganized FMP (as to Products Claims,

40

CW 01684

only) and/or the Trust may assert against such Insurer (an "Asbestos Coverage Claim"). An insurer's contribution, subrogation, indemnification, reimbursement or other similar claim against the AIG Companies in connection with coverage for Released Claims shall be allowed as an offset against an Asbestos Coverage Claim to the same extent and in the same amount as such contribution, subrogation, indemnification, reimbursement or other similar claim would have been allowable against the AIG Companies (except in the event of any injunction that was granted in connection with the confirmation of the Fourth Amended Plan), and said insurer shall receive a dollar-for-dollar credit equal to the amount awarded to said insurer in connection with its contribution, subrogation, indemnification, reimbursement or other similar claim against the AIG Companies in connection with coverage for Released Claims (the "Contribution Award"); or alternatively, Reorganized FMP (as to Products Claims only) and/or the Trust shall reduce the amount of any final binding arbitration award or final judgment against, or settlement proceeds to be received by Reorganized FMP (as to Products Claims only) and/or the Trust from, such other insurer by the amount of any final binding arbitration award or final judgment against, or settlement proceeds to be received by, such other insurer in connection with its claim for contribution, subrogation, indemnification, reimbursement or other similar claim against the AIG Companies in connection with coverage for Released Claims. The AIG Companies shall not be subject to liability for any Contribution Award, and under no circumstances shall the AIG Companies be required to pay any additional amounts to another Insurer or the Trust as a result of or related to any Contribution Award. Reorganized FMP (as to Products Claims only) and the Trust shall cooperate with the AIG Companies in any action against the AIG Companies seeking contribution, subrogation, indemnification,

41

CW 01685

reimbursement or other similar payments with respect to any liability under the Subject Policies, to the extent such liability is released under this Agreement, by supporting any arguments advanced by the AIG Companies that their obligations with respect to such claims have been fully released, satisfied, and extinguished by this Agreement.

9.    **Assignment of Subrogation, Contribution and Reimbursement Rights Against Other Insurers**

Other than claims against the AIG Companies' reinsurers or retrocessionaires, the AIG Companies agree that they shall not seek reimbursement of any payments that they have made or are obligated to make under this Agreement or otherwise with respect to Released Claims, whether by way of a claim for contribution or subrogation, or otherwise, from any Entity other than the AIG Companies' reinsurers or retrocessionaires in their capacity as such. Reorganized FMP (as to Products Claims only) and the Trust shall use their reasonable best efforts to obtain from all insurers with which they settle an agreement similar to that set forth in the preceding sentence; *provided* that, notwithstanding anything to the contrary herein, the failure of Reorganized FMP and/or the Trust to obtain such an agreement from any other insurer with which they settle shall not constitute a breach of this Agreement. Notwithstanding the foregoing, subject to the effect of any injunction issued pursuant to section 524(g) of the Bankruptcy Code, the AIG Companies may file a cross-complaint or counterclaim against any Entity that has first asserted a claim seeking reimbursement for any payment that it has paid or is required to pay, whether by way of a claim for contribution and/or subrogation or otherwise, against the AIG Companies in connection with any Released Claims; *provided* that, to the extent the AIG Companies recover in respect of such cross-complaint or counterclaim from such third party, the recover

42

CW 01686

of such recovery shall be paid by the AIG Companies per the instruction of Reorganized FMP and/or the Trust (as applicable), after the AIG Companies are reimbursed from such proceeds for their reasonable fees, costs and expenses incurred in prosecuting and defending such claim and after crediting the AIG Companies for any amounts they may owe to such third parties as a result of the third parties' claims against the AIG Companies. For the avoidance of doubt, any payment of such proceeds per the instructions of Reorganized FMP and/or the Trust shall be in addition to, and shall not reduce or count towards the AIG Companies' obligation under this Agreement to pay, in full, the Settlement Payments pursuant to and in accordance with Section 2 above.

10.    **Cooperation**

A.    The AIG Companies shall use their reasonable best efforts to comply with reasonable requests from the Trust for claims payment records or policies issued by the AIG Companies required by the Trust in connection with any insurance claims, arbitrations, or litigations related to the Settlement Payments (or any portion thereof), this Agreement or the Asbestos Claims; *provided, however* that the Trust shall have no obligation to pay any internal costs of the AIG Companies including costs associated with time or expense of the AIG Companies, or any of its agents or employees.

