UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                        :
GRANITE STATE INSURANCE CO.,            :
                                        :
                                        :
                                        :
          Plaintiff,                    :
                                        :          Before: Richard K. Eaton, Judge[*]
          v.                            :
                                        :          09 Civ. 10607 (RKE)
CLEARWATER INSURANCE CO.,               :
                                        :
                                        :
          Defendant.                    :
_____:


## OPINION

      Eaton, Judge:  This case involves an effort by plaintiff Granite State Insurance Company

("Granite State") to recover under certain facultative reinsurance[1] contracts entered into with

Skandia America Reinsurance Corporation, now known as Clearwater Insurance Company

---

     [*]     Judge Richard K. Eaton, of the United States Court of International Trade, sitting by designation.

     [1]     "Facultative reinsurance" is "policy specific.  This means that all or a portion of the reinsured's risk under one specific policy of original insurance is covered by the agreement." 1 COUCH ON INS., 3d Ed. § 9:3 (2012); *see also Travelers Cas. & Sur. Co. v. Gerling Global Reins. Corp. of Am.*, 419 F.3d 181, 184 n.3 (2d Cir. 2005) ("In facultative reinsurance, the reinsurer agrees to cover specific policies.  In treaty reinsurance, by contrast, the reinsurer agrees to cover all policies falling within a specified class of policies." (citation omitted)); *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 45 n.4 (2d Cir. 1993) ("'Facultative Reinsurance' . . . which involves the offer of a portion of a particular risk to one or more potential reinsurers, who are then free to accept or reject the risk in whole or in part . . . is distinguishable from 'treaty reinsurance,' which involves an ongoing agreement between two insurance companies binding one in advance to cede and the other to accept certain reinsurance business pursuant to its provisions." (citations and internal quotations marks omitted)).

("defendant" or "Clearwater").[2]  Plaintiff seeks money damages and a declaration that defendant is obligated to make future payments billed to it under the policies at issue.[3]  Before the court are the parties' cross-motions for summary judgment and cross-motions to strike.  The parties are citizens of different states, and the court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (2006).  Because Granite State failed to give Clearwater adequate notice of claims made under the policies, the court holds that Granite State is not entitled to recover under those policies.  Therefore, Granite State's motion for summary judgment is denied, and Clearwater's cross motion for summary judgment is granted.

FACTUAL BACKGROUND[4]

Clearwater's alleged reinsurance obligations to Granite State arise under two reinsurance policies (collectively, "the Granite State Policies").  Those policies reinsured Granite State's losses under two excess of loss policies issued by Granite State to McGraw Edison Company ("McGraw") in the early 1980s.

---

[2]  Over the course of the past several decades, the name of the defendant entity in this case has changed from Skandia America Reinsurance Corporation to Odyssey Reinsurance Corporation to Clearwater Insurance Company.  For clarity, the court will refer to the entity now named Clearwater Insurance Company as Clearwater, regardless of its operating name at the time of the events described in this opinion.

[3]  Plaintiff's Second Amended Complaint also contained two causes of action relating to alleged liability under a facultative certificate issued in connection with Colt Industries Inc.  These claims are neither the subject of any motion now before the court, nor were they briefed by the parties.  In response to an inquiry from the court, "[t]he parties jointly state[d] that" those causes of action "have been settled and should be dismissed."  Letter Signed by Matthew Lasky, Counsel to Granite State, July 15, 2013 (ECF Dkt. No. 106).

[4]  The court has taken the facts described below from the parties' Rule 56.1 statements.  Where only one party's Rule 56.1 statement is cited, the opposing party admits that fact, or the fact is supported by the record and the opposing party has offered no admissible evidence to controvert it.  Where no Rule 56.1 statement dealt directly with a fact, a citation to an uncontroverted portion of the record is provided.

2

*The Parties and Policies*

Granite State is a Pennsylvania corporation with its principal place of business in New York.  Pl.'s Statement of Undisputed Facts ¶ 1 ("Pl.'s 56.1").  Plaintiff is a subsidiary of American International Group, Inc. ("AIG"), which also has its principal place of business in New York.  Pl.'s 56.1 ¶ 2–3.

Granite State issued two excess of loss policies to McGraw.  Pl.'s 56.1 ¶ 11.  The first policy covered the period of March 1, 1980 to March 1, 1981 ("1980 Granite State Policy").  Pl.'s 56.1 ¶ 12.  The 1980 Granite State Policy provided excess coverage above the limits of the underlying insurance policies issued to McGraw by Northbrook Insurance Company and U.S. Fire Insurance Co. (collectively, "1980 Primary Underlying Policies").  Pl.'s 56.1 ¶¶ 12–13.  Specifically, under the 1980 McGraw Policy, if McGraw incurred liability between $25,000,000 and $50,000,000, Granite State would be required reimburse McGraw up to $10,000,000, depending on the total amount of McGraw's liability.  The second policy issued to McGraw covered the period of March 1, 1981 to March 1, 1982 ("1981 Granite State Policy").  Pl.'s 56.1 ¶ 14.  The 1981 Granite State Policy provided excess coverage above the limits of the underlying insurance policies issued to McGraw by First State Insurance Company and U.S. Fire Insurance Co. (collectively, "1981 Primary Underlying Policies").  Pl.'s 56.1 ¶¶ 14–15.  Specifically, under the 1981 McGraw Policy, if McGraw incurred liability between $25,000,000 and $50,000,000, Granite State would be required to reimburse McGraw up to $15,000,000, depending on the total amount of McGraw's liability.

C.V. Starr & Co. ("C.V. Starr") was an underwriting manager for Granite State and an AIG affiliate at the time the policies were issued.  Pl.'s 56.1 ¶¶ 6–7.  C.V. Starr issued the 1980

3

and 1981 Granite State Policies on behalf of Granite State through its office in Chicago, Illinois. Def.'s Statement of Undisputed Facts ¶ 3 ("Def.'s 56.1").

Clearwater is a Delaware company with its principal place of business in Connecticut. Pl.'s 56.1 ¶ 4. Clearwater issued, from its Chicago office, two facultative certificates to Granite State, reinsuring the 1980 Granite State Policy and the 1981 Granite State Policy ("the Clearwater Certificates" or "the certificates"). Pl.'s 56.1 ¶ 17. C.V. Starr procured those certificates for Granite State through its Chicago, Illinois office. Def.'s 56.1 ¶ 5. In each of the Clearwater Certificates, Clearwater agreed to provide reinsurance in an amount equal to 20% of Granite State's payments made under the 1980 and 1981 Granite State Policies, respectively. Pl.'s 56.1 ¶¶ 18, 19.

Each of the Clearwater Certificates contains the following identical General Conditions language:

3. *CLAIMS (a) [Granite State] agrees that it will promptly investigate and will settle or defend all claims under the policy reinsured hereunder and that it will notify [Clearwater] promptly of any event or development which [Granite State] reasonably believes might result in a claim against [Clearwater]. [Granite State] further agrees to forward to [Clearwater] copies of such pleadings and reports of investigations as are pertinent to the claim and/or as may be requested by [Clearwater];*

   *(b) [Clearwater] shall have the right at its own expense to be associated with [Granite State] in the defense or control of any claim, suit or proceeding involving or which may involve the reinsurance provided under this Certificate and [Granite State] and [Clearwater] agree to cooperate in every respect in the defense and control of such claim, suit or proceeding.*

   (c) Upon receipt by [Clearwater] of satisfactory evidence of payment of a loss for which reinsurance is provided hereunder, [Clearwater] shall promptly reimburse [Granite State] for its share of the loss and loss expenses . . .

   (d) The term "loss" shall mean only such amounts as are actually paid by [Granite State] in settlement of claims or in satisfaction of awards or judgments. The term "loss" shall not include loss expenses.

   (e) [Clearwater]'s liability for its proportion of a "loss" incurred by [Granite State] shall be determined as follows . . . (ii) if the reinsurance provided hereunder is on a pro rata basis, [Clearwater] shall be liable for the proportion of a "loss", after application of any reinsurance, excess or pro rata, inuring to the benefit of [Clearwater]. . . .

Both Granite State Policies, which are partially incorporated by reference into their

corresponding Clearwater Certificates, contain the following language:

> I.  COVERAGE
> [Granite State] agrees . . . to indemnify the [McGraw] for all sums which the
> [McGraw] shall be obligated to pay by reason of the liability (a) imposed upon the
> [McGraw] by law, or (b) assumed under contract or agreement by the [McGraw] . . .
> for damages, direct or consequential and expenses . . . arising out of the hazards
> covered by and as defined in the Underlying Umbrella Policies stated in item 2 of the
> Declarations . . .
>
> II.  LIMIT OF LIABILITY, UNDERLYING LIMITS
> It is expressly agreed that liability shall attach to the [Granite State] only after the
> Underlying Umbrella insurers have paid or have been held liable to pay the full
> amount of their respective ultimate net loss liability . . . .

As of 1979, McGraw had as direct or indirect subsidiaries, Studebaker-Worthington Co.