B.    Reorganized FMP and the Trust shall use their reasonable best efforts to comply with reasonable requests from the AIG Companies for documents and other information required by the AIG Companies in connection with any reinsurance claims, arbitrations, or litigations relating to the Settlement Payments, this Agreement however that the AIG Companies shall have no obligation to pay any internal

43

CW 01687

Reorganized FMP and/or the Trust including costs associated with time or expense of Reorganized FMP and/or the Trust, or any of their agents or employees.

**11.    Reasonably Equivalent Value**

The Parties acknowledge and agree that:  (i) this Agreement was bargained for and entered into in good faith and as the result of arm's-length negotiations; and (ii) this Agreement is based on their respective independent assessments, with the assistance and advice of counsel, that the payments and other benefits to be received by the Parties pursuant to this Agreement constitute a fair and reasonable settlement of the Parties' claims against each other and constitute reasonably equivalent value for the releases, indemnity, and other benefits conveyed under this Agreement.

**12.    Confidentiality**

A.    Except as set forth in Section 12.B below, the Parties agree that all matters relating to the negotiation of this Agreement shall be confidential and are not to be disclosed except by order of a court of competent jurisdiction or by written agreement of the Parties.

B.    In the event that a private litigant, by way of document request, interrogatory, subpoena, or questioning at deposition, trial, or other proceeding attempts to compel disclosure of anything protected by this Section 12, the Party from whom disclosure is sought shall decline to provide the requested information on the ground that this Agreement prevents such disclo. . . . . . even that such . . . . . . . . . . from any court . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . Revenue S . . . . . . . . . . . and Exchan . . . . . . . . . . . . . . . . . . or

44

CW 01688

requires disclosure of anything protected by this Section 12, the Party from whom disclosure is sought shall immediately give written notice by facsimile or hand-delivery to the other Parties, and shall immediately provide copies of all notice papers, orders, requests or other documents in order to allow each Party to take such protective steps as may be appropriate. Notice under this Section 12 shall be made pursuant to Section 17 below.

C. All materials protected by this Section 12 shall be deemed to fall within the protection afforded to compromises and offers to compromise by Rule 408 of the Federal Rules of Evidence and similar provisions of state law or state rules of court.

D. Notwithstanding anything in this Section 12 to the contrary, nothing in this Agreement shall prevent any Party from disclosing or releasing this Agreement in any form and at any time after the Execution Date:

1. to reinsurers or retrocessionaires of the AIG Companies directly or through intermediaries;

2. to outside auditors, attorneys or accountants of any Party;

3. to the extent required by law, including, to the extent applicable, to the Internal Revenue Service, the Securities and Exchange Commission, or other U.S. or other governmental authority that properly requires disclosure by a Party hereto;

4. to the extent and in any form that such information is required to be disclosed or released to satisfy reporting requirements imposed by law including any

the entry of the Approbation Order.

45

E.   The Trust may file with the Court a copy of this Agreement, together with the Motion.

13.   **Non-Prejudice and Construction of Agreement**

A.   This Agreement is not a contract of Insurance, nor is this Agreement subject to rules of construction governing contracts of insurance, including without limitation, the doctrine of contra proferentum.  This Agreement and the payment hereunder are a compromise between the Parties and shall not be construed as an admission of coverage under the Subject Policies, nor shall this Agreement or any provision hereof be construed as a waiver, modification or retraction of the positions of the Parties with respect to the interpretation and application of the Subject Policies, recognizing that the Parties will now be legally bound to the terms of this Settlement Agreement.

B.   This Agreement is the product of informed negotiations and involves compromises of the Parties' previously stated legal positions.  Accordingly, this Agreement does not reflect upon the Parties' views as to rights and obligations with respect to matters or Persons outside the scope of this Agreement.  This Agreement is without prejudice to positions taken by the AIG Companies with regard to other insureds, and without prejudice to positions taken by the Trust with regard to other insurers.

C.   This Agreement is the jointly-drafted product of arms'-length negotiations between the Parties with the benefit of advice from counsel, and shall not be construed ... that ...

46

CW 01690

**14.**   **No Modification**

No change or modification of this Agreement shall be valid unless made in writing and signed by the Parties (or their attorney-in-fact) whose interests are affected by such change or modification.

**15.**   **Integration**

This Agreement, including Attachment A hereto, constitutes the entire agreement among the Parties with respect to the subject matter hereof, and supersedes all discussions, agreements and understandings, both written and oral, among the Parties with respect hereto.