("SW"), Atlantic Locomotive Company ("ALCO"), and Wagner Electric ("Wagner").  Pl.'s 56.1

¶¶ 25–26; Def.'s 56.1 ¶ 27.  In 1984 and 1985, McGraw sold SW and ALCO to Dresser

Industries ("Dresser").  Def.'s 56.1 ¶ 28.  Cooper Industries purchased McGraw in 1985, thereby

also acquiring Wagner.  Def.'s 56.1 ¶ 26.  Wagner was then merged into Cooper's subsidiary

Moog Automotive, and in 1998 the merged company was sold to Federal Mogul Products

("Federal Mogul").  Def.'s 56.1 ¶ 26.

By 2001, Federal Mogul faced tens of thousands of asbestos bodily injury claims

resulting from products sold by McGraw and the McGraw subsidiaries it had acquired, and

thereafter, it began making coverage demands under potentially applicable policies, including,

but not limited to, the 1980 and 1981 Granite State Policies.  Def.' 56.1 ¶¶ 29, 31.  At around the

same time, Dresser also faced large potential liability, and made claims under the 1980 and 1981

Granite State Policies and others.  Def.'s 56.1 ¶¶ 32, 33.  Federal Mogul filed for bankruptcy

protection in 2001, and by 2003, Dresser had followed suit.  Def.'s 56.1 ¶¶ 30, 38.

Beginning in 2002, because of the large number of asbestos related claims being asserted against AIG subsidiary companies, AIG "centralized the claims handling and adjusting activities for all asbestos claims," including those asserted against Granite State, under one managerial group ("AIG Toxic Tort Group").  Decl. of Simon Yoon ¶ 7 (ECF Dkt. No. 48-11) ("Yoon Decl.").  Thus, despite being separate corporate entities, Granite State and multiple other AIG companies negotiated as one unit controlled by AIG and eventually entered into settlement agreements that treated them as one unit for purposes of payment.  *See* Dresser Settlement Agreement, Yoon Decl. at Ex. 9 (referring to Granite State and ten other entities collectively as the "AIG companies"); Federal Mogul Settlement Agreement, Decl. of Jeffrey Wactlar at Ex. 8 (ECF Dkt. No. 49-9) (referring to Granite State and seven other entities collectively as the "AIG Companies").

By the end of October 2003, declaratory judgment actions and bankruptcy proceedings making claims against Granite State and other AIG companies were in full swing and the AIG companies, Dresser, and Federal Mogul were involved in discussions, formal or informal, to resolve the coverage disputes.  Yoon Dep. 53:22–54:25, 57:19–60:9, Decl. of Stephen M. Kennedy at Ex. 5 (ECF Dkt. No. 65-5).  In 2004, Dresser and Federal Mogul agreed that they would evenly split the limits of the policies issued to McGraw by Granite State in a Partitioning Agreement.  Pl.'s 56.1 ¶ 27; Def.'s 56.1 ¶ 66.  In other words, Dresser and Federal Mogul agreed that each would be entitled to half of the available limits under each of the Granite State policies and other policies not at issue in this case.

*The Dresser Settlement*

At the time of Dresser's bankruptcy filing in 2003, the company estimated that its liabilities traceable to SW and ALCO would be at least $412,000,000.  Def.'s 56.1 ¶ 39.  The AIG Toxic Tort Group was "aware of the existence of potential coverage defenses," that might apply to individual policies, but "concluded that settlement was preferable to the risk of litigating policy-by-policy coverage defenses" and "that a settlement at a significant discount off of AIG's combined policy limits would be a very favorable result."  Yoon Decl. ¶ 21.

Granite State, the other AIG companies, and other unrelated insurance carriers,[5] against which Dresser had asserted claims, engaged NERA Economic Consulting ("NERA") to assist "in calculating the carriers' individual potential contributions to the various global settlement offers [that the group] made to Dresser."  Pl.'s 56.1 ¶ 31.  NERA modeled "exposure scenarios based on various combinations of criteria and assumptions proposed by the carriers, such as Dresser's potential liability, potential discount factors accounting for differing policy language which might support various coverage defenses, and alternative payout periods."  Yoon Decl. ¶ 24.  NERA produced a report that documented the amount each of the companies involved in the settlement negotiations, including the AIG companies and unaffiliated companies, "agreed to contribute to [a settlement] offer" made to Dresser.  Yoon Decl. ¶ 29.  The amounts, keyed to each policy in the table NERA generated, "reflect the exposure factors" NERA was engaged to analyze.  Yoon Decl. ¶ 29.  Thus, the table reflected the "potential liability, potential discount factors accounting for differing policy language which might support various coverage defenses, and alternative payout periods" available for each policy, including the sixty-three policies issued by AIG subsidiary companies.  Yoon Decl. ¶ 24.  The table indicated an exposure of

---

[5]       At this time, the AIG companies were negotiating as part of a larger group that included entities not affiliated with AIG.

$2,876,106 under the 1980 Granite State Policy and $4,390,560 under the 1981 Granite State Policy.  Yoon Decl. at Ex. 7.  These figures were well below the limits of the policies available to Dresser under the Partitioning Agreement ($5,000,000 and $7,500,000, respectively).  The NERA report, which was expressly not a "substantive coverage analysis," is nonetheless the only analysis of any kind on the record that indicates Granite State's *individual* potential liability to Dresser under the reinsured Granite State Policies.  Yoon Decl. ¶ 24.

Despite the policy by policy breakdowns in the NERA report, Granite State and the other AIG companies, did not "intend[] or expect[] that the documents generated by NERA would have any impact on AIG's internal allocation of the final loss amount agreed upon in settlement." Yoon Decl. ¶ 26.  Indeed, the expected contributions to the settlement offer of each of the AIG subsidiaries' policies were left blank in the NERA report, despite the inclusion of a liability estimate.  *See* Yoon Decl. at Ex. 7.  Therefore, Granite State and the other AIG companies adopted NERA's less-than-policy-limits estimated liability under the Granite State Policies for the purpose of settlement of the Dresser claims against AIG subsidiaries in the aggregate.  AIG did not intend the NERA report to establish the amounts Clearwater and the reinsurers of the policies issued by other AIG affiliates would be billed.  Yoon Decl. ¶ 26.

In 2004, after the AIG Toxic Tort Group, acting for Granite State and the other AIG companies, was not able to enter into a settlement with Dresser as part of the larger group of carriers that included companies not affiliated with AIG, the AIG Toxic Tort Group entered into a separate Settlement and Release Agreement with Dresser.  Pl.'s 56.1 ¶¶ 30, 32, 34, 36.  Under the terms of the Settlement Agreement, the AIG Toxic Tort Group was to cause a trust created and controlled by Lehman Brothers, Inc. ("Lehman") to pay Dresser $173,620,556 immediately. Dresser Settlement Agreement at Ex. 3, Yoon Decl. at Ex. 9.  In turn, Dresser assigned its

interest in the AIG policies to Lehman, to which Granite State and the other AIG Companies were required to make "a stream of payments" over a period of years amounting to $262,202,864 pursuant to a financing agreement.  Yoon Decl. ¶¶ 33, 34; Dresser Settlement Agreement at Ex. 3, Yoon Decl. at Ex. 9; Letter from Lehman Brothers to Christopher J. Eskeland, AIG Technical Services, Inc., Feb. 8, 2005, Yoon Decl. at Ex. 10 (detailing payment instructions).  The amount and terms of this latter set of payments "were negotiated and agreed entirely by and between the AIG companies and Lehman."  Def.'s 56.1 ¶ 60.  Obtaining the longest possible pay stream was one of AIG's primary considerations in the negotiation.  Yoon Dep. 131:11–131:17; Pl.'s Resp. to Def.'s 56.1 ¶ 59 (ECF Dkt. No. 79) (The Lehman "arrangement was the result of the AIG companies' informing Dresser that it would only agree to settlement with an extended payment stream.").

The Clearwater Certificates were not, however, assigned to Lehman and the Dresser Settlement and Financing agreements contained language indicating that Granite State and the other AIG companies would seek recovery from their reinsurers.  *See* Dresser Agreement 10, 14, 22 ("Notwithstanding any of the foregoing, however, nothing contained in this Section 3.1(E) shall limit the rights of the Participating Carriers to make reinsurance claims and pursue reinsurance recoveries. . . .[;] Indemnifying Policyholders shall have no indemnification obligation to any Released Carrier for . . . Claims for reinsurance. . . . [;] Nothing in this Agreement shall impact in any way the reinsurance rights of the Participating Carriers."); Financing Agreement, Yoon Decl. at Ex. 9B at 21, 23 ("The Releasing Policyholders shall use their reasonable best efforts to comply with reasonable requests from the AIG Companies for documents and other information required by the AIG Companies in connection with any reinsurance claims. . . . [;] Nothing in this agreement shall impact in any way the reinsurance

rights of the AIG companies."). Despite this language, Clearwater was neither a party to the Settlement and Financing agreements, nor was Clearwater a participant in their negotiation.