**16.**   **Execution**

There will be multiple signed originals of this Agreement, which may be executed in multiple counterparts. Facsimiles or scanned versions of signatures by the Parties shall be treated as originals.

**17.**   **Notices**

Unless another person is designated, in writing, for receipt of notices hereunder, notices to the respective Parties shall be sent to the following Persons:

If to The Trust:

Kirk P. Watson Esq., Managing Trustee
c/o K&L Gates
111 Congress Avenue, Suite 900
Austin, TX 78701
Tel. (512) 482-6805
Fax (512) 482-6859
email kirk.watson@klgates.com

47

CW 01691

Edward D. Robertson Jr. Esq., Trustee
c/o Bartimus, Frickelton, Robertson & Gorny
11150 Overbrook Road, Suite 200
Leawood, KS  66211
Tel.  (913) 266-2300
Fax  (913) 266-2366
email chiprob@earthlink.net

and

Hon. Kenneth M. Kawaichi (Ret.), Trustee
c/o JAMS The Resolution Experts
100 Pringle Avenue, Suite 700
Walnut Creek, California  94596
Tel.  (925) 938-5060
Fax  (925) 938-6732
email kkawaichi@sbcglobal.net

With a copy (which shall        Stanley Levine, Esq.
not constitute notice for       Campbell & Levine LLC
purposes of this Agreement) to: 1700 Grant Building
                                Pittsburgh, PA 15219
                                Tel.  (412) 261-0310
                                Fax  (412) 261-5066
                                email sel@camlev.com

and

Bette M. Orr, Esq.
Gilbert Oshinsky LLP
1100 New York Avenue, NW, Suite 700
Washington, D.C.  20005
Tel. (202) 772-2323
Fax  (202) 772-2325

48

CW 01692

If to Cooper LLC:

Cooper Industries, LLC
Attn: General Counsel
600 Travis
Suite 5800
Houston, TX  77210-4446
Telephone: (713) 209-8407
Facsimile:  (713) 209-8989

With a copy (which shall
not constitute notice for
purposes of this Agreement) to:

Michael H. Ginsberg, Esq.
Jones Day
500 Grant Street
Pittsburgh, PA  15219
Telephone: (412) 394-7919
Facsimile:  (412) 394-7959

If to Reorganized FMP:

General Counsel
Federal-Mogul Corporation
26555 Northwestern Highway
Southfield, MI  48034
Telephone:  (248) 354-7700
Facsimile:  (248) 354-8950
email: Bobby.Katz@federalmogul.com

With a copy (which shall
not constitute notice for
purposes of this Agreement) to:

Kevin Lantry, Esq.
Sidley Austin Brown & Wood
555 West Fifth Street
Los Angeles, California  90013
Telephone:  (213) 896-6022
Facsimile:  (213) 896-6600
klantry@sidley.com

49

CW 01693

If to the AIG Companies:

Steven K. Parness
Assistant Vice President
AIG Domestic Claims, Inc.
101 Hudson Street
29th Floor
Jersey City NJ 07302
Telephone: (201) 631-7061
Facsimile: (201) 631-5005

With a copy (which shall
not constitute notice for
purposes of this Agreement) to:

Thomas G. Wilkinson, Esq.
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103
Telephone: (215) 665-2000
Facsimile: (215) 665-2013

and

James B. Dolan, Jr., Esq.
Cozen O'Connor
200 Four Falls Corporate Center, Suite 400
West Conshohocken, PA 19482-0800
Telephone: (610) 941-5400
Facsimile: (610) 941-0711

18.   **Representations and Warranties**

A.   The Trust represents and warrants that it has full authority to enter this Agreement as a binding and legal obligation of itself. The person signing this Agreement on behalf of the Trust rep_____ ___ warrants that he or sh___ _____ by th___ ____ _____ __ _____ __ ___ ___ ___ ___

50

CW 01694

B.    Subject to the last clause of Section 1.H above, Cooper LLC represents and warrants that it has full corporate authority to enter this Agreement as a binding and legal obligation of itself, including full authority to grant the releases set forth in Section 3.C as a binding and legal obligation of itself.  The person signing this Agreement on behalf of Cooper LLC represents and warrants that he or she is authorized by Cooper LLC to execute this Agreement as a binding and legal obligation of Cooper LLC as to the releases set forth in Section 3.C.