In March of 2005, "AIG began making quarterly payments" pursuant to the Settlement and Financing Agreements. Decl. of Leticia Diaz ¶ 11 (ECF Dkt. No. 47) ("Diaz Decl."). AIG would decide which policies issued by one of its subsidiaries, including Granite State, would be "required to make a payment in any given quarter, and then arrange[] for those payments to be processed." Diaz Decl. ¶ 9. Payments were made by an AIG affiliated corporate entity, that is not a party to this case, pursuant to a "pooling arrangement that was internally created by AIG for regulatory purposes." Decl. of Matthew Mansour ¶ 20 (ECF Dkt. No. 46) ("Mansour Decl."). Some of these payments were "attributable to the Granite State Policies" according to an allocation method determined exclusively by AIG. Diaz Decl. ¶ 14. There is no evidence on the record that Granite State, as a free-standing legal entity, has made any payments to Dresser, Lehman, or, for that matter, into a pooled fund. Rather, payments were made to Lehman from "pool accounts maintained in the name of" other AIG entities which were "periodically reconciled to assign debits and credits on a per policy basis" and "[a]s a result of this reconciliation process" certain payments "were charged to Granite State." Second Decl. of Matthew Mansour ¶ 6 (ECF Dkt. No. 82) ("Second Mansour Decl.").

*The Federal Mogul Settlement*

By 2004, Federal Mogul estimated that its accrued and potential liabilities arising from Wagner would range from $523,900,000 to $1,786,000,000. Pl.'s 56.1 ¶ 47. Granite State and other AIG companies, acting in concert through the AIG Toxic Tort Group, and a group of other insurers who were not affiliated with AIG, "participated in mediation concerning the underlying

Federal Mogul asbestos claims jointly with Federal Mogul's other insurers." Pl.'s 56.1 ¶ 48;
Def.'s Resp. to Pl.'s 56.1 ¶ 48 (ECF Dkt. No. 70). As with the Dresser claims, the AIG Toxic
Tort Group was "aware of the existence of potential coverage defenses" that might apply to
individual policies but "concluded that settlement was preferable to the risk of litigating policy-
by-policy coverage defenses" and "that a settlement that embodied a significant discount off of
the $121 million likely exposure would be a very favorable result." Wactlar Decl. ¶ 25.

  The unaffiliated insurers, the other AIG companies, and Granite State "retained the
Brattle Group ("Brattle") to assist the carriers in preparing calculations for the various global
settlement offers that were made to Federal Mogul." Pl.'s 56.1 ¶ 49. In 2005, Brattle prepared a
"Summary of Insurance Allocation Scenarios for Wagner Claims" as part of a document created
"to provide the parties with sufficient information to engage in meaningful settlement
negotiations" that was sent to counsel for the carriers. 2005 Brattle Report, Kennedy Decl. Ex.
38 (ECF Dkt. No. 65-40) ("Brattle Report"). Brattle's estimates factored "changing assumptions
includ[ing], but were not limited to, potential discount factors to account for differing policy
language which might support various coverage defenses." Wactlar Decl. ¶ 30. The 2005 report
gave a discount off the total amount of all combined policies of 13.6% for factors such as
"F[ederal] M[ogul] not named insureds," "Expected/intended," "Notice," "Corporate
successorship," "Non-disclosure/loss in progress," "other coverage issues." Brattle Report 11. It
gave a 5.5% discount for "Policies with non-cumulation/prior insurance clauses." *Id.* It then
allocated the amounts of potential liability across all the policies potentially exposed. This
estimate pegged the total anticipated liability for the 1980 Granite State Policy at $2,157,541 and
the 1981 Granite State Policy at $3,449,653. *Id.* at 4. As with the Dresser estimates created by

NERA, these figures were far below the limits available to Federal Mogul for each of the policies under the Partitioning Agreement.

Brattle was also not "ever asked or instructed . . . to perform a substantive coverage analysis.  Nor was Brattle asked to analyze the likely outcome of the coverage litigation or the likely contribution of each insurance policy to a litigated judgment.  The Brattle spreadsheets simply reflected Brattle's modeling of variables and scenarios . . . to assist the carriers in developing global settlement offers."  Wactlar Decl. ¶ 31.  Here, too, it was "never [AIG's] intention or expectation that the Brattle spreadsheets would have any impact on AIG's internal allocation of a settlement with Federal Mogul."  Wactlar Decl. ¶ 34.

Although settlement offers were made up through at least January 2006, Granite State, the AIG companies, and the non-AIG insurers were unable to settle their claims with Federal Mogul as one group.  Wactlar Decl. ¶ 35; Def.'s 56.1 ¶ 74.  In September 2006, Federal Mogul sued Granite State and others in New Jersey state court.  Def.'s 56.1 ¶ 76.

Following the commencement of the New Jersey lawsuit, Granite State and the other AIG companies entered into a Settlement Agreement with Federal Mogul in December 2008.  Pl.'s 56.1 ¶ 50; Def.'s Resp. to Pl.'s 56.1 ¶ 50.  Under the terms of that Settlement Agreement, Granite State and the other AIG companies collectively agreed to pay Federal Mogul $40,000,000 over a period of time, and up to an additional $32,000,000, "contingent upon whether certain claim thresholds were met"[6] in a settlement that covered forty-eight policies issued by AIG subsidiary companies.  Def.'s 56.1 ¶ 78; Federal Mogul Settlement Agreement, Attach. A.  Granite State

---

[6]     Under the terms of the agreement, the AIG companies were to make additional payments of $8,000,000 for each additional $50,000,000 in total liability accrued above $800,000,000.  Federal Mogul Settlement Agreement, Attach. A.

was not required to pay any specific amount or identified as individually liable for any amount under the Settlement Agreement.

The language of this Settlement Agreement also indicated that Granite State and the other AIG companies planned to seek recovery from their reinsurers. *See* Federal Mogul Settlement Agreement 45 ("[N]othing in this Agreement shall prevent any Party from disclosing or releasing this Agreement in any form and at any time after the Execution Date . . . to reinsurers or retrocessionaires of the AIG Companies."). As with the Dresser settlement, Clearwater was not a party to this Agreement or a participant in the settlement negotiations. The record also reflects that AIG employees were aware of reinsurance coverage issues related to the Federal Mogul settlement as early as 2006. *See* Yoon Dep. 178:1–181:3 (questioning an AIG employee regarding a handwritten note referencing reinsurance issues in a memo); Memo From the Desk of Simon Yoon, Kennedy Decl. at Ex. 28 (ECF Dkt. No. 65-30) (handwritten note dated "6/8/06" with the phrase "reinsurance issues" triple underlined).

In April of 2009, "AIG began making yearly payments" pursuant to the Federal Mogul Settlement Agreement. Diaz Decl. ¶ 19. AIG would decide which policies issued by one of its subsidiaries, including Granite State, would be were "supposed make a payment in any given year, and then arrange[] for those payments to be processed." Diaz Decl. ¶ 17. Granite State did not make payments directly to Federal Mogul, rather payments were made to the Federal Mogul Asbestos Trust by a different AIG affiliated corporate entity. Checks for Payments, Diaz Decl. at Ex. 5 (ECF Dkt. No. 47-5) (identifying the paying entities as "Insurance Company of the State of Pennsylvania" and "National Union Fire Insurance Co. of Pittsburgh."[7]). According to AIG, these payments were "attributable to the Granite State Policies" in accordance with AIG's

---

[7]     Neither of these companies issued the policies reinsured by the Clearwater Certificates, nor are they parties to this action.

allocation method.  Diaz Decl. ¶ 23.  The payments were made pursuant to a pooling

arrangement between AIG companies and although initially paid by other entities "were charged

to Granite State."  Second Mansour Decl. ¶ 6.  Other than the affidavits of AIG employees

Mansour and Diaz, which only indicate that Granite State was "charged," there is no evidence on

the record that Granite State, as a free-standing legal entity, has made any payments to Federal

Mogul or into a pooled fund for payment to Federal Mogul.


*Notice to Clearwater*

      Between 1982 and 1984, Granite State sent several communications to Clearwater

indicating that some of McGraw's subsidiaries had begun to have asbestos related claims made

against them, and that relatively small settlements were being made through the Primary

Underlying Policies (collectively the "1980s communications").  *See* Decl. of Matthew J. Lasky

at Ex. 12 (ECF Dkt. No. 50) ("Lasky Decl.") ("The indication thus far is that settlements, where

necessary, appear to involve a minimal contribution on behalf of our Insured.").  These

communications, transmitted with other more detailed memoranda attached, were all sent by

C.V. Starr's Chicago office to Clearwater's Chicago office.  *See* Letter from Jean M. Willig to

William T. Green, July 2, 1985, Lasky Decl. at Ex. 12 ("Notices of potential exposure arising out

of asbestos claims were originally sent to [Clearwater's] Chicago branch office and are now

being handled in the New York City office.").