C.    Cooper represents and warrants that it is not seeking and will not seek coverage under insurance policies issued by the AIG Companies to Cooper Industries, Inc. for Wagner Claims and claims that are or could be asserted in the Adversary Proceeding, the New Jersey Coverage Action, and/or the New York Coverage Action. For the avoidance of doubt, this representation and warranty does not apply to insurance policies issued by the AIG Companies to McGraw, Studebaker, and/or any other predecessor or successor of Cooper Industries, Inc. and/or Cooper.

D.    Cooper represents and warrants that, as of the Execution Date, it is not aware of the existence of any Asbestos Claim asserted against it involving Wagner that falls outside the products hazard or completed operations hazard of the Subject Policies.

E.    Reorganized FMP represents and warrants that it has full authority to enter this Agreement as a binding and legal obligation of itself, including full authority to grant the releases set forth in Section 3.C, as a binding and legal oblig...

... ... ... ...

warrants that he or she is authorized ... ... ... ...

51

CW 01695

as a binding and legal obligation of Reorganized FMP as to the releases set forth in Section 3.B.

F.     The AIG Companies represent and warrant that they have full corporate authority to enter this Agreement as a binding and legal obligation of the AIG Companies including full authority to grant the releases set forth in Section 3.D as a binding and legal obligation of the AIG Companies.  The person signing this Agreement on behalf of the AIG Companies represents and warrants that he or she is authorized by the AIG Companies to execute this Agreement as a binding and legal obligation of the AIG Companies.

G.     Each Party represents and warrants that it has conducted a diligent search for copies or other evidence of the Subject Policies, and that, as of the Execution Date, it is not aware of any the existence of any liability insurance policies issued to Studebaker or McGraw and subscribed to by the AIG Companies other than the Subject Policies listed on Attachment A hereto.

19.     **Further Assurances**

Each Party shall use its best efforts to carry out the provisions of this Agreement and to consummate, perform, and make effective the settlement contemplated hereby.

20.     **Governing Law**

This Agreement shall be governed by, and shall be construed in accordance with, the laws of Delaware without regard to its choice of law rules.

CW 01696

12/29/08  14:33 FAX 512 482 8859          K&L GATES ·                    ☒002

IN WITNESS WHEREOF, the Parties have executed this Agreement by their duly authorized representatives.

FOR THE FEDERAL-MOGUL U.S. ABSESTOS PERSONAL INJURY TRUST

By: _Kirk Watson_

Name: _KIRK WATSON_

Title: _MANAGING TRUSTEE_

Date: _12/29/2008_

FOR REORGANIZED FEDERAL-MOGUL PRODUCTS, INC.

By: _____

Name: _____

Title: _____

Date: _____

FOR COOPER INDUSTRIES, LLC

By: _____

Name: _____

Title: _____

Date: _____

FOR AIU INSURANCE COMPANY, AMERICAN HOME ASSURANCE COMPANY, AIG CASUALTY COMPANY (f/k/a/ BIRMINGHAM FIRE INSURANCE COMPANY OF PENNSYLVANIA), GRANITE STATE INSURANCE COMPANY, INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, LEXINGTON INSURANCE COMPANY, AIG EUROPE S.A. (solely as successor in interest to L'UNION ATLANTIQUE S.A. D'ASSURANCES), AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

By: _____

Name: _____

Title: _____

Date: _____

CW 01697

IN WITNESS WHEREOF, the Parties have executed this Agreement by their duly authorized representatives.

FOR THE FEDERAL-MOGUL U.S.
ABSESTOS PERSONAL INJURY TRUST

By: _____

Name: _____

Title: _____

Date: _____

FOR REORGANIZED FEDERAL-MOGUL
PRODUCTS, INC.

By: _____

Name: Robert L. Katz

Title: General Counsel

Date: JAN | 5 | 2009

FOR COOPER INDUSTRIES, LLC

By: _____

Name: _____

Title: _____

Date: _____

FOR AIU INSURANCE COMPANY,
AMERICAN HOME ASSURANCE COMPANY,
AIG CASUALTY COMPANY (f/k/a/ BIRMINGHAM
FIRE INSURANCE COMPANY OF PENNSYLVANIA),
GRANITE STATE INSURANCE COMPANY,
INSURANCE COMPANY OF THE STATE OF
PENNSYLVANIA, LEXINGTON INSURANCE
COMPANY, AIG EUROPE S.A. (solely as successor
in interest to L'UNION ATLANTIQUE S.A.
D'ASSURANCES), AND NATIONAL UNION FIRE
INSURANCE COMPANY OF PITTSBURGH, PA

By: _____

Name: _____

Title: _____

Date: _____

53

CW 01698

IN WITNESS WHEREOF, the Parties have executed this Agreement by their duly authorized representatives.