      These 1980s communications, including the more detailed memoranda, did not indicate

that the open claims represented sufficient potential liability that their resolution was expected to

involve sums exceeding the lower limit of the Clearwater Certificates.  Clearwater nonetheless

showed some concern that it was possible that claims might reach those lower limits in the

indefinite future.  *See* Internal Clearwater Memorandum of Patrick J. McKell to Robert M.
O'Brien, May 5, 1982, Lasky Decl. at Ex. 13 ("At this point, we are not sure if any of these
claims will ever penetrate our layers, but because of the potential number of suits, we find it
necessary to make you aware of the situation.  We feel continued coverage at this time is in order
until more specific loss info is forthcoming and we can get a better feel toward a resolution.").
The latest dated correspondence in this series, received by Clearwater on February 28, 1984,
however, indicated that only $70,000 had been paid in settlement for Wagner's exposure, and
that sixty claims were pending against ALCO, for which a settlement offer representing at most
$105,000 in liability had recently been rejected by McGraw.  Mem. from Terri Mikkelsen, to
File, Feb. 23, 1984, Lasky Decl., at Exs. 12, 13 ("Several of these claims have been settled in the
area of $200–$500 each.  In many of the cases, there is no present evidence that the claimant has
actually contracted any asbestos-related disease.  One attorney representing the bulk of the
claimants has attempted to settle each case for approximately $1,750.00, but this settlement has
not been accepted by McGraw.").

On July 2, 1985, Clearwater sent a letter to C.V. Starr requesting information on "the
number of open and settled claims . . . the average settlement payment per claim and the incurred
status of the underlying aggregate limits."  *See* Letter from Jean M. Willig, to William T. Green,
July 2, 1985, Lasky Decl. at Ex. 12.  The record contains no communications from C.V. Starr or
Granite State to Clearwater responding to this request.  The record reflects that, for the next
twenty years (1985–2005), there is no indication that Granite State provided Clearwater with
information on the accumulating projected liability under the policies or about its settlement
negotiations with Dresser and Federal Mogul.

During the intervening period, Clearwater kept administrative track of the Clearwater Certificates. A "Preliminary Claims Notice" regarding the 1981 Clearwater Certificate was entered into Clearwater's filing system on June 8, 1994. That notice contains no particularized claims information, only the basic details of the policy. Moreover, in the "Ceding[8] Company Claim [Number]" field, it indicates "unknown." In other words, the document does not contain sufficient detail to indicate that Clearwater had received any information about any particular claims. *See* Preliminary Claims Notice, Lasky Decl. at Ex. 11. Indeed, although the creation of a preliminary claims notice would ordinarily have been done in response to a formal claim notice, the record reflects that it was not created for that reason here. *See* Dep. of Julie Tavernese 70:14–70:23, Kennedy Decl. at Ex. 8 ("Q. So is it fair to say . . . that when this form was created, a claim had come in? A. It's not fair to say that. Q. Why? A. Because if you look under the ceding company claim number, it says 'unknown.' And if it was a formal report, the ceding company claim number would be there.").

The record also contains screen-shots of Clearwater computer system "Claim" entries identifying the Clearwater policies. Clearwater Computer Screenshots, Lasky Decl. at Ex. 15. These entries, apparently created in 1994 and accessed to be printed in 2011, are also without particularized information regarding any claimed amounts. Indeed, the entries appear to have inaccurate information and blank fields. For example: the "In Suit" field indicates "N," presumably for no suit filed on the claims, and the "Our Last Correspondence Date" field is blank.

---

[8]   A ceding insurer is the party in a reinsurance contract that sells a portion of its interest in an underlying insurance contract in exchange for indemnification. Here, Granite State is the ceding insurer.

Finally, on August 30, 2005, after finalizing the Dresser settlement, the AIG Toxic Tort Group sent a letter to Clearwater, apparently in response to an inquiry made by Clearwater. Letter from Letiticia Diaz, AIG Toxic Tort Claims Department, to Michael Somma, Odyssey Reinsurance, Aug. 30, 2005, Kennedy Decl. at Ex. 11 (ECF Dkt. No. 65-11) ("Diaz 2005 Letter") ("This correspondence responds to your inquiry wherein you requested loss details and exhaustion of underlying limits."). This letter indicated that AIG expected that, as a result of the settlement, "the coverage beneath Lexington's policy 403143 will be exhausted by claim payments." [9] *Id.* Although it did not refer to any of the policies at issue in this litigation specifically, it included a memorandum dated June 10, 2005, providing a "to" field that reads "ALL INTERESTED REINSURERS," and indicated that an agreement with Dresser had been reached.

The status report also mentioned that Federal Mogul had acquired Wagner but made no mention of the then-pending Federal Mogul bankruptcy or ongoing mediation. *Id.*; Genereux Dep. 201:5–202:9, Kennedy Decl. at Ex. 3. Indeed, in its "PLAN OF ACTION" section it indicated only that AIG planned to "[c]ontinue to process scheduled payments via wire transfer in a timely fashion according to the terms of the [Dresser] settlement agreement." Diaz 2005 Letter. Notably, this "PLAN OF ACTION" failed to make mention that Federal Mogul had initiated ongoing bankruptcy proceedings and settlement talks of which Granite State was aware. *Id.* Put another way, the letter made no mention of the ongoing litigation and settlement talks with Federal Mogul which potentially involved the Clearwater Certificates.

---

[9]      "Lexington policy 403143" is another policy issued by an AIG subsidiary, Lexington Insurance Company, which was part of the Dresser settlement. That policy was not reinsured by the Clearwater Certificates and is not a subject of this lawsuit.

On April 16, 2008, Clearwater received a notice claiming coverage under the 1981 Clearwater Certificate. This notice came not from Granite State but from the Insurance Company of the State of Pennsylvania[10] and listed a date of loss of March 1, 1981 and a total amount due of $0.00. Decl. of Theresa A. Chavez at Ex. 2 (ECF Dkt. No. 68-2). The notice listed the policy terms as "20.0000% OF $3,759,398 IN EXCESS OF $0." The next notice to arrive came on February 17, 2009, when Clearwater received a notice pertaining to the 1980 Clearwater Policy. Chavez Decl. at Ex. 1. That notice, too, came from the Insurance Company of the State of Pennsylvania, but listed the date of loss as March 1, 1980 and also indicated an amount due of $0.00. Here, as before, the terms of the underlying policy were stated as "20.0000% OF $2,500,000 IN EXCESS OF $0." On April 14, 2009, AIG sent a letter to "All Interested Reinsurers" advising them that payments to be counted against six policies, including the Granite State Policies, were about to be made as part of the Federal Mogul settlement. Wactlar Decl. at Ex. 4. This letter was the first time any amount greater than zero was identified as specifically attributable to the Clearwater Certificates.

Thus, up to April 14, 2009, there is no indication on the record that a demand for payment was made or refused. Once claims were made, Clearwater refused to make payment and this litigation followed. Granite State also did not provide Clearwater with the estimates made by Brattle and NERA prior to discovery in this case. Def.'s 56.1 ¶ 88.

---

[10]    As noted, the Insurance Company of the State of Pennsylvania did not issue any underlying policy to the Clearwater Certificates and is not a party to this action.

DISCUSSION

I.     Summary Judgment Standard

A party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (quoting *Niagara Mohawk Power Corp. v. Hudson River–Black River Regulating Dist.*, 673 F.3d 84, 94 (2d Cir. 2012)).  In resolving a summary judgment motion, the court must construe "the evidence in the light most favorable to the nonmoving party and draw[] all reasonable inferences in [that party's] favor."  *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).

To successfully oppose a motion for summary judgment, the nonmoving party must identify probative evidence on the record which a reasonable fact-finder could rely upon to find in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986).  In other words, it must make a showing of sufficient record evidence of a "claimed factual dispute [which] require[s] a judge or jury's resolution of the parties' differing versions of the truth."  *See Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 468 (S.D.N.Y. 2011) (citation omitted).

II.    Motions to Strike

Clearwater asserts that the second declaration of Matthew Mansour, relied on by Granite State, should be stricken pursuant to Federal Rule of Civil Procedure 37(c)(1).  Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or harmless.").  According to

19

Clearwater, Granite State did not identify Mr. Mansour as someone who would have information as to the pooling arrangement between Granite State and the other AIG companies in its initial disclosures as required by Federal Rule of Civil Procedure 26(a)(1)(A).  Further, Clearwater insists that Granite State did not disclose, during discovery, any of the documents relating to the pooling arrangement about which Mansour testified in his declaration in violation of Federal Rules of Civil Procedure 26(e) and 34.  Thus, Clearwater asserts that Mr. Mansour's second declaration, "intended to prove that Granite State did in fact pay the amounts at issue," should be stricken.  Clearwater's Reply Mem. in Further Supp. of its Cross-Mot. for Summ. J. 8 (ECF Dkt. No. 85).

Granite State argues that Mansour's Second Declaration should not be stricken on the basis that it has not violated its discovery obligations and that, even if it had, the violations do not warrant striking the declaration.  Because the court finds that admission of the declaration is harmless, the motion to strike is denied.  Accordingly, the court does not reach the questions of whether a discovery violation has occurred or whether, had the evidence presented in the Second Mansour Declaration been material to the court's decision, that declaration should be stricken.