FOR THE FEDERAL-MOGUL U.S.
ABSESTOS PERSONAL INJURY TRUST

By: _____

Name: _____

Title: _____

Date: _____


FOR REORGANIZED FEDERAL-MOGUL
PRODUCTS, INC.

By: _____

Name: _____

Title: _____

Date: _____


FOR COOPER INDUSTRIES, LLC

By: _~Bruce Taten~_

Name: _Bruce Taten_

Title: _Sr. V.P. + General Counsel_

Date: _12-3-08_


FOR AIU INSURANCE COMPANY,
AMERICAN HOME ASSURANCE COMPANY,
AIG CASUALTY COMPANY (f/k/a/ BIRMINGHAM
FIRE INSURANCE COMPANY OF PENNSYLVANIA),
GRANITE STATE INSURANCE COMPANY,
INSURANCE COMPANY OF THE STATE OF
PENNSYLVANIA, LEXINGTON INSURANCE
COMPANY, AIG EUROPE S.A (solely as successor
in interest to L'UNION ATLANTIQUE S.A.
D'ASSURANCES), AND NATIONAL UNION FIRE
INSURANCE COMPANY OF PITTSBURGH, PA

By: _____

Name: _____

Title: _____

Date: _____

53

CW 01699

IN WITNESS WHEREOF, the Parties have executed this Agreement by their duly authorized representatives.

| | |
|---|---|
| FOR THE FEDERAL-MOGUL U.S. ABSESTOS PERSONAL INJURY TRUST | FOR REORGANIZED FEDERAL-MOGUL PRODUCTS, INC. |
| By: _____ | By: _____ |
| Name: _____ | Name: _____ |
| Title: _____ | Title: _____ |
| Date: _____ | Date: _____ |

FOR COOPER INDUSTRIES, LLC

By: _____

Name: _____

Title: _____

Date: _____

FOR AIU INSURANCE COMPANY, AMERICAN HOME ASSURANCE COMPANY, AIG CASUALTY COMPANY (f/k/a/ BIRMINGHAM FIRE INSURANCE COMPANY OF PENNSYLVANIA), GRANITE STATE INSURANCE COMPANY, INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, LEXINGTON INSURANCE COMPANY, AIG EUROPE S.A. (solely as successor in interest to L'UNION ATLANTIQUE S.A. D'ASSURANCES), AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

By: _____

Name: _STEVEN K. FARNESI___

Title: _ASSISTANT VICE-PRESIDENT_

Date: _December 29, 2008_

53

CW 01700

## ATTACHMENT A
### SUBJECT POLICIES

| ORIGINAL ISSUING CARRIER | POLICY NUMBER | POLICY START DATE | POLICY END DATE |
|---|---|---|---|
| AIU Insurance Company | 75100055 | 1/1/1978 | 3/1/1979 |
| AIU Insurance Company | 75-100054 | 1/1/1978 | 3/1/1979 |
| AIU Insurance Company | 75 100053 | 1/1/1978 | 3/1/1979 |
| AIU Insurance Company | 75101026 | 3/1/1979 | 3/1/1980 |
| AIU Insurance Company | 75101027 | 3/1/1979 | 3/1/1980 |
| AIU Insurance Company | 75101028 | 3/1/1979 | 3/1/1980 |
| AIU Insurance Company | 75-100908 | 3/1/1982 | 3/1/1983 |
| AIU Insurance Company | 75-103524 | 3/1/1983 | 3/1/1984 |
| AIU Insurance Company | 75-103525 | 3/1/1983 | 3/1/1984 |
| AIU Insurance Company | 75-103591 | 3/1/1984 | 3/1/1985 |
| AIU Insurance Company | 75-103592 | 3/1/1984 | 3/1/1985 |
| AIU Insurance Company | 75-103656 | 3/1/1985 | 3/1/1986 |
| AIU Insurance Company | 75-103663 | 3/1/1985 | 3/1/1986 |
| American Home Assurance Company | CB-355594 | 3/21/1969 | 3/21/1972 |
| American Home Assurance Company | CB-2692335 | 3/21/1972 | 1/1/1975 |
| American Home Assurance Company (London) | 501/A7414904 | 10/1/1974 | 10/1/1977 |
| Birmingham Fire Insurance Company of Pennsylvania | SE6073331 | 1/1/1978 | 3/1/1979 |
| Birmingham Fire Insurance Company of Pennsylvania | SE 6073469 | 3/1/1979 | 3/1/1980 |
| Granite State Insurance Company | SCLD 80-94000 | 10/1/1976 | 1/1/1977 |
| Granite State Insurance Company | SCLD 80-94063 | 1/1/1977 | 1/1/1980 |
| Granite State Insurance Company | | 1/1/1977 | |
| Granite State Insurance Company | | 1980 | |