The purpose of the exclusionary rules are "to prevent the practice of 'sandbagging' an opposing party with new evidence." *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004) (citations omitted).  Nevertheless, courts in the Second Circuit recognize that preclusion of evidence "is a drastic remedy and should be exercised with discretion and caution." *Id*. (citations omitted).  Courts have allowed the admission of "harmless" evidence where there is "an absence of prejudice to the" complaining party. *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 159 (S.D.N.Y. 2012) (citation omitted).

20

The only issue to which the second Mansour declaration is potentially material is Clearwater's defense that Granite State has not "paid or been held liable to pay" the amounts for which it claims coverage.  According to Clearwater, paying or being held liable to pay those amounts is a condition precedent to coverage under the Clearwater Certificates.  Granite State relies on the second Mansour declaration to show that Granite State's participation a pooling arrangement with other AIG companies satisfies that condition.  As explained below, however, the lack of notice given to Clearwater provides a complete defense to liability.  Thus, the court does not reach the "paid or been held liable to pay" issue.  Accordingly, the evidence contained in the second Mansour declaration is not material to the outcome of the case and Clearwater suffers no prejudice from its admission.  Thus, because Clearwater suffers no prejudice, admission of the declaration is therefore harmless, and the motion to strike is denied.

For the same reason, the court denies Granite State's request that the Declaration of Richard Pluth be stricken.  *See* Pl.'s Mem. of Law in Opp'n to Def.'s Cross-Mot. and in Further Supp. of its Mot. 24–28 (ECF Dkt. No. 78).  The factual statements in Pluth's declaration are also only material to issues that the court does not reach.  In particular, the declaration bears on whether the Clearwater Certificates contain a "follow the fortunes" clause or a "follow the form" clause and whether coverage under the Clearwater Certificates is triggered by settlement for an amount lower than the attachment point of the Certificates, where the potential liability exceeded the attachment point.  *See* Decl. of Richard S. Pluth ¶¶ 10–18 (ECF Dkt. No. 67).  As noted, this case can be fully disposed of on the issue of notice.  Thus, the court does not reach the issue to which the Pluth declaration would be related, and its admission does not prejudice Granite State and is therefore harmless.  Accordingly, it will not be stricken.

III.    Choice of Law

The parties dispute whether Illinois Law or New York law properly governs the

Clearwater Certificates.  "A federal court sitting in diversity jurisdiction applies the choice of

law rules of the forum state."  *Forest Park Pictures v. Universal TV Network, Inc*., 683 F.3d 424,

433 (2d Cir. 2012) (citations omitted).  Because this Court sits in New York State, New York's

choice of law rules apply.[11]  The Clearwater Certificates do not contain a choice of law clause.

Def.'s 56.1 ¶ 22.  Under New York law, when a contract does not contain a choice of law clause

"[t]he first step . . . is to determine whether there is an actual conflict between the laws of the

jurisdictions involved."  In re *Allstate Ins. Co. (Stolarz)*, 613 N.E.2d 936, 937 (N.Y. 1993).  An

actual conflict between the laws of two jurisdictions exists when those laws differ in a relevant

way that may affect the disposition of the case.  *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special

Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005).  Even if the laws of the two jurisdictions differ in

ways potentially relevant to the dispute, however, if the outcome of the case can be determined

applying only laws that are not at odds and which evidence the same underlying public policy,

no conflict requiring the court to make a choice of law determination arises.  *Id.* ("[W]here the

court has determined that the result would be the same under either jurisdiction's law, it need not

decide which to apply." (citation omitted)); *Wall v. CSX Trasp., Inc.*, 471 F.3d 410, 415 (2d Cir.

2006) (finding no conflict where "the laws do not differ as they apply to the facts of [the] case").

Although the laws of New York and Illinois differ on the effects of notice provisions in

reinsurance contracts, each lead to the dismissal of plaintiff's claims on grounds related to the

faulty provision of notice provided by Granite State.  *See AIU Ins. Co. v. TIG Ins. Co.*, 934 F.

---

[11]    New York's choice of law rules do not always parallel those used by other states.
*See generally* Elie Salamon, Comment, *A Neu* Neumeier*: The Need for a More Flexible
Framework for Choice of Law in the State of New York*, 76 Alb. L. Rev. 1323 (2012/2013).

Supp. 2d 594, 604–09 (S.D.N.Y. 2013).  As a consequence, the court need not reach the second step of the choice of law analysis.

Because the court finds no conflict between New York and Illinois law, it also need not reach Granite State's argument that Clearwater is judicially estopped from asserting that Illinois law controls.  *See* Pl.'s Mem. in Supp. of Mot. 22–23 (ECF Dkt. No. 44).

IV.     Granite State's Notice Was Untimely Under Illinois Law and New York Law

     *A.  Illinois and New York Construe Reinsurance Contract Terms The Same Way*

Illinois and New York courts apply the same general rules to the interpretation of unambiguous reinsurance contracts.  Because the Clearwater Certificates are not ambiguous, their interpretation would be the same under either state's laws.

Illinois applies the ordinary rules of contract interpretation to contracts for reinsurance. *Allstate Ins. Co. v. Emp'r's Reinsurance Corp.*, 441 F. Supp. 2d 865, 870 (N.D. Ill. 2005).  Thus, in an Illinois reinsurance dispute, "the primary objective of a court" is to give effect to the intention of the parties as expressed in the language of the parties' agreement.  *Id*. (citing *American States Ins. Co. v. Koloms*, 687 N.E.2d 72 (Ill. 1997)); *Country Mutual Ins. Co. v. Livorsi Marine, Inc.*, 856 N.E.2d 338, 342 (Ill. 2006) ("When construing the language of an insurance policy, a court is to ascertain and give effect to the intentions of the parties as expressed by the words of the policy. . . construed as a whole, giving effect to every provision." (citations omitted)).  In other words, under Illinois law, unambiguous reinsurance policy provisions are construed according to their plain meaning, taken in the context of the entire policy.

New York also reads reinsurance agreements as contracts and a New York "court should construe [reinsurance] agreements so as to give full meaning and effect to the material provisions." *Excess Ins. Co. v. Factory Mutual Ins.*, 822 N.E.2d 768, 770–71 (N.Y. 2004) (citations omitted) ("[W]e are mindful that in interpreting reinsurance agreements, as with all contracts, the intention of the parties should control."). Thus, as with Illinois law, New York law construes unambiguous reinsurance contracts as written.

### B.   Construction of the Provisions Related to Notice

There are four unambiguous and interrelated contractual obligations relating to notice in the Clearwater Certificates.

First, Granite State was obligated to provide prompt notice to Clearwater under Section 3(a). Both Clearwater Certificates expressly require that Granite State "will notify [Clearwater] *promptly of any event or development* which [Granite State] reasonably believes might result in a claim against [Clearwater]." Both Illinois and New York courts construe "prompt notice" to require that notice be given "within a reasonable time" after the duty to give notice has arisen. *Country Mutual Ins. Co.*, 856 N.E.2d at 343; *Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.*, 979 F.2d 268, 275 (2d Cir. 1992) (observing that "prompt" notice "require[s] notice within a reasonable time after the duty to give notice has arisen" in New York (citation omitted)). The courts of both states have recognized that notice provisions in contracts for insurance are intended to afford the insurer the opportunity to protect itself. *See Mt. Hawley Ins. Co. v. Robinette Demolition, Inc.*, 994 N.E.2d 973, 978 (Ill. App. 1st Dist. July 26, 2013) ("The primary purpose of such a notice requirement is to enable the insurer to make a timely and thorough investigation of a claim and to protect itself against unjustifiable claims." (citation and

internal quotation marks omitted)); *American Transit Ins. Co. v. Sartor*, 814 N.E.2d 1189, 1191 (N.Y. 2004) (citation and internal quotation marks omitted) (holding that the purpose of notice of loss provisions are "to afford the insurer an opportunity to protect itself" (internal quotation marks and citations omitted)).  Thus, under either state's law, whether notice has been provided within a reasonable time in an insurance contract is determined in the context of whether the insurer was afforded the opportunity to protect itself.  Put another way, both Illinois and New York read prompt notice clauses to require that, for the notice provided to be reasonable, it must be provided at a time when the insurer can take action to protect itself from liability and preserve its other rights under the contract.

Language in Section 3(a) also makes it clear that the duty to give notice only arises when there has been an "*event or development* which [Granite State] *reasonably* believes might result in a *claim* against" Clearwater.  In other words, Granite State's obligation to give notice is not triggered until after an event or development that a reasonable person with Granite State's information would believe might result in a claim under the Clearwater Certificates. Accordingly, among other things, the Clearwater Certificates require that notice must be provided when there are sufficient facts to indicate a reasonable possibility that the value of claims made will exhaust the limits of the Primary Underlying Policies, thereby triggering Granite State's duty to insure McGraw.

In furtherance of the notice requirement, Granite State also agreed in Section 3(a) to provide litigation and investigatory materials for claims triggering the notice requirement and to supplement those documents at Clearwater's request.  In particular, Granite State "further agree[d] to forward to [Clearwater] copies of such pleadings and reports of investigations as are pertinent to the claim and/or as may be requested."  Thus, the language of the Clearwater

Certificates clearly contemplates that when a claim triggering the notice requirement arises, the notice provided will shortly be followed by underlying documentation relevant to the claim.