CW 01701

| ORIGINAL ISSUING CARRIER | POLICY NUMBER | POLICY START DATE | POLICY END DATE |
|---|---|---|---|
| Granite State Insurance Company | 6681-2370 | 3/1/1981 | 3/1/1982 |
| Granite State Insurance Company | 6681-2371 | 3/1/1981 | 3/1/1982 |
| Granite State Insurance Company | 6682-3216 | 3/1/1982 | 3/1/1983 |
| Granite State Insurance Company | 6682-3217 | 3/1/1982 | 3/1/1983 |
| Granite State Insurance Company | 6683-3982 | 3/1/1983 | 3/1/1984 |
| Granite State Insurance Company | 6683-3983 | 3/1/1983 | 3/1/1984 |
| Granite State Insurance Company | 6684-4637 | 3/1/1984 | 3/1/1985 |
| Granite State Insurance Company | 6685-5584 | 3/1/1985 | 3/1/1986 |
| The Insurance Company of the State of Pennsylvania | 41767295 | 10/1/1976 | 1/1/1977 |
| Lexington Insurance Company | GC5500201 | 10/1/1974 | 1/1/1977 |
| Lexington Insurance Company | 551 1459 | 5/15/1979 | 3/1/1980 |
| Lexington Insurance Company (London) | PY105379 | 5/16/1979 | 3/1/1980 |
| Lexington Insurance Company (London) | 543/55162/80 | 3/1/1980 | 3/1/1981 |
| Lexington Insurance Company (London) | 543/55163/80 | 3/1/1980 | 3/1/1981 |
| L'Union Atlantique S.A. D'Assurances (London) | 543/55162/80 | 3/1/1980 | 3/1/1981 |
| L'Union Atlantique S.A. D'Assurances (London) | 543/55162/80 | 3/1/1980 | 3/1/1981 |
| National Union Fire Insurance Company of Pi... | | ...78 | |
| National ... Company of Pittsburgh | | | 3 |

CW 01702

## ATTACHMENT B
## AIG COMPANIES' PROOFS OF CLAIM

| Claim Number | Debtor | Total Amount of Claim at Time Case Filed |
|---|---|---|
| 6638 | Federal-Mogul Piston Rings, Inc. | Unliquidated |
| 6639 | Federal-Mogul Corporation | Unliquidated |
| 6640 | Federal-Mogul Ignition Company | Unliquidated |
| 6641 | Federal-Mogul U.K. Holdings, Inc. | Unliquidated |
| 6642 | Federal-Mogul FX, Inc. | Unliquidated |
| 6643 | Federal-Mogul Machine Tool, Inc. | Unliquidated |
| 6644 | Ferodo America, Inc. | $1,335,000.00 |
| 6645 | Federal-Mogul Mystic, Inc. | Unliquidated |
| 6646 | Federal-Mogul Global Properties, Inc. | Unliquidated |
| 6647 | Federal-Mogul Venture Corporation | Unliquidated |
| 6648 | Federal-Mogul Puerto Rico, Inc. | Unliquidated |
| 6649 | Federal-Mogul Products, Inc. | Unliquidated |
| 6650 | Federal-Mogul Dutch Holdings | Unliquidated |
| 6651 | Federal-Mogul World Wide, Inc. | Unliquidated |
| 6652 | Federal-Mogul Global Inc. | Unliquidated |
| 6653 | McCord Sealing Inc. | Unliquidated |
| 6654 | J.W.J. Holdings | Unliquidated |
| 6655 | Federal-Mogul Powertrain, Inc. | Unliquidated |
| 6656 | Gasket Holdings Inc. | Unliquidated |
| 6657 | FM International LLC | Unliquidated |
| 6658 | Carter Automotive Company, Inc. | Unliquidated |
| 6659 | Felt Products Manufacturing Co. | Unliquidated |
| 6660 | T&N Industries Inc. | $94,203.00 |

CW 01703