Section 3(b) of the Clearwater Certificates also unambiguously provides Clearwater with the related right to associate in the control, and thus the settlement, of claims that trigger the notice provision.  Specifically, that section permits Clearwater "to be associated with [Granite State] in the defense *or control of any claim*, suit or proceeding involving or which may involve the reinsurance provided under the Certificate."  Moreover, that provision required Granite State "to cooperate with [Clearwater] in every respect in the defense and *control* of such claim."  Accordingly, the Clearwater Certificates provided Clearwater with the right to both "associate with" Granite State regarding claims that trigger the notice requirement and, at its option, the right to participate in the "control" of the disposition of those claims, including their settlement.

Both Illinois and New York courts would consider the inclusion of a right to associate in an insurance contract to require that notice be provided prior to the resolution of the underlying claim.  The Seventh Circuit has found that, under Illinois law, where a reinsurance contract contained a right to associate, notice provided to the reinsurer after judgment was entered in the underlying action was untimely.  *Keehn v. Excess Ins. Co. of America*, 129 F.2d 503, 504 (7th Cir. 1942).  New York courts have held that even small delays that result in the loss of contractual rights render notice unreasonable and the court can find no instance where a New York court has held notice against a reinsurer after settlement of the underlying claim to be "prompt."  *See Pfeffer v. Harleysville Grp.*, 502 Fed. Appx. 28, 30 (2d Cir. 2012) (holding a one year delay to be unreasonable); *Esseks, Hefter & Angel v Gov't Emps. Ins. Co.*, 215 A.D.2d 430, 430 (N.Y. App. Div. 2d Dep't 1995) (holding a six month delay to be unreasonable); *Halstead Oil Co. v. N. Ins. Co.*, 178 A.D.2d 932 (N.Y. App. Div. 4th Dep't 1991) (holding a three year

delay to be unreasonable); *see Christiana*, 979 F.2d at 274 (observing that one of the "primary functions served by prompt notice to a reinsurer" is to permit it "to decide whether it wishes to exercise its right to associate in the defense of a particular claim").

That both New York and Illinois would so require is unsurprising, as failure to provide notice prior to the settlement of claims effectively renders an insurer's contractual right to associate a nullity. Thus, because the Clearwater Certificates provide Clearwater with rights of association and control of claims triggering the notice requirement, the Clearwater Certificates also require that notice be provided prior to the resolution of the claims triggering the policy.

Taken together, these four contractual provisions required (1) Granite State to provide notice to Clearwater within a reasonable time after a reasonable insurer in Granite State's position would have concluded that the Underlying Policies would be exhausted, and (2) that the notice provided contain enough information to permit Clearwater to decide either whether it desired to associate in the defense or settlement of the claim, or if it needed more information to make an informed choice.

### C.   *Granite State's Correspondence Prior to Settlement Did Not Provide Notice*

The only communications made between Granite State and Clearwater regarding asbestos claims against the McGraw Policies prior to the Dresser and Federal Mogul settlements were contained in the 1980s correspondence. However, those communications were not sufficient to satisfy the notice requirement.

First, the communications between the parties reflected such small potential exposure that no reasonable person could conclude that those claims might exhaust the Underlying Policies and that involvement of the Clearwater Certificates might follow. That is, there was no

27

indication that the damages reported under those claims were likely to be reach into the

$25,000,000 to $50,000,000 range covered by the Granite State policies.  *See* Mem. of Patrick J.

McKell, Skandia Group, to Robert M. O'Brien, Skandia America Group, May 5, 1982, Lasky

Decl. at Ex. 13 ("At this point, we are not sure if any of these claims will ever penetrate our

layers."); Mem. from Terri Mikkelsen, Marsh & McLennan, Inc., to File, Feb. 23, 1984, Lasky

Decl. at Ex. 13 (stating that only $70,000 had been paid and that the pending claims against

ALCO were not expected to be worth $105,000 in total).  Indeed, the small value of the claims

that were pending strongly suggested that those claims would not reach the levels of liability that

would involve the Clearwater Certificates.  Granite State was required to provide notice of any

event or development it believed "might result in a claim against" Clearwater.  While it may

have been prudent for Granite State to send the 1980s correspondence, given the notice language,

that correspondence was not enough because it referenced claims of such small magnitude.

Thus, that correspondence did not notify Clearwater of any claim that could reasonably be

viewed as resulting in penetration of the Clearwater layers.  Therefore, the 1980s correspondence

did not provide sufficient notice of the eventual claims against Granite State's insureds.

In addition, Granite State's conduct at the time of the 1980s correspondence does not

demonstrate that it considered the notice requirement to have been triggered at that time.  There

is no record evidence that any copies of pleadings or investigations were forwarded to

Clearwater regarding the claims discussed in the 1980s correspondence, even though the

communications clearly stated that litigation was pending.  *E.g.*, Mem. from Terri Mikkelsen, to

File, Feb. 23, 1984, Lasky Decl. at Ex. 13 ("Wagner has been dismissed totally from seven (7) of

these suits. . . .  Wagner is one of a sizeable list of defendants and is usually brought into the suit

as a third party defendant.").  Had Granite State believed its correspondence contained notice of

28

claims for which Clearwater would be responsible, it would also have forwarded copies of pleadings and reports relating to the claims as required by the Clearwater Certificates.  By failing to forward this material, Granite State evidenced its view that the litigation would not implicate the Clearwater Certificates.  Indeed, Clearwater's request for additional, specific information on the status of the Underlying Policies in 1985 (as was its express right under the Clearwater Certificates if notice had been provided) was met with twenty years of silence. *See* Letter from Jean M. Willig, to William T. Green, July 2, 1985, Lasky Decl. at Ex. 10.

Moreover, contrary to Granite State's assertion, that Clearwater prepared certain internal documents in the decades that followed the 1980s correspondence does not alter this conclusion. The bare fact that Clearwater created an internal document titled "preliminary claims notice" on May 25, 1994, more than ten years after the 1980s communications, and that there were entries in the Clearwater computer system relating to the policies does not indicate that Granite State's record communications satisfied the notice requirement.  The "preliminary claims notice" and computer system entries were bereft of any particularized information regarding active claims.  It cannot be reasonably inferred from the existence of these documents that Granite State, in fact, provided Clearwater with any additional forms of notice that have not been placed on the record before the court.  *See* Prelim. Claims Notice, Lasky Decl. at Ex. 11; Clearwater Computer Screenshots, Lasky Decl. at Ex. 15.

Granite State relies heavily on its argument that the 1980s correspondence was sufficient to satisfy the notice requirements in the Clearwater Certificates and that no further action was required on its part.  Pl.'s Reply 12.  At bottom, this argument is that any notice of an asbestos-related claim against Granite State's insureds, no matter how superficial or lacking in detail, was sufficient to satisfy the policy's notice language.  According to Granite State, the inclusion of the

term "might" in the policy language directed it to give notice once the "mere possibility" that

claims made against McGraw, the underlying insured for the Granite State Policies, arose and

that it was not "required to withhold notice until there was a certainty or high probability that the

claims 'would' arise under the Reinsurance Certificates."  Pl.'s Reply 12 ("Clearwater essentially

re-writes the contractual provision by changing the word 'might' to 'would.' . . . Granite State

was not, as Clearwater seems to contend, required to withhold notice until there was a certainty

or high probability that claims 'would' arise under the Reinsurance Certificates.  Indeed, if

Granite State did delay in notifying Clearwater, it would have breached its obligations under the

Reinsurance Certificates.").  Thus, it is Granite State's contention that it was required by the

policy language to alert Clearwater of the claims found in the 1980s correspondence even though

those claims appeared to be so small that their eventual disposition would not reach the

Clearwater Certificates.  It is Granite State's further contention that the information contained in

the 1980s correspondence was both adequate and sufficient to satisfy its full duty to provide

notice under the language of the Clearwater Certificates.  Indeed, it is plaintiff's position that this

correspondence was sufficient to satisfy the notice provision with respect to the claims it

references, the asbestos claims in later suits, the New Jersey Federal Mogul coverage action, and

the settlement negotiations resulting in the settlements themselves.

  Granite State's reading of the Certificates' language would have its notice obligations

satisfied by a communication alerting Clearwater to the existence of a few lawsuits that were

unlikely to penetrate Clearwater's layer.  Under this theory, Granite State was under no further

obligation to notify Clearwater of the multiple later lawsuits that surely would penetrate

Clearwater's layer, the New Jersey Federal Mogul coverage action, or of settlement negotiations

for claims whose amounts were large enough to implicate the Clearwater Certificates.  In making

this argument, however, it is Granite State, not Clearwater, that has rewritten the Certificates' language.  The Clearwater Certificates required Granite State to promptly notify Clearwater of "*any* event or development" that Granite State reasonably believed might result in a claim against Clearwater.  The word "any" in this context does not mean "one" or "only the first" or "a few."  Rather, it means "any and all."  *See, e.g.*, *H. S. Equities v. Hartford Accident and Indem. Co.*, 661 F.2d 264 (2d Cir. 1981); *Travelers Indem. Co. v. Northrop Grumman Corp.*, No. 12 Civ. 3040, 2014 WL 9239211 (S.D.N.Y. 2014).  This is because the purpose of the provision is to provide Clearwater with an opportunity to associate in the control and settlement of claims, as well as to ensure that Clearwater had sufficient information at its disposal to determine whether it wished to avail itself of that opportunity.  Clearwater could not avail itself of the opportunity to exercise its rights under the Certificates unless it was aware of the later suits and the settlement negotiations.  *See Cont'l Cas. Co. v. Emp'r's Ins. Co. of Wausau*, 85 AD3d 403, 408 (N.Y. App. Div. 1st Dep't 2011) ("[N]otice as to certain claims against an insured [does not] constitute notice of other claims not identified in the notice."); *Windham Solid Waste Mgt. Dist. v. Nat'l Cas. Co.*, 146 F.3d 131, 134 (2d Cir. 1998) (noting that, under Vermont law, non-specific information that liability might arise in the future in connection with an insurance policy is not notice of a claim); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Gen. Star Indem.*, 216 Fed. App'x 273, 280 (3d Cir. 2007) (finding insufficient notice to an excess insurer that was "confused and fragmentary," where excess insurer received no "updates about the progress of [the] case" and where "no suit papers were forwarded, [and the excess insurers] did not participate in a settlement conference"); *Hatco Corp. v. W.R. Grace & Co.—Conn.*, 801 F. Supp. 1334, 1370 (D.N.J. 1992) (holding notice insufficient when the communications did not contain "information sufficient to have given [the excess insurer] reason to believe that the [identified]

claim would have exceeded" the lower limits of the excess insurer's policy); *see also* Richard Neumeier, *Disclaiming Coverage When the Insured Fails to Give Proper Notice of "Any Circumstance" Giving Rise to a Claim*, 41 Tort Trial & Ins. Prac. L.J. 45, 57 (2005) ("Generally, the notice to the insurer must be specific.").

Therefore, Granite State's interpretation runs contrary to the recognized purposes of notice provisions. As noted, one of the primary purposes of notice clauses is to provide the reinsurer sufficient information to defend itself against possible claims. Where, as here, the notice provided relates only to claims amounting to a tiny portion of the liability needed to breach the lower limit of an excess of loss policy, that notice does nothing to assist the reinsurer in determining whether it should exercise its rights to associate in the defense or settlement of claims. Thus, having only the 1980s correspondence in hand, Clearwater had no reason to seek to become involved in the settlement or control of the claims mentioned in that correspondence because those claims did not approach exhaustion levels of the Primary Underlying Policies. It is only when the later claims and the settlement negotiations came along that Clearwater, had it known, would wish to associate itself in the control of the cases. Accordingly, notice of lawsuits involving asbestos in the 1980s was not sufficient because it did not provide enough information for Clearwater to make an informed determination as to whether it should exercise its rights to associate with Granite State under the Clearwater Certificates.

Consequently, the 1980s correspondence between Granite State and Clearwater was not prompt and sufficient notice under the terms of the Clearwater Certificates.

*D.  Granite State's Notice Provided After Settlement Is Untimely*

Next, Granite State has produced no evidence that it notified Clearwater of the Dresser and Federal Mogul claims until after settlements in those actions had already been reached.  *See* Letter from Leticia Diaz, AIG Toxic Tort Claims Department, to Michael Somma, Odyssey Reinsurance, Aug. 30, 2005, Kennedy Decl. at Ex. 11 (regarding the 2004 Dresser settlement); Letter from Jeffrey Wactlar, Domestic Claims Department, to Interested Reinsurers, Mar. 12, 2009, Kennedy Decl. at Ex. 52 (regarding the 2008 Federal Mogul settlement).  Accordingly, no reasonable jury could conclude that the notice Granite State provided to Clearwater of the Dresser and Federal Mogul settlements was made "promptly," as required by the Clearwater Certificates.

Granite State's obligation to notify Clearwater was triggered when it became aware of its potential exposure to Dresser in 2003 and Federal Mogul in 2004.  Without notifying Clearwater, Granite State, through its parent company, AIG, engaged in lengthy and complex negotiations with both Dresser and Federal Mogul.  AIG retained companies to make exposure estimates that identified each of its subsidiary companies' potentially exposed policies (and the level of exposure for each policy), including the policies at issue here, without notifying Clearwater of the reports as required by the Clearwater Certificates.  Indeed, this record is barren of any notice that Granite State had entered into settlement negotiations with Federal Mogul and Dresser in a manner which would have allowed Clearwater to associate in the control of the settlements.  Although Granite State, along with the other AIG affiliate companies, settled with Dresser in 2004 and with Federal Mogul in 2008, the record contains no evidence that Granite State, its agents, or its parent AIG, communicated to Clearwater that Granite State anticipated that Clearwater was liable or might be liable for claims under the policies until Clearwater began

33

receiving notices regarding the Dresser settlement from the Insurance Company of the State of Pennsylvania in 2008.[12]  Even then, the first of those notices indicated no monies due and inaccurately stated the details of the Clearwater Policies.

In other words, the record unambiguously shows that by the time that Clearwater was notified by Granite State or its agents that Dresser and Federal Mogul had made claims, those claims had been settled.  As noted, in both Illinois and New York, where a contract contains both a right to associate in the control of claims and a notice requirement, notice provided after those claims have already been settled is untimely.  Thus, Granite State's notice provided after settlement here was untimely.

V.      Granite State's Untimely Notice to Clearwater Bars its Claim Under Either State's Law

The parties disagree as to whether under Illinois law and New York law a failure to provide timely notice bars Granite State's claim for coverage under the Clearwater Certificates. The dispute hinges on whether each state's law requires some additional showing beyond the untimely notice itself for Granite State's claim to be barred.  As explained below, Illinois requires no such showing, and Granite State's untimely notice is sufficient, standing alone, to bar Granite State's claims against Clearwater under that state's law.  Under New York law, on the other hand, Clearwater must either show prejudice resulting from the untimely notice or that Granite State's failure to provide timely notice constituted a breach of its duty of utmost good faith to Clearwater.  Because the record is clear that Granite State breached its duty of utmost good faith, its claims are also barred under New York law.

---

[12]      The lone communication from Granite State to Clearwater during this period, made on August 30, 2005 was in reference to a policy issued by Lexington.  As noted, Lexington did not issue a policy underlying the Clearwater Certificates.  Even this communication was made after the Dresser settlement had been reached.

A.  *Illinois Law Bars Granite State's Claim*

The Illinois Supreme Court has not spoken directly on the issue of whether late notice without a showing of prejudice will function as a condition precedent to coverage in a reinsurance contract.  When predicting unsettled state law, "federal courts of other circuits should defer to" the interpretation of the federal circuit whose jurisdiction encompasses the state whose law is to be applied "except [in] the rare instance when it can be said with conviction that [it] has disregarded clear signals emanating from the state's highest court pointing toward a different rule" or "that the holding had been superseded."  *Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278, 283 (2d Cir. 1981); *Town of Castle Rock, Col. v. Gonzales*, 545 U.S. 748, 757 (2005) ("[A] 'presumption of deference [is] given the views of a federal court as to the law of a State within its jurisdiction.'" (quoting *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 167 (1998))).

The Illinois Supreme Court has never held that contracts for reinsurance should be interpreted differently from ordinary contracts for insurance and the federal courts of Illinois have applied the same body of law when interpreting the provisions of insurance and reinsurance contracts.  *See Keehn*, 129 F.2d at 505 (citing precedents of the Illinois Supreme Court in interpreting the notice provision of a reinsurance agreement); *Allstate Ins.*, 441 F. Supp. 2d at 870.

Under Illinois law, the violation of a notice provision of an insurance contract operates as a condition precedent to coverage, providing a complete defense to coverage.  *Country Mut.*, 856 N.E.2d at 343 ("These clauses impose valid prerequisites to insurance coverage." (citations omitted)); *Allstate Ins.*, 441 F. Supp. 2d at 875 (collecting cases) ("The law in Illinois, however, is clear that a notice requirement, such as the one contained in the Treaty, is a condition

precedent to coverage.").  Illinois courts do not require a showing of prejudice in order for a lack of notice to bar coverage.  *Country Mut.*, 856 N.E.2d at 343.

Moreover, even if prejudice were required under Illinois law, Clearwater has suffered prejudice under that state's law as a result of the delay in giving notice.  In Illinois, the loss of the ability to exercise a bargained for right constitutes prejudice without the need to demonstrate more.  *See Keehn*, 129 F.2d at 505 ("The right [to associate] was provided by the terms of the contract and we are of the view that the deprivation of such right would constitute prejudice without any actual proof that the results of the litigation would have been different.").  Here, Clearwater had bargained for rights to associate in the control of claims, to have Granite States' full cooperation therewith, and for the ability to request and be provided with information regarding claims affecting the Clearwater Certificates.  In other words, Clearwater had the bargained for right to have some control in settlement decisions and, at its election, to be an informed participant in settlement negotiations from the moment that claims implicating its policies were made.  As noted, the timing and content of Granite State's communications to Clearwater prevented Clearwater from being able to exercise these rights.

Given the foregoing, the notice provisions in the Clearwater Certificates would each operate as a condition precedent to Clearwater's obligation to pay and Granite State would be barred from recovering under Illinois law.  *Accord AIU Ins. Co.*, 943 F. Supp. 2d at 604–09.

###### B.  *New York Law Bars Granite State's Claims*

As noted, under New York law, the notice here would also not be timely because, having been provided after settlement, it was not given within a reasonable period of time of Granite State's obligation to provide notice having been triggered.  Unlike under Illinois law, however, a

showing that the notice provision of a reinsurance contract has been violated is not sufficient, standing alone, to defeat liability.  In New York, one method to defeat liability under contracts for reinsurance is for the reinsurer to prove that the delay was "material or demonstrably prejudicial."  *Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 594 N.E.2d 571, 575 (N.Y. 1992) (*Unigard I*) ("[T]he reinsurer must demonstrate how [late notice] was prejudicial and may not rely upon the presumption of prejudice that applies in the late notice disputes between primary insurers and their insureds.").  The New York Court of Appeals has held that both lack of notice and demonstrable prejudice are required for a reinsurer to have "a ground for avoiding its obligations under a reinsurance contract."  *Id.*

In addition, the Second Circuit has further clarified the definition of "demonstrable prejudice," holding that prejudice in this context requires a showing of "tangible economic injury."  *Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 4 F.3d 1049, 1068 (2d Cir. 1993) (*Unigard II*).  Loss of the right to associate in the defense of the underlying insurance policy, even when that right is written into the terms of the reinsurance contract itself, does not create a presumption of prejudice in New York.  *Id.* at 1069 ("The court expressly recognized that loss of the right to associate in the defense of claims may result from late notice from the reinsured but concluded that the risk is not 'sufficiently grave to warrant applying a presumption of prejudice.'" (quoting *Unigard I*, 594 N.E.2d at 571)).  Here, Clearwater has offered no evidence of the sort of "tangible economic injury" required to demonstrate prejudice.  Thus, it cannot defeat liability on that ground.

The inquiry into whether a reinsurer can prove prejudice, however, is not the end of the matter under New York law.  In New York, ceding insurance companies have a "duty of good faith [which] requires the ceding insurer to place the reinsurer in the same [situation] as himself

37

[and] to give him the same means and opportunity of judging . . . the value of the risks." *Id.*
(alterations in original) (citation and internal quotation marks omitted); In re *Liquidation of*
*Union Indem. Ins. Co. of N.Y.*, 674 N.E.2d 313, 319 (N.Y. 1996) ("The phrase *uberrimae fidei*
and its translation, 'of the utmost good faith,' has long been used to characterize the core duty
accompanying reinsurance contracts." (citations omitted)).  "[F]ailure to provide prompt notice
may entitle the reinsurer to relief without showing prejudice if the [ceding insurer] acted in bad
faith." *Unigard II*, 4 F.3d at 1068 (alteration in original) (quoting *Christiania*, 979 F.2d at 281
(internal quotation marks omitted)).  Breach of the duty of utmost good faith does not require
malicious intent, but may be proven by conduct amounting to at least gross negligence or
recklessness.  *Id.*  Where a cedent "willfully disregarded [a] risk to reinsurers [it] is guilty of
gross negligence." *Id.*  In such a case, that cedent has not met its obligation of utmost good faith,
and the cedent's claim will be barred even absent a showing of tangible economic injury.  *Id.*

The failure to notify Clearwater prior to entering into the various settlement
arrangements; the terms of the settlements between Granite State and its insureds, Dresser, and
Federal Mogul; and the expectations of the AIG companies as to how losses among the
companies would be allocated demonstrates beyond reasonable dispute that Granite State
willfully disregarded an obvious risk of increased liability to Clearwater.  There is no evidence
on this record that Clearwater was ever informed by Granite State that it was in settlement
negotiations with Dresser and Federal Mogul prior to entering into the settlement agreements.
The record is also bare of any evidence that Granite State informed Clearwater that those
negotiations were being undertaken jointly with numerous other AIG subsidiaries and that
Granite State's liability would be determined solely by its parent company, AIG, *post hoc*
without reference to Granite State's actual or projected liability under the Granite State Policies.

That the Dresser and Federal Mogul settlements left each policy's, and therefore each company's, contribution to the settlement unknown, to be determined later by AIG on a basis that would be most convenient for AIG, is key.  Granite State's own witnesses make clear that no detailed analysis of Granite State's potential exposure under the 1980 and 1981 Granite State Policies was ever made prior to settlement and that insofar as any exposure figures were generated at all, those figures showed an exposure well below the policy limits.  Nevertheless, Granite State entered into a settlement agreement that would potentially expose it to liability equaling the full limits of those policies.  In other words, Granite State entered into a settlement agreement that potentially exposed it to full liability under the policies at issue, even though it had no information as to what its actual, individual exposure to liability (and therefore Clearwater's exposure to liability) under the policies was.  More, it did so while fully aware that the only analyses regarding Granite State's potential exposure (and therefore Clearwater's potential exposure) indicated a lower than policy limits exposure.

The record is clear that Granite State, acting under the control of AIG, entered into these agreements because the scope of the *overall* potential liability aggregated from *other policies* issued by *other AIG companies* made it beneficial for the AIG subsidiaries *taken as a whole* to settle.  Put another way, Granite State knew when it entered into the Dresser and Federal Mogul settlements that it was taking a risk, both for itself and for Clearwater, that AIG would decide that the Granite State policies would pay their full limits, even though the only estimates performed indicated that the exposure under those policies was substantially less.  Thus, entering into those settlements without any notice to Clearwater was a knowing disregard of millions of dollars in risk to Clearwater.  Accordingly, the court finds that no reasonable jury could conclude that Granite State met its duty of utmost good faith.  Thus, plaintiff breached its duty of utmost

39

good faith to Clearwater as a matter of law.  That breach, when coupled with the untimely notice provided, bars Granite State's claim for coverage under New York Law.

### VI.     Illinois Law Would Govern if the Court Found a Conflict

Because the result in this case would not change under either New York or Illinois law, the court need not reach the second step of the New York choice of law analysis and determine which state has the greater interest in the outcome of the litigation.  Given that another court of this district has considered the second step on similar facts it is, nevertheless, worthwhile to explain that the result would not differ even if the second step of the analysis had been reached. *See AIU Ins. Co.*, 943 F. Supp. 2d at 604–09; *see also Stolarz*, 613 N.E.2d at 938 ("Because the dissent and both lower courts conclude that there is a conflict, we next address the choice of law issue to demonstrate that, even in that event, New Jersey law governs.").  Here, if the second step were reached, Illinois law would apply to the Clearwater Certificates and the outcome would remain the same.

Under New York law, if an actual conflict between the courts of the competing jurisdictions is identified then New York courts apply a "center of gravity" approach, weighing the number and nature of the contacts with the states whose laws are in conflict to determine which state has the most significant connection to the litigation.  *Forest Park Pictures*, 683 F.3d at 433 (citing *Stolarz*, 613 N.E. 2d at 939).  When applying New York's "center of gravity" approach in the reinsurance context, courts in this Circuit have given the greatest weight to the place where "'the reinsurance certificate issued and the location where performance is expected, i.e. the place to which the ceding insurer must make its demand for payment.'"  *AIU Ins. Co.*,

943 F. Supp. 2d at 600 (quoting *Folksamerica Reinsurance Co. v. Republic Ins. Co.*, No. 03 Civ. 402, 2003 WL 22852737, at *5 (S.D.N.Y. 2003)).

Here, it is not in dispute that the Clearwater Certificates were issued in Illinois.  The record is also clear that the communications between Clearwater and Granite State (via C.V. Starr) closest in time to the execution of the Clearwater Certificates were between Clearwater's Chicago office and C.V. Starr's Chicago office.  Moreover, those communications establish that Illinois was, at the time of contracting, the place that Granite State would have been expected to demand payment.  *See* Letter from Jean M. Willig, to William T. Green, July 2, 1985, Lasky Decl. at Ex. 12 ("Notices of potential exposure arising out of asbestos claims were originally sent to [Clearwater's] Chicago branch office and are now being handled in the New York office.").  Accordingly, the two most important contacts recognized by this Circuit both point toward the application of Illinois law.  Thus, if there were a conflict, Illinois law would apply.  *Accord AIU Ins. Co.*, 943 F. Supp. 2d at 604–09 (applying Illinois law).  As discussed, Granite State would be unable to recover under Illinois law.

CONCLUSION

Based on the foregoing, it is hereby

ORDERED that defendant's Cross-Motion for Summary Judgment is GRANTED, plaintiff's Cross-Motion for Summary Judgment is DENIED, and the case is dismissed.

Dated: March 31, 2014
       New York, New York

/s   Richard K. Eaton
       Richard K. Eaton, Judge

41